```
 1                    UNITED STATES DISTRICT COURT
                     SOUTHERN DISTRICT OF FLORIDA
 2                         MIAMI DIVISION
 3                      CASE 10-20767-CR-JLK
 4
     UNITED STATES OF AMERICA,
 5
                           Plaintiff,
 6
         vs.                               MIAMI, FLORIDA
 7                                         AUGUST 15, 2010
     JUDITH NEGRON,                        MONDAY - 9:00 A.M.
 8
                           Defendant.
 9
10             EXCERPT OF JURY TRIAL PROCEEDINGS
            BEFORE THE HONORABLE JAMES LAWRENCE KING
11           SENIOR UNITED STATES DISTRICT JUDGE
                            DAY 1
12   _____
     APPEARANCES:
13
     FOR THE GOVERNMENT:    JENNIFER L. SAULINO, TRIAL ATTORNEY
14                          BENJAMIN D. SINGER, ASSISTANT CHIEF
                            U.S. Department of Justice
15                          Criminal Division, Fraud Section
                            1400 New York Avenue NW, Bond Building
16                          Washington D.C.  20530
                            Email:  jennifer.saulino@usdoj.gov
17                                  benjamin.singer@usdoj.gov
18   FOR THE DEFENDANT:
                            BARRY MICHAEL WAX, ESQ.
19                          Law Offices of Barry M. Wax
                            800 Brickell Avenue, Penthouse 2
20                          Miami, FL  33131 - 305/373-4400
                            Email:  barrywax@bellsouth.net
21
     REPORTED BY:
22                          ROBIN MARIE DISPENZIERI, RPR
                            Official Federal Court Reporter
23                          United States District Court
                            400 N. Miami Avenue, Ste. 08S67
24                          Miami, FL  33128 - 305/523-5659
                            Email:  robinc1127@aol.com
25
```

TABLE OF CONTENTS

WITNESSES:                          PAGE

DORIS POTEET ................... 31

     Direct Examination By  ..... 32
Mr. Singer

     Cross-Examination By  ...... 77
Mr. Wax

     Redirect Examination  ..... 104
By Mr. Singer

INDEX TO EXHIBITS

| Exhibits | Marked for Identification | | Received in Evidence | |
|---|---|---|---|---|
| Description | Page | Line | Page | Line |
| Government Exhibit 2 ............................ | | | 40 | 2 |
| Government Exhibit 102 .......... | 72 | 15 | | |
| Defense Exhibit CC .............................. | | | 82 | 22 |
| Defense Exhibit DD .............................. | | | 90 | 4 |
| Defense Exhibit EE .............................. | | | 91 | 22 |
| Defense Exhibit FF .............. | 94 | 9 | | |
| Defense Exhibit GG .............. | 96 | 22 | | |

1                    *******************

2                 GOVERNMENT OPENING STATEMENT

3           MS. SAULINO:   Thank you, Your Honor.

4           $205 million.   That's how much money the defendant,

5    Judith Negron, and her co-conspirators tried to steal from the

6    Medicare program.

7           $87 million.   Money the defendant, Judith Negron, and

8    her co-conspirators actually did steal from the Medicare

9    program.   This was big money.   This was a big fraud, and the

10   defendant, Judith Negron, was one of the biggest players in

11   this fraud.

12          Ladies and gentlemen, this case is about Judith Negron

13   and her role in this massive fraud scheme.   It's about how she

14   used her company, American Therapeutic Corporation, for

15   services that were supposed to be provided to very, very sick,

16   very seriously mentally ill individuals, and these were very

17   specialized treatments that they were supposedly providing.

18          It's also about how they would pay kickbacks to owners

19   of halfway houses and patient workers in order to gain patients

20   that they would use to sit at ATC for that service.

21          It's about how they then took the money that Medicare

22   paid them and laundered it, millions of dollars of it, into

23   cash to pay those kickbacks and start the cycle over again.

24          Ladies and gentlemen, the defendant is charged in this

25   case with conspiracy to commit health care fraud, conspiracy to

4

1  pay illegal health care kickbacks, and several charges of money

2  laundering.  It will be your job, at the end of this case, to

3  determine whether the government has proven beyond a reasonable

4  doubt that the defendant is guilty of the crimes she is charged

5  with.  I am standing before you right now to give you a preview

6  of how we will do exactly that.

7         Ladies and gentlemen, it is my extraordinary privilege

8  and honor to be standing before you right now.  I am a

9  prosecutor for the United States Department of Justice.  My

10 name is Jennifer Saulino, as I said earlier.  I am joined in

11 this trial by my co-counsel, Mr. Benjamin Singer, by Special

12 Agent Ellen Lapp of the FBI, who is the lead investigator on

13 this case, and by Department of Justice paralegal Ms. Leah

14 Horton.

15        We will be the ones, over the next few weeks, who will

16 present to you the witnesses and evidence that you will then

17 use to determine whether we have proven beyond a reasonable

18 doubt that Ms. Negron is guilty of the crimes with which she is

19 charged.

20        Now, how will we do that?  Ladies and gentlemen, every

21 fraud case is about the appearance of legitimacy.  Fraud, the

22 point of fraud is to make things look right, appear legitimate,

23 in order to steal money and not get caught.  The appearance of

24 legitimacy is the key to a successful fraud.

25        Judith Negron and her co-conspirators made ATC appear

1   legitimate for eight years, American Therapeutic Corporation

2   for eight years.

3        Let me introduce you to some of the names that you

4   will hear throughout this trial.  Judith Negron, you have

5   already met.  Lawrence, Larry, Duran was one of her

6   co-conspirators.  Marianella Valera was another one of her

7   co-conspirators.  These three people owned three companies that

8   were key to this case.

9        You have already heard the name American Therapeutic

10  Corporation.  You will likely hear it referred to during the

11  trial as ATC or American Therapy.  That was the company that

12  did the largest part of the billing to Medicare, about $199

13  million.  That was the company that was purportedly providing

14  these very specialized services supposedly to very, very sick

15  mentally ill people.

16       Medlink Professional Management Group.  You will hear

17  Medlink through this trial.  Medlink was supposedly a

18  management company for medical companies.  The evidence will

19  show that Medlink had one client, and then another, which we

20  will talk about in a minute.  That client was American

21  Therapeutic Corporation.

22       The American Sleep Institute was a third company.

23  That company did about $6 million worth of billing to Medicare,

24  and that's the company that supposedly provided sleep study

25  services.  It was a side business that was formed a little bit

1  later than American Therapeutic Corporation.  These three

2  people, Ms. Negron, Mr. Duran, and Ms. Valera, owned these

3  three companies.

4         Now, on paper, as you will see, American Therapeutic

5  Corporation was owned by Ms. Valera.  On paper, Medlink was

6  owned by Mr. Duran and Ms. Negron, the defendant.  On paper,

7  the American Sleep Institute was owned by Ms. Negron and

8  Ms. Valera.

9         But as the witnesses will tell you throughout this

10 trial, these three people worked together and owned these three

11 companies.  They were a team.  Medlink, the management company,

12 had as its clients American Therapeutic Corporation and the

13 American Sleep Institute.  That's it.

14        The top management for this scheme, the one who ran

15 the kickbacks throughout this trial, was Ms. Margarita Acevedo.

16 She went by Maggie.  You will hear about others throughout this

17 trial that are involved, but those three are the owners, and

18 you will hear their names.

19        Now, where was American Therapeutic Corporation?

20 American Therapeutic Corporation was right here in Miami.  They

21 had one location in Orlando.  They had several locations during

22 the period of time that they were engaging in this scheme, more

23 than 7,000 patients, two sites in Fort Lauderdale, two in

24 Miami, one in Boca, one in Homestead, and one in Orlando.  The

25 American Sleep Institute was in Hialeah.

1          Medlink started out on Brickell, and then it moved in

2    with American Therapeutic Corporation in its Miami location.

3    The same building, offices all connected.  Medlink and American

4    Therapeutic Corporation.  This is where these crimes took

5    place.

6          You will notice in this picture, right in the middle,

7    is the defendant, Judith Negron.  Next to her is Marianella

8    Valera.  On the end here is Lawrence Duran, Larry Duran.  These

9    are the three owners of the three companies that I just talked

10   about.  Those were the three leaders, the ring leaders, of the

11   scheme.

12         Now, the other people in this picture, you will meet

13   during this trial.  This is Margarita Acevedo.  She pled guilty

14   to conspiracy to commit health care fraud and conspiracy to pay

15   illegal health care kickbacks.  She will testify during this

16   trial.

17         Joseph Valdez.  He will also testify during this

18   trial.  He also pled guilty to conspiracy to commit health care

19   fraud and conspiracy to pay illegal health care kickbacks.  He

20   worked for Ms. Acevedo and for the three owners; Ms. Negron,

21   Mr. Duran, and Ms. Valera.

22         Let's talk about how this worked.  The scheme that was

23   so successful for eight years, and $205 million was a cycle.

24   Medicare would pay American Therapeutic Corporation for the

25   services that were billed to Medicare.  That money would be

1  laundered into cash, and the reason it was laundered into cash

2  was to pay the kickbacks that they needed in order to get more

3  patients.  Once those patients were paid for, the patients

4  would attend supposed therapy at American Therapeutic

5  Corporation.  American Therapeutic Corporation would bill

6  Medicare and the cycle would start all over again.

7       Let me explain to you some of the evidence you will

8  hear about the various stages of this cycle.  We will start

9  here with the kickbacks.  It's a bit of a chicken and egg

10  problem, but we are going to start with the kickbacks and go

11  around the cycle.

12       Ms. Acevedo and Mr. Valdez will both testify to you

13  about how the kickback scheme worked.  In general, they would

14  pay $30 per patient, per day, to the owners of assisted living

15  facilities, halfway houses, and also to what are called patient

16  brokers.  You will learn during this trial that patient brokers

17  are exactly what the name sounds like.  They are people who go

18  and find people who are Medicare beneficiaries, with valid

19  Medicare numbers, and they bring them into places like ATC.

20       Ms. Acevedo will tell you that the $30 per patient,

21  per day, was not a small number.  Some of these brokers were

22  making thousands of dollars per month.  Some of them were

23  making hundreds of thousands of dollars a month just to bring

24  patients to American Therapeutic Corporation.  They will tell

25  you that the kickbacks were paid, some in cash, for the larger

1   volume brokers and for people who could say that they were

2   transporting patients for American Therapeutic Corporation.

3          Remember what I said about the appearance of

4   legitimacy.  If they had a transportation company, then they

5   would give a check to their transportation company, but in

6   reality it was their kickbacks.

7          Most of them got cash, which eventually will bring us

8   back around to the money laundering.  Now, how did they get

9   these patients?  Mr. Valdez and Ms. Acevedo would go into the

10  halfway houses, they would go in and ask the owner, to see the

11  patients, and they would go and talk to the patients and see if

12  they could get them to come to American Therapeutic

13  Corporation.

14         Before we go further on that, I would like to talk,

15  for a minute, about the types of patients that were supposed to

16  be treated at American Therapeutic Corporation.  I am basing

17  this on the services that American Therapeutic Corporation was

18  billing to the Medicare program.

19         They were billing, what were called, Partial

20  Hospitalization Program services, PHPs.  A Partial

21  Hospitalization Program is exactly what it sounds like, Partial

22  Hospitalization Program.  These are patients who are so sick

23  with such a serious mental illness, in such an acute stage,

24  meaning they are at such a place in their mental illness that

25  they can't function in society.  If the Partial Hospitalization

1   Program didn't exist, they will be hospitalized.

2          You will hear that from a number of people during this

3   trial.  One of them will be Doctor Marvin Herz, an expert in

4   this field.  These are people who have schizophrenic bipolar

5   disorders who get to a place that they are so sick they need to

6   be in a hospital.  There are two ways they get into the partial

7   hospitalization program.

8          One is they are actually hospitalized because they are

9   so unstable.  When they were finally stable enough to leave the

10  hospital, but not stable enough to live the community, they can

11  go to a partial hospitalization program.

12         The other way, that is less used in the real world, is

13  for a patient who is working with a psychiatrist, who is what

14  they call decompensating.  It's a big word, but what it means

15  is they are getting sicker and sicker.  That patient and that

16  psychiatrist realize that patient is going to have to go into

17  the hospital.  To try to prevent them from going into the

18  hospital, the psychiatrist puts them in the partial

19  hospitalization program.

20         Those are the patients who are supposed to get this

21  treatment.  That's how they are supposed to get there.  When

22  they get there, the type of treatment they are supposed to get,

23  you will hear, is very specialized, very individual, very

24  focused on what that patient needs in order to get better, to

25  go back out to the community, to go to a less intensive, less

1   expensive kind of treatment.

2          How are they getting the patients at American

3   Therapeutic Corporation?  People like Margarita Acevedo and

4   Joseph Valdez, who are not doctors, not nurses, not medical

5   professionals in any way, were going to assisted living

6   facilities and halfway houses, looking at their files, and

7   making sure they met three criteria:  A valid Medicare number,

8   a diagnosis of some sort of mental illness, and some sort of

9   medication that could be used to treat some sort of mental

10  illness.  They met those criteria.  That's who decided they

11  came to American Therapeutic.  Not the hospital, not their

12  psychiatrist.

13         Who are these patients?  Owners of assisted living

14  facilities and halfway houses, people who are supposed to be

15  watching out for the vulnerable people they were housing in

16  their homes, that's who got paid in this scheme.  Sometimes, as

17  you will hear, the patient brokers, the ones who were sort of

18  independent contractors who went around finding patients,

19  sometimes they would even pay the patients.  Many of the

20  patients you will hear from are vulnerable people who were

21  told, "You need to go to ATC during the day if you want to live

22  in this home," so they did.

23         Let's go back to the defendant, Judith Negron.  What

24  was her participation in this part of the scheme?

25         First, you need to know some things about her.  You

1   will learn during this trial that Ms. Negron is a licensed

2   mental health counselor.  She has a bachelor's degree in

3   psychology and a master's degree in therapy.  She actually was

4   educated enough to know whether these patients needed this kind

5   of treatment.

6          Did she know about the kickback scheme?  You will hear

7   during the trial that the kickbacks were paid in many ways, but

8   one of the main ways they were paid is that Ms. Acevedo would

9   take the cash, put it in the envelopes, and put names on the

10  fronts of the envelopes of the people that the cash was going

11  to go to.  Someone like Mr. Valdez would come and get the

12  envelopes and take them to the homes.  That happened in

13  Ms. Negron's office, you will hear during this trial.  You will

14  also hear that she was there when it happened on several

15  occasions.

16         You will hear that Ms. Negron was constantly obsessed

17  with finding out whether the centers, the American Therapeutic

18  Corporation Centers, throughout South Florida were meeting

19  their census goals.  What was a census goal?  How many patients

20  they wanted to have at that center on any day.  You will hear

21  from Ms. Acevedo that an e-mail went out in the morning to the

22  top managers in the scheme about what the census was at each of

23  the centers on any day.

24         If the census was low at any center, the first person

25  she would hear from was Ms. Negron.  Ms. Negron wanted to know

 1  from Ms. Acevedo, "What are you doing to get those numbers up?"

 2  Ms. Acevedo will testify there was one way she got numbers up.

 3  She paid kickbacks.

 4          Added to all of that, you will hear that Ms. Negron

 5  signed checks to some of these people who were getting

 6  kickbacks and signed the fronts, and sometimes the backs, the

 7  endorsements, of the checks that were used to launder the money

 8  to get the cash.  But you will also hear that Ms. Negron would

 9  leave the room when she saw that Ms. Acevedo and Mr. Valdez

10  were working on the kickback scheme.  She would see it was

11  going on.  She would gather up her things and rush out of the

12  room.

13          You will hear she would tell Ms. Acevedo, when she

14  tried to explain to her this is why the census isn't up today,

15  these are the problems I am having, Ms. Negron would put her

16  hands over her ears and say, "La La La La, I don't want to hear

17  about it."  She even said to Ms. Acevedo, "I don't want to talk

18  to you about this because I don't ever want to fail a lie

19  detector test about it."

20          So American Therapeutic Corporation has its patients,

21  and they go to attend therapy there.  What do they do with them

22  when they get there?  You will hear from Doctor Alan Gumer, who

23  has pled guilty to conspiracy to commit health care fraud.  He

24  was one of the Medical Directors at American Therapeutic

25  Corporation.  He will tell you that it was his job to sign the

1  file, flip it over.  Sign and flip.  Sign and flip.  Sign and

2  flip.  That was his job.

3      Did Ms. Negron see him doing this?  Doctor Gumer will

4  tell you that she was sitting five feet away at a desk, working

5  on the files that were then passed over to him for signature.

6  He will tell you that a red flag on a file meant the doctor was

7  supposed to sign.  There were different flags for different

8  types of people.

9      These patients' files, and you are going to see them,

10 were very thick.  They made them look legitimate.  There was

11 lots of paper in there.  You will hear that when Doctor Gumer

12 saw the red flag, the red flags that Ms. Negron was putting on

13 the files before she passed them over to him, he signed his

14 name.

15     He will also tell you that he and other doctors didn't

16 examine the patients, didn't spend time with the patients,

17 didn't give them the individualized treatments that a patient

18 who really needed this kind of service, who really needed

19 partial hospitalization, would have actually needed.

20     You will hear from others, he wasn't the only doctor

21 who did that, about the signing and the flipping.

22     You will hear from therapists who worked at American

23 Therapeutic Corporation, one of them a person who was there for

24 a few weeks, who knew that there was something wrong there.

25 You will hear from therapists who left after a few months

1    because they knew that this was not what was supposed to

2    happen, that these were not the right patients.

3        During jury selection, you heard the word Alzheimer's

4    and dementia used quite a bit in the questioning.  If you

5    remember back to when I was talking about how they got these

6    patients, some of these patients were in assisted living

7    facilities.  Some of the patients are people with Alzheimer's

8    and dementia, people who don't actually know where they are

9    being sent during the day.  Some of the patients at American

10   Therapeutic Corporation were those Alzheimer's and dementia

11   patients.

12       You will hear from Doctor Herz, and numerous

13   witnesses, who will testify that Alzheimer's patients are not

14   appropriate for Partial Hospitalization Program services,

15   because a PHP, a personal hospitalization service, is for

16   somebody who is seriously mentally ill and trying to progress,

17   trying to learn behaviors and ways of thinking and ways to get

18   out of their very serious stage of their mental illness, to get

19   better.  They are trying to interact in group therapy and get

20   better.

21       People with Alzheimer's and dementia can't do that.

22   When American Therapeutic Corporation paid kickbacks to get

23   these people to sit all day long in American Therapeutic

24   Corporation, those people sat there, but they weren't getting

25   the kind of treatment they needed.  They weren't getting the

1    kind of treatment that Medicare paid for.

2            Is it possible that, over eight years and more than

3    7,000 patients, occasionally American Therapeutic Corporation

4    purchased the right kind of patient for this treatment?  As the

5    saying goes, even a blind squirrel finds a nut every once in a

6    while.  It's possible.  But did they get the treatment they

7    needed when they got to American Therapeutic Corporation?  You

8    will hear from the evidence that they did not.  You will hear

9    from Doctor Gumer, and from the therapists, they weren't

10   getting the individualized treatment that somebody who is that

11   mentally sick needs.

12           You will also hear from these therapists, the ones

13   that were there a few months and left, that they did their best

14   to provide treatment to the people who were sitting in front of

15   them.  They tried.  You will hear that.  But again, the

16   structure of this scheme, the structure of American Therapeutic

17   Corporation paying kickbacks for patients and bringing them in,

18   signing the files without treating them individually, was set

19   up for fraud for all of these patients.

20           I mentioned the American Sleep Institute, ASI.  That

21   was the side business that the defendant and her

22   co-conspirators formed.  She was actually the President of ASI.

23   The American Sleep Institute billed Medicare for about $6

24   million of diagnostic sleep studies.  There are certain types

25   of sleep disorders which Medicare pays for in order for someone

1    to go and get a study done of when they sleep with electrodes

2    on their head to see whether they have a particular type of

3    disorder.

4         You will hear throughout this trial that the scheme at

5    ASI worked the same way as the scheme at ATC.  Ms. Acevedo and

6    Mr. Valdez, and those who worked with them, paid kickbacks to

7    the same assisted living facilities owners, to the same halfway

8    house owners, to the same patient brokers, for largely the same

9    patients to sleep at the ASI once or twice.  They actually paid

10   a much higher kickback for ASI.  They got $200 a night for

11   those patients.

12        You will also hear that those patients overlapped with

13   American Therapeutic Corporation about 75 percent.  You will

14   hear from Doctor Herz and from Doctor Gumer that patients who

15   really need Partial Hospitalization Program treatment, going

16   back to the treatment that ATC was supposed to supply, people

17   who really need partial hospitalization, people who are so sick

18   they need to be in the hospital if they don't have a partial

19   hospitalization program, if they are that mentally ill, a sleep

20   study right then in their illness is not likely to be

21   effective.

22        The medication that is used to treat the illness

23   causes sleep problems.  A diagnostic sleep study, you will

24   hear, right then is not something that is typically prescribed,

25   but you will see the percentages.  You will see the dollar

1   amounts, and you will see that 75 percent of ASI patients were

2   ATC patients.  You will hear from Mr. Valdez and from

3   Ms. Acevedo that they got them from the same place, so of

4   course that would be true.

5          Now, that's what happens when the patients are there.

6   Then they bill the Medicare program.  Medicare pays American

7   Therapeutic Corporation and the American Sleep Institute for

8   what was billed.  Medicare pays that money into the bank

9   accounts of American Therapeutic Corporation and the American

10  Sleep Institute.

11         American Therapeutic Corporation and ASI then transfer

12  many millions of dollars of that Medicare money to Medlink,

13  remember the third company, the one that was in the middle, the

14  one that Ms. Negron and Mr. Duran own.  Of those three

15  companies, that now have these millions and millions of

16  Medicare dollars, Ms. Negron controlled the bank accounts of

17  two of them.  She was a signer on the Medlink bank account and

18  on the American Therapeutic Corporation bank account.

19         Moving on to the next step of this scheme, the monies

20  laundered and converted into cash to pay those kickbacks.

21         Before we get there, what else did she do with the

22  money?  Well, she paid herself more than $1 million.  She and

23  her co-conspirators actually formed other companies beyond just

24  these three.  They put money into those, too.  But the other

25  thing they did with that Medicare money is they converted it

1  into cash.  They laundered it into cash.  Why did they need to

2  launder it?  You can't just go up to an ATM and take out

3  $100,000.  We all know that.  They needed hundreds of thousands

4  of dollars every single month in cash to pay these kickbacks to

5  the people who were providing the patients.

6        So to do that, Ms. Negron and Mr. Duran wrote checks

7  out of the Medlink bank account to themselves, and Mr. Duran

8  and Ms. Valera and Ms. Acevedo, the four of them, would drive

9  together, sometimes in the same car, you will hear, and cash

10 those checks together, and they would all hand the cash to

11 Ms. Acevedo.  It was her job to stuff the envelopes and pass

12 out that cash in the envelopes to the owners of the homes to

13 provide the patients.

14        Another way that they laundered that money was that

15 Ms. Negron and Mr. Duran wrote checks to fake employees of

16 Medlink, people that didn't work there.  These fake employees

17 were no small amount of money.  You will hear about four of

18 them who each made $800,000 over the course of a couple of

19 years, people who had no function at Medlink.

20        Not only will you hear that, you will hear that

21 Ms. Negron signed the front of some of those checks, but you

22 will also hear that she was the person who endorsed the back.

23 She is the one that signed the signatures for the four people

24 on the backs of those checks.  She forged those signatures.

25        You will hear then that those checks to those four

1  people were put in an envelope and Ms. Acevedo would take them

2  to a check casher, Mr. Lazaro Acosta.  He owned a check cashing

3  business, and he worked with them.  She would go back a couple

4  of days later and pick up the cash that was in exchange for

5  those checks.  Those checks written to four people, a total of

6  $800,000 each, $3.2 million out of the Medlink bank account to

7  people who did not work at Medlink, to people who did not even

8  sign the backs of those checks, because it was Ms. Negron who

9  signed the backs of those checks.

10       There came a time in the spring of 2009 when they

11  couldn't use that check cashing business anymore.  So they

12  hired a woman named Adriana Mejia.  You will hear from Adriana

13  Mejia, and she will tell you her job was to launder money.  She

14  got to keep six percent of the money she laundered.  That was

15  her only job.  You will see that she got checks from Medlink,

16  some of which were signed by Ms. Negron, for no other job at

17  Medlink except to launder money.

18       After some time, she actually formed some companies

19  because, as she will tell you, banks get suspicious when you

20  try to take that much cash out every month.  So she formed some

21  companies.  Those companies' only function was to serve as

22  another way to open a bank account that she could then use to

23  deposit checks and take out cash.

24       Ms. Mejia will tell you that when she came back to

25  drop off the money that she picked up from all of these various

1  bank accounts that she deposited into Medlink and American

2  Therapeutic Corporation, she brought it again to Ms. Negron's

3  office.  Ms. Negron shared that office with Mr. Duran.

4        Ms. Acevedo will testify about seeing Ms. Negron in

5  that office and about how, again, Ms. Negron would try to rush

6  out of the room when she came in.  But she will testify about

7  how, on the first occasion, she remembers Ms. Mejia actually

8  said, before Ms. Negron left the room, to Mr. Duran she said,

9  "I have your money.  I have the money."

