```
 1                    UNITED STATES DISTRICT COURT
                      SOUTHERN DISTRICT OF FLORIDA
 2                         MIAMI DIVISION
 3                      CASE 10-20767-CR-JLK
 4
     UNITED STATES OF AMERICA,
 5
                           Plaintiff,
 6
          vs.                            MIAMI, FLORIDA
 7                                       AUGUST 16, 2011
     JUDITH NEGRON                       TUESDAY - 9:00 A.M.
 8
                           Defendant.
 9
10             EXCERPT OF JURY TRIAL PROCEEDINGS
           BEFORE THE HONORABLE JAMES LAWRENCE KING
11            SENIOR UNITED STATES DISTRICT JUDGE
                           DAY 2
12   _____
     APPEARANCES:
13
     FOR THE GOVERNMENT:    JENNIFER L. SAULINO, TRIAL ATTORNEY
14                          BENJAMIN D. SINGER, ASSISTANT CHIEF
                            U.S. Department of Justice
15                          Criminal Division, Fraud Section
                            1400 New York Avenue NW, Bond Building
16                          Washington D.C.  20530
                            Email:  jennifer.saulino@usdoj.gov
17                                  benjamin.singer@usdoj.gov
18   FOR THE DEFENDANT:
                            BARRY MICHAEL WAX, ESQ.
19                          Law Offices of Barry M. Wax
                            800 Brickell Avenue, Penthouse 2
20                          Miami, FL  33131 - 305/373-4400
                            Email:  barrywax@bellsouth.net
21   REPORTED BY:
                            ROBIN MARIE DISPENZIERI, RPR
22                          Official Federal Court Reporter
                            United States District Court
23                          Wilkie D. Ferguson Federal Courthouse
                            400 N. Miami Avenue, Ste. 08S67
24                          Miami, FL  33128 - 305/523-5659
                            robin_dispenzier@flsd.uscourts.gov
25
```

TABLE OF CONTENTS

WITNESSES:                          PAGE

DOCTOR MARVIN HERZ ............... 5

      Direct Examination By  ...... 5
Ms. Saulino

      Cross-Examination By  ...... 41
Mr. Wax

MARGARITA ACEVEDO ............... 43

      Direct Examination By  ..... 43
Ms. Saulino

Reporter's Certificate .................................. 162

INDEX TO EXHIBITS

| Exhibits | Marked for Identification | | Received in Evidence | |
|---|---|---|---|---|
| Description | Page | Line | Page | Line |
| Government Exhibit 1 ............................ 49 | | | | 14 |
| Government Exhibit 10 ........................... 83 | | | | 15 |
| Government Exhibit 14 ........................... 89 | | | | 9 |
| Government Exhibit 19 .......................... 102 | | | | 10 |
| Government Exhibit 38 ........................... 12 | | | | 4 |
| Government Exhibit 88 ........................... 46 | | | | 22 |
| Government Exhibits 42J, K, L, M, N ............. 115 | | | | 24 |
| Government Exhibit 15 .......................... 137 | | | | 8 |

3

1                          MORNING SESSION

2              COURTROOM DEPUTY:  All rise.  The United States

3    District Court for the Southern District of Florida is now in

4    session.  The Honorable James Lawrence King presiding.

5              THE COURT:  Thank you.  Be seated, please.

6              I understand that you have something that you would

7    like to bring up before we bring in the jury.  The last juror

8    just arrived.  It is 9:17.

9              MR. SINGER:  There was a small incident yesterday

10   where there were some visitors gathered out in the waiting

11   area, and they referred to Ms. Poteet as lying, in profanity

12   that was very audible out in the waiting area.

13             THE COURT:  Identify them and we will have a contempt

14   hearing.  We will do that at noon.  Identify the people.  Make

15   a showing of who they are.  We will issue a rule to show cause.

16             I am not going to fool around with people out there

17   interfering with either side.  People have a right to come

18   here, make their statements, and go.  If you are asking that

19   they be held in contempt of Court and penalized, if the

20   allegations are established, fine.  We will do that at noon.

21             MR. SINGER:  Perhaps we can warn everybody in the

22   audience.

23             THE COURT:  Come up to the microphone.  What now?

24             MR. SINGER:  Your Honor, perhaps we could warn

25   everybody in the audience.

4

1          THE COURT:  I just did.  I am going to impose a fine,

2     put them in jail, if anybody messes with any witnesses coming

3     in or out.  It's your decision.  If you want to ask for a rule

4     to show cause, fine, just identify the person.  I am not going

5     to do it ad hoc.  It's easy.  Name the person, identify the

6     person.  We will have a hearing.  The person can tell me what

7     they did, whether or not they cursed a witness or the

8     defendant, and we will make a decision.

9          If they did something like that, there will be

10    sanctions.  If they didn't, they will be freed.  If you want to

11    do that, go ahead and get it done.  You won't let an agent say

12    something untoward to a defense witness, nor will I let anybody

13    else do anything.

14         Matter of fact, we will bar them from sitting out

15    there and sit on the next floor below.  That's it.  Otherwise,

16    we will just get them out of here.  They need to act like

17    courteous people.

18         I am assuming you knew nothing about this, Mr. Wax, or

19    that your client had anything to do with it?  I am assuming

20    that.

21         MR. WAX:  It was brought to my attention this morning,

22    Your Honor.

23         THE COURT:  Bring the jury.

24         [The jury returns to the courtroom at 9:20 a.m.]

25         THE COURT:  Thank you.  Be seated.

 1          Call your next witness, please.

 2          MS. SAULINO:  Thank you, Your Honor.  The United

 3   States calls Doctor Marvin Herz.

 4          COURTROOM DEPUTY:  Please raise your right hand.  Do

 5   you solemnly swear or affirm that the testimony you are about

 6   to give in this trial will be the truth, the whole truth, and

 7   nothing but the truth so help you God?

 8          THE WITNESS:  I do.

 9          COURTROOM DEPUTY:  Please state your full name and

10   spell your last name.

11          THE WITNESS:  Doctor Marvin Herz, H-e-r-z.

12          COURTROOM DEPUTY:  Thank you.

13          MS. SAULINO:  Your Honor, may I approach the witness

14   to provide some water?

15          THE COURT:  Yes.

16       DOCTOR MARVIN HERZ, GOVERNMENT'S WITNESS, SWORN

17                     DIRECT EXAMINATION

18   BY MS. SAULINO:

19   Q.  Good morning, Doctor Herz.

20   A.  Good morning.

21   Q.  I understand that you have been getting over a cold

22   recently.  If you need a minute to get some water, please let

23   the Court know.  You will have to speak very close to the

24   microphone.  We have learned that yesterday with one of our

25   witnesses.

1          Doctor Herz, can you please give the jury a synopsis

2    of your professional background.

3    A.  My professional background started after I completed my

4    psychiatric residency.  I answered to the Navy for two years,

5    served in the Navy as a psychiatrist.

6          I then went to New York City where I was Director of

7    Psychiatry at the in-patient unit in Mount Vernon, New York, a

8    major hospital.

9          After two years, I decided I wanted to direct a day

10   hospital, which I did, at the Bronx Municipal Hospital.  I

11   became very interested in the workings of partial

12   hospitalization.  I have always done research on delivery of

13   mental health service; in other words, what is the most

14   effective service delivery for the patients.

15         I then moved on to Colombia University, New York State

16   Psychiatric Institute.  They did not have a community

17   psychiatry program when I got there.  I spent years developing

18   their community psychiatry program, which was defined as really

19   dealing with patients, mental patients, in the local community.

20   I did that for a number of years, teaching and doing research.

21         Then, after a short stay at Emery University, I became

22   Chairman of Psychiatry at Buffalo.  In that capacity, I was

23   Director of Psychiatry at the Eerie County Medical Center,

24   which is similar to Jackson Memorial Hospital here.

25         I was also Director of Buffalo General Hospital

1    Center, of psychiatry, which had a community mental health

2    center.

3           After doing that for quite a while, I then went on to

4    the University of Rochester Center where I could do more

5    clinical and research work.  I was a professor there, and also

6    a Director of their long-term care program, which treated

7    almost 1,000 chronically mentally ill patients.  We had partial

8    hospital out-patient and the full range of services.

9           After spending years up north in the cold weather, my

10   wife and I decided to come to Florida.  I decided to do

11   part-time work in Miami at Jackson.  For six years I was doing

12   part-time work supervising psychiatric residents at the Jackson

13   Memorial Hospital, in the Out-patient Department, where I would

14   work with them seeing patients and giving them advice about

15   treatment.

16          Two years ago, I decided to give that up.  I am a

17   volunteer psychiatrist at the University of Miami, volunteer

18   professor.  So that's the main part of my vocational career.

19   Q.  Doctor Herz, could you please explain to the jury some of

20   the research that you have done during your career.

21   A.  Yes, I have always been interested in having the most

22   effective services delivered to psychiatric patients.  When I

23   was at Colombia New York State Psychiatric Institute, I did a

24   study comparing how effective a partial hospitalization program

25   would be instead of in-patient psychiatry.

 1            In other words, instead of hospitalizing the person

 2    full-time, they would receive partial hospitalization.  That

 3    was a random controlled study.  We found out that many

 4    patients, who would ordinarily be hospitalized, could be

 5    treated in a partial hospitalization, and the results were

 6    somewhat better for the partial hospitalization patients.

 7            Like I said, this was published.  One of the

 8    advantages was that it reduced cost considerably.  Comparing a

 9    partial hospital program, which has one shift and patients

10    don't sleep over and you don't need as much support staff, to a

11    full-time hospital.

12            The study, since we realized that patients -- there

13    were some very severe patients that couldn't be treated in a

14    partial hospital right away, because they go home at night or

15    they go to some residence and they were on their own.

16    Sometimes people, for their own protection and safety, need a

17    part-time hospital at the beginning of what we call a severe

18    episode illness.

19            So I did a study comparing brief hospitalization and

20    longer hospitalization, and following the brief

21    hospitalization, using as a transition back to the community,

22    partial hospital.  This was done at the Psychiatric Institute

23    of New York.  We found that patients who were treated with a

24    shorter in-patient stay and a partial hospital stay did better

25    than patients who stayed a longer time in the hospital with no

HERZ - Direct

1    partial hospital to smooth the transition back into the

2    community.

3            Since I have been doing a lot of work with acute

4    patients, patients who relapse and what to do about them, I

5    started to do a study of how do you prevent relapse from

6    occurring.  Interestingly enough, there had been very little

7    work about the question of how fast is relapse actually.

8            Does a mental patient relapse immediately?  I mean,

9    one day they are okay and the next day they are all of a sudden

10   relapsed and require hospital?  I think about the first

11   systematic study showed that relapse usually occurs for a

12   period of at least some days, but often weeks.  It gradually

13   goes into a relapse.

14           Then I did a study seeing whether we could reduce

15   relapse by intervening early with more medication and

16   out-patient management treatment to prevent relapse, full

17   relapse, from occurring.  This was successful.

18           All of these studies that I have talked about have

19   been published in major psychiatric journals.

20   Q.  Doctor, were you the editor of any psychiatric journals

21   that have relevance to your testimony today?

22   A.  Yes, I was Associate Editor to the International Journal of

23   Partial Hospitalization.

24   Q.  Have you won any award relevant to your testimony today?

25   A.  Yes, I received two awards for my research by the American

1    Psychiatric Association; one on hospital psychiatry and one on

2    my research in schizophrenia.  I also received an award from

3    the American College of Psychiatrists for my research in

4    schizophrenia.

5         From New York State, I received the prestigious Hines

6    and Sanford Recognition award for my research, most recently,

7    the gave me a reward.

8    Q.   Doctor, you mentioned the American Psychiatric Association.

9    Did you have any relevant involvement with that association?

10   A.   Yes, I was actively involved with the American Psychiatric

11   Association.  I received an award for my research in

12   schizophrenia.  I was Chairman of some committees of the

13   American Psychiatric Association.  One committee was on

14   developing practice guidelines for the treatment of

15   schizophrenia.  I was Chair of that committee.  There was no

16   committee to develop practice guidelines.

17        I was also Chair of their committee on quality

18   indicators.  In other words, how do we decide what is good

19   quality care, what are the measures.  So this was a major

20   committee trying to improve care by having a measure of quality

21   of care.

22        I was also Chair of the American Psychiatric

23   Association research prize committee, which picked what we

24   thought would be the person most outstanding in psychiatry and

25   research.  Those are the major involvement that I have had with

1    them.

2    Q.   Is it fair to say, Doctor, that you are one of the pioneers

3    in partial hospitalization programs in treatment and advocacy?

4    A.   Yes, I was one of the early people involved, and I was very

5    much committed to advancing this.  Just to explain, partial

6    hospital gives more dignity to patients because they don't get

7    put away in a hospital.  It's almost like going to work.

8            They go in the morning and come back in the evening.

9    They can be involved with family and friends.  It's a less

10   restrictive environment, giving patients more freedom, as long

11   as they can handle it.  In other words, they have to be able to

12   handle it in terms of their ability to function.

13           MS. SAULINO:  Your Honor, may I approach the witness?

14           THE COURT:  Yes.

15   BY MS. SAULINO:

16   Q.   Doctor Herz, I have handed you what has been previously

17   marked for identification as Government's Exhibit 38.  Do you

18   recognize that document?

19   A.   Yes, it's my curriculum vitae.  It describes all of my

20   activities over the years.

21   Q.   Did you create this document?

22   A.   Yes, I did.

23   Q.   Is it forty-three pages long?

24   A.   I haven't counted it lately.

25           MS. SAULINO:  Your Honor, at this time the United

1   States offers into evidence Exhibit 38.

2            MR. WAX:  No objection, Your Honor.

3            THE COURT:  Admitted into evidence.

4            [Government Exhibit 38 received in evidence].

5            MS. SAULINO:  Thank you, Your Honor.

6            At this time, the United States offers Doctor Herz as

7   an expert in partial hospitalization treatment and the services

8   and the treatment for individuals that suffer from mental

9   illness.

10           MR. WAX:  We have no objection.  We would renew our

11  docket entry 240 and the arguments made therein.

12           THE COURT:  The motion is granted to certify Doctor

13  Marvin Herz as an expert in the field just stated.

14           For the jury's information, normally witnesses cannot

15  offer their opinions about facts.  Fact witnesses tell you

16  about facts.  They don't express opinions about those facts.

17  That is up to you to decide.

18           Expert witnesses are permitted, under the Criminal

19  Rules of Procedure, to express an opinion.  It must be based

20  upon the facts of the given case, but they can express opinions

21  within their expertise; in this case, the psychiatric

22  evaluation and handling the problems of patients in a Partial

23  Hospitalization Program.

24           Doctor Herz can express opinions based upon

25  hypothetical questions, based upon the facts in this case, if

1    counsel poses those questions and seeks an opinion.

2         You can take an opinion of an expert as opposed to a

3    lay witness, and you weigh it and judge it as you would

4    anything else.  If it is reasonable, then fine, you accept it.

5    If there is conflicting testimony, I am not suggesting there

6    will be, I don't know, but you judge it with the same

7    credibility choices that you make.  But they can express

8    opinions.

9         While we have interrupted, several of the jurors this

10   morning, and I neglected to bring this up, said that they would

11   like to take notes and might like to take notes.

12        Joyce, you can go ahead and get those passed out while

13   I instruct the jury about the notes.  She will hand out to

14   those who want them.

15        You don't have to take notes.  If you want to take

16   notes, you can.  If you do take notes, those notes are for your

17   personal private use.  You may refer to them to help you

18   refresh your recollection or whatever.  Notes do not have any

19   priority over anybody's individual memory about the facts.

20        When you get into the jury room, and you are

21   discussing it, if one person did not take notes and one person

22   did, and you are both remembering from your memory the

23   testimony, you rely on your memories.  The notes don't take

24   some sort of priority.  A juror can't say, "Oh well, I wrote it

25   down, so you lose the discussion."  It doesn't work that way.

HERZ - Direct

1    The notes are for your personal use, and that is helpful to

2    you, and that's fine.

3              A, you can take them if you want to.

4              B, you don't have to take them if you don't want to.

5              C, they take no priority over your individual

6    memories.  Your individual memories are what counts.

7              Does everyone understand the instruction?

8              Does everyone understand the instruction about the

9    rules governing expert testimony?  Good.  We will go on, and

10   anybody that would like a notebook, just raise your hand.

11   BY MS. SAULINO:

12   Q.  Doctor Herz, could you please explain to the jury for what

13   purpose Partial Hospitalization Programs were designed.

14   A.  Partial Hospitalization Programs were designed mainly for

15   the treatment of mentally ill patients with serious mental

16   illness in what we call the acute phase of the illness.

17             These patients would ordinarily be hospitalized if

18   there were no partial hospital, but because they could

19   cooperate, at least minimally in treatment, and there was no

20   danger to themselves or others and had some support outside of

21   the hospital, they would be appropriate for partial

22   hospitalization.  So, it's a way of avoiding hospitalization

23   and still giving effective treatment.

24   Q.  What is the clinical reason for wanting patients to live in

25   their communities while being treated full-time?

1  A.  You have to remember that there is a great stigma about

2  being mentally ill.  In the past, patients were really, quote,

3  put away.  They were put in a hospital, and they were deemed

4  that they could not stay in society.  So part of it was the

5  feeling that many of those patients could remain in society.

6  They could remain with their friends or family, carry on much

7  of their lives outside, and not be totally separated.

8           It was also found that sometimes when a person gets

9  into a hospital, they kind of get -- they lose the ability to

10  function very well.

11          As a matter of fact, if you think about it with

12  physical illness, we talk about it now.  Somebody has a heart

13  attack.  We say let's have early ambulation.  The old idea was

14  to keep them in bed and stay in bed for long periods of time.

15  The new idea is to get them up and functioning quickly.  That

16  helps their rehabilitation.  It's a way from actually keeping

17  them from regressing, going back and getting worse.

18          Sometimes when they go in a hospital, it helps them to

19  adapt to go back in the community because they have been in the

20  community dealing with the issues that they have to face in the

21  community and not being put away in a hospital.  These are some

22  of the major reasons.  Of course, from the other point of view,

23  from society's point of view, it's also much less expensive.

24  Q.  Doctor Herz, can you please explain to the jury the kind of

25  patients that Partial Hospitalization Programs would have.

1   A.  Usually, it's a major mental illness.  The most prominent

2   ones are schizophrenia, bipolar disorder, and major depression.

3   Now there may be others.  These are the major mental illnesses.

4   Q.  Could you give the jury an idea of what schizophrenia might

5   look like in a patient.

6   A.  Schizophrenia is characterized by an individual who has,

7   usually, hallucinations.  Hallucinations, we talk about hearing

8   voices as an example of hallucinations, hearing voices when

9   there is nobody around and nobody in their room.

10          They can also be what we call paranoid where they have

11  fear that somebody is out to get them, wants to hurt them.

12  They can even be very strange things like a delusion that, for

13  somebody that lives a very simple life and not really involved

14  in the outside world, that the Mafia is out to get them, I

15  better hide.  It prevents them from functioning at all because

16  they are so concerned and worried about it.

17          These are the kinds of things that happen in

18  schizophrenia.  Sometimes their thinking gets a little

19  disorganized and they don't think straight.

20          Then we have bipolar disorder, which is the old manic

21  depressive disorder, where basic people have either highs or

22  lows.  In other words, manic or depressed, and they alternate.

23          Manic patients are usually -- it's almost like a steam

24  valve is ready to burst.  There is so much pressure.  When you

25  talk to such a person, they talk very fast, very quickly, and

1    it's hard to follow them.  They go from topic to topic.

2            They are very often grandiose.  They think that they

3    are king of the world.  They don't need any sleep.  They can go

4    for days without any sleep.  In other words, somebody who is

5    under tremendous pressure and very often happy.  Well, they can

6    be irritable too.

7            The depressed phase, I think most people have some

8    idea about depression.  Depression is when you are sad and blue

9    and you feel worthless.  All of these illnesses, they are

10   different from their usual self, and it impairs their ability

11   to function in their everyday lives.  A depressed patient, of

12   course, can become suicidal, and there are other symptoms, but

13   I think you have a clear idea of what depression is.

14   Q.  For major depressive order what is the difference there?

15   A.  Major depressive compared to bipolar?

16   Q.  Yes.

17   A.  Bipolar, a person can have ups and downs.  They can

18   alternate.  Depression, they don't have the up.  They just have

19   the down.  Really down, sad, blue, feeling worthless, feeling

20   like there is nothing to live for and so forth.  That's the

21   difference.  In major depression, there is no manic phase.

22   Q.  Doctor Herz, would you call each of these diseases serious

23   or severe mental illnesses?

24   A.  Yes.

25   Q.  What is the difference between a serious or severe mental

18

HERZ - Direct

1   illness, like what you described, and something like dementia
2   or Alzheimer's disease?
3   A.   Dementia, it usually occurs in older age, while the other
4   disorders or diseases begin much younger.  It could be late
5   adolescence, 20s or early 30s.  Dementia, there is demonstrable
6   evidence.  If you do an MRI or CAT scan in the brain, you can
7   see that there has been deterioration in the brain.
8          Patients with dementia will have trouble with memory.
9   They will not remember -- I was with somebody in a restaurant
10  who had early dementia, and the waiter asked what did you want
11  for dessert, and she said, "I will have ice cream."  Then later
12  on she said, "Waiter, I want to order dessert."  I said, "Well,
13  I thought you did."  "No, I didn't order any dessert.  I didn't
14  know.  Did you ask me?"
15         The first is a loss of recent memory.  Then it goes
16  on.  They have trouble concentrating on a topic.  They have
17  trouble understanding what is going on because their brain is
18  physically impaired and, of course, there are stages of
19  dementia from mild to very severe where a spouse might not
20  recognize her husband, or recognize children, or anybody close.
21         So, there are various degrees of dementia, but it can
22  usually go on to a person really not being the same person as
23  before, because they don't who you are or who they are even.
24  It's a very sad situation.
25  Q.   Doctor, stepping back to major depressive disorder and

HERZ - Direct

1    bipolar disorder, lots of people in the community know the term

2    "depressed" and can even remember times when they were

3    depressed.  Can you explain the differences between depression

4    that can be in anyone's life and major depression?

5    A.   As you said, almost everybody gets depressed once in a

6    while.  Major depression, it has to be a period of at least two

7    weeks where every day you feel sad and blue, have no pleasure

8    in life.  Really feel like you are no good, you never were any

9    good.

10          You have trouble sleeping, usually, either too much or

11   too little.  You have trouble with your appetite.  It could be

12   the gaining or losing weight.  Of course, depressed patients

13   can be candidates for people who want to kill themselves, and

14   some do.  You can really get to be so bad you have a feeling

15   that life isn't worth living, and I am going to end it.  It's a

16   matter of the severity.

17          We all have our feeling of depression once in a while,

18   maybe a few days or so.  When it goes on for at least two

19   weeks, and you are clearly different from yourself and you are

20   clearly not functioning in a way that you have been before, we

21   call that a major depression.

22   Q.   Doctor, now that you have given the jury an understanding

23   of the illnesses that are treated by a Partial Hospitalization

24   Program, can you explain to the jury the phases of these

25   illnesses that you would see throughout the course of a

1   patient's disease?

2   A.  Well, at one time we used to think that if a person became

3   mentally ill they would be always mentally ill with the same

4   symptoms.  We now know that most mental illness that we talked

5   about has different phases.

6          A person might have a few or minimal symptoms, and of

7   lesser intensity, and then at some point, usually after some

8   stress of some kind, when they get upset, they go onto having a

9   severe form of the illness, which really stops them from

10  functioning.  They may not be able to take care of themselves

11  or handle things.  In other words, they have very severe

12  symptoms.

13         I mean, I can give you an example.  For example, in

14  schizophrenia, if that would help, say a schizophrenic patient

15  who might hear voices.  When he is in, what we call, a stable

16  phase, he might be in a room and he hear somebody calling him,

17  but there is nobody else in the room.  So it doesn't really

18  bother him that much.  It occurs a few times a day.  He can

19  pass it off and go on with the regular activities.

20         When he goes into, what we call, an acute episode, the

21  severity of the symptoms become much greater.  Instead of

22  hearing an occasional voice that doesn't bother him, he may go

23  on to hearing, "People are talking about me all the time.  I

24  hear them talking about me, and they are saying terrible

25  things.  And it's happening every five minutes.  I hear this,

1  and I can't concentrate on anything else.  It's really making

2  me sick.  I can't do anything.  I can't sleep.  It wakes me up

3  at night."

4        What I am saying is there are levels of severity of

5  these illnesses which make the person -- if they are on the

6  stable phase, they can handle it.  When they get into a very

7  acute phase, it's like the end of the world for them.  They are

8  just overwhelmed.

9        With bipolar it can be the same thing.  They may be

10 feeling good part of the time, stable, but when they are in the

11 episode, in the severe episode, you get to talk to them and you

12 feel that they are overwhelming you and they are talking about

13 how wonderful and great they are.  You can't follow them.  They

14 think so fast, they go from topic to topic.

15       What I am saying to you is there are levels, the

16 intensity of the symptoms, the severity.  With depression, by

17 the way, you can have delusions in bipolar and depression and

18 schizophrenia, and, you know, for delusions when the symptoms

19 are mild, you may have a feeling that whenever I walk into a

20 room, everybody seems to be looking at me.  Or when I walk down

21 the street, people are always watching me, and I just have a

22 vague feeling that maybe somebody is out to get me.  But they

23 go on with their lives and they can function.

24       With a severe delusion, you might feel that you are

25 going to be attacked.  You have got to watch every step.  I

1  can't leave my house because if I do, somebody is going to kill

2  me, and terribly frightened and agitated.  As I said, you might

3  just stay at home and not go out at all because you are so

4  afraid that something terrible is going to happen.

5  Q.  Doctor, these different phases that occur for a patient

6  with this kind of disease, do they occur on some sort of

7  regular cycle?

8  A.  Not generally.  We think that, in many cases, something

9  that happens in their life that they get upset, and when they

10 get upset they start to get sicker, more symptoms.  Like,

11 somebody rejected them or having somebody in the family attack

12 them.  They didn't get -- if they were working, they didn't get

13 a promotions or they were fired.  So anything like that could

14 have upset them.

15      The only time that I can think of when it might occur

16 regularly, this is the thing that I am thinking about, you can

17 have what we call an anniversary reaction.  Let's say a loved

18 one died on a certain day, and he might have gotten very

19 depressed.  Maybe every year on that day you might get

20 depressed again.  That's what we call an anniversary reaction,

21 when something very bad happened on a particular day, but

22 that's not the usual kind.

23 Q.  Doctor, hypothetically, would you expect to see a patient

24 with a serious mental illness like this have a regular course

25 of a six-week episode, followed by three months, and then

HERZ - Direct

1  another six-week episode?

2  A.  No, usually there is no regular time between episodes.

3  Q.  Now, Doctor, having described the various phases of

4  disease, and the diseases, can you give the jury an

5  understanding of the various parts of the system of care for

6  patients with serious mental illness.

7  A.  Yes.  Well, before the 1960s, most patients were very often

8  put in state hospitals, and they can stay there for months or

9  even years.  It was realized that it was probably not helpful

10  for them.

11       John Kennedy was responsible for the Community Mental

12  Health Act for treatment in the local community, instead of

13  being put away in state hospitals for long periods of time.

14  That consisted of in-patient partial hospital, emergency

15  services, out-patient care, and consultation to agencies.  The

16  idea was mental illnesses, since they fluctuate, you need

17  different kinds of services to appoint to different illnesses.

18       When they get very sick, they go to an acute hospital.

19  Less sick, they go to a partial hospital.  If they need

20  emergency care, they go to the emergency room.  For most cases,

21  they go to a regular out-patient treatment where you come into

22  the clinic, you get your medication and psychotherapy, if that

23  is appropriate, individual or family treatment.

24       In the stable phase, patients would ordinarily be in

25  out-patient treatment because these are really chronic

1    illnesses and they need some care, at the very least,

2    medication management, because medications not only help an

3    acute episode, but they also help prevent relapses.

4    Q.  Doctor, can you take one of your examples, for example, a

5    schizophrenic, and explain the various types of treatment you

6    would use at each of the various phases.

7    A.  Well, as I said, we will start with the acute phase.  You

8    would obviously use, when a patient is getting worse, you

9    usually give them more medicine, or maybe a different kind of

10   medicine, or add another medicine.  You would see them more

11   frequently than when you would see a patient who is stable.

12        For medication management, many patients can benefit

13   from different kinds of talking therapy, cognitive therapy,

14   supportive therapy, helping them with their everyday problems,

15   helping them to learn how to function better, cope better.  If

16   there are problems in the family, conflicts, sometimes having

17   family treatment.

18        In the stable phase, you would do all of these things

19   --

20   Q.  Doctor, before you get to the acute phase, those things

21   that you just described, are those considered out-patient

22   treatments?

23   A.  Yes.

24   Q.  Moving into the acute phase.

25   A.  In the acute phase, obviously you would try to prevent the

1   acute phase from occurring.  If you see the person getting

2   worse, you give them more of what I just told you.  In an acute

3   phase, you put them in the hospital or partial hospital

4   depending on what they were like.  Make sure you manage their

5   medicine, manage them properly, and they receive treatment in

6   the hospital or partial hospital, which can be various kinds of

7   individual or group therapy.  It's more intensive.  Monitor

8   them carefully.

9           In the acute phase, you see changes occurring more

10  rapidly because they went from, kind of, being stable to

11  things, they got sicker, and you have to watch them closely and

12  monitor them and make sure they get treatment.

13  Q.  Doctor Herz, where does a Partial Hospitalization Program

14  fall in the system of care?

15  A.  As I said, persons who need full in-patient care, but who

16  could also be treated in a partial hospital if there is one,

17  can be treated in a partial hospital program.  There are two

18  general ways that patients get into a Partial Hospitalization

19  Program.

20          One, in-patients that stay in psychiatric hospitals

21  are very, very brief now.  They are usually often less than a

22  week.  The patients are not really recovered.  They are still

23  very sick.  So as a step down from in-patient care, as a

24  transition out into the community, they go to partial

25  hospitals.

1          The other is if they are in out-patient treatment and

2    decide to get sick, and nothing can be done to prevent them

3    from having a full relapse, if they are able to cooperate and

4    they are not a danger to themselves or others, they can be in a

5    Partial Hospitalization Program.

6    Q.  Would you expect to see a patient who was having once a

7    month talk program go to a Partial Hospitalization Program

8    without any difference in out-patient care?

9    A.  Well, I can just talk from, generally, my own experience at

10   the Jackson Out-patient Clinic.  Some patients are maintained

11   once a month on medication management.

12          Then, if they start coming in and saying that they are

13   feeling worse, the voices are getting louder, they are more

14   disturbing, we might check their medication and maybe increase

15   the dose.  I want to see you more frequently because I am a

16   little bit concerned about you.  I want to prevent anything

17   further from happening.  So you would modify.

18          Some of the patients that are maintained don't receive

19   an active psychotherapist.  If you feel you want to give them

20   something more intense, they are getting worse, let's get them

21   to talk to somebody about their problems.  So there is a

22   variety of things you can do; change their treatment in terms

23   of medication, increase their frequency, and give them new

24   kinds of out-patient therapy if they haven't had it.

25   Certainly, see them more frequently than once a month.  Once a

1  month is not going to help monitor that patient so they would

2  get well.

3  Q.  These are all things you would do before putting a patient

4  in a Partial Hospitalization Program?

5  A.  Yes, I think that's just sound practice that you don't jump

6  from a very minimum amount of treatment to a very maximum

7  amount of treatment.  There are steps in between that you can

8  do and help the patient in terms of not relapsing and help

9  society by not spending a tremendous amount of money that is

10  not necessary.

11  Q.  What would you expect to see if you were admitting a

12  patient to a Partial Hospitalization Program?  What would you

13  expect to see in terms of records from the hospital if they

14  were taking the first way in that you described, coming from a

15  hospital setting?

16  A.  Well, I would certainly like to see, at the very least, a

17  discharge note from the hospital, how the person looked when he

18  or she came in, what treatment they had, what the medications

19  were, what symptoms they had when they left the hospital, what

20  was the diagnosis, how long they were there, any

21  recommendations from the hospital to the Partial

22  Hospitalization Program.

23       I would want to know, for example, what was the

24  patient hospitalized for just before he came into the partial

25  hospital, or six months ago.  It's not just the last hospital,

1    but when was the last hospital.

2    Q.  If you had a patient who came in the second way you

3    described, who had a physician that was trying to prevent an

4    in-patient hospital stay and instead put the patient in a

5    Partial Hospitalization Program after, as you described,

6    significant out-patient care, what would you expect to see in

7    terms of records and documentation for that kind of patient

8    coming into a Partial Hospitalization Program?

9    A.  I would like to see what was done to help a patient from

10   getting sicker and needing partial hospital.  In other words,

11   what I just talked about before; what did you do, did you

12   notice a patient was getting sicker, and what did you do to

13   counteract that so the patient wouldn't get so sick they would

14   have to be partially hospitalized.

15   Q.  Once a patient is in a Partial Hospitalized Program, who is

16   responsible for monitoring the patient's symptoms?

17   A.  It should be very much like an in-patient hospital except

18   the patient comes in the day and goes home at night.  The

19   hospital is responsible for the care of the patient and

20   monitoring.

21        Usually, there is a team approach so that everybody

22   who was working with that patient should have input, so you

23   would have a general idea of how this patient is functioning

24   and how the patient is doing symptomatically.  So everybody on

25   the treatment team should get together and talk about the

1    patient, but the psychiatrist ultimately has the responsibility

2    to see how the patient is doing.

3    Q.   How important is documentation in a patient's file in a

4    Partial Hospitalization Program to that monitoring that you

5    were just talking about?

6    A.   Well, I think you need to, as in a hospital, for example,

7    most acute hospitals, the doctors make rounds with a team on

8    every patient every day and writes a brief note so you have a

9    sense of what is going on, what is the course of this illness

10   in the hospital.  Are things going right?  Do I need to change

11   something?

12          Since you are in an acute episode, you want to make

13   sure you are giving the right medication, the right dosage and

14   so forth.  The documentation is very important, and it should

15   be not just general, a patient looks better, but the patient's

16   ideas about somebody wanting to hurt them doesn't seem to

17   bother them as much.  It seems less potent.  What I am saying

18   is it ought to be specific about the symptoms changing or the

19   functioning changing.

20   Q.   Why is it that the doctor and treatment team -- would that

21   include patients and others involved in the program?

22   A.   Yes.

23   Q.   Why is it that the doctor and the treatment team are

24   monitoring the patient's progress at a Partial Hospitalization

25   Program?

1   A.   Because the acute episode is defined as a serious

2   condition, and you want to know what you are doing is helping.

3   It should be to get the person back to baseline.  I could be

4   giving a person certain medication that is having little

5   effect.  I have to be able to get an idea what the course is,

6   what is happening to the patient.

7   Q.   You mentioned medication as one example.  Would you want to

8   see the same information about whether a course of group

9   therapy was working?

10   A.   Yes, of course.

11   Q.   What is the ultimate goal of a treatment team for a patient

12   at a Partial Hospitalization Program?

13   A.   The ultimate goal is like an in-patient hospital, it's the

14   same goal, and that is to reduce the symptoms, get the patient

15   as close as possible back to its baseline where the symptoms

16   are not as severe.  You expect change.

17           Acute means it is a briefer period of time.  The

18   stable phase is usually much longer.  You want to get the

19   patient to a point where they can go back to the community and

20   receive out-patient treatment of one kind or another to help

21   maintain them again.

22   Q.   So, is the ultimate goal to get them to the point where

23   they can leave the Partial Hospitalization Program?

24   A.   Yes.

25   Q.   Is there any set period of time, like six or eight weeks,

1    that that should occur?

2    A.  Well, you know, if you get sick with a physical illness,

3    there is no definite.  You can't -- the doctor can't tell you,

4    well, in six weeks, two weeks, whatever he tells you, you will

5    be better.  No, I think patients are individual.  There are all

6    sorts of factors which lead to recovery.

7          So you can't make -- there is no way you can make a

8    statement, "You will be ready in three weeks, or you will be

9    ready in two weeks to leave."  It depends on how things go,

10   whether the therapy is working, how you are as a person.  It's

11   complicated.  There has to be a clinical decision based on the

12   status of the person at that time.

13   Q.  Doctor, you have mentioned the treatment team for a

14   patient.  What is a treatment plan?

15   A.  A treatment plan is a plan to put together the elements of

16   how you are going to treat this patient to help that person get

17   over that episode.  So what are my targets, getting the patient

18   to function better.  Reducing whatever problems, the treatment

19   team puts together what they think is a plan which will help

20   persons get back to their former state.

21   Q.  Doctor, how individualized should a treatment plan for a

22   patient at a Partial Hospitalization Program be?

23   A.  Treatment should be individualized.  Every person needs

24   something different.  Some things can overlap and some things

25   can't.  For example, if you want to teach patients about the

HERZ - Direct

1  benefits of medication, for example, that can be something that

2  a lot of people would benefit from.

3          Say you had a program for anger management.  Maybe

4  some people might need it and others wouldn't.  Different

5  people might have different goals.  You want to try to give the

6  person what you think is going to help them most with the

7  target issues that they came in the hospital for.

8  Q.  How often would a treatment plan for a patient at a Partial

9  Hospitalization Program be changed?

10 A.  Well, you know, it depends.  For medication management

11 there was no interval.  You might wait a week to see if

12 something might be working with a medication.  If it is not

13 working, you would try something else.  You might see a side

14 effect and say, "I better change that medication."

15         For different kinds of therapy, I think that takes

16 more time because you don't know.  It's not like medicine that

17 affects you immediately.  In therapy, it takes some time to see

18 how the patient is doing and whether the patient is profiting.

19 That can vary.  I think you need to, kind of, re-evaluate

20 things, I would guess, once a week, but for the sake of the

21 groups, but I don't know if it's a definite time.

22 Q.  Is group therapy part of a typical Partial Hospitalization

23 Program?

24 A.  Yes, group therapy can be.

25 Q.  Is there a standard number that you would expect to see in

1    groups for a group therapy session?

2    A.  Well, most of the literature says, if you are in group

3    therapy, eight to ten in a group probably is the most

4    effective.  It can go up maybe to twelve.  The idea being that,

5    the whole idea in a group is to form a group, to be able to

6    related to each other.  It can't be too big.  You have to have

7    a chance to contribute.  The group ought to be a manageable

8    size.  I think I would say eight to ten I would consider

9    optimal.

10   Q.  Would you consider a group of twenty people to be useful to

11   the patients in that group?

12   A.  I can't say whether it would be useful, but it's not

13   optimal.  It's not the way a group should be.  In my opinion, a

14   group shouldn't be that big.  That could be more like a class

15   when people are sitting together and you are lecturing to them.

16   A group is a spontaneous interaction and sharing.  I would say

17   twenty would not be appropriate.

18   Q.  Is there a clinical reason that you want patients in a

19   Partial Hospitalization Program to have spontaneous interaction

20   and sharing in a group setting?

21   A.  It's an amazing thing.  One of the most effective ways

22   patients get better is by sharing with each other.  This person

23   has problems and I have problems, you know, I am not alone.  I

24   can share with people that share in the same kinds of

25   experiences that I have.  It makes me feel better.  I am not

1  just way out and there is nobody like me.

