UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF FLORIDA

CASE NUMBER 10-20767-Cr-KING

UNITED STATES OF AMERICA,

        Plaintiff,

vs.

JUDITH NEGRON,

        Defendant.

_____/

**DEFENDANT'S SENTENCING MEMORANDUM AND MOTION FOR
A SENTENCE BELOW THE ADVISORY GUIDELINE RANGE**

     The Defendant, **JUDITH NEGRON** by and through undersigned counsel, pursuant to the Fifth and Eighth Amendments to the United States Constitution, 18 U.S.C. 3553(a), Fed.R.Crim.P. 32(d), (e)(2) and (f) and U.S.S.G. § 6A1.2-3, hereby files this Sentencing Memorandum and Motion for a Sentence Below the Advisory Guideline Range.

**I. INTRODUCTION**

     Pursuant to *U.S. v. Booker, 543 U.S. 220, 125 S.Ct 738, 160 L.Ed.2d 621 (2005)*, the federal sentencing process requires a three step analysis to fashion an appropriate, individualized sentence. *See also Fed.R.Crim.P.11 (b)(1)(M), amended December 1, 2007.* First, the Court is to resolve any disputed guideline issues and determine the advisory guideline range. Second, the Court is to consider if there are any factors that may warrant a departure from the advisory guideline range. As before *Booker,* the court is to depart when it is warranted under the facts and circumstances of a particular case. The application of the guidelines is not complete until the

departures, if any, that are warranted are appropriately considered. *U.S. v. Jordi, 418 F. 3d 1212, 1215 (11th Cir. 2005).* Third, the Court is to consider all of the sentencing factors of 18 U.S.C. § 3553(a) and impose a sentence which is "reasonable" and not greater than necessary to achieve the sentencing objectives set forth in 18 U.S.C. § 3553(a).

This Sentencing Memorandum is intended to provide this Honorable Court with insight into Judith Negron - her life history, family, education and role in her community – to assist in fashioning an appropriate, individualized sentence which serves the twin goals of sentencing – punishment and deterrence - and achieve the objectives of 18 U.S.C. § 3553(a).

## II. DEFENDANT'S BACKGROUND AND FAMILY CHARACTERISTICS[1]

### A. Exodus from Cuba

Judith "Judy" Negron, age 40, was born in Havana, Cuba, one of two children born to Alfredo and Barbara Cruz. Judith came to the United States with her parents and younger sister, Yamila during the Mariel boatlift of 1980. Unable to live under Fidel Castro's communist regime, Alfredo, after being advised by Cuban police that they could leave the country, picked up his daughter, Judy from school and found her crying as word had spread of a mass exodus. As Judy left the school, teachers and schoolmates called her offensive names: "escoria" (dregs) and "gusana" (worms) and accused her of selling out her country for a pair of blue jeans. At that time she was 9 years old.

The family left other relatives behind, promising to get them out of Cuba to join them in the United States. They were not allowed to take anything with them except the clothes on their

---

[1] As the Court is aware, over the past decade, due to budget restraints and lack of personnel, the U.S. Probation Office has not been able to delve into a defendant's background to provide a complete picture of a defendant's upbringing, accomplishments and family lifestyle. Today's reports consist of basic background information provided by the defendant and family members. The few paragraphs in the PSI prepared in this case provide some general information about Judith's background. This sentencing memorandum provides a more comprehensive picture of the individual and is designed to assist the Court in fashioning an individualized, reasonable sentence

backs. All their personal possessions were confiscated by the government. The family was taken to a camp and spent five days living under cardboard and a sheet. There were no toilet facilities. They later moved to a mangrove area called "El Mosquito," for obvious reasons. Like other refugees throughout the course of history, people were divided by background for the trip out of Cuba. Judy and her family were in an area divided by a cable - on the other side were prisoners and the mentally ill. Guard dogs were attached to the cables to prevent people from leaving. The Cruz family was there for several days until one morning they were taken to a 42 foot boat in the Port of Mariel. There were 77 people on board, mostly women and children, and as the boat departed the family felt much sadness as they did not know if they would ever again see their loved ones who were left behind.

