**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**Case No.  10-CR-20767-KING(s)**

**UNITED STATES OF AMERICA**

**v.**

**JUDITH NEGRON,**

**Defendant.**
_____/

**<u>GOVERNMENT'S MEMORANDUM IN AID OF SENTENCING</u>**

The United States hereby submits this Memorandum in Aid of Sentencing regarding defendant Judith Negron.  Defendant Negron, along with her co-defendants Duran and Valera, masterminded and executed one of the largest and most brazen health care fraud conspiracies in recent memory, billing Medicare for more than $205 million in fraudulent claims.  This massive fraud was committed by manipulating the proper treatment of Alzheimer's and dementia patients, brain damaged individuals, and substance abusers seeking treatment.  After a 6-day trial, the jury convicted defendant Negron on all 24 counts in which she was charged.  The evidence at trial demonstrated that Negron was not simply a player in this scheme, she was a key leader, providing the organization and structure that defendant Duran lacked.  Defendant Negron was the partner who carefully constructed, and constantly fortified, the façade that kept the scheme alive for eight years.  The United States respectfully requests that the Court (1) calculate Defendant Negron's Total Offense Level at 50 which falls into the Guidelines range of life in prison; (2) impose a sentence of 540 months (45 years); (3) impose a three year term of supervised release; and (4) require the defendant to pay restitution of $87,533,863.46 jointly and severally with her co-conspirators.

1

## FACTUAL SUMMARY

As the indictment alleges and as the Court observed during the trial, Defendant Negron and her co-conspirators engaged in an eight-year, $205 million conspiracy to defraud the Medicare program.  The vast majority of the $205 million billed to Medicare consisted of claims for partial hospitalization program (PHP) services.  The defendant was one of the three owners and operators of American Therapeutic Corporation (ATC), its management company, Medlink Professional Management Group, Inc., and their sister company the American Sleep Institute (ASI).  To obtain patients for ATC's PHP program, the defendant and her co-conspirators paid kickbacks to patient brokers, halfway house owners, and assisted living facility owners, who, in return would provide patients with valid Medicare numbers to ATC.  The patients would then attend ATC's facilities and purportedly receive PHP treatment.  The vast majority of patients for whom ATC submitted claims to Medicare for PHP treatment did not need the treatment, and even those who might have needed it, did not get appropriate PHP treatment.

PHP treatment is a highly specialized treatment for severely mentally ill individuals who are in acute phases of their diseases.  As the name suggests, a partial hospitalization program is designed to treat patients whose mental state does not permit them to function in an out-patient setting, and who would otherwise need to be hospitalized if they were not at the PHP.

The patients who attended ATC as a result of the kickbacks were some of the most vulnerable members of our society.  They were overwhelmingly either elderly residents of assisted living facilities who had dementia, Alzheimer's disease, or brain damage, or substance abusers who were too desperate for treatment to refuse when their corrupt halfway house owners required that they attend ATC.

The treatments that ATC provided were also not appropriate for a true PHP program, even if the patients had been severely mentally ill in acute phases of their diseases. The treatments were not individualized to the patient and were not designed and monitored by doctors and therapists to cause improvement in the patient's condition. As multiple witnesses testified at Negron's trial, doctors did not treat patients, but instead merely signed forms indicating they had; the length of a patient's stay was dictated by management, including defendants Duran and Valera, based on how long Medicare would pay, not on the patients' needs; and patients were cycled through ATC, sometimes ten or more times, to maximize profit regardless of the patients' conditions. To cover up the true nature of ATC, doctors and therapists, under the direction of and with the participation of the defendant, fabricated medical records to make it appear that the patients needed, and received, PHP treatment.

In addition, the defendant and her co-conspirators made some extra money by opening ASI, where they would perform diagnostic sleep studies on patients, 76% of whom also attended ATC. Just like at ATC, the defendant and her co-conspirators recruited patients to ASI through the payment of kickbacks for people who had no need for sleep studies. The defendant was the Medicare applicant, president, and registered agent of ASI. ASI was known as "her" company.

To support the massive kickback operation that fed the patient streams at ATC and ASI, the defendant and her co-conspirators engaged in a highly sophisticated money laundering scheme. The first step of the money laundering scheme often occurred when ATC and ASI each paid millions of dollars in Medicare reimbursements to Medlink. From Medlink, the defendant and her co-conspirators turned many of those millions into cash to pay kickbacks. They also laundered Medicare funds directly out of the ATC and ASI accounts. Negron personally cashed checks to launder them into cash to pay kickbacks. She also signed checks to individuals, like

3

Adriana Mejia, who testified at trial, whose sole jobs were to launder money.  She also paid money to shell corporations, knowing they were shell corporations set up solely for the purpose of laundering money, including, for instance, corporations set up by Margarita Acevedo and Adriana Mejia.  Finally, Negron and her co-conspirators, stole the identities of at least four individuals, including Gustavo Borges who testified at trial, in order to use those identities to cash a total of nearly $3.2 million in checks.  Evidence at trial proved that Negron was the co-conspirator who had primary responsibility for endorsing the checks written to these stolen identities, and she also signed numerous of those checks on behalf of Medlink as the Medlink representative.

## RESPONSE TO DEFENDANT'S OBJECTIONS TO THE PSR

On November 24, 2011, the defendant filed her objections to the PSR.  Most of those objections are addressed in the arguments below.  Specifically, however:

Objection 1 (regarding paragraph 33):  The defendant objects to the statement that "Cooperating witnesses have indicated that there were no doctors present at night to monitor the patients at ASI, who were purportedly undergoing a 'study' of their sleep ailments."

The United States notes that the statement is factually correct.  Moreover, it was proven at trial that the sleep studies were fraudulent, that patient brokers and ALF and halfway house owners received $200 in kickbacks to send patients to ASI, and that the patients never received any follow-up results from the sleep studies.  The United States defers to the Probation Office as to whether to retain this factually correct statement, but notes that no misimpression is given by the PSR.

