# GOVERNMENT EXHIBIT A

```
 1                  UNITED STATES DISTRICT COURT
                   SOUTHERN DISTRICT OF FLORIDA
 2                        MIAMI DIVISION
 3                     CASE 10-20767-CR-KING
 4
   THE UNITED STATES OF AMERICA,
 5
                          Plaintiff,
 6
        vs.                              MIAMI, FLORIDA
 7                                       SEPTEMBER 14, 2011
   LAWRENCE S. DURAN,                    WEDNESDAY - 9:30 A.M.
 8 AMERICAN THERAPEUTIC CORP.
   MEDLINK PROFESSIONAL MANAGEMENT CORP.
 9
                          Defendants.
10
11            TRANSCRIPT OF SENTENCING PROCEEDINGS
           BEFORE THE HONORABLE JAMES LAWRENCE KING
12              SENIOR UNITED STATES DISTRICT JUDGE
                             DAY 1
13 APPEARANCES:
14 FOR THE GOVERNMENT:    JENNIFER L. SAULINO, A.U.S.A.
                          Department of Justice
15                        Criminal Division - Fraud Section
                          Bond Building
16                        1400 New York Avenue N.W.
                          Washington, D.C.  20530
17                        Email:  jennifer.saulino@usdoj.gov
18 FOR THE DEFENDANT:     LAWRENCE RICHARD METSCH, ESQ.
                          Metsch & Metsch
19                        20801 Biscayne Boulevard, Ste. 307
                          Aventura, FL  33180-1432 - 305/792-2540
20                        Email:  l.metsch@metsch.com
21 REPORTED BY:           ROBIN MARIE DISPENZIERI, RPR
                          Official Federal Court Reporter
22                        United States District Court
                          Wilkie D. Ferguson Federal Courthouse
23                        400 North Miami Ave., Ste. 08S67
                          Miami, FL  33128 - 305/523-5659
24                        Robin_dispenzieri@flsd.uscourts.gov
25
```

```
 1            THE COURT:  The rest is marked into evidence.
 2            All right, now, your next witness.
 3            MR. METSCH:  I call the defendant, Mr. Duran.
 4            THE COURT:  Swear the witness.
 5            COURTROOM DEPUTY:  Raise your right hand.  Do you
 6  solemnly swear that the testimony you are about to give will be
 7  the truth, the whole truth and nothing but the truth so help
 8  you God?
 9            THE DEFENDANT:  Yes.
10            COURTROOM DEPUTY:  Please state your full name and
11  spell your last name for the record.
12            THE DEFENDANT:  Lawrence Simon Duran, D-u-r-a-n.
13         LAWRENCE SIMON DURAN, DEFENDANT'S WITNESS, SWORN
14                      DIRECT EXAMINATION
15  BY MR. METSCH:
16  Q.  Are you the defendant in this case?
17  A.  Yes.
18  Q.  Are you now in custody?
19  A.  Yes, I have been so for eleven months.
20  Q.  Please give the Court a brief resume of your formal
21  education.
22  A.  High school in Queens, New York City, Queens College, and
23  Masters in Mercy.
24  Q.  What did you study at Queens College?
25  A.  Industrial organization and psychology.
```

DURAN - Direct

1  Q.  Did you get a bachelors' degree at Queens College?

2  A.  Yes.

3  Q.  You got a master's degree in what?

4  A.  Education.

5  Q.  From?

6  A.  Mercy College.

7  Q.  Where's that?

8  A.  White Plains, New York City.

9  Q.  Did there come a time that you undertook employment in

10 which you became familiar with Medicare payment procedures and

11 practices, and if so, when did that first occur?

12 A.  It first occurred when I worked for a company called

13 American Day Treatment Center.  I think it was '92, '93 when I

14 started working for them.

15 Q.  What did you do for them?

16 A.  I started as a marketer and was assigned a program at South

17 Shore Hospital.  I was shortly promoted to open occupational

18 behavioral health programs in each of their centers.  They had

19 about 24, 25 programs throughout the United States in mental

20 health centers.

21 Q.  In the course of that employment, did you become familiar

22 with Medicare regulations?

23 A.  Yes.

24 Q.  How is that so?  Did you have a responsibility to know

25 those regulations?

1  A.  After that, I started helping them opening up centers in

2  Maryland.  I helped them open centers in Chicago.  So I had to

3  learn all the regulations as to what was required and how to

4  run the programs themselves.

5  Q.  Did you become familiar with claims procedures in Medicare?

6  A.  Not so much there, but when I started doing it myself.

7        MS. SAULINO:  I object that the question was leading

8  and compound.

9        THE COURT:  He was telling us how he knew that.  Is

10 this when you were working for the company that you just

11 described?

12       THE WITNESS:  Yes, Your Honor.  It was American Day

13 Treatment Center.  Then I opened my own company, American

14 Therapeutic Services.

15       THE COURT:  What is your next question?

16 BY MR. METSCH:

17 Q.  When you opened your own company, did you apply for and

18 become a Medicare provider?

19 A.  Yes.

20 Q.  Who was responsible in your company for maintaining

21 oversight and compliance with Medicare policies?

22 A.  I was.

23 Q.  Did you have to familiarize yourself with Medicare claims

24 and payment procedures in order to do that function?

25 A.  Yes, completely.

1  Q.  How did you go about doing that?  Did you undertake any

2  study?  If so, what did you do?

3  A.  Back in the 90s, First Coast used to have seminars.  I also

4  used to have policies and procedures and manuals that I had to

5  become familiar with.

6  Q.  Please identify for the Court what First Coast is.

7  A.  They were called the Fiscal Intermediaries.  Now they

8  changed their name to MAC, Medicare Administrative Contractors.

9  Q.  Are they engaged by Medicare to provide services for the

10 Medicare program?

11 A.  Correct, both clinical and also financial.  They are the

12 ones who we actually pay for the services provided.

13 Q.  So the government puts money at their disposal and they can

14 draw funds from the treasury and make payments to providers?

15 A.  Yes.

16 Q.  They are the ones who evaluate the claims and decide

17 whether they comply with the regulations?

18 A.  They do.

19 Q.  When you opened your first company of your own, you had to

20 familiarize yourself with those regulations?

21 A.  Yes, I did.

22 Q.  Did you, in fact, submit claims at that time?

23 A.  Yes, we did.

24 Q.  Were they paid?

25 A.  Yes, they were.

DURAN - Direct

1  Q.  Did you know at that time, back in the 90s, that the amount

2  claimed was not necessarily the amount paid?  If so, could you

3  tell the Court what the distinction is between the two.

4       MS. SAULINO:  Objection, leading.

5       THE COURT:  Yes, I think in the trial of this case

6  there is a transcript from the same lady, Ms. Winnette Sandlin.

7  She testified.  She had been an executive with First Coast.  I

8  have not read the transcript, but she had been there 29 years,

9  and she worked her way up through the whole system.

10      At the time of her testimony here a few weeks ago,

11 gave her evaluation of all of these regulations and how they

12 worked, what they provided, and the regular procedures of First

13 Coast in approving or disapproving claims that were submitted

14 under the Medicare Act.

15      The bottom line to all of this testimony is that First

16 Coast publishes publications and lets everyone know throughout

17 the health care industry that they approve exactly 80 percent

18 of a claim and submit the money and pay the money to the person

19 that submitted it.  They do an evaluation and all of that, but

20 the purpose of all of this is to show that routinely, and

21 traditionally, and regularly, First Coast and the health care

22 people approve 80 percent of claims that are submitted and

23 leave the other 20 percent up to the provider or the claimant,

24 whatever it may be, pharmacy, doctor, clinic, whatever, to look

25 to co-pay for the other 20 percent.

1    If that's the purpose of this, I've heard that

2  testimony.  She was subject to cross-examination.  She was

3  here.  I don't think there is any dispute about it.  I think we

4  might be able to cut to the heart of this point.  Is that your

5  point in proceeding with asking your client, witness?

6    Are you attempting to establish that in First Coast

7  the payment is usually 80 percent, and that everybody knows

8  that, everybody in the industry knows that; is that your point?

9    MR. METSCH:  That is not quite my point, Your Honor.

10  There is a very important distinction.

11    THE COURT:  Go ahead.  I hope that we are not going to

12  waste time with all this stuff that's already in the record

13  about which there is no real dispute.

14    MR. METSCH:  As a matter of fact, Exhibit 6, DX6, is

15  the transcript of that testimony that you are talking about,

16  Your Honor.

17    THE COURT:  I remember the lady testifying clearly and

18  the cross-examination.

19    MR. METSCH:  Let me elicit this from the witness.

20    THE COURT:  Go ahead.

21  BY MR. METSCH:

22  Q.  Mr. Duran, is there a distinction, based on your experience

23  dealing with Medicare, between the amount billed and the amount

24  that's deemed to be customary and reasonable to be paid?

25    MS. SAULINO:  Objection, Your Honor.

1          THE COURT:  Well, the issue that we have here, what

2     you all are driving at, of course, I understand certainly, is

3     whether or not, under the regulations, under sentencing

4     guidelines, not the Medicare Act, but sentencing guidelines, in

5     talking about what a person intends to obtain as a result of

6     his or her acts, speech, or submissions of claims as intended

7     theft, intended violation, intended or expected amount of

8     value.

9          It should be either 80 percent or 100 percent or some

10    variation thereof or some other factors.  I don't mean to

11    exclude any other factors.  I had thought there was no dispute

12    between the parties that the claims are submitted through the

13    Medicare process to First Coast by claimants.  It is generally

14    understood by people that submit those, clinics, doctors,

15    pharmacies, everybody, that the claim will generally be paid

16    only by 80 percent.