10       That's the cycle.  That's how they appeared legitimate

11  for eight years.  What were their roles?  Mr. Duran, he was the

12  glad handler.  He was the wheeler and dealer.  He was the big

13  man on campus.  The one that made all the deals.

14       You will hear that Ms. Valera wanted to be the CEO of

15  a health care company.  She got her wish.  She was the CEO of

16  American Therapeutic Corporation.

17       You will hear that Ms. Negron was the details woman.

18  She was the one who watched the bottom line.  She was the one

19  who watched the census to make sure they had as many patients

20  as they could get in a day.  She was the one who changed the

21  patients' lunches from hot lunches to cold sandwiches to save

22  money.  She was the one who would tell people to turn off the

23  lights and turn off the printers to save money.  She was the

24  one who signed some of these checks I am talking about.  It was

25  her office, her office, that was at the center of this scheme.

1          Every glad handler, every wheeler and dealer, needs a

2    details person.  Every Larry needs a Judy, and Ms. Negron

3    filled her role extraordinarily well in this scheme.  This was

4    a big money fraud.  These were the big players, and Ms. Negron

5    had a very big, very important role that you will hear about

6    throughout this trial.

7          At the end of the trial, Mr. Singer will have an

8    opportunity to speak with you again.  At that time we will ask

9    you to return a verdict of guilty, guilty against Ms. Negron

10   for every single count she has been charged with.

11         I thank you for your time.  I look forward to the time

12   when we get to speak with you again.  Thank you.

13         THE COURT:  Please remove those placards.  Thank you.

14         All right, ladies and gentlemen, we will now hear from

15   Mr. Wax, counsel for the defense.

16                    DEFENSE OPENING STATEMENTS

17         MR. WAX:  May it please the Court, Counsel.

18         United States of America versus Judith Negron.  This

19   is Judith Negron.  She is not a chart.  She is not a statistic.

20   She is not a number.  She is a 40 year old mother of two,

21   married to Hector Negron, you heard earlier, with a bachelor's

22   of psychology degree from Florida International University and

23   a master's degree, where she was a straight A student at St.

24   Thomas University, in mental health.

25         In 2002, Judith went to work as a program therapist at

1   American Therapeutic Corporation.  American Therapeutic

2   Corporation, at the time, was a business that had been opened

3   by Larry Duran and Marianella Valera.  It was a small business

4   over on 2nd Avenue in Miami.  Judith was hired as the first

5   Program Therapist.  Her job was to run group therapy, to

6   conduct assessments and evaluations, and to treat people who

7   were suffering from mental illness.  This is what she had

8   wanted to dedicate her life to, and this is what she did.

9           American Therapeutic Corporation, as a community

10  mental health center, was serving this community, and serving

11  it valuably.  As you might imagine, over the few months and

12  years, as time went by, American Therapeutic Corporation grew,

13  like any business grew.  Other Program Therapists were hired.

14  Judith rose to the level of Program Director.

15          Understand, when you are treating people and you have

16  patients coming in, there are many people who are involved in

17  the function of the company because, after all, even though

18  this business is providing mental health services, it is a

19  business.

20          So, as Judith dedicated herself to American

21  Therapeutic Corporation, and other individuals came into the

22  company and the company began to grow, Judith is one of the

23  people who got in on the ground floor, had an opportunity to

24  become management of this company, and she took that

25  opportunity.  As Judith became management of this company, the

24

1    company grew.  That office in Miami turned into another office

2    in Homestead, in Boca Raton, in Fort Lauderdale, in Orlando,

3    and satellite offices in Fort Lauderdale and in South Dade.

4          The company grew, drivers were hired.  Transportation

5    people were hired.  Other program therapists were hired.  It

6    was serving the community.

7          Prior to the company growing, it had to obtain

8    Medicare accreditation.  Medicare had to approve the company as

9    a provider of services.  This is a process that has to be gone

10   through by any company that wants to provide services and be

11   compensated for those services by Medicare.  It's not as if you

12   just file an application and Medicare sends you a provider

13   number.  There is a process that you have to go through, which

14   involves inspections and making sure that you understand how to

15   comply with Medicare, and that you have policies and procedures

16   in place which comply with what they require of companies that

17   are providing services to the community.

18         Now, it took several months after American Therapeutic

19   opened to get their Medicare provider number.  Every time a

20   facility was opened, they had to go through the same

21   inspections, the same application process, the same policies

22   and procedures being implemented to comply with Medicare.  And

23   they did that.

24         As the company grew, and as Judith's role in the

25   company grew, there was a division of labor.  There was a

1   clinical side to American Therapeutic Corporation, that is that

2   side of the company that provided services, direct services to

3   people, and then there was the operations side, which was

4   running the company.  That was Judith's job.  Judith became,

5   essentially, the Operations Director of American Therapeutic

6   Corporation.

7         Now, corporations, being what they will, as an

8   Operations Director you have to supervise dozens of people.

9   Remember, we are talking, at its apex, seven locations, dozens

10  of employees, hundreds of clients, and all of the attending

11  matters that go along with that.  Whether its operating

12  expenses, human resource issues, insurance issues,

13  transportation issues, you name it.  You can imagine what it's

14  like to run a corporate structure like this, and this was

15  Judith's job.  She dedicated her life to it.

16        This mother of two gave 24/7 of her life to American

17  Therapeutic Corporation to grow this business and make it the

18  best possible business it could be.  You will hear from people

19  who will take the witness stand and tell you that Judith was a

20  tough taskmaster.  If you weren't following the policies and

21  procedures of American Therapeutic Corporation, you heard about

22  it.  If you were wasting money, you heard about it.  If there

23  was a problem with an employee, she took care of it.  She was

24  that manager who was tasked with that responsibility.

25        You will hear that, in addition to all of the clinical

1  operations of American Therapeutic Corporation, there was a

2  very, very strict policy in place for management.  Every day

3  the clinics would have meetings in the morning with the Program

4  Therapists, with the drivers, with the Program Directors.  They

5  would sit down.  These were called "flash meetings" to discuss

6  any issues that were going on with the patients.  They would

7  have meetings with the Program Directors of all the facilities

8  to make sure that everyone was following consistent policies

9  and procedures.

10      They would have meetings with the Medical Directors,

11  the doctors, where they would talk about patient issues,

12  developments with Medicare, and how the centers needed to be

13  run to comply with the policies and procedures of Medicare and

14  the policies and procedures of American Therapeutic

15  Corporation.

16      At some point around 2005, American Therapeutic

17  Corporation gained accreditation through an organization called

18  JACO, the Joint Commission for the Accreditation of Health Care

19  Organization.  This was no easy task either.  To get JACO

20  accreditation, this involved stepping up your game, so to

21  speak.  You couldn't just do the threshold things that Medicare

22  required to get a provider number.  Now you had to comply with

23  procedures from an accredited organization that showed the type

24  of health care organization you had and gave you that extra

25  level.  It's sort of like a college.

1          Some colleges are accredited, and some colleges are

2    not.  It takes time to get from one level to the other.  In

3    order for that to happen, they had to do what are called

4    performance improvement studies.  This involved studies on

5    things that they handled there like medication management,

6    admission criteria, history and physicals for the staff and

7    patients, infection control, management information systems,

8    staff certifications and verification, and on and on and on.

9          This was a six-month process where people would come

10   to the facility.  They would interview staff and look at the

11   manuals in place, the policies and procedures, these

12   performance studies that we are talking about.

13         At the end of this six-month period of inspection,

14   American Therapeutic Corporation was accredited by JACO.  They

15   had to maintain this accreditation throughout.  This was what

16   Judith worked so hard at doing.  She dedicated her life to

17   American Therapeutic Corporation.

18         Now, in return for this dedication, she stands before

19   you accused by the United States of America with some very,

20   very, very serious crimes.

21         And why?  Why is she being accused of these things?

22   She is being accused of these things because, unknown to her,

23   while she is dedicating her life to making this corporation the

24   best it can be, there is a group of people who are going rogue.

25   There is a group of people out there who are cutting corners

1   and doing what they want to do and not following the policies

2   and procedures.

3        You heard from the government about the Marketing

4   Director, Maggie Acevedo.  Yes, she will testify.  You are

5   going to hear about Margarita Acevedo and how, when she came to

6   work for American Therapeutic Corporation, she couldn't get

7   anyone to send patients to American Therapeutic Corporation.

8        She was hired by Larry Duran as the Behavior Health

9   Promotions Manager.  Her job was to go into the community and

10  to educate owners of halfway houses, owners of assisted living

11  facilities, doctors, about the services that American

12  Therapeutic Corporation offered.  Not just the partial

13  hospitalization program, but the other services that American

14  Therapeutic Corporation offered also; contracts with the drug

15  courts throughout the State of Florida from the court system,

16  substance abuse evaluation classes, supervised parental

17  visitation for people going through divorce, and many other

18  community based programs.  But she wasn't good at her job.  For

19  a year and a half she tried to do her job.

20        Finally, one day, she went to Larry Duran, and Larry

21  Duran, who, unbeknownst to Judith, had also gone rogue, said,

22  "Come with me."  You will hear from Margarita Acevedo how Larry

23  Duran taught her the easy way to get patients to come to ATC,

24  by paying people.  She is going to tell you that.  You are

25  going to hear from Maggie Acevedo, who, yes, has pled guilty

1    and made a deal with the government.  You will hear about that

2    arrangement she made with the government as well.  All she has

3    to do is tell you, members of the jury, that Judith knew also,

4    because it's her ticket to freedom.

5         So we come to the United States of America versus

6    Judith Negron.  But what this really is, what this really is,

7    is the United States of America versus American Therapeutic

8    Corporation.  The United States of America directing all of its

9    resources, all of its lawyers, agents, experts, analysts at one

10   woman, Judith Negron, in an attempt to persuade you that she

11   knew and participated in this fraud.

12        Members of the jury, there will be many other

13   witnesses, many other witnesses, who will testify in this case

14   besides Margarita Acevedo.  I ask you to listen to what every

15   one of them has to say, carefully, because that is your job.

16   That is your role here.  You are the triers of fact.

17        The government has a very, very strict burden in this

18   case.  They must, they must prove the case against Judith

19   beyond and to the exclusion of every reasonable doubt.  There

20   is no higher standard in our law.

21        Judith Negron, Judith has pleaded not guilty.  Every

22   time she has stood in this courtroom she has said, "I am not

23   guilty.  I want a trial," and this is her trial.  As she sits

24   there, she is presumed innocent.  Everything the government

25   said to you in their opening statement, charts, numbers,

1    testimony, it's meaningless because she sits there presumed

2    innocent.  She carries that presumption with her through the

3    entire trial.

4           Judge King has instructed you about this briefly in

5    jury selection, but it is the essence of our system of justice.

6    The government does bear the entire burden of proving their

7    case.  I am not going to sit there and do nothing.  My job is

8    to represent Judith, and you stand between the United States of

9    America and Judith.

10          The indictment that they have filed in this case, the

11   indictment that frames the charges that you are here to

12   determine today, is a piece of paper.  It's not evidence.  It's

13   a piece of paper that says, "This is what we believe," but

14   belief is not proof.  Proof comes from the witness stand and

15   from the evidence.

16          Members of the jury, I ask you, on behalf of Judith

17   Negron, to fulfill your responsibilities as jurors in this

18   case, to abide by those concepts that are in our justice

19   system, that she is presumed innocent, and as she sits here

20   today, she is not guilty.

21          At the conclusion of this case, you are going to have

22   all of the evidence.  You are going to have heard all of the

23   testimony.  I will also have a chance to talk with you again,

24   but at the end of the day, it's up to you.  It's up to the

25   twelve of you to make that most important decision.

1           Members of the jury, I am confident that after you

2   have heard everything you will come to the conclusion that is

3   the appropriate conclusion, and that is that Judith Negron is

4   not guilty of these charges.

5           I thank you.

6           THE COURT:  All right, ladies and gentlemen, before we

7   commence the testimony, we will take a short fifteen-minute

8   recess.  You will have time for a cup of coffee or tea or

9   whatever.  Thank you.  We will be in recess for fifteen

10  minutes.

11                  [Short recess was taken].

12          COURTROOM DEPUTY:  All rise.  Court is back in

13  session.

14          THE COURT:  Jury, please.

15              [The jury returns to the courtroom].

16          THE COURT:  Thank you.  Be seated, please.

17          Call your first witness.

18          MS. SAULINO:  Thank you, Your Honor.  The government

19  calls Doris Elizabeth Poteet.

20          COURTROOM DEPUTY:  Please raise your right hand.  Do

21  you solemnly swear or affirm that the testimony you are about

22  to give in this trial will be the truth, the whole truth, and

23  nothing but the truth so help you God?

24          THE WITNESS:  I do.

25           DORIS POTEET, GOVERNMENT'S WITNESS, SWORN

1                    DIRECT EXAMINATION

2              COURTROOM DEPUTY:  Please state and spell your full

3    name for the record.

4              THE WITNESS:  Doris, D-o-r-i-s, Elizabeth,

5    E-l-i-z-a-b-e-t-h, Poteet, P-o-t-e-e-t.

6              THE COURT:  Yes, sir.

7              MR. SINGER:  Thank you.

8    BY MR. SINGER:

9    Q.  How old are you?

10   A.  40.

11   Q.  I understand that you may be getting over the flu, so if

12   you need to take a break, let the Court know, okay?

13   A.  Thank you.

14   Q.  Describe for the jury your educational background, starting

15   with your bachelor's degree.

16   A.  I have a bachelor's of psychology.

17   Q.  From what university?

18   A.  Wright State University.

19   Q.  Do you have any post graduate education?

20   A.  I do.

21   Q.  Could you tell the jury your post graduate education.

22   A.  I have a master's in counseling from the University of

23   Dayton.

24   Q.  Please make sure you speak into the microphone.

25              After your master's degree, did you pursue other

POTEET - Direct

1  education?

2  A.  Yes.

3  Q.  Can you explain.

4  A.  Sure, I have an additional year of graduate school in

5  counseling.  I also have some additional course work in

6  criminal justice, in substances abuse.  I also completed half

7  of a master's in business, and I completed my course work and

8  my competency for a doctorate in leadership.

9  Q.  Do you have any professional licenses?

10  A.  I do.

11  Q.  When did you obtain your first professional license?

12  A.  I received my first license in 1999.

13  Q.  What was the license?

14  A.  Professional counselor.

15  Q.  What do you get a professional counselor's license to do?

16  A.  Counseling.

17  Q.  What type of counseling?

18  A.  Psychotherapy, working with mental and emotional disorders.

19  Q.  What state issued that license?

20  A.  Ohio.

21  Q.  Were there requirements in order to obtain that license?

22  A.  I had to have two years of graduate school, and I had to

23  pass a comprehensive examination.

24  Q.  Did you obtain other professional licenses?

25  A.  I did.

POTEET - Direct

1   Q.   Did you obtain any from the State of Florida?

2   A.   I did.   I received my LMHC, which is Licensed Mental Health

3   Counselor, in 2003.

4   Q.   Did you obtain yet another license on top of that?

5   A.   Yes, I have my Professional Clinical Counselor license,

6   which I received in 2002, which was from the State of Ohio.   I

7   am a licensed Professional Clinical Counselor in the State of

8   Florida.

9   Q.   Now, during one of your answers, did you mention that one

10  of the requirements was a residency program?

11  A.   Yes.

12  Q.   As part of that residency, did you work at a Partial

13  Hospitalization Program?

14  A.   I did.

15  Q.   What state was that in?

16  A.   Ohio.

17  Q.   What types of patients is a Partial Hospitalization Program

18  designed to treat?

19  A.   A Partial Hospitalization Program is designed to treat

20  mentally ill patients, and it's designed to stabilize any

21  symptoms they may have so they don't relapse and have to return

22  to an in-patient psychiatric center.

23  Q.   If a patient wasn't going to be put into a Partial

24  Hospitalization Program, where would they otherwise need to go?

25  A.   They would be living either by themselves, with family.

1    Q.   In other words, is it designed to keep people from having

2    to go to in-patient treatment?

3    A.   Yes, it's designed to keep people stable so they don't have

4    to return to the hospital.

5    Q.   You mentioned that you have a license from the State of

6    Florida.  Where did you work in Florida in the mental health

7    field?

8    A.   I first worked at Plantation General Hospital as a Social

9    Worker in their in-patient substance abuse center.

10   Q.   Where did you work after that?

11   A.   After that, I worked at Fair Oaks Pavilion where I was also

12   a Social Worker for the in-patient psych center treating the

13   geriatric adult population as well as substance abuse.

14   Q.   After that, where did you work?

15   A.   After that, I worked for -- wait a minute, Nova

16   Southeastern University in their Community Mental Health Center

17   as the Senior Crisis Clinician and Acting Director.

18   Q.   Did you have another job before you came to American

19   Therapeutic?

20   A.   I worked at Children's Home Society where I was a Program

21   Director.

22   Q.   You mentioned that one of the places you worked was a

23   community mental health center at, I believe, Nova

24   Southeastern; is that correct?

25   A.   Yes.

POTEET - Direct

1  Q.  Tell the jury, what is a community mental health center?

2  A.  A community mental health center is designed to work with

3  the mentally ill population to keep them from going into

4  in-patient psychiatric hospitals.

5       It contains -- typically, a community health center is

6  going to have services such as case management, which the Case

7  Manager works directly with the patient, such as if they needed

8  assistance with finding housing or benefits or food, that type

9  of thing.

10      They also have -- sometimes some of them will have a

11  Partial Hospitalization Program, group therapy, individual

12  therapy.  They would also see a psychiatrist and have bed

13  monitoring.

14  Q.  You mentioned that one of the things that a community

15  mental health center does is it has a Partial Hospitalization

16  Program; is that right?

17  A.  Some of them do.

18  Q.  That is a component within the community mental health

19  center; is that fair to say?

20  A.  Yes.

21  Q.  Are you familiar with a company called American Therapeutic

22  Corporation?

23  A.  Yes.

24  Q.  If I refer to it today as ATC, will you know what I am

25  talking about?

POTEET - Direct

1   A.   Yes.

2   Q.   How are you familiar with ATC?

3   A.   I was employed there.

4   Q.   When were you employed there?

5   A.   April of '07 until September of '07.

6   Q.   That's for approximately five months?

7   A.   A little over, yes.

8   Q.   When you first started at ATC, what position did you have?

9   A.   Program Therapist.

10  Q.   At that time, what did you understand that ATC did?

11  A.   From the research that I did prior to my interview, I

12  understood that they were a community mental health center.

13  Q.   Did you come to understand the primary type of treatment

14  ATC supposedly delivered to patients?

15  A.   Yes, a Partial Hospitalization Program.

16  Q.   Other than the Partial Hospitalization Program treatment,

17  did ATC provide any of the other services that you mentioned in

18  connection with a community mental health center?

19  A.   No.

20  Q.   How did the patients who attended ATC pay for their

21  treatment?

22  A.   Their Medicare coverage was billed.

23  Q.   The entire time you were there, did you meet patients that

24  didn't have Medicare coverage?

25  A.   No, not that I can recall.

POTEET - Direct

1  Q.  What was your understanding of how ATC made money?

2  A.  By billing Medicare.

3  Q.  Billing Medicare for what?

4  A.  For services rendered to the patients.

5  Q.  Partial hospitalization services?

6  A.  Correct.

7  Q.  Are you familiar with a company called Medlink Professional

8  Management?

9  A.  Yes.

10  Q.  What was Medlink?

11         Can I call it Medlink, is that okay?

12  A.  Yes.

13  Q.  What was Medlink?

14  A.  That was the Human Resources Department at ATC.

15  Q.  What was your understanding of who the owners and operators

16  of ATC were?

17  A.  It was my understanding that it was Mr. Duran, Ms. Valera,

18  and Ms. Negron.

19  Q.  That's Judith Negron; is that correct?

20  A.  Correct.

21  Q.  What was the relationship in terms of those three owners

22  and their operation of Medlink and ATC?  Did you have an

23  understanding of that?

24         MR. WAX:  Objection, no predicate.

25         THE COURT:  Sustained.

 1          MR. SINGER:  Thank you, Your Honor.  I will come back

 2   to that.

 3   BY MR. SINGER:

 4   Q.  Did ATC have multiple facilities?

 5   A.  Yes.

 6   Q.  Where were those facilities located?

 7   A.  Orlando, Florida; Boca Raton, Florida; Fort Lauderdale,

 8   Florida; Miami, Florida; and Homestead, Florida.

 9          MR. SINGER:  Your Honor, may I approach the witness?

10          THE COURT:  Yes.

11   BY MR. SINGER:

12   Q.  I am going to hand you what has been marked for

13   identification purposes as Government's Exhibit 2.  Do you

14   recognize that?

15   A.  Yes.

16   Q.  What is it?

17   A.  A photograph.

18   Q.  A photograph of what?

19   A.  The main center in Miami, Florida.

20   Q.  Did you visit that center?

21   A.  Yes.

22          MR. SINGER:  Your Honor, at this time we move to admit

23   Government's Exhibit 2 into evidence.

24          MR. WAX:  No objection.

25          THE COURT:  Admitted into evidence, Government's

POTEET - Direct

1    Exhibit 2.

2            [Government Exhibit 2 received in evidence].

3            MR. SINGER:  May I publish to the jury, Your Honor?

4            THE COURT:  Yes.

5    BY MR. SINGER:

6    Q.  Where were the ATC corporate offices located?

7    A.  In Miami, Florida.

8    Q.  At this location?

9    A.  Yes.

10   Q.  Where were the Medlink corporate offices located?

11   A.  Also in this building.

12   Q.  When you first started, where did you meet Ms. Negron?

13   A.  At the Miami location.

14   Q.  At these offices?

15   A.  Correct.

16   Q.  When you first started working, which location were you

17   working out of?

18   A.  Fort Lauderdale.

19   Q.  Who was your supervisor at the Fort Lauderdale facility?

20   A.  Angela Coley.

21   Q.  What was Ms. Coley's position?

22   A.  She was the Program Director.

23   Q.  Can you explain how that worked at each facility.  Did each

24   facility have a Program Director?

25   A.  Yes.

1  Q.  What was the Program Director's job at each facility?

2  A.  It was to manage the day-to-day activities, provide

3  supervision to the therapists.

4  Q.  And you were one of those therapists at Fort Lauderdale,

5  right?

6  A.  Yes.

7  Q.  So you reported to the Program Director, who was Ms. Coley.

8  Who did Ms. Coley report to?

9  A.  Ms. Negron, Ms. Valera, and Mr. Duran.

10  Q.  Were there times when Ms. Coley would be out of the office?

11  A.  Yes, she was out quite a bit in the beginning.

12  Q.  When she was out, who would take over her responsibilities?

13  A.  The three of them; Mr. Duran, Ms. Negron, and Ms. Valera

14  would take turns coming in and out of the office

15  Q.  Ms. Negron would come in and fill in for her while you were

16  there?

17  A.  Yes.

18  Q.  Would her oversight simply involve operations, or would she

19  also talk about clinical with you?

20          MR. WAX:  Objection, leading.

21          MR. SINGER:  I can rephrase the question.

22  BY MR. SINGER:

23  Q.  What did you talk about when Ms. Negron would come in and

24  to fill in for Ms. Coley?  What would she discuss with you?

25  A.  We would talk to her about anything; anything to do with

1    the patients, the running of the facility, anything that we
2    needed we would go to her.
3    Q.   What were your primary responsibilities as a Program
4    Therapist at ATC?  What did you do?
5    A.   I ran group sessions.  I also met with the patients to do
6    biopsychosocial assessments, development of treatment plans,
7    treatment plan reviews, discharge summaries, and progress notes
8    after the group therapy session.
9    Q.   One thing you mentioned there was the biopsychosocial
10   assessment; is that correct?
11   A.   Yes.
12   Q.   Explain briefly to the jury what a biopsychosocial
13   assessment is.
14   A.   A biopsychosocial assessment is when a therapist meets with
15   a patient.  Basically, you take down their life history.  You
16   find out all about their medical history, all of their
17   development and education, their social development, and any
18   psychiatric history.
19   Q.   How many patients would be at the Fort Lauderdale facility
20   on any given day?
21   A.   At the Fort Lauderdale location, anywhere from sixty to
22   eighty patients.
23   Q.   How would they receive therapy?  Would that be group
24   therapy or individual therapy?
25   A.   Group therapy.

POTEET - Direct

1    Q.   How large would the groups be?

2    A.   Anywhere from ten to twenty patients.

3    Q.   If there are sixty to eighty patients, and there's ten to

4    twenty people in a group, how many groups would be operating at

5    the facility at a given time?

6    A.   Four.

7    Q.   How many groups would the patients go to each day?

8    A.   Four.

9    Q.   How did that work?

10   A.   The patients would be in a room, and the therapists would

11   rotate throughout the different group sessions.  The therapists

12   could be in the same room the same day also.

13   Q.   From when a patient would first come into ATC to when they

14   were discharged from the facility, explain to the jury what the

15   different steps are that would occur from the beginning of

16   their treatment to the end.

17   A.   Sure.  A patient would come on their first day for

18   treatment and they would start group sessions right away.  At

19   some point, they would meet with the therapists to do the

20   biopsychosocial assessment and to work on developing the

21   treatment plan.

22        At some point, they would meet with a nurse for a

23   health assessment and a psychiatrist for a psychiatric

24   evaluation.

25        Then, over time, the therapists would do a treatment

POTEET - Direct

1  plan review until the end of treatment, which at that point we

2  would do a discharge summary.  We also did a progress note for

3  each patient after each group session.

4  Q.  Throughout this process, from the first time the patient

5  came in to the end, would ATC personnel complete paperwork for

6  each step of that process?