2         They can help each other because they have each tried

3  various tactics for their health.  They have to be able to talk

4  to each other openly.  I think these kind of things makes the

5  group work.

6  Q.  As the treating psychiatrist, what kind of notes would you

7  expect to see in the patient's chart or file from the

8  therapists in a group therapy session?

9  A.  Well, basically, they might give a little description of

10  how the patient looked.  Were they dressed well?  Did they seem

11  depressed or out of it or whatever?

12         In the group, there should be a description.  How did

13  you do in a group?  Did the person seem to be listening?  Did

14  the person talk?  When they talked, did somebody answer them?

15  How did they deal with the answers?  Were they hostile to

16  anybody that suggested something to them, or did they say, "Oh,

17  that's great."  In other words, how did the person function in

18  that group.

19  Q.  Would it be useful to you to see group notes that were the

20  same across all the patients in the group?

21  A.  Not really, no.

22  Q.  Doctor, what is the appropriate, and you have talked about

23  this a bit, but are there any average lengths of stay for

24  patients at a Partial Hospitalization Program?

25  A.  I can't tell you the figures.  I really can't give you.  I

HERZ - Direct

1   don't know the latest figures.  I would say probably at least a

2   few weeks.  I don't have the exact number.

3   Q.  Is there any appropriate optimal number, and I know you

4   have addressed this in an earlier answer somewhat?

5   A.  It depends on the individual does.  Is the person improving

6   enough to be able to leave or not?  It's as simple as that.

7   Q.  Doctor, if you were working at a PHP program, and you had

8   five patients admitted on day X, would it surprise you to see

9   those same five people discharged on the same date six days

10  later?

11  A.  Well, it would be unusual, because people get better at

12  different rates.  No two are the same.  I guess the bottom line

13  is treatment has to be individualized.  You have to evaluate

14  each person separately as to how that person is doing and what

15  is best for that person.

16  Q.  How is discharge decided at a PHP?  How is it decided when

17  a patient leaves a PHP?

18  A.  Well, usually there has been some kind of a team meeting,

19  and the psychiatrist gets opinions and finally makes a decision

20  about whether the person is ready to go.

21  Q.  Where should the patient go next?  What kind of treatment

22  should they get after that?

23  A.  Well, they should receive some form of out-patient

24  treatment.  As I said, these are usually chronic illnesses that

25  require care at every phase.  And one of biggest problems in

1    treating patients is that very often they get lost between the
2    cracks.
3            In other words, they are in the hospital, a portion of
4    the hospital, and they go out and there is no follow-up.
5    Sometimes that's because of the system.  Sometimes some parents
6    don't want it and refuse it.  There are a variety of reasons.
7    We want to make sure that the patients get proper care.
8    Q.  Doctor, switching gears a bit, you talked earlier about the
9    diseases dementia and Alzheimer's.  Are dementia or Alzheimer's
10   patients appropriate for PHP, Partial Hospitalization Program?
11   A.  In general, I would say no, because what is dementia.  If
12   you can't remember what you just heard, you can't comprehend
13   what has been told to you, and you have trouble with attention,
14   you are probably not very capable of learning.
15           I try to tell you something and five minutes later you
16   don't remember.  So the very nature of dementia makes it
17   unlikely that you are going to be able to profit.  To be fair,
18   if somebody is in a very, very early stage, and memory is not
19   impaired greatly, possibly.  But generally speaking, I would
20   say no.
21   Q.  Doctor, some might argue that at least past that very, very
22   early age, at least the dementia patient who is past that early
23   stage is getting some interaction at a Partial Hospitalization
24   Program.  They are having some interaction with people, and
25   because of that interaction, they are benefiting.  How would

1  you respond to that?

2  A.  There are other kinds of programs for seriously mentally

3  ill patients when they are stable.  There are social clubs

4  where patients come and they socialize.  That helps them.

5  Sometimes they are so this way, they can be with other people.

6       There are some day activities.  They are less intense.

7  They are not focused on active intense therapy.  There are ways

8  of maintaining people in the community so they don't get worse.

9  Maybe make things better for them.

10 Q.  What is the practical difference between those community

11 socializations programs you were talking about and a Partial

12 Hospitalization Program?

13 A.  Well, I mean, mostly, Partial Hospitalization Program is a

14 much more intensive and, obviously, a much more expensive kind

15 of program.

16 Q.  Doctor, what kinds of medications are prescribed for people

17 with dementia?

18 A.  Well, there are medications which hopefully help the person

19 have less symptoms of the dementia so it might help their

20 memory and all aspects of what dementia causes.  Two of the

21 most prominent today are Aricept and Namenda.  I hasten to say

22 that they can help the person with the symptoms of dementia to

23 some extent it can be helpful, but the basic underlying

24 deterioration of drug addiction in the brain is not affecting

25 them.  So there is a progression of the disease over time.

1    Q.   If you saw in a patient's file that they had been

2    prescribed by another doctor, Aricept or Namenda, what would

3    that tell you about the patient?

4    A.   Well, that the patient needs help with things that Aricept

5    and Namenda can do.  There may be other uses, but they are most

6    commonly used for that purpose.

7    Q.   Doctor, is the Partial Hospitalization Program, as you have

8    been describing it, is it designed to treat Alzheimer's or

9    dementia?

10   A.   Not generally, no, I would say no.

11   Q.   Doctor, are substance abuse patients appropriate for

12   psychiatric PHP treatment?

13   A.   Well, if they have a primary psychiatric diagnosis, one of

14   the disorders that I talked about, for example, and they also

15   are substances abusers, then they can be treated, as long as

16   they are not actively taking the substances every day so they

17   would not be able to really profit.

18         If they are basically in need of detoxification for

19   their substance abuse, or they have a serious mental disease

20   which is in a stable phase, what they really need is the

21   substance abuse treatment.  Then they would not be appropriate

22   for PHP.

23   Q.   They would not be?

24   A.   No.

25   Q.   Is the PHP the same thing as rehabilitation for a substance

1  abuser?

2  A.   No, it's different.

3  Q.   Doctor, would it surprise you to learn that a PHP was

4  handing out packs of cigarettes to patients every day?

5  A.   Yes, it would.  I think we are in the business of trying to

6  improve people's health, and we do not encourage in any way

7  smoking.  Smoking, as you know, is detrimental to your health.

8  We should not be encouraging it among our patients.  It would

9  surprise me very much, yes.

10  Q.   Doctor, switching gears, are you familiar with sleep

11  studies?

12  A.   In a general way.  I am not an expert in sleep studies.

13  Q.   Would a patient who is attending a Partial Hospitalization

14  Program, your expertise, typically be prescribed a sleep study

15  while attending the PHP?

16        MR. WAX:  Objection.

17  BY MS. SAULINO:

18  Q.   Would a diagnostic sleep study typically be the treatment

19  for a patient attending a PHP?

20  A.   Not typically.  It occurs occasionally, but for the great

21  number of patients, no.

22  Q.   Can you explain to the jury why not.

23  A.   Sleep studies are designed for particular kinds of sleep

24  problems.  When patients are admitted in an acute episode of

25  schizophrenic or depression or bipolar, they already have sleep

1    problems.  They have a different kind of sleep problem.

2    Diagnosis is part of the symptoms of the illness.  When you

3    treat the illness, you are treating the sleep problem.  When

4    the person gets better, they usually have better sleep.

5         Sleep problems are defined in a narrow way.  I might

6    -- there is something called obstructive sleep apnea.  That is

7    a situation where usually people who sleep on their backs, they

8    snore a lot, and they wake up during the night gasping for

9    breath and choking.  What the problem is, is there is an

10   obstruction in their airway that comes on at various times.

11        So these people need a sleep study to find out whether

12   they do have this obstructive sleep apnea.  In that case, I

13   certainly would do it with a schizophrenic or bipolar patient,

14   because there is a treatment for it which can be very helpful.

15   Obstructive sleep apnea can be very dangerous for your physical

16   health because you are not getting enough oxygen.

17   Q.  How common or rare would that be in your treating of a

18   schizophrenic or bipolar patient?

19   A.  Well, I would say it's not usual, not common at all.

20   Q.  Have you, Doctor, ever prescribed a sleep study for a

21   patient?

22   A.  I personally have not.  In the clinic, we have a few, you

23   know, of the hundreds or thousands.

24   Q.  Doctor, would you expect there to be a large overlap

25   between people who would benefit from a sleep study and people

1    who are attending a PHP?

2    A.  No, no.  Obviously no.

3          MS. SAULINO:  Thank you very much.  I have nothing

4    further, Your Honor.

5          THE COURT:  It is now 10:30.

6          MR. WAX:  Judge, my cross-examination is so brief.  It

7    is probably three or four questions at the most.

8          THE COURT:  That's fine.  Go ahead.

9                    CROSS EXAMINATION

10   BY MR. WAX:

11   Q.  Good morning, Doctor Herz.  My name is Barry Wax.  I

12   represent Judith Negron.

13          The government retained to you testify today; is that

14   correct?

15   A.  Yes.

16   Q.  You entered into an agreement with them where you would be

17   paid $300 an hour for your time, correct?

18   A.  Yes.

19   Q.  That would include your time meeting with the government,

20   correct?

21   A.  Yes.

22   Q.  And you did meet with them, didn't you?

23   A.  Yes.

24   Q.  It included your time, perhaps, reviewing your documents

25   and preparing for testimony, correct?

HERZ - Cross

 1  A.   Yes.

 2  Q.   It also included your time testifying, correct?

 3  A.   Yes.

 4  Q.   How many hours have you spent on the case, Doctor?

 5  A.   I haven't, frankly, added it up.  Maybe twenty.  I am not

 6  sure.  I really can't tell you.

 7  Q.   Approximately twenty hours at $300 an hour?

 8  A.   Yeah.

 9  Q.   So approximately $6,000 would be fair?

10  A.   Maybe more.  Maybe $9,000.

11  Q.   Approximately $9,000 for your testimony?

12  A.   It's a guess.

13       MR. WAX:  Thank you.  I have no further questions.

14       THE COURT:  Thank you, sir.  You may step down.  You

15  are excused.

16                 [Witness was excused].

17       THE COURT:  Ladies and gentlemen, we will take a brief

18  recess, about fifteen minutes.  Thank you.

19            [The jury leaves the courtroom at 10:37 a.m.]

20            COURTROOM DEPUTY:  All rise.

21            THE COURT:  Jury, please.

22          [The jury returns to the courtroom at 10:50 a.m.]

23            THE COURT:  Thank you.  Be seated, please.

24            MS. SAULINO:  The government will call Margarita

25  Acevedo.

 1           THE COURT:  Please swear the witness.

 2           COURTROOM DEPUTY:  Do you solemnly swear or affirm

 3    that the testimony you are about to give will be the truth, the

 4    whole truth, and nothing but the truth so help you God?

 5           THE WITNESS:  Yes, I do.

 6           COURTROOM DEPUTY:  You may be seated.  Please state

 7    your full name and spell your last name for the record.

 8           THE WITNESS:  Margarita Acevedo, A-c-e-v-e-d-o.

 9         MARGARITA ACEVEDO, GOVERNMENT'S WITNESS, SWORN

10                      DIRECT EXAMINATION

11    BY MS. SAULINO:

12    Q.  Could you spell your last name, Ms. Acevedo.

13    A.  A-c-e-v-e-d-o.

14    Q.  Ms. Acevedo, while I am doing my questioning today, if you

15    could remember to speak directly into the microphone.  We have

16    put a cup of water in front of you if you need it.

17    A.  Thank you.

18    Q.  Please describe for the jury your educational background.

19    A.  I graduated from La Salle High School here in Miami.  I did

20    about a year and a half, two years, of basic credits at Miami

21    Dade.  I did a vocational at, I think it was called, Miami

22    Technical for eight months for Medical Assistant.

23    Q.  Could you give the jury an understanding of your work

24    history, please.

25    A.  My first job was in retail at the mall.  From there I went

1    to work at a mortgage company as a receptionist.  Then I was at

2    this place for -- Center for Pediatric Therapy.  I was there

3    for five, six years.  I started as a receptionist, and then was

4    the office manager.

5            From there I went to work at Trader Publishing, which

6    is Auto Trader, Boat Trader, and Bargain Trader.  I was a sales

7    rep there for eight years.  That was the job before this one,

8    which was at Medlink Management, and I was there for five

9    years.

10   Q.  At the Center for Pediatric Therapy, did you have any

11   medical responsibilities?

12   A.  No, it was just office administration stuff.

13   Q.  Office administration?

14   A.  Yes, ma'am.

15   Q.  At Auto Trader, what was your position?

16   A.  I was a sales rep.

17   Q.  What did that entail?

18   A.  Going to visit new accounts and get them to try to

19   advertise in the magazine.  Doing their ad campaigns for autos

20   and, later on, for boats.

21   Q.  You mentioned that you worked for Medlink Professional

22   Management Group; is that right?

23   A.  Yes.

24   Q.  Can I refer to that as Medlink while we are engaging in

25   your questioning?

1  A.  Yes.

2  Q.  When did you start to work for Medlink?

3  A.  In 2005, towards the end of 2005.

4  Q.  What was your job at Medlink?

5  A.  My title was Education and Promotions Analyst.  It's

6  basically marketing.

7  Q.  Do you still work there, Ms. Acevedo?

8  A.  No, I do not.

9  Q.  What led to you not working there?

10  A.  The company was closed down, and I was arrested.

11  Q.  When did that happen?

12  A.  October 21st, 2010.

13  Q.  Ms. Acevedo, what were you charged with?

14  A.  Medicare fraud, paying kickbacks.

15  Q.  Did you commit that crime?

16  A.  Yes, I did.

17  Q.  Did you pay illegal health care kickbacks?

18  A.  Yes, I did.

19  Q.  Did you commit money laundering?

20  A.  Yes, I did.

21  Q.  Ms. Acevedo, yes or no to this question, is there anyone in

22  the courtroom who committed that crime with you, just a yes or

23  no?

24  A.  Yes.

25  Q.  Did the defendant commit these crimes with you?

1  A.  Yes.

2  Q.  Ms. Acevedo, have you entered into a plea agreement with

3  the government?

4  A.  Yes, I have.

5          MS. SAULINO:  Your Honor, may I approach the witness?

6          THE COURT:  Yes.

7  BY MS. SAULINO:

8  Q.  Ms. Acevedo, I have handed you what has been marked for

9  identification as Government's Exhibit 88.  Could you please

10 take a look at that document and tell me whether you recognize

11 it.

12 A.  Yeah, this is my plea agreement.

13 Q.  That's your plea agreement?

14 A.  Yes.

15 Q.  On the back, a couple of pages, do you see your signature?

16 A.  Yes.

17         MS. SAULINO:  Your Honor, at this time the government

18 would offer into evidence Government's Exhibit 88.

19         MR. WAX:  No objection.

20         THE COURT:  Government's Exhibit 88 is admitted into

21 evidence.

22         [Government Exhibit 88 received in evidence].

23         MS. SAULINO:  Thank you, Your Honor.

24 BY MS. SAULINO:

25 Q.  Ms. Acevedo, do you know what your potential sentence will

ACEVEDO - Direct

1   be under your plea agreement?

2   A.   Yes, I do.

3   Q.   What is your potential sentence?

4   A.   Fifteen years.

5   Q.   Is that the maximum that you could receive?

6   A.   Yes.

7   Q.   Who decides what your sentence will be, Ms. Acevedo?

8   A.   The Judge.

9   Q.   Which Judge?

10  A.   Judge King.

11  Q.   Ms. Acevedo, does your plea agreement include language that

12  allows you to cooperate with the government?

13  A.   Yes, it does.

14  Q.   Can you explain to the jury your understanding of that part

15  of the agreement.

16  A.   My understanding is that hopefully they will take into

17  consideration, you know, from everything I have told the truth,

18  that hopefully they will consider that at the end.

19  Q.   Do you expect to gain anything by testifying today,

20  Ms. Acevedo?

21  A.   I hope that the Judge and the government will see that I

22  have told the truth and take that into consideration at my

23  sentencing, yes

24  Q.   Have I, or any government lawyer, made you any promises in

25  that?

1  A.   No.

2  Q.   Ms. Acevedo, moving back to your work at Medlink, can you

3  explain to the jury the relationship between Medlink and

4  American Therapeutic Corporation.

5  A.   Well, when I first got hired at Medlink, I was told that we

6  were going to have several clients that I was going to help in

7  the Marketing Department with, meaning that I would do the

8  hiring and all of that stuff with the Marketing Department with

9  the other clients, although at the time there was only one

10  client, which was American Therapeutic Corporation.

11  Q.   Ms. Acevedo, to your knowledge, who controlled Medlink and

12  American Therapeutic Corporation on paper?

13  A.   Well, from what I know, the owners of Medlink were Lawrence

14  Duran and Judith Negron, my bosses, and then American

15  Therapeutic, the owner of that is Marianella Valera.

16  Q.   Who did you and the other staff know as top management at

17  both companies?

18  A.   Larry, Mary, and Judy.

19  Q.   Lawrence Duran, Marianella Valera, and Judith Negron?

20  A.   Yes.

21  Q.   For both companies?

22  A.   Yes.

23          MS. SAULINO:  Your Honor, may I approach the witness?

24          THE COURT:  Yes.

25  BY MS. SAULINO:

ACEVEDO - Direct

1  Q.  I have handed you what has been previously marked for

2  identification as Government's Exhibit 1.  Do you recognize

3  this document?  What is it?

4  A.  This is a picture of Larry, Judy, Mary, myself, and Joseph.

5  Q.  Do you recognize this picture?

6  A.  Yes, it was at a fundraiser.

7  Q.  Do you remember when it was taken?

8  A.  Yes.

9        MS. SAULINO:  Your Honor, at this time the government

10  would offer into evidence Government's Exhibit 1.

11        MR. WAX:  No objection.

12        THE COURT:  Government's Exhibit 1 is admitted into

13  evidence.

14        [Government Exhibit 1 received in evidence].

15        MS. SAULINO:  Your Honor, may I publish for the jury?

16        THE COURT:  Yes.

17  BY MS. SAULINO:

18  Q.  Ms. Acevedo, I have a larger version of Government's

19  Exhibit 1.  I will hold it up for the jury.  Can you explain

20  who each of the individuals are in the picture.

21  A.  The gentleman to the far right is Lawrence Duran.  He was

22  my boss.  Next to him is Mary.  She was the owner of American

23  Therapeutic Corporation.

24        Next to her, in the middle, is Judith Negron, my boss

25  at Medlink.  That is myself, and at the end over here is Joseph

1   Valdez.  He was a BHP for -- actually, he also worked for

2   Medlink.  He was the marketing person for Medlink as well.

3   Q.  Ms. Acevedo, you testified that at the beginning you were

4   told Medlink would have other clients.  Did Medlink have any

5   other clients besides American Therapeutic Corporation?

6   A.  Just one more, American Sleep Institute.

7   Q.  May I refer to American Therapeutic Corporation as ATC?

8   A.  Yes.

9   Q.  And American Sleep Institute as ASI?

10  A.  Yes.

11  Q.  When you began working for Medlink in 2005, how is it that

12  you came to work for Medlink?

13  A.  I got a phone call at my house from Judy's husband, who

14  actually spoke to my husband.  They are friends.  He told him,

15  "Maggie should give Judy a call.  There is a pretty good

16  opportunity for her to work for Judy."

17  Q.  When you refer to Judy, you mean Judith Negron, the

18  defendant?

19  A.  Yes.

20  Q.  Did you have a prior relationship with Ms. Negron?

21  A.  Yes, I have known her about seventeen, eighteen years.  Our

22  husbands played softball together.  We were kind of, like, the

23  softball wives.

24  Q.  Did you eventually call Ms. Negron or have the meeting that

25  was suggested in that phone call?

1  A.  Yes, the following day I went to her office to meet with

2  her.  I thought we were going to go out to lunch.  I figured

3  she was just going to pick my brain about marketing and how she

4  can help grow her business and stuff like that.  But then when

5  I got there, she was busy interviewing someone.

6          I just waited in the little waiting area.  Then

7  Lawrence Duran came in and introduced himself to me.  Said,

8  "Why don't you come with me into my office," and we just

9  started talking.

10 Q.  What did you talk about during that meeting with Mr. Duran?

11 A.  He just asked me what did I do, where was I working.  Just

12 kind of getting to know each other, kind of, while she was

13 busy.  That was it until she was done, then she came over.

14 Q.  When Ms. Negron came in the room, what happened?

15 A.  When she came into the office, he kind of made a joke about

16 it and said, "So, are you ready to work with your buddy?"  We

17 all laughed about it.  I was like was this a job interview?  At

18 that time it was very unclear to me what they really wanted.

19 So it was all confusing.  That was it.  I just left.

20 Q.  Did you eventually start working for Medlink and ATC?

21 A.  I did.  Shortly after that, I got a phone call from Larry

22 trying to find out if I was going to work there or not.

23 Q.  From Larry Duran?

24 A.  Yes.  I said I guess I can do a couple of hours part-time.

25 At Trader, it was full-time since it was a sales only and

ACEVEDO - Direct

1   commission only job.  I was doing my work in three days, so I

2   still had time left over to make some extra income, and I

3   thought it would be a good opportunity.  I said yes.

4   Q.  What was your salary at Auto Trader when you left?

5   A.  Between $70,000 and $75,000 a year.

6   Q.  Was that based largely on commission?

7   A.  Only commission.  There was no salary.

8   Q.  You did that in about three days a week?

9   A.  I did.

10  Q.  You decided to work for Medlink part-time.  Did you end up

11  working for Medlink part-time?

12  A.  Actually, no.  After my first or second time in the office,

13  he was explaining more of what he wanted from me, and I

14  realized it was way too much.  The expectations were way too

15  much.  There was no way I was going to be able to do both jobs.

16  Q.  Who was he?

17  A.  Larry Duran.

18  Q.  What happened then when you realized that you couldn't do

19  both jobs?

20  A.  Then I was honest.  I called him up and I said there is too

21  much.  There is no way I can do both jobs effectively.  Either

22  I stay here or stay there.  If I stay here, you are going to

23  have to at least match my salary.

24      At that time he didn't match it.  It was still less.

25  He said not to worry because it was a growing company and

1    eventually I would be able to get to where I was at and be a

2    part of a growing company, which is more of what I wanted.  I

3    wanted a career, not just a job.

4    Q.  So what did you decide?

5    A.  I decided to stay with Medlink, and I went back and gave my

6    two weeks notice at Auto Trader.

7    Q.  Did they match your salary at Medlink?

8    A.  No, they did not.  I believe it was $60,000 or $65,000.

9    Around $60,000.

10   Q.  It was lower than your pay had been at Auto Trader?

11   A.  Yes.

12   Q.  What did you understand your job responsibilities were to

13   be at Medlink?

14   A.  Everything that I knew about sales and marketing, that I

15   had learned throughout the years, to start a Marketing

16   Department for American Therapeutic Corporation because they

17   didn't really have one.  They wanted to open more centers and

18   bring in new clients.  So my job was to hire and train the

19   staff that were going to bring in the people.

20   Q.  What did you understand your job responsibilities to be

21   with respect to ATC?

22   A.  That I was going to oversee the Marketing Department.  The

23   only thing that was kind of confusing was -- it's confusing

24   because it's a marketing department, but it's not.

25   Q.  Can you explain to the jury why it was not a marketing

ACEVEDO - Direct

1    department, a marketing department but not?

2    A.  I know.  I guess in health care you are not allowed to have

3    sales reps or marketing reps.  The department was actually

4    called Behavioral Health Promotions, and the job description

5    was to go out in the community and inform them of the services

6    and let them know that American Therapeutic Corporation is

7    there for them as a resource.

8    Q.  How did you come to the understanding that in health care

9    there are no marketing reps?

10   A.  Larry Duran told me.

11   Q.  Was your job really marketing?

12   A.  Yes.  I mean, everything that I had learned from sales is

13   what I was applying through the promotions.

14   Q.  Now, can you explain to the jury how you were initially

15   introduced to the staff at the American Therapeutic

16   Corporation.

17   A.  I am not sure if it was the first or second day.  At the

18   beginning, Judy took me to all the different centers and

19   introduced me to the staff.

20   Q.  By Judy, you mean Judith Negron?

21   A.  Yes, ma'am.

22   Q.  Can we understand, unless you specify otherwise, when you

23   say "Judy" you mean the defendant, Judith Negron?

24   A.  Yes.

25   Q.  You said she took you on a tour of all of the facilities.

1    What was your understanding at that time of what Ms. Negron's

2    position was at American Therapeutic Corporation?

3    A.   That she was the boss.

4    Q.   How did you come to that understanding?

5    A.   Just the way that people reacted to her, the authority that

6    she had.  You know, she was introducing me as one of the new

7    employees.  Yeah, that was it.

8    Q.   This was at the American Therapeutic Corporation, not the

9    Medlink Facility?

10   A.   Yes, at the American Therapeutic Facility.

11   Q.   Ms. Acevedo, did your understanding of your job

12   responsibilities change over time at American Therapeutic

13   Corporation?

14   A.   Yes, it did, constantly.

15   Q.   What was your understanding at the end of your time at ATC?

16   What was your understanding of your job then?

17   A.   Basically, I was held responsible or accountable for the

18   census and to make sure that all the kickbacks were tallied up

19   and given out.

20   Q.   Was Ms. Negron involved with that?

21   A.   Yes.

22   Q.   Ms. Acevedo, at first, when you first started at Medlink

23   and American Therapeutic, did somebody teach you how to do your

24   job at that time?

25   A.   Yes, Larry Duran.

1  Q.  What did he teach you?

2  A.  First, he had me read a lot of paperwork, binders, to learn

3  a little bit about mental health, about what an assisted living

4  facility is, and took me around to see a couple of assisted

5  living facilities and meet the owners.

6  Q.  Did he introduce you to any legal requirements?

7  A.  Actually he did.  He had me read, and I think sign off on,

8  the anti-kickback laws and start laws.

9  Q.  You said he had you read about assisted living facilities.

10  What is an assisted living facility?

11  A.  It's a home for someone that needs assistance or

12  supervision.  It can be an older home.  There is also mental

13  health assisted living facilities for people that have mental

14  health issues.

15  Q.  Do you, at times, refer to assisted living facilities as

16  ALFs?

17  A.  Yes, that's actually pretty much what they refer to.

18  During my training, I thought it was a stupid question, what is

19  an ALF.  I had to ask what is an ALF.

20  Q.  You said he took you around.  Did he take you to the

21  assisted living facilities on that first time he drove you

22  around?

23  A.  Yeah, he drove me around to ALFs.

24  Q.  Do you remember any particular visits from that day?

25  A.  Yes, I remember my first visit to an ALF.  It was pretty

1    bad.  It smelled horrible.  It was in West Palm Beach.  I

2    remember seeing him talking to the administrator, and I didn't

3    know how he could breath and talk at the same time.

4         After he spoke to her, she let us in.  That was the

5    first time that he wanted to see how I would interact with a

6    potential client.  He sent me off, and he said go talk to them.

7    So I started interviewing some of the residents to see if they

8    would come to the program.

9    Q.  Did he give you any requirements for what residents could

10   come to the program?

11   A.  Yes, they had to have a psychiatric diagnosis.  They had to

12   be on some type of psych meds, and they had to have insurance

13   benefits.

14   Q.  Now, Ms. Acevedo, I know you described your education and

15   work history, do you have any formal medical training of any

16   sort?

17   A.  No, I do not.

18   Q.  Any education in the medical field other than your

19   vocational course?

20   A.  The medical assistant course, that was just, like,

21   weighing, blood pressure, stuff like that.

22   Q.  In your course work, did you learn anything about serious

23   mental illnesses?

24   A.  No.

25   Q.  Did you learn anything about when a serious mental illness

1  patient is in an acute phase?

2  A.  No.

3  Q.  Did they teach you any of those topics?

4  A.  No, sir.

5  Q.  Was it in any of your reading that you did?

6  A.  I don't know if it was in any of the reading.  It was a

7  huge binder of a lot of things.  I mean, back from when PHPs

8  were invented, something with a war and the Germans.  So there

9  was, like, a lot.  I wasn't taught, like, a specific

10  psychiatric thing on diagnosis.  Actually, I had a little cheat

11  sheet with diagnoses and medications to look for.  That's

12  really what I used.

13  Q.  Were you told you should first determine whether the

14  patient had actually been referred by a psychiatrist to attend

15  a Partial Hospitalization Program?

16  A.  At that time, when I first started, that wasn't a

17  requirement.  Then later on it was.

18  Q.  Okay.  Ms. Acevedo, you explained your training.  When you

19  started doing your job, were you very successful at it?

20  A.  No, I wasn't very good at it.

21  Q.  Can you explain to the jury what you believe made you

22  unsuccessful at that time?

23  A.  What happened was I would go -- in sales we call it a "cold

24  call."  I would just go into a facility and promote the

25  services, and then they would just thank me at the door.  I

1   wasn't very successful.  The only clients that were really

2   coming to the program were clients that had been referred

3   before or a facility that was currently referring someone.

4   Although there were still patients coming in, you know, part of

5   their expectations was that I bring in new clients and make new

6   contacts, and I was failing miserably at that.

7   Q.  Did you deliver anything to these assisted living

8   facilities when you were visiting them?

9   A.  Yeah, a couple of times at the beginning Larry gave me some

10  envelopes and said there were prescriptions that needed to be

11  handed back to the ALFs' owners, and it was confidential and to

12  not look into it.

13  Q.  Did Mr. Duran give you any instructions if you were having

14  difficulty with any new ALFs?

15  A.  Yes.  He said, "I am here for you.  If you are having an

16  issue with closing a deal, just call me.  I will come in and

17  back you up."  Normally, in sales, that's pretty much what

18  always happens.  Your manager comes in and helps close a deal.

19  I did call him a couple of times, and he came out and met with

20  the owner of a facility, and it worked out.

21  Q.  Did he have more success than you did?

22  A.  He did.  It actually just made it more frustrating.

23  Q.  Ms. Acevedo, did there come a time when you understood why

24  Mr. Duran was more successful than you were?

25  A.  Yes.  Much later on, I realized what was the secret to his

60

ACEVEDO - Direct

1  success.

2  Q.  Can you explain to the jury what you came to understand was

3  the secret to his success.

4  A.  The cash kickbacks.

5  Q.  Can you explain to the jury what you mean by that.

6  A.  We were giving the referral sources cash for the patients

7  that they would refer to us.  Basically, at that time it was

8  $30 a day, per person per day.

9  Q.  How did you learn that this was the secret to his success?

10  Did somebody tell you?

11  A.  Larry himself told me.

12  Q.  How did you react when you learned that?

13  A.  Well, at first I couldn't believe it.  Then I thought no

14  way, there has to be another way.  I mean, surely some people

15  will send them just because, I don't know, get them out of

16  their hair, not have to feed them or not have to worry about so

17  much stuff.  There has to be a million other reasons.

18         Clearly, them needing the services wasn't sufficient

19  for the ALFs to send them.  I was still trying to see if there

20  were other ways without having to give the kickback.

21  Unfortunately, that didn't prove to be true.

22  Q.  Did you try for a time to do your job without paying the

23  cash?

24  A.  I did, I did, on several occasions, try to do it that way.

25  Actually, even towards the end, there were still some places

ACEVEDO - Direct

1 that at first wouldn't ask for money.  I would come back saying

2 I did it, I did it.  They are not asking.  Eventually, we would

3 get the call of "where is my money," so, no.

4 Q.  Ms. Acevedo, are you familiar with the term "patient

5 broker?"

6 A.  Yes.

7 Q.  How did you come to learn what that term meant?

8 A.  Right when I found out about the kickbacks and stuff, Larry

9 warned me about being a patient broker.  He told me I was going

10 to run into things or people.  I was going to meet people.

11 They were going to offer me to work for them, meaning

12 recruiting patients and stuff.

13       He said you are going to easily be able to make

14 $100,000 by recruiting patients.  This is illegal.  Don't do

15 that.  You can get into a lot of trouble.

16 Q.  Was it your understanding that some patient brokers paid

17 patients?

18 A.  Right.  At that time he clarified that a patient broker

19 recruits a patient and pays them cash.  What we were doing was

20 different.  I mean, we were working with the ALFs, and we

21 weren't paying the patients.  We were actually paying just the

22 ALF owners at that time.

23       That's where my understanding came from, when he told

24 me that my involvement, like, I wouldn't be in trouble for it

25 because I wasn't paying the kickback.  It wasn't my money.  I

1   was just the person doing what my boss told me.  So I, kind of,

2   believed him on that.

3   Q.  Back to those envelopes that Mr. Duran told you were full

4   of prescriptions that you were handing out before you learned

5   the true nature of marketing at ATC.  Did you eventually learn

6   what had been in the envelopes?

7   A.  Yes, later on I realized those were cash, and those were

8   envelopes that I later on started filling with cash.

9   Q.  Ms. Acevedo, you said that Mr. Duran told you that paying

10  patients, like patient brokers did, was something different

11  than what you were doing.  Did Mr. Duran explain to you why he

12  wouldn't pay the patients?

13  A.  The patients had nothing to lose, so they can either tell

14  on you -- I mean, they were mental.  Any moment they could just

15  start talking to people and start saying stuff.

16          However, an ALF owner had a lot to lose.  It's their

17  business, their license, so chances are they would never tell.

18  Q.  Ms. Acevedo, were halfway houses involved as well?

19  A.  Yes, there were halfway houses as well.

20  Q.  Can you explain what a halfway house is.

21  A.  A halfway house, they don't have assistance like an ALF

22  where someone watches over you, and bathes you, and feeds you.

23  They can come and go as they please, but there are some types

24  of restrictions.  Mainly, a lot of them have been in jail and

25  recently have just been let out and a lot of them are drug

1    addicts.

2    Q.  Were halfway houses also receiving kickbacks for patients?

3    A.  And halfway houses were receiving kickbacks as well.

4    Q.  For American Therapeutic Corporation?

5    A.  For American Therapeutic Corporation.

6    Q.  Ms. Acevedo, when you learned about these cash kickbacks,

7    did you know they were illegal?

8    A.  Yes, I did.

9    Q.  Did you know, from that point forward, that what you were

10   doing was wrong?

11   A.  Yes, I did.

12   Q.  Ms. Acevedo, was there a progression over the years in

13   terms of how many kickbacks you were paying?

14   A.  Yeah, when I first started, a typical envelope could have

15   anywhere between $300 and $500.  Where towards the end an

16   envelope could have over $100,000 cash.

17              MS. SAULINO:  Your Honor, may I approach the witness?

18              THE COURT:  Yes.

19   BY MS. SAULINO:

20   Q.  Ms. Acevedo, did everyone get cash, or did some people get

21   checks?

22   A.  Some people got checks and cash.

23   Q.  Can you explain what those differences were.

24   A.  Typically, the ALFs would never take a check.  They only

25   wanted cash for reasons being that they didn't want to have any

1    attachment or any relations to this.  But then, as far as like

2    later on when we were working with patient brokers, we would

3    give them checks.

4           A lot of them transported them, so we could write it

5    off as transportation.  They had their own vans.  They brought

6    their own patients.  We would be able to write it off as

7    transportation for that.  Then, sometimes, especially towards

8    the end, it was really, really hard for, I guess, the company

9    to get cash.  So I would try to convince some of the sources

10   to, you know, please take a check, just this time, or, yeah,

11   just for different reasons.

12   Q.  When you say you could "write it off as transportation,"

13   what do you mean by that?

14   A.  I don't mean write it off like taxes, but it could appear

15   to be as if it was for transportation and not a kickback for

16   attending therapy.

17   Q.  Appear to who?

18   A.  Appear to the government.  Appear to anyone.

19   Q.  Ms. Acevedo, in reality, were these checks for kickbacks?

20   A.  Yes.

21   Q.  Ms. Acevedo, did you talk to the defendant, Judith Negron,

22   about your job?

23   A.  Yes.

24   Q.  Did you discuss the whole procedure with her on a regular

25   basis?

ACEVEDO - Direct

1  A.  Not on a regular basis.  Well, not about the kickbacks on a

2  regular basis, but definitely the census and how many people

3  were in the program daily, yes.

4  Q.  What was the reason that you did not discuss the kickbacks

5  on a regular basis?

6  A.  She didn't want to hear about it.

7  Q.  Were there times that you brought it up anyway?

8  A.  Well, yeah, it was just a natural thing to report to my

9  boss where, you know, where I stood with the money, or how many

10 people were still pending.  Sometimes the lack of money

11 reflected on the amount of patients that were in the program.

12 So, yeah, in that sense.

13 Q.  What would she do when you started talking about it?

14 A.  Typically, we didn't engage in a long conversation.  A lot

15 of times she would cover her ears and run off because she

16 didn't want to hear about it.  She always said if it was up to

17 her nobody would be getting kickbacks.

18 Q.  But did you talk about it with her?

19 A.  Yes.

20 Q.  Did the defendant tell you any concerns she had about

21 having to take a lie detector test?

22 A.  Yes, she was always fearful of something happening and her

23 having to take a lie detector test.  That's why, I guess, she

24 didn't want to talk about it or have to know more than she did,

25 so she wouldn't have to fail the lie detector test.

ACEVEDO - Direct

1   Q.   Did she discuss this lie detector concern on more than one

2   occasion?

3   A.   Yes, several times.

4   Q.   Now, Ms. Acevedo, you said that Ms. Negron knew about your

5   job; is that right?

6   A.   Yes, she did.

7   Q.   How do you know that she knew?

8   A.   Sometimes she would just ask me how far along are we.  I

9   would just answer.  She wouldn't ask me, "How much money have

10  you given out?"  My response was that -- I can remember a

11  specific incident where I said, "You know, I have only seen the

12  brokers, and I haven't even started seeing the ALFs, and we are

13  already, like, almost done with all the money."

14  Q.   What does "how far along are we" mean when she was asking

15  it of you?

16  A.   My reply was to how far along in the kickbacks we were,

17  meaning how many people we had already seen, are we almost

18  done, like that.

19  Q.   When you responded how many people you had already seen,

20  what was the meaning of that in your conversation?

21  A.   How many people I already had delivered the kickbacks to.

22  Q.   Was there ever a point when you talked about being ahead or

23  behind in your payments with Ms. Negron?

24  A.   Yes, I remember I would say, "I can't believe next month is

25  already coming up.  We haven't even finished last month."

ACEVEDO - Direct

1  Q.  Why would it matter as to whether you would pay the

2  kickbacks on time?

3  A.  Well, a lot of it reflected on the census.  Sometimes the

4  owners, if I hadn't gone back to give them the kickbacks, they

5  would either withhold the patients or not send them in or not

6  send any new ones.

7        For that matter, if I got the call saying the numbers

8  are so low, the numbers are so low, why are they so low, it

9  would be difficult for me to go back and say, "I need more

10 patients," when I haven't even paid them for the first round of

11 patients.

12 Q.  You mentioned the word "census" and said that Ms. Negron

13 asked about it.  What does "census" mean in terms of American

14 Therapeutic Corporation?

15 A.  The census means the number of patients entered into the

16 program and how many were in attendance that day.  Each center

17 had a target goal.

18 Q.  Would Ms. Negron ask about the census?

19 A.  Yes.

20 Q.  Was there any particular time of the week that the census

21 would be discussed?