      There was little food and water onboard, and the family was given only four sausages to eat. While at sea, the boat encountered several storms, one where the boat ran into eight foot waves. Everyone on the vessel was crying, screaming and vomiting for fear of drowning. Smaller boats following behind disappeared from view and many people apparently drowned. One of the vessel's engines caught fire and the boat's captain had to veer off course to try and get out of the storm. Sharks suddenly appeared and Mr. Cruz feared the boat would capsize and death would be imminent for him and his family. Thankfully, his fears were unfounded. After being at sea for more than 25 hours and rescuing another smaller boat, the family finally reached Key West.

      This upheaval from her childhood home, and the harrowing journey to America had a profound effect on Judith, as it would any small child. Memories of this ordeal played a significant role in her determination to be successful, both personally and professionally.

---

below the advisory guideline range.

### B. Childhood in Florida

Upon arriving in Florida, Judy, her sister and parents went to live with her father's aunt in Tampa. No one spoke English, including Judy. She learned to speak English on her own while attending school, socializing with English speaking friends and watching television. After six months, the family moved to Miami, where they have lived ever since. Alfredo opened a welding shop and her mother, Barbara, who was seamstress in Cuba, began a sewing business. Her parent's hard work paid for the rent, food and other costs of living but little was left over for recreational purposes.

The family lived in three different houses during their early years in Miami, one of which was made of coral rock. Judy and Yamila called it "Royal Castle". According to Judy and her family, they lived in what was considered "bad" and "tough" neighborhoods. She was not allowed to play outside after dark. She began her education at Kensington Park Elementary School and graduated from Hialeah Miami Lakes High School in 1989. Judy attended Florida International University, attaining a Bachelor of Science in Psychology and St. Thomas University, where she received a Masters of Science in Mental Health Counseling.

### C. Immediate Family

Judy is blessed with a close knit family, which has been unwavering in its support of her throughout the difficult ordeal of these past two years. The bond between these family members is extremely strong and very supportive. The recent absence of Judy from their lives has significantly affected each of them.

Alfredo Cruz, Judy's father is 64 years of age, and lives in a modest home in Hialeah, Florida. He has been a welder since 1981 and is employed with Ryder Welding in Opa-Locka,

Florida servicing residential and commercial properties. Judy's mother, Barbara Cruz is 62 years of age and retired. Barbara and Alfredo have been married for 42 years and have two children, Judy and Yamila.

Judy's sister, Yamila Estrada is 35 years old and lives with her husband and children in Miami. She and her husband, Jorge Estrada have been married since 1992 and have two children, R.E. and V.E., ages 9 and 6, respectively. Yamila is a part time Marketing Associate with Raymond James and Associates in Coral Gables, Florida. In addition, she is the Vice President of the PTA at her children's school.

Judy's grandmother, with whom she is very close, Isabel Crisitna Cruz also lives in Hialeah. She is 82 years old, and suffers from a myriad of medical problems including diabetes, pulmonary emphysema, hypertension, asthma and circulatory problems including arthritis. All family members act as her caregiver.

### D. Marriage and Family Life

Judy has been married to Hector Negron, age 45 since 1992. They own a modest 3 bedroom, 2 bath home located in a middle class residential area in Miami Lakes, where they live with their two sons, B.N. and B.N., ages 11 and 7. Hector is the self employed owner of Worldwide Pools since 2001. The business is located in Hialeah, Florida, and services and maintains residential and commercial swimming pools.

The bond between Judith and Hector remains strong as ever, although Mr. Negron knows full well the severe repercussions that await his wife. The Negrons were childhood sweethearts who began dating as teenagers. They married in 1992 and the birth of two loving sons eventually followed. Judy, although a hard working individual, is also a doting mother involved fully in her sons' upbringing, education and all around wellbeing. Since her incarceration, the full

responsibility for their boys has now fallen to Hector.

B.N. and B.N. are profoundly suffering from the recent separation from their mother. B.N., due to his mother's incarceration and lack of communication with her, has developed emotional problems and is being treated by a mental health counselor. He has withdrawn from everyday communications and his grades and behavior in school have deteriorated. This is in stark contrast to the happy child he was before. Unfortunately, once sentence is imposed, and the possibility of a lengthy incarceration period becomes reality, the fear is that B.N. will withdraw even further from the family and society.

B.N., the oldest, although despondent about his mother's absence, is not exhibiting the same psychological symptoms as B.N. However, due to his age he is acutely aware that his mother will be gone for many years. He speaks to his father often hoping to hear those comforting words, "everything will be alright," but all his father can do is provide emotional comfort. Judy fears that she will not again be with her children and family until after she is released from imprisonment as a very elderly woman.