Objection 2 (regarding paragraph 47):  The defendant objects to the concept that she transferred, by using shell companies and sham transactions, monies to herself.

4

There is plentiful evidence that this statement applied to Defendant Negron.  She was an owner of and had signature power over the bank accounts of ASI, Medlink, and Fates Elite.  Money transferred to those companies was money transferred to her.  She also had a shell company – T-Med Logistics – that was hers alone and to which money was transferred.  The objection should be denied.

Objection 3 (regarding paragraph 51):  The defendant objects to the inclusion of the statement that she and "other indicted co-conspirators, including Adriana Mejia and Lazaro Acosta, opened phony corporations to receive checks and wire transfers from both ATC and Medlink…"

The defendant's objection is, plainly, wrong.  Evidence at trial demonstrated Negron was a leader and organizer of this complicated scheme.  She personally signed hundreds of checks written out of the Medlink account, including checks written to shell companies and to the money launderer Adriana Mejia.  She also signed both the fronts – and endorsed the backs – of checks made out to stolen identities that were laundered through the check casher, Lazaro Acosta.

Objection 14 (regarding paragraph 116):  The United States takes no position on this objection and defers to the Probation Office on the accuracy of the description of the information provided to it.

Objections 4 through 13 and 15:  These objections refer to legal arguments related to the appropriate loss amount calculation and the application of enhancements.  These objections are addressed in the Guidelines Calculations section below.

## <u>GUIDELINE CALCULATIONS</u>

The United States Probation Office recommends that the Total United States Sentencing Guidelines (USSG or Guidelines) Offense Level is 48.[1]  The United States concurs with all of the calculations of the United States Probation Office but requests an enhancement for Abuse of Position of Trust under Guidelines Section 3B1.3.  The United States's calculation of the Total Offense Level is as follows:

|      |                                                                                 |     |
|------|---------------------------------------------------------------------------------|-----|
| (1)  | Base Offense Level, § 2B1.1(a)(2):                                               | 6   |
| (2)  | Loss (Greater than $200 million but less than $400 million), §2B1.1(b)(1)(O):    | 28  |
| (3)  | Sophisticated Means, §2B1.1(b)(9)(C):                                            | 2   |
| (4)  | Money Laundering (18 U.S.C. § 1956), §2S1.1(b)(2)(B):                            | 2   |
| (5)  | Sophisticated Laundering, §2S1.1(b)(3):                                          | 2   |
| (6)  | Vulnerable Victims, §3A1.1(b)(1) and (2):                                        | 4   |
| (7)  | Leadership Role in Offense Involving More Than Five Participants, §3B1.1(b):     | 4   |
| (8)  | Abuse of a Position of Trust, §3B1.3:                                            | 2   |

TOTAL OFFENSE LEVEL:                                                                              <u>50</u>

Sentencing Guideline Range:                                                                       Life[2]

The basis for these calculations is set forth below.

---

[1] The Probation Office's preliminary PSR calculates the total offense level at 48.  The United States timely filed an objection requesting the enhancement for Abuse of Position of Trust pursuant to USSG Section 3B1.3.  The Probation Office has advised that it agrees with the United States's objection and will apply the enhancement.

[2] Pursuant to Guidelines Section 5G1.1(a), because Negron's statutory maximum sentence is 275 years, which is less than Life, the statutorily authorized maximum sentence is the maximum sentence.

**(A) Amount of intended loss**

The intended loss in this case is appropriately determined by the amount the defendant and her co-conspirators billed to the Medicare program during the course of the conspiracy, $205,225,560. Pursuant to Section 2B1.1 of the Guidelines, the base offense level is increased by the greater of the actual loss or the intended loss. USSG §2B1.1. The Probation Office recommends that the loss amount is more than $200 million but less than $400 million. The United States agrees with the recommendation of the Probation Office. The defendant objects to the $205 million loss figure. The Court has already decided this question during the sentencings of co-defendants Duran and Valera, determining that the appropriate calculation is $205 million, as the defendants attempted to collect every cent they could, including the co-payments from Medicaid. The Court should apply the same reasoning for Defendant Negron, who was Duran and Valera's co-owner, co-leader, and co-conspirator.

The commentary to the Guidelines provides that the proper loss amount for purposes of calculating the loss enhancement is "the greater of actual loss or intended loss." U.S.S.G. § 2B1.1, comment (n.3(A)). Under the Patient Protection and Affordable Care Act ("PPACA"), the aggregate dollar amount of fraudulent bills submitted to a government healthcare program [in this case more than $205 million] is *prima facie* evidence of the amount of the "intended loss." PL 111-148, 2010 H.R. 3590 §10606(a)(2)(B). The Eleventh Circuit has affirmed loss calculations based on the full amount billed to Medicare, even after finding that the doctor knew or reasonably should have known she would only receive 80% of what she billed to Medicare. *United States v. Hoffman-Vaile*, 568 F.3d 1335 (11th Cir. 2009).[3]

_____

[3] *Hoffman-Vaile* might be interpreted to require that the co-conspirators in a fraud conspiracy tried to collect the co-payments that Medicare required in order to be responsible for

Congress, the Courts, and the Sentencing Commission have recognized the full amount billed to Medicare as the *prima facie* evidence of intended loss in a Medicare fraud case, despite Congress's, the Courts' and the Sentencing Commission's full knowledge of Medicare's payment schedules and percentages of payments.  These entities, the Circuit Courts, and this Court have repeatedly recognized that Medicare fraudsters should be responsible for the amount they billed to Medicare.  The Fourth Circuit explained in *Miller* the reason that intended loss should rest in the amount billed to Medicare: "As anyone who has received a bill well knows, the presumptive purpose of a bill is to notify the recipient of the amount to be paid.  Indeed, courts have recognized this principle for well over a hundred years." *United States v. Miller*, 316 F.3d 495, 504 (4th Cir. 2003) (citations omitted).  Courts, including the Eleventh Circuit, have similarly rejected a requirement that the intended loss in a fraud case be "economically realistic." *See, e.g.*, *United States v. Wai-Keung*, 115 F.3d 874, 877 (11th Cir. 1997) ("It is not required that an intended loss be realistically possible."); *Miller*, 316 F.3d at 501-02 ("[T]he majority of circuits in more recent cases, however, have rejected this 'economic reality' approach, holding that the Guidelines permit courts to find intended loss in an amount exceeding that which was in fact possible or probable.") (collecting cases).  Nor is a defendant's subjective "expectation" the correct gauge of intended loss.  "[E]xpectation is not synonymous with intent when a criminal does not know what he may expect to obtain, but intends to take what he can." *United States v. Geevers*, 226 F.3d 186, 193 (3d Cir. 2000).