17         The other 20 percent is up to the doctor to collect

18    from its patient, up to the pharmacist to collect from the

19    prescription holder who is getting the prescription filled and

20    so on.  I thought that was not in dispute.

21         MR. METSCH:  That can't be.  The amount billed was

22    $205 million.  The amount that was paid was $87 million.  What

23    we're looking at is that Medicare --

24         THE COURT:  Hold your argument until later.  The one

25    fact that you are asking him for his opinion, as a practitioner

1    in the field back in the 80s, or whenever he is talking about,

2    is whether or not the people in the field believed that they

3    would get paid back 80 percent or not.  I don't think there is

4    any dispute about that.  If counsel wants to go on, I've got

5    plenty of time.  What was your objection?

6         MS. SAULINO:  Actually, it was that the question was

7    highly leading.

8         MR. METSCH:  I am trying to move this along a little

9    bit, Judge.

10        THE COURT:  I don't think you are trying to move it

11   along if you don't want to accept and understand the

12   stipulation that 20 percent they didn't expect to get paid.

13   People testified about that in the trial of this case.

14        By the way, this is the same transcript.  It is part

15   of the same transcript of this case, which is one defendant

16   went to trial.  The evidence in that case is admissible here.

17   There was no dispute about the matter that 80 percent/20

18   percent was the breakdown.  If you have another point, go ahead

19   and try to make it.  The question I am dealing with is

20   materiality.  She wanted me to sustain that and tell you to ask

21   a more specific question without leading your client.  Go

22   ahead.

23   BY MR. METSCH:

24   Q.  Please tell the Court, based on your familiarity with both

25   the regulations and the procedures and your own experience,

1   what the factor was the 80 percent was applied to -- what was

2   the 80 percent applied to in determining the amount paid by

3   Medicare?  Was it the amount billed or some other number?

4           THE COURT:  He is talking about the mental processes

5   of First Coast.  I will sustain that objection.

6           He can say what he did, what he said, and what

7   happened.  Facts.  Just rambling about impressions, that would

8   come in the second phase of the sentencing hearing when you all

9   can tell me anything at all.  Sunday school attendance, family

10  friends.

11          In this phase, we have to deal with facts.  If you

12  want to elicit from him facts about claims he submitted and

13  what he got repaid, but that was years ago.  It's not related.

14  You have got some other point.  Go ahead.

15  BY MR. METSCH:

16  Q.  In the 90s, when you had the prior company, was there ever

17  a time when Medicare paid your company 80 percent of what you

18  billed?

19  A.  Back then it was actually cost reimbursement.  It was based

20  on your cost.  Now, in 2000, they have a 20 percent deductible

21  times your CCR, which is your cost per charge ratio.  Every

22  submission that you submitted was to receive what was paid by

23  Medicare and no more than that by First Coast.  We knew that we

24  were never going to receive what was billed.  We knew we were

25  going to receive what was paid, which was the total deducted by

53

DURAN - Direct

1   the CCR and the 20 percent deductible.

2   Q.  Did there come a time in which that operation was shut down

3   and you got involved with ATC and Medlink?

4   A.  In 2000, they left the providers that were Mutual of Omaha

5   open.  They placed everyone under 100 percent review and closed

6   maybe ninety-five percent of the programs here in Florida,

7   including my two programs.

8   Q.  What does "100 percent review" mean?

9   A.  Before you are paid, they would review every single chart.

10  You submit your billings and your charts.  They review it until

11  you get paid.  At the time, they were refusing -- 100 percent

12  of the charges were denied.

13  Q.  Did there come a time when your previous company was put on

14  100 percent review?

15  A.  Yes.

16  Q.  You had to shut the door because there was no more money

17  coming in?

18  A.  Correct.

19  Q.  Did there come a time in 2003 when you became involved with

20  American Therapeutic Corporation?

21  A.  Yes.

22  Q.  Did you, at that point, refamiliarize yourself with

23  Medicare?

24  A.  Yes, we opened in 2002.  We submitted the application.  We

25  start getting educated.  I went to Louisiana to find out what

1    was going on with Medicare and so forth.  I went to a couple of

2    conferences there, and I came back and we opened the company.

3    Q.  Did you apply for and get a Medicare provider number?

4    A.  Yes, we did that.

5    Q.  Did you become familiar with the way in which Medicare

6    claims were being paid for mental health services starting in

7    2003 when you got the new provider number?

8    A.  Yes, we realized that it changed from cost reimbursement to

9    fee for service.  We received a bundled amount for the day

10   services.

11   Q.  Was there any correlation between the amount that you would

12   bill and the amount that you would receive?

13   A.  What I had said earlier, what they would do is they would

14   put a 20 percent deductible and they would also deduct more

15   based on what your costs were in the facility, based on your

16   cost report that you submitted.

17   Q.  That was in 2003?

18   A.  2003, yes.

19   Q.  Is there a benchmark for paying these claims?  Is there

20   some published schedule that you would know in advance of what

21   Medicare would pay for a particular service?

22   A.  They come out with it at the beginning of the year.  They

23   come out with proposed rates, and it usually comes out in

24   September or October.

25   Q.  Was it published in print where every provider could see

1  what they would pay for a particular service?

2  A.  Yes.

3  Q.  I understand that you would customarily bill quite a bit

4  more than what the published rate was; isn't that correct?

5  A.  Yes, it's common practice to usually bill more than what

6  the Medicare billings would allow.

7  Q.  Why would you do that?

8  A.  Not quite sure.  In the 90s, we billed $900 a day and we

9  used to get paid $280, $290.  Now we were billing about $300 a

10  day and getting paid about $160.

11  Q.  At the time that you were getting $160 a day per patient

12  for mental health services when you submitted a claim for, say,

13  $300, did you intend to get the $300 or some other number?

14  A.  No, we knew we were going to receive $160.

15  Q.  Was the $160 then subject to a deductible or a co-pay?

16  A.  No, we used to receive $160.

17  Q.  Each time you submitted a bill, say hypothetically for one

18  day of service for a mental health care patient who is enrolled

19  in ATC, was it your understanding that you were going to get

20  the lower number based upon the published schedule that they

21  put out?

22  A.  Yes, each facility was a little different.  So Fort

23  Lauderdale would get $162, Miami may get $163.

24  Q.  Why was there a difference?

25  A.  Based on the CCR, the cost for charge ratio, for each of

1    those facility and the area, I think also.

2    Q.  When we got all these numbers that we have here, and we

3    know you have been working on this case since you were arrested

4    a year ago, we know that American Therapeutic Corporation,

5    between 2003 and 2010, billed slightly over $200 million to

6    Medicare; isn't that correct?

7    A.  Correct.

8    Q.  We also know that, during that same period, American

9    Therapeutic was paid approximately between $85 and $87 million.

10   A.  Yes.

11   Q.  Was the fact that you received so much less than what you

12   billed a surprise to you?

13   A.  No.

14   Q.  Why not?

15   A.  No, it's customary.  We knew exactly what it was.  Our

16   billing person would send me the totals every morning, the next

17   morning within a couple of hours, telling us exactly what it

18   was, and she would deduct the deductibles that were customary

19   from First Coast.  I would know exactly what we were going to

20   get paid.

21   Q.  Did it have any relationship at all to what you billed?

22   A.  No.

23   Q.  They applied their own standard for that; is that correct?

24   A.  Correct.

25            MR. METSCH:  Your Honor, at this time I have no

1   further questions for the witness.  There are other elements of

2   his life that will come in when we get to the other subject.

3            THE COURT:  This phase deals with the objections to

4   the PSI, as I have told you before.  The defendant will have a

5   full opportunity, if he wishes, or any other witnesses you wish

6   to call, in the second phase dealing with the application of

7   advisory guidelines once determined.  The second phase, dealing

8   with a person's life and all of the factors that go into

9   sentencing, he will have full opportunity about anything in

10   that phase that he wishes to talk about.  If he wishes to.  He

11   is not compelled to.

12            That breakdown, which I am sure all counsel know,

13   based on that, we should exhaust anything that you have

14   regarding any of the objections, the amount of the billing, or

15   anything else at this point.  If you have concluded that, fine

16   then, we will turn to cross.

17            MR. METSCH:  That's it.  I am finished, Your Honor.

18   Thank you.

19            THE COURT:  Thank you.

20            Ms. Saulino, bring your papers up to the podium.

21   Cross-examination.

22            MS. SAULINO:  Thank you, Your Honor.

23                         CROSS EXAMINATION

24   BY MS. SAULINO:

25   Q.  Mr. Duran, the purpose of your testifying on this issue is

1   to try to get a lower sentence, right?

2   A.   Yes, it is.

3   Q.   You know that the loss figure here, depending on how Judge

4   King decides to calculate it, is potentially worth four to six

5   levels in your guideline calculation, right?

6   A.   Well, it's either 46 years or life, that's correct.

7   Q.   That's correct, Mr. Duran.

8        You have admitted that all $205 million that were

9   billed to the Medicare program were billed fraudulently, right?

10  A.   Yes, I have.

11  Q.   Every single penny that you billed during the time you just

12  testified about, that you were in charge of American

13  Therapeutic, it was all fraud?

14  A.   Yes, I have pled guilty.

15  Q.   You just testified that every morning you would get an

16  accounting from the billing person about how the billing was

17  going, right?