7  A.  Yes.

8  Q.  Was there paperwork for the initial psychiatric evaluation?

9  A.  Yes.

10  Q.  There was also, you said, a biopsychosocial.  Was there

11  paperwork associated with that?

12  A.  Yes.

13  Q.  What about the medical assessment?  Would there be

14  paperwork for that?

15  A.  Yes.

16  Q.  The treatment plan, that would be a document?

17  A.  Yes.

18  Q.  Would that be periodically reviewed?

19  A.  Yes.

20  Q.  You mentioned that there would be progress notes created

21  after each group?

22  A.  Correct.

23  Q.  Finally, the discharge, would that be reflected in a

24  document?

25  A.  Yes.

1  Q.  Were you aware, at that time, of whether Medicare required

2  that documentation to be put in the patient's file?

3  A.  Yes, they did.

4  Q.  Did you have an understanding of why Medicare required that

5  type of paperwork?

6        MR. WAX:  Objection, no predicate, outside the scope

7  of the witness's knowledge.

8        THE COURT:  Sustained.

9  BY MR. SINGER:

10  Q.  How long did you work in the medical field, Ms. Poteet?

11  A.  Fourteen years.

12  Q.  Did you ever have to be at facilities that billed the

13  Medicare program?

14  A.  Pretty much every place I worked.

15  Q.  As part of that, were you aware of certain Medicare

16  regulations and what they stood for?

17  A.  Absolutely.

18  Q.  At that time, did you have an understanding as to why

19  Medicare required that paperwork?

20  A.  Yes.

21  Q.  Can you tell the jury what your understanding was.

22        MR. WAX:  Same objection, Your Honor.

23        THE COURT:  Sustained.  You can ask her what she did.

24  She can tell us some facts.  She hasn't been qualified as an

25  expert or tendered as one.  She may be, but she has not been

 1    certified at this point.

 2              MR. SINGER:  Yes, Your Honor.

 3    BY MR. SINGER:

 4    Q.  Now, there would be paperwork to document each stage of the

 5    patient's care; is that correct?

 6    A.  Correct.

 7    Q.  Based on your experience, as a Program Therapist at the

 8    Fort Lauderdale facility, did the paperwork always match what

 9    actually happened at the facility?

10    A.  No.

11    Q.  Can you describe what you mean to the jury.

12    A.  Patients would come in and I was told to --

13              MR. WAX:  Objection, hearsay.

14              MR. SINGER:  It's a statement in furtherance of the

15    conspiracy, Your Honor.

16              THE COURT:  It has to establish who was speaking, who

17    was there, the usual predicate; what was said, who said it, all

18    of that.

19              MR. SINGER:  I will try to do that, Your Honor.

20    BY MR. SINGER:

21    Q.  Who were you told by?

22              THE COURT:  Who were you talking to?

23    BY MR. SINGER:

24    Q.  Who were you talking to, Ms. Poteet?

25    A.  Nichole Eckert was the Senior Therapist that trained me.

POTEET - Direct

1  Q.  You were talking to her in connection with your training at

2  ATC?

3  A.  Correct.

4  Q.  You were talking with her about how to fill out paperwork

5  at ATC?

6  A.  Correct.

7  Q.  What did she tell you?

8          MR. WAX:  Objection, Your Honor.

9          THE COURT:  I am not sure who this lady is.  I think

10  we need a predicate.

11          You were talking to somebody named Nichole.  Did she

12  have a last name?

13          THE WITNESS:  Eckert.

14          THE COURT:  When was this conversation, approximately?

15  Where was it?  What did she say, and what did you say?

16          We need that kind of predicate.

17  BY MR. SINGER:

18  Q.  When was the conversation?

19  A.  When I first started.

20  Q.  That would have been in, approximately, April of 2007?

21  A.  Correct.

22  Q.  Was Mr. Eckert your supervisor at that time period?

23  A.  No.

24  Q.  Was she the Senior Therapist at the facility?

25  A.  Yes, and she was in charge of training me.

POTEET - Direct

1  Q.  She was in charge of your training process, correct?

2  A.  Yes.

3  Q.  She was training you in terms of how to complete the

4  documentation, correct?

5  A.  Yes.

6  Q.  In training you on how to complete documentation at ATC,

7  what did she say to you?

8           MR. WAX:  Your Honor, I'm going to make the same

9  objection and also lodge a Sixth Amendment objection as well.

10           THE COURT:  We haven't established where all of this

11  took place.  Sustained.

12           Let's lay the predicate.  Who was there?  Where was

13  it?  When was it?  Then showing that it is connected, in some

14  fashion, to one of the alleged co-conspirators.  Then it is

15  admissible.  Otherwise, it's not.  That's it.

16           I don't have a clue as to where this took place.  I

17  will ask you.

18  BY THE COURT:

19  Q.  Where did this conversation take place?

20  A.  All the therapists sat in a room together.  Nichole and I

21  sat next to each other.  It was in that room where we sat.

22  Q.  Was this in New York City?  San Francisco?  Please, where

23  was it?

24  A.  Fort Lauderdale, Florida.

25  Q.  Did the building have a name?

```
 1  A.   At ATC.
 2  Q.   And that stands for?
 3  A.   American Therapeutic Corporation.
 4  Q.   All right.  This lady, what was her function at ATC?  This
 5  lady that was your supervisor, what was her position, if any?
 6  A.   She was a Program Therapist, but she was also the Senior
 7  Therapist in charge of training me.
 8           THE COURT:  All right.  Next question.
 9  BY MR. SINGER:
10  Q.   Ms. Poteet, at the Fort Lauderdale facility, when you are
11  having the conversation --
12           THE COURT:  She said all of that.
13  BY MR. SINGER:
14  Q.   What did Ms. Eckert say to you?
15           MR. WAX:  I am going to make the same objection.  It
16  hasn't been connected to any co-conspirator.
17           THE COURT:  Is the company not alleged to be a
18  co-conspirator?
19           MR. SINGER:  It is, Your Honor.
20           THE COURT:  Overruled.  Go ahead.
21  BY MR. SINGER:
22  Q.   You may proceed, Ms. Poteet.
23           What did Ms. Eckert say to you?
24  A.   She told me that when patients came into treatment, the
25  paperwork had to match what Medicare would approve for
```

1    reimbursement.

2    Q.  Would she tell you to make changes in the substance --

3    compared to what you saw, make changes in the files?

4    A.  Patients would come into treatment that I would see.  I did

5    not see the symptomology that I felt they needed to be in

6    treatment.  So Nichole explained to me that we needed to

7    exaggerate the wording to make sure that the paperwork would be

8    approved by Medicare and reimbursed.

9    Q.  Give the jury some specific examples that you remember

10   where that took place.

11   A.  It happened very frequently.  I would be meeting with a

12   patient to do the biopsychosocial assessment, and I would ask

13   the patient, "Are you having any difficulty eating or

14   sleeping?"  The patient would say, "No, I am sleeping eight

15   hours a night.  My eating is fine."

16        Nichole explained, "Well, that won't pass Medicare, so

17   you need to change that to the patient is having difficulty

18   sleeping, only sleeping two, three, four hours a night."  Same

19   thing with the eating habits.  That's just one example.

20   Q.  What did you understand, based on your training, were the

21   criteria for a patient to be eligible for a Partial

22   Hospitalization Program treatment?

23        MR. WAX:  Objection, no predicate, outside the scope

24   of the witness's knowledge.

25        THE COURT:  Yes, I have to sustain the question as

1    formed, "what was your understanding."  You can ask her --

2            MR. SINGER:  I will try to clarify, Your Honor.

3            THE COURT:  A straightforward question to her, and

4    then I am out of this.

5            What did Medicare require for you to fill out about

6    that treatment to meet their standards?  What did it require,

7    if you know?

8            THE WITNESS:  Medicare requires the patient to have a

9    diagnosable mental illness and be at risk of in-patient

10   psychiatric treatment without treatment at the Partial

11   Hospitalization Program.

12           THE COURT:  All right.

13   BY MR. SINGER:

14   Q.  Based on your observations while you were at ATC, and your

15   training, what percentage of the Fort Lauderdale patients,

16   approximately, qualified under those standards?

17   A.  Between fifteen to twenty percent.

18   Q.  And the remainder?  What about the remaining seventy-five

19   to eighty percent?

20   A.  They did not meet criteria for treatment.

21   Q.  Based on the documentation that you saw while you were at

22   ATC, what percentage of patients qualified in the documentation

23   that you saw for PHP treatment?

24   A.  A hundred percent.

25   Q.  Did you ever witness charts being created for therapy that

POTEET - Direct

1   was not given to a patient?

2   A.   An entire chart being created?

3   Q.   Did you ever see documentation that was created to reflect

4   something that did not actually occur?

5   A.   Yes, progress notes.

6   Q.   Can you describe what you saw to the jury.

7   A.   There would be times when the patients would come in late

8   for the first group session or sometimes not come in at all.   I

9   was told to develop a progress note anyway, because otherwise

10  we would not be able to bill Medicare.

11  Q.   Did you complain to your management about this?

12  A.   I complained to -- yes, I did.

13  Q.   Who did you complain to?

14  A.   I complained directly to Nichole Eckert.

15  Q.   Do you recall this conversation with Ms. Eckert?

16  A.   Yes.

17  Q.   Was Ms. Negron present during that conversation?

18  A.   Yes.

19  Q.   What did you tell Ms. Eckert?

20  A.   I was bringing up my concerns that we were billing for

21  patients that are not there, and I didn't think it was right,

22  and I was concerned for my license.

23  Q.   When you were having this conversation, do you recall the

24  room that you were in?

25  A.   We were in the front office.

POTEET - Direct

1   Q.   How big was the front office?

2   A.   Rather small, maybe ten by ten feet.

3   Q.   Where was Ms. Negron in relation to where you were standing

4   when you were having this conversation with Ms. Eckert?

5   A.   She was a couple feet away.

6   Q.   What was Ms. Eckert's response?

7   A.   She really didn't say a whole lot except --

8           MR. WAX:  Objection, hearsay to the other individual's

9   response.

10          THE COURT:  I'm sorry.  I didn't hear the question.

11   What was Ms. Eckert's response?  That's overruled.  Yes, you

12   can say what she said to you.  What did she say to you?

13          THE WITNESS:  She told me that we would still have to

14   do it, otherwise we would not be able to bill Medicare, and

15   that management would not be happy with that.

16   BY MR. SINGER:

17   Q.   Did Ms. Negron step in to correct Ms. Eckert's statement?

18   A.   No.

19   Q.   During your time at ATC, at the Fort Lauderdale location,

20   did you become familiar with where the patients who came to the

21   facility came from?

22   A.   Yes, the majority of them came from halfway houses or group

23   homes.

24   Q.   What is a halfway house?

25   A.   A halfway house is where somebody with a substance abuse

1  disorder might live until they are functioning better and able
2  to live on their own.
3  Q.  Would the patients come in individually?
4  A.  Not that I recall, maybe one or two.  Not that I recall.
5  Q.  How would they come in?
6  A.  We had drivers, mental health technicians, that would take
7  vans and go and pick up the patients from the group homes and
8  the halfway houses and bring them to the facility.
9  Q.  Based on your observations of these patients, as a
10 therapist at the Fort Lauderdale facility, what type of
11 treatment did these patients need?
12 A.  Substance abuse treatment.
13 Q.  Did they qualify for Partial Hospitalization Program
14 treatment?
15 A.  No.
16 Q.  Was the conditions of these patients, was it readily
17 apparent to someone who was at the Fort Lauderdale facility,
18 such as yourself?
19         MR. WAX:  Objection.
20         THE COURT:  Sustained.
21 BY MR. SINGER:
22 Q.  Was Ms. Negron at the Fort Lauderdale facility while you
23 worked there?
24 A.  Yes.
25 Q.  Did she have the same opportunity to make the same

1    observations that you did?

2    A.  Yes.

3              MR. WAX:  Objection.

4              THE COURT:  Sustained.

5              MR. WAX:  Ask that it be stricken.

6              THE COURT:  Yes, it is stricken.

7              You can ask her facts.  You can't ask what's in the

8    mind of somebody else.  You can describe where people were

9    standing and describe what happened.  Then it's up to the jury

10   to decide whether people could see them or not.

11   BY MR. SINGER:

12   Q.  Was Ms. Negron present at the Fort Lauderdale facility

13   while you were there?

14   A.  Yes.

15   Q.  Was she there on more than one occasion?

16   A.  Yes.

17   Q.  Was she in a position where she could see patients while

18   she was there?

19              MR. WAX:  Objection.

20              THE COURT:  Sustained.

21   BY MR. SINGER:

22   Q.  Did ATC, to your knowledge, offer any inducements for

23   patients to attend the Partial Hospitalization Program

24   treatment?

25   A.  Yes.

 1          MR. WAX:  Objection, no predicate.

 2          MR. SINGER:  I can establish a predicate.

 3          THE COURT:  Either that or if you represent that you

 4  will tie it in.

 5          MR. SINGER:  I believe I will tie it in, Your Honor.

 6          THE COURT:  All right.  Subject to a motion to strike,

 7  Mr. Wax, if he doesn't tie it in.  Some latitude in getting

 8  into the area.  Go ahead.

 9          MR. SINGER:  Thank you, Your Honor.

10  BY MR. SINGER:

11  Q.  Did you observe ATC offering any inducements for patients

12  to come into the facility?

13  A.  Yes.

14  Q.  What did you observe?

15  A.  I observed them passing out packs of cigarettes to patients

16  for coming into the center for treatment.

17  Q.  How long did you work in the medical field, Ms. Poteet?

18  A.  About fourteen years.

19  Q.  Had you ever seen a facility offering packs of cigarettes

20  to patients before?

21          MR. WAX:  Objection, relevance.

22          THE COURT:  Sustained.  What other people did, or

23  didn't do, is not relevant.

24  BY MR. SINGER:

25  Q.  Did you see Ms. Negron at the Fort Lauderdale facility

1  during the time period that you were there?

2  A.  Yes.

3  Q.  Did you see her present while the cigarettes were being

4  passed out to these patients?

5        MR. WAX:  Objection, Your Honor, irrelevant and also

6  leading.

7        THE COURT:  No, that is eliciting a fact.  What did

8  you observe?  Did you see her there when this was being done?

9        MR. SINGER:  What is the answer?

10        THE COURT:  Answer my question.

11        THE WITNESS:  Yes.

12        THE COURT:  Next question.

13  BY MR. SINGER:

14  Q.  Did you ever complain to the ATC management that cigarettes

15  were being passed out at the facility?

16  A.  Yes, I did.

17  Q.  What was the result of your complaint?

18  A.  Nothing.

19  Q.  While you were at ATC, at the Fort Lauderdale facility, did

20  you hear of any other inducements that were being offered to

21  patients?

22  A.  It was common knowledge that therapists would talk about,

23  or staff in general would talk about --

24        MR. WAX:  Judge, I am going to object.

25        THE COURT:  Sustained.

1           MR. SINGER:  Your Honor --

2           THE COURT:  I know what you want to do, but the

3    objection is sustained.

4           MR. SINGER:  Yes, Your Honor.

5    BY MR. SINGER:

6    Q.  Did you hear discussion of payments while you were at ATC?

7    Did you hear that?

8           MR. WAX:  Same objection, and leading.

9           THE COURT:  It's yes or no.  You may answer.

10   Overruled.  Yes or no only.

11          THE WITNESS:  Yes.

12   BY MR. SINGER:

13   Q.  Did there come a time when you were promoted at ATC?

14   A.  Yes.

15   Q.  When were you promoted, approximately?

16   A.  June of 2007.

17   Q.  What position were you promoted to?

18   A.  Program Director.

19   Q.  As a Program Director, did you have, at that time, more

20   interaction with Ms. Negron?

21   A.  Yes.

22   Q.  Describe to the jury what your interactions with Ms. Negron

23   generally consisted of.

24   A.  She would come to my center to help with training and to,

25   more or less, get me acclimated to my center location.

POTEET - Direct

1   Q.   That's at the Homestead location?

2   A.   Correct.

3   Q.   Other than your one-on-one interaction, did you have other

4   interaction with Ms. Negron?

5   A.   Yes, she would be present on conference calls.

6   Q.   Who participated in these conference calls?

7   A.   It would be the Program Directors as well as Mr. Duran,

8   Ms. Valera, and Ms. Negron.

9   Q.   When you participated in these conference calls, who took

10  charge of the call?

11  A.   Really, it would just be the three of them at different

12  times.

13  Q.   When you say "the three of them," who are you talking

14  about?

15  A.   Mr. Duran, Ms. Negron, and Ms. Valera.

16  Q.   What were the principal topics of conversation during the

17  call?

18  A.   Mostly, the topics of conversation would be about making

19  sure the census, which is the number of patients at each

20  facility, was a very high number.

21  Q.   Did you have an understanding, at that time, of why the

22  census was important?

23  A.   Yes, because we got reimbursed by Medicare for the number

24  of patients that we would have in each center.

25  Q.   Who, during the call, would stress the importance of

POTEET - Direct

1   keeping the census up?

2   A.   The three leaders; Mr. Duran, Ms. Negron, and Ms. Valera.

3   Q.   Now, how did the patient population at the Homestead

4   facility compare to what you saw in Fort Lauderdale?

5   A.   The patient population at Homestead, the majority of the

6   patients there were geriatric, meaning they were senior

7   citizens.

8   Q.   What was the condition of the patients?

9   A.   The majority of the patients there suffered from

10  Alzheimer's Disease.

11  Q.   And can you explain, for those members of the jury who

12  might not be familiar, what is Alzheimer's?

13  A.   Alzheimer's is a degenerative cognitive disease where you

14  are losing a lot of intellectual skills, social skills, mental

15  skills, including memory.

16  Q.   Are you familiar with the treatment of people with severe

17  mental illnesses?

18  A.   Yes.

19  Q.   Is that similar to the way you treat someone with

20  Alzheimer's?

21  A.   No.

22  Q.   Can you explain to the jury why you would treat someone

23  with a severe mental condition, like schizophrenia, differently

24  than someone with Alzheimer's?

25  A.   The main difference is that people with Alzheimer's,

POTEET - Direct

1   unfortunately, have difficulty gaining insight and learning.

2   That's the main problem with the degeneration.  Their cognitive

3   ability, their ability to learn and to remember, is impaired.

4   Q.  Why would that, for example, make Partial Hospitalization

5   Program treatment not appropriate for someone with Alzheimer's?

6   A.  They can't understand really what you're talking about.

7   They can't remember anything.  They can't gain any insight.

8   They can't learn.

9   Q.  Based on your observations, and your training, did the

10  patients at Homestead need Partial Hospitalization Program

11  treatment?

12  A.  No.

13  Q.  What percentage of the patients that you saw at Homestead

14  actually needed partial hospitalization treatment?

15  A.  Maybe ten percent.

16  Q.  According to the charts, or the documentation that you

17  reviewed at the Homestead facility, what percentage of patients

18  needed partial hospitalization treatment?

19  A.  A hundred percent.

20  Q.  How are you able to determine that the patients that you

21  saw had Alzheimer's and, for example, not some severe mental

22  illness like schizophrenia or bipolar disorder?

23  A.  By conducting a mental status exam.

24  Q.  Did you actually conduct exams of the patients at the

25  Homestead facility?

1    A.    Yes.

2    Q.    Did you also have a chance to observe the patients?

3    A.    Yes.

4    Q.    What did you observe that led you to believe that they had

5    Alzheimer's?

6    A.    It was very evident.  It would be evident for, pretty much,

7    anybody.  They didn't know where they were.  They didn't know

8    what year it was, who the President was, where they lived.

9            Maybe there were patients that were crying

10   hysterically, with their head laying down on the table.  We had

11   a couple of patients, on more than one occasion, urinate and

12   defecate in the trash can in the group session room.

13   Q.    That's in the middle of the group session?

14   A.    Correct.

15   Q.    Did you have conversations with -- at this point, you are a

16   Program Director, correct?

17   A.    Yes.

18   Q.    You are supervising other therapists?

19   A.    Yes.

20   Q.    Did you have conversations with the therapists at the

21   Homestead location about these patients?

22   A.    I did.  When I first went to the Homestead location, I feel

23   it's very important to meet with each one of your staff,

24   obviously, to get to know them and find out what they like

25   about their job, what they don't like, what their concerns are.

1    I got to meet with every one of them.

2    Q.  Did your staff's opinions differ from yours?

3            MR. WAX:  Objection.

4            THE COURT:  Yes, sustained.  She is not qualified as

5    an expert.  She can only give facts.  She can't give opinions.

6    BY MR. SINGER:

7    Q.  Did your therapists come up to you and try and change

8    things --

9            THE COURT:  Now you are leading her.  Ask her in some

10   way that you don't lead her.

11   BY MR. SINGER:

12   Q.  Was it evident, other than just your conversations, whether

13   your staff members agreed or disagreed with you about the

14   condition of the patients?

15           MR. WAX:  I object to the form of the question.

16           THE COURT:  Sustained.

17   BY MR. SINGER:

18   Q.  Did your staff members in any way indicate that they -- did

19   your staff members indicate whether they agreed or disagreed

20   with your assessment?

21   A.  Yes.

22   Q.  What did they indicate?

23   A.  I had staff members that would tell me on a regular basis

24   that the patient --

25           MR. WAX:  Objection, hearsay.

 1            THE COURT:  Yes.

 2            MR. SINGER:  I will move on, Your Honor.

 3            THE COURT:  There is no predicate.  Go ahead.

 4  BY MR. SINGER:

 5  Q.  How long would patients be in the ATC Partial

 6  Hospitalization Program for?

 7  A.  An average of eight weeks.

 8  Q.  Would the patients then be discharged?

 9  A.  Yes.

10  Q.  Were there occasions when the patients would come back

11  later?

12  A.  Yes.

13  Q.  Did you notice any type of a cycle or pattern with the

14  patients' treatment?

15  A.  Yes.

16  Q.  Can you describe that to the jury.

17  A.  I would hear periodically from --

18            MR. WAX:  Objection, hearsay.

19            THE COURT:  Don't tell us what people told you.  He

20  asked you what you saw that indicated to you some sort of

21  pattern about return.  Tell the jury, in your own words,

22  without relating gossip or what somebody else told you.

23            THE WITNESS:  I noticed that patients would be coming

24  back to the center on a very cyclical basis.

25  BY MR. SINGER:

1   Q.   What was the cycle that you are talking about?

2   A.   They would be coming back about every three months.

3   Q.   Was that something, for example, that you would see in the

4   charts of patients?

5          Did you have an opportunity to review the medical

6   charts of the patients?

7   A.   Yes.

8   Q.   Was it indicated in the charts when they would be

9   discharged and when they would come back?

10          THE COURT:  Let me interrupt, in your own words, tell

11   the jury what it was that you noticed or saw that indicated a

12   cyclical return.  What did you see, if anything?

13          THE WITNESS:  I would see multiple charts.

14   BY THE COURT:

15   Q.   What would you see on the charts when you looked at them?

16   A.   Each chart would have the same paperwork that you have to

17   have for each admission.  So a patient would come in and they

18   would get the whole paperwork setting that I was talking about

19   before.  They would be discharged, come back, and you would see

20   a chart with the same paperwork again.

21          THE COURT:  Thank you.  That wasn't so hard.

22          MR. SINGER:  Thank you.

23   BY MR. SINGER:

24   Q.   Were you aware of any therapeutic reason that there would

25   be a cycle that the patients would be following in terms of

1  their treatment?

2  A.  No.

3  Q.  Can you explain to the jury why you wouldn't expect to see

4  that, a therapeutic reason for that?

5  A.  Mental illness is not cyclical.  Just like having the flu

6  is not cyclical.

7  Q.  Were there ever conversations, for example, during the

8  conference calls that you had, about why patients would be

9  brought back into the ATC?

10  A.  Yes, to have a high census to bill Medicare.

11  Q.  Was Ms. Negron on those calls when those conversations took

12  place?

13  A.  Yes.

14  Q.  Now, you said that you were a Program Director at the

15  Homestead location; is that correct?

16  A.  Yes.

17  Q.  If you believed that the patients did not need treatment,

18  did you do anything about it?

19  A.  I did.

20  Q.  What did you do?

21  A.  I started to discharge patients.

22  Q.  And did you also communicate the fact that you wanted to

23  discharge patients to ATC's management?

24  A.  I did.

25  Q.  Do you know who Amy Lynn Graham is?

POTEET - Direct

1    A.   Yes.

2    Q.   Who is she?

3    A.   She was the Senior Therapist at ATC at the Homestead

4    location.

5    Q.   Did you work with her during this time period?

6    A.   Yes.

7             MR. SINGER:  Your Honor, may I approach the witness?

8             THE COURT:  Yes.

9    BY MR. SINGER:

10   Q.   I want to show you what has been marked as Government's

11   Exhibit 102.  Do you recognize that document?

12   A.   Yes.

13   Q.   What is it?

14   A.   It is an e-mail that I received while I was working as the

15   Director at Homestead.

16   Q.   Does this e-mail reflect the type of discharge of patients

17   that you were just discussing?

18   A.   Yes.

19   Q.   Who is the e-mail sent to?

20   A.   The e-mail was sent to Ms. Valera, CC'ing myself as well as

21   Ms. Negron.

22   Q.   Does the e-mail discuss -- what is the substance of the

23   e-mail?

24            MR. WAX:  I am going to object to the substance of the

25   e-mail being discussed.  It is not in evidence.

1          MR. SINGER:  I move to admit it into evidence at this

2   time.