22 A.  Well, I know that on Mondays I always try to find out

23 through the other BHPs where the census was at, or were there

24 any upcoming discharges, or any new referrals, just so that I

25 wouldn't fall behind on the numbers.  Every morning, Larry,

1    Judy, and myself would get an e-mail with the numbers on the
2    census.
3    Q.  Did you receive any phone calls after you received those
4    e-mails?
5    A.  Yes, if the numbers were really low, I would get a call
6    from Judy saying, "What's going on?  Why are the numbers low?
7    What are you going to do to correct it?"  Like that.
8    Q.  Would you tell her what you were going to do to correct it?
9    A.  Yes.
10   Q.  What was your job?  How would you correct it?
11   A.  Well, there was, kind of, a two part thing.  If she sent me
12   an e-mail, then the response was more like, well, the food,
13   transportation, all the other issues that really were issues, I
14   would address those.  But if it was a phone conversation that
15   her and I had, I would be honest and tell her, "You know, I
16   still haven't paid everyone, so I can't go back there and get
17   more," although that wasn't an acceptable answer.
18   Q.  It was not an acceptable answer?
19   A.  No, it was not.
20   Q.  What gave you the impression that she believed it was not
21   an acceptable answer?
22   A.  It didn't matter.  I needed to do whatever I needed to do
23   to get the patients.
24   Q.  You said if you received an e-mail you would respond to her
25   in one way.  If you were on the phone, you would respond

ACEVEDO - Direct

1  differently.  Why did you respond differently in an e-mail?

2  A.  In an e-mail, there was no way I would send her an e-mail

3  discussing money or kickbacks.

4  Q.  Why not?

5  A.  It was wrong.  It was illegal.  Anybody could read it.

6  Then that would compromise her in knowing.

7  Q.  What was the reason Ms. Negron was concerned about the

8  census being too low at the centers?

9  A.  Well, she told me that every center had to have a certain

10  amount of patients to be able to be feasible to justify the

11  staff and to pay the bills.

12  Q.  What was your understanding as to who was paying the bills

13  for those patients?

14  A.  Medicare.

15  Q.  Compared to the other owners, who, among the three of them,

16  kept the closest eye on the census?

17  A.  Judy.

18  Q.  Now, you have said that it was important to know whether

19  you had finished paying people from the month before.  Would

20  the ALFs respond differently to you if they hadn't received

21  their payments?

22  A.  Yes.  If they had not received their payments, they would

23  hold back patients or not send new ones.

24  Q.  Did you explain this to Ms. Negron?

25  A.  Yes, I did.

ACEVEDO - Direct

1   Q.   What was her response?

2   A.   Find different people.  Do whatever it is that needs to be

3   done.

4   Q.   Did Ms. Negron ever explain to you that the individuals

5   that you were recruiting needed to have severe mental illnesses

6   in acute phases?

7   A.   No.

8   Q.   When she was talking to you about the censuses, did she

9   ever tell you to go to the hospital and see if they had

10  seriously mental ill patients that could come to American

11  Therapeutic Corporation?

12  A.   No.

13  Q.   When she was asking you about the census, did she ever

14  discuss with you, at all, anything about what the mental

15  condition of the patients should be?

16  A.   No.

17  Q.   Now, Ms. Acevedo, when you went about getting the kickbacks

18  ready, how did you do that?

19  A.   I would go into the network, into the server, and I would

20  go into the master patient log, and I would print out a list of

21  the patients that had attended that month.

22        Then I would go into the billing and I would print out

23  the billing for that month.  That's where I would count how

24  many days they had attended that month, and I would multiply it

25  by $30.

1  Q.  You used the words "master patient log."  Can you explain
2  to the jury what you mean by that.
3  A.  The master patient log is, basically, a log that tells you
4  the person's name, the client's name, their address, their
5  phone number, their emergency contact, and the person that
6  referred them to the program.
7  Q.  The person that referred them to the program, who was that?
8  A.  The referral source.
9  Q.  That was who was paid?
10 A.  Yes.
11 Q.  That was listed in the master patient log?
12 A.  Under referrals, yes, it would be.  It would be impossible
13 for me to have kept a tally of that in my head.
14 Q.  It would not be possible for you to keep a tally of that in
15 your head?
16 A.  No.
17 Q.  Why was that?
18 A.  There was too many.
19 Q.  Where was that log kept?
20 A.  In the network, the server.
21 Q.  Did Ms. Negron have access to it?
22 A.  Yes.
23 Q.  How do you know that?
24 A.  Well, several times I actually spoke to her about it.
25 There was always, like, wrong information entered, which for me

ACEVEDO - Direct

1  was a big deal because if the person that entered the wrong

2  information entered the wrong referral source, that meant I

3  would give the wrong kickback to the wrong person.

4          I would ask her to please, please, please help me and

5  make sure that when she trained the operations coordinators,

6  which are the people that typically entered the information,

7  that they knew how to use it right because otherwise it would

8  mess me up in doing my job.

9  Q.  Did you explain to her exactly how it would mess you up in

10 doing your job?

11 A.  Yes.

12 Q.  I think you may have just answered this, but who at the

13 center was responsible for entering the information into that

14 database?

15 A.  It was the job duty of the Operations Coordinator, but I

16 believe, in several centers, sometimes the Administrative

17 Assistant could to it.

18 Q.  Who did the Operations Coordinator, or the Administrative

19 Assistant, report to ultimately?

20 A.  To Judith.

21 Q.  Judith Negron?

22 A.  Yes.

23 Q.  Did you and Ms. Negron ever discuss any changes that might

24 be made to the database?

25 A.  Yes, towards the later end they were updating the master

1    patient log.  We discussed what were the important columns that
2    needed to stay on so I could read it and be able to do my job.
3    Q.   You discussed that with Judith Negron?
4    A.   Yes.
5    Q.   Did you discuss what particular fields you needed to do
6    your job?
7    A.   Yes, particularly there was always confusion between the
8    referral source and the contact person, so that was something
9    that we would go back and forth on and clarify who was who.
10   Q.   When you say "go back and forth on," you mean you and
11   Ms. Negron?
12   A.   Yes.
13   Q.   What was the point of clarifying who was the referral
14   source and who was the contact?
15   A.   The contact was the emergency contact person.  if there was
16   an emergency with a patient, then that's the person that needed
17   to be contacted.  But the referral source was specifically to
18   be the person that I was going to give the kickback to.
19   Q.   And you and Ms. Negron discussed that specifically?
20   A.   We discussed that specifically several times.
21   Q.   Several times?
22   A.   Yes.
23   Q.   You said you would have the master patient log and you
24   would look at the billing.  How did you look at the billing?
25   A.   You mean how did I access it?

ACEVEDO - Direct

1  Q.  Yes.

2  A.  I would wait until it was closer to the end of the month

3  because the kickbacks were due on the 30th.  I would wait until

4  the 30th to print out the billing so I wouldn't be missing

5  days.

6       On there it says the patients' names and the dates

7  that they attended.  I would check it off as one, two, three,

8  four.  At the end of the month, I would multiply that by 30, or

9  some other people had different rates, so by that rate.

10  Q.  Some people had different rates?

11  A.  Yes.

12  Q.  Were their rates higher than $30 per patient per day?

13  A.  Yes, some were $40, some were $45.  Some were $40 plus $15

14  for transportation because, again, they were transporting them.

15  We would also give them for transportation.

16  Q.  Now, Mrs. Acevedo, you had your master patient log and your

17  billing sheets.  What did you do then?

18  A.  So, then I would -- on the master patient log sheet that I

19  printed out, it had all the patients' names.  On the bottom I

20  would tally it up, multiply by $30.  Then I would get the cash,

21  put that sheet along with the cash inside the envelope, and

22  then deliver it.

23  Q.  What kind of envelopes were you putting the cash and the

24  sheets into?

25  A.  Just a white letter envelope.

ACEVEDO - Direct

1    Q.  Ms. Acevedo, did you ever stuff those envelopes in front of

2    Ms. Negron?

3    A.  Yes, I did.

4    Q.  On more than one occasion?

5    A.  Yes.

6    Q.  Can you explain to the jury the first specific example you

7    remember of that happening.

8    A.  I walked into her office and she was there working on some

9    charts.  There was like a little round conference table next to

10   her desk.  I just ran in with all of my stuff.  As usual, it

11   was rush, rush.  I just walked in saying, "I'm sorry, I'm

12   sorry, I'm sorry," and I plopped myself right next to her desk.

13   Q.  Can you describe for the jury the size of the office and

14   how it was situated.

15   A.  Like, this is her desk, and the conference table is

16   probably, like, right there.  Along the side there.

17   Q.  So close by her desk?

18   A.  And close enough that we would talk and stuff, yes.

19   Q.  You would talk while you were sitting there?

20   A.  Yes.

21   Q.  Can you explain why you said you ran in saying, "I'm sorry

22   I'm sorry, I'm sorry."  Why did you apologize?

23   A.  I knew that she wouldn't want me to sit there and do that

24   in front of her.

25   Q.  So you came in.  Were you carrying cash with you at that

ACEVEDO - Direct

1   time?

2   A.   I had two big manilla envelopes, my purse, typically a

3   shopping bag.

4   Q.   What was in the shopping bag?

5   A.   The cash.

6   Q.   How much cash might that be on any given occasion?

7   A.   Um, wow, $50,000, $60,000, just for that one month.

8   Q.   In cash?

9   A.   In cash.

10  Q.   You mentioned that Ms. Negron was working on charts, you

11  remember, when you walked in the door.  What's a chart?

12  A.   A patient file.

13  Q.   Do you know what kind of work she was doing on those files?

14  A.   No, I know that she was reviewing it, and then signing.

15  Then reviewing and signing.  But I don't know what she was

16  doing.

17  Q.   So you came in with your manilla envelopes and your

18  shopping bag.  Did you close the door?

19  A.   Actually I did.  Typically, I would lock it, which is why I

20  would go in there.  In the centers, none of the doors really

21  have locks, but in her office it had a lock.  So that way

22  nobody would catch me or see me, because I would have to spread

23  out everything to work.

24  Q.   How did you spread it out on the table?

25  A.   I would have my billing sheets, the cash I actually had in

ACEVEDO - Direct

1  different little piles, then the envelopes so I could just put

2  it all together.

3  Q.  What kinds of piles of cash were you making?

4  A.  There were hundreds, fifties, different denominations so it

5  would make it easier for me to add everything up.

6  Q.  Could Ms. Negron see what you were doing?

7  A.  Yes.

8  Q.  Was there ever a time when you didn't have the right

9  denominations that you needed of the cash?

10 A.  Yes, several times.  Actually, yeah, there were several

11 times that I did have -- some sources got paid in uneven

12 numbers, so I needed like a five or something.  On several

13 occasions I asked her if she had change.  She helped me make

14 change.

15 Q.  Did she know what she was making change for?

16 A.  Yes.

17 Q.  How do you know that?

18 A.  I had my billing sheets, the envelopes, we were talking.

19 The stacks of cash were there.  I said, you know, "I need

20 change for this."

21 Q.  Were you covering up what you were doing so she couldn't

22 see it?

23 A.  No.

24 Q.  Were there times that you would cover up what you were

25 doing?

ACEVEDO - Direct

1    A.  Yes, if somebody knocked on the door or people got closer

2    with their footsteps, yes.  I would run and cover it.

3    Actually, I remember a time when someone did knock on the door.

4    Q.  Can you explain that to the jury.

5    A.  Someone did knock on the door.  She waited for me to cover

6    everything up so she could let them in.

7    Q.  Ms. Negron waited for you to cover everything up?

8    A.  Yes.

9    Q.  How did you cover it up?

10   A.  I just threw papers on top, my purse.

11   Q.  After you were done covering, what did Ms. Negron do?

12   A.  Then she proceeded to let the person in.

13   Q.  Do you remember any other particular times when you were

14   stuffing the envelopes with Ms. Negron in the office?

15   A.  Um.

16   Q.  Was there ever a time when someone who worked with you in

17   the kickback operation came into the office?

18   A.  Yes, another BHP broker came into the office and I was

19   meeting him there to give him the envelopes that he was going

20   to deliver for Broward and Boca.

21        At this point, I wasn't delivering all of them.  He

22   was helping me out because there was a lot.  I met him there in

23   her office, and I gave him the envelopes.

24   Q.  Do you know Joseph's last name?

25   A.  Valdez.

1   Q.   Was Ms. Negron present when this happened?

2   A.   Yes, she was there.

3   Q.   Were there any other times that you remember?

4   A.   I remember this one incident that I needed change another

5   time.  She had change.  For some reason, in the stacks that I

6   had, there were two dollar bills.  I remember that she kept one

7   and I kept one for good luck.

8   Q.   Were there times she did not stay in her office when you

9   were working in the office on the kickbacks?

10  A.   Yeah, there was, you know, other times that she would just

11  grab her stuff and get up and leave.  I would be like, "I am

12  going to only be here for ten or fifteen minutes."  I felt bad

13  that she was going to leave, but she clearly didn't want to

14  stay there.

15  Q.   Do you know why she didn't want to stay there?

16          MR. WAX:  Objection.

17          THE COURT:  Sustained.

18  BY MS. SAULINO:

19  Q.   Ms. Acevedo, did Ms. Negron share the office that she had

20  at Medlink with anyone?

21  A.   Yes, with Larry Duran.

22  Q.   Approximately, how many times do you recall it occurring

23  that Ms. Negron was present when you were working on the

24  kickbacks in her and Mr. Duran's office?

25  A.   Well, during the course of my working there, fifteen times,

1  but not all in that office.

2  Q.  Sometimes it would be in other places?

3  A.  Yeah, I don't recall specifically.  I know it wasn't all

4  there.  But yeah, fifteen times.

5  Q.  Now, Ms. Acevedo, when you were talking about Joseph

6  Valdez, did he work for you?

7  A.  Yeah, I was his supervisor.

8  Q.  You said he was a BHP.  Can you explain to the jury what

9  you meant by that.

10  A.  BHP is the title that was given to the marketing people,

11  which meant that they were Behavioral Health Promoters.  They

12  would go out in the community and meet with potential sources

13  like doctors, ALF owners, hospitals.

14      Actually, Joseph Valdez, particularly, was our court

15  liaison, meaning that he would actually attend the drug court

16  or mental health court.  If someone was assigned to have to

17  attend a program, then he would refer them or try to get them

18  to come over to the program.

19  Q.  Did you supervise the Behavioral Health Promotions

20  Department of American Therapeutic Corporation during your

21  entire time working there?

22  A.  Yes, I did.

23      MS. SAULINO:  One moment, Your Honor.

24      THE COURT:  Yes.  Is this a reasonable time to break

25  for lunch?

ACEVEDO - Direct

 1          MS. SAULINO:  Actually, this is a great time, Your

 2    Honor.

 3          THE COURT:  All right, ladies and gentlemen, we will

 4    take a recess until 1:00 today.  I ask that you be back a few

 5    minutes before 1:00.  Remember the instruction not to discuss

 6    the case with anyone during the recess or let anyone talk to

 7    you.

 8          If anybody has any contact with you that you think is

 9    inappropriate, let the Marshal know and we will take care of

10    it.  Just walk away from the situation.

11          If there should be anything in the radio, television,

12    or newspaper, don't read it, watch it, or listen to it.  We

13    thank you very much for your patience.  We will see you this

14    afternoon at 1:00.  You may be excused.

15          I am going to ask everyone to remain in the courtroom,

16    all the spectators, until the jury gets down the hall.

17                    [Jury exits the courtroom].

18          THE COURT:  While the jury is going out, let me

19    instruct the witness, Ms. Acevedo, that you are on the witness

20    stand now.  You are partway through your testimony.  So

21    normally you could talk to the lawyers, if they wanted to talk

22    to you, or agents or someone.

23          Right now, do not discuss your testimony.  Certainly

24    you can talk to Ms. Saulino or someone about where to go to

25    lunch, or what to do, and that's all right.  Do not talk about

1   your testimony.  Then be back here a few minutes before 1:00,

2   and we will resume the testimony.

3           MS. SAULINO:  Your Honor, on the topic of Ms. Acevedo

4   and her interaction with the government, we will have a law

5   enforcement officer with her at all times during the break for

6   security reasons.  The law enforcement officers have been

7   instructed just like you have instructed her.

8           THE COURT:  Do not discuss with anybody that is with

9   you, law enforcement, or anything like that, or a Marshal.

10  Don't talk about your testimony with anyone, okay?

11          THE WITNESS:  Yes.

12          THE COURT:  Thank you.  You may step down.  We will be

13  in recess for an hour.

14              [There was a recess for the noon hour].

15               AFTERNOON SESSION - 1:09 P.M.

16          THE COURT:  Jury please.

17              [The jury returns to the courtroom]

18          THE COURT:  Mrs. Saulino.

19  BY MS. SAULINO:

20  Q.  Mrs. Acevedo, before we broke, I asked you if there were

21  people that worked in the Behavioral Health Promotions

22  Department, do you recall that?

23  A.  We would call them BHPs for short.

24          MS. SAULINO:  Your Honor, may I approach the witness?

25          THE COURT:  Yes.

1    BY MS. SAULINO:

2    Q.  I have handed you what has been previously marked as

3    Government's Exhibit 10.  Do you recognize that document?

4    A.  Yes, I do.

5    Q.  Did you write that document?

6    A.  Yes, I did.

7    Q.  Was it something that you wrote in the course of your

8    business activities at American Therapeutic and Medlink

9    A.  Yes, I was supposed to have BHP meetings --

10           MS. SAULINO:  Just one minute, Ms. Acevedo.

11           Your Honor, at this time I move Exhibit 10 into

12   evidence.

13           MR. WAX:  No objection, Your Honor.

14           THE COURT:  Exhibit 10 is admitted into evidence.

15           [Government Exhibit 10 received in evidence].

16           MS. SAULINO:  Thank you, Your Honor.  May I retrieve

17   the document and publish it to the jury?

18           THE COURT:  Yes.

19   BY MS. SAULINO:

20   Q.  Ms. Acevedo, what is this document?  Can you see it?

21   A.  I can see half of it.

22   Q.  What is it, the half that you can see?

23   A.  This is an agenda meeting that I was going to have with the

24   BHPs.

25   Q.  When did that meeting occur?

ACEVEDO - Direct

1  A.  March of 2006.

2  Q.  I will move the document so that you can see all of the

3  bullet points.  Is that all of the bullet points on the

4  document?

5  A.  Yes.

6  Q.  Do you see the last bullet point on the document?

7  A.  Yes.

8  Q.  What were you doing with that bullet point?

9  A.  I was thanking Jovanna and Irma for helping out the last

10  couple of weeks with the centers.  They had come in on the

11  weekend.  I don't know exactly.  They were working on some

12  charts.  They were doing something.  I needed an effort from

13  everyone in the company to help out and expedite whatever it

14  was.

15      Unfortunately, I didn't attend because I was with my

16  daughter.  They were there for the weekend, and they were there

17  for a big part of the day.  I was thanking them for

18  contributing.

19  Q.  Did Jovanna and Irma work for you?

20  A.  Yes, they were BHPs?

21  Q.  Did that mean they were a marketer?

22  A.  Yes.

23  Q.  Do you know whether any of them were licensed therapists?

24  A.  No, none of them were therapists.

25  Q.  Do you know if any of them had a college education?

85

ACEVEDO - Direct

1   A.   No, none of them attended college actually.   They were just

2   sales people.

3   Q.   Do you recall what Jovanna and Irma said to you after they

4   attended the weekend sessions --

5            MR. WAX:   Objection.

6            MS. SAULINO:   It's a co-conspirator statement.

7            MR. WAX:   It hasn't been published.

8            MS. SAULINO:   Your Honor, it will be after the

9   statement.

10           THE COURT:   Are they going to be witnesses at this

11   point?

12           MS. SAULINO:   At this point, no, Your Honor.

13           THE COURT:   I am going to sustain this.   You can bring

14   it up later or call her back if it is developed later.   Let's

15   move on.

16   BY MS. SAULINO:

17   Q.   Ms. Acevedo, what was your understanding of what they were

18   doing with the files that weekend.   Did you have an

19   understanding?

20           MR. WAX:   Objection, hearsay.

21           THE COURT:   Sustained, her understanding would only

22   come from them.

23           MS. SAULINO:   Your Honor, I established --

24           THE COURT:   She can tell what she saw, what she heard,

25   conversations that she had.   But her understanding is an

1   opinion.  Opinions are not admissible from lay witnesses.  Move

2   on.

3   BY MS. SAULINO:

4   Q.  All right, Ms. Acevedo, moving onto a different topic.

5          Ms. Acevedo, you mentioned early on in your company

6   called ASI, the American Sleep Institute.

7   A.  Yes.

8   Q.  Can you explain what the American Sleep Institute was.

9   A.  It was introduced to us as the sister company for ATC,

10  American Therapeutic Corporation.  They were going to conduct

11  sleep studies.

12  Q.  Who was in charge at ASI?

13  A.  Judy.

14  Q.  How do you know that?

15  A.  Well, she was the owner, and she told me.  She was the

16  boss.

17  Q.  When did ASI come into existence?

18  A.  Around 2006.

19  Q.  And is ASI still open today?

20  A.  No, ASI was closed.

21  Q.  Do you know the reason or reasons that ASI is closed?

22  A.  Well, from what I was told there was two reasons.

23          MR. WAX:  Objection, hearsay.

24          THE COURT:  Sustained.

25          MS. SAULINO:  Your Honor, this company is referred to

1    in the indictment, and it is owned by the defendant.  The

2    reasons for its closure would be --

3              THE COURT:  It only speaks through persons or agents.

4    We don't know who is speaking, where she got her information,

5    from the janitor, from the President, no predicate.  Sustained.

6    BY MS. SAULINO:

7    Q.  Ms. Acevedo, from whom did you learn why ASI was closed?

8    A.  Lawrence Duran.

9    Q.  Was he a co-conspirator with you --

10             THE COURT:  Sustained.  Opinion.

11   BY MS. SAULINO:

12   Q.  What did he say to you?

13   A.  He said was going to stop functioning because we were

14   paying out more kickbacks than we were actually getting

15   reimbursed and then they were placed on review.

16   Q.  Do you know how ASI got its patients?

17   A.  It was ninety percent of the ones that were coming already

18   to ATC.

19   Q.  How do you know that, Mrs. Acevedo?

20   A.  When we were recruiting them, I mean, the first group, you

21   know, immediately start calling the AFLs that was already

22   referring patients.  It just seemed a logical easier thing to

23   do.  We already knew the referral sources.  They already

24   trusted us as far as bringing the residents to our facilities.

25   We already told them that we were opening ASI and they would be

1  able to send the residents to us.

2  Q.  You mentioned the census with respect to ATC earlier.  Was

3  the census something that was a concern with ASI as well?

4  A.  Yes.  We were supposed to have at least four patients a

5  night because there were four beds.

6  Q.  Who made that rule?

7  A.  Judy.

8  Q.  Ms. Negron?

9  A.  Yes.

10        MS. SAULINO:  Your Honor, may I approach the witness?

11        THE COURT:  Yes.

12  BY MS. SAULINO:

13  Q.  Ms. Acevedo, I handed you what has been previously marked

14  for identification as Government's Exhibit 14.  Do you

15  recognize that document?

16  A.  Yes, I do.

17  Q.  What is it?

18  A.  It's an e-mail from Judy to myself just kind of reminding

19  me that the census was low and that I needed to get on it and

20  bring in more patients.

21  Q.  What is the second part of that document, the top part?

22  Did you respond to Ms. Negron?

23  A.  Yes.  I already spoke to who was Nelson Fernandez who was a

24  patient broker and that I was working on bringing in those

25  clients.

1   Q.   Was this an e-mail that you wrote to Ms. Negron in the

2   regular course of your business activities with respect to ASI?

3   A.   Yes.

4        MS. SAULINO:   Your Honor, at this time the government

5   would offer into evidence Government's Exhibit 14.

6        MR. WAX:   No objection.

7        THE COURT:   Government's Exhibit 14 is admitted into

8   evidence.

9        [Government Exhibit 14 received in evidence].

10       MS. SAULINO:   May I publish it, Your Honor?

11       THE COURT:   Yes.

12  BY MS. SAULINO:

13  Q.   Mrs. Acevedo, we will start with the bottom of the

14  document.   It's my understanding that will be the first e-mail

15  in the chain, is that right?

16  A.   Yes.

17  Q.   I will try to put it all on the screen page for you.

18       Now, you have already described this, basically,

19  Mrs. Acevedo, but the bottom part is an e-mail from whom to

20  whom?

21  A.   From Judith Negron to myself.

22  Q.   What was she asking?

23  A.   To bring in more patients because the census was low.

24  Q.   What is the subject matter of this e-mail?

25  A.   ASI census.

1  Q.  The top part of the e-mail, who is that from and to?

2  A.  That is my response to Judith.

3  Q.  It says Margarita De La Cruz.  Can you explain to the jury

4  why the difference in name.

5  A.  My maiden name is de la Cruz, and as far as my social

6  security number, I am de la Cruz.  However, my driver's license

7  says Acevedo.  That's really what I refer myself to.  Legally

8  it's de la Cruz Acevedo.

9  Q.  Now, you started to describe your response to Ms. Negron.

10  When she asked you about bringing the census up at ASI, how did

11  you respond?

12  A.  I was just letting her know that I was working on it.  I

13  had contacted Nelson Fernandez, who was a patient broker.  It

14  should have been something simple to bring in the patients

15  because they had already been spoken to and they already knew

16  what to expect, and it should just be them actually coming in.

17  Q.  Who is Larry M. that is referred to in this e-mail?

18  A.  Larry Morris.  He is the BHP in Broward.

19  Q.  Was he a BHP like Mr. Valdez who participated in the

20  kickback scheme?

21  A.  Yes, he was a BHP like Mr. Valdez.

22  Q.  You said Nelson Fernandez was a patient broker.  Was he a

23  patient broker to bring in patients for ATC?

24  A.  ATC and ASI.

25  Q.  One more question on this e-mail, Ms. Acevedo.  When you

ACEVEDO - Direct

1  say in the e-mail, "I did speak with Nelson F" why didn't you
2  use his full last name?
3  A.  Well, as far as Nelson, he never wanted anyone to know his
4  full name.  I wanted for her to know who Nelson F was.  There
5  were several Nelsons.  In the master patient log it doesn't
6  even say Nelson F.  There was another aliases that he would go
7  by.
8  Q.  Was it your understanding that Ms. Negron would know who
9  you were talking about?
10         MR. WAX:  Objection.
11         THE COURT:  Sustained.  It's an opinion.
12  BY MS. SAULINO:
13  Q.  Did you ever talk with Ms. Negron about who Nelson was and
14  what he did for ATC and ASI?
15  A.  Yes, I did.
16  Q.  What was that conversation about?
17         THE COURT:  Why don't you simply say what did she say
18  and what did you say?  The jury can evaluate it.
19         What did she say to you when you told her that?  You
20  told her about whoever it was she just asked you about.  You
21  had a conversation with Ms. Negron.  About when was it
22  approximately?
23         THE WITNESS:  It was recently right when Nelson came
24  on board that he started referring patients.  I told her that
25  Nelson was going to refer patients to ASI as well.  Everything

1    had already been cleared with him.  We had established what he

2    was going to get, and then from there on he was just going to

3    refer.  So I just needed to, I guess, figure out the logistics

4    of transporting the patients and getting them to the center.

5    It had already been determined that he was going to get his 200

6    kickback fee.

7    BY THE COURT:

8    Q.  What did she say, as best you can recall?

9    A.  For that specific conversation, I don't recall her response

10   on that.

11          THE COURT:  All right, okay.

12          MS. SAULINO:  Thank you, Your Honor.

13   BY MS. SAULINO:

14   Q.  Now Mrs. Acevedo, you just referred to 200.  What was the

15   standard kickback for ASI?

16   A.  It was $200.

17   Q.  Why was it different from ATC, do you know?

18   A.  Originally, I was told it was going to be $150.  However,

19   the ASI didn't wanted $150.

20          MR. WAX:  Your Honor, I am going to object.

21          THE COURT:  The jury will disregard.  We don't know

22   who is talking.  We don't know who is saying what.  If you want

23   to relay a conversation, you have to lay a predicate.  Who was

24   there.  Who spoke.  What they said.  Not somebody's idea of a

25   generalized statement.  She was thinking this.  I was thinking

1    that.  No, none of that.

2          MS. SAULINO:  I will, Your Honor, thank you.

3    BY MS. SAULINO:

4    Q.  Ms. Acevedo, specifically how much was standard kickback

5    for ATC?

6    A.  $30 a day.

7    Q.  How much was it for ASI?

8    A.  $200 a night, for a test.

9    Q.  How many times could a patient attend ASI?

10   A.  Once, and then on that once, if they found that they

11   required a follow-up, then they can return.

12   Q.  If you had patients returning, would you pay them the $200

13   again, the recruiters?  Would you pay the recruiters $200

14   again?

15   A.  I don't recall the exact fee, but we did pay.  I know it

16   was less.  I don't know if it was $150 or $200.  But it was

17   less the second time around.

18   Q.  Ms. Acevedo, you said the standard kickback for ASI was

19   $200.  Was it always $200?

20   A.  No, when ASI first opened and we were trying to bring in

21   patients, the homes weren't sending them over not so easily.

22   Q.  Were you trying to bring in patients without kickbacks?

23   A.  Yes, we were just testing the waters to see if it would

24   work out.  They already knew us and trusted us.  We figured

25   maybe they would go along with it.  That didn't work out.  So

1  we had to go back and offer.

2  Q.  What was the first offer you made?

3  A.  $150.

4  Q.  Who told you to make that offer?

5  A.  Larry Duran.

6  Q.  Do you know how he came to that number?

7         MR. WAX:  Objection.

8         THE COURT:  Sustained.  You can establish the

9  predicate.  If they had a conversation, you can bring it out.

10 Just asking her opinion about what was being said, I will

11 sustain all of those objections.

12 BY MS. SAULINO:

13 Q.  Ms. Acevedo, did you try to use the $150 kickback with the

14 referral sources?

15 A.  I did.  I offered them $150.  They said that was too

16 little, that the going rate was $300.

17        MR. WAX:  Objection, no predicate.

18        THE COURT:  I have to sustain that.  We don't know

19 when, where, who.  Can't.  Sustained.  But you can get it in if

20 you lay the predicate.

21 BY MS. SAULINO:

22 Q.  Ms. Acevedo, do you recall any specific times that you

23 offered $150 to referral sources?

24 A.  Several times but I can't specify who, when.  I just know

25 that it was overall.

ACEVEDO - Direct

1  Q.  Were these AFLs owners?

2  A.  AFLs.

3  Q.  Did you offer the $150 to any patient brokers?

4  A.  No, because at that time we didn't start with the patient

5  brokers.  We just start with the ALFs.

6  Q.  What about halfway house owners?

7  A.  The halfway house owners, he got, I believe it was a flat

8  fee.  So it was already included.  I didn't pay the halfway

9  house owners because they were paid with check and not cash.

10  That went straight from the office.

11  Q.  With respect to the ALF owners, you did offer some of them

12  $150?

13  A.  Yes, I did.

14  Q.  Did any of them take it?

15  A.  No, they did not.

16  Q.  Did any of them tell you why they were not taking it?  It's

17  a yes or no answer.

18         MR. WAX:  Objection, no predicate.

19         THE COURT:  Sustained.  The substance of her opinion

20  with what was said from an unknown person at an unknown time is

21  hearsay.  Sustained.

22         MS. SAULINO:  Your Honor, may I respond?

23         THE COURT:  No, the last question.

24         Now, at that point she has to ask you who were you

25  talking to.  Where was it?  When was it?  What did you say to

1    them and what did they say to you?

2            So, let's start that way and let's go through it one

3    time and maybe we can put an end to all of this.

4            Do you remember?  You don't have to remember the exact

5    date.  Do you remember generally, summer, fall, a month or

6    something, when you had a conversation with an assisted living

7    facility owner, any one of them, about the matter of $150.

8            THE WITNESS:  I'm sorry, Your Honor, I don't.  This

9    was 2006.  They gave me a list from the master patient log of

10   people to go talk to.  I spoke to a lot of them.

11   BY THE COURT:

12   Q.  You spoke to a lot of them?

13   A.  I did.

14   Q.  Over the period of time of when to when approximately?

15   A.  It was definitely 2006.  It was within the first week of

16   ASI opening.

17   Q.  So the first week you were there, you went to talk to a lot

18   of people, right?

19   A.  Yes.

20   Q.  You offered them this $150 kickback for sleep people?

21   A.  Correct.

22   Q.  And nobody took it, right?

23   A.  Yes.

24            THE COURT:  That's the end of that subject.  That's

25   all she knows.  Let's move onto something else.

 1          MS. SAULINO:  Thank you, Your Honor.

 2   BY MS. SAULINO:

 3   Q.  Ms. Acevedo, did you have a conversation with Ms. Negron

 4   about the fact that the ASI patients wouldn't take the $150?

 5   A.  Yes.

 6   Q.  What did you say to her?

 7          THE COURT:  Do you want to lay the predicate, the

 8   usual predicate, so we don't have a problem?

 9   BY THE COURT:

10   Q.  When did you talk to her about that?

11   A.  During the first couple of weeks.

12   Q.  Where was she when you talked to her and where were you?

13   A.  We were at ASI.

14   Q.  And what did you say to her, and what did she say to you,

15   if anything?  It's very simple to get this out.

16   A.  I told her that the response wasn't good, and they didn't

17   want the $150.  They wanted the $300.  She said that was

18   absurd.  "The reason why we can't do that is we actually have a

19   facility with four beds and we provide transportation.  There

20   are other companies, fly-by-nights that actually do sleep

21   studies in a Holiday Inn so they can afford to give more of a

22   kickback than we can".

23   Q.  What did you say to her in response to that?

24          See, the conversation and then the jury can decide.

25          What did you say back, if anything?

1   A.  Nothing, I just let her know that it was going to be very

2   hard to sell.

3               MS. SAULINO:  Thank you, Your Honor.  I appreciate it.

4               THE COURT:  I am not trying to help one side or the

5   other.  When we talk about a predicate it's basic; who, what,

6   when, where.  What was said.  Not her opinion as what somebody

7   was thinking when somebody said something.  What did the person

8   say, and the jury can evaluate it.  Let's move on.

9   BY MS. SAULINO:

10  Q.  Mrs. Acevedo, did there come a point when you did pay

11  kickbacks for assisted living facility patients for ASI?

12  A.  Yes.

13  Q.  How much did you pay them?

14  A.  $200.

15  Q.  Per patient, per night?

16  A.  Per patient, per night.

17  Q.  Who told you to pay them $200?

18  A.  Larry Duran.

19  Q.  Do you remember when that conversation was?

20  A.  That was after the conversation that you had with Judy.

21  Q.  After the conversation you just described?

22  A.  Yes.

23  Q.  Do you remember how long after?

24  A.  Not really, but it wasn't too long after.

25  Q.  Do you remember where you had the conversation with

ACEVEDO - Direct

1  Mr. Duran?

2  A.  I don't.  I think it was in the car or something, but I am

3  not sure.

4  Q.  What did Mr. Duran say to you?

5  A.  He said that we were going to be giving the $200.  Not the

6  $300 but $200.

7  Q.  Ms. Acevedo, you referred to 200.  What do you mean by

8  that?

9  A.  Like I said, the other fly-by-night sleep lab people were

10  giving $300 cash back.  We were only giving $200.

11  Q.  Did you ever speak with Ms. Negron about the agreement that

12  you understood to give $200 to the assisted living facility

13  owners?

14  A.  Yes.

15  Q.  Do you remember when that conversation was?

16  A.  Yes, she wasn't really too happy about it.

17  Q.  Ms. Acevedo, do you know when that was?

18  A.  Not a specific day.  I know it was when I was going to go

19  back out again and start marketing again.  Let's say a couple

20  of weeks after that.

21  Q.  Do you remember where it was?

22  A.  No, I think it was at ASI.  At that time we were actually

23  working out of ASI when I was working for ASI patients.

24  Q.  Where was ASI located?

25  A.  Off the Palmetto in Hialeah, next to the "Palmetto Ed"

ACEVEDO - Direct

1  building.

2  Q.  What did you say to Ms. Negron?

3  A.  I just, you know, I let her know, okay, so we are doing the

4  $200.  She wasn't happy about it.  She was upset.  "There he

5  goes again giving away stuff".

6  Q.  That was her response to you?

7  A.  Yes.

8  Q.  Did she tell you what she meant when she said, "there he

9  goes again"?

10  A.  No, it was understood.  It was clear to me she was

11  referring, once again, to Larry was deciding to give away, I

12  guess, more than she wanted to.

13  Q.  Now, did Ms. Negron give you any instructions about the

14  types of patients to recruit for ASI?

15  A.  Yes.  We had, like, a little "in service" with all the

16  BHPs, and she told us basically anybody that has high blood

17  pressure, somebody that snores a lot, someone that gets up to

18  go to the bathroom a lot, that was kind of like a heads-up that

19  they can come to get the sleep study, because there are several

20  diagnoses that fall into that.  When they come in, they would

21  get a screening done or something.  Then they would determine

22  when or how to do the sleep study.

23  Q.  Ms. Acevedo, did she give you any type of form or sheet to

24  use?

25  A.  Yes, we had a referral form.  On that form there were

ACEVEDO - Direct

1  several things that you can just check off.  It was kind of a

2  guide so if we were talking to the patients we knew what to ask

3  and which one needed to be marked off.  After a while we would

4  just make copies and leave them at doctors' offices or with the

5  referral source so they can fill it out an send it over.

6  Q.  Did Ms. Negron give you any instructions on how to ask

7  these questions of the patients?

8  A.  Yeah, just, you know, saying, asking them "do you get up at

9  night?" It's kind of like coaxing it out of them.

10         MR. WAX:  Overruled.  Answer the question.

11         THE WITNESS:  Everyone at some point gets up to go to

12  the bathroom.  These people were easy to say, yes, yes, at some

13  given point people just say yes, I snore.  Yes, I snore.  Even

14  if it's just once or twice.  You kind of engage them in that,

15  and they start following into it.  It fits within the criteria

16  that is on the referral sheets and then you can just check it

17  off.  Then they come in.

18  BY MS. SAULINO:

19  Q.  Those were her instructions to you

20  A.  Yes.

21         MS. SAULINO:  Your Honor, may I approach the witness?

22         THE COURT:  Yes.

23  BY MS. SAULINO:

24  Q.  I am handing you what has been previously marked as

25  Government's Exhibit 19.  Do you recognize that?

1   A.  Yes.

2   Q.  What is that?

3   A.  The referral sleep study.

4   Q.  The guide that you just described?

5   A.  Yes.

6        MS. SAULINO:  Your Honor, the government would move to

7   admit Government's Exhibit 19.

8        MR. WAX:  No objection.

9        THE COURT:  19 is admitted into evidence.

10        [Government Exhibit 19 received in evidence].

11        MS. SAULINO:  Your Honor, may I publish it to the

12   jury?

13        THE COURT:  Yes.

14   BY MS. SAULINO:

15   Q.  Ms. Acevedo, I know it's a bit hard to see, but you have

16   just looked at this document.  The document that we now have on

17   the screen, is this the referral sheet that you were talking

18   about?

19   A.  Yes, this is actually one of two because there was two of

20   them.

21   Q.  Ms. Acevedo, you referred to a bit ago that many of the

22   patients, I think you said ninety percent, from ASI were coming

23   from ATC, is that right?