Their boys' aunt, Yamila is doing all she can to assist in their care but it simply isn't the same as the love and comfort of their mommy. This deprivation of love and affection has been further compromised by a lack of daily communication, as Judy's telephone privileges at the Federal Detention Center (FDC) have been removed because of an infraction. On her second day in custody after remand, she was talking to her husband, and he placed a call on another phone to her sister, Yamila. Hector placed both phones on speaker mode, so they could have a three way conversation. Unbeknownst to Judy, Hector or Yamila, this is prohibited by the Bureau of Prisons. Despite the fact that she was unaware of this policy, her phone privileges were suspended for 6 months – an extremely harsh punishment for a mother of two young

children. Since the discipline was imposed, Judy's contact with the boys is limited to one visit per week. This has only served to exacerbate the separation anxiety and emotional issues which the two boys are experiencing.

The family has also suffered financially since the loss of Judy's income. Previously, the family income earned by Hector and Judy went towards living expenses, their children's education and savings. As a result of their current economic situation, Hector will no longer be able to afford his sons' tuition at Dade Christian School, and they will be denied the Christian education they have known since entering this institution.

Attached as Appendix 1 to this Sentencing Memorandum are a series of photographs depicting Judith Negron and her family during milestone occasions and everyday family life. They are included to provide this Honorable Court with an understanding of the uniqueness of Judy and how much she means to her family.

### III. THE DEFENDANT'S EDUCATION AND ACCOMPLISHMENTS

As the PSI briefly mentions, Judith has received degrees from institutions of higher learning. What the educational section of the report does not address is all of her major accomplishments, continuing education, grade point averages and extracurricular activities.

Judith began her educational career at Kensington Park Elementary, Citrus Grove Jr. High School, and Miami High School. She transferred to Hialeah Miami Lakes High School in the 10th grade and graduated in 1989. While in high school, Judy participated in Modern Dance and entered the Jazz Dance Competition in 1988, winning the National Acclaim Award along with other members of the dance troupe. At the same time, she also worked to assist her family financially. Judy held jobs at Domino's Pizza, Union Central Life Insurance (which provided her

with scholarship funds) and as a clerk at a local auto dealership. She graduated from high school with a 4.0 Grade Point Average and received a scholarship in Art Architecture to attend Miami Dade Community College. Judy received an Associate of Arts degree and continued her undergraduate education at Florida International University (FIU). At FIU she changed her major to Psychology and took graduate courses and psychology lab classes. She graduated from FIU with a 3.8 GPA and was admitted to the graduate school at St. Thomas University for her Masters Degree. Judith graduated in 1998 with a 4.0 GPA in Mental Health Counseling.

## Continuing Education and Certificates[2]

In addition to Judy's classroom curriculum and Masters Degree in Mental Health Counseling, she continued to increase her knowledge of her chosen profession by attending numerous continuing education classes and receiving certificates of accomplishment:

### National Board of Certified Counselors

National Certified Counselor, October 2, 2002

### American Psychotherapy Association

Board Certified Professional Counselor, November 2007

### State of Florida Licensure

Licensed Mental Health Counselor, AC #2422804, issued November 19, 1992

### Continuing Studies

University of Miami, Disease of Addiction, A grade, March 10, 1997

### Training and Certification

---

[2] Attached to this Sentencing Memorandum as Appendix 2 are copies of many of Judith Negron's advanced degrees and certificates.

Northwestern University, Child and Adolescent Needs and Strengths, February 18, 2003
Functional Assessment and Rating Scale, June 25, 2005
Children's Functional Assessment Rating Scale, June 25, 2005