Just as in *Geevers* and *Miller*, while the defendant and her co-conspirators here "may not have expected to get it all, [they] could be presumed to have wanted to." *Id*; *Miller* 316 F.3d at 504.  Here, there is no evidence that defeats the prima facie evidence of the amount of the bills

---

the full 100% of intended loss.  Here, both of Negron's co-leaders in this scheme have admitted under oath they tried to collect the co-payments.

the defendant and her co-conspirators submitted to Medicare.  The defendant and her co-conspirators carefully constructed their fraud to avoid doing things Medicare would not pay for. For instance, they altered patient files to contain the appropriate wording that Medicare would want to see if a claim was challenged.  They paid doctors to sign patient files without seeing the patients.  They appealed every denied claim, as Defendant Duran admitted under oath.  *See, e.g.*, Transcript of Sentencing Hearing, Day 1 (September 14, 2011) (Exhibit A) at 66-67 ("Q: You appealed claims with some regularity, right? A: We appealed every claim. Q: You appealed every claim that was denied? A: Yes. . . . Q: Appealing the claim means you are telling Medicare, 'You wrongfully denied this claim. You should pay this claim,' right? A: Yes.  Q: You knew at the time that Medicare had rightly denied the claim, right? A: Not always. Q: But it was all fraud, wasn't it, Mr. Duran? A: Yes. Q:  So Medicare had rightly denied it, right? A: Correct.") Indeed, evidence admitted at trial demonstrated that Negron herself appealed denied claims for ASI.  (*See* Exhibit B attached).  As Ms. Acevedo testified at Negron's trial, the co-conspirators even moved patients from the Homestead center to the Miami center when they learned that the Homestead center was "on review" so it would be harder to get payment for those patients.

    Further, both Duran and Valera admitted under oath that they also attempted to collect the co-payments for patients from Medicaid and private insurers.  *See, e.g.*, Exhibit A at 71-72 ("Q: You knew that you were required to collect co-pays, right, for the services that American Therapeutic performed?  A: Yes, ma'am.  Q: Not only did you know that you were required to collect them, you did go through the motions of trying to collect them, didn't you? A: That's correct, we did.").

The leaders of this scheme, including Negron, wanted to get every cent they could get out of Medicare, and if Medicare would have paid them the full $205 million, they certainly would have accepted it, as Defendant Duran admitted during his sentencing hearing. *See,* Exhibit A at 65 ("Q:  Mr. Duran, you wanted to get as much money out of Medicare that you could possibly get, right? A: Yes. Q: If they sent you the $205 million, you wouldn't have sent it back, right? A: Probably not.").  Negron is responsible for the full $205 million in loss just as the Court found for Duran and Valera.

### (B) Sophisticated means

A two-level enhancement for offenses involving "sophisticated means" is appropriate in this case.  The Probation Office recommends that, pursuant to the USSG, the "sophisticated means" enhancement should apply.  The defendant objects.  The ATC scheme spanned eight years, seven facilities, involved hundreds of employees, assisted living facility owners, halfway house owners, patient brokers, and money launderers, generated and paid out hundreds of thousands of dollars in kickbacks monthly, and evaded detection for years.  The defendant and her co-conspirators each separately and together engaged in extensive efforts to conceal their crimes, including by altering patient files, hiring doctors to sign patient files for patients they had not treated, and paying massive kickbacks for patients to sit at ATC all day receiving "therapy" that they did not need.  Negron also engaged in personal efforts to avoid detection, including taking her cell phone battery out of her phone in a purported effort to evade the FBI and using different colored pens when forging endorsements on money laundering checks to give the appearance the endorsements had not been signed by the same person.  The Court has already determined this was a sophisticated scheme, during the sentencings of Duran, Valera, and

Acevedo, and should consistently apply this scheme-based enhancement for Defendant Negron as well.

### (C) Sophisticated Laundering

The Probation Office recommends that the sophisticated laundering enhancement should apply.  The Court has already applied the Sophisticated Laundering enhancement under Section 2S1.1(b)(3) for Negron's co-conspirators and should apply the enhancement here as well.

 As the Commentary explains, Sophisticated Laundering means "complex or intricate offense conduct pertaining to the execution or concealment of the 18 U.S.C. §1956 offense." USSG §2S1.1(b)(3), Application Note 5.  The Commentary further elaborates that Sophisticated Laundering typically involves the use of "fictitious entities," "shell corporations," and "two or more levels (i.e. layering) of transactions. . . involving criminally derived funds that were intended to appear legitimate."  *Id.*; *see also, United States v. Miles*, 360 F.3d 472 (5th Cir. 2004) (affirming enhancement in a Medicare fraud case that included layering as described in the Commentary, even though the defendant was somewhat inept in the layering).

Here, the defendant and her co-conspirators directed a complicated money laundering operation that included fictitious entities and shell corporations owned by themselves, Margarita Acevedo, Adriana Mejia, and others.  They used Medlink to layer millions of dollars in transactions by first transferring illicitly gained Medicare funds from ATC and ASI to Medlink and then to others, including Mejia, Acevedo, and their fictitious shell corporations.  And they used layered Medlink funds coupled with stolen identities and a check cashing store to launder more than $3.2 million in funds.