18  A.   Correct.

19  Q.   You kept close track of that, didn't you?

20  A.   I did.

21  Q.   You kept very close track of how much money was coming in

22  to American Therapeutic and being transferred around to your

23  other companies, right?

24  A.   I kept track of the money that was coming in and our

25  expenses, yes.

1  Q.  You knew that money was being transferred from the American

2  Therapeutic and American Sleep Institute's accounts to Medlink,

3  right?

4  A.  Yes.

5  Q.  You were one of the owners of Medlink, right?

6  A.  Of course, we were paying between $300,000 and $450,000 in

7  kickbacks on a monthly basis, so you're right.

8  Q.  I'm glad you brought up the kickbacks.  You kept a close

9  eye on the kickbacks, too, right?

10  A.  Yes.

11  Q.  You knew how much money was going out in cash and in checks

12  to people who were purchasing patients for you every month,

13  right?

14  A.  Yes.

15  Q.  You knew that money was coming out of what you received

16  from Medicare, right?

17  A.  Yes.

18  Q.  So you had to keep a close eye on the back and forth there,

19  right?

20  A.  Yes, I did.

21  Q.  You are the person who kept an eye on all of those people

22  who were getting the cash for you, right?

23  A.  Yes.

24  Q.  You are the one they brought the cash to, right?

25  A.  Yes.

1  Q.  You had control of a number of companies, not just Medlink,

2  that received money that ultimately came from Medicare to

3  American Therapeutic and American Sleep Institute, right?

4  A.  I did.

5  Q.  Some of those companies are discussed in your probation

6  report, right?  You have seen that report, right?

7  A.  I have seen the probation report.

8  Q.  And some of them are discussed in there, right?

9  A.  I am sure that they were.  I'm sure that there were a

10  couple of companies in there.

11  Q.  But not all of them, right?  You didn't tell them about all

12  of them, did you?

13  A.  No, there was a lot of them.  I didn't tell them about any

14  of them.  All of a sudden I saw them there in the PSI.

15  Q.  You didn't talk to the Probation Office about where all

16  this money went, did you?

17  A.  She didn't ask.  We didn't discuss that.  You are right.

18  The money did go.  It was fraudulent.  I never, ever should

19  have done that.  I never should have opened the company in the

20  first place knowing that, here in Florida, that's kind of the

21  way it operated.  You are right.  I was wrong.  That's the

22  reason why I pled guilty.  From the beginning, I told the

23  officer this has been going on for five years.  Now is when we

24  are actually starting somewhere.  So you are right.

25  Q.  You didn't plead guilty on the day you were arrested,

1   Mr. Duran.

2   A.  I would have.  I wanted to.

3   Q.  But you didn't.

4   A.  I didn't.  It took me -- after the superseding, I wanted to

5   plead guilty before the superseding indictment four or five

6   times.  I was told not to because the superseding indictment

7   was coming.  On the day of the superseding indictment, I did

8   it.  What else could we have said other than we were guilty?

9   We never should have opened up the companies in the first place

10  here.

11  Q.  Mr. Duran, where is the remainder of the money?

12  A.  Every cent was paid out for kickbacks.

13  Q.  You received a good deal of that money yourself, didn't

14  you, Mr. Duran?

15  A.  I received -- I received -- yes.

16  Q.  Not every cent was sent out in the kickbacks, right?

17  A.  I received salary, a check, just like everybody else in the

18  company did.  The cash went out.  If we didn't have the cash to

19  pay the kickbacks, we wouldn't have the census.  We wouldn't be

20  able to maintain 350 employees.  You are right, it never, ever

21  should have happened.  I am at fault.  I accept that.

22  Q.  Not every cent went out in kickbacks, did it?

23  A.  Of course not.  We had an operation.  We had to pay our

24  taxes and health care expenses, everything.

25  Q.  Millions of those dollars went into your pocket, right?

1 A.  Well, you see my taxes.  You can tell exactly how much I

2 received.

3 Q.  Millions of dollars, right?

4 A.  Okay.

5 Q.  Are you disputing that you drove around in a Maserati prior

6 to your arrest?

7 A.  Not prior to my arrest.  I gave it back to the dealership

8 about four or five months before.

9 Q.  You had a Maserati, right?

10 A.  I had a Maserati for about seven months.

11 Q.  You had several properties, right?

12 A.  Yes.

13 Q.  You had a number of companies that were getting money from

14 American Therapeutic that came from Medicare, right?

15 A.  I agree with you totally, you are right.  I tried to open a

16 restaurant.  I spent $1.7 million of Medicare money, which I

17 should never have spent.  The restaurant never opened.

18       I bought a property in Tennessee.  I tried to build a

19 log cabin.  I had sixteen and a half acres.  That was money

20 from Medicare.  I never should have done that.  I bought

21 property in Orlando, a warehouse.  One of the properties were

22 in foreclosure.  I bought the building where we were located,

23 $1.5 million.  That was also Medicare money.  So yes, you are

24 correct.

25 Q.  At some point, you told Adriana Mejia to give the cash she

1  was converting directly to you so it wasn't going out for

2  kickbacks, didn't you?

3  A.  I asked her to give me the money because she didn't know

4  anybody else in the company.  She was supposed to give me the

5  money.  You are right, I gave her checks, and she was supposed

6  to come back and give me the cash.

7  Q.  You didn't answer my question, Mr. Duran.  At some point

8  during your dealings with Ms. Mejia, you told her to give the

9  money right to you so it wouldn't be a part of the kickback

10 operation, right, so that you would have it?

11 A.  Probably 99 percent of the time she gave the money back to

12 me.

13 Q.  Is that a yes or no to my question, Mr. Duran?

14 A.  I'm sorry, I am trying to remember if I had said something

15 like that to her.  I really can't recall.  I really, really

16 can't.  I did tell her that the cash comes back to me, so yes,

17 I did tell her that.

18 Q.  Are you disputing that you gave large amounts of cash to

19 your mother to hold for you?

20 A.  Yes, definitely.  I never did that.  Never did that, never.

21 Q.  In other words, your mother never received any money from

22 this fraud?

23 A.  My mother never received one cent from this fraud.

24 Q.  Not even to hold for you, Mr. Duran?

25 A.  Never.

1  Q.  Your ex-wife, she received no money from this fraud?

2  A.  She did not receive one cent from this fraud except she did

3  receive a salary.  She had a salary.  The salary was used to

4  pay the expenses of the house.

5  Q.  She didn't perform any services for American Therapeutic,

6  did she?

7  A.  She had for a period of time, and then she stopped.

8  Q.  She received a salary that was simply money going into her

9  pocket, right?

10  A.  To pay the expenses for the house, yes.  I transferred the

11  money over, as part of the divorce, to pay for the house

12  expenses, so yes, she did receive that.

13  Q.  How much of Medicare's money was transferred to your

14  ex-wife?

15  A.  I wouldn't know the total amount right now.

16  Q.  Millions?

17  A.  I don't think so.

18  Q.  Are your children still in private school, Mr. Duran?

19  A.  Yes, they are.

20  Q.  Medicare money paying for that, right?

21  A.  No, Medicare money is not paying for that.  My ex-wife has

22  a job now, and my mother gave her $69,000 the day I was

23  arrested.

24  Q.  $69,000 that originally came from you; isn't that right,

25  Mr. Duran?

1  A.  No, ma'am, it did not come from me.  It came from her.  It

2  actually came my father when he passed away back in 1991.

3  Q.  Mr. Duran, you said that you knew you weren't going to get

4  all of the money you billed to Medicare, right?

5  A.  That's correct.

6  Q.  If you could have gotten all of that money, you would have

7  taken it, right?

8  A.  I knew that wasn't the case.

9  Q.  Mr. Duran, you admitted to billing $205 million

10 fraudulently to the Medicare program.  You wanted to get as

11 much as you could possibly get, right?

12 A.  That's not realistic.  That wasn't the case.  Why would I

13 budget something that I knew wasn't going to happen?

14 Q.  Mr. Duran, you wanted to get as much money out of Medicare

15 that you could possibly get, right?

16 A.  Yes.

17 Q.  If they sent you the $205 million, you wouldn't have sent

18 it back, right?

19 A.  Probably not.

20 Q.  You testified all about the schedules that are used by

21 Medicare, right?  You know about the payment schedules?

22 A.  Yes.

23 Q.  You know that those schedules changed over time, right?

24 A.  Yes, every year.

25 Q.  So you know that the amount that Medicare paid was not an

1  exact 80 percent every year, right?

2  A.  No, it was actually less than 80 percent.

3  Q.  You know it changed over time, right?

4  A.  Correct.

5  Q.  Part of the reason, Mr. Duran, that you billed higher than

6  you thought you would get is because you wanted to make sure

7  you were, at least, billing enough to meet with the schedules,

8  right?  You didn't want to lose out on any of the money that

9  Medicare was going to pay, did you?

10  A.  Ms. Saulino, you are right.  I would have done anything

11  possible to accept and receive the money that I was going to be

12  paid.  I knew exactly what that amount was going to be every

13  single day that we billed and made a submission.

14  Q.  In fact, Mr. Duran, when one of your facilities was placed

15  on review in Homestead, you moved the Homestead patients to

16  Miami so that those files wouldn't be reviewed, right?

17  A.  I didn't want to -- yes, you are right.  I didn't want to

18  layoff all the staff.  I opened one track in Miami that was for

19  Homestead patients, yes.

20  Q.  You moved the patients so that Medicare's review wouldn't

21  have any affect on your billing, right?