3          MR. WAX:  I object to this being admitted.  There is

4   no predicate.

5          THE COURT:  Lay a proper predicate.  It's sustained.

6          MR. WAX:  I also have a Sixth Amendment objection to

7   the introduction of this document pursuant to Crawford v.

8   Washington.

9          THE COURT:  The simple thing, without getting into

10  multiple objections, there is no predicate laid.

11         You handed her a document, and I am not even sure if

12  she received it or sent it or is reading it because you handed

13  it to her.  I don't know what the document is.  Establish some

14  predicate for it, and then we will see if there is further

15  objection.

16  BY MR. SINGER:

17  Q.  Ms. Poteet, do you recall receiving this e-mail while you

18  were employed at ATC?

19  A.  Yes.

20  Q.  Do you know the person who sent it to you?

21  A.  Yes.

22  Q.  Do you recall the substance of the actual e-mail?

23         THE COURT:  Who sent it?  Who sent it?  Santa Claus

24  sent it?

25         THE WITNESS:  Amy Graham sent it.

POTEET - Direct

1  BY THE COURT:

2  Q.  Who is Amy Graham?

3  A.  She was the Senior Therapist at the Homestead location.

4  Q.  What is her connection with you?

5  A.  I supervised her, and we shared an office.

6  Q.  Routinely, was it proper for you to communicate back and

7  forth between you and Amy Graham?

8  A.  Yes, I instructed her to do that.

9  Q.  You were her supervisor?

10  A.  Yes.

11  Q.  Was this done in the normal course of business with you and

12  Amy, that you had correspondence about patients?

13  A.  Yes.

14  Q.  Is this one of those normal procedures that you sent back

15  and forth?

16  A.  Yes.

17          THE COURT:  You are offering it into evidence.

18          Is there an objection, Mr. Wax?

19          MR. WAX:  Yes, Your Honor.  The objection is a Sixth

20  Amendment objection.

21          THE COURT:  Ladies and gentlemen, let me take this up

22  with counsel.  If you will step into the jury room briefly.

23  Thank you.

24              [The jury leaves the courtroom].

25          THE COURT:  What is your specific objection?

 1          MR. WAX:  There are two, and I believe the government

 2   is going to try to introduce a second e-mail.  It would be the

 3   same objection.

 4          THE COURT:  This one is 102.  For the record, I like

 5   to know what we are talking about.  102 and there may be

 6   another one?

 7          MR. WAX:  103.

 8          THE COURT:  State your objection, please.

 9          MR. WAX:  With respect to Exhibit 102, which is in

10   front of you, we object to the introduction of this document

11   pursuant to Crawford v. Washington and the Sixth Ammendment of

12   the United States Constitution.

13          This purports to be an e-mail from Amy Lynn Graham, an

14   individual who will not be testifying in this case, to my

15   understanding.  We do not have an opportunity to confront

16   Ms. Graham with respect to the contents of this e-mail.

17          Additionally, it has not been shown to the Court yet

18   that Ms. Graham was in any way a participant in the conspiracy

19   which has been charged or had knowledge of the conspiracy.

20          Finally, Your Honor, you will note that this is just

21   an e-mail that is dated August 13th, 2007.  Down in the lower

22   left corner is a date of August 27th, 2007.  This document was

23   not obtained, to my knowledge, from the servers from American

24   Therapeutic Corporation or any documents that they stored as

25   business records, which would render it inadmissible under any

 1   theory of a business records exception, or that it was

 2   maintained by American Therapeutic in the normal course of

 3   business.  Simply put, I don't know where this document came

 4   from.

 5            THE COURT:  Mr. Singer?

 6            MR. SINGER:  Yes, Your Honor, I will try to address

 7   each of those points.

 8            First of all, the Crawford point.  As you know,

 9   Crawford does not permit testimonial evidence.  This e-mail is

10   not testimonial in nature.

11            THE COURT:  You are offering it not just for the fact

12   that she got e-mails.  You are offering it for what is written

13   in the e-mail, which is to create the evidence in the record

14   that this particular patient was having these particular

15   problems.

16            You don't care to establish that Amy and this lady

17   exchanged e-mails.  The purpose is what is written in the

18   e-mail.  That's testimonial.  Why don't you simply call the

19   lady that wrote, that saw it, that can testify about it, so she

20   can be cross-examined, if it's important to get it into

21   evidence.

22            The reason why we have the Sixth Amendment prohibition

23   is that anybody can send an e-mail to anybody about anything.

24            Make a silly example, some notorious drug dealer in

25   Colombia could send you an e-mail this afternoon that said,

POTEET - Direct

1  "What did you do with the ham sandwich that I gave you the

2  other day?"  That would make you look very bad as a prosecutor.

3        If you want testimony about this patient, bring

4  somebody that knows something about it.  There may be other

5  people that know about it.

6        On this basis, it's clearly getting evidence into the

7  record that there is no opportunity to cross-examine.  I have

8  no choice.  Sustained.

9        It will be marked for identification.  It may be

10 offered later, if you can lay a proper predicate through

11 somebody that wrote it, or through some other business record,

12 or some other exception that has not been established at this

13 point.  Sustained.

14        Bring in the jury.

15     [Government Exhibit 102 marked for identification].

16        [The jury returns to the courtroom at 4:12 p.m.]

17        THE COURT:  Thank you.  Be seated.

18        Mr. Singer?

19 BY MR. SINGER:

20 Q.  When we left off you were testifying about discharging

21 patients.  What occurred when you started discharging patients?

22 A.  I was instructed that I shouldn't be discharging patients,

23 and I was terminated.

24 Q.  Who did that instruction come from?

25 A.  It came from all three of management at different times;

1   Ms. Valera, Ms. Negron, and Mr. Duran.

2   Q.   And you said you were terminated from ATC?

3   A.   Correct.

4   Q.   After you were terminated, did you threaten litigation

5   against ATC?

6   A.   Yes.

7   Q.   Can you briefly describe that.

8   A.   I hired an attorney to sue them based upon the

9   Whistleblower Act.  I wanted it documented, formally

10  documented, what was going on.

11  Q.   What was the result of your dispute, your employment

12  dispute, with ATC?

13  A.   We went to mediation, and I was awarded $75,000.

14  Q.   Earlier you mentioned that each patient at ATC was supposed

15  to receive an initial assessment from a psychiatrist; is that

16  correct?

17  A.   Correct.

18  Q.   When, during the treatment, would that occur?  When was it

19  supposed to occur?

20  A.   In the beginning when the patient would come in for

21  treatment, in the first few days.

22  Q.   Based on the medical charts that you reviewed, was that

23  reflected in each of the patient charts?

24  A.   Yes.

25  Q.   Who was the psychiatrist who worked at the Homestead

1    facility?

2    A.   Doctor Ayala.

3    Q.   While you were the Director of the Homestead facility, how

4    many days a week were you at the facility?

5    A.   Five days a week.

6    Q.   What days?

7    A.   Monday through Friday.

8    Q.   While you worked at Homestead, did you observe Doctor Ayala

9    actually performing initial assessments of patients?

10   A.   Yes, a few.

11   Q.   Approximately what percentage of patients did you observe

12   him assessing?

13   A.   Maybe ten to fifteen percent of patients.

14   Q.   Based on the medical charts that you observed, what

15   percentage of patients did he assess?

16   A.   One hundred.

17   Q.   Did you ever either see a patient -- strike that.

18        Did you ever find in a chart that he did not qualify a

19   patient for partial hospitalization treatment?

20   A.   No.

21   Q.   What did you see Doctor Ayala doing at the Homestead

22   facility?

23   A.   The majority of his time would be spent signing paperwork.

24   Q.   Explain to the jury how that signing process would work.

25   A.   He would come into the office, into what we call the chart

1  room, which is where all the charts are located.  I would have

2  a stack of paperwork ready for him, and it had little tabs on

3  where he needed to sign.  He would sit down with a pen, and I

4  would quickly flip through the papers and he would sign and

5  just continue to sign the papers as I flipped through them.

6  Q.  Were you able to tell whether he was reviewing the files

7  that he was signing?

8  A.  He was not.

9  Q.  What type of paperwork was he signing?

10  A.  Psychiatric evaluations, treatment plans, discharge

11  summaries.  I think that's about it.

12  Q.  For each of that paperwork that he was signing, did you

13  discuss those patients with Doctor Ayala?

14  A.  No.

15  Q.  Was Ms. Negron ever present for these signing sessions?

16  A.  Yes.

17  Q.  What was she doing during the signing sessions?

18  A.  She and Doctor Ayala would just be talking about things

19  outside of work.

20  Q.  Things of a personal nature?

21  A.  Correct.

22  Q.  Are you familiar with someone named Roger who worked at

23  ATC?

24  A.  Yes.

25  Q.  Who was Roger?

1  A.  He was the physician's assistant.

2  Q.  What was he supposed to be doing at the Homestead facility?

3  A.  He would meet with the patients on a regular basis to see

4  how they are doing and see if maybe they needed a change in

5  medication.

6  Q.  Were you able to observe how often Roger would actually

7  meet -- how many patients he would meet with in a given week

8  while you were there?

9  A.  Yes.

10  Q.  Approximately how many patients would he meet with?

11  A.  Again, maybe ten to fifteen percent, if that.

12  Q.  When you say ten to fifteen percent, ten to fifteen percent

13  of what?

14  A.  Anywhere from seventy-five to a hundred patients.

15  Q.  Did you have an opportunity to see the paperwork that was

16  generated by Roger reflecting supposed visits?

17  A.  Yes.

18  Q.  How did you come to review that paperwork?

19  A.  It was part of my responsibility to review his dictation.

20  Q.  Did the notes that you saw, or the paperwork that you saw,

21  correspond with the visits that you observed Roger actually

22  performing?

23  A.  No.

24  Q.  Can you explain that to the jury.

25  A.  That's how I realized he wasn't seeing patients as often as

Poteet - Cross

1  he was supposed to, or if at all.  I recognized that he was

2  billing for patients that were not at the center or on days

3  that he wasn't even at the center.

4  Q.  Was it your understanding that these additional visits that

5  were reflected in the paperwork were ones that were being

6  billed to Medicare?

7  A.  Yes.

8  Q.  Did you confront Roger about this?

9  A.  Yes.

10 Q.  Was Ms. Negron present during that conversation?

11 A.  Yes.

12 Q.  What did you tell Roger?

13 A.  I explained to him that, as the Director of Homestead, I

14 would in no way accept that type of behavior.  It was illegal,

15 and if he was there to see patients, he needed to see patients

16 as he was supposed to.

17 Q.  What was Ms. Negron's reaction?

18 A.  Nothing.

19 Q.  Did this problem get fixed?

20 A.  No.

21        MR. SINGER:  No further questions, Your Honor.

22        THE COURT:  Mr. Wax, cross-examination.

23                    CROSS EXAMINATION

24 BY MR. WAX:

25 Q.  Good afternoon, Ms. Poteet.  My name is Barry Wax.  I

Poteet - Cross

1  represent Ms. Negron.  You and I have never met before, have
2  we?
3  A.  No.
4  Q.  We have never discussed your testimony before, have we?
5  A.  No.
6  Q.  You have, however, met with members of the United States
7  government prosecution team, haven't you?
8  A.  Yes.
9  Q.  In fact, you met with members of the Department of Justice
10 as early as January of 2010; is that correct?
11 A.  Yes, sir.
12 Q.  At that time, you met, I believe, with an attorney, a
13 Department of Justice attorney, Vanessa Reed; is that correct?
14 A.  No.
15 Q.  Do you remember meeting with an investigator by the name of
16 Ken Bailey?
17 A.  Yes.
18 Q.  You also met with the government on November 24th of 2010;
19 is that correct?
20 A.  Yes.
21 Q.  Most recently, you met with the government on August 5th,
22 2011, just about a week ago, correct?
23 A.  Correct.
24 Q.  During that time, of course, you met with Mr. Singer,
25 correct?

1    A.  Yes.

2    Q.  And Agent Lapp?

3    A.  Yes.

4    Q.  And Ms. Saulino?

5    A.  Yes.

6    Q.  You have had the opportunity to discuss your testimony with

7    them as well, correct?

8    A.  Yes.

9    Q.  Now, you were originally hired by American Therapeutic

10   Corporation on August 9th of 2007, correct?

11   A.  I remember it was --

12   Q.  I'm sorry, April 9th, 2007, right?

13   A.  I remember it being April of 2007.

14   Q.  At that time, you filled out an application as a Program

15   Therapist, correct?

16   A.  I can't recall.

17   Q.  At that time, you were not working, correct?

18   A.  Correct.

19   Q.  As you indicated, on your direct examination, you had been

20   working at the Children's Home Center, right?

21   A.  Children's Home Society.

22   Q.  And when you were working at the Children's Home Society,

23   you had applied for a position there as the Assistant Director,

24   didn't you?

25   A.  No.

1  Q.  You didn't do that?

2  A.  No, I did not.

3  Q.  When you met with the government on January 29th, 2010,

4  didn't you, in fact, tell them that you had turned down a

5  promotion?  I'm sorry, that you had turned down a promotion.  I

6  take it back.

7  A.  Correct.

8  Q.  You had been offered a promotion at the Children's Home

9  Society as Assistant Director?

10  A.  Correct.

11  Q.  And you turned that down?

12  A.  Correct.

13  Q.  You had been working there, at the time, for about three

14  years, correct?

15  A.  Yes.

16  Q.  When you applied as a Program Therapist at American

17  Therapeutic Corporation, and you filled out the application,

18  you submitted along with that some letters of recommendation,

19  didn't you?

20  A.  I don't remember.

21  Q.  Do you remember submitting a letter of recommendation from

22  a woman you knew by the name of Michelle Vecchio [phonetic]?

23  A.  Yes.

24  Q.  And you interviewed at American Therapeutic Corporation,

25  correct?

Poteet - Cross

1    A.   Yes.

2    Q.   You interviewed at that Miami office, didn't you?

3    A.   No.

4    Q.   Where did you interview?

5    A.   Fort Lauderdale.

6    Q.   You were hired for that job, weren't you?

7    A.   Yes.

8    Q.   Your starting salary for that job was $52,000 a year,

9    wasn't it?

10   A.   It was around that.  I can't remember exactly.

11   Q.   Is there anything that can refresh your recollection?

12   A.   No.

13   Q.   You said you think it was around $50,000?

14   A.   Yes.

15   Q.   As a Program Therapist, there was a job description that

16   went along with that, wasn't there?

17   A.   You mean that I was given?

18   Q.   Yes, I mean a job description that laid out what your job

19   responsibilities were as a Program Therapist.

20   A.   Ms. Coley went over that with me in the interview.

21   Q.   It was a written document, wasn't it?

22   A.   I don't remember that.

23            MR. WAX:  May I approach, Your Honor?

24            THE COURT:  Yes.

25   BY MR. WAX:

Poteet - Cross

1   Q.  I am showing you a copy of what has been marked for

2   identification as Defendant's Exhibit CC.  Do you recognize

3   that document?

4   A.  I don't remember it.

5   Q.  Could you take a look through it, please.

6          Do you see your signature anywhere on that document?

7   A.  Yes.

8   Q.  Where do you see your signature?

9   A.  At the end of the job description.

10  Q.  Is that your signature?

11  A.  Yes.

12  Q.  Is there a date on that document?

13  A.  Yes.

14  Q.  What's the date?

15  A.  April 9th, 2007.

16  Q.  Do you now recognize that document?

17  A.  No, but I recognize my signature.

18          MR. WAX:  Your Honor, I move Defendant's Exhibit CC

19  into evidence.

20          MR. SINGER:  No objection.

21          THE COURT:  Defendant's CC is admitted into evidence.

22          [Defense Exhibit CC received in evidence].

23  BY MR. WAX:

24  Q.  This document is a job description of a Program Therapist,

25  isn't it?

Poteet - Cross

1    A.   Yes.

2    Q.   It indicates that you signed that job description on April

3    9th of 2007, correct?

4    A.   Yes.

5    Q.   On April 9th, 2007, you said, in signing it, "I have read

6    and been oriented to this job description.  My signature

7    attests to the fact that I understand my job responsibilities

8    as stated therein," correct?

9    A.   Correct.

10   Q.   That had many different things on it, right?  Job

11   relationships, for instance.  It indicated that you were

12   responsible to the Senior Therapist, correct?

13   A.   Yes.

14   Q.   To the Program Director, correct?

15   A.   Yes.

16   Q.   And to the Assistant Program Director, correct?

17   A.   We didn't have an Assistant Program Director.

18   Q.   It indicated that you did not supervise any individuals,

19   correct?

20   A.   Correct.

21   Q.   It went on to talk about all of the qualifications that you

22   have to have, the responsibilities, the duties, and standards

23   of performance, correct?

24   A.   Yes.

25   Q.   You took a training program, didn't you, when you were

84

Poteet - Cross

1  hired as a Program Therapist?

2  A.  Yes.

3  Q.  It was a week-long training program, I believe, wasn't it?

4  A.  Yes.

5  Q.  There was an orientation period, wasn't there?

6  A.  Yes.

7  Q.  It took you through, for instance, what a typical day would

8  be as a Program Therapist at American Therapeutic Corporation,

9  correct?

10  A.  Yes.

11  Q.  You would see that the first thing that was done in the

12  morning was what was called a "flash meeting," correct?

13  A.  Yes.

14  Q.  What was a "flash meeting?"  Tell the jury.

15  A.  A flash meeting lasted a few minutes to talk about anything

16  that management needed to bring to our attention for day-to-day

17  activities.

18  Q.  Patient issues?

19  A.  Sometimes.

20  Q.  Your orientation continued with training on how to complete

21  a file, correct?

22  A.  I can't remember.

23  Q.  Do you recall being trained by a woman by the name of

24  Jackie Arias?

25  A.  Yes.

Poteet - Cross

1  Q.  Who was Jackie Arias?

2  A.  She worked in Human Resources.

3  Q.  Excuse me?

4  A.  She worked in Human Resources.

5  Q.  Do you recall being trained by another licensed mental

6  health counselor by the name of Isabel Solaire [phonetic]?

7  A.  Yes.

8  Q.  She trained you on clinical orientation, correct?

9  A.  What do you mean by "clinical orientation?"

10 Q.  How things ran around the particular clinic.

11 A.  Yes.

12 Q.  That training, as we indicated, took place for

13 approximately a week, correct?

14 A.  Yes.

15 Q.  Then you began running groups?

16 A.  Yes.

17 Q.  Now, your job as a Program Therapist was demanding, wasn't

18 it?

19 A.  Yes.

20 Q.  You are running four groups a day, correct?

21 A.  Not always, no.

22 Q.  Monday through Friday?

23 A.  Yes.

24 Q.  And I believe you testified, on direct examination, that

25 there would be somewhere in the neighborhood of fifteen to

Poteet - Cross

1 twenty people in each group?

2 A.  Ten to twenty.

3 Q.  Ten to twenty people in each group?

4 A.  Yes.

5 Q.  Every day, you would have to complete a progress note for

6 every patient, correct?

7 A.  For every group for every patient, yes.

8 Q.  On the low end, if you have got people in every group, and

9 you're running four groups a day, you have to do forty progress

10 notes a day, don't you?

11 A.  If that was how many groups we were running a day.

12 Q.  If there were three groups a day, and you had fifteen

13 people in each group, you would have to do forty-five notes a

14 day?

15 A.  Correct.

16 Q.  These notes were due within twenty-four hours, weren't

17 they?

18 A.  I can't remember.

19 Q.  The idea was to get them done and turn them in, wasn't it?

20 A.  Yes.

21 Q.  Because if you didn't, you would just get backed up because

22 you'd have the next day and you'd have all those new notes to

23 do, wouldn't you?

24 A.  Yes.

25 Q.  You did complete your progress notes, didn't you?

Poteet - Cross

1   A.   Yes.

2   Q.   You would sit down at the computer, right?

3   A.   Yes.

4   Q.   ATC provided you with a computer, didn't they?

5   A.   Yes.

6   Q.   And a password, right?

7   A.   Yes.

8   Q.   And a log-in?

9   A.   Yes.

10  Q.   You would sit there and you would type your progress notes

11  into the computer, correct?

12  A.   Correct.

13  Q.   You would print those progress notes out when you were

14  done, correct?

15  A.   Yes.

16  Q.   Because you had to sign them, right?

17  A.   Yes.

18  Q.   You would sign those progress notes, wouldn't you?

19  A.   Yes.

20  Q.   They were in your own words, weren't they?

21  A.   Yes.

22  Q.   You would put them in an in-box so they could be sent to

23  medical records, correct?

24  A.   Yes.

25  Q.   That was a very demanding part of your job, wasn't it, to

1   get those progress notes done?

2   A.   Everything in the mental health field is demanding.

3   Q.   That's very true.  It really is.

4          You had indicated earlier that you were promoted at

5   American Therapeutic Corporation, weren't you?

6   A.   Yes.

7   Q.   You rose through the ranks pretty quickly, didn't you?

8   A.   Yes.

9   Q.   You were hired April 9th as a Program Therapist, correct?

10  A.   Yes.

11  Q.   Then there was an opening as a Program Director in

12  Homestead, wasn't there?

13  A.   Yes.

14  Q.   Although you were working at the Fort Lauderdale location,

15  you applied to be the Program Director at Homestead?

16  A.   Yes.

17  Q.   Now, you had spoken about all of the things that you

18  observed going on in Fort Lauderdale in your direct examination

19  in response to Mr. Singer's questions.  You were present on

20  conference calls, correct?

21  A.   Not when I was in Ft. Lauderdale.

22  Q.   So when you testified on direct examination about that, you

23  were referring to Homestead?

24  A.   Yes.

25  Q.   Everything that you testified to, with respect to the

Poteet - Cross

1  conversations that you had with Nichole Eckert, for instance,

2  took place in Fort Lauderdale or Homestead?

3  A.  Fort Lauderdale.

4  Q.  Which was from April of 2007 until June of 2007, correct?

5  A.  Yes.

6  Q.  Approximately two months, two and a half months of time?

7  A.  Yes.

8  Q.  Notwithstanding all of the things that you testified to on

9  direct examination, you applied to be a Program Director in

10 Homestead for a promotion, correct?

11 A.  Yes.

12 Q.  You submitted an application for that position, didn't you?

13 A.  I don't remember.

14 Q.  You don't remember submitting an application for the

15 position?

16 A.  No.

17 Q.  In any event, you got hired for the position, didn't you?

18 A.  Yes.

19 Q.  You got hired on June 1st of 2007, didn't you?

20 A.  I know it was in June of 2007.

21 Q.  I am showing you what has been marked for identification as

22 Defendant's Exhibit DD.

23        MR. WAX:  Your Honor, I am going to move to admit

24 Defendant's Exhibit DD into evidence.  I believe there is no

25 objection.

Poteet - Cross

1          MR. SINGER:  No objection, Your Honor.

2          THE COURT:  Exhibit DD for the defense is admitted

3     into evidence.

4          [Defense Exhibit DD received in evidence].

5     BY MR. WAX:

6     Q.  Ms. Poteet, Exhibit DD is a letter from American

7     Therapeutic Corporation to you, correct?

8     A.  Yes.

9     Q.  That letter congratulates you on being hired as a Program

10    Director, correct?

11    A.  Yes.

12    Q.  Can you see that?  That letter indicates that you were

13    hired on June 1st, 2007, correct?

14    A.  No, that's just the date of the letter.

15    Q.  It indicates that your position will start on June 18th,

16    2007, correct?

17    A.  Yes.

18    Q.  It indicates that your starting salary will be $70,000,

19    correct?

20    A.  Yes.

21    Q.  That was a raise over what you were making before, wasn't

22    it?

23    A.  Yes.

24    Q.  It was approximately a $20,000 raise over what you were

25    making before?

1   A.   Yes.

2   Q.   Likewise, there was a job description for Program Director,

3   wasn't there, much the same as the description for Program

4   Therapist.

5   A.   I don't remember.

6   Q.   I am showing you what has been marked for identification as

7   Defendant's Exhibit EE.  Do you recognize that?

8   A.   Yes.

9   Q.   What is that?

10  A.   The job description for Program Director.

11  Q.   Do you see your signature on that document?

12  A.   Yes, sir.

13  Q.   Is it dated?

14  A.   Yes.

15  Q.   Is that your signature?

16  A.   Yes.

17        MR. WAX:  Your Honor, I move Defendant's Exhibit EE

18  into evidence.

19        MR. SINGER:  No objection.

20        THE COURT:  Defendant's Exhibit EE is admitted into

21  evidence.

22        [Defense Exhibit EE received in evidence].

23  BY MR. WAX:

24  Q.   Now, this also had the description.  Unlike the Program

25  Therapist, you were now responsible to the Corporate Director

Poteet - Cross

1    of Operations, correct?

2    A.   I don't remember.

3    Q.   Well, why don't we put it up here.  Do you see that first

4    line?  Job relationships, responsible to Corporate Director of

5    Operations.

6    A.   Yes.

7    Q.   It also says, "Responsible to Corporate Director of

8    Clinical Services," correct?

9    A.   Yes.

10   Q.   And President CEO, correct?

11   A.   Yes.

12   Q.   Below that, it now has individuals who were supervised by

13   you, correct?

14   A.   Yes.

15   Q.   Now, as the Program Director, you are supervising the

16   Assistant Program Director, if there is one that exists,

17   correct?