24   A.  Yes.

25   Q.  Did any problems arise from having the same patients at

1   both programs?

2   A.  Yeah, it became a scheduling conflict.  If they came over

3   to do the sleep study, typically you would think a person

4   sleeps.  But they really don't.  They were hooked up to a

5   monitor.  People were watching.  That meant in the morning they

6   didn't want to come to ATC since it was ninety-five percent the

7   same patients.  So they wouldn't go to ATC.  Or maybe they

8   weren't back home yet on time when the ATC van went to pick

9   them up.  So it kind of became a conflict with attendance

10  because then the census would drop, or we would have absences

11  increasing.

12  Q.  So what did you do to correct this problem?

13  A.  Well, what happened was then, of course, Marianella came up

14  to me, the owner of ATC, and brought it up because she saw that

15  the absences were increasing.  What we did was we stuck to

16  bringing in the ones that had recently graduated from the

17  program --

18  Q.  Ms. Acevedo, can you explain what you mean by recently

19  graduated the program?

20  A.  The patients in the PHP program can only be there for four

21  to six weeks.  After that, they were, like, on a break for

22  three months.  Within that time period we could bring them in

23  because then it wouldn't be a problem.  Or if, you know, if

24  they had never been to ATC, if we were getting ready to bring

25  them in, ATC would try to put them into ASI first and then to

ACEVEDO - Direct

1   ATC, whichever way.

2   Q.  Do you know whether the patients who went to ASI had

3   prescriptions?

4   A.  Yes, they all had to have prescription.

5   Q.  Who told you that?

6   A.  Judy.

7   Q.  Ms. Negron?

8   A.  Yes.

9   Q.  Did you ever help facilitate those prescriptions?

10  A.  I did.  I took patients to a doctor so that way they can

11  get seen by a doctor and get their prescription.

12  Q.  Did you talk to the patients ahead of time before they went

13  to talk to the doctor?

14  A.  I did.  I told them remember, don't forget to tell the

15  doctor that you get up at night.  Don't forget to tell him that

16  you snore.  Stuff like that.

17  Q.  Were these patients that you were taking to the doctor

18  coming from any place?

19  A.  Those specifically, they were coming from a halfway house

20  at this point.

21  Q.  Do you remember who owned the halfway house?

22  A.  Yes, Mathis Moore from 7th Avenue Recovery.

23  Q.  Was Mathis Moore a patient broker that you worked with?

24  A.  Yes.

25  Q.  Did Ms. Negron know that Mathis Moore was sending patients

ACEVEDO - Direct

1    to ASI?

2            MR. WAX:  Objection.

3    BY MS. SAULINO:

4    Q.  Did you tell Ms. Negron that Mathis Moore was sending

5    patients to ASI?

6    A.  Yes.

7    Q.  Did she ever tell you not to allow how him to send patients

8    to ASI?

9    A.  No, she did not.

10   Q.  What volume of business did Mathis Moore do with ATC and

11   ASI approximately?

12   A.  Wow, huge.  He was, I would say forty percent.  He was

13   already referring patients before I even started working there.

14   Like I said, he got a flat fee for volume.  I never tallied up

15   his days.  But I needed to make sure that he always had

16   anywhere between 15 to 20 patients enrolled in the program.

17   Q.  What other BHP referred patients to ASI?

18   A.  Frank Creato.  Frank Edwards.  Butler Moltry.  Keith Humes,

19   Curtis Gates.  I can't remember a lot of others.

20   Q.  I think you earlier mentioned Mr. Nelson Fernandez.  Was he

21   one of them?

22   A.  Yes, I'm sorry.  Nelson Fernandez, yes.

23   Q.  Ms. Acevedo, starting with Mathis Moore, did he do anything

24   for Medlink or ATC other than send patients?

25   A.  No.

ACEVEDO - Direct

1   Q.   James Edwards?

2   A.   No.

3   Q.   Keith Humes?

4   A.   No.

5   Q.   Nelson Fernandez?

6   A.   Transport the patients that he referred, no.

7   Q.   Frank Creato?

8   A.   Transport and refer.  That's it.

9   Q.   He would transport the patients he referred?

10  A.   Yes.

11  Q.   Curtis Gates?

12  A.   Nothing, just refer.

13  Q.   Butler Moltry?

14  A.   Just refer.

15  Q.   Do you know of any other reason that any of these gentlemen

16  would have been receiving payments from Medlink or ATC?

17  A.   No, I do not.

18  Q.   Mrs. Acevedo, was there a master patient log for ASI?

19  A.   Yes, there was.

20  Q.   Where was it kept?

21  A.   It was kept in the server, in the computer, the network.

22  Q.   Did you have access to it?

23  A.   I did.

24  Q.   Who gave you access to it?

25  A.   Judy authorized Arturo, the IT guy, to connect me to it.

107

ACEVEDO - Direct

1  Q.  Did you discuss the ASI master patient log with Ms. Negron?

2  A.  We did.

3  Q.  Do you remember when?

4  A.  Back when we first started receiving patients because I

5  needed to see who attended ASI so that way I can know who I

6  needed to give the kickback to.

7  Q.  Do you remember where you were when you had this

8  conversation?

9  A.  I don't.  I believe it was at ASI, but I am not sure.

10  Q.  Did Ms. Negron have an office at ASI?

11  A.  Yes, she did.  She worked out of her ASI office.

12  Q.  When you were speaking with her at ASI, would it have been

13  in her office?

14  A.  Yes.

15  Q.  Was the master patient log for ASI just like the master

16  patient log for ATC?

17  A.  No, it was a lot more simple.  It had the basic

18  information.  Well, ATC had a lot of information.  Then I would

19  just get the information that I read.  For ASI, when I would go

20  into it, it was pretty much just the information that I needed.

21  But I think there was other aspects to it that I probably

22  didn't have access to or look at.  I don't know.

23  Q.  What information did you need out of the master patient

24  log?

25  A.  The patient's name, the date that they attended and the

1    person that referred them.

2    Q.   That was available in the ASI master patient log?

3    A.   Yes.

4    Q.   How was the person that referred them denoted in the log?

5    How could you see it in the log?

6    A.   It would say "patient name" and "referral source."

7    Q.   Referral source?

8    A.   Yes.

9    Q.   Do you know whether, yes or no, do you know whether

10   Ms. Negron reviewed that log?

11   A.   Yes.

12   Q.   How do you know?

13   A.   She reviewed everything, and especially the master patient

14   log because she wanted --

15            MR. WAX:  Objection as to what she wanted.

16            THE COURT:  Let me sustain the last objection and

17   instruct the jury to disregard it.  That's opinion.  Your next

18   question.

19            MS. SAULINO:  Thank you, Your Honor.

20   BY MS. SAULINO:

21   Q.   Did you talk to Ms. Negron about the ASI master patient

22   log?

23   A.   Yes, we did.

24   Q.   What did she tell you about the ASI master patient log?

25   A.   Just general statements about it.  Nothing specific.  Is

109

ACEVEDO - Direct

1   the information accurate.  At one point we needed to change it

2   because I had to be able to determine who I had actually paid

3   back.  It got really confusing with the same patients but

4   different times attending.

5   Q.  So Ms. Acevedo, you are recalling a specific time that you

6   recall talking to Ms. Negron about the ASI master patient log?

7   A.  Yes.

8   Q.  Do you remember when that conversation was?

9   A.  Not exactly when.  I know why.

10  Q.  Do you have a ballpark of when it was?

11  A.  Probably towards the later end, like 2007.  It was because,

12  again, a lot of the patients that were in attendance at ATC

13  were now not being brought into ASI, so they weren't on my

14  rounds of this month that I am going to see.  So I had to

15  carefully keep track of now I had another ALF that I had to

16  visit for, let's say, just one patient.  I was trying to see if

17  I can carry it over until the next time they were referring

18  patients to ATC so I could put it all together instead of a

19  visit for ATC and a visit to ASI because that got really,

20  really confusing.

21  Q.  Did you discuss that with Ms. Negron?

22  A.  Yes, we discussed it because we were trying to

23  trouble-shoot it.  I believe it was someone else that came up

24  with highlighting --

25          MR. WAX:  Objection.

ACEVEDO - Direct

1          THE COURT:  Just a moment, we have to deal with the

2    summary of what she said.

3          But what did she actually say to you about this?  Tell

4    us when it was.  About when did you have this conversation?

5          THE WITNESS:  Somewhere in 2007.

6          THE COURT:  What did she say to you about this, as

7    best you recall, generally?

8          THE WITNESS:  Nothing.  She was trying to help me out.

9    Nothing was decided that very moment.  It was just something

10   that was trouble-shooted.

11         THE COURT:  You told her the problem, and she didn't

12   say anything to you.  She just stood there silently?

13         THE WITNESS:  No, she didn't.  I don't remember the

14   exact words.

15         THE COURT:  I didn't ask you her exact words.  I just

16   asked you what she said to you, that's all.

17         THE WITNESS:  Unfortunately, I don't recall what she

18   said.

19         MS. SAULINO:  Thank you, Your Honor.

20   BY MS. SAULINO:

21   Q.  Do you recall eventually that master patient log was

22   changed?

23   A.  Yes.

24   Q.  Was it changed in response to your concerns?

25   A.  Yes, it was.

ACEVEDO - Direct

1  Q.  Did the changes reflect what you needed?

2  A.  Yes, it did.

3  Q.  What were those changes?

4  A.  To be able to highlight the people that I already had seen

5  so I wouldn't double pay them.

6  Q.  Did you do that highlighting?

7  A.  Yes, I did.  At first I didn't.  Then I did.  Then I didn't

8  again.

9  Q.  Who did it at first?

10  A.  Lily.

11  Q.  Lily?

12  A.  Yes.

13  Q.  Did she work for Ms. Negron?

14  A.  Yes.

15  Q.  At American Sleep Institute?

16  A.  Yes.

17  Q.  And then you did it for a while.  Who did it after you

18  stopped?

19  A.  Then lily did it again.

20  Q.  Ms. Acevedo, I am going to change topics.  You talked a

21  good bit today about the kickbacks that you were providing to

22  various homes and patient brokers.  Starting in the early

23  years, where did you get that cash from?

24  A.  From a Check Cashing Store.

25  Q.  Do you know who owned that Check Cashing Store?

ACEVEDO - Direct

1   A.  Yes, I do.

2   Q.  What was the name?

3   A.  Lazaro Acosta.

4   Q.  How do you know that you got the cash from the Check

5   Cashing Store?

6   A.  I went and picked it up myself several times.

7   Q.  Now, can you explain to the jury how the process worked of

8   you getting cash from the Check Cashing Store?

9   A.  Yes, Larry would give me some checks, which I would take to

10  the Check Cashing Store and drop them off.  Later on, Larry

11  would call me and say you can go back and pick up the cash.  So

12  I did.  It wasn't all of it.  It was, like, in two or three

13  days I would pick up the total amount.

14  Q.  Do you know how many checks you were taking to the Check

15  Cashing Store?

16  A.  Yes, from what I remember, at first, it was about four or

17  five people, individuals that the checks were written out to.

18  Each one of them had four checks to their names.  Dated, like,

19  I week apart.

20          MS. SAULINO:  Pardon me for a moment, Your Honor.

21          THE COURT:  Yes.

22  BY MS. SAULINO:

23  Q.  Ms. Acevedo, how often would you go per month?

24  A.  Well, it was definitely once a month.  Maybe two or three

25  times within that month.

ACEVEDO - Direct

1  Q.  Do you recall the first time that you went to the Check
2  Cashing Store?
3  A.  Yes, I did.
4  Q.  Can you describe that to the jury.
5  A.  Larry had given me checks to take to Judy.
6  Q.  Ms. Negron?
7  A.  Ms. Negron.  So I met her at Shula's kind of for lunch.
8  Q.  I'm sorry, you met her you said kind of for lunch?
9  A.  Kind of for lunch and then drop off the checks.  We went to
10  the Check Cashing Store and dropped them off.
11  Q.  Did you go in the same car?
12  A.  Yes, we did.
13  Q.  Did you hand the checks to her before you went to the Check
14  Cashing Store?
15  A.  Yes, I did.
16  Q.  Who went into the Check Cashing Store that first time?
17  A.  That first time, she did.
18  Q.  When you went to the Check Cashing Store, what happened
19  when you went inside?
20  A.  I would just drop off the checks either with Lazaro or
21  George, who also worked there, or the girls at the front, and I
22  would just leave them there.
23  Q.  When you say "Lazaro," you mean Lazaro Acosta?
24  A.  Yes.
25  Q.  He was the owner?

1    A.   Yes.

2    Q.   Would you do that at the front window of the Check Cashing

3    Store?

4    A.   If Lazaro was there, sometimes we would go out to the back

5    office.   If not, I would just leave it at the front window.

6    Q.   Ms. Acevedo, you said that you did this a few times a

7    month, is that right?

8    A.   Two, three times a month, yeah.

9    Q.   Now, do you know who these checks were made out to?

10   A.   They were made out to four or five individuals.

11   Q.   Do you know who those individuals were?

12   A.   You mean their names?

13   Q.   Yes, we will start with their names.

14   A.   The ones that I recall were Pedro Sosa, Yoisel Cancio

15   Gustavo Borges, and there was one more which I can't remember.

16   I think his last name was Torres, but I can't remember.

17            MS. SAULINO:   Your Honor, may I approach the witness?

18            THE COURT:   Yes.

19            MS. SAULINO:   Thank you, Your Honor.

20   BY MS. SAULINO:

21   Q.   I just handed you what has been previously marked

22   Government's Exhibit 42K through 42N.   Could you take a look at

23   them and tell me if you recognize these documents.

24   A.   Yeah, these are the ones that I used to drop off at the

25   Check Cashing Store.

1   Q.   These are copies of the checks that you would drop off at

2   the Check Cashing Store?

3   A.   Yes.

4   Q.   I will let you finish looking at it.

5   A.   Yes.

6   Q.   Are these all of the checks that you ever dropped off

7   there?

8   A.   That I recall, yes.

9   Q.   Let me clarify my question.  Were there more than just

10  these?

11  A.   Yes.

12  Q.   Ms. Acevedo, how much money were these checks for

13  generally?

14  A.   They were, like, payroll salary checks, so anywhere between

15  2 and $3,000.

16          MS. SAULINO:  Your Honor, at this time the government

17  would offer into evidence Exhibits 42J, K, L, M and N.

18          MR. WAX:  By agreement of the parties, Your Honor, no

19  objection.

20          THE COURT:  All right, there is no objection.  The

21  documents just named, 42J, K, L, M, N are admitted into

22  evidence and may be shown to the jury if you wish.

23          MS. SAULINO:  Thank you, Your Honor.

24   [Government Exhibits 42J, K, L, M, N received in evidence].

25  BY MS. SAULINO:

ACEVEDO - Direct

1  Q.  I am going to show you from Exhibit 42K this check is made

2  out to Yoisel Cancio.  Is that one of the checks that you took

3  to the Check Cashing Store?

4  A.  Yes.

5  Q.  This check appears to Gustavo Borges.  Is he another one of

6  those individuals?

7  A.  Yes.

8  Q.  This check appears to be to Pedro Sosa.  Is he another one

9  of those individuals?

10 A.  Yes.

11 Q.  This last check is to Luis Escobar, is that one of those

12 individuals?

13 A.  Yes.

14 Q.  Is that the name you were having trouble remembering?

15 A.  Yes.

16 Q.  Ms. Acevedo, do you see in the memo line there is a date

17 03/03/06?

18 A.  Yes.

19 Q.  Right there?

20 A.  Yes.

21 Q.  Do you know what that represented?

22 A.  That was the pay period.

23 Q.  That was the pay period?

24 A.  Yes.

25 Q.  Ms. Acevedo, did any of these gentlemen work for Medlink?

ACEVEDO - Direct

```
 1  A.  No.
 2  Q.  Did you ever meet any of them?
 3  A.  No.
 4  Q.  Approximately how many people worked for Medlink?
 5  A.  I would say ten max.
 6  Q.  Was there any other satellite office that you might not
 7  have ever gone to?
 8  A.  No.
 9  Q.  Did you meet all the people who worked at Medlink?
10  A.  Yes, I did.
11  Q.  Did you ever meet any of these four gentlemen?
12  A.  No.
13  Q.  Was there a yearly Christmas party at Medlink?
14  A.  Yes, we did a gift exchange every year.
15  Q.  And were any of these four gentlemen ever included in the
16  gift exchange?
17  A.  No, they were not.
18  Q.  To your knowledge, Ms. Acevedo, what were these gentlemen's
19  job function at Medlink?
20  A.  To just cash checks.
21  Q.  But who cashed the checks?
22  A.  I did.
23  Q.  Do you know of any other reason why these checks were being
24  written?
25  A.  Well, it was money laundering so that we --
```

1    MR. WAX:  Objection.

2    THE COURT:  Sustained.

3    Do you know why you took the checks there to that

4 place and cashed them?  Do you know what the purpose was other

5 than to cash the checks?

6    THE WITNESS:  We needed the cash for the kickbacks.

7    THE COURT:  Okay.

8 BY MS. SAULINO:

9 Q.  Now, let me ask you about another gentleman.  Do you recall

10 Charles Tipton?

11 A.  I do.

12 Q.  Did he work at Medlink?

13 A.  No.

14 Q.  Did he receive checks from Medlink?

15 A.  Well, yes.

16 Q.  How do you know that?

17 A.  I delivered them and I remember seeing it.

18 Q.  You delivered them to where?

19 A.  To Lazaro Acosta at the check cashing place.

20 Q.  Did you ever meet Mr. Tipton?

21 A.  No, I did not.

22 Q.  What about Victor Rodriguez?

23 A.  I never met him either.

24 Q.  Did you deliver checks to him to the Check Cashing Store?

25 A.  Yes, I did.

1  Q.  Did you pick up the cash afterward?

2  A.  Yes, I did.

3  Q.  Juan Carlos Savantes, did you ever meet him?

4  A.  No, I never did.

5  Q.  Did you deliver checks to him at the Check Cashing Store?

6  A.  Yes.

7  Q.  Did you pick up the cash afterward?

8  A.  Yes, I did.

9  Q.  The first time that you went to the Check Cashing Store to

10  Ms. Negron, do you know what checks she was bringing to

11  Mr. Acosta?

12  A.  No, I was still in the new stage, so I didn't know what

13  happened, so I didn't pay attention.  I was just delivering

14  something to her.

15  Q.  How long after that time did you start bringing checks to

16  the Check Cashing Store?

17  A.  Probably the following month, or the month after that.

18  Probably a month after.

19  Q.  Do you know approximately when that was?

20  A.  In 2006 I believe.

21  Q.  From that point forward, did you handle the dealings at the

22  Check Cashing Store?

23  A.  Yes.

24  Q.  Now, when you picked up the cash from the Check Cashing

25  Store, where did you take it?

1  A.  Well, in the early years, I would take it right back to

2  Larry and give it to him, and he would hold it.  Eventually

3  when, I guess, he had all the money that he needed, then he

4  would give it back to me for the kickbacks.  Then later on, I

5  would just, I guess, just hold onto it and fill out the

6  envelopes and distribute it.

7  Q.  For how long a period of time did this method of check

8  cashing go on?

9  A.  At least three years.

10  Q.  Can you explain to the jury how you know.

11  A.  Well, I was the one taking the checks and picking up the

12  cash.

13  Q.  Was there a point when you stopped using this method to get

14  cash?

15  A.  Yes.

16  Q.  Do you remember when that was?

17  A.  Yeah, that was around 2010, the tail end of 2009.  I am not

18  good with time frames but it was around 2010 I would say, the

19  beginning.

20  Q.  Now, Ms. Acevedo, let me put up Exhibit 42J, the first

21  page.  Is it your understanding that the top of this exhibit is

22  the front of the check, and the bottom is the back of the

23  check?

24  A.  Yes.

25  Q.  Ms. Acevedo, do you see the endorsement over here on the

ACEVEDO - Direct

1  right hand side?

2  A.  Yes.

3  Q.  Who is this check made out to?

4  A.  Gustavo Borges.

5  Q.  And does it appear to be endorsed by Gustavo Borges?

6  A.  Yes.

7  Q.  Did he endorse it?

8  A.  No.

9  Q.  Do you know who did?

10  A.  Yes.

11  Q.  Who endorsed these checks, Ms. Acevedo?

12          THE COURT:  Answer the question.

13          THE WITNESS:  Judy did.

14  BY MS. SAULINO:

15  Q.  How do you know that Ms. Negron endorsed these checks,

16  Mrs. Acevedo?

17  A.  I was with her on several occasions when she did.

18  Q.  Ms. Acevedo, did Ms. Negron have any particular procedures

19  that she used when she endorsed these checks?

20  A.  Yes, she did.

21  Q.  If you need some water, there is some right in front of

22  you.

23  A.  She had a cheat sheet --

24  Q.  Ms. Acevedo, I'm sorry, can you speak into the microphone.

25  A.  She had a cheat sheet with the signatures on it and she

ACEVEDO - Direct

1   would copy it.  She would use several different pens so it

2   wouldn't be the same ink.

3   Q.  So it wouldn't be the same ink?

4   A.  Yes.

5   Q.  Do you recall any particular times when she was using

6   several different pens?

7   A.  Yes, when we were in her car.  She needed to sign them for

8   me so I could run off and take them to the Check Cashing Store.

9   So we were fidgeting in my purse, the glove box just to try to

10  have different pens for her to sign them.

11  Q.  Did you see that cheat sheet?

12  A.  Yes, I saw it at first.  I remember she was upset because I

13  guess Larry had lost it or something, he misplaced it.

14  Q.  Did she tell you that she was upset?

15  A.  Yes.

16  Q.  Did Ms. Negron tell you why she was using several different

17  colored pens?

18  A.  Yes, so it wouldn't look suspicious or raise flags.

19  Q.  So it wouldn't raise flags, is that what you said?

20  A.  Yes.

21  Q.  When she was signing these checks, was she signing one per

22  person?

23  A.  No, she was signing all four per person.

24  Q.  Ms. Acevedo, when you stopped using the procedure of going

25  to the Check Cashing Store, just tell me whether this is true,

123

ACEVEDO - Direct

1  did someone tell you, or did you learn why you stopped using

2  the Check Cashing Store?

3  A.  Someone told me, Larry told me.

4  Q.  Mr. Duran told you?

5  A.  Yes.

6  Q.  Do you remember when that was?

7  A.  Not a specific day.  It was toward the end when we stopped.

8  Q.  Did he tell you why you stopped using the check cashing

9  store?

10  A.  He said that bring checks because the Check Cashing Store

11  was under investigation or had been shut down.

12  Q.  Now, at that point did you still need to get cash to pay

13  the kickbacks?

14  A.  Yes, we did.

15  Q.  What did you do to get the cash to pay the kickbacks?

16  A.  In the interim we started cashing checks ourselves.

17  Q.  When you say "we," who do you mean?

18  A.  Larry, Judy, Marianella and myself.

19  Q.  Ms. Valera, Ms. Negron, Larry and yourself?

20  A.  Yes.

21  Q.  Where did you go to cash the checks?

22  A.  We went to Wacovia.

23  Q.  Did you all go together?

24  A.  Sometimes we went together.  Sometimes just two.  Yeah, a

25  lot of the time we would go together.

ACEVEDO - Direct

1  Q.  All four of you?

2  A.  All four of us.

3  Q.  When you would go to cash checks together, what happened

4  then?

5  A.  We would go up to tellers, and actually I remember they

6  would ask me "do you need change."

7  Q.  Who would ask you?

8  A.  Larry, or Judy, even Mary.  Do you need hundreds?  How many

9  do you need?  So we would just try to get change.  Then all

10  four of us would walk out and get back in the car, and they

11  would each give me the envelopes of the checks that they cashed

12  and they would give it to me, and I would put it in my purse.

13  Q.  They would give you the cash after you went to the bank

14  together?

15  A.  Yes.

16  Q.  What would you use the cash for?

17  A.  The kickbacks.

18  Q.  You said that they would sometimes ask you if you needed

19  change?

20  A.  Yes.

21  Q.  Did that happen before you would go to the teller window?

22  A.  No, it kind of just happened at the teller window.

23  Q.  For what reason did you need change?

24  A.  For the kickbacks.  Sometimes it was an uneven number.

25  Sometimes I just needed tens and twenties and not all hundreds.

ACEVEDO - Direct

1   Q.   How much were those checks made out for, approximately,

2   when the four of you would go together to cash checks?

3   A.   For $4,900 each.

4   Q.   Why was it $4,900?

5   A.   If it was $5,000 or more, the bank would have to report it.

6   Q.   Where did you learn that?

7   A.   Larry Duran told me.

8   Q.   You said that at times not all four of you would go.  Were

9   there times when you were not with the group when they went to

10  cash the checks?

11  A.   Yes, sometimes Larry and Judy would go.  Other times Mary

12  and Judy would go.

13  Q.   How would you know that they went to cash checks?

14  A.   Because eventually they would bring me the cash.

15  Q.   How do you know that's where they got it?

16  A.   Oh, the little envelope had a little Wacovia Bank on it.

17  Q.   How long did this process of getting cash go on?

18  A.   For a couple of months, and then later on it was just

19  sporadically on emergency basis.

20  Q.   After a couple of months, what happened then?

21  A.   Then Larry came to me one day and said that he had found

22  someone that was going to cash the checks for us and it was

23  actually going to work out better because she was going to

24  charge them a cheaper rate.

25  Q.   A cheaper rate than what?

1  A.  I guess Lazaro was charging them some percentage.  This

2  person was now going to charge them less percent.

3  Q.  Who was that person?

4  A.  Adriana Mejia.

5  Q.  Do you know how Adriana Mejia got the money that she would

6  turn into cash?

7  A.  Yes, she got the checks from Medlink.

8  Q.  Were those checks made out to her?

9  A.  No, they were made out to several companies that she had

10 opened up, corporations.

11 Q.  Do you know whether those corporations she opened up were

12 providing services to Medlink or American Therapeutic

13 Corporation?

14         MR. WAX:  Objection, no predicate.

15         THE COURT:  Sustained.

16 BY MS. SAULINO:

17 Q.  Ms. Acevedo, do you know what corporations she opened up?

18 A.  Do I know their names?

19 Q.  Do you know their names, or do you know what they were

20 supposed to do?

21 A.  I know one of them was called something dirt.com or

22 whatever.  They never performed any businesses.

23 Q.  How do you know that?

24         MR. WAX:  Same objection, Your Honor, no predicate.

25         THE COURT:  She may say how she knows it, with a name

 1  of a person or whatever.  Not the conversation.

 2          How do you know it?  Did someone tell you or not?

 3  Just yes or no, did somebody tell you?

 4          THE WITNESS:  Yes.

 5          THE COURT:  You never saw the envelopes from the bank

 6  or anything like the other testimony you just gave?

 7          THE WITNESS:  No, I know for a fact --

 8          THE COURT:  I don't want to know what anybody told

 9  you?  How do you know?  Did you see envelopes that says Jones

10  Bank or what?  How did you know?

11          THE WITNESS:  Larry and I instructed her to make

12  invoices for services.

13          THE COURT:  Larry and I did what?

14          THE WITNESS:  Told her to make invoices for services.

15          THE COURT:  Who did she give them to, Larry, or you,

16  or who?

17          THE WITNESS:  The invoices.

18          THE COURT:  Yes.

19          THE WITNESS:  I believe nothing.

20          THE COURT:  I will let you try to bring out some way

21  however she knows the information.

22  BY MS. SAULINO:

23  Q.  Ms. Acevedo, you testified that you instructed Ms. Negron

24  -- Ms. Mejia to make invoices for services?

25  A.  Actually, I never did.  Larry did.  She was going to be

ACEVEDO - Direct

128

1  giving me the cash.  He was going over the procedures.  That

2  was a part of it.  He specifically said "make sure to write out

3  invoices and bring them back to me so we can file them."  I

4  think she may have done a couple of them.  I don't know if she

5  turned them in.  She told me.

6  Q.  Adriana told you?

7  A.  Yes, she told me "I made my invoices I just have to bring

8  them in."  So I know that for a fact.

9  Q.  You mentioned she would bring you the cash.  Did Ms. Mejia

10  bring you the cash?

11  A.  Yes, she did.

12  Q.  Approximately how much?

13  A.  70, $80,000 in a shopping bag.

14  Q.  Total?

15  A.  Yes.

16  Q.  Per month or total?

17  A.  Per month.

18  Q.  I'm sorry, you said she would bring them in a shopping bag?

19  A.  Yes.

20  Q.  Is that the same shopping bag that you would take into

21  Ms. Negron's office?

22  A.  Yes, the same shopping bag.

23  Q.  Ms. Acevedo, did you form any corporations in order to get

24  cash?

25  A.  Yes, I did.

1   Q.   What were those?

2   A.   Ace Catering and VIU PR.

3   Q.   Why the name Ace Catering?

4   A.   Ace Catering because if asked or questioned, I can always

5   say it was for catering for the centers.  The VIU PR, meaning

6   it's view public relations.  Since I have always done

7   marketing, the PR would be public relations for the company.

8   Q.   Did Ace Catering ever perform any catering?

9   A.   No, it did not.

10  Q.   Was there even an Ace Catering facility?

11  A.   There was no Ace Catering facility.

12  Q.   Did VIU PR ever perform any PR work?

13  A.   No, VIU did not perform any PR work.

14  Q.   Do you remember any incidents that occurred at the bank

15  regarding Ace Catering?

16  A.   Yes, I remember I went to the bank to cash a check or to

17  cash several checks.  Since I had been there so many times, one

18  of the tellers said to me some relative of hers was going to

19  get married and she was planning a wedding, and can I do the

20  catering for her.  She asked me for a business card, and I

21  didn't have a business card or a company for that matter.  So I

22  never went back there again.

23  Q.   You never went back there again?

24  A.   No.

25  Q.   Ms. Acevedo, what was the function of Ace Catering?

ACEVEDO - Direct

```
 1  A.  Laundering money.
 2  Q.  What was the function of VIU PR?
 3  A.  Laundering money.
 4  Q.  Are you familiar with a company called T-Med?
 5  A.  Yes.
 6  Q.  What is T-Med?
 7  A.  I don't know.  I know it's called T-Med Logistics, but I
 8  don't know exactly what it is.
 9  Q.  Whose company is T-Med?
10  A.  I believe it's a --
11          MR. WAX:  Objection to what it is.
12          THE COURT:  Yes.
13          THE WITNESS:  It's Judy's and Larry's.
14          MR. WAX:  Move to strike.
15          THE COURT:  Ask another question.
16  BY MS. SAULINO:
17  Q.  Do you know who owns T-Med?
18  A.  Judy and Larry.
19  Q.  How do you know that?
20  A.  I don't know.
21  Q.  Did Ms. Negron tell you?
22  A.  I don't remember.
23  Q.  Did Mr. Duran tell you?
24  A.  I don't remember.
25          MR. WAX:  Move to strike.
```

ACEVEDO - Direct

1            THE COURT:  All right.  Next question.

2   BY MS. SAULINO:

3   Q.  Where is T-Med?

4   A.  In Medlink.

5   Q.  Why do you say that?

6   A.  There was a phone line assigned to T-Med.  If someone were

7   to answer that they had to answer "T-Med."

8   Q.  Did you ever see any business being conducted by T-Med at

9   Medlink?

10  A.  No.

11  Q.  Ms. Acevedo, do you know whether there were other people

12  who also cashed checks for Medlink?

13  A.  Yes.

14  Q.  What other people that you recall?

15  A.  There was a mechanic, Luis Vega that we used to take all of

16  our vans to.

17  Q.  Was he receiving payment for those vans?

18  A.  No, I would pick up the cash sometimes from him for the

19  kickbacks.  It was a separate thing.

20          I know I had asked at one point, Sabrina, another one

21  of the BHPs, to cash checks.

22  Q.  This was another person like Mr. Valdez who worked as a

23  marketer?

24  A.  Yes.

25  Q.  Someone who also did kickbacks?

ACEVEDO - Direct

1  A.  Yes.

2  Q.  You asked her to cash checks for Medlink?

3  A.  Yes.

4  Q.  Who else?

5  A.  Judy's mom.

6  Q.  Judy's mother?

7  A.  Yes.

8  Q.  How do you know that Judy's mother cashed checks?

9  A.  Because I would pick it up at her house.

10  Q.  You would pick up the cash at her house?

11  A.  Well, just like once or twice.  Mainly, I would meet up

12  with Judy for it.

13  Q.  You would meet up with Judy for it?

14  A.  Yes.

15  Q.  How do you know it came from Judy's mother?

16  A.  I know because I picked it up at her house and the check

17  was from Regions Bank.

18  Q.  How did you know that the cash you were picking up then

19  came from Judy's mother?

20  A.  I would ask Judy, "did you get the cash from your mom yet

21  so I can meet up with you."  Sometimes I would have to meet her

22  or wait.  We talked about it.

23  Q.  You and Ms. Negron talked about it?

24  A.  Yes.

25  Q.  How much money was Ms. Negron's mother cashing for Medlink

ACEVEDO - Direct

1   per month?

2   A.   About $1,200.

3   Q.   About $1,200?

4   A.   Yes.

5   Q.   Ms. Acevedo, do you know of a company called Fates Elite?

6   A.   Yes.

7   Q.   What was Fates Elite?

8   A.   It was a holding company for a restaurant that we were

9   suppose to open.

10  Q.   Who is we?

11  A.   Larry, Marianella, Judy and myself.

12  Q.   Did you ever open this restaurant?

13  A.   No, it never opened because there were a bunch of issues.

14  Q.   There were a bunch of issues?

15  A.   Yes.

16  Q.   Do you know where Fates Elite got its funding?

17  A.   We were borrowing money from Medlink or ATC.  Once the

18  restaurant started working and earning its own money, it would

19  pay back ATC or Medlink.

20  Q.   But that never happened?

21  A.   The restaurant never opened and we never got to pay back

22  ATC or Medlink, no.

23  Q.   Ms. Acevedo, as one of the people who was running American

24  Therapeutic Corporation and Medlink, how concerned was

25  Ms. Negron to the details of those businesses visually to those

ACEVEDO - Direct

1   like you?

2   A.  Very.  She overlooked everything.  She overlooked -- like,

3   her job was basically the operations of the centers and to make

4   sure that everything was functioning and following procedures.

5   Q.  What do you mean by everything, all the procedures?

6   A.  I mean anything from the census to the menu, to schedules,

7   vacations.  Everything went through her for approval or not.

8   Q.  Were you familiar with a meeting called an AOF meeting?

9   A.  Yes.

10  Q.  What was that?

11  A.  It was a meeting that all the program directors and either

12  Marianella, or Judy, or both attended, and it was done, I

13  believe, it was once a month.  It was a conference call.

14  Q.  Do you know any of the topics that were discussed in those

15  meetings?

16  A.  They discussed center issues, employee issues, staffing

17  issues, anything.

18  Q.  Did they discuss the census to your knowledge?

19  A.  Definitely the census, yes.

20  Q.  Did Ms. Acevedo keep an eye on the expenses of the

21  businesses.  I'm sorry, Ms. Negron.  You are Ms. Acevedo.

22  A.  Yes, very much so.

23  Q.  Do you recall something called a reconciliation?

24  A.  Yes, she would ask the girls at Medlink to give her a

25  reconciliation report for the month or something, on the month

ACEVEDO - Direct

1  expenses and stuff.

2  Q.  Did you see her doing that?

3  A.  Yes, I did, and the girls would complain about it.

4  Q.  And the girls would complain about it?

5  A.  Yes.

6  Q.  Did she talk to you about the money coming in and going out

7  of the businesses?

8  A.  Not really.

9  Q.  Did she talk to you about her concerns about it?

10  A.  No, not really.

11  Q.  How do you know that she was keeping an eye on the business

12  expenses?

13  A.  The BHPs were getting paid for mileage.  30 cents a mile

14  exactly.  I was to be on top of it.  If I didn't, she would

15  remind me that so-and-so has gone over their miles.  Anything

16  from cell phone bills, lunch, because I know they did cutbacks

17  from warm meals to sandwiches.

18  Q.  Ms. Acevedo, can you explain that to the jury.  When you

19  say "lunch," who is the lunch for?

20  A.  Lunch for the patients.  We used to get them catered lunch,

21  meaning rice and beans and stuff like that.  Then later on, to

22  safe money, they changed it from that to, like, a sandwich and

23  chips.

24  Q.  Do you know the reason that the lunch was changed from a

25  hot meal to sandwich and chips?

ACEVEDO - Direct

1   A.   Yeah, to save money.

2   Q.   Do you know who made that decision?

3   A.   Judy was in part, well, Judy and Larry and Marianella.

4   Q.   Was that because American Therapeutic wasn't making money?

5   A.   No, it was because they needed to save money for their

6   attorneys' fees.

7   Q.   Ms. Acevedo, why was it important that some of the patients

8   get a warm meal at lunch time?

9   A.   A lot of them, specifically the ones in the halfway house,

10  especially in Boca and Broward, don't really get warm meals.

11  So that was kind of, you know, the kickback was for the

12  referral sources or the ALF owners, but the patients really

13  enjoyed their warm meal.  They loved Kentucky Fried Chicken.

14  It was their favorite.  It was a big deal for them not to get

15  it.  Almost to the point that it would even deter them from not

16  wanting to come.

17          MS. SAULINO:  Your Honor, may I approach the witness?

18          THE COURT:  Yes.

19  BY MS. SAULINO:

20  Q.   Ms. Acevedo, I have handed you what has been previously

21  marked for identification as Government's Exhibit 15.  Do you

22  recognize this document?

23  A.   Yes.

24  Q.   What is it?

25  A.   It's an e-mail from Judy explaining different ways to cut

1   costs.

2   Q.  Did you see this e-mail in the ordinary course of business?

3   A.  Yes.

4           MS. SAULINO:  Your Honor, at this time the government

5   would move into evidence Government's Exhibit 15.

6           MR. WAX:  No objection.

7           THE COURT:  15 is admitted into evidence.

8           [Government Exhibit 15 received in evidence].

9           MS. SAULINO:  Thank you, Your Honor.  May I publish

10  it?

11          THE COURT:  Yes.

12  BY MS. SAULINO:

13  Q.  Ms. Acevedo, what is the subject e-mail?

14  A.  Reducing expenses.

15  Q.  Just generally what is the e-mail about?

16  A.  It's just on everything from turning off lights, and I am

17  not sure if it's on there or not, I know AC was a big issue.

18  Q.  I am going to move the e-mail up, Ms. Acevedo.

19  A.  I mean, it's just a lot of stuff.  Water, recycling,

20  everything.  Everything possible to --

21  Q.  To save money?

22  A.  To save money.

23  Q.  Ms. Acevedo, I am pointing where I think the

24  air-conditioning point that you were referring to is made, is

25  that right?

ACEVEDO - Direct

1  A.  Yes.

2  Q.  Ms. Acevedo, just slightly further down, what does that

3  sentence say?

4  A.  Always, always encourage each patient to attend the program

5  every day".

6  Q.  What did it mean for ATC if the patients attended the

7  program every day?

8  A.  Then they would be able to bill for them.

9  Q.  Who were they billing?

10  A.  Medicare.

11  Q.  Ms. Acevedo, you mentioned very early on in your testimony

12  that you were arrested in October of 2010.  Is that right?