## Ongoing Licensure Continuing Education Hours

Catalyst Inc.,8 Hour, Post Graduate Mental Health Counseling, September 28, 2002
Lock Towns Community Mental Health Center Staff Training Certification in Children's Bio-Psychological Assessment Training, December 3, 2002
Lock Towns Community Mental Health Center Staff Training Certification for Assessment and Treatment Planning, January 24, 2003
Family Services of Metro Orlando for Adoption Competency Training, May 9, 2008
American Therapeutic Corporation for Your Heart Matters, November 2, 2005
American Therapeutic Corporation for Slip, Trip and Falls, November 2, 2005
COMPUSA Quickbooks Introduction, July 19, 2005
Continuing Education Certificate for Issues of Supervision, September 28, 2006
ABCOMM, Inc for Bipolar Disorder, April 10, 2006
Family Counseling Services for Diagnostic Classification, February 26, 2004
University of South Florida, Department of Health Law & Policy, March 21, 2006
Human Resources Council for Fundamentals of Personnel Law for Managers and Supervisors, February 6, 2006
Orange County Coalition for a Drug Free Community Treatment Conference, June 26, 2006
University of South Florida, Baker Act Training, March 21, 2006
SkillPath Seminars, How to Effectively Manage Multiple Locations, August 24, 2006
ADP Employer Services, Benefits Tracking and HR Expert, May 12, 2009
ADP Employer Services, Pay Expert, May 7, 2009
Mental Health Association of Broward County at Nova Southeastern University, Community Resources, March 5, 2010
Jackson Health System, Domestic Violence/Abuse Reporting, October 18, 2002

## Certificates of Attendance

University of South Florida, Department of Mental Health Law and Policy, Treatment Planning Tutorial and Lab, September 2002
Nursing Unlimited, Inc., American Heart Association Health Care and CPR, April 26, 2009
Eleventh Judicial Circuit Parenting Coordination Training, November 12, 2003
Laura Weber Mental Health Associates, P.A., Service Planning for Case Managers, November 2006
Doctor's Assistance Corporation for HIPPA Compliance, June 14, 2003

## Miscellaneous Course Completion

State of Florida Executive Department, Notary Public
Life Office Management Association, Inc., Associate Customer, Service September 1996
Comprehensive Risk Services, Inc., Defensive Driving Training, June 25, 2008
Florida Medicaid Program, Approval for Billing for Community Mental Services,

December 30, 2003
Agency for Health Care Administration (AHCA) Approval for Group Comprehensive
  Behavioral Assessment, August 28, 2003

Judith embraced her profession, and enjoys helping people in need. She put her education into practice to assist in the treatment of mental health patients beginning with her internship while at St. Thomas University, working at the Lock Town Community Mental Health Center (now Jackson South), various mental health centers during the 1990's and eventually with ATC as a mental health counselor. During her involvement with the aforementioned agencies, Judith developed various mental health programs, including one for children. Her work was very well respected and in several of the agencies where she worked she was promoted to program director.

### IV. MOTION FOR A SENTENCE BELOW THE ADVISORY GUIDELINE RANGE

#### A. Family Ties and Responsibilities

As discussed above, Judith has an extremely close and loving relationship with her whole family, especially her husband and two young children. Her youngest son, B.N. has developed serious emotional issues due to his mother's absence and incarceration. In addition he is unable to speak to her via telephone due to a sanction by the Bureau of Prisons. Although her youngest son is overtly manifesting his struggles, an excessive term of incarceration will significantly affect Judy's relationship with all her family members. Judy is only asking for the opportunity to share as much as she can of the upcoming formative years with her sons, participate in family milestones such as graduations, weddings, the birth of children and reunite with her family in a reasonable time. She is praying this Honorable Court will consider this, and show leniency in its sentence.

In *Gall v. U.S., 552 U.S. 38, 128 S. Ct. 586 (2007)*, the court found that "compelling family circumstances" would justify a downward variance from the guidelines. The Seventh Circuit has held that the district court is required to consider a defendant's family circumstances and to provide an adequate analysis of how much weight, if any, it should command, *U.S. v. Schroeder, 536 F.3d 746 (7th Cir. 2008)*. The Ninth Circuit found that family ties may warrant a non-guideline sentence even if they do not support a departure, *U.S. v. Menyweather, 447 F.3d 625 (9th Cir. 2006)* (affirming a departure for family ties but noting that even if the court erred in departing, *Booker* now permits the court to consider family ties and responsibilities as part of the "history and characteristics" of the defendant under 18 U.S.C. 3553(a)(1)); *U.S. v. Antonakopoulos, 399 F.3d 68, 81 (1st Cir. 2005)* (in bank fraud case, on remand district court may consider fact that defendant was caretaker for his brain damaged son as grounds for sentence below range even though there were alternative means of care so defendant apparently did qualify for traditional departure); *U.S. v. Galante, 11 F.3d 1029 (2d Cir. 1997)* (affirming district court's 13 level downward departure in drug case from 46-57 months to 8 days where defendant showed he was conscientious and caring father of two young sons who would have faced financial hardships). Other courts including the 6th Circuit, 8th Circuit and the 10th Circuit have permitted downward variances based on family ties and responsibilities. Mrs. Negron prays the Court takes into consideration her very important role as a mother and impose a sentence below the advisory guideline range.