The defendant contends that the Court may not apply both the sophisticated means enhancement and the sophisticated laundering enhancement here.  The defendant is wrong.

Application note 5(B) to USSG Section 2S1.1 states that "if subsection (b)(3) applies, and the conduct that forms the basis for an enhancement under the guideline applicable to the underlying offense is the <u>only</u> conduct that forms the basis for application of subsection (b)(3) of this guideline, do not apply subsection (b)(3) of this guideline."  USSG §2S1.1(b)(3), Application Note 5 (emphasis added).  Here, the sophisticated means enhancement is supported by plentiful sophisticated conduct aside from money laundering conduct, including alteration of patient files, payment of kickbacks to patient recruiters, ALF owners and halfway house owners, and hiring doctors to sign patient medical files to make them appear legitimate.  The sophisticated laundering enhancement, on the other hand, is fully supported by the laundering conduct. Therefore, the conduct forming the basis for the sophisticated means enhancement is <u>not</u> the <u>only</u> conduct forming the basis for application of the sophisticated laundering enhancement.  Indeed, there was so much sophisticated conduct, the court could fully separate the sophisticated fraud conduct and the sophisticated money laundering conduct and still more than amply support both enhancements.

**(D) Vulnerable Victims**

The Probation Office recommends that a four-level adjustment should apply because the defendant "knew or should have known that a victim of the offense was a vulnerable victim" (two-level adjustment) and "the offense involved a large number of vulnerable victims" (additional two-level adjustment).  USSG §3A1.1(b)(1) and(2).  The Probation Office is correct. The Court has already applied this enhancement for Defendants Duran and Valera and should likewise apply the enhancement here.[4]

According to the Application Notes to Section 3A1.1(b) a "vulnerable victim" means a person who is a victim of any conduct for which the defendant is accountable under the Guidelines and who is "unusually vulnerable due to age, physical or mental condition. . . ." USSG §3A1.1, Application Note 2.  The Eleventh Circuit has recently affirmed the application of this enhancement in a Racketeer Influenced and Corrupt Organizations Act (RICO) case charged in connection with a Medicaid fraud scheme where the scheme involved recycled blood derivatives that ultimately ended up going to AIDS and hemophilia patients.  *See United States v. Bradley*, 644 F.3d 1213 (2011).  The Eleventh Circuit rejected the argument that the vulnerable patients were not "victims" in that case because they did not suffer bodily injury, *id.* at 1288, and made clear that the enhancement applies even when the vulnerable patients did not suffer financial losses related to the fraud.  *Id.* at n. 128 ("Nor is there the requirement, as with § 2B1.1(b)(2), . . . that a victim suffer part of the financial loss counted towards the total attributed

---

[4]     The Court articulated two groups of victims in applying the Vulnerable Victims enhancement for Duran and Valera.  The first group included the thousands of vulnerable patients that ATC purchased as props from assisted living facility and halfway house owners. The second group included the millions of vulnerable Medicare beneficiaries who suffer harm as a result of such a massive fraud because of reduced services and increased barriers to treatment. Negron argues that the Court's second group does not fall within Eleventh Circuit case law. Regardless of the merits of Negron's argument regarding the second group, the first group falls squarely within the Guidelines and Eleventh Circuit case law.

to the defendant's fraud."); *see also United States v. Echevarria*, 33 F.3d 175, 180-81 (2nd Cir. 1994) ("[E]ven though there is a scam, ... the economic impact of which is on the government, an enhancement for vulnerable victims is appropriate where the exploitation of patients is part of the scam.") (citations and quotations omitted) (*superseded on other grounds*); *United States v. Bachynsky*, 949 F.2d 722, 735 (5th Cir. 1991) ("We do not find that the only victims of Dr. Bachynsky's scheme were the deep pockets that paid the phony claims, or that his patients were in no way victims of the fraud.").

The vulnerable victims here were ATC's and ASI's patients. These elderly, sick, demented, and substance abusing people were props that Negron, Duran, Valera, and their co-conspirators used to show Medicare they had real patients. These patients were at ATC because they had valid Medicare numbers and because an assisted living facility owner or halfway house owner sold their presence to the defendants. As the Court heard former ATC therapist Amy Lynn Graham-Mullins testify at Negron's trial, ATC patient Ruth Herrera was in a neuro-vegetative state, unable even to hold up her head, much less speak or respond. Ms. Herrera would sit in her wheelchair all day with her head hanging down, such that a large lump had formed at the back of her neck. She was non-responsive to staff. As the Court heard, upon repeated complaints from Ms. Graham-Mullins to management, Ms. Negron personally visited the center, approached Ms. Herrera, and yelled into her ear "Ruth! Ruth!" until Ms. Herrera finally lifted her head briefly, and then dropped it back down again. Ms. Herrera was one of the patients whose billings to Medicare made up the $205 million in fraud.

Ms. Herrera was by no means the only impaired patient at ATC. Therapists, including those who testified at the trial, reported noticing patients who were so demented they could not participate in group therapy, and at times would urinate or defecate on themselves during the

14

group therapy sessions.  The patient files at ATC contained numerous examples of patients who were taking Alzheimer's medications, not to mention those files that had been scrubbed of any reference to Alzheimer's or dementia.  Patient Ruben Martinez, whose claims make up counts 6 and 7 in the Superseding Indictment, was cycled through ATC at least seven times.  Upon reviewing his files, Agent Lapp testified that she found indications of Alzheimer's drugs, as well as patient notes that plainly did not have anything to do with Mr. Martinez, as they were describing a woman.

Regarding the substance abuse patients, Keith Humes testified that halfway house owners like him would require their patients to attend ATC, even though those patients, who needed substance abuse treatment, did not get substance abuse treatment at ATC.  Substance abuse patients, like those Humes provided, would relapse after attending ATC because they had not received the treatment they needed.