22  A.  Yes.

23  Q.  You appealed claims with some regularity, right?

24  A.  We appealed every claim.

25  Q.  You appealed every claim that was denied?

1   A.   Yes.

2   Q.   Every single claim that was denied was appealed by you?

3   A.   We were very efficient.

4   Q.   Appealing the claim means you are telling Medicare, "You

5   wrongfully denied this claim.  You should pay this claim,"

6   right?

7   A.   Yes.

8   Q.   You knew at the time that Medicare had rightly denied the

9   claim, right?

10  A.   Not always.

11  Q.   But it was all fraud, wasn't it, Mr. Duran?

12  A.   Yes.

13  Q.   So Medicare had rightly denied it, right?

14  A.   Correct.

15  Q.   Mr. Duran, you are familiar with a study that was

16  commissioned by the National Association for Behavioral Health

17  that Medicare's reimbursements for PHP services were sufficient

18  to cover the cost for the services, right?

19  A.   Could you say it again.

20  Q.   The NABH, you are familiar with that organization?

21  A.   Yes, I am.

22  Q.   You are familiar with a study that they commissioned to

23  find out whether Medicare was paying the right amount for PHP

24  services?

25  A.   Yes, I am familiar with that.

1  Q.  You were involved with commissioning that study, right?

2  A.  Yes.

3  Q.  You were also involved in knowing that the result of that

4  study was that Medicare did pay the right amount, right?

5  A.  The disparity there was if you wanted to understand what

6  the difference was between a hospital-based facility and a

7  freestanding facility, so we commissioned a study for that

8  because the government saw it as different costs.  We were

9  trying to say it was the same.  Actually, the government was

10 correct.

11 Q.  All of that was done because you wanted to be able to bill

12 more to Medicare so you would get more from Medicare, right?

13 A.  It was done because we wanted to receive the exact same

14 amount that hospital-based -- Partial Hospitalization Program

15 was receiving, yes.

16 Q.  You wanted to receive more than what you were receiving?

17 A.  We wanted to make sure that we were not going to receive

18 less than a hospital-based program, yes.

19 Q.  And again, everything you were receiving was fraud?

20 A.  Yes.

21 Q.  You never told Medicare you didn't want all of the money

22 you were billing, right?

23 A.  No.  I did send two letters to CMS after I met with them

24 letting them know about the epidemic of kickbacks here in

25 Florida.  I also did the same thing with Program Safeguard, but

1  to no avail.  It didn't help.  I continued doing illegal and

2  fraudulent activities.

3  Q.  You sent those letters during the time that you were paying

4  out hundreds of thousands of dollars in kickbacks for patients

5  every month, right?

6  A.  Yes.

7  Q.  Mr. Duran, you are very familiar, it sounds like, with

8  Medicare guidelines and fee schedules and requirements, right?

9  A.  Well, it's been a year since I have had any contact at all

10  with it.

11  Q.  You were back when you opened American Therapeutic, right?

12  A.  Yes.

13  Q.  And as you just described it, when you opened American

14  Therapeutic, you reopened the business, right, in 2002?

15  A.  Well, yes, that's what I said, yes.

16  Q.  And you described it that way because you had a previous

17  business called American Therapeutic Services, right?

18  A.  Correct.

19  Q.  That your name was on, right?

20  A.  Yes.

21  Q.  Your name was not on the American Therapeutic Corporation

22  applications to Medicare, was it?

23  A.  No, it wasn't.

24  Q.  That was for a very specific reason, wasn't it, Mr. Duran?

25  A.  Yes, I owed $2 million from the previous.

1  Q.  You didn't want Medicare to know that you were involved in

2  American Therapeutic Corporation, did you?

3  A.  I didn't want them to know that I had ownership, yes.

4  Q.  That's because you wanted to make sure that Medicare would

5  approve the applications so that you could again start billing

6  Medicare, right?

7  A.  Yes.

8  Q.  You knew that if they knew you were involved they might not

9  approve the applications, right?

10  A.  Yes.  I still had two programs that were active.  The

11  Medicare numbers were active.  If I would have opened those,

12  they would have started taking back the $2 million that I owed

13  them, you are right.

14  Q.  You did it because you wanted to keep the $2 million that

15  you owed them, and you wanted to make sure to be able to bill

16  $205 million more, right?

17  A.  Well, what happened is we were placed on 100 percent

18  review.  I closed the companies.  I had just been audited

19  fiscally by Mutual of Omaha.  They told us that they were going

20  to place us on 100 percent review because of what we were

21  billing on a daily basis, the $900.00.

22       I asked them what we needed to do, do we need to

23  submit a cost report when we close down, because I can't stay

24  open.  She said, "No, you don't need to.  You just zero it

25  out," but that was incorrect.  So what happened was that,

1  because we closed down, we did not submit a cost report, and

2  they made the total amount that we received that year -- and

3  that was $2 million.

4  Q.  You wanted not to have to pay that money back, right?

5  A.  Correct.

6  Q.  You wanted to make sure that American Therapeutic

7  Corporation would get approved so that you could bill more to

8  Medicare, right?

9  A.  Yes.

10  Q.  From day one, you were billing fraudulently, right?

11  A.  Yes.

12  Q.  You knew that you were required to collect co-pays, right,

13  for the services that American Therapeutic performed?

14  A.  Yes, ma'am.

15  Q.  Not only did you know that you were required to collect

16  them, you did go through the motions of trying to collect them,

17  didn't you?

18  A.  That's correct, we did.

19  Q.  You tried to collect them from Medicaid, right?

20  A.  Well, we actually filed a process.  The process is that you

21  have to submit letters to your patients.  If you don't receive

22  the payments, then you go back to Medicare.

23       What happened was that before we opened and received

24  our Medicare provider number, we had a Medicaid number to

25  provide comprehensive behavioral health assessments.  That

1   number was attached to our Medicare number.  You are correct in

2   that what happened automatically was we started getting back

3   the co-pay from Medicare, automatically, because Medicaid would

4   deny them and Medicare would pay them.

5   Q.  So it is not correct, Mr. Duran, that you didn't intend to

6   get the co-pays, right?  You intended to get the co-pays if you

7   could get them, didn't you?

8   A.  Yes.

9         MS. SAULINO:  No further questions, Your Honor.

10        THE COURT:  Okay.

11        MR. METSCH:  Nothing further, Your Honor.

12        THE COURT:  You may step down.

13              [Witness was excused].

14        MR. METSCH:  Your Honor, may I have one moment to

15   confer with Mr. Duran?

16        THE COURT:  Of course, of course.

17              [Counsel confer off the record].

18        MR. METSCH:  We have no further evidence to present on

19   the issue of the calculation of the guidelines.  That is the

20   loss amount.  That is the issue that, I think, Your Honor was

21   focusing on at this phase, the calculation of the loss amount.

22   We have nothing further on that.

23        THE COURT:  Yes, we were focusing on that.  I want to

24   look at the other two -- I'm sorry, objection number three

25   about a question of sophisticated laundering, which I presume

```
 1   is going to be more legal argument based on the record, that
 2   record being the PSI, the trial transcript, and whatever
 3   evidence is introduced at this hearing.  That's number three.
 4          Number four is assistance to the government and an
 5   objection that the defendant has not been given, or has the
 6   government sought, any defense assistance reduction or
 7   computation in the advisory guidelines.  I think that also, in
 8   this record, you have the facts to argue that, although you may
 9   wish to offer evidence.  If you do, what I am getting at is I
10   understand and respect what you are saying about the loss
11   amount.
12          Now, I want to get all the evidence first.  It's a
13   complicated way to saying that I believe that you are intending
14   to stop with any further testimonial evidence or documents at
15   this point since the others have enough facts there that you
16   can make your legal argument on.  I am not trying to create a
17   problem in your mind, but I think you have covered everything.
18          If you have not, this is the time you need to do it.
19   We won't take objection number two about loss amount and then
20   come back here with some more on something else.  That is maybe
21   a better way of explaining what I am trying to do in terms of
22   keeping it organized into the two segments.  Certainly,
23   anything personal, that all comes in the second phase after the
24   advisory guidelines are calculated.
25          To remind you, the other two deal with assistance to
```

1   the government and sophisticated laundering, and we have a

2   pretty elaborate trial on the laundering aspect and all of

3   that.  I am not suggesting that there is something more you

4   need to do, but I want to be clear before I turn to the

5   government, because they are going to be limited to pretty much

6   what you brought out.

7           MR. METSCH:  With respect to the sophisticated

8   laundering, I am not going to offer any further evidence.

9           However, with substantial assistance to the

10  government, we do intend to put evidence on through some

11  testimony of Mr. Duran.  The reason I didn't elicit that before

12  was that I was under the impression that Your Honor was

13  focusing exclusively on the calculation of the loss amount at

14  this phase.

15          THE COURT:  No, I am looking at the whole PSI.  The

16  trial Judge's responsibility at sentencing hearings is to

17  formulate and make findings dealing with the advisory guideline

18  points, all of these points, all of these calculations.  You

19  have filed the objections, which we have discussed, which I am

20  comfortable that you and Mr. Duran and the government all know

21  what I am talking about.  We have discussed that, and we are

22  working through those.

23          The government, now, has raised their points that they

24  are going to be presenting.  You may have rebuttal to that.

25  Fine.  You will be given an opportunity to do that.  Whatever

1    that may be, the government is urging enhancements on a couple

2    of areas.  I think three areas.  I won't analyze those with you

3    now because I don't want to suggest more facts for you all to

4    get into.  You can think of enough on your own without my help.