18   A.   We didn't have one, but yeah.

19   Q.   Senior Therapist, correct?

20   A.   Yes.

21   Q.   Program Nurses, correct?

22   A.   Yes.

23   Q.   Operations Coordinator, correct?

24   A.   Yes.

25   Q.   And you took this responsibility on July 2nd of 2007,

Poteet - Cross

1  correct?

2  A.   No, that's when I signed the form.

3  Q.   Because your job started June 18th, correct?

4  A.   Correct.

5  Q.   On July 2nd, you acknowledged that you had read and been

6  oriented to the job description, and your signature attests to

7  the fact that you understand your responsibilities as stated

8  therein, correct?

9  A.   Yes.

10  Q.   So now, since one of the people who you were responsible to

11  was the Corporate Director of Operations, you had direct

12  contact with Judith Negron, correct?

13  A.   Yes.

14  Q.   Because she was the Director of Operations, correct?

15  A.   I don't remember.

16  Q.   In August of 2007, you missed some time from work, didn't

17  you?

18  A.   Yes.

19  Q.   Unfortunately, your mother was ill, wasn't she?

20  A.   Correct.

21  Q.   You had to travel outside of South Florida for about two

22  weeks, didn't you?

23  A.   Yes.

24  Q.   Prior to the time that you traveled outside of South

25  Florida, you communicated this, of course, to Judith Negron,

Poteet - Cross

1  right?

2  A.   Yes.

3  Q.   She told you that they would fill in for you, right?

4  A.   I don't remember the conversation.

5  Q.   I am showing you what has been marked for identification as

6  Defendant's Exhibit FF.  I'll just ask you to take a look at

7  that and see if that refreshes your recollection.

8  A.   Yes.

9       [Defense Exhibit FF marked for identification].

10  BY MR. WAX:

11  Q.   Did you communicate with Judith Negron about taking time

12  off?

13  A.   Yes, sir.

14  Q.   Did they accommodate your need to take time off?

15  A.   Yes.

16  Q.   You were told that Marianella Valera would come to your

17  center and assume your duties, correct?

18  A.   Yes.

19  Q.   And that after hours, in case anything came up, that you

20  should forward the phones to Judith Negron, correct?

21  A.   Correct.

22  Q.   You were away, I believe at that time, for approximately

23  two weeks, was it?

24  A.   Yes, sir.

25  Q.   Now, in August of 2007, Judith Negron communicated to you

1  some issues that were taking place in Homestead that she was

2  concerned about; isn't that correct?

3  A.  I don't remember that.

4  Q.  Do you remember receiving communications from Judith Negron

5  that charts were pending that needed to be prepared?

6  A.  No.

7  Q.  Do you remember getting any sort of communication that

8  charts had to be created within twenty-four hours of admission

9  for an individual patient, and it wasn't being done?

10  A.  I don't remember that.

11  Q.  If charts weren't being created, wouldn't that be your

12  responsibility?

13  A.  No.

14  Q.  As the Program Director in charge of Homestead, it wouldn't

15  be your responsibility to oversee the individuals, the Program

16  Therapists, the medical records people at Homestead, who had to

17  prepare those documents?

18  A.  To oversee those people, but not to do it myself.

19  Q.  No one said to do it yourself.  As the Program Director, a

20  concern like that would be something that you would be expected

21  to handle, correct?

22  A.  Correct.

23  Q.  Do you remember it being communicated to you by Judith

24  Negron that proper medication information was pending for

25  clients and wasn't being included in the charts?

1  A.  No.

2  Q.  Would that be something that, as the Program Director,

3  would be your responsibility?

4  A.  Yes.

5  Q.  Do you remember being told by Judith Negron that filing of

6  documentation was inaccurate, in that notes were in the wrong

7  sequence or being filed inappropriately, that signatures were

8  not identified, and matters such as that?

9        MR. SINGER:  Objection, hearsay, calls for hearsay.

10  Counsel is testifying.

11        THE COURT:  The defendant is the one that is the

12  speaker under this.  She was asked what Judith Negron told her.

13  Overruled.

14        You may answer the question.

15        THE WITNESS:  Can you repeat the question?

16        MR. WAX:  I will in a moment.

17  BY MR. WAX:

18  Q.  I am showing you what has been marked for identification as

19  Defendant's Exhibit GG.  Would you take a moment and look at

20  that.

21  A.  Okay.

22        [Defense Exhibit GG marked for identification].

23  BY MR. WAX:

24  Q.  Do you recognize that e-mail?

25  A.  No.

Poteet - Cross

1   Q.  What's the date on that e-mail?

2   A.  August 23rd, 2007.

3   Q.  Who wrote it?

4        MR. SINGER:  Objection, Your Honor, she just testified

5   she doesn't recognize it.

6        THE COURT:  Sustained, I suppose, about the contents

7   at this point.

8        MR. WAX:  I am just considering it, Your Honor.

9   BY MR. WAX:

10  Q.  Does that document refresh your recollection as to any

11  concerns which Judith Negron may have brought to your attention

12  about the Homestead facility, in August of 2007, after you

13  returned from being away to take care of your mother?

14  A.  No.

15       THE COURT:  That last answer was in reference to

16  Defendant's Exhibit GG for identification, so the record is

17  clear.

18  BY MR. WAX:

19  Q.  Now, Ms. Poteet, you indicated that Ms. Negron would be at

20  your facility relatively regularly, correct?

21  A.  In the beginning, yes.

22  Q.  Isn't it a fact that there was a concern about people

23  leaving early and not staying throughout the day?

24  A.  People, who?  I don't know who you are referring to.

25  Q.  You were going to school at the same time, weren't you, or

1  teaching school, one or the other?

2  A.  Yes.

3  Q.  There was a time when you had to leave early because you

4  had school obligations, correct?

5  A.  Yes.

6  Q.  This was a matter that was addressed between you and

7  Ms. Negron, correct, whether you left early and the reasons you

8  left early?

9  A.  Yes.

10  Q.  That was something that would be between you, as the

11  Program Director, and Ms. Negron, as the Director of

12  Operations, correct?

13  A.  Yes.

14  Q.  It would also involve other individuals under your

15  supervision who might be leaving early, correct?

16  A.  Yes.

17  Q.  In, I believe it was, August of 2007, you applied for jobs

18  outside of the State of Florida, didn't you?

19  A.  Yes.

20  Q.  You applied for jobs in Georgia, correct?

21  A.  Yes.

22  Q.  You applied for jobs in Arizona, correct?

23  A.  Yes.

24  Q.  One of the jobs you applied for in Georgia was with the

25  State of Georgia, correct?

1  A.  Yes.

2  Q.  As a Regional Manager, wasn't it?

3  A.  Yes.

4  Q.  By the way, you spoke about Amy Graham on direct

5  examination.  Who was Amy Graham?

6  A.  She was the Senior Therapist at the Homestead location.

7  Q.  So, as the Program Director, you supervised Amy Graham,

8  correct?

9  A.  Yes.

10  Q.  When you applied for your job with the State of Georgia,

11  you were, at the time, the Program Director for Homestead,

12  weren't you?

13  A.  Yes, sir.

14  Q.  And Amy Graham was the Senior Therapist, who you

15  supervised, right?

16  A.  Correct.

17  Q.  Isn't it a fact that in your application for employment

18  with the State of Georgia, you indicated that your supervisor's

19  name was Amy Graham?

20  A.  Absolutely.

21  Q.  You submitted that to the State of Georgia for employment,

22  correct?

23  A.  Yes, I did.

24  Q.  That was not true, was it?

25  A.  That was not true.

Poteet - Cross

1  Q.  Shortly thereafter, you were fired American Therapeutic

2  Corporation, weren't you?

3  A.  Correct.

4  Q.  I believe the date that you were fired was September 4th,

5  2007, wasn't it?

6  A.  I don't remember the exact date, but the beginning of

7  September, yes.

8  Q.  So you started at Homestead as the Program Director on June

9  18th, 2007, correct?

10  A.  Yes.

11  Q.  And you were gone for two weeks in August, correct?

12  A.  Yes.

13  Q.  You were fired on September 4th, correct?

14  A.  Yes.

15  Q.  That means that you were the Program Director at Homestead

16  for -- let's see, June 18th, July 18th, August 18th, beginning

17  of September, about two and a half months, right?

18  A.  Yes.

19  Q.  During those two and a half months, you were gone about two

20  weeks; is that fair?

21  A.  Yes.

22  Q.  On direct examination, you testified that when you were in

23  Homestead the patients were returning and cycling through the

24  program every three months, correct, that was your testimony to

25  the jury, wasn't it?

Poteet - Cross

1   A.   That's what I saw when I was in Fort Lauderdale.

2   Q.   You didn't say, on direct examination in response to

3   Mr. Singer's questions, about the Homestead patients being

4   geriatric, not needing partial hospitalization, and that later

5   those patients would return and cycle through the program every

6   three months?  You were talking about Fort Lauderdale?

7   A.   Actually, it happened at both locations.

8   Q.   Let me see.  You were in Fort Lauderdale from April 9th to

9   June 18th, right?

10  A.   That's right.

11  Q.   April, May, and half of June, two and a half months?

12  A.   Correct.

13  Q.   But you are telling this jury that the patients cycled

14  every three months.  You weren't even there for three months?

15  A.   The patients didn't start the first day that I started.

16  Q.   So in Homestead, you were there two and a half months?

17  A.   Correct.

18  Q.   Patients were cycling every three months, even though you

19  weren't there three months?

20  A.   Correct, they didn't start the same day I started there

21  either.

22  Q.   You testified on direct examination that you hired an

23  attorney after you were fired.

24  A.   Yes.

25  Q.   In fact, you hired Deutsch Rotbart & Associates, didn't

Poteet - Cross

1  you?

2  A.  Yes.

3  Q.  You hired an attorney by the name of Erika Deutsch Rotbart,

4  correct?

5  A.  Yes.

6  Q.  Ms. Deutsch Rotbart notified American Therapeutic

7  Corporation of your intention to file a lawsuit, correct?

8  A.  Correct.

9  Q.  You didn't actually file a lawsuit, correct?

10  A.  Did I actually file a lawsuit?

11  Q.  Your lawyer did not actually file a lawsuit.  Isn't it a

12  fact that your lawyer merely sent a demand letter to American

13  Therapeutic Corporation?

14  A.  I am not a lawyer.  I am not really sure exactly what she

15  sent.

16  Q.  One of the things we know that you didn't do is you said

17  that you filed it under the Florida Whistleblower Act.  You

18  didn't call the FBI with your concerns, did you?

19  A.  No.

20  Q.  You didn't call the Association for Health Care

21  Accreditation, did you?

22        I'm sorry, you didn't call the Center for Medicare

23  Services, did you?

24  A.  I was advised by my lawyer not to.

25  Q.  When your lawyer advised you not to make those phone calls,

Poteet - Cross

1  or whistle blow, so to speak, your lawyer sent a letter to
2  American Therapeutic, correct?
3  A.  Correct.
4  Q.  And made a demand on American Therapeutic for $200,000;
5  isn't that correct?
6  A.  Yes.
7  Q.  And you went to mediation, as you said on direct
8  examination, didn't you?
9  A.  Yes.
10 Q.  That was pre-suit mediation, wasn't it?
11 A.  What does pre-suit mean?
12 Q.  Before a lawsuit is filed.
13 A.  I don't really know how that works.
14 Q.  You entered into a settlement with American Therapeutic,
15 didn't you?
16 A.  Correct.
17 Q.  That settlement was for $75,000, correct?
18 A.  Yes.
19 Q.  After you got that settlement from American Therapeutic,
20 you didn't call the FBI, did you?
21 A.  No.
22 Q.  You didn't call the Center for Medicare Services, did you?
23 A.  I was instructed not to.
24 Q.  You took the check, right?
25 A.  Yes.

POTEET - Redirect

1   Q.  You cashed it, didn't you?

2   A.  Yes, sir.

3   Q.  And you went about your merry way?

4   A.  Yes, sir.

5           MR. WAX:  I have no further questions, Your Honor.

6           THE COURT:  Thank you.  Redirect.

7                   REDIRECT EXAMINATION

8   BY MR. SINGER:

9   Q.  Ms. Poteet, do you recall, during cross-examination,

10  Mr. Wax asking you some questions about an application form in

11  which you listed Amy Graham as your supervisor, rather than the

12  other way around?

13  A.  Yes, sir.

14  Q.  What was the reason that you listed Amy Graham as your

15  supervisor?

16  A.  I asked Amy's permission because I said that I did not want

17  to list either Ms. Negron, Ms. Valera, or Mr. Duran because

18  they were unethical and committing Medicare fraud.

19  Q.  Do you recall some questions during cross-examination about

20  being out for two weeks in August?

21  A.  Yes.

22  Q.  Do you recall, on your direct testimony, that you mentioned

23  that you were trying to discharge some patients at the

24  Homestead facility?

25  A.  Yes, sir.

1    Q.  Did you start trying to discharge patients before you left

2    for your vacation?

3    A.  Yes, I did.

4    Q.  What happened when you got back -- you came back to ATC,

5    right?

6    A.  Yes.

7    Q.  What happened when you came back?

8                MR. WAX:  Objection, outside the scope of cross.

9                THE COURT:  Overruled.

10               THE WITNESS:  When I came back, I had determined that

11   the patients that I had discharged were readmitted.

12   BY MR. SINGER:

13   Q.  For what reason did you discharge the patients in the first

14   place?

15               THE COURT:  She covered that on direct.

16               MR. SINGER:  Thank you, Your Honor.  No further

17   questions.

18               THE COURT:  You may step down.

19                         [Witness was excused].

20               THE COURT:  All right, ladies and gentlemen, you have

21   been very patient.  We have gone through a very good opening

22   day.  We completed the jury selection, the opening statements,

23   and the first witness.

24               We thank you for your careful attention to the case.

25   We will see you tomorrow morning at 9:00.  Remember the

POTEET - Redirect

1   instruction not to discuss the case with anyone.  This includes

2   your spouses, your friends, anybody.  Even the folks that you

3   live with.  You say, "Gee whiz, why can't I talk to my wife or

4   husband about this?"

5          Well, quite innocently, they might say something to

6   you, if you discuss the facts, that maybe you hadn't been

7   thinking about, and it could affect your verdict.  If you

8   simply tell them, "At the end of the case, I will tell you

9   everything that happened.  In the meantime, the Judge told me

10  not to discuss it with you."  This will accomplish two things.

11         One, it will keep you free from getting any innocent

12  comment that might affect you.

13         Number two, at the end of the case, if you tell

14  someone you have lived with for a long time that you can't talk

15  to them about something, and you wait and you wait and it's a

16  few days or so, you would be surprised how interested they are

17  at the end of the time.  They may listen to you for the first

18  time in five years, really listen to you.  So, please do not

19  talk about the case.

20         If there is anything in the radio, television, or the

21  newspaper, don't read it, watch it, or listen to it.  Don't let

22  anything come to your attention.  Of course, if anybody should

23  try to talk to you about that, that's a serious offense.

24  Report it to the Marshal, and we will take care of it.

25         In short, don't let anything come to your attention

POTEET - Redirect

1    except what you have been seeing here in the courtroom.

2         Please be here at least five minutes before.  We will

3    try to start promptly at 9:00 with the next witness.  The

4    Marshal will meet you in the morning.  Don't linger out there

5    in the lobby.  Don't say anything to any of the parties or the

6    lawyers or anybody.

7         Thank you.  We will see you in the morning at 9:00.

8    We'll be in recess.  Please go on out.

9              [Jury exits the courtroom].

10        THE COURT:  Is there anything further from the

11   lawyers?

12        MR. WAX:  No, Your Honor, not from the defense.

13        THE COURT:  My compliments to counsel for the

14   expeditious way we have moved the case along.  Obviously, you

15   all are prepared very thoroughly.

16        Having said that, now watch.  I compliment lawyers and

17   the next day the roof falls in.

18        You all handled yourselves extremely well today.  I

19   think we have a fair jury and a good, fair trial.  That's what

20   we all want.  Thank you.

21        MS. SAULINO:  Thank you, Your Honor.

22              [Proceedings recessed at 5:00 p.m.]

23

24

25

1                    C E R T I F I C A T E

2         I hereby certify that the foregoing is an accurate

3   transcription of proceedings in the above-entitled matter.

4

5

6

7

8

9    8-16-2011              /S/ ROBIN MARIE DISPENZIERI

10   ---------------         ----------------------------------------
     DATE                    ROBIN MARIE DISPENZIERI, RPR
                             Official Federal Court Reporter
11                           United States District Court
                             Wilkie D. Ferguson Federal Courthouse
12                           400 N. Miami Avenue, Ste. 08S67
                             Miami, FL  33128 - 305/523-5659
13                           Robin_dispenzieri@flsd.uscourts.gov

14

15

16

17

18

19

20

21

22

23

24

25

**A**

abide 30:18
ability 61:3,3
able 52:10 53:14 54:1 61:20 75:6
  76:6
above-entitled 108:3
Absolutely 45:17 99:20
abuse 28:16 33:6 35:9,13 53:25
  54:12
accept 77:14
acclimated 58:25
accommodate 94:14
accomplish 106:10
account 18:17,18 19:7 20:6,22
accounts 18:9,16 21:1
accreditation 24:8 26:17,18,20
  27:15 102:21
accurate 108:2
accused 27:19,21,22
Acevedo 6:15 7:13,20 8:12,20 9:9
  11:3 12:8,21 13:1,2,9,13,17 17:5
  18:3 19:8,11 20:1 21:4 28:4,5,22
  28:25 29:14
acknowledged 93:5
Acosta 20:2
Act 73:9 102:17
Acting 35:17
activities 41:2 84:17
actual 68:22
acute 9:23
Added 13:4
addition 25:25
additional 33:4,5 77:4
Additionally 70:17
address 71:6
addressed 98:6
admissible 48:15
admission 27:6 65:17 95:8
admit 39:22 68:1 89:23
admitted 39:25 68:3 82:21 90:2
  91:20
Adriana 20:12,12
adult 35:13
advised 102:24,25
affect 106:7,12
affirm 31:21
afternoon 71:25 77:25
Agent 4:12 79:2
agents 29:9
ago 78:22
agreed 63:13,19
ahead 49:20 56:8 64:3
Alan 13:22
alleged 48:14 49:17
Alzheimer's 15:3,7,10,13,21 60:10
  60:12,13,20,24,25 61:5,21 62:5
Amendment 48:9 68:6 69:20 71:22
America 1:4 22:18 27:19 29:5,7,8
  30:9
American 3:14 5:1,9,11,20,22 6:1,4
  6:7,12,13,19,20,25 7:2,3,24 8:4
  8:5,24 9:2,12,16,17 11:2,11
  12:7 13:20,24 14:22 15:9,22,23
  16:3,7,16,20,23 17:13 18:6,7,9,9
  18:11,18 21:1,16 23:1,1,9,12,20
  24:18 25:1,5,16,21 26:1,14,16
  27:14,17 28:6,7,11,13 29:7
  35:18 36:21 49:3 70:23 71:2
  79:9 80:16,24 84:8 88:5 90:6
  100:1 102:6,12 103:2,4,14,19
Amendment 70:11
amount 19:17
amounts 18:1
Amy 66:25 68:25 69:2,7,12 70:13
  71:16 99:4,5,7,14,19 104:11,14
Amy's 104:16
analysts 29:9
Angela 40:20
answer 57:9,10 58:9 96:14 97:15
answers 34:9
anybody 62:7 71:23,23 106:2,22
  107:6
anymore 20:11
anyway 52:9
apex 25:9
apparent 54:17
appear 4:22,25
appearance 4:21,23 9:3

APPEARANCES 1:12
appeared 21:10
application 24:12,21 79:14 80:17
  89:12,14 99:17 104:10
applied 79:23 80:16 88:15 89:9
  98:17,20,22,24 99:10
approach 39:9 67:7 81:23
appropriate 15:14 31:3 61:5
approve 24:8 49:25
approved 50:8
approximately 37:6 47:14,20
  51:16 58:15 74:11 76:10 85:13
  89:6 90:24 94:22
April 37:5 47:20 79:12,13 82:15
  83:2,5 88:9 89:4 101:8,11
area 56:8
Arias 84:24 85:1
Arizona 98:22
arrangement 29:2
ASI 16:20,22 17:5,9,10 18:1,11
asked 84:20 96:12 104:16
asking 104:10
assess 74:15
assessing 74:12
assessment 42:10,13,14 43:20,23
  44:13 50:12 63:20 73:15
assessments 23:6 42:6 74:9
assistance 36:8
assistant 1:14 76:1 79:23 80:9
  83:16,17 92:16
assisted 8:14 11:5,13 15:6 17:7
  28:10
associated 44:11
Associates 101:25
Association 102:20
assume 94:17
ATC 3:20 4:25 5:11 8:19 11:21 17:5
  17:16 18:2 28:23 36:24 37:2,8
  37:10,14,17,20 38:1,14,16,22
  39:4 40:6 42:4 43:13 44:5 47:2,5
  48:6 49:1,4 51:14,22 53:19
  55:22 56:11 57:14,19 58:6,13
  64:5 66:9 67:3 68:18 73:2,5,12
  73:14 75:23 87:4 105:4
ATC's 66:23
ATM 19:2
attempt 29:10
attend 8:4 13:21 55:23
attended 37:20
attending 25:10
attention 84:16 97:11 105:24
  106:22,25
attests 83:7 93:6
attorney 1:13 73:8 78:12,13 101:23
  102:3
August 1:7 70:21,22 78:21 79:10
  93:16 94:25 97:2,12 98:17
  100:11,16 104:20
Avenue 1:15,19,23 23:4 108:12
average 64:7
awarded 73:13
awards 41:15 65:24
Ayala 74:2,8,21 75:13,18
A.M 1:7

**B**

bachelor's 12:2 22:21 32:15,16
back 9:8 10:25 11:23 15:5 17:16
  19:22 20:3,24 31:12 39:1 64:10
  64:24 65:2,9,19 66:9 69:6,14
  80:6 105:4,4,7,10
backed 86:21
background 32:14
backs 13:6 19:24 20:8,9
bad 72:2
Bailey 78:16
bank 18:8,16,17,18 19:7 20:6,22
  21:1
banks 20:19
Barry 1:18 77:25
barryward@bellsouth.net 1:20
based 28:16 46:7 50:20 51:14,21
  54:9 61:9 73:8,22 74:14
Basically 42:15
basing 9:16
basis 63:23 64:24 72:6 76:3
bear 30:6
bed 36:12
began 23:22 85:15

beginning 41:11 43:15 73:20
  97:21 100:6,16
behalf 30:16
behavior 28:8 77:14
behaviors 15:17
belief 30:14
believe 30:13 35:23 56:5 62:4 70:1
  78:12 84:3 85:24 89:24 94:22
  98:17 100:4
believed 66:17
beneficiaries 8:18
benefits 36:8
Benjamin 1:14 4:11
benjamin.singer@usdoj.gov 1:17
best 16:13 25:18 27:24
better 10:24 15:19,20 54:1
beyond 4:3,17 18:23 99:19
big 3:9,9 10:14 21:12 22:4,4,5 53:1
biggest 3:10
Bill 8:5 18:6 52:10 53:14 66:10
billed 7:25 16:23 18:8 37:22 45:12
  77:6
billing 5:12,23 9:18,19 38:2,3
  52:20 77:2
biopsychosocial 42:6,9,12,14
  43:20 44:10 50:12
bipolar 10:4 61:22
bit 5:25 8:9 15:4 41:11
blind 16:5
blow 103:1
Boca 6:24 24:2 39:7
Bond 1:15
bottom 21:18
break 32:12
Brickell 1:19 7:1
briefly 30:4 42:12 69:22 73:7
bring 8:19,23 9:7 54:8 72:3,14
  84:16
bringing 16:17 52:20
brokers 8:16,16,21 9:1 11:17 17:8
brought 2:1 66:9 97:11
building 1:15 7:3 40:11 48:25
burden 29:17 30:6
business 5:25 16:21 20:3,11 23:2
  23:3,13,18,19 25:17,18 33:7
  69:11 70:25 71:1,3 72:11

**C**

C 108:1,1
call 10:14 31:17 38:11 59:10,17,25
  71:18 74:25 102:18,20,22
  103:20,22
called 8:19 19:1 26:5,17 27:3 36:21
  38:7 84:12
calls 31:19 59:5,6,9 66:8,11 88:20
  96:9 102:25
campus 21:13
can't 9:25 15:21 19:2 55:7 61:6,7,7
  61:8 63:5 79:16 81:10 84:22
  86:18 106:3,14
car 19:9
care 3:25 4:1 7:14,15,18,19 13:23
  21:15 25:23 26:18,24 46:5 71:16
  97:13 102:20 106:24
careful 105:24
carefully 29:15
carries 30:2
case 1:3 3:12,25 4:2,13,21 5:8
  29:13,18,18 30:7,10,18,21 36:6
  36:6 70:14 94:19 105:24 106:1,8
  106:13,19 107:14
cash 3:23 8:1,1,25 9:7 12:9,10 13:8
  18:20 19:1,1,4,9,10,12 20:4,20
  20:23
cashed 104:1
casher 20:2
cashing 20:2,11
caught 4:23
causes 17:23
CC 2:14 82:2,18,21,22
CC'ing 67:20
census 12:19,19,22,24 13:14
  21:19 59:19,22 60:1 64:10
center 12:20,24 21:25 23:10 34:22
  35:9,12,16,23 36:1,2,5,15,19
  37:12,18 39:19,20 56:16 58:24
  58:25 59:24 64:24 77:2,3 79:20
  94:17 102:22 103:22
centers 12:17,18,23 26:12