13  A.  Yes.

14  Q.  Do you recall a car trip that you took with Ms. Negron

15  shortly prior to that time?

16  A.  Yes, I do.

17  Q.  Where were you going?

18  A.  We went to the Orlando office.

19  Q.  Were you in the car together on the way to Orlando?

20  A.  Yes, we were.

21  Q.  Did you talk in the car while you were going there and

22  coming back?

23  A.  Yes, we did.

24  Q.  Did you discuss work?

25  A.  We did.

ACEVEDO - Direct

1  Q.  What did you discuss about work?

2  A.  Well, on the way up there, we were discussing, you know,

3  staff issues.  I was up there to train someone.  She was going

4  to meet with a program director.  On the way back, we were

5  discussing about we had recently -- actually, while we were

6  there, the Homestead center was put on review, so we were

7  discussing the changes that were to be made.

8  Q.  While you were in Orlando, the Homestead center was put on

9  review.  How did you learn that?

10  A.  We got a phone call from Larry Duran at 7 in the morning,

11  7:30.

12  Q.  Were you both on the phone with Mr. Duran?

13  A.  Yes, she got the call on her cell phone.  Once he told her

14  what was happening, then she put me on speaker.

15  Q.  What was Mr. Duran saying during that call?

16  A.  He had notified us that yes, Homestead was put on review,

17  and then from that point forward, some of the patients were

18  going to be transferred over to the downtown office.

19  Q.  Did Ms. Negron respond?

20  A.  Yes.  Yes, she agreed, and we just started planning on the

21  new pick-ups.

22  Q.  The new pick-ups, what do you mean by that?

23  A.  Well, picking them up and bringing them over to downtown

24  versus the Homestead office.

25  Q.  Can you explain what you mean by "on review"?

ACEVEDO - Direct

1   A.   When Medicare puts a center on review, then that means you

2   don't really get paid.  If you are put on review for 75

3   percent, then that means you don't get paid 75 percent.  So

4   that was a reason why we needed to move the patients to

5   downtown, because in Homestead they weren't going to get paid.

6   I don't recall what percentage they were placed on.  That's why

7   we switched them to downtown.

8   Q.   Because downtown wasn't on review?

9   A.   Right.

10  Q.   Now, on the way back from Orlando, what did you and

11  Ms. Negron discuss?

12  A.   Well, we discussed about the transportation stuff.  It was

13  a review, but then we also had a more personal conversation.

14  Q.   What was the personal conversation about?

15  A.   She was really worried that she was going to loose her

16  house.  She was upset with Larry because he hadn't paid for her

17  taxes.

18  Q.   And did she tell you why she was upset with Mr. Duran for

19  not paying for her taxes?

20  A.   Yes, because he had already paid for -- or they had already

21  paid for Mary's taxes, and his taxes were paid for but her's

22  were not.

23  Q.   Did she tell you why it was that Mr. Duran would be paying

24  her taxes?

25  A.   Well, because that's not money that she had earned.

ACEVEDO - Direct

1    Q.   What money was it?

2    A.   That was for, you know, money that was for the kickbacks.

3    So technically it wasn't hers.   It was just reflected to be

4    hers.

5    Q.   Did Ms. Negron do anything with the technology in the car

6    during this conversation?

7    A.   Yes, she took out the battery of her phone.

8    Q.   Did she tell you why?

9    A.   She told me if we took the battery out of the phone that

10   definitely nobody could listen in on it, meaning, like, the FBI

11   or something.

12   Q.   Did you take the battery out of your phone?

13   A.   No, I didn't, but she took hers out.

14   Q.   What else did you talk about in the car on the way back

15   from Orlando?

16   A.   Just personal stuff.   She was telling me to be careful with

17   Larry and warning me of him.

18   Q.   Ms. Acevedo, did you have an intimate relationship with

19   Mr. Duran?

20   A.   Yes, I did.

21   Q.   Are you married to someone other than Mr. Duran?

22   A.   Yes, I am.

23   Q.   Did Mr. Duran tell you more about how the company worked

24   after you became intimate with him?

25   A.   Yes, he did.

ACEVEDO - Direct

1   Q.   Is that when you learned about the kickbacks?

2   A.   That's exactly when I learned about the kickbacks.

3   Q.   Do you have personal knowledge whether Ms. Negron had an

4   intimate relationship with Mr. Duran?

5               MR. WAX:  Objection.

6               THE COURT:  I would sustain that on materiality at

7   this point unless it has something to do subsequently with any

8   credibility issues, which, of course, the defendant has no

9   obligation to bring into this record at any time.  So unless it

10  becomes a matter of credibility or in some other fashion.

11  Mr. Wax?

12              MR. WAX:  Your Honor, I would reserve a motion.

13              THE COURT:  Well, I was thinking out loud, but I hope

14  I corrected it.  Should I make it plainer to the jury.

15              MR. WAX:  I would move to strike and ask for a

16  curative instruction.

17              THE COURT:  Fine, I will do that.  I was thinking out

18  loud about my reasons and what might make something admissible.

19  It could be misinterpreted on being some obligation on Mr. Wax

20  to present any evidence.  He has no obligation to do that.  So

21  disregard my remarks on the ruling there and totally disregard

22  it.  I am about to explain it further.  I doubt that what I

23  said to you makes much sense right now anyway.  I think that I

24  will leave it that way.

25              Getting back to the basic objection, the question was

1    -- let me excuse the jury and discuss this with counsel please.

2                    [The jury leaves the courtroom]

3            THE COURT:  Would you have the witness join whoever it

4    is, you mentioned somebody, have her wait outside in the

5    conference room.  I am going to excuse the witness at this

6    point so as to not have her involved or listening to the

7    objections pro and con.  No objection to that, Mr. Wax?

8            MR. WAX:  No, Your Honor, I would request it as well.

9    Thank you.  You anticipated my request.

10           MS. SAULINO:  No objection, Judge.

11           THE COURT:  Now, then, I will hear from Mr. Wax with a

12   full statement of his objection and then I will hear from

13   Mrs. Saulino.

14           MR. WAX:  Your Honor, my objection is that the

15   question which the government just posed to the witness did,

16   and Robin can read it back to the Court.

17           THE COURT:  Robin, could you read it back.

18               [The requested text was read].

19           MR. WAX:  I object to the question, obviously, that it

20   is irrelevant to any material facts to the evidence in this

21   case.  However, what I would further submit to the Court is the

22   mere asking of the question is so highly prejudicial to my

23   client that it renders it impossible for her to now receive a

24   fair trial from this jury.  The government has essentially --

25           THE COURT:  Let's find out if it's relevant first.

1    Your objection is relevance.  I will give you more time to talk

2    about a mistrial later.  Right now, let's find out if it's

3    relevant.  Then the rest of it you can make your objection.  If

4    it's not relevant, then it may have a bearing on mistrial.

5    Let's take it one step at a time.  You are objecting on the

6    grounds that it is not relevant.  Any other specific objection?

7    I can't think of any, but is there any, other than referring a

8    mistrial later on after we rule on this?

9         MR. WAX:  Obviously, my relevancy objection goes

10   towards not just 401 but Rule 403 Your Honor.  We are getting

11   into the issue of probative effect versus personal value.  That

12   may go directly towards my motion for mistrial.

13        THE COURT:  Let me hear from the government.  I will

14   give you full time to flush this out in a moment.

15        For the government, Ms. Saulino, what is the relevancy

16   of any personal relationship between the defendant, Ms. Negron

17   and the co-defendant, who we all know has already plead guilty,

18   Mr. Larry Duran.

19        MS. SAULINO:  If the Court would look a little bit

20   further back in the transcript before that last question that

21   Robin read, the previous two questions before that were about

22   whether Ms. Acevedo had an intimate relationship with Mr. Duran

23   and whether he told her about the scheme with her after they

24   became intimate.  The answers to that were yes.

25        Your Honor, it is fully the knowledge of both the

ACEVEDO - Direct

1   defendant and the government that Mrs. Acevedo does, in fact,

2   have personal knowledge of the ultimate relationship between

3   Ms. Negron and Mr. Duran.

4           THE COURT:  What is the relevancy between any

5   relationship, personal or otherwise, between this defendant and

6   a co-defendant?  You see, that's the problem.  The fact that

7   this lady, the witness, Ms. Acevedo, had a personal

8   relationship where Mr. Duran told her things, fine.  The fact

9   that she had a personal relationship deals with credibility and

10  credence.  She might have learned things that she might not

11  have learned from a stranger or something like that.  In any

12  event, no objection to that.  There wasn't any, so I didn't

13  have to get into that.

14          Right now your argument turns upon the fact that,

15  well, he had a personal relationship with this lady and told

16  her secrets.  If he had a personal relationship with the other

17  lady, he may have told her secrets.  That doesn't follow.  That

18  doesn't compute.  That wouldn't make it admissible.  You have

19  to have what he told her, when he told her.  He might have had

20  a personal relationship with anybody.  He might have told them

21  secrets, might not have.  You only get that from the speaker or

22  from the person who was listening to him if it's in the concept

23  of a conspiracy or atmosphere of a conspiracy.

24          What is the relevancy from this lady?  Apparently,

25  this is something that Mrs. Negron, apparently, I am down the

1    road, is this something that Ms. Negron told this woman that is

2    a witness?

3         MS. SAULINO:  In fact, Your Honor, the three of them

4    were together on several occasions, all of them, together.

5         THE COURT:  Sure, we heard that from the Check Cashing

6    Store.

7         MS. SAULINO:  In an intimate fashion, Your Honor.

8         THE COURT:  What does that have to do with whether or

9    not they were laundering money and filing false and fraudulent

10   returns for Medicare proceeds which they didn't perform those

11   services and were not entitled?  What does that have to do with

12   that?

13        MS. SAULINO:  It is the government's contention it is

14   circumstantial evidence if Mr. Duran would have told

15   Ms. Acevedo and brought her into the conspiracy after they

16   became intimate, then he would have done the same with

17   Ms. Negron.

18        THE COURT:  That is not logical.  It doesn't compute.

19   What is interesting to me is that there is a quite simple way

20   to get at this evidence without having to get into this very

21   going out on a limb dangerous element of talking about, well,

22   he talked to one lady after he had relations with her, and he

23   told her secrets, so he must have done it with everybody he

24   slept with.  That doesn't follow.  That's not logical, and it

25   wouldn't be admissible -- the longer I am on the bench, the

ACEVEDO - Direct

1    more lawyers get like my wife who I have a lot of respect for

2    as I do for lawyers, but you all get to where you assume you

3    know what I am going to say next and interrupt me in the middle

4    of my sentence.  I have been married to her over 30 years so

5    she is entitled to do that.  You two are not.

6         Now, what the end of that sentence would be, right

7    now, on the status of this record, simply because Mr. Duran, at

8    least according to this witness, had a relationship with her

9    and told her secrets about the confidential matters that would

10   indicate -- Marshal, let's make sure that the people going in

11   and out of this courtroom stops.  Anybody that wants to get

12   out, get out now.  This is interrupting these proceedings.

13        Have we got two marshals in the courtroom?

14        CSO JOHN:  Yes, Your Honor.

15        THE COURT:  If anybody else wants to go, go and don't

16   come back in.

17        Let's get back to this.  This is serious.  I can't

18   have people jumping up and down and running in and out of the

19   courtroom.

20        Now, conversations wherein co-conspirators were to

21   gather where they were in the presence of each other and said

22   things, and I am not prejudging it, Mr. Wax, but those are

23   admissible conversations if they are about the criminal acts,

24   the alleged criminal acts.  So that's where I have trouble with

25   this backing in the back door about and all of this stuff.  I'm

148

ACEVEDO - Direct

1   sorry, but I don't wish to get off on tangents here on

2   questionable rulings that have caused, I almost said provoked,

3   caused Mr. Wax to make a motion for mistrial.

4           We can avoid all of that.  What I am perplexed about

5   is why doesn't the government pursue the direct route about

6   conversations; was there ever a time when the defendant and

7   Mr. Duran were together; when was it.  Establish the time, the

8   place.  I should be directing this to Mr. Wax I suppose, but

9   now the government hasn't elected to pursue that line of

10  questioning.  I am not presuming to tell them how to do it.

11  I'm trying to avoid getting into this issue of a mistrial

12  which, of course, is another issue, but it's an important

13  issue.

14          Let me hear from Mr. Wax.  We all understand the rules

15  of evidence and the exceptions to the otherwise hearsay

16  objection.  So Mrs. Saulino, would you mind stepping back to

17  your place and let me hear from Mr. Wax briefly.  Mr. Wax, I

18  don't mean to put you or Ms. Saulino in a difficult position.

19  I believe that ultimately the government can get at this

20  evidence.

21          Maybe not.  Maybe they were, I don't know, but she has

22  represented that the three of them were together on an occasion

23  under circumstances where they might have been discussing the

24  business or might not have been.  I don't know.

25          MR. WAX:  Your Honor, we have heard a plethora, for

 1   want of a better word, of evidence of Mr. Duran, Ms. Acevedo,

 2   Ms. Negron talking about this alleged fraud scheme.  We have

 3   heard about this business.  We have heard about them talking

 4   about kickbacks.  We heard them talking about money laundering

 5   by Ms. Acevedo's testimony.  What we are getting into right now

 6   though is out-and-out slander of Ms. Negron's character.  This

 7   is inadmissible character evidence.

 8            THE COURT:  If offered for that purpose, yes.  But if

 9   offered for the purpose of getting into a conversation between

10   them.  Now, the circumstances are a bit unusual.  I thought I

11   had really seen everything in these approximate, whatever it

12   is, 6, 7,000 trials I have been involved with, but this is a

13   little bit different and unusual.  Let me interrupt you before

14   we get too far.  We have got a lot of family people here and

15   everything else.

16            Let me ask you this; why could it not be that the

17   government pursued conversations without identifying the

18   circumstances under which the conversation was had, that is,

19   the intimacy aspect thing of this.  Is there a reason that the

20   government could not say were you ever together and did you

21   have conversations together about whatever the subject is,

22   kickbacks or whatever?  She would say yes, and then without

23   getting into -- as part of the predicate, which is usually laid

24   when, where, what, you could get when, who was present and who

25   said what.  Not what she thought what was going on in somebody

1    else's mind.  What did Mr. Duran say.  What did Ms. Negron say.

2    What did she say.  That sort of thing.  Can we do it in that

3    fashion without unduly tying the hands of the government from

4    presenting the case in the way they want to present it to avoid

5    this delicate problem, for lack of a better word, is that a

6    possibility?

7              MS. SAULINO:  The government has done that on several

8    occasions throughout Ms. Acevedo's testimony.  The most recent

9    testimony she gave about Orlando, there was actually someone

10   else present in the room about the Homestead facility review.

11   It was a gentleman that spent the night with Mrs. Acevedo and

12   Ms. Negron together in the room, which the government did not

13   bring out.  The government told Mr. Wax that it was going to

14   address the issue and did address it in a very delicate manner,

15   and was not planning to go into the intimate aspects of the

16   relationships of these parties and other individuals, but as I

17   stated to the Court before, and I understand the Court's ruling

18   --

19             THE COURT:  I haven't ruled yet.  I am discussing with

20   you, a way within the rules of admissibility of evidence, in a

21   federal criminal trial, to try to somehow reach some minor

22   agreement.  What you just said to me, the Court appreciates.  I

23   am sure Mr. Wax does, and I am sure his client does.  That's

24   appreciated.  That's fine.  See, without any of that

25   background, it looked like something that might be more gossip

1    than relevancy.

2         You are suggesting that perhaps what, that you would

3    establish generally the time and where they were?  Well, we

4    were in a hotel in Orlando, and not getting into the details

5    and could bring out this in that fashion.  If you can do that,

6    similar to what you say you did with the Orlando meeting with

7    somebody else, whatever, Mr. Wax, where does that leave you in

8    terms of do you have an objection to that proceeding knowing

9    that under the rule of statements made between alleged

10   co-conspirators, at a given time and place, were admissible,

11   she is not going to ask -- it's hard to talk about this -- it's

12   hard to ask about ultimate dealing about who was doing what,

13   she is going to say what was said.

14         MR. WAX:  Your Honor, the genie is out of the bottle

15   so to speak.  I want to clarify something because I did discuss

16   this matter pre-trial with the government.  I was seeking a

17   stipulation from the government that evidence of intimate

18   relationships between Ms. Acevedo, Mr. Duran, Ms. Negron and

19   anybody would not be admissible.  The final decision which I

20   received from the government was that they would, and I use

21   Ms. Saulino's words, that she would front the issue with

22   Ms. Acevedo of her affair with Mr. Duran.

23         THE COURT:  What was the word?

24         MR. WAX:  The word she used was front.

25         THE COURT:  Tell me what you interpreted that to mean.

152

ACEVEDO - Direct

1          MR. WAX:  She would ask Ms. Acevedo if she had an

2    affair or was intimate with Mr. Duran, and she explained to me

3    the reason being that is when Mr. Duran disclosed his true

4    scheme to her.  I went on to say, will you be asking, then,

5    about Ms. Negron.  My understanding was that her response to me

6    was that she would not unless I opened the door.  I advised her

7    that I would not be cross-examining Ms acevedo on that issue in

8    any respect so as not to open the door.

9          Be that as it may, Your Honor.  When I heard the

10   question about asking Ms. Acevedo if she was intimate, you did

11   not hear an objection.  It was when I heard the question about

12   whether Ms. Negron was intimate is when I made the objection.

13   The basis for my motion for mistrial is that while something

14   may be relevant and something may be admissible, at some point

15   it's prejudicial effect overcomes its probative value.  This is

16   precisely the case with this evidence.

17         I brought up the fact of the plethora of evidence that

18   the government has previously brought in.  In terms of Your

19   Honor conducting that weighing of the evidence required by Rule

20   403.  Your Honor also articulated that just because Ms. Acevedo

21   was intimate with Mr. Duran and he disclosed his information,

22   does not logically or syllogistically follow that even if he

23   were intimate with Ms. Negron he did the same thing.

24         THE COURT:  On a separate incident, at a separate

25   time, but all together makes a big difference.  Those are

ACEVEDO - Direct

1   factors that I didn't know.  My first analogy was because he

2   slept with one lady and told her secrets, doesn't mean that if

3   he slept with 20 it wouldn't make sense that he told everybody.

4   That was that analysis.  Now we are into a different analysis.

5   So your objection specifically is that the prejudicial value

6   outweighs -- the prejudicial aspect outweighs the probative

7   value.

8            MR. WAX:  Yes, I would go on to say, Your Honor, that

9   what the government has done by merely asking the question is

10  put a big red A, a Scarlett letter on my client for this jury.

11  They now say adulterer.  This is character evidence.  It is

12  plainly and simply inadmissible evidence.  I believe it has

13  irrevocably tainted my client in the eyes of this jury to the

14  extent that she can no longer receive a fair trial.  I move for

15  a mistrial.

16           THE COURT:  Fine.  Do you wish to respond?  We now

17  have the two motions, the objection to the last question and

18  the motion for mistrial.  Do you wish to reply?

19           MS. SAULINO:  I do wish to respond, Your Honor.  With

20  all due respect to Mr. Wax, and Mr. Wax and I have had a very

21  good relationship throughout this case and throughout this

22  trial, I believe he is mistaken in his memory of our

23  conversation about this issue when we discussed it prior to

24  trial.  In fact, I specifically remember him using the words,

25  "Gosh, now I am going to have to make Ms. Acevedo look like the

1    whore of Babalon."  I believe he may be mistaken in regards to

2    how that conversation went.  Be that as it may, Your Honor, the

3    government did advise Mr. Wax prior to trial that this issue

4    would come up.

5          In addition to that, Mr. Wax has had access for months

6    to the debriefing notes from the agents from the debriefing of

7    Ms. Acevedo.  He had every opportunity to file a motion in

8    limine with this Court dealing with the issue of adultery.  It

9    was quite clear from the debriefing notes that Ms. Negron, on

10   many occasions, was intimate with individuals other than her

11   husband, and that those intimate sessions took place during

12   relevant times to this conspiracy.

13         For instance, the example that I just gave the Court

14   during the Orlando trip that was just discussed, there was

15   actually someone else in the room when they had the

16   conversation with Mr. Duran.  But the government, in an

17   abundance of caution, in seeking to treat this issue delicately

18   and not present it in a prejudicial fashion, did not go into

19   those descriptions and simply asked the questions very plainly

20   and similarly in the line that I just used at the end of our

21   questioning.

22         I am willing to withdraw the question and leave the

23   evidence as it is, as I believe the government has presented

24   extremely strong evidence through this witness without the

25   intimacy issues.  But Your Honor, they were a part of this

ACEVEDO - Direct

155

 1   conspiracy.  They were a part of what happened.  It was within

 2   the government's province to ask.  If Mr. Wax had an issue with

 3   it, he should have filed a motion prior to trial.

 4          THE COURT:  All right.  The specific objection to the

 5   specific question, and I am not going to ask her to go back and

 6   read it, from memory, and I think this is it, the question had

 7   words to the effect of do you have knowledge, or do you know

 8   that Ms. Negron had an intimate relationship with Mr. Duran, or

 9   words to that effect.

10          The government has proffered that they would be glad

11   to withdraw, and that's fine.  That would be good, but whether

12   they did, even before she said that, it seems to me that on the

13   basis of this record at this point that the objection should be

14   sustained, and the jury told at this point to disregard it.

15          Now, as I have indicated to you, ask in a different

16   fashion about a time when Mrs. Negron, alleged co-conspirator,

17   and Mrs. Acevedo, alleged co-conspirator, and Mr. Duran, were

18   present and talking about this, and Ms. Negron were talking

19   about this in each other's presence is admissible and, so,

20   should the government lay a different predicate or lead it in a

21   different way, they can, and to avoid having to excuse the jury

22   again, they can properly get into this question, the Court

23   ruling that the prejudicial effect does not outweigh the

24   probative value.  That's what it is all about.

25          If it is about blackening the name of Mrs. Acevedo or

ACEVEDO - Direct

1    Mrs. Negron, or anybody else, then of course, it is

2    inadmissible, as Mr. Wax has stated, but if it has the purpose

3    of dealing with credibility issues, which is what was going

4    through my mind earlier when I was thinking out loud and spoke

5    a little bit out loud, I don't think anybody except the lawyers

6    understood what I was saying, but credibility issues, certainly

7    statements made in the presence of each other under intimate

8    circumstances, there is an ora of credibility about that that

9    is persuasive.  It is not as if it is repeating something

10   Mr. Duran said to a stranger or something else.  But be that as

11   it may, I cannot say that it does not have the probative value

12   for which it is offered by the government in this case.  It

13   does have probative value.  It is not immaterial.  It is

14   therefore admissible.  It must be presented with the proper

15   predicate and the proper fashion if the government decides to

16   go forward and present it.

17         I would suggest, and it's only a suggestion because

18   you all try your case the way you want to, I do my best to keep

19   it error free.  If it's error in it, then you all have to live

20   with it, both of you.  All I can do is my best to keep it on an

21   even keel.  But if someone is entitled to present evidence,

22   relevant conversations about criminality, pertinent to this

23   indictment, then so be it, it has to come out with that then,

24   it would seem to me, a mere slight suggestion that if those

25   conversations can come out in the context without getting into

1    the details of whatever other activity was going on at the

2    time, fine.  That would be perhaps a good way to deal with the

3    issue.  That's up to counsel.  I am not telling you can't do

4    that.  I am not telling you that you can or should or

5    shouldn't.  That is up mainly to Ms. Saulino, the prosecutor,

6    in how she approaches this.  The Court is, obviously, not bound

7    by your private conversations, whatever they may have been.

8           Mr. Wax interpreted a conversation in discussions in

9    preparing for the trial as being something that suggested to

10   him in which he sort of thought that this issue wouldn't be

11   gone into.  Fine, I am sure he told me his best belief.

12          Ms. Saulino has a slightly different viewpoint.  Fine.

13   I am sure she is right.  I wasn't there.  I am not judging who

14   is right or wrong on that.  It makes no difference because your

15   private agreements are not relevant to the admissibility or

16   inadmissibility to facts.  They don't bind the Court.  They

17   can't.  I can't go off and try who said what about something

18   like this.  So, therefore, the ruling is the government may

19   proceed as they are best advised.  They have, I believe,

20   withdrawn this particular question.

21          I would have sustained the objection and told the jury

22   to disregard it at this point; however, within the next hour or

23   so, the evidence, I presume is going to come out anyway about

24   the conversations between the parties with Ms. Negron present

25   and Mrs. Acevedo present, Mr. Duran present.  So at that point

1   in time, any instruction is academic because the full thing is

2   going to come out anyway.

3            Right now my ruling is at this point in the status of

4   this record, the objection is sustained.  The jury will

5   disregard it.

6            Then the government goes forward and does what they

7   feel they are entitled to do under the rules.  Mr. Wax will, as

8   he has been doing very carefully and competently, make the

9   proper objections.  If need be, we will excuse the jury and

10  discuss it outside the presence of the jury.  That is the

11  ruling.  The ruling is that the objection is sustained.  The

12  jury will be told to disregard it, and the further ruling is

13  that this does appear to be relevant evidence if the proper

14  predicate is laid in that the probative value certainly

15  outweighs the prejudicial effect.  It is not given just for the

16  purpose of smearing anybody's name.  It is given for the

17  purpose of bringing out relevant facts in the case.

18           It is now 3:35.  Is it helpful to counsel at all to

19  have a brief conversation with their respective parties and

20  clients and perhaps each other?  You know, my insistence of

21  being punctual with the parties.  You all have been very good

22  about it.  You have every reason to think if I am going to take

23  a ten minute recess, I mean it.  Implicating if you all need a

24  little bit more time, under the circumstances, a few minutes to

25  talk about anything you want to, together or separately, I am

ACEVEDO - Direct

1    talking about with your respective clients, parties, then that

2    time is available too.  I am trying to be reasonable is what I

3    am trying to do.  It's hard for me to do.  I don't have much

4    practice with that.

5             MR. WAX:  Your Honor, I truly appreciate the

6    accommodation that the Court is extending to my client and to

7    me.  The gentleman who left the courtroom while you were

8    originally hearing this matter was Mrs. Negron's husband.  Of

9    course, you can imagine that Mrs. Negron is in a bit of

10   emotional distress.  I would ask if the Court could give us a

11   thirty minute recesses.  We would appreciate it very, very

12   much.

13            THE COURT:  Yes, I have no difficulty with that.

14   Mr. Saulino might have been joining in that timing.  Frankly, I

15   am not sure that's enough time for to you talk to your client

16   about this serious matter.  Let me go off the record.

17                 [discussion held of the record]

18            THE COURT:  I propose to call the jury back.  I will

19   make a simple ruling and excuse them for the evening.  I think

20   we need to resolve that first.  Bring them in.

21            [The jury returns to the courtroom at 3:17 p.m.]

22            THE COURT:  Thank you.  Be seated please.  Ladies and

23   gentlemen, the objection is sustained.  The jury will disregard

24   the last question and answer.

25            Now, passing on, we have some legal matters that we

1    need to take up outside the presence of the jury.  That's our

2    shorthand for meaning that the jury is not here, you are

3    sitting in the room on your third cup of tea wondering what is

4    taking so long.  We try not to have that happen to you.  We try

5    not to have you sitting there while we take up matters that we

6    have to that are serious matters, legal matters.  We are going

7    to do that now, but we have agreed, the lawyers have asked me

8    and it's very reasonable to let you all be in recess, rather

9    than just sitting there while we take another half hour or

10   hour.  We are going to excuse you for the evening to come back

11   in the morning.  In the morning we will ask you to come back

12   the same time, 9:00, a few minutes before, and thank you for

13   your patience.  I remind you not to talk to anybody about the

14   facts of the case, not to let anybody talk to you about the

15   case.

16        I forgot, because I am not too familiar with all the

17   new technology, but my younger colleagues remind me that I am

18   suppose to be telling the jury don't go on the Internet and

19   look up the Homestead address of the place or something.  Don't

20   do that please.  Don't go trying to do discovery and stuff with

21   the Internet, sounds kind of silly, but you wouldn't be

22   permitted to go out and look at a scene of an accident by

23   yourself.  The same thing is true here.  Don't do discovery

24   stuff on the Internet or anything like that.  I can't think of

25   what it would be.  Don't do that.

ACEVEDO - Direct

1        If there is anything in the newspaper, don't read it.

2   If there is anything on television, don't watch it.  If it

3   comes on about the trial, click it off.  Let your spouse or

4   friend watch it, and they can tell you all about it later on,

5   if there is anything.  Don't let anything come to your

6   attention except what you hear in this courtroom.

7        When you come to and from, be careful not to overhear

8   any conversations.  Other than that, we thank you for your

9   patience.  You have been very patient.  We move it along very

10  well in the trial.  We covered several witnesses that we might

11  well have been expected to take longer, the Doctor, the

12  gentleman, the older gentleman.  I say older.  I don't get to

13  do that often.  He might have taken all day without better

14  lawyers in a different court.  You have been patient, and we

15  have moved along well.  Bear with us.  We will see you in the

16  morning.  We will look for you at 9:00.

17        Marshal, see that they get down uninterrupted to the

18  elevator.

19        A JUROR:  Have a good day.

20        THE COURT:  Yes.

21        [The jury leaves the courtroom at 3:21 p.m.]

22        THE COURT:  All right.  Unless there is something

23  else, I am going to excuse myself.

24        MR. WAX:  Your Honor, did you want to make a formal

25  ruling on my motion for mistrial?

1          THE COURT:  I believe I had in my general statement or

2   implicit therein.  Formally, the motion for mistrial is denied

3   at this time.  It is denied.  Anyone can make a motion for

4   mistrial at any time.  Not the government, but anybody else.

5          [Proceedings recessed at 3:30 p.m. to be continued on

6   8-17-2011 at 9:00 a.m.]

7                    C E R T I F I C A T E

8       I hereby certify that the foregoing is an accurate

9   transcription of proceedings in the above-entitled matter.

10

11

12   08-16-2011          /S/ ROBIN MARIE DISPENZIERI, RPR
    _____      _____
13   DATE FILED           ROBIN MARIE DISPENZIERI, RPR-CP
                          Official Federal Court Reporter
14                        United States District Court
                          400 No. Miami Avenue, Ste. 08S67
15                        Miami, FL  33128   305/523-5659
                          robin_dispenzieri@flsd.uscourts.gov
16

17

18

19

20

21

22

23

24

25

## A

ability 11:12 15:9 17:10
able 11:11 20:10 26:3 30:5 33:5
  34:3 35:6 36:17 38:17 52:15
  53:1 61:13 64:6 69:10 73:2 88:1
  109:2 111:4 138:8
above-entitled 162:9
absences 103:10,15
absurd 97:18
abundance 154:17
abuse 38:11,19,21
abuser 39:1
abusers 38:15
AC 137:17
academic 158:1
accept 13:4
acceptable 68:17,18,21
access 71:21 73:25 106:22,24
  107:22 154:5
accident 160:22
accommodation 159:6
accountable 55:17
accounts 44:18
accurate 109:1 162:8
Ace 129:2,3,4,8,10,11,15,25
Acevedo's 149:5 150:8
Acosta 112:3 113:23 118:19
  119:11
act 4:16 23:12
active 26:19 37:7
actively 10:10 38:16
activities 11:20 20:19 37:6 83:8
  89:2
activity 157:1
acts 147:23,24
acute 9:3 14:16 20:20 21:7 23:18
  24:3,7,20,24,25 25:1,2,9 29:7,12
  30:1,17 39:24 58:1 70:6
ad 4:5 44:19
adapt 15:19
add 24:10 77:5
added 4:24
addiction 37:24
addicts 63:1
addition 154:5
address 68:14 71:4 150:14,14
  160:19
addressed 35:4
administration 44:12,13
Administrative 72:16,18
administrator 57:2
admissibility 150:20 157:15
admissible 86:1 142:18 145:18
  146:25 147:23 151:10,19 152:14
  155:19 156:14
admit 102:7
admitted 12:3 35:8 39:24 46:20
  49:12 83:14 89:7 102:9 115:21
  137:7
admitting 27:11
adolescence 18:5
Adriana 126:4,5 128:6
adulterer 153:11
adultery 154:8
advancing 11:5
advantages 8:8
advertise 44:19
advice 7:14
advise 154:3
advised 152:6 157:19
advocacy 11:3
affair 151:22 152:2
affirm 5:5 43:2
afford 97:21
AFLs 87:21 95:1,2
afraid 22:4
afternoon 81:14 82:15
afterward 119:1,7
age 18:3 36:22
agencies 23:15
agenda 83:23
agent 4:11
agents 81:22 87:3 154:6
agitated 22:2
ago 7:16 27:25 102:21
agreed 139:20 160:7
agreement 41:16 46:2,12,13 47:1
  47:11,15 99:11 115:18 150:22
agreements 157:15

ahead 4:11 13:12 41:8 66:22
  104:12
airway 40:10
air-conditioning 137:24
ALF 16:9,19,25 61:2 62:16,21
  80:13 95:11 109:15 136:12
ALFs 56:16,23 59:11,14 60:19
  61:20 63:24 66:12 69:20 95:5
aliases 91:6
allegations 3:20
alleged 147:24 149:2 151:9 155:16
  155:17
allow 105:7
allowed 54:2
allows 47:12
alternate 16:22 17:18
Alzheimer's 18:2 36:9,9 38:8
amazing 33:21
ambulation 15:13
AMERICA 1:4
American 9:25 10:3,8,10,13,22
  48:4,10,12,14 49:22 50:5,6,7,9
  53:16 54:6,15 55:2,8,10,12,23
  63:4,5 67:13 70:10 80:23 83:8
  86:6,8,10 111:15 126:12 133:23
  136:4
amount 27:6,7,9 65:11 69:10
  112:13
analogy 153:1
analysis 153:4,4
Analyst 45:5
anger 32:3
anniversary 22:17,20
answer 34:14 35:4 66:9 68:17,18
  68:21 95:17 100:12 121:12
  131:7,7 159:24
answered 6:4 72:12
answers 34:15 144:24
anticipated 143:9
anti-kickback 56:8
anybody 4:2,12 14:10 18:20 34:16
  69:5 81:8 82:8 100:16 127:8
  145:20 147:11,15 151:19 156:1
  156:5 160:13,14 162:4
anybody's 13:19 158:16
anyone's 19:4
anyway 65:7 142:23 157:23 158:2
AOF 134:8
apart 112:19
apnea 40:6,12,15
apologize 75:22
apparently 145:24,25
appear 64:14,17,18,18 121:5
  158:13
APPEARANCES 1:12
appears 116:5,8
appetite 19:11
applying 54:13
appoint 23:17
appreciate 98:3 159:5,11
appreciated 150:24
appreciates 150:22
approach 5:13 11:13 28:21 46:5
  48:23 63:17 82:24 88:10 101:21
  114:17 136:17
approaches 157:6
appropriate 14:21 23:23 33:17
  34:22 35:3 36:10 38:11,21
approval 134:7
appropriate 149:11
approximately 42:7,9,11 79:22
  91:22 96:14 105:11 117:4
  119:19 125:1 128:12
area 3:11,12 51:6
argue 36:21
argument 145:14
arguments 12:11
Aricept 37:21 38:2,4
arrested 45:10 138:12
arrived 3:8
articulated 152:20
Arturo 106:25
ASI 50:9 86:6,12,17,19,20,21 87:7
  87:16,25 88:3 89:2,25 90:10,24
  91:14,25 92:15,19 93:7,9,18,20
  96:16 97:4,13 98:11 99:22,23,23
  99:24 100:14 102:22 103:25
  104:2 105:1,5,8,11,17 106:18
  107:1,5,9,10,11,12,15,19 108:2
  108:21,24 109:6,13,19

asked 18:10 51:11 67:13 77:13
  82:20 90:10 91:20 110:16 129:4
  129:20 131:20 132:2 154:19
  160:7
asking 3:18 61:2 66:14 70:13
  89:22 94:10 101:8 143:22 152:4
  152:10 153:9
aspect 149:19 153:6
aspects 37:20 107:21 150:15
assigned 80:8 131:6
assistance 56:11 62:21
assistant 1:14 43:22 57:20 72:17
  72:19
assisted 56:3,4,9,10,13,15,21 59:7
  96:6 98:11 99:12
Associate 9:22
association 10:1,8,9,11,13,23
assume 147:2
assuming 4:18,19
ATC 50:7 51:20 53:21 55:15 62:5
  86:9 87:18 88:2 90:23,24 91:14
  92:17 93:5 102:23 103:6,7,8,14
  103:24,25 104:1 105:10,24
  106:16 107:16,18 109:12,18,19
  133:17,19,22 138:6
atmosphere 145:23
attachment 64:1
attack 15:13 22:11
attacked 21:25
attend 58:14 80:15,17 84:15 93:9
  138:4
attendance 67:16 103:9 109:12
attended 70:21,24 74:7 85:1,4
  107:5,25 134:12 138:6
attending 39:13,15,19 41:1 64:16
  109:4
attention 4:21 36:13 119:13 161:6
ATTORNEY 1:13
attorneys 136:6
audible 3:12
audience 3:22,25
AUGUST 1:7
authority 55:5
authorized 106:25
autos 44:19
available 108:2 159:2
Avenue 1:15,19,23 104:22 162:14
average 34:23
avoid 148:4,11 150:4 155:21
avoiding 14:22
award 9:24 10:2,6,11
aware 45:22
A-c-e-v-e-d-o 43:8,13
a.m 1:7 4:24 42:19,22 162:6

## B

B 14:4
Babalon 154:1
back 8:21 9:1 11:8 15:17,19 18:25
  30:3,15,19 31:20 46:15 48:2
  53:5 58:7 59:11,17 61:1 62:3
  67:4,9 68:16 69:23 73:9,10 81:4
  82:1 85:14 94:1 97:25 99:10,19
  103:8 107:4 109:3 112:1 114:4
  120:1,4,22 124:10 128:3 129:22
  129:23 133:19,21 138:22 139:4
  140:10 141:14 142:25 143:16,17
  144:20 147:16,17,25 148:16
  155:5 159:18 160:10,11
background 6:2,3 43:18 150:25
backing 147:25
backs 40:7
bad 19:14 22:21 57:1 79:12
bag 76:3,4,18 128:13,18,20,22
ballpark 109:10
bank 124:13 125:5,16 127:5,10
  129:14,16 132:17
bar 4:14
Bargain 44:6
Barry 1:18,19 41:11
barrywax@bellsouth.net 1:20
based 12:19,24,25 31:11 52:6
baseline 30:3,15
basic 16:21 37:23 43:20 98:5
  107:17 142:25
basically 34:9 38:18 45:6 55:17
  60:7 71:3 89:18 100:16 134:3
basis 64:25 65:1,2,5 125:19 152:13