Attached to this Sentencing Memorandum as Appendix 3 are 60 character reference letters from Judith Negron's family and friends which highlight how she has touched each of their lives, and demonstrating her value as an individual. These letters provide a wealth of information for this Honorable Court to consider in fashioning an appropriate sentence.

## B. Proportionality in Sentencing

An important issue in sentencing is proportionality. The concept of proportionality is central to the Eighth Amendment. Embodied in the Constitution's ban on cruel and unusual punishments is the "precept of justice that punishment for crime should be graduated and proportioned to [the] offense." *Graham v. Florida, 130 S. Ct. 2011, 2021, 176 L. Ed. 2d 825 (2010), as modified (July 6, 2010), citing Weems v. United States, 217 U.S. 349, 367, 30 S.Ct. 544, 54 L.Ed. 793 (1910).* When comparing the economic offenses for which Judith Negron was convicted with the total offense levels and guidelines imprisonment range of other crimes, especially violent crimes, the disproportionality of the advisory guidelines sentence here is evident. The following offense levels involve other crimes that are more or equally egregious. The majority of these offense levels include offense characteristics, but no Chapter Three adjustments. As calculated in the PSI, Judith Negron's Total Offense Level is 48 (43) with an imprisonment range of life.[3]

| OFFENSE | LEVEL | RANGE |
| --- | --- | --- |
| Homicide § 2A1.1 | 43 | Life |
| Second Degree Murder § 2A1.2 | 38 | 235-293 |
| Assault with Intent to Commit Murder | 33 | 135-168 |

---

[3] The Defendant has filed Objections to the Presentence Investigation Report (D.E. 382), contending that the Total Offense Level should appropriately be level 35, translating to an advisory guideline range of 168 to 210 months imprisonment.

| Offense | Level | Range |
|---|---|---|
| Criminal Sexual Abuse § 2A3.1 (Includes characteristics) | 42 | 360-Life |
| Criminal Sexual Abuse of a Minor (Statutory Rape)  § 2A3.2 (Includes characteristics) | 28 | 78-97 |
| Kidnapping § 2A4.1 (Includes characteristics) | 40 | 292-365 |
| Aircraft Piracy § 2A5.1 (If death resulted) | 38<br>43 | 235-293<br>Life |
| Economic Offenses § 2B1.1 (Includes characteristics and $100,000,000.00 loss | 40 | 292-365 |
| Armed Robbery § 2B3.1 (Includes characteristics and $5,000,000 loss) | 38 | 235-293 |
| Drugs § 2D1.1 (Involves 1,000,000 kilograms of Heroin) | 38 | 235-293 |
| Continuing Criminal Enterprise § 2D1.5 (Involves 1,000,000 kilograms of Heroin) | 42 | 360-Life |
| Sexual Conduct with a Minor (Commercial, trafficking, includes Characteristics) | 40 | 292-365 |
| Involuntary Servitude/Slave Trade § 2H4.1 (includes characteristics) | 31 | 108-135 |
| Arson § 2K1.4 ($2,000,000 damage) | 40 | 292-365 |
| Treason § 2M1.1 | 43 | Life |
| Sabotage § 2M2.1 | 32 | 121-151 |

| | | |
|---|---|---|
| Providing Materials to Foreign Terrorists (includes characteristic) | 28 | 78-97 |
| Nuclear/Biological Weapons of Mass Destruction § 2M6.1 | 44 | Life |
| Antitrust Offenses § 2R1.1 (Involves in excess of $1,500,000) | 29 | 87-108 |

The advisory guideline range in Judith's case equates her with individuals who have committed Homicide, Criminal Sexual Abuse, Aircraft Piracy, CCE, Treason and Possession of Nuclear/Biological Weapons of Mass Destruction! How can a comparable advisory guideline range be reconciled in the case at bar?