The patients that ATC had at its facilities were not getting the treatment they needed for the diseases they actually had.  And they were in no position to complain about it because they were too frail (Alzheimer's and dementia patients) or because they needed a place to live (halfway house patients).  As the *Bradley* court stated:  "They were victims because Bradley III caused their physicians to provide them with recycled blood-derivatives. And Bradley III's schemes targeted them, exploiting their need for medication so he could make a profit. The district court did not err in applying the § 3A1.1(b) Adjustment."  *Id.* at 1289.  Here, too, the patients were victims because Negron, Duran, Valera, and their co-conspirators paid their caretakers for their presence, so that Negron, Duran, and Valera could make a profit from Medicare, even though Duran, Valera, and Negron knew that no legitimate treatments would be

provided and that the patients' presence at ATC would prevent them from getting treatments they actually needed.  The adjustments in Section 3A1.1(b) should apply.

### (E) Leadership Role

A four-level adjustment for defendants who were "organizer[s] or leader[s] of a criminal activity that involved five or more participants or was otherwise extensive" is appropriate for Negron. USSG §3B1.1(a).  The Probation Office recommends that, pursuant to the Guidelines, a four-level enhancement should apply.  The defendant contends she was merely a manager.

This defendant was one of the three leaders and organizers of this massive scheme, which involved hundreds of employees and also hundreds of assisted living facility and halfway house owners.  The scheme was also "otherwise extensive," for many reasons, including that Negron and her co-conspirators used thousands of unwitting patients as props in this scheme.  *See* USSG §3B1.1(a), Application Note 3 ("[A] fraud that involved only three participants but used the unknowing services of many outsiders could be considered extensive.").

As the evidence at trial demonstrated, she was the brains behind the operation – the one who would call Ms. Acevedo regarding the census, every time the census report was low at any facility.  Evidence showed she would sit in a file room with Dr. Gumer personally handing him files to sign.  The evidence at trial showed that she was one of the two signers on the Medlink bank account – the account through which millions of dollars were laundered and used to pay kickbacks – and she personally signed hundreds of those Medlink checks.  Moreover, she was the primary one who endorsed the more than $3 million in checks written to individuals whose identities were stolen and cashed at a check cashing store.  She even used different colored pens to try to create the impression that the checks had been endorsed at different times by different people.

The Court appropriately applied a manager enhancement for Ms. Acevedo. She was hired by Duran after Negron originally brought her in, and she managed the kickback operation. Negron, on the other hand, was a leader and an organizer. She was the owner and Medicare applicant for ASI. She was the vice-president and part-owner of Medlink. And witnesses throughout the trial referred to Negron as one of the owners of ATC.

**(F) Abuse of Position of Trust**

Pursuant to the Guidelines, Section 3B1.3, a two-level enhancement applies if the defendant "abused a position of public or private trust, or used a special skill, in a manner that significantly facilitated the commitment or concealment of the offense." *See* USSG § 3B1.3. The guideline text states that the enhancement may be applied in addition to an adjustment under § 3B1.1 (aggravating role) if it is based upon abuse of position of trust; if based upon use of a special skill, it may not be employed in addition to an aggravating role enhancement. The application notes define "public or private trust" as "a position of public or private trust characterized by professional or managerial discretion (i.e. substantial discretionary judgment that is ordinarily given considerable deference)." *See* USSG § 3B1.3, Note 1.

Medical personnel occupy a position of trust vis-a-vis the Medicare program and private insurance carriers. *See*, *e.g.*, *United States v. Hodge*, 259 F3d 549, 557 (6th Cir. 2001) (holding therapist deserved enhancement under section 3B1.3 because "[h]e was the founder and manager of the substance abuse treatment facility and he was also a treating therapist there.").

Defendant Negron "abused a position of public or private trust in a manner that significantly facilitated the commission or concealment of the offense," so the enhancement should apply to Negron's Total Offense Level. Negron, a licensed mental health counselor in the State of Florida, was one of the three owners and operators of American Therapeutic

17

Corporation. Testimony at trial demonstrated that she was focused on keeping the "census" at ATC at high levels, and when the census was low at any particular center, she pushed the marketers to bring in more patients – which she knew meant paying more kickbacks for inappropriate, and often vulnerable, patients. Negron also signed numerous patient files as the treating or supervising therapist, for the purpose of validating those files if Medicare were ever to examine them, even though she knew the patients to be inappropriate and/or did not supervise the session. Testimony at trial demonstrated that Negron would personally determine whether certain patients were qualified when therapists had raised concerns. One such patient, Ruth Herrera, was in a neuro-vegetative state, but Negron yelled her name into her ear until she lifted her head, at which point Negron, a licensed therapist, supervisor, and owner, declared Ms. Herrera qualified over the objections of other therapists at that center.

Negron was also the president and owner of the sister corporation, ASI, that fraudulently billed nearly $6 million for unnecessary sleep studies. She was the Medicare applicant for ASI, meaning that she was the person who stood in the position of trust with Medicare. She signed the certification stating that she would not fraudulently bill Medicare and would follow all Medicare rules and regulations. As was proven at trial, more than three quarters of ASI's patients were also ATC's patients, even though it was also proven at trial that only the very rare patient could theoretically qualify for both PHP treatment and sleep study treatment at the same time. Evidence at trial proved that patient brokers, halfway house owners, and assisted living facility owners would receive $200 per patient per night, with Negron's knowledge and consent, for each patient they sent to ASI.