5    So we have that.

6            To those, you would get to rebut as she is getting to

7    rebut yours now.  That is the procedure.  It's commonplace,

8    straightforward trial and evidence just like we have had, from

9    my knowledge, in the last half century in this district.

10   Nothing has changed.  We are just keeping it as organized as we

11   can rather than having the lawyers get up and argue with no

12   evidentiary factual basis.  In other words, just lawyers get

13   up, and it's human to say, "Well, he went to Sunday school.

14   She taught church."  Nothing in the record about it.  You see

15   what I am getting at.  I like the record first.

16           Enough with that.  I didn't mean to suggest that you

17   need to proceed further at this point.  I think I'm clear in my

18   mind with the way we'll proceed.

19           MR. METSCH:  If Your Honor would like me to present

20   evidence on substantial assistance, I am prepared to do that

21   now.

22           THE COURT:  That is one of your objections, number

23   four or five.

24           MR. METSCH:  However, there is one item that I would

25   like, with the Court's permission, to approach side-bar with

1    counsel for the government so we could discuss it in a somewhat

2    intimate session.  There is a problem with one of these

3    elements on substantial assistance.

4           THE COURT:  All right.  It is now 11:52, so I think

5    that we can recess this hearing at this point in time and let

6    everybody go to lunch that wants to go to lunch, or whatever

7    they want to do, except I will ask the lawyers to remain to

8    take up with you some of the issues that have been presented in

9    your objections number four and five, whatever it is that you

10   wish to discuss with me.  That's the way we will handle that.

11          I will take five minutes while everybody clears the

12   courtroom.  Then I will ask the Courtroom Deputy and my Court

13   Reporter to remain, and the Marshal remain, and counsel to

14   remain.  We will then go into a side-bar conference.  I don't

15   have people coming up whispering to me because I can't hear

16   you, Robin can't take it down, so we will do it that way.  We

17   will take five minutes, and then we will return back.

18          Marshal, you can clear the courtroom.

19          COURTROOM DEPUTY:  Court is in recess.

20          [There was a short recess at 11:50 a.m.]

21          COURTROOM DEPUTY:  All rise.  Court is back in

22   session.

23                 [Returned at 12:10 p.m.]

24          THE COURT:  All right.  Fine, have a seat.  We have

25   cleared the courtroom pretty much.  There is nobody here that

77

1   is a reporter or a spectator or anything like that.  Stephanie

2   is my law clerk.  She is with me.  She is fine.

3            All right, then.

4            MR. METSCH:  One element is that we filed a motion

5   under seal.

6            THE COURT:  Let the record reflect that we have a seal

7   unless ordered released by the Court.

8            The defendant is here, the government is here, all the

9   parties are here.  Mr. Metsch?

10            MR. METSCH:  You will see that items 274 and 275 were

11   items under seal.  One was filed on behalf of Duran, and one on

12   behalf of Valera, in an effort to seek consideration by the

13   Court for substantial assistance to the government in

14   connection with information provided to Ms. Saulino by me from

15   Mr. Duran concerning Mr. Duran's payments to a --

16            THE COURT:  It wasn't clear on that.  I read that

17   carefully.  Your submission is broader than what I was able to

18   discern.  What I discerned was that kickbacks were paid.  My

19   memory is that kickbacks were paid to get people from the drug

20   program, State of Florida drug program, bused to the clinics so

21   that the fraudulent claims could be made.

22            MR. METSCH:  That's not what happened.

23            THE COURT:  That would not indicate who received the

24   money or whatever.  What I am getting at is we need some sort

25   of factual basis, some sort of something, if you proffer

1    something, if you are going to go into this.  Backing up from

2    that is a predicate.  I know of no authority that I have, as a

3    matter of law, to require the Department of Justice or the U.S.

4    Attorney to prosecute anyone or to bring any indictment.

5         I can refer matters, any Judge could, any citizen, I

6    suppose, could refer a matter to the U.S. Attorney and say here

7    is something I want to bring your attention to whatever, and

8    you wish to do about it, if anything, and away it goes.  That's

9    the end of it.  I can't order them to prosecute anybody.  Under

10   the separation of powers, that's exclusively reserved to the

11   executive to enforce the criminal law of the nation of the

12   state.

13        So it only would come up as a matter of judicial

14   evaluation, fact finding, and order if the government has

15   promised to do something in a plea bargain, or in some sort of

16   way, in exchange for a plea of guilty, for example.  That's one

17   way it could come up, if the government has, in light of the

18   contention or ultimately the facts, improperly and unlawfully

19   withheld keeping the bargain, keeping their promise.

20        Now here, we have no promises made because the

21   government endeavored to make promises, and the defendant

22   endeavored to work it out, and the Court rejected that.  I have

23   forgotten whatever it was, if I ever knew.

24        MR. METSCH:  I don't think you knew, Judge.

25        THE COURT:  I didn't know the details, but I knew

 1    there was an attempted plea bargain.  Fine, that is perfectly

 2    proper, but that was rejected.

 3           Thereafter, the defendant was given his right to

 4    withdraw his plea of guilty, at least the right that I enforce

 5    in this division of Court, and I have for 41 years.  So he did

 6    that.  Then, a few days later, a week, ten days later, whatever

 7    it was, the defendant elected to plead guilty without a plea

 8    bargain, without arrangements, without promises to the 38, 39

 9    counts as we have come to refer to it "straight up."

10           That is where we are.  We have no promises made, nor

11    can there be any promises made, and it is simply a matter that

12    the defense says we have given evidence and information to the

13    government, which, based on that, they should have come forward

14    and made us a promise that they would give us, that is the

15    defense, some credit.

16           See, the jurisdiction of the Court to be involved in

17    that is limited to a promise that was made, relied upon by the

18    defendant, and defaulted upon unlawfully by the government.

19           I recognize the difficulty you and Mr. Tifford are

20    having to get a benefit for your client out of what you

21    perceive to be available information of commission of a crime,

22    or possible commission of a crime, but I don't know that I have

23    any jurisdiction to go into it at all because if I found that

24    everything you have implied or alluded to, referred to in your

25    sealed documents 274 and 275, was absolutely true and

1    absolutely correct and you could prove it seven ways to Sunday,

2    and the government would never have known about it but for your

3    client, that's in the same category if Judge Gold sees

4    something tomorrow and he refers it to the U.S. Attorney and

5    says look at this.  We have no authority to do anything about

6    it because the government has not defaulted on a promise

7    because there are no promises.

8         Tell me how we get around the jurisdictional

9    conundrum.  If you can think of a way.  I can think of none.

10   Before we get into the crime that your client is willing to

11   help the government.

12        MR. METSCH:  Your order of September 2nd, 2011, docket

13   number 287 at page 3, the first full paragraph deals precisely

14   with this problem.  May I read it, or would you like me to just

15   show it to the Court?

16        THE COURT:  Can you just tell me about it.

17        MR. METSCH:  It says here, it is very clearly written.

18   It was beautiful.  "Despite the government's decision not to

19   move for a 5K1.1 deduction for these defendants, the Court has

20   discretion to consider evidence of the defendant's offers of

21   assistance under the history and character of the defendant

22   factor of the sentencing guidelines, 18 U.S.C. 3553(a)(1).  See

23   U.S. versus Fernandez, 443 F.3d 1933-34, Second Circuit, 2006,

24   holding that a District Court may, in its discretion, consider

25   evidence of the defendant's efforts to cooperate even if those

1    efforts did not yield the government motion for a downward

2    departure.  Pursuant to U.S.S.G., Section 5K1.1."

3           Upon review of defendant's motions and the claims of

4    the substantial instance contained therein, the Court will

5    exercise its discretion to consider evidence in this matter as

6    part of the history and character of the defendant factor.

7    Again citing 18 U.S.C. 3553(a)(1).

8           The Court will not, however, take evidence on the

9    merits of the substantial assistance information offered.  It

10   is entirely within the discretion of the executive as to

11   whether allegations of criminal activity warrant further

12   investigation or prosecution, citing U.S. versus Cox, 342 F.2d

13   167, Fifth Circuit.

14          THE COURT:  Okay.  I have gone into that before,

15   that's why it was pretty familiar to me.  Personally, as

16   opposed to all this sentencing guideline stuff that we have to

17   deal with, then we will do the history, and then he comes

18   forward and says, in effect, "I really tried.  I gave them

19   evidence of other criminal activity."

20          The facts of what he knows about, that would be

21   criminal activity, or what he believes he knows about, would

22   not be admissible into evidence.  It would be simply a matter

23   that, "I made an effort factually through my lawyer.  I made a

24   submission on July 4th, 2011."  I'm making this up.  "I called

25   and I told them evidence of kickback activity that was criminal

1    or something like that," but wouldn't get into the merits of

2    who he paid kickbacks to or what he did, this or that.  That's

3    what I am getting at.

4            I think the only way out of the conundrum is to permit

5    him to say that he was willing to tell about other criminal

6    activity.  He may know about some other health care provider

7    that is out there today busing people into clinics just to

8    manufacturer claims or whatever.  He may know a lot.  I don't

9    know.  He may be offering to give that to the government.  He

10   may have already offered to.  I don't know.

11           But of course, as a cautionary note, cross-examination

12   of that would, were he to even go as far as I have said I am

13   willing to let him go in the second phase of the proceeding,

14   namely to say, "I tried to give other evidence, and they didn't

15   listen or something," even going that far, that would subject

16   him to cross-examination about the things he didn't offer to

17   do, which gets back into this stuff on the cross about where is

18   the money and stuff like that.  He has answered that.