CEO 21:14,15 92:10
certain 16:24 45:15
certifications 27:8
certified 46:1
certify 108:2
chance 30:23 62:2
change 50:17 63:7 76:4
changed 21:20
changes 50:2,3
charge 47:25 48:1 49:7 59:10
  95:14
charged 3:24 4:4,19 22:10 70:19
charges 4:1 30:11 31:4
chart 22:19 52:2 65:16,20 74:18,25
charts 29:25 51:25 61:16 65:4,6,8
  65:13,15 73:22,23 74:14 75:1
  95:5,8,11,25
check 9:5 20:2,2,11 103:24
checks 13:5,7 19:6,10,15,21,24,25
  20:5,5,8,9,15,23 21:24
chicken 8:9
CHIEF 1:14
Children's 35:20 79:20,21,22 80:8
choice 72:8
cigarettes 56:15,19 57:3,14
citizens 60:7
City 48:22
clarify 51:2
classes 28:16
Claus 68:23
clear 97:17
clearly 72:6
client 5:19,20
clients 6:12 25:10 95:25
clinic 85:10
clinical 25:1,25 34:5,7 41:19 85:8,9
  92:8
Clinician 35:17
clinics 26:3
clue 48:16
coffee 31:8
cognitive 60:13 61:2
cold 21:21
Coley 40:20 41:7,8,10,24 81:20
Coley's 40:21
college 26:25
colleges 27:1,1
Colombia 71:25
come 9:12 12:11 27:9 28:22,23
  29:5 31:2 37:13 39:1 41:15,23
  43:13,17 46:12 50:4 52:7,8 54:3
  54:5 56:12 58:13,24 63:7 64:10
  65:9,17,19 72:24 73:20 74:25
  76:18 94:16 106:22,25
comes 30:14
coming 23:16 41:14 56:16 64:23
  65:2
commence 31:7
comment 106:12
Commission 26:18
commit 3:25 7:14,18 13:23
committing 104:18
common 57:22
communicate 66:22 69:6 94:11
communicated 93:25 94:25 95:23
communication 95:7
communications 95:4
community 10:10,25 23:9,10 24:6
  24:17 28:9,18 35:16,23 36:1,2,5
  36:14,18 37:12,18
companies 5:7,18 6:3,11 7:9 18:15
  18:23 20:18,21,21 24:16
company 3:14 5:11,13,18,22,23,24
  6:11 9:4,5 18:13 21:5 23:17,22
  23:22,24,25 24:1,4,7,8,10,24,25
  25:2,4 36:21 38:7 49:17
compare 60:4
compared 50:3
compensated 24:11
competency 33:8
complain 52:11,13 57:14
complained 52:12,14
complaint 57:17
complete 44:5 48:3,6 84:20 86:5
  86:25
completed 33:6,7 105:22
compliment 107:16
compliments 107:13
comply 24:15,16,22 26:13,22
component 36:18

comprehensive 33:23
computer 87:2,4,11
concepts 30:18
concern 95:20 97:22
concerned 52:22 95:2
concerns 52:20 62:25 97:11
  102:18
conclusion 30:21 31:2,3
condition 60:8,23 63:14
conditions 54:16
conduct 23:6 61:24
conducting 61:23
conference 59:5,6,9 66:8 88:20
confident 31:1
confront 70:15 77:8
congratulates 90:9
connected 7:3 48:13 49:16
connection 37:18 47:1 69:4
considering 97:8
consisted 58:23
consistent 26:8
conspiracy 3:25,25 7:14,14,18,19
  13:23 46:15 70:18,19
constantly 12:16
Constitution 70:12
contact 93:12
contains 36:5
contents 2:1 70:16 97:6
continue 75:5
continued 84:20
contractors 11:18
contracts 28:14
control 27:7
controlled 18:16
conversation 47:14,18 48:19
  49:11 52:15,17,23 53:4 59:16,18
  77:10 94:4
conversations 62:15,20 63:12
  66:7,11 89:1
converted 18:20,25
Coordinator 92:23
copy 82:1
corner 70:22
corners 27:25
corporate 25:14 40:6,10 91:25
  92:4,7 93:11
corporation 3:14 5:1,10,21 6:1,5
  6:12,19,20 7:2,4,24 8:5,5,24 9:2
  9:13,16,17 11:3 12:18 13:20,25
  14:23 15:10,22,24 16:3,7,17
  17:13 18:7,9,11,18 21:2,16 23:1
  23:2,9,12,21 25:1,6,17,21 26:1
  26:15,17 27:14,17,23 28:6,7,12
  28:14 29:8 36:22 49:3 70:24
  79:10 80:17,24 94:6 86:5 90:7
  100:2 102:7,13
corporations 25:7
correspond 76:21
correspondence 69:12
couldn't 20:11 26:21 28:6
counsel 22:15,17 69:22 96:10
  107:13
counseling 32:22 33:5,16,17
counselor 12:2 33:14 34:3,5,7 85:6
counselor's 33:15
count 22:10
couple 19:18 20:3 53:5 62:11
course 18:4 19:18 33:5,7 69:11
  71:2 78:24 93:25 106:22
court 1:1,22,23 22:13,17 28:15
  31:6,12,14,16 32:6,12 38:25
  39:10,25 40:4 45:8,23 46:16,22
  47:9,14 48:10,18 49:8,12,17,20
  50:25 51:3,12 53:10 54:20 55:4
  55:6,20 56:3,6,22 57:7,10,12,25
  58:2,9 63:4,9,16 64:1,3,19 65:10
  65:14,21 67:8 68:5,9,23 69:1,17
  69:21,25 70:4,8,17 71:5,11
  72:17 77:22 81:24 82:21 90:2
  91:20 96:11 97:6,15 104:16 105:9
  105:15,18,20 107:10,13 108:10
  108:11
Courthouse 108:11
courtroom 29:22 31:12,15,20 32:2
  69:24 72:16 107:1,9
courts 28:15
coverage 37:22,24
covered 105:15
co-conspirator 49:16,18
co-conspirators 3:5,8 4:25 5:6,7

16:22 18:23 48:14
co-counsel 4:11
Crawford 68:7 70:11 71:8,9
create 71:13
created 44:20 51:25 52:2,3 95:8,11
crimes 4:4,18 7:4 27:20
criminal 1:15 33:6
Crisis 35:17
criteria 11:7,10 27:6 50:21 51:20
cross 77:23 105:8
cross-examination 2:5 77:22
  104:9,19
cross-examine 72:7
cross-examined 71:20
crying 62:9
cup 31:8
cutting 27:25
cycle 3:23 7:23 8:6,8,11 21:10
  64:13 65:1,25 101:5
cycled 101:13
cyclical 64:24 65:12 66:5,6
cycling 100:23 101:18

D

D 1:14 108:11
Dade 24:3
date 70:22 82:12,14 90:14 97:1
  100:4,6 108:10
dated 70:21 91:13
day 1:11 8:14,21 11:21 12:20,23
  15:9,23 21:20 26:2 28:20 30:24
  42:20 43:7,12,17 72:2 84:7
  85:20 86:5,9,10,11,12,14,22
  97:23 101:15,20 105:22 107:17
days 20:4 73:21 74:4,5,6 77:2
  106:16
Dayton 32:23
day-to-day 41:2 84:16
DD 2:15 89:22,24 90:2,4,6
deal 29:1
dealer 21:12 22:1 71:24
deals 21:13
decide 55:10
decided 11:10
decision 30:25
decompensating 10:14
dedicate 23:8
dedicated 23:20 25:15 27:16
dedicating 27:23
dedication 27:18
defecate 62:12
defendant 1:8,18 3:4,7,10,24 4:4
  6:6 7:7 11:23 76:21 96:11
Defendant's 82:2,18,21 89:22,24
  91:7,17,20 94:6 96:19 97:16
defense 2:14,15,16,17,18 22:15,16
  82:22 90:2,4,19 94:9 96:22
  107:12
degeneration 61:2
degenerative 61:3
degree 12:2,3 22:22,23 32:15,25
delivered 37:14
demand 102:12 103:4
demanding 85:17 87:25 88:2
dementia 15:4,8,10,21
Department 1:14 4:9,13 38:14 78:9
  78:13
deposit 20:23
deposited 21:1
DEPUTY 31:12,20 32:2
describe 32:14 46:11 52:6 55:8,9
  58:22 64:16 73:7
designed 34:18,19,20 35:1,3 36:2
desk 14:4
details 21:17 22:2
detector 13:19
determine 4:3,17 30:12 61:20
determined 105:10
Deutsch 101:25 102:3,6
develop 52:9
developing 43:20
development 42:6,17,17
developments 26:12
diagnosable 51:9
diagnosis 11:8
diagnostic 16:24 17:23
dictation 76:19

didn't 10:1 14:15,16,17 19:16
  37:24 52:21 53:7,10 56:23 62:7
  62:7 79:24 80:1,4,19 81:2 83:17
  83:25 86:21,25 87:4 88:7 89:12
  89:17,19 92:18 93:16,22 98:18
  101:2,15,20,25 102:9,16,18,20
  102:22 103:8,15,20,22 104:1
differ 63:2
difference 60:25
different 14:7,7 43:11,15 59:11
  72:25 83:10
differently 60:23
difficulty 50:13,17 61:1
direct 2:4 25:2 32:1 79:19 85:24
  88:18,22 89:9 93:11 99:4 100:22
  101:2,22 103:7 104:22 105:15
directing 29:8
directly 36:7 52:14
Director 23:14 25:5,8 28:4 35:17
  35:21 40:22,24 41:7 58:18,19
  62:16 66:14 67:15 74:3 77:13
  79:23 80:9 83:14,16,17 88:11,15
  89:9 90:10 91:2,10,25 92:4,7,15
  92:16 93:11,14 95:14,19 96:2
  98:11,11 99:7,11 100:8,15
Directors 13:24 26:4,7,10 59:7
Director's 41:1
disagreed 63:13,19
discharge 42:7 44:2,23 66:21,23
  67:16 75:10 104:23 105:1,13
discharged 43:14 64:8 65:9,19
  105:11
discharging 72:20,21,22
discuss 26:5 41:24 67:22 75:13
  79:6 106:1,6,10
discussed 67:25 78:4
discussing 67:17
discussion 58:6
disease 60:10,13
disorder 17:3 54:1 61:22
disorders 10:5 16:25 33:18
DISPENZIERI 1:22 108:9,10
dispute 73:11,12
District 1:1,1,11,23 108:11
division 1:2,15 24:25
divorce 28:17
doctor 10:3 13:22 14:3,6,11,20
  15:12 16:9 17:14,14 74:2,8,21
  75:13,18
doctorate 33:8
doctors 11:4 14:15 26:11 28:11
document 44:16,24 46:4 67:11
  68:7,11,13 70:10,22 71:3 81:21
  82:3,6,12,16,24 91:11 97:10
documentation 45:2 48:4,6 51:21
  51:22 52:3 61:16 96:6
documented 73:9,10
documents 70:24 95:17
doesn't 56:7 97:5
doing 13:1 14:3 27:16 28:1 74:21
  75:17 76:2,4
dollar 17:25
dollars 3:22 8:22,23 18:12,16 19:4
don't 13:16,17,18 15:8 17:18 34:21
  35:3 48:16 62:25 63:10 64:19
  68:13 71:3,16,18 80:20 81:22
  82:4 86:10 89:13,14 91:5 92:2,3
  93:15 94:4 95:3,10 97:24 100:6
  103:13 106:21,21,25 107:4,5
Doris 2:3 31:19,25 32:4
doubt 4:4,18 29:19
dozens 25:8,9
drive 19:8
drivers 24:4 26:4 54:6
drop 20:25
drug 28:14 77:21
due 86:16
Duran 5:5 6:2,6 7:8,8,21 18:14
  19:6,7,15 21:3,8,11 23:3 28:8,20
  28:21,23 38:17 41:9,13 59:7,15
  60:2 73:1 104:17
duties 83:22 94:17
D-o-r-i-s 32:4
D.C 1:16

E

E 108:1,1
earlier 4:10 22:21 73:14 88:4
early 78:10 97:23 98:3,7,8,15

ears 13:16
easy 26:19 28:23
eating 50:13,15,19
Eckert 46:25 47:13,22 49:14,23
  52:14,15,19 53:4 89:1
Eckert's 53:6,11,17
educate 28:10
educated 12:4
education 32:19,21 33:1 42:17
educational 32:14
EE 2:16 91:7,17,20,22
effective 17:21
egg 9:3
eight 5:1,2 7:23 16:2 21:11 50:14
  64:7
eighty 42:22 43:3 51:19
either 26:19 34:25 56:3 74:17
  101:21 104:17
electrodes 17:1
eliciting 57:7
eligible 50:21
Elizabeth 31:19 32:4
Ellen 4:12
Email 1:16,20,24
emotional 33:18
employed 37:3,4 68:18
employee 25:23
employees 19:15,16 25:10
employment 73:11 99:17,21
endorsed 19:22
endorsements 13:7
engaging 6:22
entered 103:14
entire 30:3,6 37:23 52:2
envelope 20:1
envelopes 12:9,10,12 19:11,12
Erika 102:3
ESQ 1:18
essence 30:5
essentially 25:5
establish 46:16 56:2 68:13 71:16
established 48:10 72:12
evaluation 28:16 43:24 44:8
evaluations 23:6 75:10
event 89:17
eventually 9:7
evidence 2:10 4:16 5:18 8:7 16:8
  30:12,15,22 39:23,25 40:2 67:25
  68:1 69:17 71:9,13,21 72:6
  82:19,21,22 89:24 90:3,4 91:18
  91:21,22
evident 62:6,6 63:12
exact 100:6
exactly 4:6 8:17 9:21 81:10 102:14
exaggerate 50:7
exam 61:23
examination 2:4,7 32:1 33:23
  77:23 79:19 85:24 88:18,22 89:9
  99:5 100:22 101:2,22 103:8
  104:7
examine 14:16
example 50:19 61:4,21 65:3 66:7
  71:24
examples 50:9
exams 61:24
exception 71:1 72:12
EXCERPT 1:10
exchange 20:4
exchanged 71:17
exclusion 29:19
Excuse 85:3
excused 105:19
Exhibit 2:12,13,14,15,16,17,18
  39:13,23 40:1,2 67:11 70:9
  72:15 82:2,18,22 89:22,24 90:2
  90:4,6 91:7,17,20,22 94:6,9
  96:19,22 97:16
Exhibits 2:9,10
exist 10:1
exists 92:16
exits 107:9
expect 66:3
expected 95:20
expeditious 107:14
expenses 25:12
expensive 11:1
experience 46:7
expert 10:3 45:25 63:5
experts 29:9
explain 8:7 13:14 33:3 40:23 42:12

43:14 60:11,22 66:3 74:24 76:24
**explained** 50:6,16 77:13
**extra** 26:24
**extraordinarily** 22:3
**extraordinary** 4:7
**extremely** 107:18
**E-l-i-z-a-b-e-t-h** 32:5
**e-mail** 12:21 67:14,16,19,20,22,23
67:25 68:17,22 70:2,13,16,21
71:9,13,18,23,25 96:24 97:1
**e-mails** 71:12,17

### F

**F** 108:1
**facilities** 8:15 11:6,14 15:7 17:7
26:7 28:11 39:4,6 45:12
**facility** 24:20 27:10 40:19,23,24
41:1 42:1,19 43:5,14 46:8,9
47:24 49:10 53:21 54:8,10,17,22
55:12 56:12,19,25 57:15,19
59:20 60:4 61:17,25 74:1,3,4,22
76:2 97:12,20 104:24
**fact** 29:16 57:7 66:22 71:11 78:9
80:4 83:7 93:7 97:22 99:17
101:25 102:12
**facts** 45:24 55:7 63:5 106:6
**fail** 13:18
**fair** 35:11 36:19 100:20 107:19,19
**falls** 107:17
**familiar** 36:21 37:2 38:7 53:20
60:12,16 75:22
**family** 34:25
**fashion** 48:14
**FBI** 4:12 102:18 103:20
**Federal** 1:22 108:10,11
**feel** 62:22
**feet** 14:4 53:2,5
**felt** 50:5
**Ferguson** 108:11
**FF** 2:17 94:6,9
**field** 10:4 35:7 45:10 56:17 88:2
**fifteen** 31:9 51:17 74:13 76:11,12
76:12 85:25 86:12
**fifteen-minute** 31:7
**file** 14:1,6 24:12 45:2 84:21 102:7,9
102:10,11
**filed** 30:10 96:7 102:17 103:12
**files** 11:4 14:5,9,13 16:18 50:3 75:6
**filing** 96:5
**fill** 41:15,24 47:4 51:5 94:3
**filled** 22:3 79:14 80:17
**finally** 10:9 28:20 44:23 70:20
**find** 8:18 42:16 62:24 74:18
**finding** 11:18 12:17 36:8
**finds** 16:5
**fine** 50:15
**fired** 100:1,4,13 101:23
**first** 11:25 12:24 21:7 23:4 31:17
33:11,12 35:8 37:8 40:12,16
43:13,17 44:4 47:19 52:8 62:22
71:8 73:21 84:11 92:3 101:15
105:13,23 106:17
**five** 14:4 37:6 74:5 106:18 107:2
**fixed** 77:19
**FL** 1:20,24 108:12
**flag** 14:6,12
**flags** 14:7,12
**flash** 26:5 84:12,14,15
**flip** 14:1,1,1,2 75:4
**flipped** 75:5
**flipping** 14:21
**floor** 23:23
**Florida** 1:1,6 12:18 22:22 28:15
34:1,8 35:6,6 39:7,7,8,8,8,19
40:7 48:24 93:21,25 98:18
102:17
**flu** 32:11 66:5
**focused** 10:24
**folks** 106:2
**following** 25:20 26:8 28:1 65:25
**food** 36:8
**foregoing** 108:2
**forged** 19:24
**form** 63:15 93:2 104:10
**formally** 73:9
**formed** 5:25 16:22 18:23 20:18,20
51:1
**Fort** 6:23 24:2,3 39:7 40:18,19 41:4

42:19,21 46:8 48:24 49:10 51:15
53:19 54:10,17,22 55:12 56:25
57:19 60:4 81:5 88:14,18 89:2,3
101:1,6,8
**forth** 69:7,15
**forty** 86:9
**forty-five** 86:13
**forward** 22:11 94:20
**four** 19:8,17,23,25 20:5 43:6,8
50:18 85:20 86:9
**fourteen** 45:11 56:18
**frames** 30:11
**Francisco** 48:22
**fraud** 1:15 3:9,11,13,25 4:21,21,22
4:24 7:14,19 13:23 16:19 22:4
29:11 104:18
**free** 106:11
**freedom** 29:4
**frequently** 50:11
**Friday** 74:7 85:22
**friends** 106:2
**front** 16:14 19:21 52:25 53:1 70:10
**fronts** 12:10 13:6
**Ft** 88:21
**fulfill** 30:17
**full** 32:2
**function** 9:25 19:19 20:21 23:17
49:4
**functioning** 54:1
**further** 9:14 68:14 77:21 104:5
105:16 107:10
**furtherance** 46:14

### G

**gain** 3:19 61:7
**gained** 26:17
**gaining** 61:1
**game** 26:20
**gather** 13:11
**Gee** 106:3
**general** 8:13 35:8 57:23
**generally** 58:23
**generated** 76:16
**gentlemen** 3:12,24 4:7,20 22:14
31:6 69:21 105:20
**Georgia** 98:20,24,25 99:10,18,21
**geriatric** 35:13 60:6 101:4
**getting** 10:15 11:2 13:5 15:24,25
16:10 32:11 56:7 68:9 72:6 95:7
106:11
**GG** 2:18 96:19,22 97:16
**give** 4:5 9:5 14:17 31:22 50:9 63:5
63:5
**given** 42:20 43:5 52:1 76:7 81:17
**glad** 21:12 22:1
**go** 8:10,17 9:9,10,11,14 10:11,16
10:25,25 11:21,23 12:11 13:21
17:1 19:2 20:3 24:13,20 25:11
28:9 34:24 35:2 42:2 43:7 49:20
54:7 56:8 64:3 107:8
**goal** 12:19
**goals** 12:19
**God** 31:23
**goes** 16:5
**going** 8:10 10:16,17 11:5 12:10
13:11 14:9 17:15 26:6 27:24
28:5,17,24,25 30:7,21,22 34:23
36:3,6 39:12 48:8 49:15 57:24
67:24 70:2 73:10 88:18 89:23
97:25
**good** 28:18 77:25 105:21 107:19
**gossip** 64:22
**government** 1:13 2:12,13 3:2 4:3
28:3 29:1,2,17,24 30:6 31:18
40:2 70:1 72:15 78:7,18,21 80:3
**Government's** 31:25 39:13,23,25
67:10
**graduate** 32:19,21 33:4,22
**Graham** 66:25 68:25 69:2,7 70:13
70:16,18 99:4,5,7,14,19 104:11
104:14
**grew** 23:12,13 24:1,4,24,25
**ground** 23:23
**group** 5:16 15:19 23:5 27:24,25
36:11 42:5,8,23,25 43:4,11,18
44:3,21 52:8 53:22 54:7 62:12
62:13 86:1,3,7,8,13
**groups** 43:1,4,7 85:15,20 86:9,11
86:12

**grow** 23:22 25:17
**growing** 24:7
**guilty** 4:4,18 7:13,18 13:23 22:9,9
28:25 29:21,23 30:20 31:4
**Gumer** 13:22 14:3,11 16:9 17:14

### H

**habits** 50:19
**hadn't** 106:6
**half** 28:19 33:6 89:6 100:17,19
101:11,11,16
**halfway** 3:19 8:15 9:10 11:6,14
17:7 28:10 53:22,24,25 54:8
**ham** 72:1
**hand** 19:10 31:20 39:12
**handed** 68:11,12
**handle** 95:21
**handled** 27:5 107:18
**handler** 21:12 22:1
**hands** 13:16
**happen** 15:2 27:3
**happened** 12:12,14 46:9 50:11
55:9 101:7 105:4,7 106:9
**happens** 18:15
**happy** 53:15
**hard** 27:16 65:21
**hasn't** 45:24 49:16
**haven't** 48:10 78:7
**head** 17:2 62:10
**health** 3:25 4:1 7:14,15,18,19 12:2
11:17,20 12:6,13,14,16,20,25
13:4,8,13,16,22 14:11,20,22,25
15:12 16:8,8,12,15 17:4,12,14
17:24 18:2 19:9,17,20,20,22,25
20:12 21:14,17 22:5,14 25:18,25
28:5,22,25 29:1 53:10 57:20
58:6,7 64:17
**heard** 5:9 15:3 22:21 25:21,22 28:3
30:22 31:2
**hearsay** 46:13 53:8 63:25 64:18
96:9,9
**Hector** 22:21
**help** 31:23 58:24
**Herz** 10:3 15:12 17:14
**Hialeah** 6:25
**high** 59:20 66:10
**higher** 17:10 29:20
**hired** 20:12 23:4,13 24:4,5,5 28:8
73:8 79:9 81:6 84:1 88:9 89:17
89:19 90:9,13 101:22,25 102:3
**history** 27:6 42:15,16,18
**home** 11:22 35:20 79:20,21,22
80:8
**homes** 11:16 12:12 19:12 53:23
54:7
**Homestead** 6:24 24:2 39:8 59:1
60:3,5 61:10,13,17,25 62:21,22
66:15 67:3,15 69:3 73:25 74:3,8
74:21 76:2 77:13 88:12,15,23
89:2,10 95:1,14,16 97:12 99:6
99:11 100:8,15,23 101:3,16
104:24
**honor** 3:3 4:8 31:18 39:1,9,22 40:3
45:22 46:2,15,19 47:8 48:8
49:19 51:2 56:5,9 57:5 58:1,4
64:2 67:7 69:19 70:20 71:6
77:21 81:23 82:18 89:23 90:1
91:17 97:4,8 104:5 105:16
107:12,21
**HONORABLE** 1:10
**Horton** 4:14
**hospital** 10:6,10,17,18 11:11 17:18
35:4,8
**hospitalization** 9:20,21,22,25 10:7
10:11,19 14:19 15:14,15 17:15
17:17,19 28:13 34:13,17,19,24
36:11,15 37:15,16 38:5 50:22
51:11 54:13 55:23 61:4,10,14,18
64:6 74:19 101:4
**hospitalized** 10:1,8
**hospitals** 36:4
**hot** 21:21
**hours** 50:15,18 86:16 94:19 95:8
**house** 17:8 53:24,25

**houses** 3:19 8:15 9:10 11:6,14
28:10 53:22 54:8
**housing** 11:15 36:8
**human** 25:12 38:14 85:2,4
**hundred** 51:24 61:19 74:16 76:14
**hundreds** 8:23 19:3 25:10
**husband** 104:4
**hysterically** 62:10