155:13
bathes 62:22
bathroom 100:18 101:12
battery 141:7,9,12
Beach 57:1
beans 135:21
Bear 161:15
bearing 144:4
bed 15:14,14
beds 88:5 97:19
began 50:11
beginning 8:17 50:3 54:18 59:9
  120:19
Behavioral 54:4 80:11,19 82:21
belief 157:11
believe 53:8 58:21 60:13 66:24
  72:16 95:7 107:9 109:23 119:20
  127:19 130:10 134:13 148:19
  153:12,22 154:1,23 157:19
  162:1
believed 62:2 68:20
bench 146:25
benefit 24:12 32:2 40:25
benefiting 36:25
benefits 32:1 57:13
BENJAMIN 1:14
benjamin.singer@usdoj.gov 1:17
best 35:15 92:8 118:1 128:20
  157:11,19
better 8:6,24 16:15 24:15,15 29:15
  31:5,18 32:14 33:22,25 35:11
  37:9 40:4,4 125:23 149:1 150:5
  161:13
BHP 50:1 78:18 80:8,10 83:9 90:18
  90:19,21 105:17
BHPs 67:23 82:23 83:24 84:20
  100:16 131:21 135:13
big 33:6,14 72:1 76:2 84:17 136:14
  137:17 152:25 153:10
biggest 35:25
bill 138:8
billing 70:22,23 73:24,24 74:4,17
  76:25 77:18 138:9
bills 69:11,12 79:6 135:16
bind 157:16
binder 58:7
binders 56:2
bipolar 16:2,20 17:15,17 19:1 21:9
  21:17 39:25 40:13,18
bit 26:16 34:23 36:8 56:3 102:15
  102:21 111:21 144:19 149:10,13
  156:5 158:24 159:9
blackening 155:25
blood 57:21 100:16
blue 17:8,19 19:7
board 91:24
Boat 44:6
boats 44:20
Boca 78:20 136:10
Bond 1:15
Borges 114:15 116:5 121:4,5
borrowing 133:17
boss 49:22,24 55:3 62:1 65:9
  86:16
bosses 48:14
bother 20:18,22 29:17
bottle 151:14
bottom 35:12 74:19 89:13,19
  120:22
bound 157:6
box 122:9
brain 18:6,7,17 37:24 51:3
break 80:24 82:5 103:21
breath 40:9 57:3
Brickell 1:19
brief 8:19,20 25:21 29:8 41:6 42:17
  158:19
briefer 30:17
briefly 148:17
bring 3:7,7 4:23 13:10 53:18,19
  59:5 85:13 88:20 89:23 90:14,23
  93:20,22 94:9 103:22,24 123:10
  125:14 127:20 128:3,7,9,10,18
  142:9 150:13 151:5 159:20
bringing 87:24 88:24 90:10 103:16
  119:10,15 139:23 158:17
broke 82:20
broker 61:5,9,18 78:18 88:24 90:13
  90:22,23 104:23
brokers 61:16 62:10 64:2 66:12

Page 164

95:3,5 111:22
**Bronx** 6:10
**brought** 4:21 64:5 65:7 103:14
109:13 146:15 152:17,18
**Broward** 78:20 90:18 136:10
**buddy** 51:16
**Buffalo** 6:22,25
**building** 1:15 100:1
**bullet** 84:3,3,6,8
**bunch** 133:13,14
**burst** 16:24
**business** 39:5 51:4 62:17 83:8
89:2 105:10 129:20,21 131:8
135:11 137:2 148:24 149:3
**businesses** 126:22 133:25 134:21
135:7
**busy** 51:5,13
**Butler** 105:18 106:13

**C**

**C** 14:5 162:7,7
**call** 5:1 8:17 14:16 16:10 17:22
19:21 20:15,20 22:17,20 42:24
50:13,15,24 25 51:21 58:23,24
59:16,19 61:3 67:7 68:5 82:23
85:14 112:11 134:13 139:10,13
139:15 159:18
**called** 40:6 43:21 52:20 54:4 86:6
126:21 130:4,7 133:5 134:8,23
**calling** 20:16 87:21
**calls** 5:3 68:3
**campaigns** 44:19
**Cancio** 114:14 116:2
**candidates** 19:13
**can't** 13:24 21:1,2,2,13 22:1 31:3,3
31:7,25 33:6,12 34:25,25 36:12
36:12 42:6 66:24 68:16 94:19,24
97:18 105:19 114:15,16 144:7
147:17 157:3,17,17 160:24
**capable** 36:14
**capacity** 6:22
**car** 99:2 113:11 122:7 124:10
138:14,19,21 141:5,14
**card** 129:20,21
**care** 7:6 10:19,20,21 20:10 23:5,15
23:20 24:1 25:14,15,23 26:8
28:6,19 35:25 36:7 45:17 54:2,8
81:9
**career** 7:18,20 53:3
**careful** 141:16 161:7
**carefully** 25:8 109:15 158:8
**Carlos** 119:3
**carry** 15:6 109:17
**carrying** 75:25
**case** 1:3 12:20,21,25 40:12 42:4
81:6 143:21 150:4 152:16
153:21 156:12,18 158:17 160:14
160:15
**cases** 22:8 23:20
**cash** 60:4,6,23 61:19 62:7,8 63:6
63:16,20,22,25 64:9 74:20,21,23
75:25 76:5,6,8,9,25 77:3,9,19
95:9 99:10 111:23 112:4,8,11
117:20 118:5,6 119:1,7,24
120:12,14 123:12,15,21 124:3
124:13,16 125:2,10,13,14,17,22
126:6 128:1,9,10,24 129:16,17
131:18,21 132:2,10,18,20
**cashed** 117:21 118:4 124:11
131:12 132:8
**cashing** 111:24,25 112:5,8,10,15
113:2,10,14,16,18 114:2,25
115:2 116:3 118:19,24 119:5,9
119:16,22,24 120:8 122:8,25
123:2,8,10,16 132:25 146:5
**CAT** 18:6
**catch** 76:22
**catered** 135:20
**catering** 129:2,3,4,5,8,8,10,11,15
129:20,25
**cause** 3:15 4:4
**caused** 148:2,3
**causes** 37:20
**caution** 154:17
**cell** 135:16 139:13
**census** 55:18 65:2 67:3,12,13,15
67:18,20,23 68:2 69:8,16 70:13
88:2,3,19 89:23,25 90:10 103:10
134:6,18,19

**censuses** 70:8
**center** 6:23 7:1,2,4 44:2,10 67:16
69:9 72:13 92:4 134:16 139:6,8
140:1
**centers** 53:17 54:18 69:8 72:16
76:20 84:10 129:5 134:3
**cents** 135:13
**certain** 22:18 30:4 69:9
**certainly** 26:25 27:16 40:13 81:23
156:6 158:14
**Certificate** 2:9
**certify** 12:12 162:8
**chain** 89:15
**Chair** 10:15,17,22
**Chairman** 6:22 10:12
**chance** 33:7
**chances** 62:17
**change** 26:22 29:10 30:16 32:14
55:12 77:13,14,15,20 79:4,5
109:1 111:20 124:6,9,19,23
**changed** 32:9 110:22,24 135:22,24
**changes** 25:9 72:23 111:1,3 139:7
**changing** 29:18,19
**character** 149:6,7 153:11
**characterized** 16:6
**charge** 86:12 125:24 126:2
**charged** 45:13
**charging** 126:1
**Charles** 118:10
**chart** 34:7 76:11
**charts** 75:9 76:10 84:12
**cheap** 58:10 121:23,25 122:11
**check** 26:14 63:24 64:10 74:7 95:9
101:1,16 111:24,25 112:4,8,10
114:2 113:10,13,16,18 114:2
114:25 115:2 116:1,3,5,8,11
118:19,24 119:5,9,16,22,24
120:7,22,23 121:3 122:8,25
123:2,8,10 129:16 132:16 146:5
**checks** 63:21,22 64:3,19 112:9,14
112:17,18 113:5,9,13,20 114:9
115:1,6,12,14 116:2 117:20,21
117:23 118:3,5,14,24 119:5,10
119:15 120:11 121:11,15,19
122:21 123:10,16,21 124:3,11
125:1,2,10,13,22 126:7,8 129:17
131:12,21 132:2,8
**Chicken** 136:13
**CHIEF** 1:14
**children** 18:20
**chips** 135:23,25
**choices** 13:7
**choking** 40:9
**Christmas** 117:13
**chronic** 23:25 35:24
**chronically** 7:7
**cigarettes** 39:4
**circumstances** 148:23 149:10,18
156:8 158:24
**circumstantial** 146:14
**City** 6:6
**clarified** 61:18
**clarify** 73:9 115:9 151:15
**clarifying** 73:13
**class** 33:14
**clear** 17:13 100:10 154:9
**cleared** 92:1
**clearly** 19:19,20 60:18 79:13
**click** 161:3
**client** 4:19 48:10 57:6 143:23
150:23 153:10,13 159:6,15
**clients** 48:6,9 50:4,5 53:18 59:1,2
59:5 88:25 158:20 159:1
**client's** 71:4
**clinic** 23:22 26:10 40:22
**clinical** 7:5 14:24 31:11 33:18
**close** 5:23 18:20 30:15 59:18 75:17
75:18 76:18
**closed** 45:10 86:20,21 87:7
**closely** 25:11
**closer** 74:2 78:1
**closest** 69:16
**closing** 9:16
**closure** 87:2
**clubs** 37:3
**coaxing** 101:9
**cognitive** 24:13
**cold** 5:21 7:9 58:23
**colleagues** 160:17

**college** 10:3 84:25 85:1
**Colombia** 6:15 7:23
**colored** 122:17
**columns** 73:1
**come** 3:17,23 7:10 11:8 23:21 37:4
51:8 54:8 55:4 57:8,10 59:16,23
61:1,7 62:23 70:10 80:18 84:10
85:22 86:17 98:10 100:19,20
101:17 103:6 136:16 147:16
154:4 156:23,25 157:23 158:2
160:10,11 161:5,7
**comes** 28:18 40:10 59:18 161:3
**coming** 4:2 26:12 27:14 28:8 59:2
59:4 66:25 87:17 90:16 102:22
104:18,19 135:6 138:22
**commission** 52:1,6,7
**commit** 45:15,19,25
**committed** 11:5 45:22
**committee** 10:13,15,16,17,20,23
**committees** 10:12
**common** 40:17,19
**commonly** 38:6
**communities** 14:25
**community** 6:16,18,19 7:1 8:21
9:2 15:19,20,21 19:1 23:11,12
25:24 30:19 37:8,10 54:5 80:10
**companies** 48:17,21 97:20 126:9
**company** 44:1 45:10 52:25 53:2
64:8 84:13 86:5,9,25 129:7,21
130:4,9 133:5,8 141:23
**compared** 17:15 69:15
**comparing** 7:24 8:8,19
**competently** 158:8
**complain** 135:3,4
**completed** 6:3
**complicated** 31:11
**comprehend** 36:12
**compromise** 69:6
**compute** 145:18 146:18
**computer** 106:21
**con** 143:7
**concentrate** 21:1
**concentrating** 18:16
**concept** 145:22
**concern** 66:1 88:3
**concerned** 16:16 26:16 69:7
133:24
**concerns** 65:20 110:24 135:9
**condition** 30:2 70:15
**conduct** 86:10
**conducted** 131:8
**conducting** 152:19
**conference** 75:9,15 134:13 143:5
**confidential** 59:11 147:9
**conflict** 103:2,9
**conflicting** 13:5
**conflicts** 24:16
**confusing** 51:19 53:23,23 109:3
109:20
**confusion** 73:7
**connect** 106:25
**consider** 33:8,10 47:18
**considerably** 8:8
**consideration** 47:17,22
**considered** 24:21
**consisted** 23:14
**conspiracy** 145:23,23 146:15
154:12 155:1
**constantly** 55:14
**consultation** 23:15
**contact** 7:1,5 73:8,14,15,15 81:8
**contacted** 73:17 90:13
**contacts** 59:6
**contempt** 3:13,19
**contention** 146:13
**CONTENTS** 2:1
**context** 156:25
**continued** 162:5
**contribute** 33:7
**contributing** 84:18
**controlled** 8:3 48:11
**conversation** 65:14 66:20 68:14
91:16,21 92:9,23 94:9 96:6 97:3
97:24 98:19,20,21,25 99:15
107:8 109:8 110:4 127:1 140:13
140:14 141:6 149:9,18 153:23
154:2,16 157:8 158:19
**conversations** 85:25 147:20,23
148:6 149:17,21 156:22,25
157:7,24 161:8

**convince** 64:9
**cooperate** 14:19 26:3 47:12
**Coordinator** 72:15,18
**coordinators** 72:5
**cope** 24:15
**copies** 101:4 115:1
**copy** 122:1
**Corporation** 48:4,10,12 49:23 50:5
50:7 53:16 54:6,16 55:2,8,13
63:4,5 67:14 70:11 80:20 86:10
126:13 133:24
**corporations** 126:10,11,17 128:23
**correct** 41:14,17,20,25 42:2 68:7,8
68:10 96:21 103:12
**corrected** 142:14
**cost** 8:8
**costs** 137:1
**couldn't** 8:13 52:18 60:13 77:21
**counsel** 13:1 143:1 157:3 158:18
**count** 10:23
**counted** 11:24
**counteract** 28:13
**counts** 14:6
**County** 6:23
**couple** 46:15 51:24 56:4 59:9,19
84:10 97:11 99:19 125:18,20
128:4
**course** 15:22 17:12 18:18 19:12,25
22:24 29:9 30:5,8,10 57:19,20
57:22 79:25 83:7 89:2 103:13
137:2 142:8 148:12 156:1 159:9
**courteous** 4:17
**Courthouse** 1:23
**courtroom** 3:2 4:24 5:4,9,12 42:19
42:20,22 43:2,6 45:22 81:15,17
82:17 143:2 147:11,13,19 159:7
159:21 161:6,21
**Court's** 150:17
**cover** 65:15 77:24 78:2,5,7,9
**covered** 161:10
**covering** 77:21 78:11
**co-conspirator** 85:6 87:9 155:16
155:17
**co-conspirators** 147:20 151:10
**co-defendant** 144:17 145:6
**cracks** 36:2
**cream** 18:11
**create** 11:21
**Creato** 105:18 106:7
**credence** 145:10
**credibility** 13:7 142:8,10 145:9
156:3,6,8
**credits** 43:20
**crime** 45:15,22
**crimes** 45:25
**criminal** 1:15 12:18 147:23,24
150:21
**criminality** 156:22
**criteria** 101:15
**CROSS** 41:9
**cross-examination** 2:5 41:6
**cross-examining** 152:7
**Cruz** 90:3,5,6,8
**CSO** 147:14
**cup** 43:16 160:3
**curative** 142:16
**currently** 59:3
**curriculum** 11:19
**cursed** 4:7
**Curtis** 105:19 106:11
**cut** 136:25
**cutbacks** 135:16
**cycle** 22:7

**D**

**D** 1:14,23
**Dade** 43:21
**daily** 65:3
**danger** 14:20 26:4
**dangerous** 40:15 146:21
**database** 72:14,24
**date** 35:9 96:5 107:25 116:16
162:13
**Dated** 112:18
**dates** 74:6
**daughter** 84:16
**day** 1:11 6:9 9:9,9 19:7 20:18 22:18
22:19,21 28:18 29:8 35:8 37:6
38:16 39:4 51:1 54:17 56:24

60:8,8 67:16 74:12 84:17 93:6
99:18 123:7 125:21 138:5,7
161:13,19
**days** 9:12 17:4 19:18 35:9 52:1,8
70:24 74:5 105:15 112:13
**de** 90:3,5,6,8
**deal** 34:15 59:16,18 72:1 110:1
136:14 157:2
**dealing** 6:19 15:20 151:12 154:8
156:3
**dealings** 119:21
**deals** 145:9
**debriefing** 154:6,6,9
**decide** 10:18 12:17 26:2 53:4
97:24
**decided** 6:9 7:10,10,16 35:16,16
52:10 53:5 110:9
**decides** 47:7 156:15
**deciding** 100:11
**decision** 4:3,8 31:11 35:19 136:2
151:19
**deemed** 15:3
**defendant** 1:8,18 4:8 45:25 50:18
54:23 64:21 65:20 87:1 142:8
144:16 145:1,5 148:6
**defense** 4:12
**defined** 6:18 30:1 40:5
**definite** 31:3 32:21
**definitely** 65:2 96:15 112:24
134:19 141:10
**degrees** 18:21
**delicate** 150:5,14
**delicately** 154:17
**deliver** 59:7 74:22 78:20 118:24
119:5
**delivered** 7:22 66:21 118:17,18
**delivering** 78:21 119:13
**delivery** 6:12,14
**delusion** 16:12 21:24
**delusions** 21:17,18
**dementia** 18:1,3,5,8,10,19,21 36:9
36:9,11,16,22 37:17,19,20,22
38:9
**demonstrable** 18:5
**denied** 162:2,3
**denominations** 77:4,9
**denoted** 108:4
**department** 1:14 7:13 48:7,8 53:16
53:22,24 54:1,1,3 80:20 82:22
**depending** 25:4
**depends** 31:9 32:10 35:5
**depressed** 16:22 17:7,11 19:2,3,5
19:12 22:19,20 34:11
**depression** 16:2 17:8,8,13,18,21
19:3,4,6,17,21 21:16,17 39:25
**depressive** 16:21 17:14,15 18:25
**DEPUTY** 3:2 5:4,9,12 42:20 43:2,6
**describe** 43:18 75:13 90:9 113:4
**described** 18:1 23:3 24:21 27:14
28:3,5 57:14 89:18 98:21 102:4
**describes** 11:19
**describing** 38:8
**description** 2:13 34:9,12 54:4
**descriptions** 154:19
**designed** 14:13,14 38:8 39:23
**desk** 75:10,12,15,17
**dessert** 18:11,12,13
**details** 133:25 151:4 157:1
**detector** 65:21,23,25 66:1
**deter** 136:15
**deterioration** 18:7 37:24
**determine** 58:13 100:21 109:2
**determined** 92:5
**detoxification** 38:18
**detrimental** 39:7
**develop** 10:16
**developed** 85:14
**developing** 6:17 10:14
**diagnoses** 58:11 100:20
**diagnosis** 37:20 38:13 40:2 57:11
58:10
**diagnostic** 39:18
**didn't** 4:10 18:13,13 22:12,12
41:22 52:24 53:17 57:2 60:21
63:25 65:6,14,16,24 68:22 77:8
79:13,15 84:15 91:1 92:19 93:25
95:4,8 97:16 103:6 107:22
110:1,13,15 111:7,7 119:12,13
129:21 135:14 141:13 145:12
146:10 153:1

**died** 22:18
**difference** 17:14,21,25 26:8 37:10
90:4 152:25 157:14
**differences** 19:18 63:23
**different** 17:10 19:19 20:5 22:5
23:17,17 24:9,13 31:24 32:4,5
32:15 35:12 39:2 40:1 54:18
61:20 62:10 64:11 70:2 74:9,10
77:1,4 86:4 92:17 109:4 122:1,6
122:10,16 136:25 149:13 153:4
155:15,20,21 157:12 161:14
**differently** 69:1,1,20
**difficult** 67:9 148:18
**difficulty** 59:14 159:13
**dignity** 11:6
**direct** 2:4,8 5:17 6:9 43:10 148:5
**directing** 148:8
**directly** 43:15 144:12
**director** 6:6,23,25 7:6 139:4
**directors** 134:11
**dirt.com** 126:21
**discharge** 27:17 35:16
**discharged** 35:9
**discharges** 67:24
**disclosed** 152:3,21
**discovery** 160:20,23
**discuss** 64:24 65:4 66:1 70:14
72:23 73:5 81:5,23 82:8 107:1
109:21 134:18 138:24 139:1
140:11 143:1 151:15 158:10
**discussed** 67:21 73:1,3,19,20
109:22 134:14,16 140:12 153:23
154:14
**discussing** 13:21 69:3 139:2,5,7
148:23 150:19
**discussion** 13:25 159:17
**discussions** 157:8
**disease** 18:2 20:1 22:6 23:4 37:25
38:19
**diseases** 17:22 18:4 23:4 36:9
**disorder** 16:2,20,21 18:25 19:1
**disorders** 18:4 38:14
**disorganized** 16:19
**DISPENZIERI** 1:21 162:12,13
**disregard** 92:21 108:17 142:21,21
155:14 157:22 158:5,12 159:23
**distress** 159:10
**distribute** 120:6
**District** 1:1,1,11,22 3:3,3 162:14
**disturbing** 26:14
**Division** 1:2,15
**docket** 12:11
**doctor** 2:3 5:3,11,16,19 6:1 7:19
9:20 10:8 11:2,16 12:6,12,24
14:12 15:24 17:22 18:25 19:22
22:5,23 23:3 24:4,20 25:13
29:20,23 31:3,13,21 34:22 35:7
36:8,21 37:16 38:2,7,11 39:3,10
40:20,24 41:11 42:4 104:10,11
104:13,15,17 161:11
**doctors** 29:7 80:13 101:4
**document** 11:18,21 46:10 49:3
83:3,5,17,20 84:2,4,6 88:15,21
89:14 102:16,16 136:22
**documentation** 28:7 29:3,14
**documents** 41:24 114:23 115:21
**doesn't** 13:25 20:17,22 29:16 91:5
145:17,18 146:18,24 148:5
153:2
**doing** 6:20 7:3,11 9:3 28:24 29:2
30:2 32:18 35:14 43:14 44:19
52:1 58:19 61:19 62:1,11 63:10
72:8,10 76:13,16 77:6,21,25
84:8,12 85:18 100:3 135:2
151:12 158:8
**dollar** 79:6
**don't** 8:10,10 11:6 12:16 13:6,15
13:23 14:4,4 16:19 17:3,18
18:23 26:18 27:5 32:16,21 35:1
35:2 36:6,16 37:8 51:8 58:6
60:15 61:14 62:21 64:14 76:15
80:3 81:12 82:10 84:11 87:4
91:17 92:9,21,22 93:15,16 94:18
96:4,8 97:8 99:2 103:4 104:14
104:15 107:9,22 110:13,17
112:8 128:4 130:7,8,20,22,24
136:10 140:2,3,6 147:15 148:1
148:18,21,24 156:5 157:16
159:3 160:18,19,20,23,25 161:1
161:2,5,12

**door** 58:25 76:11,18 78:1,3,5
147:25 152:6,8
**doors** 76:20
**dosage** 29:13
**dose** 26:15
**double** 111:5
**doubt** 142:22
**downs** 17:17
**downtown** 139:18,23 140:5,7,8
**dressed** 34:10
**driver's** 90:6
**drop** 103:10 112:10 113:9,20
114:24 115:1
**dropped** 113:10 115:6
**drove** 56:21,23
**drug** 37:24 62:25 80:15
**due** 74:3 153:20
**Duran** 48:14,19 49:21 51:7,10,23
52:17 54:10 55:25 59:13,24 62:3
62:9,11 79:21 87:8 94:5 98:18
99:1,4 123:4 125:7 130:23
139:10,12,15 140:18,23 141:19
141:21,23 142:4 144:18,22
145:3,8 146:14 147:7 148:7
149:1 150:1 151:18,22 152:2,3
152:21 154:16 155:8,17 156:10
157:25
**Duran's** 79:24
**duty** 72:15
**D.C** 1:16

---
**E**
---

**E** 162:7,7
**earlier** 35:4 36:8 88:2 105:20 156:4
**early** 9:15 11:4 15:13 18:5,10 36:18
36:22,22 86:5 111:22 120:1
138:11
**earned** 140:25
**earning** 133:18
**easier** 77:5 87:22
**easily** 61:13 93:21
**easy** 4:5 101:12
**Ed** 9:20
**editor** 9:20,22
**education** 45:5 57:14,18 84:25
**educational** 43:18
**Edwards** 105:18 106:1
**Eerie** 6:23
**effect** 30:5 32:14 144:11 152:15
155:7,9,23 158:15
**effective** 6:14 7:22,24 14:23 33:4
33:21
**effectively** 52:21
**effort** 84:12
**eight** 30:25 33:3,8 43:22 44:7
**eighteen** 50:21
**either** 3:17 16:21 19:10 52:21
62:13 67:5 113:20 118:23
134:11
**elected** 148:9
**element** 146:21
**elements** 31:15
**elevator** 161:18
**Elite** 133:5,7,16
**else's** 150:1
**Email** 1:16,20
**emergency** 23:14,20,20 71:5 73:15
73:16 125:19
**Emery** 6:21
**emotional** 159:10
**employee** 134:16
**employees** 55:7
**encourage** 39:6 138:4
**encouraging** 39:8
**endorse** 121:7
**endorsed** 121:5,11,15,19
**endorsement** 120:25
**enforcement** 82:5,6,9
**engage** 65:14 101:14
**engaging** 44:24
**enjoyed** 136:13
**enrolled** 105:16
**entail** 44:17
**entered** 14:16 46:2 67:15 71:25
72:1,2,6
**entering** 72:13
**entire** 80:21
**entitled** 146:11 147:5 156:21 158:7

**entry** 12:11
**envelope** 63:14,16 74:21,25
125:16
**envelopes** 59:10 62:3,6,8 74:23
75:1 76:2,17 77:1,18 78:14,19
78:23 120:6 124:11 127:5,9
**environment** 11:10
**episode** 8:18 20:20 21:11,11 22:25
23:1 24:3 29:12 30:1 31:17
39:24
**episodes** 23:2
**error** 156:19,19
**Escobar** 116:11
**especially** 64:7 108:13 136:10
**ESQ** 1:18
**essentially** 143:24
**establish** 94:8 148:7 151:3
**established** 3:20 85:23 92:1
**evaluate** 35:13 91:18 98:8
**evaluation** 12:22
**evening** 11:8 159:19 160:10
**event** 145:12
**eventually** 50:24 51:20 53:1 61:2
62:5 110:21 120:2 125:14
**everybody** 3:21,25 19:5 21:20
28:21,24 146:23 153:3
**everyday** 17:11 24:14
**evidence** 2:12 12:1,3,4 18:6 46:18
46:21,22 49:10,13,14 83:12,14
83:15 89:5,8,9 102:9,10 115:17
115:22,24 137:5,8 142:20
143:20 146:14,20 148:15,20
149:1,7 150:20 151:17 152:16
152:17,19 153:11,12 154:23,24
156:21 157:23 158:13
**exact** 35:2 93:15 96:4 110:14,15
**exactly** 72:9 84:11 109:9 130:8
135:14 142:2
**Examination** 2:4,8 5:17 41:9 43:10
**example** 6:8 20:13,13 24:4 27:23
29:6 30:7 31:25 32:1 38:14 75:6
154:13
**examples** 24:4
**exceptions** 148:15
**EXCERPT** 1:10
**exchange** 117:14,16
**excuse** 143:1,5 155:21 158:9
159:19 160:10 161:23
**excused** 42:15,16 81:14
**exhibit** 2:14,15,16,17,18,19,21
11:17 12:1,4 46:9,18,20,22 49:2
49:10,12,14,19 83:3,11,14,15
88:14 89:5,7,9 101:25 102:7,10
114:22 116:1 120:20,21 136:21
137:5,8
**Exhibits** 2:11,20 115:17,24
**existence** 86:17
**exits** 81:17
**expect** 22:23 26:6 27:11,13 28:6
30:16 32:25 34:7 40:24 47:19
90:16
**expectations** 52:14 59:5
**expected** 161:11
**expedite** 84:13
**expenses** 134:20 135:1,12 137:14
**expensive** 15:23 37:14
**experience** 26:9
**experiences** 33:25
**expert** 12:7,13,18 13:2 14:9 39:12
19:24 24:5 39:22 47:14 48:3
49:19 53:25 54:14 58:21 60:2,5
62:11,20 63:23 69:24 70:4 71:1
72:9 75:6,21 78:4 80:8 86:8 90:3
103:18 112:7 120:10 135:18
139:25 142:22
**explained** 58:18 152:2
**explaining** 52:13 136:25
**express** 12:16,19,20,24 13:7
**extending** 159:6
**extent** 37:23 153:14
**extra** 52:2
**extremely** 154:24
**eye** 69:16 134:20 135:11
**eyes** 153:13
**e-mail** 68:1,12,24 69:1,2,2 88:18
89:1,14,19,24 90:1,17,25 91:1
136:25 137:2,13,15,18
**e-mails** 68:4

**F**

F 91:1,4,6 162:7
face 15:20
facilitate 104:9
facilities 54:25 56:5,9,13,15,21
59:8 87:24
facility 55:9,10 56:4,10 58:24 59:3
59:20 96:7 97:19 98:11 99:12
129:10,11 150:10
fact 4:14 12:15 15:11 97:4 127:7
128:8 145:1,6,8,14 146:3 152:17
153:24
factors 31:6 153:1
facts 12:15,16,16,20,25 13:19
143:20 157:16 158:17 160:14
fail 65:25
failing 59:6
fair 11:2 36:17 42:9 143:24 153:14
fall 25:14 67:25 96:5 100:20
false 146:9
familiar 39:10 61:4 130:4 134:8
160:16
family 11:9 15:6 22:11 23:23 24:16
24:17 149:14
far 49:21 64:1 66:8,14,16 87:24
90:5 91:3 149:14
fashion 142:10 146:7 150:3 151:5
154:18 155:16 156:15
fast 9:7 16:25 21:14
Fates 133:5,7,16
favorite 136:14
FBI 141:10
fear 16:11
fearful 65:22
feasible 44:9
federal 1:22,23 150:21 162:13
fee 92:6 93:15 95:8 105:14
feed 60:16
feeds 62:22
feel 17:9 19:7,8 21:12,24 26:19
33:25 158:7
feeling 15:5 17:19,19 19:14,17
21:10,19,22 26:13
fees 136:6
felt 79:12
Ferguson 1:23
Fernandez 88:23 90:13,22 105:20
105:22 106:5
fidgeting 122:9
field 12:13 57:18
fields 73:5
fifteen 42:18 47:4 79:12,25 80:4
fifths 77:4
figure 92:3
figured 51:2 93:24
figures 34:25 35:1
file 29:3 34:7 38:1 76:12 128:3
154:7
filed 155:3 162:13
files 76:13 85:18
filing 146:9
fill 101:5 120:5
filling 62:8
final 151:19
finally 35:19
find 40:11 51:22 67:22 70:2 143:25
144:2
fine 3:20 4:1,4 13:4 14:2 41:8
142:17 145:8 150:24 153:16
155:11 157:2,11,12
finish 115:4
finished 66:25 69:19
fired 22:13
first 9:10 18:15 27:14 43:25 48:5
52:12 54:17 55:22,22 56:2,21,25
57:5 58:13,16 60:13 61:1 63:14
67:10 75:6 87:20 89:14 93:20
94:2 96:15,17 97:11 103:25
107:4 111:7,9 112:16 113:1,16
113:17 119:9 120:20 122:12
143:25 153:1 159:20
fits 101:15
five 20:25 35:8,9 36:15 44:3,8
77:12 112:17 114:10
FL 1:20,24 162:15
flags 122:18,19
flat 105:14
floor 4:15
Florida 1:1,6 3:3 7:10

fluctuate 23:16
flush 144:14
fly-by-night 99:9
fly-by-nights 97:20
focused 37:7
follow 17:1 21:13 145:17 146:24
152:22
followed 22:25
following 8:20 51:1 101:15 119:17
134:4
follow-up 36:4 93:11
food 68:12
fool 3:16
footsteps 78:2
foregoing 162:8
forget 104:14,15
forgot 160:16
form 20:9 33:5 35:23 100:23,25,25
128:23
formal 57:15 161:24
Formally 162:2
former 31:20
forth 17:20 29:14 73:9,10
forty 105:12
forty-three 11:23
forward 63:9 119:21 139:17 156:16
158:6
found 8:3,23 15:8 61:8 93:10
125:21
four 41:7 74:8 88:4,5 97:19 103:20
112:16,18 114:10 117:11,15
122:23 124:1,2,10 125:2,8
frames 120:18
Frank 105:18,18 106:7
frankly 42:5 159:14
fraud 1:15 45:14 149:2
fraudulent 146:9
free 156:19
freed 4:10
freedom 11:10
frequency 26:23
frequently 24:11 26:15,25
Fried 136:13
friend 161:4
friends 11:9 15:6 50:14
frightened 22:2
front 43:16 75:1,24 113:21 114:2,5
120:22 121:21 151:21,24
frustrating 59:22
full 5:9 7:8 9:16 25:15 26:3 43:7
62:3 91:2,4 143:12 144:14 158:1
fully 144:25
full-time 8:2,11 14:25 51:25
function 11:12 15:10 17:11 21:23
24:15 31:18 34:17 117:19
129:25 130:2
functioning 15:15 16:15 19:20
20:10 28:23 29:19 87:13 134:4
funding 133:16
fundraiser 49:6
further 26:17 41:4 42:13 138:2
142:22 143:21 144:20 158:12

**G**

gain 47:19
gaining 19:12
gasping 40:8
Gates 105:19 106:11
gather 147:21
gathered 3:10
gears 36:8 39:10
general 6:25 25:18 28:23 29:15
36:11 39:12 108:25 162:1
generalized 92:25
generally 22:8 26:9 36:19 38:10
96:5 110:7 115:13 137:15 151:3
genie 151:14
gentleman 49:21 118:9 150:11
159:7 161:12,12
gentlemen 42:17 81:3 106:15
116:25 117:11,15 159:23
gentlemen's 117:18
George 113:21
Germans 58:8
getting 5:21 15:17 24:8 25:1 26:13
26:20 28:10,12 31:17 36:23
40:16 51:12 65:17 70:17 87:14
92:4 103:24 112:8 125:17
135:13 142:25 144:10 148:11

149:5,9,23 151:4 156:25
gift 117:14,16
girls 113:21 134:24 135:3,4
give 5:6 6:1 7:16 16:4 20:13 23:4
24:9 25:2 26:19,23 32:5 34:9,25
43:3,23 50:15 57:9 59:13 60:20
64:3 67:4 72:3 73:18 74:15
78:19 97:21 99:12 100:11,13,23
101:6 107:6 112:9 120:2,4
124:11,12,13 127:15 134:24
144:1,14 159:10
given 12:20 19:22 55:19 66:10
76:6 80:10 101:13 113:5 151:10
158:15,16
gives 111:6
giving 7:14 11:10 14:23 29:13 30:4
60:6 99:5,10,10 100:5 128:1
glad 155:10
glove 122:9
go 3:18 4:1 8:14,15 11:8 13:12
14:9 15:18,19 17:1,3 18:22 20:8
20:19,22 21:14,23 22:3 23:18,19
23:20,21 25:24 26:7 30:19 31:9
33:4 35:20,21 36:4 41:8 51:2
54:5 57:6 58:23,24 62:23 67:9
68:16 70:9,19,20,22 73:9,10
76:20 80:12 81:24 91:6 93:25
94:1 96:2,10 99:18 100:16
101:11 103:7 107:19 112:11,23
113:1 114:4 120:8 123:21,23
123:25 124:3,5,21 125:2,8,11,12
125:17 144:12 147:15,15 150:15
153:8 154:18 155:5 156:16
157:17 159:16 160:18,20,22
goal 30:11,13,14,22 67:17
goals 32:5
God 5:7 43:4
goes 9:13 18:15 19:18 20:20 28:18
100:5,9 144:9 158:6
going 3:16 4:1,4 11:7 15:17 18:17
19:15 21:25 22:1,4 27:1 29:9,10
31:16 32:6 36:17 44:18 48:6,6
51:2,3,22 52:15,22 53:19,22
61:9,10,11,13 68:6,7,8 73:18
78:19 79:12,13 81:15,18 83:23
85:10,13 86:10 87:13 91:25 92:2
92:2,5,18,20 94:16 98:1 99:5,18
109:14 111:20 116:1 122:24
125:22,23,23 126:2 127:25
128:1 129:18 135:6 137:18
138:17,21 139:3,18 140:5,15
143:5 146:21 147:3,10 149:25
150:13 151:11,13 153:25 155:5
156:3 157:1,23 158:2,22 160:6
160:10 161:23
good 5:19,20 10:18 14:9 19:8,9
21:10 41:11 50:15 52:3 58:20
79:7 97:16 111:21 120:18
153:21 155:11 157:2 158:21
161:19
Gosh 153:25
gossip 150:25
gotten 22:18
governing 14:9
government 1:13 2:14,15,16,17,18
2:19,20,21 12:4 41:13,19 42:24
46:3,17,22 47:12,21,24 49:9,14
64:18 82:4 83:15 89:4,9 102:6
102:10 115:16,24 137:4,8
143:15,24 144:13,15 145:1
148:5,9,19 149:17,20 150:3,7,12
150:13 151:16,17,20 152:18
153:9 154:3,16,23 155:10,20
156:12,15 157:18 158:6 159:10
government's 5:16 11:17 43:9
46:9,18,20 49:2,10,12,18 83:3
88:14 89:5,7 101:25 102:7
114:22 136:21 137:5 146:13
155:2
grab 79:11
gradually 9:12
graduated 43:19 103:16,19
grandiose 17:2
granted 12:12
great 15:1 21:13 34:17 39:20 81:1
greater 20:21
greatly 36:19
grounds 144:6
group 25:7 30:8 32:22,24 33:1,2,3
33:5,5,7,10,11,13,14,16,20 34:5

34:8,12,13,18,19,20 44:22 87:20
125:9
groups 32:21 33:1
grow 51:4
growing 52:25 53:2
guess 32:20 35:12 42:12 51:24
54:2 64:8 65:23 92:3 100:12
120:3,5 122:13 126:1
guide 101:2 102:4
guidelines 10:14,16
guilty 144:17
Gustavo 114:15 116:5 121:4,5
guy 106:25

**H**

hadn't 67:4 69:20 140:16
hair 60:16
half 43:20 83:21,22 160:9
halfway 62:18,19,20,21 63:2,3 95:6
95:7,8 104:19,21 136:9
hall 81:16
hallucinations 16:7,7,8
hand 5:4 13:13 14:10 113:13 121:1
handed 11:16 46:8 49:1 59:11 83:2
88:13 114:21 136:20
handing 39:4 62:4 101:24
handle 11:11,12 20:11 21:6 119:21
handling 12:22
hands 150:3
happen 16:17 22:4 45:11 124:21
160:4
happened 22:21 51:14 52:18 58:23
79:1 103:13 113:18 119:13
124:3,22 125:20 133:20 155:1
happening 20:25 26:17 30:6 65:22
75:7 139:14
happens 22:9 59:18
happy 17:5 99:16 100:4
hard 17:1 64:8 98:2 102:15 151:11
151:12 159:3
hasn't 85:7 148:9
hasten 37:21
haven't 11:24 26:24 42:5 66:12,25
67:10 68:16 150:19
head 71:13,15
heads-up 100:18
health 6:13 7:1 23:12 34:3 39:6,7
40:16 45:17 54:2,4,8 56:3,13,14
80:11,16,19 82:21
hear 20:15,16,24,25 65:6,16
143:11,12 144:13 148:14,17
152:11 161:6
heard 36:12 85:24 146:5 148:25
149:3,3,4 152:9,11
hearing 3:14 4:6 16:7,8 20:22,23
159:8
hearsay 85:20 86:23 95:21 148:15
heart 15:12
held 3:19 55:17 159:17
help 5:7 13:17 20:14 24:2,3 27:1,8
27:8 28:9 30:20 31:16,19 32:6
34:2 37:18,19,22 38:4 43:4 48:6
51:4 72:4 84:13 98:4 104:9
110:8
helped 77:13
helpful 14:1 23:9 37:23 40:14
158:18
helping 24:14,15 30:2 78:22 84:9
helps 15:16,18 37:4 59:18
Herz 2:3 5:3,11,16,19 6:1 7:19
11:16 12:6,13,24 14:12 15:24
17:22 25:13 41:11
her's 140:21
Hialeah 90:25
hide 16:15
high 43:19 100:16
higher 74:12
highlight 111:4
highlighting 109:24 111:6
highly 143:22
highs 16:21
Hines 53:18
hire 53:18
hired 48:5
hiring 48:8
history 43:24 57:15
hoc 4:5
hold 49:19 69:23 120:2,5
holding 133:8