Not surprisingly, a review of the history of the increases in the fraud loss enhancements under §2B1.1(b)(1) demonstrates that the increases are legislative/political reactions, rather than being based on empirical evidence that more severe sentences were needed to deter further criminal conduct or protect the public. *See U.S.S.G. §2B1.1 (historical notes) (2003 amendments)* (noting a previous maximum enhancement of 26 levels). Interestingly, these amendments were designed to "punish adequately offenses that cause catastrophic losses of magnitudes previously unseen, such as the serious corporate scandals that gave rise to certain portions of the Sarbanes Oxley Act." *U.S.S.G. 2B1.1 (historical notes) (2003 amendments) (reason for amendments)*. Guidelines that are not empirically rooted but are instead politically motivated or based on other types of institutional pressure undermine the factors of Section 3553(a). In discussing this, one legal scholar noted:

> A general increase in federal economic crime sentences might have been justifiable on deterrence grounds if there were evidence that existing penalties were failing to deter potential offenders. One indicator of sufficient stringent penalties for a class of crimes would be an increase in the general incidents of such crimes. However, the available statistics show exactly the opposite trend for economic offenses. *See Frank O. Bowman, III, Pour encourager les autres? The Curious History and Distressing Implications of the Criminal Provisions of the Sarbanes-Oxley Act and the Sentencing Guidelines*

14

*Amendments That Followed, 1 Ohio St. J. Crim. Law 373, 419 (2003-2004) (collecting evidence).*

In the case at bar, the disproportionate enhancement of 30 levels under §2B1.1(b)(1) for a loss in excess of $200 million does not alone result in an advisory guideline range of life imprisonment. Added to the Base Offense Level calculations in the PSI are increases of 2 levels for vulnerable victims, 2 levels for a large number of vulnerable victims, 2 levels for "sophisticated means" under Section 2B1.1(b)(2)(c), 2 levels for violation of 18 U.S.C. 1956 and 4 levels for role in the offense as an organizer/leader, resulting in a total offense level 48. One wonders how it would be realistic to expect an over $200 million fraud loss not to involve numerous victims and involve sophisticated means (as defined so broadly by the Guidelines). Thus, for all practical purposes, before any other common upward adjustments are even considered, a $ 200 million dollar plus fraud loss will invariably yield a "life" sentence under the advisory guidelines. Under the circumstances, the strict application of the United States Sentencing Guidelines in this particular case exposes what United States District Court Judge Jed S. Rakoff warned as: "the utter travesty of justice that sometimes results from the guidelines' fetish with abstract arithmetic, as well as the harm that guideline calculations can visit on human beings if not cabined by common sense." *United States v. Adelson, 441 F. Supp. 2d 506, 512 (S.D.N.Y. 2006).*

This court is required to consider 18 U.S.C. 3553(a)(6) which involves "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct. *See also Gall, 552 U.S. at 50; Rita v. United States, 551 U.S. 338,356, 127 S.Ct. 2456, 168 L.Ed.2d. 293(2007)* ("The sentencing judge should set forth enough to satisfy the appellate court that he has considered the parties' arguments and has a reasoned basis for exercising his own legal decision-making authority.")

The following are illustrative of cases in the Southern District of Florida, and the

15

sentences imposed for various financial offenses:

**Anthony Giordano**, 05-80061-Cr-Zloch, hedge fund/securities fraud, loss $7 million or less, 10 years BOP

**Salvatore Argento**, 04-60206-Cr-Cohn, 18 U.S.C. 371 conspiracy (5 year cap), loss between $7 mil and $20 million, 45 months BOP

**Joseph Zumwalt**, 05-80061-Cr-Zloch, securities fraud, loss $7 million or less, 5 years BOP after a §5K1.1 Departure

**Jack Abramoff**, 05-60204-Cr-Huck, Conspiracy to Commit Wire and Mail fraud (charged with bribing members of the U.S. Congress including powerful Representative Bob Ney (R. Ohio) who was charged with conspiracy for covering up the influence peddling investigation of Ambramoff), $35,000,000 loss, 70 months BOP (since released from confinement)

**Carlos Benhamu**, 04-20337-Cr-Martinez, Bank Fraud, $2.2 million loss, 2 years BOP

**Barry Silverstein**, 06-60115-Cr-Cooke, Health Care Fraud, $1.7 million, 46 months BOP

**Lawrence Gallo**, 02-20637-Cr-Marra; 04-20478-Cr-Marra, Securities Fraud, Mail and Wire Fraud, loss between $2.5 and $7 million   Defendant committed latter offense while first charge pending, 135 months BOP