Negron cites *Garrison*, but *Garrison* is inapplicable here. *See United States v. Garrison*, 133 F.3d 831 (11th Cir. 1998). As the Eleventh Circuit clarified in *United States v. Liss*,

*Garrison* was not saying the enhancement does not apply in a Medicare fraud case, but instead that it may not apply if the only relationship is an arms-length business relationship.  265 F.3d 1220, 1229 (11th Cir. 2001) (affirming application of enhancement for doctor in kickback scheme); *see also United States v. Garcia* 211 F.3d 128 (11th Cir. 2000) (Table) ("The district court could properly have found that Garcia was just that discretion-possession physician (or, in this case, psychiatrist) that section 3B1.3 envision[ed]; it was the trust that Medicare proposed in Garcia as a medical professional that permitted him to oversee the falsification of patient-treatment records to accomplish the fraud.").  In *Garrison*, the case was not about fraudulent treatment but instead about the complicated cost-reporting system that applied to the provider and was manipulated by the defendant to allow for personal expenses, political contributions, and double-counting in salaries. Moreover, the district court made a point of noting that the cost reports were first reviewed and approved by Aetna. *Garrison*, 133 F.3d at 841 ("Furthermore, Garrison and Healthmaster did not report directly to Medicare but to Aetna, the fiscal intermediary whose specific responsibility was to review and to approve requests for Medicare reimbursement before submitting those claims to Medicare for payment.").  The distinction that the Eleventh Circuit made was whether the Medicare program relies on the person's professional discretion to make decisions about valid claims.  *Id.* at 842 ("In contrast to Garrison's lack of discretion and inability to produce the fraudulent Medicare reimbursement requests as section 3B1.3 envisions is a physician who possesses the expertise to create erroneous medical records and, consequently, fraudulent Medicare reports that are difficult to detect and to question.").

Negron was a supervising therapist, whose signature on hundreds of ATC patient files certified to Medicare the treatments those ATC files purported to document were medically necessary and appropriate.  Negron was also the president of ASI whose signature on the

Medicare application certified that she would not submit false claims to Medicare.  Yet Negron plainly submitted hundreds of false claims through ASI.  In fact, as the evidence at trial showed, she even filed appeals trying to convince Medicare to pay claims it had (it turns out, rightly) denied.

The Medicare representative at trial was Winnette Sandlin.  She testified that First Coast Service Options is the Medicare contractor that receives and pays Medicare claims in Florida.  First Coast effectively is Medicare.  The relationship is different than the one in *Garrison*.  Millions upon millions of claims are submitted electronically and paid within a short period of time.  The only way this is possible, according to Ms. Sandlin, is because Medicare is a trust-based system. *See* Transcript of Testimony of Winnette Sandlin (August 17, 2011) at 175 (Exhibit C).  Defendant Negron was one of the people Medicare trusted here both because of her position as a therapist and because of her position as the Medicare applicant for ASI.  The enhancement is appropriate here.

## SENTENCING FACTORS

Title 18, United States Code, Section 3553(a), enumerates several factors that the Court shall consider in sentencing the defendant.  These factors are discussed below numbered as they are in Section 3553(a).

**(1)  The nature and circumstances of the offense and the history and characteristics of the defendants.**

**(A)     The Offense**

The circumstances of the offense are especially egregious here.  Defendant Negron did not just steal money from Medicare, she and her co-conspirators stole $87 million from Medicare, and they tried to steal $205 million.  Worse yet, they did it all by buying patients from the patients' supposed caretakers and using the patients as mere props to sit in ATC's centers,

appearing to receive PHP treatment.  In reality, ATC's patients were demented, brain damaged, or substance abusers hoping for a recovery program, and none of the treatments these patients actually needed were provided by ATC.  The defendant and her co-conspirators victimized the most vulnerable members of our society so that they could wear nicer clothes, drive nicer cars, and eat at fancier restaurants.

      **(B)**      **The history and characteristics of the defendant**

As the defendant details in her Sentencing Memorandum (DE 383), she has a Masters Degree in Mental Health Counseling, has received dozens of professional certificates, and attended dozens of specialized training courses. She is plainly well-educated in the very subject of her fraud – the mentally ill and how to treat them.  And the evidence at trial illustrated that she was a savvy business-person.  She was the member of the conspiracy who kept the trains running on time – she monitored the census, she policed expenses, and she personally endorsed the money laundering checks with different colored pens.  It was her education and savvy that allowed this fraud to continue so long without law enforcement intervention.  Moreover, the defendant and co-conspirators Duran and Valera, knowing a *qui tam* lawsuit had been filed, and knowing that they were under investigation, flagrantly continued violating the very laws they had been violating since the outset of this fraud.  They simply became more careful about their record-keeping, their emails, and their telephone conversations.  Negron even removed her cell phone battery, telling Ms. Acevedo she was trying to thwart any FBI listening devices.  These co-conspirators continued to buy patients through kickbacks and continued to manufacture patient records.  And they continued to amass Medicare money for their scheme and for themselves.

The defendant discusses in her Sentencing Memorandum (DE 383) various aspects of her history and characteristics. She focuses on two primary themes: that she had a difficult childhood because of her family's flight from Cuba and that she has an extraordinarily strong family bond and is an exemplary mother.

It is unclear why Negron details her family's flight from Cuba in her sentencing memorandum; there is no connection in the memorandum to any legal argument relating to that time in her life. Regardless, Negron's family's quest to become Americans is important to this sentencing. It is important because people risk their livelihood, and even their lives, every day to become Americans, just like Negron's family did. They do so because they want to be a part of this country that allows them the freedom to live and thrive; to be a part of a country with a strong education system for every child; and to be a part of a country that provides for free or reduced health care for the most needy, the most ill, and the most elderly. In light of Negron's family's extraordinary efforts to reach this country and be a part of this great system, her fraud is all the more reprehensible. She took every benefit this country had to offer. She attended school, became highly educated, and she thrived. And then she took those benefits, that knowledge, and her depth of experience, and she used it to try to steal as much as she could for herself at the expense of the most vulnerable of our society – the mentally ill, the sick, and the elderly. Instead of embracing the system her family fought to be a part of, Negron exploited it.

Negron further argues that her family bond, and particularly her bond with her children, should warrant a reduced sentence. While the United States has no desire to separate these children from their mother, Negron made that choice every day for eight years as she engaged in this massive fraud. She knew the laws she was breaking and she worked diligently to conceal her crimes. While she may treat her own family well, she, through her company and co-

conspirators, purchased sick and vulnerable human beings like cattle so that they would serve as props to conceal this massive fraud from Medicare.  It is extremely unfortunate that one of Negron's children is having trouble coping with his mother's plight, but it is also unfortunate that each and every one of the patients – like Ruth Herrera – whom Negron used for her own gain had no one to care properly for them, to speak for them, or to watch over them as they deserved to be watched over.  Each and every day of the eight years Negron committed this fraud, she had the opportunity to mitigate the potential effect on her own children by ceasing the horrific fraud she was committing.  That her family may suffer as a result of her punishment is tragic, but it is a consequence solely of the crimes Negron knowingly and willfully committed.