19           I don't mean to get into an analysis of that, but

20   that's where we would be all heading.  That's the only place it

21   can come up, I think.  I don't think it can come up here, as an

22   objection to the PSI about willingness to cooperate and failure

23   to do so, unless it first be shown that the government made him

24   a promise, which they didn't.

25           You have done your best on it.  It's there in the

1    record.  If the Appellate Court says, "Oh, no, Judge, you

2    should have listened to all this," then so be it.  That's where

3    we are.

4          MR. METSCH:  The issue I have, so I don't have a

5    problem later on with a client who is sitting in prison and

6    he's going to be filing motions and the Court is going to be

7    getting 2255 motions, I want to make sure I am doing the exact

8    right thing to make sure I am protecting the client's rights at

9    this stage.

10         I think I need to put testimony in the record about

11   his effort to communicate this information to the government at

12   a very early stage in this proceeding.  I was under the

13   impression that Your Honor wanted all the testimony that I had

14   at this time.  The only bullets I have left deal with

15   substantial assistance.  The reason I ask that the room be

16   closed is because --

17         THE COURT:  Excuse me for interrupting you, but I have

18   no difficulty with you putting it on right now, if you wish,

19   about the facts of trying to cooperate, but not the merits of

20   it.  I can't do anything about the merits of it.  If he has

21   evidence that he watched somebody shoot their wife and murder

22   her, all I can do is send it over to Ms. Rundel and say to the

23   State Attorney here is something you may want to look into.  I

24   can't order them to indict somebody for murder or whatever.

25         Does the government have a brief summary of attempts

1    -- they may well be in the record, but if he wants to put on

2    some live testimony or another exhibit, a letter or something,

3    not the merits of what it is, but the fact that he attempted to

4    cooperate.  What is your viewpoint of all of that?

5              MS. SAULINO:  Thank you, Your Honor.  The answer to

6    your question, I believe, you have actually just stated.  The

7    defendants laid out their position on this issue in docket

8    entries 274 and 275.  The government responded in docket entry

9    285, which is the redacted version, and the Court and counsel

10   received the unredacted version.

11             Your Honor, there is no testimony that is relevant to

12   the Court that Mr. Duran could put on because the government

13   never spoke with Mr. Duran prior to today.

14             Any information that would be imparted to Your Honor

15   to make any decisions, as Your Honor has just outlined, is in

16   the briefing that Your Honor has already seen.  I see no

17   relevance to Mr. Duran's testimony at all.

18             THE COURT:  Let me see the unredacted statement that

19   you are talking about.  I remember getting two documents, one

20   redacted and one unredacted.  I know I read the redacted one.

21   I don't know that I read the other one because by that time I

22   think I had already gone through the legal analysis and

23   concluded that there was nothing I could do about it, because

24   there was no promise made by the government.

25             What I was determining was whether it was proper or

1    improper.  There were no promises.  There is nothing for the

2    Court to enforce.  It was just a matter of an offer of

3    information about other crimes, which the defendant can make,

4    and the government can do as they wish on that, either move for

5    something or do something.  That's totally up to the

6    government, as long as there is no broken promise, if that be

7    the word.

8              This is the unredacted?

9              MS. SAULINO:  It is, Your Honor.

10             THE COURT:  Let me make this finding so we can move

11   forward, because we have a long way to go.  Counsel has,

12   through the filing of these exhibits, defense 274, 275, and the

13   government's responses thereto, which are --

14             MS. SAULINO:  The redacted version is docket entry

15   285.

16             THE COURT:  That's under seal?

17             MS. SAULINO:  The redacted version is not under seal.

18   Rather than file the unredacted version under seal, the

19   government simply provided it to the Court and counsel.

20             THE COURT:  Numbers?

21             MS. SAULINO:  285, Your Honor.

22             THE COURT:  Let me find that that advises the Court

23   fully on this issue, and it is the ruling of the Court that,

24   under these circumstances, any evidence of other crimes

25   volunteered by the defendant to the government falls outside

1    the parameters of anything that the Court has any discretion

2    within which to act to require the government to agree to or to

3    urge the Court to find a lesser point evaluation under the

4    sentencing guidelines.

5           The sealed portions will remain sealed.  The

6    unredacted portions are in the record, and this matter may be

7    raised, if necessary or desired, in the Appellate Court.

8    Therefore, the Court finds that the objections asserted in

9    objection number four to the PSI -- wait a minute, four deals

10   with identity theft.  Excuse me, number five, objection number

11   five.  No, that's identity theft.  Somewhere in here there's --

12   well, wherever it pertains to this offer to give proof of other

13   crimes and that sort of thing, that is not, does not rise to

14   the level of something that the Court would have any authority

15   to order the government to seek or to file something to help

16   the defendant get a reduced level under the advisory

17   guidelines.

18          MR. METSCH:  Your Honor, we weren't asking for the

19   Court to order the government to do anything.  What we were

20   looking forward to is exactly what Your Honor said in your

21   order on September 2nd, 2011, docket 287, on page 3.  That was

22   perfectly fine with us, what you said then, that you would

23   exercise your discretion to consider this under the history and

24   character of the defendant under the Fernandez decision from

25   the Second Circuit.

```
 1              THE COURT:  Which would come in the second phase when
 2      you move for downward departure, but it would not come under
 3      the heading of objections to the PSI where I have no
 4      discretion.  That is my ruling.  Another Court may disagree,
 5      and that's fine.
 6              So you can raise the bland issue of an offer to help;
 7      factually, I offered on July 4th, without getting into what was
 8      offered, what was offered, because that is unimportant.  Would
 9      he be a better citizen if he was telling about a murder as
10      opposed to telling about seeing somebody cross Flagler Street
11      in the middle of the block?  No, it wouldn't matter.  He
12      offered to help, and he gets credit for that as a good citizen
13      under 3553(a), and that's what we are talking about.  That
14      takes care of those objections.
15              Now, the other objection that is there is this
16      business of offering to help with identity theft and offering
17      to help the government with pleading guilty on behalf of the
18      corporation as corporate officers.  That would not -- I don't
19      see that that rises to the level of something that would compel
20      the government.  I guess you're just raising it, and the
21      government will say whatever they wish to say on that.  Let me
22      hear from them, and then I will make a ruling on that.  I don't
23      think we need to open it up to a public hearing.
24              This identity theft, I listened to the two men come in
25      here and say their identities had been stolen, the government
```

1   found them, located them, and brought them into this trial in

2   the case where Judith Negron was the defendant.  The two people

3   said, "My identities were stolen.  I never cashed any checks.

4   I didn't know anything about this.  My credit has been ruined."

5   The government, of course, dismissed the indictments.

6          That's the incident that they're talking about with

7   the identity theft of these two people, Pedro Sosa and Oisel

8   Cancio.  Those two individuals, the defendant stole their

9   identity, used it for money laundering purposes, and they

10  didn't know it.  They didn't have anything to do with it.  So

11  the defendant is offering to the government proof that their

12  identities were stolen, which he stole.  What's the

13  government's position?

14         MS. SAULINO:  Your Honor, quite simply, the

15  government's position is that none of the issues that were

16  raised through counsel to the government rose to the level of

17  substantial assistance.  Specifically with respect to this

18  issue, the identity theft issue, it was the defendant and his

19  co-conspirators who stole the identities, Your Honor, who

20  caused all of the problems for these gentlemen, including the

21  two gentlemen who were arrested by the government for

22  involvement in this scheme because the identity theft was done

23  so well, but it was not the defendant that caused the

24  government to dismiss them from the case, Your Honor.  That's

25  the issue here.

1          The government's investigation was ongoing, as it

2    always is.  One of the gentleman actually took a polygraph

3    examination.  The government uncovered a great deal of other

4    evidence and, at that time, dismissed those gentlemen from the

5    case in which they were the charged.

6          Your Honor heard from Gustavo Brutos, whose identity

7    was also stolen, and that is the testimony that you're

8    recalling, Your Honor.  There is no assistance by the defendant

9    to the government.  In fact, he is the reason those gentlemen

10   were ultimately arrested because he is the reason that the

11   government thought they were involved in these crimes, because

12   he stole their identities.  It would be a perversion of

13   substantial assistance to give him credit for that, Your Honor.

14         Beyond that, Your Honor, with respect to the Medlink

15   and American Therapeutic pleas, as corporate officer, Mr. Duran

16   pled his company guilty because it was guilty.  The Court saw a

17   great deal of the evidence as to why it was guilty during the

18   trial of Judith Negron.  He pled himself to $205 million of

19   fraud.  It was not a great leap to the Court to see that the

20   company was also guilty, the company that he controlled and

21   through which he committed these crimes.  None of these things

22   rise to the level of substantial assistance.

23         The bottom line is, as Your Honor has recognized, the

24   Supreme Court said in Wade, and the Eleventh Circuit has said

25   many times over, that this is a decision that the United States

1   Attorney's Office makes.  We do so very thoughtfully and in

2   comparison with other cases and in comparison with substantial

3   assistance credit that has been given in the past, and we did

4   so here.  We have reasoned that there was no substantial

5   assistance here that merited any kind of credit.

6           THE COURT:  Anything in brief rebuttal?

7           MR. METSCH:  If I am not going to have an opportunity

8   to put the witness on, I would give you a proffer, if you don't

9   mind, Your Honor, very quickly in five minutes.