### I

**idea** 86:19
**identification** 2:10 39:13 72:9,15
82:2 89:21 91:6 94:5,9 96:18,22
97:16
**identified** 96:8
**illegal** 4:1 7:15,19 77:14
**illness** 9:23,24 11:8,10,15 18 17:20
17:22 23:7 51:9 61:22 66:5
**illnesses** 60:17
**imagine** 23:11 25:13
**impaired** 61:3
**implemented** 24:22
**importance** 16:16
**important** 22:5 30:25 59:22 62:23
71:20
**improvement** 27:4
**inaccurate** 96:6
**inadmissible** 70:25
**inappropriately** 96:7
**included** 95:25
**includes** 106:1
**including** 60:15
**independent** 11:18
**INDEX** 2:9
**indicate** 63:18,19,22
**indicated** 64:20 65:8,11 79:19
83:11,18 85:12 88:4 97:19 99:18
**indicates** 83:2 90:12,15,18
**indictment** 30:10,11
**individual** 10:23 36:11 42:24 70:14
95:9
**individualized** 14:17 16:10
**individually** 14:18 54:3
**individuals** 3:16 23:21 83:18 92:12
95:15 98:14
**individual's** 53:8
**inducements** 55:22 56:11 57:20
**infection** 27:7
**information** 27:7 95:24
**initial** 44:8 73:15 74:9
**innocent** 29:24 30:2,19 106:11
**innocently** 106:5
**insight** 61:1,7
**inspection** 27:13
**inspections** 24:14,21
**instance** 83:11 84:7 89:1
**Institute** 5:22 6:7,13,25 16:20,23
18:7,10
**instructed** 30:4 69:8 72:22 103:23
**instruction** 72:24 106:1
**insurance** 25:12
**intellectual** 60:14
**intensive** 10:25
**intention** 102:7
**interact** 15:19
**interaction** 58:20 59:3,4
**interactions** 58:22
**interested** 106:16
**International** 22:22
**interrupt** 65:10
**interview** 27:10 37:11 81:4,20
**interviewed** 80:24 81:2
**introduce** 5:3 70:2
**introduction** 68:7 70:10
**investigator** 4:12 78:15
**involve** 41:18 98:14
**involved** 6:17 23:16 26:20 27:4
**involves** 24:14
**in-box** 87:22
**in-patient** 34:22 35:2,9,12 36:4
51:9
**irrelevant** 57:5
**Isabel** 85:6
**isn't** 13:14 82:25 95:2 97:22 99:17
102:11 103:5
**issued** 33:19
**issues** 25:12,12,13 26:6,11 84:18
95:1
**it's** 3:13,18,21 8:9 10:14 16:6 24:11

25:13 26:25 29:4 30:1,12,12,24
30:24 34:20 35:3 46:14 48:15
55:9 58:9 62:23 68:5 71:20 72:6
106:15
I'll 94:6
I'm 48:8 53:10 79:12 80:5 102:22

**J**

Jackie 84:24 85:1
JACO 26:18,19 27:14
JAMES 1:10
January 78:10 80:3
Jennifer 1:13 4:10
jennifer.saulino@usdoj.gov 1:16
job 4:2 13:25 14:2 19:11 20:13,15
20:16 23:5 25:4,15 28:9,18,19
29:15 30:7 35:18 41:1 62:25
81:6,8,15,18,18 82:9,24 83:2,6,7
83:10 85:17 87:25 91:2,10 92:4
93:3,6 99:10
jobs 98:17,20,22,24
joined 4:10
Joint 26:18
Joseph 7:17 11:4
Judge 1:11 30:4 57:24 106:9
Judith 1:7 3:5,7,10,12 4:25 5:4 7:7
11:23 22:18,19,25 23:4,14,20,22
23:25 25:4,19 27:16 28:21 29:3
29:6,10,18,21,21 30:8,9,16 31:3
38:19 93:12,25 94:11,20,25 95:4
95:23 96:5,12 97:11
Judith's 24:24 25:4,15
Judy 22:21
July 92:25 93:5 100:16
June 58:16 89:4,19,20 90:13,15
93:3 100:8,16 101:9,11
jurors 30:17
jury 1:10 15:3 29:3,12 30:5,16 31:1
31:14,15 32:14,21 36:1 40:3
42:12 43:14 45:21 46:11 50:9
52:6 55:9 58:22 60:11,22 64:16
64:21 65:11 66:3 69:22,24 72:14
72:16 74:24 76:24 84:14 100:25
101:13 105:22 107:9,19
justice 1:14 4:9,13 30:5,18 33:6
78:9,13

**K**

keep 20:14 35:1,3 36:3 106:11
keeping 60:1
Ken 78:16
key 4:24 5:8
kickback 3:13 12:6 13:10 17:10
kickbacks 3:18,23 4:1 6:15 7:15,19
8:2,9,10,25 9:6 12:7 13:3,6
15:22 16:17 17:6 18:20 19:4
kind 11:1 12:4 14:18 15:25 16:1,4
47:16
King 1:10 30:4
knew 14:24 15:1 29:3,11 80:22
know 11:25 12:4,6,25 15:8 19:3
32:12 36:24 51:7 58:2 62:7,24
66:25 68:13,20 70:5 71:3,8 72:5
89:20 97:24 102:16 103:13
knowledge 45:7 50:24 55:22 57:22
70:19,23
knows 72:4

**L**

L 1:13
La 13:16,16,16,16
labor 24:25
ladies 3:12,24 4:7,20 22:14 31:6
69:21 105:20
lady 47:9 49:4,5 71:16,19
laid 68:10 81:18
Lapp 4:12 79:2
large 43:1
largely 17:8
larger 8:25
largest 5:12
Larry 5:5 7:8 22:2 23:3 28:8,20,20
28:22
lasted 84:15
late 52:7
latitude 56:7
Lauderdale 6:23 24:2,3 39:7 40:18
40:19 41:4 42:19,21 46:8 48:24
49:10 51:15 53:19 54:10,17,22

55:12 56:25 57:19 60:4 81:5
88:14,18,21 89:2,3 101:1,6,8
launder 13:7 19:2 20:13,17
laundered 3:22 8:1,1 18:20 19:1,14
20:14
laundering 4:2 9:8
law 1:19 29:20
Lawrence 1:10 5:5 7:8
lawsuit 102:7,9,10,11 103:12
lawyer 102:11,12,14,24,25 103:1
lawyers 29:9 107:6,11,16
lay 48:12 68:5 72:10
laying 62:10
Lazaro 20:2
lead 4:12 63:10
leaders 7:10,10 60:2
leadership 33:8
leading 41:20 57:6 58:8 63:9
Leah 4:13
learn 8:16 12:1 15:17 61:3,8
learning 61:1
leave 10:9 13:9 98:3
leaves 69:24
leaving 97:23 98:15
led 62:4
left 14:25 16:13 21:8 70:22 72:20
98:7,8 105:1
legitimacy 4:21,24 9:4
legitimate 4:22 5:1 14:10 21:10
letter 80:21 90:6,9,12,14 102:12
103:1
letters 80:18
let's 7:22 11:23 48:12 100:16
level 23:14 26:25 27:2
license 33:11,12,13,15,19,21 34:4
34:5 35:5 52:22
licensed 12:1 34:2,7 85:5
licenses 33:9,24
lie 13:18
life 23:8 25:15,16 27:16,23 42:15
lights 21:23
Likewise 91:2
line 2:11,11 21:18 92:4
linger 107:4
list 104:17
listed 104:11,14
listen 29:14 106:17,18,21
litigation 73:4
little 5:25 37:7 75:2
live 10:10 11:21 54:1,2 106:3
lived 62:8 106:14
living 8:14 11:5,13 15:6 77:7 28:10
34:25
LMHC 34:2
lobby 107:5
located 39:6 40:6,10 75:1
location 6:21 7:2 40:8,13,16 42:21
53:19 58:25 59:1 62:21,22 66:15
67:4 69:3 88:14 99:6
locations 6:21 25:9 101:7
lodge 48:9
log-in 87:8
long 15:23 45:10 56:17 64:5
106:14
look 4:22 14:10 21:11 27:10 72:2
82:5 94:6 96:19
looked 65:15
looking 11:6
losing 60:14
lot 53:7 60:14
lots 14:11
low 12:24 86:8
lower 70:21
lunches 21:21,21
Lynn 66:25 70:13

**M**

M 1:19
Maggie 6:16 28:4,25
main 12:8 39:19 60:25 61:2
maintain 27:15
maintained 71:2
majority 53:22 60:5,9 74:23
making 8:22,23 11:7 24:14 27:23
59:18 90:21,25
man 21:13
manage 41:2
management 5:16,18 6:11,14
23:24,25 26:2 27:5,7 36:6 38:8

52:11 53:15 57:14 66:23 72:25
84:16
manager 25:24 28:9 36:7 99:2
managers 12:22
manuals 27:11
Margarita 6:15 7:13 11:3 28:5,22
29:14
Marianella 5:6 7:7 23:3 94:16
MARIE 1:22 108:9,10
marked 29:3 39:12 67:10 72:9,15
82:1 89:21 91:6 94:5,9 96:18,22
Marketing 28:3
married 22:9
Marshal 106:24 107:4
Marvin 10:3
massive 3:13
master's 12:3 22:23 32:22,25 33:7
match 46:8 49:25
matter 98:6 108:3
matters 25:11 96:8
mean 46:11 81:17,18 85:9 103:11
meaning 92:4 60:6
meaningless 30:1
means 10:14 100:15
meant 14:6
mediation 73:13 103:7,10
medical 5:18 11:4 13:24 26:10
42:14 46:13 45:10 56:17 65:5
73:22 74:14 87:23 95:16
Medicare 3:6,8,21 5:12,23 7:24,25
8:6,18,19 9:18 11:7 16:1,23,25
18:6,6,8,12,16,25 24:8,8,11,12
24:15,19,22 26:12,13,21 37:22
37:24 38:2,3 45:1,4,13,15,19
49:25 50:8,16 51:5,8 52:10
53:14 59:23 66:10 77:6 102:22
103:22 104:18
medication 11:9 17:22 27:5 76:5
95:24
Medlink 5:16,17,17,19 6:5,11 7:1,3
18:12,17 19:7,16,19 20:6,7,15
20:17 21:1 38:7,10,11,13,22
40:10
meet 7:12 37:23 40:12 43:19,22
107:4
meeting 12:18 50:11 78:15 84:12
84:14,15
meetings 26:3,5,7,10
meets 42:14
Mejia 20:12,13,24 21:7
members 29:3,12 30:16 31:1 60:11
63:13,18,19,23 98:3 99:6
memory 60:15
mental 3:9,24 22:11 8,9 12:2 15:18
22:24 23:7,10,18 33:18 34:2
35:6,16,23 36:1,2,15,18 37:12
37:18 51:9 54:6 60:14,21 79:1
61:21,23 66:5 85:5 88:2
mentally 3:16 5:15 15:16 16:11
17:19 34:20 36:3
mention 34:9
mentioned 16:20 35:5,22 36:14
37:17 42:9 44:20 73:14 104:22
merely 102:12
merry 104:3
met 5:5 11:7,10 42:5 78:1,6,9,12
78:18,21,24 80:3
Miami 1:2,6,20,23,24 6:20,24 7:2
12:21 34:24 39:8,19 40:7,13 81:2
108:12,12
MICHAEL 1:18
Michelle 80:22
microphone 32:24
middle 7:6 18:13 62:13
million 3:4,7 5:13,23 7:23 16:24
18:22 20:6
millions 3:22 18:12,15,15
mind 55:8
minute 5:20 9:15 35:15
minutes 31:10 84:15 107:2
missed 93:16
moment 96:16,19
Monday 1:7 74:7 85:22
money 3:4,7,9,21 4:1,23 7:25 9:8
13:7 18:8,12,22,24,25 19:14,17
20:13,14,17,25 21:9,9,22,23
22:4 25:22 38:1
monies 18:19
monitoring 36:13

month 8:22,23 19:4 20:20
months 14:25 16:13 23:11 24:18
37:6 65:2 89:6,6 100:17,19,24
101:6,11,14,14,16,18,19
morning 12:21 26:3 84:12 105:25
107:4,7
mother 22:20 25:16 93:19 97:13
motion 56:6
move 39:22 64:2 68:1 82:18 89:23
91:17
moved 7:1 107:14
Moving 18:19
multiple 39:4 65:13 68:10

**N**

N 1:23 108:12
name 4:10 5:9 8:17 14:14 25:13
32:3 47:12 48:25 77:25 78:15
80:22 84:23 85:6 99:19 102:3
named 20:12 47:11 75:22
names 5:3 6:18 12:9
nature 71:10 75:20
need 10:5 11:21,25 17:15,17,18
19:1 32:12 34:24 47:10,16 50:17
54:11 61:10 66:17 94:14
needed 8:2 12:4 14:18,18,19 15:25
16:7 19:3 26:12 36:7 42:2 50:5,6
61:14,18 75:3 76:4 77:15 84:16
95:5
needing 101:4
needs 10:24 16:11 22:1,2
Negron 1:7 3:5,7,10,12 4:18,25 5:4
6:2,6,7 7:7,20 11:23 12:1,16,25
12:25 13:4,8,15 14:3,12 18:14
18:16 19:6,15,21 20:8,16 21:3,4
21:5,8,17 22:2,4,9,18,19,21 29:6
29:10,21 30:17 31:3 38:18,19
40:12 41:9,13,15,23 52:17 53:3
53:17 54:22 55:12 56:25 58:20
58:22 59:4,8,15 60:2 66:11
67:21 73:1 75:15 77:10 78:1
93:12,25 94:11,20,25 95:4,24
96:5,12 97:11,19 98:7,11 104:17
Negron's 12:13 21:2 77:17
neighborhood 85:25
never 78:1,4
new 1:15 48:22 86:22
newspaper 106:21
Nichole 46:25 47:11 48:20 50:6,16
52:14 89:1
night 17:10 50:15,18
normal 69:11,14 71:2
note 44:2 52:9 70:20 86:5
notes 42:7 44:20 52:5 76:20 86:10
86:13,16,22,25 87:10,13,18 88:1
96:6
notice 7:6 64:13
noticed 64:23 65:11
notified 102:6
notorious 71:24
Notwithstanding 99:8
Nova 35:15,23
November 78:18
number 8:21 10:2 11:7 22:20 24:13
24:19 26:22 59:19,20,23 106:13
numbers 8:19 13:1,2 29:25
numerous 15:12
nurse 43:22
nurses 11:4 92:21
nut 16:5
NW 1:15

**O**

Oaks 35:11
object 57:24 63:15 67:24 68:3
70:10
objection 38:24 39:24 41:20 45:6
45:22 46:13 47:8 48:9,9 49:15
50:23 53:8 54:19 55:3,19 56:1
56:21 57:5 58:3,8 63:3,25 64:18
68:6,15 69:18,19,20,25 70:3,8
82:20 89:25 90:1 91:19 96:9
97:4 105:8
objections 68:10
obligations 98:4
observations 51:14 54:9 55:1 61:9
observe 56:11,14 57:8 62:2,4 74:8
74:11 76:6
observed 56:15 74:14 76:21 88:18

obsessed 12:16
obtain 24:7 33:11,21,24 34:1,4
obtained 70:23
obviously 62:24 107:14
occasion 21:7 55:15 62:11
occasionally 16:3
occasions 12:15 64:10
occur 43:15 52:4 73:18,19
occurred 72:21
offense 106:23
offer 55:22
offered 28:12,14 57:20 72:10 80:8
offering 56:11,19 69:17 71:11,12
office 12:13 21:3,3,5,25,25 24:1,1
  41:10,14 52:25 53:1 69:5 74:25
  81:2
offices 1:19 7:3 24:3 40:6,10,14
Official 1:22 108:10
Ohio 33:20 34:6,16
okay 32:12 38:11 96:21
old 22:20 32:9
once 8:3 16:5 17:9
ones 4:15 11:17 16:12 77:5
one-on-one 59:3
open 20:22
opened 23:2 24:19,20
opening 3:2 22:16 29:25 88:11
  105:21,22
operating 25:11 43:4
operation 38:22
operations 25:3,5,8 26:1 41:18
  92:1,5,23 93:11,14 98:12
operators 18:5
opinions 63:2,5
opportunity 22:8 23:23,25 54:25
  65:5 70:15 72:7 76:15 79:6
order 3:19 4:23 8:2 10:24 16:25
  27:3 33:21
organization 26:17,19,23,24
orientation 84:5,20 85:8,9
oriented 83:6 93:6
originally 79:9
Orlando 6:21,24 24:2 39:7
outside 45:6 50:23 75:19 93:21,24
  98:18 105:8
overlapped 17:12
overruled 49:20 53:11 58:10 96:13
  105:9
oversee 95:15,18
oversight 41:18
owned 5:7 6:2,5,6,7,10 20:2
owner 9:10
owners 3:18 6:17 7:9,20 8:14
  11:13 17:7,8 19:12 28:10,10
  38:15,21

**P**

packs 56:15,19
Page 2:2,11,11
paid 3:22 8:3,25 11:16 12:7,8 13:3
  15:22 16:1 17:6,9 18:22
paper 6:4,5,6 14:11 30:12,13
papers 75:4,5
paperwork 44:5,8,11,14 45:5,19
  46:4,8 47:4 49:25 50:7 65:16,18
  65:20 74:23 75:2,9,12 76:15,18
  76:20 77:5
paralegal 4:13
parental 28:16
part 5:12 11:24 34:12 45:15 76:19
  87:25
partial 9:19,20,21,25 10:6,11,18
  14:19 15:14 17:15,17,18 28:12
  34:12,17,19,23 36:11,15 37:15
  37:16 38:5 50:21 51:10 54:13
  55:23 61:4,10,14,18 64:5 74:19
  101:4
participant 70:18
participated 29:11 59:6,9
participation 11:24
particular 17:2 71:14,14 85:10
parties 107:5
pass 19:11 33:23 50:16
passed 14:5,13 57:4,15
passing 56:15
password 87:6
patient 3:19 8:14,15,16,20 10:13
  10:15,16,24 11:17 14:17 16:4
  17:8 26:11 34:23 36:7 42:15
43:13,17 44:3,4 50:12,13,14,17
  50:21 51:8 52:1 60:3,5 63:24
  65:17 71:14 72:3 73:14,20,23
  74:17,19 84:18 86:6,7 95:9
  105:21
patient's 46:2 46:5
pattern 64:13,21
Pavilion 35:11
pay 3:18,23 4:1 7:14,19,24 8:2,14
  11:19 18:20 19:4 37:20
paying 16:17 28:24
payments 58:6
pays 16:25 18:6,8
pen 75:3
pending 95:5,24
Penthouse 1:19
people 5:7,15 6:2,10 7:12 8:17,18
  9:1 10:2,4 11:3,14,15,20 12:10
  13:5 14:8 15:7,8,21,23,24 16:14
  17:16,17 19:5,16,19,23 20:1,5,7
  20:7 21:22 23:6,15,16,23 24:5
  25:3,8,18 27:9,24,25 28:17,24
  35:1,3 43:4 55:8,10 56:22 60:16
  60:25 64:19 72:5 86:1,3,8,13
  93:10 95:16,18 97:22,24
percent 17:13 18:1 20:14 51:17,19
  51:24 61:15,19 74:13 76:11,12
  76:12
percentage 51:15,22 61:13,17
  74:11,15
percentages 17:25
performance 27:4,12 83:23
performing 74:9 76:22
period 6:22 27:13 47:22 57:1 67:5
  84:5
periodically 44:18 64:17
permission 104:16
permit 71:9
person 12:24 14:23 19:22 22:2
  68:20
personal 15:15 75:20
personnel 44:5
persuade 29:10
phone 102:25
phones 94:20
phonetic 80:22 85:6
photograph 39:17,18
PHP 15:15 51:23
PHPs 9:20
physicals 27:6
physician's 76:1
pick 20:4 54:7
picked 20:25
picture 7:6,12
piece 30:12,13
placards 22:13
place 7:5 9:24 10:5 18:3 24:16 26:2
  27:11 45:14 48:11,16,19 50:10
  66:12 85:12 89:2 95:1 105:14
places 8:19 35:22
Plaintiff 1:5
plan 42:7 43:21 44:1,16
plans 42:6 75:10
Plantation 35:8
players 3:10 22:4
pleaded 29:21
please 22:13,17 31:14,16,20 32:2
  32:24 48:22 70:8 82:5 106:18
  107:2,8
pled 7:13,18 13:23 28:25
point 4:22 26:16 43:19,22 44:1
  46:1 62:15 71:8 72:13 97:7
points 71:7
policies 24:15,21 25:20 26:8,13,14
  27:11 28:1
policy 26:2
population 35:13 36:3 60:3,5
position 37:8 40:21 49:5 55:17
  58:17 79:23 89:12,15,17 90:15
possible 16:2,6 25:18
post 32:19,21
Poteet 2:3 31:19,25 32:5 45:10
  46:24 49:10,22 56:17 68:17
  77:25 90:6 97:19 104:9
predicate 38:24 45:6 46:17 47:10
  47:16 48:12 50:23 56:1,2 64:3
  68:4,5,10,14 72:10
prepare 95:17
prepared 95:5 107:15
prescribed 17:24
present 4:16 52:17 55:12 57:3 59:5
  75:15 77:10 88:19
President 16:22 62:8 92:10
presumed 29:24 30:1,19
presumption 30:2
pretty 45:14 62:6 88:7
prevent 10:17
preview 4:5
pre-suit 103:10,11
primary 37:13 42:3
principal 59:16
print 87:13
printers 21:23
prior 24:7 37:11 93:24
privilege 4:7
problem 8:10 25:23 61:2 77:19
problems 13:15 17:23 71:15
procedures 24:15,22 25:21 26:9
  26:13,14,23 27:11 28:2 69:14
proceed 49:22
proceedings 1:10 107:22 108:3
process 24:9,13,21 27:9 44:4,6
  48:1 74:24
professional 5:16 33:9,11,14,15
  33:24 34:5,7 38:7
professionals 11:5
program 3:6,9 9:18,20,21,22 10:1
  10:7,11,19 15:14 17:15,19 18:6
  22:25 23:5,13,14 24:5 26:3,4,7
  28:13 34:10,13,17,19,24 35:20
  36:11,16 37:9,15,16 40:22,24
  41:1,7 42:3 45:13 46:7 49:6
  50:22 51:11 54:13 55:23 58:18
  58:19 59:7 61:5,10 62:16 64:6
  66:14 79:14 80:16 81:15,19
  91:3,10,24 92:15,16,21 95:14,15
  95:19 96:2 98:11 99:7,11 100:18
  100:15,24 101:5
programs 28:18
progress 15:16 42:7 44:2,20 52:5
  52:9 86:5,9,25 87:10,13,18 88:1
prohibition 71:22
promoted 58:13,15,17 88:4
promotion 80:5,5,8 89:10
Promotions 28:9
promptly 107:3
proof 30:14,14
proper 68:5 69:6 72:10 95:24
prosecution 78:7
prosecutor 4:9 72:2
prove 29:18
proven 4:3,17
provide 16:14 19:13 24:10 37:17
  41:2
provided 3:15 5:24 25:2 87:4
provider 24:9,12,19 26:22
providing 3:17 5:13 19:5 23:18
  24:17
proving 30:6
psych 35:12
psychiatric 34:22 36:4 42:18 43:23
  44:8 51:10 75:10
psychiatrist 10:13,16,18 11:12
  36:12 43:23 73:15,25
psychology 12:3 22:22 32:16
Psychotherapy 33:18
publish 40:3
purchased 16:4
purportedly 5:13
purports 70:13
purpose 71:17
purposes 39:13
pursuant 68:7 70:11
pursue 32:25
put 12:9,9 13:15 18:24 20:1 34:23
  42:17 55:7 87:22 92:3
puts 10:18
putting 14:12
P-o-t-e-e-t 32:5
p.m 72:16 107:22

**Q**

qualifications 83:21
qualified 45:24 51:16,22 63:4
qualify 54:13 74:18
question 41:21 49:8 50:25 51:3
  53:10 57:10,12 63:15 96:14,15
questioning 15:4
questions 77:21 88:19 101:3 104:5
  104:10,19 105:17
quickly 75:4 88:7
quite 15:4 41:11 106:5

**R**

R 108:1
radio 106:20
raise 31:20 90:21,24
ran 6:14 42:5 85:10
ranks 88:7
Raton 24:2 39:7
reaction 77:17
read 83:5 93:5 106:21
readily 54:16
reading 68:12
readmitted 105:11
ready 75:2
real 10:12
reality 9:6
realize 10:6
realized 76:25
really 14:18,18 17:15,17 29:6,6
  53:7 59:11 61:6 88:3 102:14
  103:13 106:18
reason 8:1 65:24 66:4 71:22
  104:14 105:13
reasonable 4:3,17 29:19
reasons 98:7
recall 37:25 52:15,23 54:4,4 68:17
  68:22 79:16 84:23 85:5 104:9,19
  104:22
receive 42:23 73:15
received 2:10 33:12 34:2,6 40:2
  67:14 68:12 82:22 90:4 91:22
receiving 68:17 95:4
recess 31:8,9,11 107:8
recessed 107:22
recognize 39:14 67:11 82:2,16,17
  91:7 96:24 97:5
recognized 77:1
recollection 81:11 94:7 97:10
recommendation 80:18,21
record 32:3 70:4 71:13 72:7,11
  97:16
records 70:25 71:1 87:23 95:16
red 14:6,12,12
Redirect 2:7 104:6,7
Reed 78:13
refer 36:24
reference 97:15
referred 5:10
referring 88:23 97:24
reflect 52:3 67:16
reflected 44:23 73:23 77:5
reflecting 76:16
refresh 81:11 97:10
refreshes 94:7
Regional 99:2
regular 63:23 76:3
regularly 97:20
regulations 45:16
reimbursed 50:8 59:23
reimbursement 50:1
relapse 34:21
relating 64:22
relation 53:3
relationship 38:21
relationships 83:11 92:4
relatively 97:24
relevance 56:21
relevant 56:23
remainder 51:18
remaining 51:18
remember 9:3 15:5 18:13 25:9
  50:9 61:3,7 78:15 79:11,13
  80:20,21 81:10,22 82:4 84:22
  86:18 89:13,14 91:5 92:2 93:15
  94:4 95:3,4,7,10,23 96:5 100:6
  105:25
remembers 21:7
remove 22:13
render 70:25
rendered 38:4
repeat 96:15
rephrase 41:21
report 41:8 106:24
reported 1:21 41:7