Holiday 97:21
home 8:14 22:3 28:18 56:11,12 103:8
homes 93:21 111:22
Homestead 139:6,8,16,24 140:5 150:10 160:19
honest 52:20 68:15
Honor 3:24 4:22 5:2,13 11:13,25 12:2,5 41:4 46:5,17,23 48:23 49:9,15 63:17 80:23 81:2 82:3 82:24 83:11,13,16 85:8,12,23 86:25 88:10 89:4,10 92:12,20 93:2 95:22 96:8 97:1 98:3 101:21 102:6,11 108:19 110:19 112:20 114:17,19 115:16,18,23 126:24 136:17 137:4,9 142:12 143:8,14 144:10,25 146:3,7 147:14 148:25 151:14 152:9,19 152:20 153:8,19 154:2,25 159:5 161:24
Honorable 1:10 3:4
hooked 103:4
hope 47:21 142:13
hopefully 37:18 47:16,18
horrible 57:1
hospital 6:8,10,10,24,25 7:8,13 8:9 8:11,14,17,22,24,25 9:1,10 10:1 11:6,7 14:18,21 15:3,9,18,21 23:14,18,19 25:3,3,6,6,16,17 27:13,15,17,19,21,25,25 28:1,4 28:10,17,19 29:6,10 30:13 32:7 36:3,4 70:9
hospitalization 6:12 7:24 8:2,5,6 8:19,20,21 9:23 11:3 12:7,23 14:13,14,22,22 15:25 19:23 25:13,18 26:5,7 27:4,12,22 28:5 28:8 29:4,24 30:12,23 31:22 32:9,22 33:19 34:24 36:6,23 37:12,13 38:7 39:13 58:15
hospitalized 8:4 14:17 27:24 28:14 28:15
hospitalizing 8:1
hospitals 23:8,13 25:20,25 29:7 80:13
hostile 34:15
hot 135:25
hotel 151:4
hour 41:17 42:7 82:13,14 157:22 160:9,10
hours 42:4,7 51:24
house 22:1 50:13 62:20,21 95:6,7 95:9 104:19,21 132:9,10,16 136:9 140:16
houses 62:18,19 63:2,3
huge 58:7 105:12
Humes 105:18 106:3
hundreds 40:23 77:4 124:8,25
hurt 16:11 29:16
husband 18:20 50:13,14 154:11 159:8
husbands 50:22
hypothetical 12:25
hypothetically 22:23
H-e-r-z 5:11

I

ice 18:11
idea 15:13,15 16:4 17:8,13 23:16 28:23 30:5 33:4,5 92:24
ideas 29:16
identification 2:12 11:17 46:9 49:2 88:14 136:21
identify 3:13,14 4:4,5
identifying 149:17
illegal 45:17 61:14 63:7 69:5
illness 8:18 12:9 14:16,16 15:12 16:1 18:1 20:4,9 22:24 23:6 29:9 31:2 40:2,3 57:25
illnesses 16:3 17:9,23 19:23,25 21:5 23:16,17 24:1 35:24 57:23 70:5
imagine 159:9
immaterial 156:13
immediately 9:8 32:17 87:21
impaired 18:18 36:19
impairs 17:10
Implicating 158:23
implicit 162:2
important 29:3,14 69:18 73:1

136:7 148:12
impose 4:1
impossible 71:12 143:23
impression 68:20
improve 10:20 39:6
improving 35:5
inadmissibility 157:16
inadmissible 149:7 153:12 156:2
inappropriate 81:9
incident 3:96 61:19 79:4 152:24
incidents 129:14
include 29:21 41:19 47:11
included 41:24 42:2 95:8 117:15
income 52:2
increase 26:14,23
increasing 103:11,15
INDEX 2:10
indicate 147:10
indicated 155:15
indicators 10:18
indictment 87:1 156:23
individual 13:19 14:5,6 16:6 23:23 25:7 31:5 35:5
individualized 31:21,23 35:13
individuals 12:8 49:20 70:4 112:17 114:10,11 116:6,9,12 150:16 154:10
inform 54:5
information 12:14 30:8 71:25 72:2 72:6,13 87:4 107:18,18,19,20,23 109:1 127:21 152:21
initially 54:14
ink 122:2,3
Inn 97:21
input 28:22
inside 74:21 113:19
insistence 158:20
instance 154:13
Institute 6:16 7:23 8:22 50:6,9 86:6 86:8 111:15
instruct 13:13 81:19 108:17
instructed 82:7,7 127:11,23
instruction 14:7,8 81:5 142:16 158:1
instructions 59:13 100:13 101:6 101:19
insurance 57:12
intense 26:20 37:6,7
intensity 20:7 21:16
intensive 25:7 37:14
interact 57:5
interaction 33:16,19 36:23,24,25 82:4
interested 6:11 7:21
interesting 146:19
Interestingly 9:6
interfering 3:17
interim 123:16
International 9:22
Internet 160:18,21,24
interpreted 151:25 157:8
interrupt 147:3 149:13
interrupted 13:9
interrupting 147:12
interval 32:11
intervening 9:15
interview 51:17
interviewing 51:5 57:7
intimacy 149:19 154:25
intimate 141:18,24 142:4 144:22 144:24 146:7,16 150:15 151:17 152:2,10,12,21,23 154:10,11 155:8 156:7
introduce 56:6
introduced 51:7 54:15,19 86:9
introducing 55:6
invented 58:8
investigation 123:11
invoices 127:12,14,17,24 128:3,7
involved 10:10 11:4,9 16:13 29:21 55:20 62:18 143:6 149:12
involvement 10:9,25 61:24
in-patient 6:7 7:25 8:24 23:14 25:15,23 28:4,17 30:13
in-patients 25:20
Irma 84:9,19 85:3
irrelevant 143:20
irrevocably 153:13
irritable 17:6
isn't 19:15

issue 3:15 59:16 137:17 144:11 148:11,12,13 150:14 151:21 152:7 153:23 154:3,8,17 155:2 157:3,10
issues 15:20 32:7 56:14 68:13,13 133:13,14 134:16,16,17 139:3 142:8 154:25 156:3,6
it's 4:3,5 11:7,9,19 14:22 15:16,23 16:1,23 17:1 18:24 19:15 20:25 21:1,7 25:7 27:25 30:13 31:10 32:16,21 33:12,13,21 35:6 39:2 40:19 42:12 45:5 53:23,24,24 56:11 62:16 85:6 88:18 89:14 90:8 91:11 95:16 97:15 98:5 101:9,14 102:15 129:6 130:7,10 130:13 136:25 137:16,17,19 143:25 144:2,4 145:22 148:12 151:11,11 152:15 156:17,19 159:3 160:8
I'm 75:11,11,12,21,22,22 96:8 105:22 113:8 121:24 128:18 134:21 147:25 148:11

J

Jackson 6:24 7:11,12 26:10
jail 4:2 62:24
James 1:10 3:4 106:1
janitor 87:5
JENNIFER 1:13
jennifer.saulino@usdoj.gov 1:16
job 43:25 44:7 45:4 51:17 52:1 53:3,12,18,20 54:4,11 55:11,16 55:24 58:19 60:22 64:22 66:5 68:10 72:8,10,15 73:2,6 117:19 134:3
jobs 52:15,19,21
John 23:11 147:14
join 143:3
joining 159:14
joke 51:15
Jones 127:9
Joseph 49:4,25 80:5,14
Joseph's 78:24
Journal 9:22
journals 9:19,20
Jovanna 84:9,19 85:3
Joyce 13:12
Juan 119:3
judge 1:11 13:3,6 41:6 47:8,9,10 47:21 143:10
judging 157:13
Judith 1:7 41:12 48:14,19 49:24 50:17 54:20,23 64:21 72:20,21 73:3 89:21 90:2
Judy 48:18 49:4 50:15,16,17 54:18 54:20,23 68:1,6 69:17 86:13 88:7,18 98:20 104:6 106:25 113:5 121:13 123:18 124:8 125:11,12 130:18 132:12,13,20 133:11 134:12 136:3,3,25
Judy's 50:13 130:13 132:5,6,8,15 132:19
jump 27:5
jumping 147:18
juror 3:7 13:24 161:19
jurors 13:9
jury 1:10 3:7 4:23,24 6:1 7:19 13:13,20 14:12 15:24 16:4 19:22 19:24 23:4 39:22 42:12 44:12 43:18,23 47:14 48:3 49:15,19 53:25 54:14 58:21 60:2,5 71:2 75:6,13 78:4 80:8 81:16,17,18 82:16,17 83:17 90:3 91:18 92:17 97:24 98:8 102:12 108:17 112:7 113:4 115:22 120:10 135:18 142:14 143:1,24 153:10,13 155:14,21 157:21 158:4,9,10,12 158:18,21,23 160:1,2,18 161:21
jury's 12:14
Justice 1:14
justify 69:10

K

K 2:20 115:17,21,24
keel 156:21
keep 15:14 71:14 109:15 134:20 156:18,20
keeping 15:16 135:11
Keith 105:18 106:3

Kennedy 23:11
Kentucky 136:13
kept 69:16 71:13,19 79:6,7 106:20 106:21
kickback 60:20 61:25 64:15 72:3 73:18 78:17 90:20 92:6,15 93:4 93:18 94:13 96:20 97:22 107:6 136:11
kickbacks 45:14,17 55:18 60:4 61:8 63:2,3,6,13 64:19 65:1,4,17 66:16,21 67:2,4 69:3 70:17 74:3 79:9,24 87:14 93:22 98:11 111:21 118:6 120:4 123:13,15 124:17,24 131:19,25 141:2 142:1,2 149:4,22
kill 19:13 22:1
kind 15:9,24 20:8 22:6,22 24:9 25:10 28:7 30:20 32:19 34:4,6 35:18,21 37:14 40:1 50:22 51:12,15 53:23 62:1 68:11 74:23 76:13 88:18 100:18 101:1,9,14 103:9 113:7,8,9 124:22 136:11 160:21
kinds 16:17 23:17 24:13 25:6 26:24 32:15 33:24 37:2,16 39:23 77:3
king 1:10 3:4 17:3 47:10
knew 4:18 53:14 66:4,7 72:7 75:23 87:23 90:15 93:24 101:2
knock 78:3,5
knocked 78:1
knowing 69:6 151:8
knowledge 48:11 117:18 134:18 142:3 144:25 145:2 155:7
known 50:21
knows 96:25 126:25 127:21

L

L 1:13 2:20 115:17,21,24
la 43:19 90:3,5,6,8
lab 99:9
lack 65:10 150:5
ladies 42:17 81:3 159:22
lady 145:7,15,17,24 146:22 153:2
laid 149:23 158:14
language 47:11
large 40:24
largely 52:4
larger 49:18
Larry 48:18 49:4 51:21,23 52:17 54:10 55:25 59:9 60:11 61:8 67:25 79:21 90:17,18 94:5 98:18 100:11 112:9,10 113:5 120:2 122:13 123:3,18,19 124:8 125:7 125:11,21 127:11,13,15,25 130:18 133:11 136:3 139:10 140:16 141:17 144:18
Larry's 130:13
late 18:4
lately 11:24
latest 35:1
laughed 51:17
laundering 45:19 117:25 130:1,3 146:9 149:4
law 1:19 82:4,6,9
Lawrence 1:10 3:4 48:13,19 49:21 51:7 87:8
laws 56:8,8
lawyer 47:24
lawyers 81:21 147:1,2 156:5 160:7 161:14
lay 13:3 86:1 92:23 94:20 97:7 155:20
Lazaro 112:3 113:20,23,23 114:4 118:19 126:1
lead 31:6 155:20
learn 24:15 39:3 56:2 57:22,25 60:9 61:7 62:5 87:7 123:1 125:6 139:9
learned 5:24 53:15 54:12 60:12 62:4 63:6 142:1,2 145:10,11
learning 36:14
leave 22:1 30:23 31:9 35:6 79:11 79:13 101:4 113:22 114:5 142:24 151:7 154:22
leaves 35:17 42:19 143:2 161:21
lecturing 33:15
led 45:9
left 27:19 51:19 52:2,4 159:7

legal 56:6 159:25 160:6
Legally 90:7
lengths 34:23
lesser 20:7
letter 74:25 153:10
letting 90:12
let's 15:13 22:17 26:20 85:14 96:2
 96:2,25 98:8 99:19 109:16
 143:25 144:2,5 147:10,17
levels 21:4,15
liaison 80:15
license 62:17 90:6
licensed 84:23
lie 65:21,23,25 66:1
life 16:13 19:4,8,15 22:9
lights 137:16
lily 111:10,11,19
limb 146:21
limine 154:8
line 2:13,13 35:12 116:16 131:6
 148:9 154:20
list 70:20 96:9
listed 71:11
listen 81:12 141:10
listening 34:13 143:6 145:22
literature 33:2
little 9:6 16:18 19:11 26:16 30:4
 34:9 51:6 56:3 58:10 75:9 77:1
 94:16 100:15 125:16,16 144:19
 149:13 156:5 158:24
live 14:24 17:20 156:19
lives 15:7 16:13 17:11 21:23
living 11:10,23 15:14 23:13 27:20
 38:15 65:14 98:23,24 119:15
 120:7 125:17 160:4
local 6:19 23:12
located 99:24
lock 76:19,21
locks 76:21
log 70:20 71:1,3,3,11,19 73:1,23
 74:16,18 91:5 96:9 106:18 107:1
 107:15,16,24 108:2,4,5,10,14,22
 108:24 109:6 110:21
logical 87:22 146:18,24
logically 152:22
logistics 92:3 130:7
long 11:10,23 15:14 23:13 27:20
 38:15 65:14 98:23,24 119:15
 120:7 125:17 160:4
longer 8:20,25 30:18 146:25
 153:14 161:11
long-term 7:6
look 16:5 46:10 58:11 59:12 73:24
 73:24 107:22 114:22 122:18
 144:19 153:25 160:19,22 161:16
looked 27:17 34:10 102:16 150:25
looking 21:20 115:4
looks 29:15
loose 140:15
lose 13:25 15:9 62:13,16
losing 19:12
loss 18:15
lot 36:1 122:13
lot 9:3 32:2 40:8 56:2 58:7,9 61:15
 62:16,24,25 64:4 65:14 67:3
 78:22 96:10,12,17 100:17,18
 105:19 107:17,18 109:12 123:25
 136:9 137:19 147:1 149:14
lots 19:1
loud 142:13,18 156:4,5
louder 26:13
loved 22:17 136:13
low 67:8,8,8 68:5,6 69:8 88:19
 89:23
lower 53:10
lows 16:22
luck 79:7
Luis 116:11 131:15
lunch 51:2 80:25 81:25 113:7,8,9
 135:16,19,19,20,20,24 136:8
lying 3:11

**M**

M 1:19 2:20 90:17 115:17,21,24
Mafia 16:14
magazine 44:19
Maggie 50:15
maiden 90:5
main 7:18
maintain 30:21
maintained 26:10,18
maintaining 37:8
major 6:8 9:19 10:19,25 15:22 16:1
 16:2,3 17:14,15,21 18:25 19:4,6
 19:21
making 21:1 77:3,15 136:4
mall 43:25
manage 25:4,5
manageable 33:7
management 9:16 24:2,12 26:11
 32:3,10 44:8,22 48:16
manager 44:4 59:18
manic 16:20,22,23 17:21
manilla 76:2,17
manner 150:14
March 84:1
Margarita 2:7 42:24 43:8,9 90:3
Marianella 48:15,19 103:13 123:18
 133:11 134:12 136:3
MARIE 1:21 162:12,13
marked 2:11 11:17 46:8 49:1 83:2
 88:13 101:3,24 114:21 136:21
marketer 84:21 131:23
marketing 45:6 48:7,8 50:2 53:1
 53:14,15,22,24,25 54:1,3,9,11
 62:5 80:10 99:19 129:7
married 129:19 141:21 147:4
Marshal 81:9 82:9 147:10 161:17
marshals 147:13
Marvin 2:3 5:3,11,16 12:13
Mary 48:18 49:4,22 124:8 125:11
Mary's 140:21
master 70:20 71:1,3,11 72:25
 73:23 74:16,18 91:5 96:9 106:18
 107:1,15,15,23 108:2,13,21,24
 109:6 110:21
match 52:23,24 53:7
material 143:20
materiality 142:6
Mathis 104:22,23,25 105:4,10,23
matter 4:14 15:11 19:16 67:1,7
 68:22 89:24 96:7 129:21 142:10
 151:16 159:8,16 162:9
matters 147:9 159:25 160:5,6,6
max 117:5
maximum 27:6 47:5
ma'am 44:14 54:21
meal 135:25 136:8,13
meals 135:17 136:10
mean 9:8 20:13 37:13 50:17 54:12
 54:20,23 58:7 60:5,14 61:20
 62:14 64:13,14 66:14 67:13 71:2
 73:10,25 84:21 87:20 99:7
 103:18 113:23 114:12 123:17
 134:5,6 137:19 138:6 139:22,25
 148:18 151:25 153:2 158:23
meaning 48:7 61:11 66:17,20
 80:15 129:5 135:21 141:10
 160:2
means 30:17 67:15 140:1,3
meant 61:7 72:2 80:9,11 100:8
 103:5
measure 10:20
measures 10:19
mechanic 131:15
medical 6:23 43:22 44:11 57:15,18
 57:20
Medicare 45:14 69:14 138:10
 140:1 146:10
medication 9:15 23:22 24:2,12
 26:11,14,23 29:13 30:4,7 32:1
 32:10,12,14
medications 24:2 27:18 37:16,18
 58:11
medicine 24:9,10,10 25:5 32:16
Medlink 44:8,21,24 45:2,4 48:2,3,5
 48:11,13 49:25 50:2,2,4,4,11,12
 51:20 52:10,11 53:5,7,13 55:9
 55:22 79:20 83:8 105:24 106:16
 116:25 117:4,9,13,19 118:12,14
 126:7,12 131:4,9,12 132:2,25
 133:17,19,22,24 134:24
meds 57:12
meet 41:22 51:1 56:5 61:10 80:12
 117:2,9,11 118:20 119:3 132:11
 132:13,21,21 139:4
meeting 35:18 41:19 50:24 51:10
 78:19 83:23,25 134:8,8,11 151:6
meetings 83:9 134:15
Mejia 126:4,5 127:24 128:9
memo 116:16
Memorial 6:24 7:13
memories 13:23 14:6,6
memory 13:19,22 18:8,15 36:18
 37:20 153:22 155:6
mental 6:13,19 7:1 9:8 12:8 14:15
 16:1,3 17:23,25 20:4 22:24 23:6
 23:11,16 38:19 56:3,12,13 57:23
 57:25 62:14 70:5,10,14 80:16
mentally 7:7 14:15 15:2 20:3,3
 37:2
mentioned 10:8 30:7 31:13 44:21
 67:12 76:10 86:5 88:2 105:20
 128:9 138:11 143:4
menu 150:14
mere 143:22 156:24
merely 153:9
mess 72:8,9
messes 4:2
met 59:19 78:22 113:7,8 118:23
method 120:7,13
Miami 1:2,6,20,23,24 7:11,17 43:19
 43:20,21 162:14,15
MICHAEL 1:18
microphone 3:23 5:24 43:15
 121:24
middle 49:24 147:3
mild 18:19 21:19
mile 135:13
mileage 135:13
miles 135:15
million 60:17
mind 148:16 150:1 156:4
minimal 20:6
minimally 14:19
minimum 27:6
minor 150:21
minute 5:22 83:10 158:23 159:11
minutes 20:25 36:15 42:18 79:12
 81:5 82:1 158:24 160:12
miserably 59:6
misinterpreted 142:19
misplaced 122:13
missing 74:4
mistrial 144:2,4,8,12 148:3,11
 152:13 153:15,18 161:25 162:2
 162:4
modify 26:17
Moltry 105:18 106:13
mom 132:5,20
moment 62:14 80:23 110:1,9
 112:20 144:14
Mondays 67:22
money 27:9 45:19 61:1,3,25 65:9
 65:10 66:9,13 69:3 115:12
 117:25 120:3 126:5 130:1,3
 132:25 133:17,18 135:6,22
 136:1,4,5 137:21,22 140:25
 141:1,2 146:9 149:4
monitor 25:7,12 27:1 103:5
monitoring 28:16,20 29:4,24
month 26:7,11,25,25:21 1 66:24,25
 69:19 70:21,23,24 74:2,8 76:7
 96:5 109:14 112:23,24,25 114:7
 114:8 119:17,17,18 128:16,17
 133:1 134:13,25,25
months 22:25 23:8 27:25 43:22
 152:13 153:18 154:7 155:3
Moore 10:24,22,25 105:4,10,23
morning 3:1 4:21 5:19,20 11:8
 13:10 41:11 67:25 103:5 139:10
 160:11,11 161:16
Morris 90:18
mortgage 44:1
mother 132:6,8,15,19,25
motion 12:12 142:12 144:12 148:3
 152:13 153:18 154:7 155:3
 161:25 162:2,3
motions 153:17
Mount 6:7
move 83:11 84:2 85:15 86:1 96:25
 98:8 102:6 130:14,25 137:5,8
 140:4 142:15 153:14 161:9
moved 6:15 161:5
moving 24:24 48:2 86:4
MRI 18:6
multiply 70:24 74:8,20
Municipal 6:10
**N**

N 1:23 2:20 115:17,21,24
name 4:5 5:9,10 44:11 43:7,7,12
 71:4,4 78:24 90:4,5 91:2,4
 107:25 108:6 112:2 114:16
 116:14 126:25 129:3 155:25
 158:16
named 115:21
Namenda 37:21 38:2,5
names 74:6,19 112:18 114:12,13
 126:18,19
narrow 40:5
natural 65:8
nature 36:16 62:5
Navy 6:4,5
necessary 27:10
need 4:16 5:22 8:10,16 17:3 23:16
 23:19 24:1 25:15 29:6,10 32:4
 32:19 38:18,20 40:11 43:16 67:9
 77:19 107:23 121:21 123:12
 124:6,8,9,23 158:9,23 159:20
 160:1
needed 59:10 68:22,22 70:5 73:2,5
 73:16 77:9,12 79:4 84:12 88:19
 92:3 101:3 105:15 107:5,6,20
 109:1 111:1 118:6 120:3 122:7
 124:18,25 136:5 140:4
needing 28:10 60:18
needs 31:23 38:4 56:11 70:2
neglected 13:10
Negron 1:7 4:1:12 48:14,19 49:24
 50:17,20,24 51:14 54:20,23
 55:20 64:21 66:4,23 67:12,18
 69:7,24 70:4 71:21 72:21,23
 73:3,11,19 75:2 76:10 77:6 78:7
 78:11,14 79:1,19,23 88:8,22
 89:1,21 90:9 91:8,13,21 97:3
 99:11 100:2,13 101:6 104:7,25
 105:4 107:1,10 108:10,21 109:6
 109:21 111:13 113:6,7 119:10
 121:15,18 122:16 123:19 127:23
 130:21 132:23 133:25 134:21
 138:14 139:19 140:11 141:5
 142:3 144:16 145:3,25 146:1,17
 149:2 150:1,12 151:18 152:5,12
 152:23 154:9 155:8,16,18 156:1
 157:24 159:9
Negron's 55:1 128:21 132:25
 149:6 159:8
Nelson 88:23 90:13,22 91:1,3,4,6
 91:13,23,25 105:20,22 106:5
Nelsons 91:5
network 70:19 71:20 106:21
never 19:6 62:17 63:24 91:3
 103:24 105:14 118:23 119:4
 126:22 127:5,25 129:22,23
 133:13,20,21,21
new 1:15 6:6,7,15 7:23 8:23 10:5
 15:15 26:23 44:18 53:18 55:6
 59:5,5,14 67:6,24 69:23 119:12
 139:21,22 160:17
newspaper 81:12 161:1
night 8:14 21:3 28:18 40:8 88:5
 93:8 98:15,16 101:9 104:15
 150:11
ninety 87:17 102:22
ninety-five 103:6
noon 3:14,20 82:14
normally 12:14 59:17 81:21
north 7:9
note 27:17 29:8
notebook 14:10
notes 13:11,11,13,15,16,16,16,18
 13:21,23 14:1 34:6,19 154:6,9
notice 28:12 53:6
notified 139:16
number 6:20 32:25 35:2,3 39:21
 67:15 71:5 90:6 94:6 124:24
numbers 67:7,8,25 68:1,5,6 77:12
NW 1:15

**O**

object 92:20 143:19
objecting 144:5
objection 12:21,10 39:16 46:19
 49:11 79:16 83:13 85:5,20 86:23
 89:6 91:10 94:7,17 95:18 102:8
 105:2 108:15,16 109:25 115:19
 115:20 118:1 126:14,24 130:11

137:6 142:5,25 143:7,10,12,14
144:1,3,6,9 145:12 148:16 151:8
152:11,12 153:5,17 155:4,13
157:21 158:4,11 159:23
**objections** 94:11 143:7 158:9
**obligation** 142:9,19,20
**obstruction** 40:10
**obstructive** 40:6,12,15
**obviously** 24:8,25 37:14 41:2
143:19 144:9 157:6
**occasion** 66:2 75:4 76:6 148:22
**occasional** 20:22
**occasionally** 32:9
**occasions** 60:24 77:13 121:17
146:4 150:8 154:10
**occur** 22:5,6,15 31:1 83:25
**occurred** 129:14
**occurring** 9:6,17 25:1,9 79:22
**occurs** 9:11 18:3 20:18 39:20
**October** 45:12 138:12
**offer** 12:15 46:18 49:10 61:11 89:5
94:1,2,4 95:3,11 115:17
**offered** 94:15,23 96:20 149:8,9
156:12
**offers** 12:1,6
**office** 44:4,12,13 51:1,8,15 52:12
75:8,13 76:21 78:14,17,18,23
79:8,9,19,24 80:1 95:10 107:10
107:11,13 114:5 117:6 128:21
138:18 139:18,24
**officer** 82:5
**officers** 82:6
**offices** 1:19 101:4
**Official** 1:22 162:13
**Oh** 13:24 34:16 126:16
**okay** 9:9 58:18 82:10 92:11 100:3
118:7
**old** 15:13 16:20
**older** 18:3 56:12 161:12,12
**once** 19:5,17 26:6,11,25,25 28:15
32:20 93:10,10 100:11 101:14
112:24 132:11 133:17 134:13
139:13
**ones** 16:2 67:6 69:23 87:17 103:16
114:14,24 158:9
**open** 53:17 86:19 133:9,12 152:8
**opened** 93:20 126:10,11,17 133:13
133:21 152:6
**opening** 87:25 96:16
**openly** 34:4
**operation** 78:17
**operations** 72:5,15,18 134:3
**opinion** 12:19 13:1,2 33:13 86:1
87:10 91:11 94:10 95:19 98:6
108:17
**opinions** 12:15,16,20,24 13:8
35:19 86:1
**opportunity** 50:16 52:3 154:7
**opposed** 13:2
**optimal** 33:9,13 35:3
**ora** 156:8
**order** 17:14 18:12,13 128:23
**ordinarily** 8:4 14:17 23:24
**ordinary** 137:2
**originally** 92:18 159:8
**Orlando** 138:18,19 139:8 140:10
141:15 150:9 151:4,6 154:14
**other's** 155:19
**ought** 29:18 33:7
**outside** 14:20 15:7 16:14 143:4
158:10 160:1
**outstanding** 10:24
**outweigh** 155:23
**outweighs** 153:6,6 158:15
**out-and-out** 149:6
**out-patient** 7:8,13 9:16 23:15,21
23:25 24:21 26:1,8,10,24 28:6
30:20 35:23
**overall** 94:25
**overcomes** 152:15
**overhear** 161:7
**overlap** 31:24 40:24
**overlooked** 134:2,2
**Overruled** 101:10
**oversee** 53:22
**overwhelmed** 21:8
**overwhelming** 21:12
**owned** 87:1 104:21 111:25
**owner** 48:15 49:22 59:20 62:16
86:15 96:7 103:14 113:25

**owners** 48:13 56:5 59:11 61:22
67:4 69:15 80:13 95:1,6,7,9,11
99:13 136:12
**owns** 130:17
**oxygen** 40:16

**P**

**packs** 39:4
**page** 2:2,13,13 89:17 120:21
**pages** 11:23 46:15
**paid** 41:17 61:16 67:10 68:16 71:9
77:11 95:9 109:2 135:13 140:2,3
140:5,16,20,21,21
**Palm** 57:1
**Palmetto** 99:25,25
**paper** 48:12
**papers** 78:10
**paperwork** 56:2
**paranoid** 16:10
**Pardon** 112:20
**parents** 36:5
**part** 7:18 15:4 21:10 32:22 40:2
47:14 53:2 59:4 68:11 84:17
88:21,21 89:19 90:1 128:2 136:3
149:23 154:25 155:1
**partial** 6:11 7:7,24 8:2,5,6,9,14,22
8:24 9:1,23 11:3,5 12:7,22 14:13
14:14,18,21 15:9 25:1 23:19 23:14
23:19 25:3,6,13,16,17,18,24
26:5,7 27:4,12,21,24 28:5,8,10
28:15 29:4,24 30:12,23 31:22
32:8,22 33:19 34:24 36:10,23
37:11,13 38:7 39:13 58:15
**partially** 28:14
**participated** 90:19
**particular** 22:21 39:23 56:24 67:20
73:5 78:13 121:18 122:5 157:20
**particularly** 73:7 80:14
**parties** 115:18 150:16 157:24
158:19,21 159:1
**parts** 23:5
**partway** 81:20
**party** 117:13
**part-time** 7:11,12 8:17 51:24 52:10
52:11
**pass** 20:19
**passed** 13:21
**passing** 159:25
**patience** 81:13 160:13 161:9
**patient's** 20:1 28:16 29:3,15,24
34:7 38:1 107:25
**pay** 45:17 53:10 62:12 67:1 69:11
93:12,13,15 95:8 98:10,13,17
111:5 116:22,23 119:13 123:12
123:15 133:19,21
**paying** 45:14 60:22 61:21,21,25
62:9 63:13 69:12,19 87:14
140:19,23
**payment** 131:17
**payments** 66:23 69:21,22 106:16
**payroll** 115:14
**pays** 61:19
**Pediatric** 44:2,10
**Pedro** 114:16 116:8
**penalized** 3:19
**pending** 65:10
**pens** 12:6,10,17
**Penthouse** 1:19
**people** 3:14,16,17 4:17 8:16 11:4
16:21 17:7 19:1,13 20:23 21:21
32:2,4,5 33:10,15,24 35:9,11
36:24 37:5,8,16 40:7,11,25,25
53:19 55:5 56:13 60:14 61:10,10
62:15 63:20,22 65:2,10 66:17,19
66:21 69:19 70:2 72:6 74:9,10
78:1 80:10 82:21 85:2 96:10,18
96:20 99:9 101:12,13 103:5
111:4 112:17 117:4,9 131:11,14
133:23 147:10,18 149:14
**people's** 39:6
**percent** 87:17 102:22 103:6 105:12
126:2 140:3,3
**percentage** 126:1 140:6
**perform** 129:8,12,13 146:10
**performed** 126:22
**period** 9:12 19:6 30:17,25 96:14
103:22 116:22,23 120:7
**periods** 15:14 23:13
**permitted** 12:18 160:22

**perplexed** 148:4
**person** 4:4,5,6,6 8:1 10:24 13:21
13:21 15:8 16:25 17:17 18:22,22
20:2,6 21:5 25:1 27:17 30:3,4
31:10,12,16,23 32:6 33:22 34:13
34:14,17 35:5,14,14,15,20 37:18
37:22 40:4 50:2 60:8 62:1 71:5,7
72:1,3 73:8,15,16,18 78:12
95:20 98:7 103:3 108:1,4 122:22
122:23 126:2,3 127:1 131:22
145:22
**personal** 13:17 14:1 140:13,14
141:16 142:3 144:11,16 145:2,5
145:7,9,15,16,20
**personally** 40:22
**persons** 25:15 31:20 87:3
**person's** 71:4
**persuasive** 156:9
**pertinent** 156:22
**phase** 14:16 17:7,21 20:16 21:6,7
23:24 24:7 18,20,24,25 25:1,3,9
30:18 35:25 38:20 58:1
**phases** 19:24 20:5 22:5 23:3 24:6
70:6
**phone** 50:13,25 51:21 68:3,14,25
71:5 131:6 135:16 139:10,12,13
141:7,9,12
**PHP** 35:7,16,17 36:10 38:12,22,25
39:3,15,19 41:1 103:20
**PHPs** 58:7
**physical** 15:12 31:2 40:15
**physically** 18:18
**physician** 28:3
**pick** 51:3 103:8 112:11,13 119:1,7
131:18 132:9,10
**picked** 10:23 112:6 119:24 132:16
**picking** 120:11 132:18 139:23
**pick-ups** 139:21,22
**picture** 49:4,5,20
**piles** 77:1,3
**pioneers** 11:2
**place** 44:2 104:18 118:4,19 148:8
148:17 151:10 154:11 160:19
**placed** 87:15 140:6
**places** 60:25 80:2
**plainer** 142:14
**plainly** 153:12 154:19
**Plaintiff** 1:5
**plan** 31:14,15,15,19,21 32:8
**planning** 129:19 139:20 150:15
**played** 50:22
**plea** 46:2,12,13 47:1,11
**plead** 144:17
**please** 3:5 5:1,4,9,22 6:1 7:19
14:12 15:24 42:21,23 43:1,6,18
43:24 46:9 62:23 64:10 72:4,4,4
82:16 143:1 159:22 160:20
**pleasure** 19:7
**plethora** 148:25 152:17
**plopped** 75:12
**plus** 74:13
**point** 15:22,23 20:7 30:19,22 63:9
66:22 73:13 78:21 84:6,8 85:11
85:12 95:24 98:10 101:11,13
104:20 109:1 119:21 120:13
123:12 131:20 136:15 137:24
139:17 142:7 143:6 152:14
155:13,14 157:22,25 158:3
**pointing** 137:23
**points** 84:3,3
**portion** 36:3
**posed** 143:15
**poses** 13:1
**position** 44:15 55:2 148:18
**possibility** 150:6
**possible** 30:15 71:14 137:20
**possibly** 36:19
**Potent** 3:11 1
**potent** 29:17
**potential** 46:25 47:3 57:6 80:12
**PR** 129:2,5,7,12,12,13 130:2
**practical** 37:10
**practice** 10:14,16 27:5 159:4
**precisely** 152:16
**predicate** 87:5 92:23 94:9,17,20
95:18 97:7,8 98:5 126:14,24
149:23 155:20 156:15 158:14
**prejudging** 147:22
**prejudicial** 143:22 152:15 153:5,6
154:18 155:23 158:15

**preparing** 41:25 157:9
**prescribed** 37:16 38:2 39:14 40:20
**prescription** 104:4,11
**prescriptions** 59:10 62:4 104:3,9
**presence** 147:21 155:19 156:7
158:10 160:1
**present** 79:1,23 142:20 149:24
150:4,10 154:18 155:18 156:16
156:21 157:24,25,25
**presented** 154:23 156:14
**presenting** 150:4
**President** 87:5
**presiding** 3:4
**pressure** 16:24 17:5 57:21 100:17
**prestigious** 10:5
**presume** 157:23
**presuming** 148:10
**pretty** 50:15 56:17,25 59:17 107:20
**prevent** 9:5,16 24:3,25 26:2,16
28:3
**prevents** 16:15
**previous** 144:21
**previously** 11:16 49:1 83:2 88:13
101:24 114:21 136:20 152:18
**pre-trial** 151:16
**primary** 38:13
**print** 70:20,22 74:4
**printed** 74:19
**prior** 50:20 138:15 153:23 154:3
155:3
**priority** 13:19,24 14:5
**private** 13:17 157:7,15
**prize** 10:23
**pro** 143:7
**probably** 23:9 33:3 35:1 36:14 41:7
75:16 107:21 109:11 119:17,18
**probative** 144:11 152:15 153:6
155:24 156:11,13 158:14
**problem** 40:1,3,9 97:8 103:12,23
110:11 145:6 150:5
**problems** 22:24:14,16 26:21
31:18 33:23,23 35:25 39:24 40:1
40:5 102:25
**procedure** 12:19 64:24 122:24
**procedures** 121:18 128:1 134:4,5
**proceed** 157:19
**proceeded** 78:12
**proceeding** 151:8
**proceedings** 1:10 147:12 162:5,9
**proceeds** 146:10
**process** 112:7 125:17
**profanity** 3:11
**professional** 6:2,3 44:21
**professor** 7:5,18
**proffered** 155:10
**profit** 36:17 38:17
**profiting** 32:18
**program** 6:17,18 7:6,24 8:9 12:23
19:24 25:13,17,19 26:5,7,7 27:4
27:12,22 28:5,8,15 29:4,21,25
30:12,23 31:22 32:3,9,23 33:19
34:24 35:7 36:10,24 37:12,13,15
38:7 39:14 57:8,10 58:19 59:2
65:3,11 67:16 71:6,7 80:17,18
103:17,19,20 105:16 134:11
138:4,7 139:4
**programs** 11:3 14:13,14 15:25
37:2,11 103:1
**progress** 29:24
**progression** 37:25 63:12
**prominent** 14:3 17:21
**promises** 47:24
**promote** 58:24
**Promoters** 80:11
**promotions** 22:13 45:5 54:4,13
80:19 82:21
**proper** 36:7 156:14,15 158:9,13
**properly** 25:5 155:22
**propose** 159:18
**prosecutor** 157:5
**protection** 8:16
**prove** 60:21
**provide** 5:14 97:19
**providing** 111:21 126:12
**province** 155:2
**provoked** 148:2
**psych** 57:12
**psychiatric** 6:4,16 7:12,22,23 8:22
9:19,20 10:1,8,10,13,22 12:21
25:20 38:12,13 57:11 58:10

psychiatrist 6:5 7:17 29:1 34:6 35:19 58:14
Psychiatrists 10:3
psychiatry 6:7,17,18,22,23 7:1,25 10:1,24
psychotherapist 26:19
psychotherapy 23:22
public 129:6,7
publish 49:15 83:17 89:10 102:11 137:9
published 8:7 9:19 85:7
Publishing 44:5
punctual 158:21
purpose 14:13 38:6 118:4 149:8,9 156:2 158:16,17
purse 76:2 78:10 122:9 124:12
pursue 148:5,9
pursued 149:17
put 4:2 11:7 15:3,3,21 23:8,13 25:3 28:4 31:15 43:16 74:21 77:1 89:17 96:3 103:25 109:18 120:20 124:12 139:6,8,14,16 140:2 148:18 153:10
puts 31:19 140:1
putting 27:3 74:23
p.m 82:15 159:21 161:21 162:5

**Q**

quality 10:17,19,20
question 9:7 45:21 56:18 90:25 95:23 101:10 108:18 115:9 121:12 130:15 131:1 142:25 143:15,19,22 144:20 152:10,11 153:9,17 154:22 155:5,6,22 157:20 159:24
questionable 148:2
questioned 129:4
questioning 43:14 44:25 148:10 154:21
questions 12:25 13:1 41:7 42:13 101:7 144:21 154:19
quickly 15:15 16:25
quite 7:3 146:19 154:9
quote 15:2