**Laurence Isaacson,** 08-20071-Cr-Jordan, Securities Fraud, found guilty by jury, 18 U.S.C. 371, $15 million loss, 36 months BOP

**Milton Barbarosh,** 08-20071-Cr-Jordan, Securities Fraud, 18 U.S.C. 371, $15 million loss, 30 days BOP after §5K1.1 Motion

**Eric Hauser,** 08-20071-Cr-Jordan, Securities Fraud, pled guilty 18 U.S.C. 371, $220,000,000 loss, 60 months BOP, 30 days BOP after §5K1.1 Motion

**Thomas McKenzie**, 08-20440-Cr-Gold, Medicare Fraud, $84 million restitution, 168 months BOP

**Miguel Libera**, 08-20851-Cr-Lenard, Medicare Fraud, $9.8 million restitution, 136 months BOP

**Vivian Hernandez**, 08-20851-Cr-Lenard, Medicare Fraud, $3.6 million restitution, 72 months BOP

While the aforementioned cases involve differing amounts in comparison to the funds

involved in the case before the Court, it is the significance of the punishment imposed on the <u>individual</u> which they illustrate. This Honorable Court, having heard the trial, hopefully has come to the conclusion that Mr. Duran and Ms. Valera controlled ATC and benefited greatly from this scheme. A review of the forfeiture count in the superseding indictment makes it clear that the majority of ill gotten gains in this case were used by Duran and Valera to make extravagant purchases and fund their lifestyles. The money Judy received from ATC and Medlink was primarily in the form of salary – half of which was deposited in a joint account with her husband to pay their bills, and the other half of which was deposited into a Raymond James investment account. Unlike Duran and Valera, Judy didn't purchase real estate, fancy cars and watches or go on vacations.

Judith's involvement in this case does not warrant the same punishment as Mr. Duran and Ms. Valera, who received 50 and 35 years imprisonment, respectively.  This Honorable Court sentenced the other primary participant, Margarita Acevedo to 91 months after granting the government's §5K1.1 motion. And further reduction is anticipated for Ms. Acevedo via a Rule 35 motion for additional cooperation.  It is therefore appropriate for the Court to consider a sentence somewhere between the two extremes.

In departing from an advisory guideline range of 360 to life to a sentence of incarceration of 60 months in the case of *United States v. Lennox Parris, 05-cr-0636-FB (E.D.N.Y. 2005)*, Senior District Judge Frederic Block reflected that "it is difficult for a sentencing judge to place much stock in a guidelines range that does not provide realistic guidance. My search for more relevant guidance, therefore had to proceed in other directions, although I would have much preferred a sensible guideline range to give me some semblance of real guidance." In the case of

Judith Negron, it is respectfully submitted that guidance comes from a review of the relevant factors under 18 U.S.C. § 3553 as mandated by the Supreme Court, a comparison of other relevant sentences in comparable cases and an appreciation of the individual standing before the Court for sentencing.

## V. CONCLUSION

Judith Negron stands before this Honorable Court confronted with an advisory guideline imprisonment range of life based on Medicare billings in excess of $205 million. She faces an astonishingly severe punishment of the type reserved for terrorists, murderers, child abusers and other violent offenders. But she is also the mother of two children, with a loving husband and family who are all suffering through this ordeal. The reality is that she will be separated from them for many years, important years which will never be replaced. She asks only that this Honorable Court impose a reasonable sentence which is sufficient, but not greater than necessary, to punish her for the crimes for which she has been convicted.

**WHEREFORE,** the Defendant, **JUDITH NEGRON** moves this Honorable Court to consider this Sentencing memorandum, and grant her Motion for a Sentence Below the Advisory Guideline Range.

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on this 1st day of December, 2011, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to the following: Jennifer Saulino, Trial Attorney (jennifer.saulino@usdoj.gov), United States Dept. Of Justice, Criminal Division, Fraud Section, 1400 New York Avenue, N.W., Washington, D.C. 20005.

Respectfully submitted,

s/ Barry M. Wax
**Barry M. Wax**
Florida Bar No. 509485
Attorney for Defendant Judith Negron
**LAW OFFICES OF BARRY M. WAX**
800 Brickell Avenue
Penthouse 2
Miami, Florida 33131
Telephone  (305) 373-4400
Facsimile  (305) 358-4010
barrywax@bellsouth.net