Negron, by her own description, was a highly educated counselor, who supposedly dedicated her life to the mentally ill.  Instead she dedicated her career to exploiting services for the mentally ill for her own gain with no regard for the vulnerable people she used like cattle or for the millions of vulnerable Medicare beneficiaries who have lost services and encounter greater barriers to treatment because of fraudsters like her.

**(2) The need for the sentence imposed (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence; (C) to protect the pubic from further crimes of the defendant; and (D) to provide defendant with appropriate education or vocational training.**

Negron's punishment should take into account not only the extraordinary seriousness of her criminal conduct, which is described above and was borne out at trial, but also the need to deter future criminals from stealing from the Medicare program.  As this Court stated, there is a "critical, critical need for deterrence."  *See* Transcript of Sentencing, Day 3 (September 16, 2011) at p. 81 (Exhibit D).

South Florida remains ground zero for Medicare fraud, and the schemes are becoming more sophisticated, like the ATC scheme was.  *See e.g.*, *United States v. Macli, et al.*, 11-20587-CR-LENARD (PHP Fraud amounting to $55 million); *United States v. Nunez, et al.* 11-CR-20113-LENARD (home health fraud amounting to $20 million).  Moreover, the United States is now combating other PHP schemes in south Florida and elsewhere.  Taxpayers have poured billions and billions of dollars into these new fraud enterprises.

While the defendant argues that economic crimes Guidelines overstate the sentences that should reasonably be imposed, last year, Congress directed the Sentencing Commission to add a specific offense <u>enhancement</u> for "a Federal health care offense relating to a Government health care program" that involves $1 million or more.  PPACA, PL. No. 111-148, § 10606(a)(2)(C), 124 Stat. 119, 1006-07 (March 23, 2010).  Under that enhancement, if the loss amount is between $1 million and $7 million, 2 levels are added; if it is between $7 million and $20 million, 3 levels are added; and if it is $20 million or more, 4 levels are added.  *Id.* Congress also directed the Sentencing Commission to review the Guidelines and policy statements for health care fraud offenses to ensure that they "reflect the serious harms associated with health care fraud and the need for aggressive and appropriate law enforcement action to prevent such fraud" and to provide "increased penalties for persons convicted of health care fraud offenses in appropriate circumstances." *Id.* § 10606(a)(3)(A).  In so doing, Congress made plain by its actions that the Guidelines enhancement for loss amount actually understates the sentence that should be imposed for Medicare fraudsters and required an additional add-on for high-dollar Medicare frauds.  These Sentencing Guidelines Amendments took effect this month.

If the defendant and her co-conspirators had been able to conceal their fraud one year longer, they would receive a 4-level enhancement simply because they had perpetrated a

Medicare fraud of more than $20 million.  The amount of intended loss here is more than 10 times that amount.  *See United States v. Mateos*, 623 F.3d 1350, 1368 (11th Cir 2010) (considering the effect the new enhancements would have had, as a part of determining a 30-year sentence for a doctor to be reasonable).  The Guidelines appropriately reflect the seriousness of this offense, and they state that this Court may sentence Negron to the statutory maximum 275 years.

### (3)  The kinds of sentences available

Convictions of conspiracy to commit health care fraud and health care fraud carry a maximum statutory term of ten years imprisonment per count.  *See* 18 U.S.C. §§ 1349, 1347. Conspiracy to defraud the United States and to pay and receive illegal health care kickbacks carries a maximum penalty of 5 years per count. *See* 18 U.S.C. § 371.  Conspiracy to commit money laundering carries a maximum statutory term of 20 years per count.  *See* 18 U.S.C. § 1956(h).  Money laundering in violation of 18 U.S.C. § 1957 carries a maximum penalty of 10 years per count.  *See* 18 U.S.C. § 1957.  Money laundering in violation of 18 U.S.C. § 1956(a)(1)(B)(i) carries a maximum penalty of 20 years per count.  *See* 18 U.S.C. § 1956. Structuring to avoid reporting requirements carries a maximum penalty of 10 years per count. *See* 31 U.S.C. § 5324(a)(1) and (d)(2).

Therefore, defendant Negron faces a statutory maximum of 275 years imprisonment as a result of her conviction.

### (4)  The sentencing range established by the USSG

The United States maintains that the Total Offense Level should be a 50 and that she should be sentenced to a term of years that is appropriate for her crimes and appropriate to enforce the message that Medicare fraud will not be tolerated, but that is still below the

Guidelines range of Life and the statutory maximum of 275 years.  The United States's position

on the Guidelines calculation is set forth in the Guideline Calculation section, *supra*.  The United

States respectfully recommends a sentence of 45 years.

### (5) Any pertinent policy statement issued by the USSG

The United States is unaware of any pertinent policy statements issued by the USSG.

### (6) The need to avoid unwarranted sentencing disparities among defendants with similar records

The United States requests that the Court impose a sentence of 45 years.  This defendant

acted as one of the three masterminds and executors of this massive, unprecedented, Medicare

fraud.  As the evidence at trial demonstrated, she was effectively the second-in-command.  She

was the partner who paid close attention to the details of the daily activities of the scheme.  She

was the one who monitored the census and the books and made sure the patient files were signed

and assembled for any potential inspections.  Defendant Duran, the first leader of the scheme,

was sentenced to 50 years in prison by this Court.  Defendant Valera, the third leader of the

scheme, and the public face of ATC, was sentenced to 35 years.  It is therefore wholly

appropriate and reasonable to sentence Negron between her two fellow leaders, at 45 years.