10          THE COURT:  Not on the merits, but on anything that's

11  not in these exhibits.  Your efforts to offer cooperation are

12  permanently a matter of record in your exhibits and in your

13  motion here.  I take them in the light as truthful and that you

14  made the effort to do that.

15          MR. METSCH:  This is what happened.  I could put on

16  Mr. Duran to testify, and even Mr. Tifford, who was there at

17  the time when this happened.

18          The superseding indictment in this case was filed on

19  February 8th, 2011 and unsealed on February 15th, 2011.

20          On February 25th, 2011, Mr. Tifford and I met with

21  Ms. Saulino.  In that period between the time that the

22  superseding indictment was turned down, the same day that

23  happened, the indictment in the Judge Seitz case came out.

24  That's case 11-20100.  We showed that indictment in the Seitz

25  case to Mr. Duran, and he said to us that those two guys had

1    nothing to do with it.

2          We then met with Ms. Saulino on February 25th, 2011,

3    which was just ten days after the indictment was unsealed.  We

4    told her that two people who were innocent had been indicted

5    and arrest and charged with money laundering, and they had

6    nothing to do with it.  Ms. Saulino advised us that she would

7    go back to the agent and verify it and see whether or not we

8    were telling her accurate information.

9          It turns out that the information we gave her was

10   accurate, because several months later the government dismissed

11   those two.  The first news she had that these two people had

12   been wrongfully indicted and arrested came from me and

13   Mr. Tifford at the direction of our client.  Mr. Tifford and I

14   had no knowledge of this.  We got it from out clients.

15         If exoneration of two innocent people does not amount

16   to substantial assistance in this day and age, we are in big

17   trouble in this country.  We made it possible.  We sent them

18   back and they did another check, and they found out that these

19   two men should not have been indicted.  How else would we have

20   known that these two men were innocent, except our clients were

21   involved in the scheme?  Mr. Duran already admitted he was

22   involved in the scheme of money laundering and fraud.

23         Ordinary people walking up and down Flagler Street,

24   they would have no way of knowing whether Cancio and Sosa had

25   been unlawfully indicted, arrested, prosecuted, and dragged

1    into detention like this.  A huge service was done without any

2    promises coming back.

3         All we are asking the Court to do, in align with your

4    order of September 2nd, is to take this into account with

5    respect to the history and character of the defendant.  He came

6    forward with nothing to gain and said, "Here, without getting

7    anything in return, these two men are innocent.  They should

8    not be prosecuted for this."

9         With respect to the corporation of Medlink, you

10   recall, Your Honor, there was a huge problem in this case

11   involving these two corporations.  The corporations did not

12   have counsel.  Under the rules, it was very difficult to

13   process the case going forward without counsel.  There was a

14   not guilty plea entered.

15        Your Honor demanded a report from the government about

16   what efforts they had made to get counsel appointed for these

17   two corporations.  The government came back and reported to

18   Your Honor that, under the Criminal Justice Act, there is no

19   authority for appointing counsel at government expense for a

20   corporation, only for individuals.  We were in a deadlock.

21        After the day that Ms. Valera and Mr. Duran pleaded

22   guilty in front of Magistrate Garber, Mr. Tifford and I were

23   approached by Ms. Saulino and asked for our client's help in

24   getting these corporations to plead guilty.  We went to our

25   clients and recommended that they, indeed, provide the help to

1    the government in getting it done, and they did.  They came

2    into court and executed waivers of counsel and entered guilty

3    pleas for these two corporate defendants.  But for that, the

4    government would have to go through a three or four or

5    six-month trial against two corporations.

6         THE COURT:  It was a five-day trial.  The trial we had

7    only took five days for the evidence.  They wanted to wait

8    until Monday to argue it.  They argued it by noon, were out in

9    the afternoon.  The evidence took five days.  It didn't take

10   months.

11        MR. METSCH:  Your Honor, going into that episode, on

12   the eve that they go on trial, the participants of that trial

13   were told to expect to be in court for 30 days or more.  The

14   government eliminated most of its witnesses.  They were

15   successful.

16        THE COURT:  They got out of it because they found out

17   that the Judge was going to preside.  I don't know.  I hate to

18   interrupt you, but Good heavens, you and Mr. Tifford know, and

19   Ms. Saulino now knows, that we are not going to conduct a trial

20   on the basis that lawyers on both sides can just bring in any

21   bucket of facts they want to and dump them on the middle of the

22   floor like feeding hogs on a farm and let the Court sort it

23   out.  We don't run it that way.  Therefore, these cases, it was

24   never in my wildest imagination that the case would take three

25   or four months to try.

1       If it had, without lawyers for them, it probably would

2   have taken a half a day.  I don't mean to quarrel with you

3   about it.  I know that you did your best, but to come in and

4   plead guilty for the corporations was resolvable.

5       The fact that he did it, fine, but you are asking me

6   to give him credit when we listen to your final argument on his

7   behalf on what the ultimate sentence ought to be, if we ever

8   get to it, wading through sentencing guidelines regulations,

9   for trying to tell, or for bringing to the government's

10  attention that by using the names of innocent people to launder

11  money the government should dismiss charges and free those

12  innocent people.

13      That is good that he did that in terms of seeking

14  forgiveness, understanding, or trying to recoup an element of

15  goodwill because he had been responsible, or his companies had,

16  for abusing these people, but it sort of balances out.

17      However, I have just analyzed, I have just described

18  with you, how I will take it into consideration, balance it

19  out, and whatever credit may be available, it can be given to

20  him mentally about what his sentence ought to be.  I will do

21  that.  I would have done it anyway.  It doesn't matter whether

22  we have a record here or not.  A person tries to do something

23  good, we are going to give him credit for it.

24      To that extent, I don't know that Ms. Saulino was

25  objecting to what was your ultimate motion, that is that the

 1   Court take into account that he tried to straighten it out and
 2   get some innocent people released.  You already made your
 3   argument that the people were only involved because he brought
 4   them in and involved them in the first place.  So it basically
 5   comes back up to zero.  If you are balancing it up and down, it
 6   comes out to an even break both ways; is that what you are
 7   saying?
 8              MS. SAULINO:  That's a fair statement, Your Honor,
 9   except that the government did a great deal of its own
10   investigation and had other witnesses and other evidence.
11              THE COURT:  I understand.  Once you got a tip that all
12   of this had happened, you went out and did all of that.  The
13   point is that, all right, I am granting the defense motion to
14   give consideration to the fact that Mr. Duran brought out that
15   there were two, maybe three, people whose identities were
16   stolen from his company.
17              I overrule it as an objection to the PSI in objections
18   four and five about substantial assistance to the government,
19   but you can argue that he should get credit.  She will argue
20   that he shouldn't.  I will take that into consideration.  That
21   comes back to three, which is the sophisticated laundering
22   objection, and two is the intended loss objection, which we
23   will resume when we get back after lunch.
24              MR. METSCH:  Your Honor, if I may, the government,
25   last week on Friday afternoon, injected two other elements,

1  which have not been addressed by the Probation Office, which I

2  tried to bring out earlier today.

3          One of them is the government's claim that there

4  should be a four-point increase because of a vulnerable victim,

5  and there should be a four-point upward adjustment because of

6  major disruption of a governmental function, eight-point

7  increase altogether.

8          THE COURT:  Have you had an opportunity to, since that

9  appeared in the sentencing memorandum in which the government

10 is obviously going to argue -- what is your motion?  Are you

11 requiring a recess to prepare time to respond to that?  I have

12 indicated I am going to let them argue that.

13         That is, basically, an argument by the government that

14 the PSI calculation is inaccurate, that it should be higher,

15 that it should be enhanced to cover these two or three items,

16 the two or three items being sophisticated means under

17 2B1.1(b)(9)(C) and vulnerable victims under Section 3A1.1(b)(1)

18 and (2), for a four-point addition.  The four-point enhancement

19 the government is arguing in their memorandum is for an upward

20 departure for a significant disruption of a governmental

21 function under Section 5K2.7.

22         Now, that is what we know they are going to argue

23 because of their inner memorandum.  You're saying that if they

24 had filed it back when you filed your objection, which was on

25 August --

1          MR. METSCH:  August 30, Your Honor.

2          THE COURT:  Thank you.  That you would have had time

3    to get better prepared for it.  I am making your argument for

4    you.  When you got it, you got it when they filed their

5    memorandum, which seems to have been -- I don't have the exact

6    date --

7          MR. METSCH:  Late in the afternoon on the 9th of

8    September, Your Honor.

9          THE COURT:  We are now at the 14th.  Of course, I am

10   not looking to force anybody to go forward if they are not

11   prepared.  I think I made that point very clear in these

12   proceedings.  So we are at a point where, on those enhancements

13   or objections to the calculation that the government feels

14   should be added in, the Court indicated in its written order

15   yesterday that I am going to consider that.  You know that from

16   the Court.

17          Now, are you moving for additional time to prepare

18   something, or what is your motion?

19          MR. METSCH:  We believe that the Probation Office

20   should come out with a further addendum to its PSI report,

21   which deals with the two additional government demands for

22   enhancements.  When we met with the Probation Officer on

23   Monday, we said to her that we received, Friday afternoon,

24   these two additional elements from the government.  The

25   Probation Officer said they were going to come out with yet

1    another addendum dealing with vulnerable victim and disruption

2    of a governmental function.

3            THE COURT:  So your motion is to give them time to do

4    that?