**Reporter** 1:22 108:10
**represent** 30:8 56:3 78:1
**require** 24:16 51:5,6
**required** 26:22 45:1,4,19
**requirements** 33:21 34:10
**requires** 51:8
**research** 37:11
**residency** 34:10,12
**resource** 25:12
**resources** 29:9 38:14 85:2,4
**respect** 70:9,16 88:25
**response** 53:6,9,11 88:19 101:2
**responsibilities** 30:17 41:12 42:3
81:19 83:7,22 93:7
**responsibility** 25:24 76:19 92:25
95:12,15 96:3
**responsible** 83:12 91:25 92:4,7
93:10
**result** 57:17 73:11
**return** 22:9 27:18 34:21 35:4 64:21
65:12 101:5
**returned** 97:13
**returning** 100:23
**returns** 31:15 72:16
**review** 44:1 65:5 76:18,19
**reviewed** 44:18 61:17 73:22
**reviewing** 75:6
**reviews** 42:7
**right** 4:5,8,22 6:20 7:6 15:2 16:4
17:20,24 22:14 31:6,20 36:16
41:5 43:18 49:4,8 51:12 52:21
56:6 79:12,20 83:10 87:2,6,16
94:1,3 99:15 100:17 101:9,10
103:24 105:5,20
**ring** 7:10
**rise** 31:12
**risk** 51:9
**ROBIN** 1:22 108:9,10
**robinc1127@aol.com** 1:24
**Robin_dispenzieri@flsd.uscour...**
108:13
**Roger** 75:22,25 76:6,16,21 77:8,12
**rogue** 27:24 28:21
**role** 3:13 22:3,5 24:24 29:16
**roles** 21:11
**roof** 107:17
**room** 13:9,12 21:6,8 43:10,12
48:20,21 52:24 62:12 69:22 75:1
**rose** 23:14 88:7
**rotate** 43:11
**Rotbart** 101:25 102:3,6
**Routinely** 69:6
**RPR** 1:22 108:10
**run** 23:5 25:14 26:13
**running** 25:4 42:1 85:15,20 86:9
86:11
**rush** 13:11 21:5

**S**

**S** 108:9
**salary** 81:8 90:18
**San** 48:22
**sandwich** 72:1
**sandwiches** 21:21
**Santa** 68:23
**sat** 15:24 48:20,21,21
**satellite** 24:3
**Saulino** 1:13 3:3 4:10 31:18 79:4
107:21
**save** 21:21,23
**saw** 13:9 14:12 50:3 51:21,23 52:6
60:4 61:13,21 64:20 65:11 71:19
76:20,20 101:1
**saying** 16:5
**says** 30:13 92:7
**scheme** 3:13 6:14,22 7:11,22 8:13
11:16,24 12:6,22 13:10 16:16
17:4,5 18:19 21:25 22:3
**schizophrenia** 60:23 61:22
**schizophrenic** 10:4
**school** 33:4,22 97:25 98:1,4
**scope** 45:6 50:23 105:8
**seated** 31:16 72:17
**second** 70:2
**Section** 1:15
**see** 6:4 9:10,11 13:10 14:3,9 17:2
17:25,25 18:1 20:15 36:12 50:4
50:5 52:3 55:10,17 56:25 57:3,8
65:3,12,13,15,19 66:3 68:14

74:17,21 76:3,4,15 77:15,15
82:6,8 84:11 90:12 91:11 92:3
94:7 100:16 101:8 105:25 107:7
**seeing** 21:4 76:25 107:1
**seen** 56:19
**selection** 15:3 30:5 105:22
**send** 28:7 71:23,25
**sends** 24:12
**senior** 1:11 35:17 46:25 47:24 49:6
60:6 67:3 69:3 83:12 92:19 96:9
99:14
**sent** 15:9 67:19,20 68:12,20,23,23
68:24,25 69:14 87:22 102:12,15
103:1
**September** 37:5 100:4,7,13,17
**sequence** 96:7
**serious** 9:23 15:18 27:20 106:23
**seriously** 3:16 15:16
**serve** 20:21
**servers** 70:23
**service** 3:20 14:18 15:15
**services** 3:15 5:14,25 7:25 9:17,20
15:14 23:18 24:9,10,11,17 25:2
25:2 28:11,13 36:6 37:17 38:4,5
92:8 102:23 103:22
**serving** 23:10,10 24:6
**session** 31:13 42:8 44:3 52:8
62:12,13
**sessions** 42:5 43:11,18 75:15,17
**set** 16:18
**setting** 65:18
**settlement** 103:14,17,19
**seven** 25:9
**seventy-five** 51:18 76:14
**severe** 60:16,23 61:21
**shared** 21:3 69:5
**short** 31:7,11 106:25
**Shortly** 100:1
**shouldn't** 72:22
**show** 5:19 67:10
**showed** 26:23
**showing** 48:13 82:1 89:21 91:6
94:5 96:18
**shown** 70:17
**sick** 3:15 5:14 9:22 10:5 16:11
17:17
**sicker** 10:15,15
**side** 5:25 16:21 25:1,2,3
**sign** 13:25 14:1,1,1,7 20:8 75:3,4,5
87:16,18
**signature** 14:5 82:6,8,10,17 83:6
91:11,15 93:6
**signatures** 19:23,24 96:7
**signed** 13:5,6 14:13 19:21,23 20:9
20:16 21:24 83:2 93:2
**signer** 18:17
**signing** 14:21 16:18 74:23,24 75:7
75:9,12,15,17 83:5
**silly** 71:24
**similar** 60:19
**simple** 68:9
**simply** 41:18 71:3,18 106:8
**Singer** 1:14 2:4,7 4:11 22:7 32:7,8
39:1,3,9,11,22 40:3,5 41:21,22
45:9 46:2,3,14,19,20,23 47:17
49:9,13,19,21 51:2,13 53:16
54:21 55:11,21 56:2,5,9,10,24
57:9,13 58:1,4,5,12 63:6,11,17
64:2,4,25 65:22,23 67:7,9 68:1
68:16 71:5,6 72:18,19 77:21
78:24 82:20 90:1 91:19 96:9
97:4 104:8 105:12,16
**Singer's** 88:19 101:3
**single** 19:4 22:10
**sir** 32:6 78:11 91:12 94:13,24 99:13
104:2,4,13,25
**sit** 3:20 15:23 26:5 30:7 75:3 87:2
87:10
**sites** 6:23
**sits** 29:23 30:1,19
**sitting** 14:4 16:14
**six** 20:14
**Sixth** 48:9 68:6 69:19 70:11 71:22
**sixty** 42:21 43:3
**six-month** 27:9,13
**skills** 60:14,14,15
**sleep** 5:22,24 6:7,13,25 16:20,23
16:24,25 17:1,9,19,23,23 18:7
18:10
**sleeping** 50:14,14,18,18

**small** 8:21 19:17 23:3 53:2
**social** 35:8,12 42:17 60:14
**society** 9:25 35:20 79:21,22 80:9
**Solaire** 85:6
**solemnly** 31:21
**somebody** 15:16 16:10 47:11
53:25 55:8 64:22 72:4,11
**sorry** 53:10 79:12 80:5 102:22
**sort** 11:8,8,9,17 26:25 64:20 95:7
**sounds** 8:17 9:21
**South** 12:18 24:3 93:21,24
**Southeastern** 35:16,24
**SOUTHERN** 1:1
**speak** 22:8,12 26:21 32:24 103:1
**speaker** 96:12
**speaking** 46:16
**Special** 4:11
**specialized** 3:17 5:14 10:23
**specific** 50:9 69:25
**speed** 32:2
**spend** 14:16
**spent** 74:23
**spoke** 99:4
**spoken** 88:17
**spouses** 106:2
**spring** 20:10
**squirrel** 16:5
**St** 22:23
**stabilize** 34:20
**stable** 10:9,10 35:3
**stack** 75:2
**staff** 27:6,8,10 57:23 62:23 63:13
63:18,19,23
**staff's** 63:2
**stage** 9:23 15:18 46:4
**stages** 8:8
**stand** 25:19 30:8,14
**standard** 29:20
**standards** 51:6,16 83:22
**standing** 4:5,8 53:3 55:9
**stands** 27:18 49:2
**start** 3:23 8:6,8,10 43:18 90:15
101:15,20 105:1 107:3
**started** 7:1 37:8 40:12,16 47:19
62:21 72:21 93:3 100:8 101:15
101:20
**starting** 32:14 81:8 90:18
**state** 28:15 32:2,18 33:19 34:1,6,7
34:15 35:5 70:8 98:18,25 99:10
99:18,21
**stated** 83:8 93:7
**statement** 3:2 29:25 46:14 53:17
**statements** 22:16 105:22
**States** 1:1,4,11,23 4:9 22:18 27:19
29:5,7,8 30:8 70:12 78:6 108:11
**statistic** 22:19
**status** 61:23
**staying** 97:23
**Ste** 1:23 108:12
**steal** 3:5,8 4:23
**step** 18:19 44:6 53:17 69:22
105:18
**stepping** 26:20
**steps** 43:15
**stood** 29:22 45:16
**stored** 70:24
**straight** 22:23
**straightforward** 51:3
**stress** 59:25
**stricken** 55:5,6
**strict** 26:2 29:17
**strike** 56:6 74:17
**structure** 16:16,16 25:14
**student** 22:23
**studies** 16:24 27:4,4,12
**study** 5:24 17:1,20,23
**stuff** 19:11
**Subject** 56:6
**submitted** 80:18 89:12 99:21
**submitting** 80:21 89:14
**substance** 28:16 35:9,13 50:2
53:25 54:12 67:22,24 68:22
**substances** 33:6
**successful** 4:24 7:23
**sue** 73:8
**suffered** 60:9
**suffering** 23:7
**summaries** 42:7 75:11
**summary** 44:2
**supervise** 25:8 83:18

**supervised** 28:16 69:5 92:12 99:7
99:15
**supervising** 62:18 92:15
**supervision** 41:3 98:15
**supervisor** 40:19 47:22 49:5 69:9
104:11,15
**supervisor's** 99:18
**supply** 17:16
**suppose** 97:6
**supposed** 3:15 8:4 9:15 10:20,21
10:22 11:14 14:7 15:1 17:16
73:14,19 76:2,16 77:1,16
**supposedly** 3:17 5:14,17,24 37:14
**sure** 11:7 21:19 24:14 26:8 32:24
33:4 43:17 47:9 50:7 59:19
68:11 102:14
**surprised** 106:16
**suspicious** 20:19
**sustain** 50:25
**sustained** 38:25 45:8,23 48:11
54:20 55:4,20 56:22 57:25 58:3
63:4,16 68:5 72:8,13 97:6
**swear** 31:21
**SWORN** 31:25
**symptomology** 50:5
**symptoms** 34:21
**system** 28:15 30:5,19
**systems** 27:7

**T**

**T** 108:1,1
**table** 2:1 62:10
**tabs** 75:2
**take** 12:9,12 19:2 20:1,20,23 25:19
31:7 32:12 41:12,14 42:15 48:19
54:6 69:21 80:6 82:5 94:6,14
96:19 97:13 106:24
**taken** 31:11
**takes** 27:2
**talk** 5:20 7:22 9:11,14 13:17 26:11
30:23 41:19,23,25 57:22,23
83:21 84:15 106:3,14,19,23
**talked** 7:9
**talking** 15:5 21:24 25:9 27:12
36:25 46:22,24 47:1,4,11 59:13
61:6 65:1,18 70:5 75:18 101:6
**task** 26:19
**tasked** 25:24
**taskmaster** 25:20
**taught** 28:23
**tea** 31:8
**teaching** 98:1
**team** 6:11 78:7
**technicians** 54:6
**television** 106:20
**tell** 6:9 8:20,24 13:13,25 14:4,6,15
20:13,19,24 21:22 25:19 28:24
29:3 32:21 36:1 45:21,24 47:7
50:2 52:19 63:23 64:19,21 65:10
75:6 77:12 80:4 84:14 106:8,8
106:13
**telling** 101:13
**ten** 43:2,3 53:2,2 61:15 74:13
76:11,12,12 86:2,3
**tendered** 45:25
**terminated** 72:23 73:2,4
**terms** 38:21 48:3 65:25
**test** 13:19
**testified** 85:24 88:22,25 89:8 97:4
100:22 101:22
**testify** 7:15,17 8:12 13:2 15:13
21:4,6 28:4 29:13 71:19
**testifying** 70:14 72:20 96:10
**testimonial** 71:9,10,18
**testimony** 30:1,23 31:7,21 72:3
78:4 79:6 100:24 104:22
**thank** 3:3 22:11,12,13 31:5,9,16,18
32:7,13 39:1 56:9 65:21,22
69:23 72:17 104:6 105:16,24
107:7,20,21
**that's** 3:4 5:24 6:13 10:21 11:10,16
18:5 21:10,10 37:6 38:19 48:15
50:19 53:11 59:11 62:13 62:13
71:18 75:11 76:25 88:3 90:14
93:2 101:1,10 106:23 107:19
**theory** 71:1
**therapeutic** 3:14 5:1,9,21 6:1,4,12
6:19,20 7:2,4,24 8:4,5,24 9:2,12
9:16,17 11:3,11 12:17 13:20,24

14:23 15:10,22,23 16:3,7,16
17:13 18:7,9,11,18 21:2,16 23:1
23:1,9,12,21 24:18 25:1,5,17,21
26:1,14,16 27:14,17 28:6,7,12
28:14 29:7 35:19 36:21 49:3
65:24 66:4 70:24 71:2 79:9
80:17,24 84:8 88:5 90:7 100:1
102:6,13 103:2,4,14,19
**therapist** 22:25 23:5 37:9 42:4,14
46:7,25 47:24 49:6,7 54:10 67:3
69:3 79:15 80:16 81:15,19 82:24
83:12 84:1,8 85:17 88:9 91:4,25
92:19 99:6,14
**therapists** 14:22,25 16:9,12 23:13
24:5 26:4 41:3,4 43:10,11,19,25
48:20 57:22 62:18,20 63:7 95:16
**therapy** 5:11 8:4 12:3 13:21 15:19
23:5 36:11,12 42:8,23,24,24,25
51:25
**there's** 43:3
**thick** 14:10
**thing** 18:25 36:9 42:9 50:19 68:9
84:11
**things** 4:22 11:25 13:11 26:21 27:5
27:21,22 36:14 63:8 75:18,20
83:10 85:10 88:17 89:8 102:16
106:10
**think** 47:9 52:21 75:11 81:13
107:19
**thinking** 15:17 106:7
**third** 5:22 18:13
**Thomas** 22:24
**thoroughly** 107:15
**thousands** 8:22,23 19:3
**threaten** 73:4
**three** 5:7,7 6:1,3,10,10,17 7:9,9,10
7:20 11:7 18:14,24 38:21 41:13
50:18 59:11,13 60:2 65:2 72:25
80:13 86:12 100:24 101:6,14,14
101:18,19
**threshold** 26:21
**ticket** 29:4
**tie** 56:4,5,7
**time** 6:22 14:16 20:10,18 22:8,11
22:11 23:2,12 24:19 27:2 29:22
31:8 37:10,23 39:22 43:5,25
44:4 45:1,18 47:22 53:19 57:1
58:13,19 59:21 67:5 68:2 74:23
78:12,24 79:14,17 80:13 89:6
93:16,24 94:11,14,22 97:25 98:3
99:11 106:14,17,18
**times** 41:10 52:7 59:12 72:25
**today** 13:14 30:12,20 36:24 107:18
**told** 11:21 46:12,21 49:24 52:9
53:13 64:19,22 94:3,16 96:5,12
107:9
**tomorrow** 105:25
**top** 6:14 12:22 34:4
**topics** 59:16,18
**total** 20:5
**tough** 25:20
**trained** 46:25 84:23 85:5,8
**training** 47:1,25 48:1,3,6 49:7
50:20 51:15 58:24 61:9 83:25
84:3,20 85:12
**transcription** 108:3
**transfer** 18:11
**transportation** 9:4,5 24:4 25:13
**transporting** 9:2
**trash** 62:12
**travel** 93:21
**traveled** 93:24
**treat** 11:9 17:22 23:6 34:18,19
60:19,22
**treated** 9:16
**treating** 16:18 23:15 35:12
**treatment** 10:21,22 11:1 12:5
15:25 16:1,4,6,10,14 17:15,16
35:2 37:13,16,21 42:6,7 43:16
43:18,21,25 44:1,16 49:24 50:4
50:6,22 51:6,10,10,20,23 54:11
54:12,14 55:24 56:16 60:16 61:5
61:11,14,18 64:14 66:1,17 73:18
73:21 74:19 75:10
**treatments** 3:17 14:17
**trial** 1:10,13 4:11 5:4,11,17 6:10,15
6:17 7:13,16,18 8:16 10:3 12:1,7
12:13 17:4 22:6,7 29:23,23 30:3
31:22 107:19
**tried** 3:5 13:14 16:15 28:19

**triers** 29:16
**true** 18:4 88:3 99:24,25
**truth** 31:22,22,23
**try** 10:17 20:20 21:5 46:19 51:2
63:7 70:2 71:6 106:23 107:3
**trying** 15:16,17,19 104:23 105:1
**turn** 21:22,23 86:19
**turned** 24:1 80:4,5,11
**turns** 41:14
**twelve** 30:25
**twenty** 43:2,4 51:17 86:1,2,3
**twenty-four** 86:16 95:8
**twice** 17:9
**two** 6:23,23 10:6 18:17 22:20 25:16
33:22 50:18 54:4 70:1 89:6,6
93:21 94:23 100:11,17,19,19
101:11,16 104:20 106:10,13
**type** 10:22 17:2 26:23 33:17 36:8
37:13 45:5 54:10 64:13 67:16
75:9 77:14 87:10
**types** 9:15 14:8 16:24 34:17
**typical** 84:7
**typically** 17:24 36:5

## U

**unbeknownst** 28:21
**understand** 23:15 24:14 32:11
37:10,13 50:20 61:6 83:7 93:7
**understanding** 38:1,15,17,23 45:4
45:18,21 51:1 59:21 70:15 77:4
**understood** 37:12
**unethical** 104:18
**unfortunately** 61:1 93:19
**United** 1:1,4,11,23 4:9 22:18 27:19
29:5,7,8 30:8 70:12 78:6 108:11
**university** 22:22,24 32:17,18,22
35:16
**unknown** 27:22
**unstable** 10:9
**urinate** 62:11
**use** 3:20 4:17 20:11,22
**usual** 46:17
**U.S** 1:14

## V

**v** 68:7 70:11
**vacation** 105:2
**Valdez** 7:17 8:12 9:9 11:4 12:11
13:9 17:6 18:2
**Valera** 5:6 6:2,5,8 7:8,21 19:8
21:14 23:3 38:17 41:9,13 59:8
59:15 60:2 67:20 73:1 94:16
104:17
**valid** 8:18 11:7
**valuably** 23:11
**Vanessa** 78:13
**vans** 54:7
**various** 8:8 20:25
**Vecchio** 80:22
**verdict** 22:9 106:7
**verification** 27:8
**versus** 22:18 29:5,7
**visit** 39:20
**visitation** 28:17
**visits** 76:16,21 77:4
**volume** 9:1
**vs** 1:6
**vulnerable** 11:15,20

## W

**wait** 35:15 106:15,15
**want** 11:21 13:16,17,18 28:1 29:23
58:2 67:10 72:3 104:16 107:20
**wanted** 12:20,25 21:14 23:8 66:22
73:9
**wants** 24:10
**Washington** 1:16 68:8 70:11
**wasn't** 14:20 28:18 34:23 65:21
76:25 77:3 81:9,16,21 84:3,5
85:17 86:19 87:25 88:12 90:21
91:3 93:19 95:9,25 99:2 100:5
100:25 103:10
**wasting** 25:22
**watch** 106:21 107:16
**watched** 21:18,19
**watching** 11:15
**Wax** 1:18,19 2:6 22:15,17 38:24
39:24 41:20 45:6,22 46:13 47:8
48:8 49:15 50:23 53:8 54:19

55:3,5,19 56:1,7,21 57:5,24 58:8
63:3,15,25 64:18 67:24 68:3,6
69:18,19 70:1,7,9 77:22,24,25
81:23,25 82:18,23 89:23 90:5
91:17,23 94:10 96:16,17,23 97:8
97:9,18 104:5,10 105:8 107:12
**way** 10:12 11:5 13:2 17:5 19:14
20:22 28:23 60:19 63:10,18
70:18 77:14 99:4 104:3,12
107:11
**ways** 10:6 12:7,8 15:17,17
**week** 74:4,5 76:7 78:22 85:13
**weeks** 4:15 14:24 64:7 93:22 94:23
100:11,20 104:20
**week-long** 84:3
**went** 6:16 11:18 12:21 22:25 23:12
28:20 62:22 73:13 81:16,20
83:21 103:7 104:3
**weren't** 15:24,25 16:9 25:20 81:6
86:16 87:20 88:5 95:11 97:25
99:12 100:2 101:14,16
**We'll** 107:8
**what's** 55:7 82:14 97:1
**wheeler** 21:12 22:1
**whistle** 103:1
**Whistleblower** 73:9 102:17
**whiz** 106:3
**wife** 106:3
**Wilkie** 108:11
**wish** 21:15
**witness** 25:19 30:14 31:17,24,25
32:4 39:9 47:13 51:8,25 53:13
57:11 58:11 64:23 65:13 67:7
68:25 96:15 105:10,19,23 107:3
**witnesses** 2:2 4:16 6:9 15:13 29:13
29:13
**witness's** 45:7 50:24
**woman** 20:12 21:17 29:10 80:22
84:23
**won't** 50:16
**word** 10:14 15:3
**wording** 50:7
**words** 35:1 64:21 65:10 87:20
**work** 19:16 20:7 22:25 28:6 33:5,7
34:12 35:6,10,14 36:2 43:9,20
45:10 56:17 67:5 74:24 75:19
93:16
**worked** 6:10 7:20,22 8:13 14:22
17:5,6 20:3 27:16 35:8,11,15,20
35:22 40:23 45:14 54:23 73:25
74:8 75:22 85:2,4
**Worker** 35:9,12
**workers** 3:19
**working** 10:13 13:10 14:4 33:18
40:16,17 67:14 79:17,20,22
80:13 88:14
**works** 36:7 103:13
**world** 10:12
**worth** 5:23
**wouldn't** 66:3 86:23 87:18 95:11
95:14
**Wright** 32:18
**written** 20:5 71:12,17 81:21
**wrong** 14:24 96:6
**wrote** 19:6,15 71:19 72:11 97:3

## Y

**yeah** 92:18
**year** 22:20 28:19 33:4 62:8 81:8
**years** 5:1,2 7:23 16:2 19:19 21:11
23:12 33:22 45:11 56:18 80:14
106:18
**York** 1:15 48:22
**you'd** 86:22,22
**you're** 61:6 86:9

## $

**$1** 18:22
**$100,000** 19:3
**$199** 5:12
**$20,000** 90:24
**$200** 17:10
**$200,000** 103:4
**$205** 3:4 7:23
**$3.2** 20:6
**$30** 8:14,20
**$50,000** 81:13
**$52,000** 81:8
**$6** 5:23 16:23

**$70,000** 90:18
**$75,000** 73:13 103:17
**$800,000** 19:18 20:6
**$87** 3:7

## 0

**07** 37:5,5
**08S67** 1:23 108:12

## 1

**1** 1:11
**1st** 89:19 90:13
**10-20767-CR-JLK** 1:3
**102** 2:13 67:11 70:4,5,9 72:15
**103** 70:7
**104** 2:7
**13th** 70:21
**1400** 1:15
**15** 1:7 2:13
**18th** 90:15 93:3 100:9,16,16,16
101:9
**1999** 33:12

## 2

**2** 1:19 2:12,12 39:13,23 40:1,2
**2nd** 23:4 92:25 93:5
**2002** 22:25 34:6
**2003** 34:3
**2005** 26:16
**2007** 47:20 58:16 70:21,22 79:10
79:12,13 82:15 83:3,5 89:4,4,19
89:20 90:13,16 92:25 93:16
94:25 97:2,12 98:17 100:5,9
**2009** 20:10
**2010** 1:7 78:10,18 80:3
**2011** 78:22
**20530** 1:16
**22** 2:14,16,18
**23rd** 97:2
**24th** 78:18
**24/7** 2:5
**27th** 70:22
**29th** 80:3

## 3

**305/373-4400** 1:20
**305/523-5659** 1:24 108:12
**31** 2:3
**32** 2:4
**33128** 1:24 108:12
**33131** 1:20

## 4

**4** 2:15
**4th** 100:4,13
**4:12** 72:16
**40** 2:12 22:20 32:10
**400** 1:23 108:12

## 5

**5th** 78:21
**5:00** 107:22

## 7

**7,000** 6:23 16:3
**72** 2:13
**75** 17:13 18:1
**77** 2:5

## 8

**8-16-2011** 108:9
**800** 1:19
**82** 2:14

## 9

**9** 2:17
**9th** 79:10,12 82:15 83:3,5 88:9
101:8
**9:00** 1:7 105:25 107:3,7
**90** 2:15
**91** 2:16
**94** 2:17
**96** 2:18