**R**

R 162:7
radio 81:11
raise 5:4 14:10 122:18,19
ran 75:10,21
random 8:3
range 7:8
rapidly 25:10
rare 40:17
rate 74:9 94:16 125:24,25
rates 35:12 74:9,10,12
reach 150:21
react 60:12
reacted 55:5
reaction 22:17,20
read 56:2,7,9 69:5 73:2 81:12 107:19 143:16,17,18 144:21 155:6 161:1
reading 58:5,6
ready 16:24 31:8,9 35:20 51:16 70:18 103:24
reality 64:19
realized 8:12 23:9 52:14,18 59:25 62:7
really 6:18 15:2 16:13 17:19 18:22 19:8,14 20:9,17 21:1 23:25 25:22 34:21,25 38:17,20 42:6 51:18 53:17 54:11 58:12 59:1 64:8,8 68:5,13 76:20 90:7 98:24 99:16 103:4 109:3,19,20 135:8 135:10 136:10,12 140:2,15 149:11
reason 14:24 33:18 65:4 69:7 79:5 86:21 97:18 106:15 117:23 124:23 135:24 140:4 149:19 152:3 158:22
reasonable 13:4 80:24 159:2 160:8
reasons 15:22 36:6 60:17 63:25 64:11 82:6 86:21,22 87:2 142:18
recall 79:22 80:3 82:22 85:3 92:8,9 93:15 94:22 109:6 110:7,17,21 113:1 114:14 115:8 118:9 122:5 131:14 134:23 138:14 140:6
recalling 109:5

receive 8:2 25:5 26:18 30:20 35:23 47:5 68:3 118:14 143:23 153:14
received 2:11 9:25 10:2,5,11 12:4 46:22 49:14 68:3,24 69:20,22 83:15 89:9 102:10 115:24 137:8 151:20
receiving 63:2,3 106:16 107:4 131:17
receptionist 44:1,3
recess 42:18 81:4,6 82:13,14 158:23 160:8
recessed 162:5
recesses 159:11
Recognition 10:6
recognize 11:18 18:20,20 46:10 49:2,5 83:3 88:15 101:25 114:23 136:22
recollection 13:18
recommendations 27:21
reconciliation 134:23,25
record 43:7 142:9 147:7 155:13 158:4 159:16,17
records 27:13 28:7
recovered 25:22
recovery 31:6 104:22
recruit 100:14
recruiters 93:13,13
recruiting 61:12,14 70:5 87:20
recruits 61:19
recycling 137:19
red 153:10
reduce 9:14 30:14
reduced 8:8
Reducing 31:18 137:14
refer 13:17 44:24 50:7,17 56:15,17 60:7 80:17 90:7 91:25 92:3 106:8,12,14
referral 60:6 71:8 72:2 73:8,13,17 87:23 94:14,23 100:25 101:5,16 102:3,17 108:6,7 136:12
referrals 67:24 71:12
referred 3:11 58:14 59:2 71:6,7 86:25 90:17 92:14 99:7 102:21 105:16 106:6,9 108:1,4
referring 59:3 87:22 91:24 100:11 105:13 109:17 137:24 144:7
reflect 111:1
reflected 65:11 67:3 141:3
refresh 13:18
refuse 36:6
regarding 129:15
regards 154:1
Regions 132:17
regressing 15:17
regular 20:19 22:7,24 23:2,21 64:24 65:1,2,5 89:2
regularly 22:16
rehabilitation 15:16 38:25
reimbursed 87:15
rejected 22:11
relapse 9:4,5,7,8,11,13,15,16,17 26:3
relapsed 9:10
relapses 24:3
relapsing 27:8
related 33:6
relations 64:1 129:6,7 146:22
relationship 48:3 50:20 141:18 142:4 144:16,22 145:2,5,8,9,15 145:16,20 147:8 153:21 155:8
relationships 150:16 151:18
relative 129:18
relay 92:23
relevance 9:21 144:1
relevancy 144:9,15 145:4,24 151:1
relevant 9:24 10:9 143:25 144:3,4 144:6 152:14 154:12 156:22 157:15 158:13,17
rely 13:23
remain 15:5,6 81:15
remarks 142:21
remember 15:1 18:9 19:2 36:12,16 43:15 49:7 56:24,25 57:2 66:10 66:24 75:7 76:11 78:3,13 79:3,4 79:6 81:5 96:4,4,5 98:19,25 99:15,21 104:14,21 105:19 107:3,7 109:8 110:13 112:16 114:15,16 118:17 120:16 122:12 123:6 124:5 129:14,16 130:20 130:24 153:24

remembering 13:22 116:14
remind 135:15 160:13,17
reminding 88:18
renders 143:23
renew 12:10
rep 44:7,16
repeating 156:9
reply 66:16 153:18
report 65:8 72:19 125:5 134:25
REPORTED 1:21
Reporter 1:22 162:13
Reporter's 2:9
represent 41:12
represented 116:21 148:22
reps 54:3,3,9
request 143:8,9
requested 143:18
require 9:10 35:25
required 93:11 152:19
requirement 58:17
requirements 56:6 57:9
research 6:12,20 7:5,20 9:25 10:2 10:3,6,11,23,25
reserve 142:12
residence 8:15
residency 6:4
residents 7:12 57:7,9 87:24 88:1
resolve 159:20
resource 54:7
respect 53:21 88:2 89:2 95:11 147:1 152:8 153:20
respective 158:19 159:1
respond 37:1 68:24,25 69:1,20 88:22 90:11 95:22 139:19 153:16,19
responded 66:19
response 66:10 68:12 70:1 90:2,9 92:9 97:16,23 100:6 110:24 152:5
responsibilities 44:11 53:12,20 55:12
responsibility 29:1
responsible 23:11 28:16,19 55:17 72:13
rest 144:3
restaurant 18:9 133:8,12,18,21
restrictions 62:24
restrictive 11:10
results 8:5
resume 82:2
retail 43:25
retained 41:13
retrieve 83:16
return 93:11
returning 93:12
returns 4:24 42:22 82:17 146:10 159:21
review 87:15 139:6,9,16,25 140:1,2 140:8,13 150:10
reviewed 108:10,13
reviewing 41:24 76:14,15
reward 10:7
re-evaluate 32:19
rice 135:21
right 3:17 5:4 8:14 29:10,13,13 44:22 49:21 61:8,18 66:5 72:7 75:12,16 77:8 81:3,23,25 86:4 89:15 91:23 92:11 96:18,22 102:23 114:7 115:20 116:19 120:1 121:1,21 131:1 137:25 138:12 140:9 142:23 144:2 145:14 147:6 149:5 155:4 157:13,14 158:3 161:22
rise 3:2 42:20
road 146:1
Robin 121 143:16,17 144:21 162:12,13
robin_dispenzieri@flsd.uscourt... 162:15
robin_dispenzier@flsd.uscourt... 1:24
Rochester 7:4
Rodriguez 118:22
room 13:20 16:9 20:16,17 21:20 23:20 51:14 143:5 150:10,12 154:15 160:3
round 67:10 75:9
rounds 29:7 109:14
route 148:5
RPR 1:21 162:12

RPR-CP 162:13
rule 3:15 4:3 88:6 144:8,10 151:9 152:19
ruled 150:19
rules 12:19 14:9 148:14 150:20 158:7
ruling 142:21 150:17 155:23 157:18 158:3,11,11,12 159:19 161:25
rulings 148:2
run 61:10 65:15 78:2 122:8
running 133:23 147:18
rush 75:11,11

**S**

S 162:12
Sabrina 131:20
sad 17:8,19 18:24 19:7
safe 135:22
safety 8:16
sake 32:20
salary 52:4,7,23 53:7 115:14
sales 44:6,16 51:25 53:14 54:3,12 58:23 59:17 85:2
Salle 43:19
sanctions 4:10
sandwich 135:22,25
sandwiches 135:17
Sanford 10:6
satellite 117:6
Saulino's 151:21
Savantes 119:3
save 136:1,5 137:21,22
saw 38:1 85:24 103:14 122:12 127:5
saying 20:24 21:4,15 26:12 29:17 61:1 62:15 67:7 68:6 75:11,21 92:22 101:8 139:15 156:6
says 33:2 74:6 90:3,7 127:9
scan 18:6
Scarlett 153:10
scene 160:22
schedules 134:6
scheduling 103:2
scheme 90:20 144:23 149:2 152:4
schizophrenia 10:2,4,12,15 16:2,4 16:6,18 20:14 21:18
schizophrenic 20:14 24:5 39:25 40:13,18
School 43:19
screen 89:17 102:17
screening 100:21
seated 3:5 4:25 42:23 43:6 159:22 93:17
second 28:2 52:12 54:17 88:21 93:17
secret 59:25 60:3,9
secrets 145:16,17,21 146:23 147:9 153:2
Section 1:15
security 82:6 90:6
see 18:7 19:25 22:23 24:10,11 25:1 25:9 26:6,15,25 27:11,13,16 28:6,9 29:2 30:8 32:11,13,17,25 34:7,19 35:8 46:15 47:21 56:4 57:5,7 60:19 70:9 76:22 77:6,22 81:13 83:20,21,22 84:2,6 93:23 97:24 102:15 107:5 108:5 109:14,16 116:16 120:25 122:11 127:9 131:8 135:2 137:2 145:6 150:24 161:15,17
seeing 7:14 9:14 57:2 66:12 118:17
seeking 151:16 154:17
seeks 13:1
seen 66:11,17,19 104:11 111:4 149:11
self 17:10
sell 98:2
send 60:15,19 67:5,6 69:2,23 88:1 101:5 105:7,24
sending 93:21 104:25 105:4
SENIOR 1:11
sense 29:9 65:12 142:23 153:3
sent 57:6 68:11
sentence 46:25 47:3,7 138:3 147:4 147:6
sentencing 47:23
separate 131:19 152:24,24
separated 15:7

separately 35:14 158:25
serious 14:15 17:22,25 22:24 23:6 30:1 38:19 57:22,25 147:17 159:16 160:6
seriously 37:2 70:10
served 6:5
server 70:19 71:20 106:21
service 6:13,14 100:15
services 7:8,22 12:7 23:15,17 54:5 58:25 60:18 126:12 127:12,14 127:24 146:11
session 3:1,4 33:1 34:8 82:15
sessions 85:4 154:11
set 30:25
setting 27:15 33:20
seventeen 50:21
severe 8:13,17 17:23,25 18:19 20:9,11 21:11,24 30:16 70:5
severity 19:16 20:21 21:4,16
share 33:24,24 79:19
sharing 33:16,20,22
sheet 58:11 74:18,21 100:23 102:17 121:23,25 122:11
sheets 74:17,24 76:25 77:18 101:16
shift 8:9
shopping 76:3,4,18 128:13,18,20 128:22
short 6:21 82:23
shorter 8:24
shorthand 160:2
shortly 51:21 138:15
shouldn't 33:14 157:5
show 3:15 4:4 116:1
showed 9:11
showing 3:15
shown 115:22
Shula's 113:7
shut 123:11
sick 21:2 23:18,19 25:23 26:2 28:13 31:2
sicker 22:10 25:11 28:10,12
side 3:17 32:13 75:16 98:4 121:1
sign 56:7 122:7,10
signature 46:15
signatures 121:25
significant 28:6
signing 76:14,15 122:21,21,23
silently 110:12
silly 160:21
similar 6:24 151:6
similarly 154:20
simple 16:13 35:6 90:14 97:15 107:17 146:19 159:19
simply 91:17 147:7 153:12 154:19
SINGER 1:14 3:9,21,24
sir 42:14 58:4
sister 86:9
sit 4:15 75:23
sitting 4:14 33:15 75:19 160:3,5,9
situated 75:14
situation 18:24 40:7 81:10
six 7:11 27:25 30:25 31:4 35:9 44:3 103:21
six-week 22:25 23:1
size 33:8 75:13
slander 149:6
sleep 8:10 17:3,4 21:2 39:10,12,14 39:18,23,23,25 40:1,3,4,5,6,7,11 40:12,15,20,25 50:6,9 86:6,8,11 96:20 97:20 99:9 100:19,22 102:3 103:3 111:15
sleeping 19:10
sleeps 103:4
slept 146:24 153:2,3
slight 156:24
slightly 138:2 157:12
small 3:9
smearing 158:16
smelled 57:1
smoking 39:7,7
smooth 9:1
snore 40:8 101:13,13 104:16
snores 100:17
social 37:3 90:5
socializations 37:11
socialize 37:4
society 15:4,5 27:9
society's 15:23
softball 50:22,23

solemnly 5:5 43:2
somebody 15:12 16:11,13 17:4 18:9 20:16 21:22 22:1,11,11 26:21 29:16 34:14 36:18 55:23 60:10 78:1 98:6,7 100:17 127:3 143:4 149:25 151:7
somebody's 92:24
somewhat 8:6 35:4
sorry 75:11,12,12,21,22,22 96:8 105:22 113:8 121:24 128:18 134:21 148:1
sort 13:24 22:6 57:16 150:2 157:10
sorts 31:6
Sosa 114:14 116:8
sound 27:5
sounds 160:21
source 71:8 72:2 73:8,14,17 101:5 108:6,7
sources 60:6 64:9 77:11 80:12 87:23 94:14,23 136:12
Southern 1:1 3:3
so-and-so 135:15
speak 5:23 43:15 91:1 99:11 121:24 151:15
speaker 139:14 145:21
speaking 36:19 87:4 107:12
speaks 87:3
specific 29:18 58:9 66:11 75:6 92:9 94:22 99:18 108:25 109:5 123:7 144:6 155:4,5
specifically 73:17,19,20 80:3 93:4 104:19 128:2 136:9 153:5,24
specify 54:22 94:24
spectators 81:16
spell 5:10 43:7,12
spending 7:9 27:9
spent 6:17 42:4 150:11
spoke 50:14 57:4 71:24 88:23 92:24 96:10,12 156:4
spoken 90:15
spontaneous 33:16,19
sporadically 125:19
spouse 18:19 161:3
spread 76:22,24
stable 20:15 21:6,10 23:24 24:11 24:18 25:10 30:18 37:3 38:20
stacks 77:19 79:5
staff 8:10 48:16 53:19 54:15,19 69:11 139:3
staffing 134:16
stage 36:18,23 119:12
stages 18:18
stand 81:20
standard 32:25 92:15 93:4,18
start 22:10 24:7 26:12 45:2 51:20 53:15 56:8 62:15,15 87:21 89:13 95:4,5 96:2 99:19 101:15 114:13 119:15
started 6:3 9:5 44:3 51:9 55:22 57:7 58:16,19 62:8 63:14 65:13 66:12 90:9 91:24 105:13 107:4 123:16 133:18 139:20
starting 105:23 111:22
state 5:9 6:15 7:23 10:5 23:8,13 31:20 43:6
stated 12:13 150:17 156:2
statement 31:8 85:6,9 92:25 143:12 162:1
statements 3:18 108:25 151:9 156:7
States 1:1,4,11,22 3:2 5:3 12:1,6 162:14
status 31:12 147:7 158:3
stay 6:21 8:24,24 15:4,14 22:3 23:8 25:20 28:4 34:23 52:22,22,22 53:5 73:2 79:8,14,15
stayed 8:25
Ste 1:23 162:14
steam 16:23
step 21:25 25:23 42:14 82:12 144:5
stepping 18:25 148:16
steps 27:7
stigma 4:8
stipulation 151:17
stood 65:9 110:12
stop 87:13
stopped 111:18 120:13 122:24 123:1,7,8
stops 20:9 147:11

store 111:24,25 112:5,8,10,15 113:2,10,14,16,18 114:3,25 115:2 116:3 118:24 119:5,9,16 119:22,25 122:8,25 123:2,9,10 146:6
straight 16:19 95:10
strange 16:12
stranger 145:11 156:10
street 21:21
stress 20:8
strike 130:14,25 142:15
strong 154:24
stuck 103:15
studies 9:18 39:11,12,23 86:11 97:21
study 7:24 8:3,12,19 9:5,11,14 39:14,18 40:11,20,25 100:19,22 102:3 103:3
stuff 44:12 48:8 51:4 57:21 60:17 61:8,12 62:15 75:1,10,18 79:11 100:5 104:16 135:1,21 137:19 140:12 141:16 147:25 160:20,24
stuffing 78:14
stupid 56:18
subject 89:24 96:24 137:13 149:21
submit 143:21
subsequently 142:7
substance 38:11 19,21,25 95:19
substances 38:15,16
success 59:21 60:1,3,9
successful 9:17 58:19 59:1,24
sudden 9:9
suffer 12:8
sufficient 60:18
suggest 156:17
suggested 34:16 50:25 157:9
suggesting 13:5 151:2
suggestion 156:17,24
suicidal 17:12
summary 110:2
summer 96:5
supervise 80:19
supervising 7:12
supervision 56:12
supervisor 80:7
support 8:10 14:20
supportive 24:14
suppose 133:9 148:8 160:18
supposed 83:9 88:4 126:20
sure 25:4,12 29:13 36:7 42:6 54:17 55:18 72:5 99:3 105:15 107:9 128:2 134:4 137:17 146:5 147:10 150:23,23 157:11,13 159:15
surely 60:14
surprise 35:8 39:3,9
suspicious 122:18
sustain 85:13 94:11,18 108:16 142:6
sustained 79:17 85:21 86:24 87:5 87:10 91:11 94:8,19 95:19,21 118:2 126:15 155:14 157:21 158:4,11 159:23
swear 5:5 43:1,2
switched 140:7
switching 36:8 39:10
SWORN 5:16 43:9
syllogistically 152:22
symptomatically 28:24
symptoms 17:12 20:4,6,12,21 21:16,18 22:10 27:19 28:16 29:18 30:14,15 37:19,22 40:2
synopsis 6:1
system 23:5 25:14 36:5
systematic 9:11

| T |
|---|

T 162:7,7
table 2:1 75:9,15 76:24
tactics 34:3
tail 120:17
tainted 153:13
take 13:2,11,11,15,15,16,21,23 14:3,4,5 20:10 24:4 42:17 46:10 47:16,22 56:20 63:24 64:10 65:21,23 81:4,9 95:14 97:4 112:9 113:5 114:22 119:25 120:1 122:8 128:20 131:15 141:12 144:5 158:22 160:1,5,9

161:11
taken 49:7 161:13
takes 32:15,17
tale 15:12 16:7,25,25 21:11 26:7,9 26:21 28:25 34:3,14 51:10 57:3 57:6 64:21 65:18,24 75:18,19 81:6,21,21,24,25 82:10 91:13 96:10,17 97:10 98:5 104:12,13 108:21 135:6,9 138:21 141:14 144:1 151:11 158:25 159:15 160:13,14
talked 9:18 20:4 28:11 34:14,22 36:8 38:14 66:22 97:12 111:20 132:22,23 146:22
talking 20:23,24 21:12 24:13 29:5 37:11 51:9 57:2 62:15 65:13 70:8 77:18 80:5 91:9 92:22 95:25 101:2 102:17 109:6 146:21 149:2,3,4 155:18,18 159:1
tallied 55:18 105:14
tally 71:13,14 74:20
tangents 148:1
target 32:7 67:17
targets 31:17
taught 58:9
taxes 64:14 140:17,19,21,21,24
tea 160:3
teach 31:25 55:23 56:1 58:3
teaching 6:20
team 28:21,25 29:7,20,23 30:11 31:13,19 35:18
Technical 43:22
technically 141:3
technology 141:5 160:17
television 81:11 161:2
tell 4:6 12:15 31:3 34:25 36:15 38:3 42:6 46:10 60:10 62:13,17 65:20 68:8,15 70:9 85:24 95:16 100:8 104:14,15 105:4,7 108:24 110:3 114:23 122:14,16,25 123:1,8 127:2,3 130:21,23 140:18,23 141:8,23 148:10 151:25 161:4
teller 124:21,22
tellers 124:5 129:18
telling 141:16 157:3,4 160:18
tells 31:4 71:3
ten 33:3,8 79:12 117:5 158:23
tens 124:25
term 19:1 61:4,7
terms 11:12 26:22 27:8,13 28:7 63:13 67:13 151:8 152:18
terrible 20:24 22:4
terribly 22:2
test 65:21,23,25 93:8
testified 50:3 127:23
testify 41:13
testifying 42:2 47:19
testimony 5:5 9:21,24 13:5,23 14:9 41:25 42:11 43:3 81:20,23 82:1 82:2,10 127:6 138:11 149:5 150:8,9
testing 93:23
text 143:18
thank 3:5 4:25 5:2,12 12:5 41:3 42:13,14,18,23 43:17 46:23 58:25 81:13 82:12 83:16 92:12 93:2 97:1 98:3 108:19 110:19 114:19 115:23 137:9 143:9 159:22 160:12 161:8
thanking 84:9,17
that's 4:15 7:18 14:2 17:20 22:20 22:22 27:5 34:17 36:5 41:8 46:13 56:17 58:11 59:17 61:23 65:23 70:23 73:16 81:25 90:7 96:24,24 106:8 108:17 110:16 125:15 140:6,25 142:2 145:6 146:24 147:24 150:23,24 155:11 155:24 157:3 159:15 160:1
Therapeutic 48:4,10,12,15 49:23 50:5,7 53:16 54:6,15 55:2,8,10 55:12,23 63:4,5 67:14 70:11 80:20 83:3 88:6 110 126:12 133:24 136:4
therapists 34:8 84:23,24
therapy 24:13,13,14 25:7 26:24 30:9 31:10 32:15,17,22,24 33:1 33:3 34:8 37:7 44:2,10 64:16
thing 21:9 22:16 33:21 38:25 53:23 58:10 65:8 68:11 87:22 131:19

149:19 150:2 152:23 158:1
160:23

**things** 16:12,17 20:11,25 24:18,20
25:11 26:22 27:3 29:10 31:9,24
31:24 32:20 34:4 37:9 38:4 58:7
61:10 101:1 145:8,10 147:22

**think** 9:10 15:11 16:19 17:2,7,13
20:2 21:14 22:8,15 27:5 29:6
31:5,19 32:6,15,19 33:8 34:4
39:5 43:21 56:7 72:12 81:8 99:2
99:22 102:22 103:3 105:20
107:21 114:16 128:4 137:23
142:23 144:7 155:6 156:5
158:22 159:19 160:24

**thinking** 16:18 22:16 92:25,25 98:7
142:13,17 156:4

**third** 160:3

**thirty** 159:11

**thought** 10:24 18:13 51:2 52:3
56:18 60:13 149:10,25 157:10

**thousands** 40:23

**three** 22:25 31:8 41:7 52:1,8 69:15
74:7 103:22 112:12,24 114:8
120:9 146:3 148:22

**threw** 78:10

**time** 8:25 11:25 12:6 15:14 20:2,23
21:10 22:15 23:2,13 30:17,25
31:12 32:16,17,21 37:25 41:17
41:19,24 42:2 46:17 48:9 49:9
51:18 52:2,12,24 55:1,12,15,24
56:21 57:3,5 58:16,22 59:23
60:7,22 61:18,22 64:10 67:2,20
76:1 77:8 78:3,16 79:5 80:21,24
81:1 83:11 89:4 93:17 95:4,20
96:3,14 99:22 103:8,22 104:12
109:5,17 113:1,16,17 115:16
119:9,15 120:7,18 123:25 136:8
137:4 138:15 142:9 144:1,5,14
148:6,7 151:3,10 152:25 155:16
157:2 158:1,24 159:2,15 160:12
162:3,4

**times** 19:2 20:18 40:10 56:15 59:9
59:19 65:7,15 66:3 71:24 73:20
73:21 77:10,11,24 78:13 79:3,8
79:10,22,25 80:4 82:5 93:9
94:22,24 109:4 112:6,25 114:6,8
122:5 125:8,9,11 129:17 154:12

**timing** 159:14

**Tipton** 118:10,20

**title** 45:5 80:10

**today** 9:21,24 37:21 41:13 43:14
47:19 81:4 86:19 111:21

**told** 25:2 36:13 47:17,22 48:5 50:4
50:14 54:10 58:13 60:11 61:9,23
62:1,3,9 69:8 86:15,22 87:25
91:19,20,24 92:18 94:4 97:16
98:17 100:16 104:5,14 110:11
123:3,3,4 125:7 127:8,14 128:5
128:6,7 139:13 141:9 144:23
145:8,15,17 19,19,20 146:1,14
146:23 147:9 150:13 153:2,3
155:14 157:11,21 158:12

**top** 48:16 78:10 88:21 90:1 120:21
135:14

**topic** 17:1,1 18:16 21:14,14 82:3
86:4

**topics** 58:3 111:20 134:14

**Torres** 114:16

**total** 112:13 128:14,16

**totally** 15:7 142:21

**tour** 54:25

**track** 109:15

**Trader** 44:5,6,6,6,15 51:25 52:4
53:6,10

**train** 53:18 139:3

**trained** 72:5

**training** 56:18 57:15 58:18

**transcript** 144:20

**transcription** 162:9

**transferred** 139:18

**transition** 8:21 9:1 25:24

**transport** 106:6,8,9

**transported** 64:4

**transporting** 74:14 92:4

**treat** 31:16 38:8 40:3 154:17

**treated** 7:8 8:5,13,23 14:25 19:23
25:16,17 38:15

**treating** 34:6 36:1 40:3,17

**treatment** 7:15 9:16 10:14 11:3
12:7,8 14:15,19,23 23:12,21,23
23:25 24:5,17 25:5,12 26:1,22
27:6,7,18 28:25 29:20,23 30:11
30:20 31:13,14,15,18,21,23 32:8
35:13,21,24 38:12,21 39:18
40:14

**treatments** 24:22

**tremendous** 17:5 27:9

**trial** 1:10,13 5:6 143:24 150:21
153:14,22,24 154:3 155:3 157:9
161:3,10

**trials** 149:12

**tried** 34:2

**trip** 138:14 154:14

**trouble** 18:8,16,17 19:10,11 36:13
61:15,24 116:14 147:24

**trouble-shoot** 109:23

**trouble-shooted** 110:10

**true** 60:21 62:5 122:25 152:3
160:23

**truly** 159:5

**trusted** 87:24 93:24

**truth** 5:6,6,7 43:3,4,4 47:17,22

**try** 24:25 32:5,13 36:15 44:18
60:22,24 64:9 67:22 80:17 89:17
94:13 103:25 122:9 124:9
127:20 150:21 156:18 157:17
160:4,4

**trying** 10:20 28:3 39:5 51:22 60:19
93:20,22 98:4 109:16,22 110:8
148:11 159:2,3 160:20

**TUESDAY** 1:7

**turn** 126:6

**turned** 128:5

**turning** 137:16

**turns** 145:14

**twelve** 33:4

**twenties** 124:25

**twenty** 33:10,17 42:5,7

**twice** 101:14 132:11

**two** 6:4,9 7:16 9:25 19:6,18 25:17
31:4,9 35:12 37:20 43:20 53:6
68:11 74:7 76:2 79:6 86:22
102:19,19 112:12,24 114:8
123:24 144:21 147:5,13 153:17

**tying** 150:3

**type** 57:12 100:23

**types** 24:5 62:23 100:14

**typical** 32:22 63:14

**typically** 39:14,18,20 63:24 65:14
72:6 76:2,19 103:3

**T-Med** 130:4,6,7,9,17 131:3,6,7,8

---

**U**

**ultimate** 30:11,13,22 145:2 151:12

**ultimately** 29:1 72:19 148:19

**Um** 76:7 81:5

**unclear** 51:18

**underlying** 37:23

**understand** 3:6 5:21 14:7,8 53:12
53:20 54:22 60:2 148:14 150:17

**understanding** 18:17 19:22 23:5
43:23 47:14,16 54:8 55:1,4,11
55:15,16 61:16,23 69:12 85:17
85:19,21,25 89:14 91:8 120:21
152:5

**understood** 59:23 99:12 100:10
156:6

**unduly** 150:3

**uneven** 77:11 124:24

**Unfortunately** 60:21 84:15 110:17

**uninterrupted** 161:17

**unit** 6:7

**United** 1:1,4,11,22 3:2 5:2 11:25
12:6 162:14

**University** 6:15,21 7:4,17

**unknown** 95:20,20

**unsuccessful** 58:22

**untoward** 4:12

**unusual** 35:11 149:10,13

**upcoming** 67:24

**updating** 72:25

**ups** 17:17

**upset** 20:8 22:9,10,14 100:4
122:12,14 140:16,18

**use** 13:17 14:1 24:6,8 72:7 91:2
94:13 100:24 122:24 124:16
151:20

**useful** 33:10,12 34:19

**uses** 38:5

**usual** 110:22 22:40:19 75:10
97:8

**usually** 9:11 16:1,7,23 18:3,22
19:10 20:7 23:2 24:9 25:21
28:21 30:18 35:18,24 40:4,7
149:23

**U.S** 1:14

---

**V**

**vacations** 134:7

**vague** 21:22

**Valdez** 50:1 78:25 80:6,14 90:19
90:21 131:22

**Valera** 48:15,19 123:19

**value** 144:11 152:15 153:5,7
155:24 156:11,13 158:14

**valve** 103:8

**van** 103:8

**vans** 64:5 131:16,17

**variety** 26:22 36:6

**various** 18:21 23:3,5 24:5,6 25:6
34:3 40:10 111:22

**vary** 32:19

**Vega** 131:15

**Vernon** 6:7

**version** 49:18

**versus** 139:24 144:11

**Victor** 118:22

**view** 15:22,23 129:6

**viewpoint** 157:12

**visit** 44:18 56:25 109:16,19,19

**visiting** 59:8

**visitors** 3:10

**visits** 56:24

**visually** 133:25

**vitae** 11:19

**VIU** 129:2,5,12,13 130:2

**vocational** 7:18 43:21 57:19

**voice** 20:22

**voices** 16:8,8 20:15 26:13

**volume** 105:10,14

**volunteer** 7:17,17

**vs** 1:6

---

**W**

**Wacovia** 123:22 125:16

**wait** 32:11 74:2,3 132:22 143:4

**waited** 51:6 78:5,7

**waiter** 18:10,12

**waiting** 3:10,12 51:6

**wake** 40:8

**wakes** 21:2

**walk** 21:19,20 81:10 124:10

**walked** 75:8,11 76:11

**want** 4:3,10 13:14,15 14:3,4 18:10
18:12 19:13 26:15,16,19 27:23
29:12 30:2,7,18 31:25 32:5
33:18 36:6,7 63:25 65:6,16,24
75:23 79:13,15 92:22 97:7,17
103:6 127:8 149:1 150:4 151:15
156:18 158:25 161:24

**wanted** 6:9 51:18 52:13 53:2,3,17
57:5 63:25 81:21 91:3,4 92:19
97:17 100:12 108:14,15

**wanting** 14:24 29:16 136:16

**wants** 16:11 147:11,15

**war** 58:8

**warm** 135:17 136:8,10,13

**warn** 33:21,24

**warned** 61:9

**warning** 141:17

**Washington** 1:16

**wasn't** 58:9,16,20 59:1 60:18 61:25
61:25 68:17 78:21 80:3 97:16
98:24 99:16 100:4 112:12 136:4
140:8 141:3 145:12 157:13

**watch** 21:25 25:11 81:12 161:2,4

**watches** 62:22

**watching** 21:21 103:5

**water** 5:14,22 43:16 121:21 137:19

**waters** 93:23

**Wax** 11:18,19 2:6 4:18,21 12:2,10
36:19 41:6,10,11 42:13 46:19
49:11 79:16 83:13 85:5,7,20
86:23 89:6 91:10 92:20 94:7,17
95:18 101:10 102:8 105:2
108:15 109:25 115:18 118:1

**way** 13:25 14:22 15:16 19:20 21:17
27:14 28:2 31:7 33:13 34:1 37:5
39:6,12 40:5 52:14,14,15,21
55:5 60:14,14,24 68:25 69:2
76:21 96:2 104:1,10 107:5
127:20 138:19 139:2,4 140:10
141:14 142:24 146:19 150:4,20
152:21 156:18 157:2

**ways** 25:18 33:21 37:7 60:20
136:25

**weather** 7:9

**wedding** 129:19

**week** 25:22 32:11,20 52:8 67:20
96:15,17 112:19

**weekend** 84:11,16 85:4,18

**weeks** 9:12 19:7,19 30:25 31:4,4,8
31:9 35:2 53:6 84:10 97:11
99:20 103:21

**weigh** 13:3

**weighing** 57:21 152:19

**weight** 19:12

**went** 6:6 7:3 25:10 43:25 44:5 51:1
53:5 70:17 95:10 96:17 103:8
104:2,12 112:6 113:1,9,13,16,18
113:19 119:9 123:22,24 124:13
125:9,13 129:16,22,23 134:7
138:18 152:4 154:2

**weren't** 61:21 93:21 103:8 109:13
140:5

**West** 57:1

**What's** 68:6 76:11

**whichever** 104:1

**white** 74:25

**whore** 154:1

**wife** 7:10 147:1

**Wilkie** 1:23

**willing** 154:22

**window** 114:2,5 124:21,22

**wish** 115:22 148:1 153:16,18,19

**withdraw** 154:22 155:11

**withdrawn** 157:20

**withhold** 67:5

**witness** 4:7,12 5:1,8,11,13,16
11:13 13:3 42:16 43:1,5,8,9 46:5
48:23 63:17 81:19,19 82:11,24
88:10 91:23 96:8 101:11,21
110:5,8,13,17 114:17 118:6
121:13 127:4,7,11,14,17,19
130:13 136:17 143:3,5,15 145:7
146:2 147:8 154:24

**witnesses** 2:2 4:2 5:25 12:14,15,18
85:10 86:1 161:10

**wives** 50:23

**woman** 146:1

**won** 9:24

**wonderful** 21:13

**wondering** 160:3

**won't** 4:11

**word** 67:12 149:1 150:5 151:23,24

**words** 6:13 8:1 10:18 11:11 16:22
17:4 20:11 28:10 34:17 36:3
71:1 110:14,15 151:21 153:24
155:7,9

**work** 7:5,11,12,14 9:3,7 11:7 13:25
34:5 43:23 44:1,5 45:2,7 48:2
50:12,16 51:16,22 52:1,10 57:15
57:22 61:11 76:13,23 80:6 84:19
93:24,25 111:13 116:25 118:12
125:23 129:12,13 138:24 139:1

**worked** 44:21 50:1 59:20 78:16
82:21 104:23 107:11 112:7
113:21 117:4,9 131:22 141:23

**working** 22:12 28:22 30:9 31:10
32:12,13 35:7 45:9 50:11 51:11
51:20 52:11 61:20 64:2 75:8
76:10 79:9,23,25 80:21 84:11
88:24 90:12 99:23,23 105:13
133:18

**workings** 6:11

**world** 16:14 17:3 21:7

**worried** 16:16 140:15

**worry** 52:25 60:16

**worse** 15:17 24:8 25:2 26:13,20

**Page 172**

**August 16, 2011**

37:8
**worth** 19:15
**worthless** 17:9,19
**wouldn't** 28:13 32:4 61:1,24 62:12
65:25 66:9 67:25 74:4 75:23
97:4 103:7,23 111:5 122:2,3,18
122:19 145:18 146:25 153:3
157:10 160:21
**wow** 76:7 105:12
**write** 64:4,6,12,14 83:5 128:2
**writes** 29:8
**written** 112:17 117:24
**wrong** 63:10 69:5 71:25 72:1,2,3,3
157:14
**wrote** 13:24 83:7 89:1

**X**

**X** 35:8

**Y**

**yeah** 42:8 46:12 55:7 56:23 59:9
63:14 64:10 65:8,12 77:10 79:10
80:3,4,7 101:8 103:2 114:8,24
120:17 123:24 136:1
**year** 22:19 43:20 52:5 117:14
**yearly** 117:13
**years** 6:4,9,17,20 7:9,11,16 11:20
23:9 43:20 44:3,7,9 47:4 50:21
53:15 63:12 111:23 120:1,9
147:4
**yesterday** 3:9 5:24
**Yoisel** 114:14 116:2
**York** 1:15 6:6,7,15 7:23 8:23 10:5
**younger** 18:4 160:17

**$**

**$1,200** 133:2,3
**$100,000** 61:14 63:16
**$15** 74:13
**$150** 92:18,19 93:16 94:3,13,15,23
95:3,12 96:7,20 97:4,17
**$200** 92:16 93:8,12,13,16,19,19
98:14,17 99:5,6,10,12 100:4
**$3,000** 115:15
**$30** 60:8 70:25 74:12,20 93:6
**$300** 41:17 42:7 63:15 94:16 97:17
99:6,10
**$4,900** 125:3,4
**$40** 74:13,13
**$45** 74:13
**$5,000** 125:5
**$50,000** 76:7
**$500** 63:15
**$6,000** 42:9
**$60,000** 53:8,9 76:7
**$65,000** 53:8
**$70,000** 52:5
**$75,000** 52:5
**$80,000** 128:13
**$9,000** 42:10,11

**0**

**03/03/06** 116:17
**08S67** 1:23 162:14
**08-16-2011** 162:12

**1**

**1** 2:14 49:2,10,12,14,19
**1,000** 7:7
**1:00** 81:4,5,14 82:1
**1:09** 82:15
**10** 2:15,17 83:3,11,14,15
**10-20767-CR-JLK** 1:3
**10:30** 41:5
**10:37** 42:19
**10:50** 42:22
**102** 2:17
**115** 2:20
**12** 2:18
**137** 2:21
**14** 2:14,16 88:14 89:5,7,9
**1400** 1:15
**15** 2:15,21 105:16 136:21 137:5,7,8
**16** 1:7
**162** 2:9
**19** 2:17 101:25 102:7,9,10
**1960s** 23:7

**2**

**2** 1:11,19 115:15
**20** 105:16 153:3
**20s** 18:5
**200** 92:5,14 99:7
**2005** 45:3,3 50:11
**2006** 84:1 86:18 96:9,15 119:20
**2007** 109:11 110:5
**2009** 120:17
**2010** 45:12 120:17,18 138:12
**2011** 1:7
**20530** 1:16
**21st** 45:12
**22** 2:19
**24** 2:20
**240** 12:11

**3**

**3:17** 159:21
**3:21** 161:21
**3:30** 162:5
**3:35** 158:18
**30** 74:8 135:13 147:4
**30s** 18:5
**30th** 74:3,4
**305/373-4400** 1:20
**305/523-5659** 1:24 162:15
**33128** 1:24 162:15
**33131** 1:20
**38** 2:18 11:17 12:1,4

**4**

**4** 2:18
**400** 1:23 162:14
**401** 144:10
**403** 144:10 152:20
**41** 2:5
**42J** 2:20 115:17,21,24 120:20
**42K** 114:22 116:1
**42N** 114:22
**43** 2:7,8
**46** 2:19
**49** 2:14

**5**

**5** 2:3,4

**6**

**6** 149:12

**7**

**7** 139:10
**7th** 104:22
**7,000** 149:12
**7:30** 139:11
**70** 128:13
**75** 140:2,3

**8**

**8** 2:21
**8-17-2011** 162:6
**800** 1:19
**83** 2:15
**88** 2:19 46:9,18,20,22
**89** 2:16

**9**

**9** 2:16
**9:00** 1:7 160:12 161:16 162:6
**9:17** 3:8
**9:20** 4:24