The requested sentence is also reasonable in comparison to similar fraud cases.  *See e.g.*,

*United States v. De Los Rios*, No. 10-527-CR-LENARD, Docket Entry No. 291 (S.D. Fl. June

29, 2011) (sentencing defendant doctor to 20 years imprisonment for involvement in schemes

totaling $42.6 million) (Exhibit E); *United States v. Mateos*, 623 F.3d 1350, 1368 (11th Cir

2010) (affirming 30-year sentence for physician involved in $11 million health care fraud

scheme); *United States v. Okun*, No. 3:08-cr-00132, Docket Entry No. 328 (E.D. Va. Sept. 2,

2009) (sentencing defendant to 100 years' imprisonment for charges related to theft of more than

$120 million) (Exhibit F); *United States v. Rothstein*, No. 0:09-cr-60331, Docket Entry No. 290

(S.D. Fl. June 9, 2010) (sentencing defendant to 50 years' imprisonment for charges related to defrauding investors with losses of $430 million) (Exhibit G).

The relevant comparison for sentencing includes *United States v. Alvarez*, 08-20270-CR-MORENO, in which Dr. Ana Alvarez was sentenced by Chief Judge Moreno to 360 months imprisonment for her role as a physician at a fraudulent HIV infusion clinic.  In that case, Defendant Ana Alvarez was responsible for conspiring with others to submit thousands of false claims totaling more than $11 million to the Medicare program.  During the course of her criminal conspiracy, Alvarez falsified medical records, performed sham medical examinations, and ordered and authorized hundreds of medically unnecessary procedures.  On appeal, the Eleventh Circuit upheld defendant Alvarez's 360 month sentence in a decision authored by the Honorable Sandra Day O'Connor, Associate Justice of the United States Supreme Court, sitting by designation.  *See United States v. Mateos*, 623 F.3d 1350 (11th Cir. 2010).

Recently, physician Rene De Los Rios was sentenced by Judge Lenard to 20 years in prison for his role in two HIV infusion schemes totaling $46.2 million in intended loss.  *See* No. 10-527-CR-LENARD, Docket Entry No. 291 (S.D. Fl. June 29, 2011) (Exhibit E).  De Los Rios similarly falsified medical records, performed sham medical examinations, and authorized medically unnecessary procedures.

The ATC scheme was massive even in comparison to the huge Medicare frauds discussed above.  The co-conspirators here were not simply participants in this scheme, they were the masterminds and the individuals who perpetuated and concealed it for eight years.  They not only falsified medical records, but taught others to do so.  There are doctors who participated in this scheme whose loss exposure is higher than that of Alvarez or De Los Rios, but those doctors were hired and directed by Negron and her co-conspirators.  They paid for the patients those

doctors signed off on, and they knew where those patients were coming from and how vulnerable they were.

Negron, like Duran and Valera, is therefore perhaps more comparable to Scott Rothstein, the lawyer turned Ponzi-schemer in Ft. Lauderdale who was sentenced to 50 years in prison even after he pled guilty pursuant to a plea agreement and was extensively cooperating with the government. *See* Exhibit G; *see also id.* DE 277, at 2 ("The Government concedes that a variance in this case is supported by several salient factors. While the Defendant's criminal activity in this case can only be described as reprehensible, it is beyond dispute that his post-offense conduct has been extraordinary."). Although Rothstein pled guilty to $430 in losses, comparatively, Negron's Medicare fraud was vast in scope like Rothstein's. Like a Ponzi scheme, Negron preyed on vulnerable people to make money for them. But unlike a Ponzi scheme, Negron did not just steal money, they used sick, elderly, vulnerable people as props for days and weeks on end, sitting in their centers. Significantly also, Rothstein's cooperation includes efforts to recover the remaining money and assets for the fraud's victims, unlike Negron and her co-conspirators who have left the government to take what it can find.

### (7) The need to provide restitution

The defendant should pay restitution of $87,533,863.46, which represents the gross proceeds from the ATC and ASI frauds, jointly and severally with her co-conspirators.

## RECOMMENDATION

The victims of the ATC fraud included more than the Medicare program and the taxpayers. As became apparent during the trial, the three owners and masterminds of this scheme used sick, elderly, demented, brain damaged, drug-dependent, homeless, and other vulnerable people as their props in this game to bilk as much money as they could out of

Medicare.  The ATC "patients" were some of the most vulnerable citizens in our population, and ATC preyed on them, filled their centers with them, and billed Medicare for as much as they could on their behalves.  These sick and dependent people could have received treatment elsewhere – treatment that would have been more appropriate for their diseases – but instead were bought and sold by the very people who were supposed to be protecting their interests, the assisted living facility owners, halfway house owners, and the owners of the Community Mental Health Center – ATC – where they ended up.  The chief perpetrators of this fraud should be punished not just for the money they tried to steal, but for the way in which they tried to steal it.

The United States requests a sentence of imprisonment of 45 years.  The United States also requests that the Court impose a three year term of supervised release and require the defendant to pay restitution, jointly and severally her co-conspirators, of $87,533,863.46.

Respectfully submitted,

WIFREDO FERRER
UNITED STATES ATTORNEY

By:  _____/s/_____

Jennifer L. Saulino
Trial Attorney
U.S. Department of Justice
1400 New York Avenue, NW
Washington, DC 20005
Phone:  202-445-9674
Fax:  202-514-7021
Jennifer.Saulino@usdoj.gov

## CERTIFICATE OF SERVICE

On this 5th day of December, 2011, I hereby certify that I have electronically filed and served this document using CM-ECF and provided a copy to Counsel and the Probation Office via email.


                    _____/s/_____
                    JENNIFER L. SAULINO
                    Trial Attorney
                    United States Department of Justice
                    Criminal Division, Fraud Section
                    1400 New York Ave., NW
                    Washington, DC  20005
                    Tel: (202) 445-9674 (mobile)
                    Jennifer.Saulino@usdoj.gov