5            MR. METSCH:  That is right.

6            THE COURT:  What is the government's position?

7            MS. SAULINO:  Your Honor, the government's position is

8    that it seems to me unnecessary to give the Probation Office

9    that time.  I agree with the Court that if the defendant,

10   himself, needs time to prepare he should have whatever time he

11   needs to prepare.  That is not the defendant's motion.  He

12   would like Probation to respond to the government's sentencing

13   memorandum.

14           If the Court chooses to hear from Probation on that

15   issue, the Court could hear from Probation on that issue today.

16   It is ultimately up to the Court whether the government is

17   correct as to whether the enhancements and departure should be

18   applied, and whether the Probation Office comes out with

19   another report is simply of no moment at this point.

20           THE COURT:  Briefly.

21           MR. METSCH:  May it please the Court.  I think that

22   the system, as the guidelines and federal rules of criminal

23   procedure envision, the Probation Officer should be involved at

24   precisely this issue.  We are getting to analysis of the

25   guidelines.  The expertise of the Court is, in great measure,

1    [unintelligible] in the Probation Office.  They deal with this

2    every single day.

3            THE COURT:  Not this Judge.  I take their reports, and

4    I already demonstrated in this hearing that I reject their

5    advice frequently.  I have done it once for your client today.

6            To me, I say great.  It's interesting.  It's good,

7    helpful.  Well-meaning, good people, very good people, good

8    professionals.  Fine.

9            I listen to lawyers who are trained professionals

10   giving me their positions on these matters.  Then I make a

11   decision based on my half a century of doing this.  I

12   frequently reject what they give me.  On your routine average

13   normal cases where there is very little or no objections, a lot

14   of times I look at it and say, well, you know if everybody is

15   pretty much in agreement, life goes on and we do it.

16           Now, I haven't done that in this case.  I have studied

17   these things very carefully.  I made my own charts, you know,

18   scribbled out comparisons with how they arrived at a

19   recommendation on a given thing, or looking at the statutory

20   cap, and this cap, or that cap.  I made a little diagram of the

21   defense position, the Probation guy's recommendation, the

22   government's position.  Out here were some inaccuracies.

23           I even found that there was an addition, a mistake,

24   that was hurting the defendant, would have hurt the defendant,

25   but I saw that in the paragraph there was a two-point thing

1    that was buried there.

2            So they make calculations.  They are human beings.

3    They do what they can.  I don't think going back and having

4    them give me another viewpoint -- this case has been pending

5    for over a year.

6            Now, if you need time to formulate your argument or

7    your presentation you want to make -- you see, how did I know

8    that there were those three points?  I have got my own

9    handwritten notes about what you all were talking about.

10   Frankly, all these number -- can you imagine a number --

11   sophisticated means is Section 2B1.1(b)(9)(C).  Can you imagine

12   all of that getting thrown at me this morning with a room full

13   of people?  So I had to go read that stuff this morning.  I

14   think I am more informed right now than the Probation Office.

15           I would rather listen to you lawyers argue that.

16   Whether the government is going to prevail on that or not, or

17   whether you are or not, is an open question to be decided after

18   I listen to your arguments.

19           My responsibility is to make sure that this is a level

20   playing filed, that the Court gives careful consideration to

21   the positions of both sides.  I am comfortable that I have done

22   that thus far in the last ten days or so that I have worked on

23   this hearing when I had time, these proceedings and reading,

24   thinking, being concerned about it.  So, I am very comfortable

25   with keeping this at a very level playing field.

1          The lawyers are very professional people.  They have

2    done a very good job of alerting me to the problems, alerting

3    me to the sentencing guidelines, numbers of paragraphs that

4    would perhaps shed light on these things.

5          Perhaps I am seeing some problems here that may be

6    obvious only to me.  Nobody else is certainly talking about it.

7    It's in the category of things of whether I should be

8    interjecting myself further into this, and I conclude I should

9    not.  I leave two experience counsel to go forward and present

10   what you wish to present, which is what I am doing.  I am

11   keeping it as fair and balanced as I can.  I think it has been

12   a fair and balanced hearing thus far.

13         One of the biggest issues that we haven't heard

14   testimony on is the actual loss, anticipated loss, or intended

15   loss, all of those nice generalized terms that the sentencing

16   guideline people have used and the Courts have been using.  We

17   will get back to that.  After we make those findings, we will

18   get to the Title 18 3553 motion elements and the ultimate

19   sentencing.

20         I think, though, that we need to take our time with

21   all of this.  We had scheduled the co-defendant's hearing to

22   commence and the corporation's sentencing hearing to be held

23   this day.  On the recesses, I go out and dictate things to

24   myself so I don't forget what the testimony is and what have

25   you.  I have done that, but that's very rough.  You are

1    presenting what is really a trial here and wanting a lot of

2    findings of fact.  I think that we should take the rest of the

3    day so that we are not rushed in doing that.

4         Therefore, I am going to continue the hearing on the

5    co-defendant Valera.  We have Mr. Tifford's client.  I do

6    better dealing with the lawyer's name.  Mr. Tifford's client,

7    Marianella Valera, was to be sentenced this afternoon.

8    Anticipating that it may take a similar amount of time, I think

9    we should continue that until tomorrow, or tomorrow afternoon,

10   or whatever it takes us so that I do not cut short whatever

11   Mr. Metsch and his client wish to present today or the

12   government, Ms. Saulino, wants to present today.  I think that

13   is where we are headed.

14        I will ask Ms. Williams to notify the Probation people

15   and whoever else was coming to the hearing that you know of.  I

16   guess it's just Probation.  Well, Mr. Tifford, you may have to

17   notify witnesses.  I don't know.  I'm sorry that it's so late.

18        MR. TIFFORD:  Your Honor, I will be glad to take care

19   of all of those.

20        THE COURT:  Then we will resume this hearing at 2:00

21   today.  Thank you.

22        [There was a recess for the noon hour].

23        THE COURT:  Thank you.  Be seated, please.

24        Resuming the sentencing hearing.  Did you have

25   something further, Mr. Metsch?

1       MR. METSCH:  Yes, Your Honor, we offer into evidence

2   DX11 and DX13.  DX11 is the letter that I sent to Ms. Saulino

3   dated June 17th, 2001.  Ms. Saulino will have a response on

4   that.

5       Ms. Saulino has advised me that she has no objection

6   on DX13.  DX13 is the Medicare financial statements for the

7   years 2010 and 2009.

8       The only issue we have left is DX11.

9       THE COURT:  13 is admitted into evidence without

10  objection.

11      [Defense Exhibit 13 received in evidence].

12      THE COURT:  I will hear from the government on

13  Defendant's Exhibit 11.

14      Joyce, I want all of those exhibits admitted into

15  evidence put up here on the corner of my desk.

16      MR. METSCH:  DX11 is being offered for the very

17  limited purpose to establish that we made a timely request to

18  the government that it file a 5K1.1 motion in light of the

19  exculpatory evidence that was provided by Mr. Duran concerning

20  the two innocent victims of the identity theft.  That's the

21  subject-matter of that letter.  I just wanted to make sure I

22  had an evidentiary trail here in the record that that was

23  requested and brought to the attention of the government.

24      THE COURT:  Ms. Saulino?

25      MS. SAULINO:  If this is something that the Court

1   would like to see, I have no objection.  Based on Your Honor's

2   earlier statement that you didn't want additional attorney

3   writings in the record, but if you would like to have this

4   letter in the record, there is no objection.

5            THE COURT:  I don't think there is any question.  The

6   date is the day that the attempt was made.  I am going to

7   sustain the objection to 11.  It will be marked for

8   identification and go along with the record.

9            The other documents, Joyce, put them up on my desk.

10            [Defense Exhibit 11 marked for identification].

11            THE COURT:  Anything further for the defense on the

12   first segment, the evidentiary phase?

13            MR. METSCH:  If the government is going forward today

14   --

15            THE COURT:  They are.

16            MR. METSCH:  -- with the two new grounds which came in

17   on Friday afternoon --

18            THE COURT:  They have the opportunity to present any

19   evidence they want to regarding the case that you have made on

20   your objections.  Then we take up the next step.

21            MR. METSCH:  For the record, we object to the two

22   additional grounds for enhancement that the government came out

23   with last Friday afternoon.

24            One of them is that there was an exploitation of

25   vulnerable victims.

1           The second one is significant disruption of a

2    governmental function.  There is no evidence that we have seen

3    so far with that.  We are waiting to see what their evidence is

4    to support that.  It's hard for us to object to it when we

5    can't present any evidence to counter something that we haven't

6    seen.

7           THE COURT:  I asked you if you wanted time to prepare

8    anything, you said no.  You wanted to make your objection,

9    which I have already ruled on, both in writing and orally.

10           Ms. Saulino, at this point, any testimony or

11    documentary evidence that you wish to offer regarding your

12    response to the objections to the PSI made by the defense in

13    this morning's hearing?

14           MS. SAULINO:  Your Honor, so long as --

15           THE COURT:  I'm sorry, throughout the trial.  Anything

16    they put -- do you have any evidentiary testimony, any

17    witnesses, or anything like that?

18           MS. SAULINO:  Your Honor, I haven't had a chance yet

19    to ask the defense counsel if he will stipulate to this.  I

20    don't think that this will be an issue if I just may have one

21    moment.

22           THE COURT:  Go right ahead.

23               [Counsel confer off the record].

24           MS. SAULINO:  Your Honor, at this time the government

25    will briefly recall Mr. Freedman for one question.