```
 1                  UNITED STATES DISTRICT COURT
                   SOUTHERN DISTRICT OF FLORIDA
 2                        MIAMI DIVISION
               CASE NO. 10-20767-CRIMINAL-KING
 3

 4   UNITED STATES OF AMERICA,        Miami, Florida

 5                  Plaintiff,        December 8, 2011

 6         vs.                        10:10 a.m. to 4:27 p.m.

 7   JUDITH NEGRON,

 8                  Defendant.        Pages 1 to 139
     _____
 9

10                      SENTENCING HEARING
           BEFORE THE HONORABLE JAMES LAWRENCE KING,
11                 UNITED STATES SENIOR JUDGE

12

13   APPEARANCES:

14
     FOR THE GOVERNMENT:        JENNIFER L. SAULINO, ESQ.,
15                              BENJAMIN D. SINGER, ESQ., and
                                PATRICK KOETH, ESQ.
16                              US DEPARTMENT OF JUSTICE
                                CRIMINAL DIVISION, FRAUD SECTION
17                              1400 New York Avenue NW
                                Washington, DC 20530
18
     FOR THE DEFENDANT:         BARRY MICHAEL WAX, ESQ.
19                              LAW OFFICES OF BARRY M. WAX
                                800 Brickell Avenue, Penthouse II
20                              Miami, Florida 33131

21   FOR US PROBATION:          LAKEISHA BRANTLEY

22   REPORTED BY:               LISA EDWARDS, CRR, RMR
                                Official Court Reporter
23                              400 North Miami Avenue
                                Twelfth Floor
24                              Miami, Florida 33128
                                (305) 523-5499
25
```

1                           I N D E X

2

3    EXHIBITS RECEIVED IN EVIDENCE                    PAGE

4    Defendant's Exhibit A                             67

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              THE COURT:  Thank you.

 2              Be seated, please.

 3              We have scheduled for hearing this morning the

 4    sentencing in the matter of the United States versus Negron,

 5    10-20767-Criminal.

 6              And we have Ms. Saulino, Assistant US Attorney for the

 7    Government, and we have Mr. Wax and Mr. Mineau for the

 8    Defendant, who's present in court.

 9              The objections have been filed to the presentence

10    report, furnished by the Probation Office.  And we'll take up

11    those objections to the sentencing guideline recommendations

12    and the computation of the Probation Office of the recommended

13    advisory guideline range.

14              According to the presentence report, I believe there

15    were six objections by the defense, one objection by the

16    Government.  And I think it would be helpful if we went through

17    the objections in that order.  They involve multiple counts.

18    There are multiple subparts, but there are six broad

19    categories.

20              Mr. Wax.

21              MR. WAX:  Thank you, your Honor.  Good morning.

22              THE COURT:  Good morning.

23              MR. WAX:  As a preliminary matter, your courtroom

24    deputy was kind enough to provide us with an interpreter for

25    Ms. Negron's father at the time when he will be addressing the
```

1    Court at the second phase or third phase of this hearing.

2         The interpreters' office showed up this morning as

3    they were instructed to, but I am requesting, your Honor, at

4    their behest and, also, at mine to permit them to be excused at

5    this time and to be re-called when we get to the second phase

6    of the hearing, when her father will address you, so that they

7    can attend to other courtrooms in the building.

8         THE COURT:  When do you anticipate that would be?

9         MR. WAX:  I think it really would be dictated, your

10   Honor, by the length of the objections.  And I want to just

11   candidly advise you, since we have cogently articulated our

12   objections in writing, that it is not my intention to belabor

13   the objections.

14        I won't be calling witnesses.  It will consist

15   entirely of legal argument based upon the facts adduced at

16   trial and your Honor's familiarity with the case.  So it would

17   really be dependent upon how long that takes.

18        THE COURT:  Well, let me grant your motion and excuse

19   them for an hour, then.

20        They can be excused to return at, well, say, 11:15.

21   Thank you.

22        THE INTERPRETER:  Thank you, Judge.

23        THE COURT:  Ms. Saulino, we'll start with the

24   Government's objection.  You have one objection dealing with

25   the question of -- or the matter of professional qualifications

1    and violation of trust.

2          MS. SAULINO:  Yes, your Honor.

3          The United States did have one objection to the

4    preliminary PSR, and that is that the United States requested

5    an enhancement for abuse of position of trust.

6          I would note that the Probation Office in its amended

7    PSR, which I received yesterday, does include that enhancement

8    and has recalculated the guidelines accordingly.  And, as such,

9    the United States no longer has any objection to the PSR.

10         THE COURT:  All right.  I've reviewed that very --

11   thank you.

12         Before I hear from Mr. Wax, I have reviewed that very

13   carefully and gone through that very carefully and reviewed my

14   substantial notes and the previous presentence investigation

15   reports in the matter of Duran, Acevedo and others.

16         And I'm inclined to the view that the objection of the

17   defense is well taken to the original PSI and that the -- I'm

18   sorry -- the objection which I now treat as being to both

19   the -- a response to the Government's objection and the

20   ultimate redetermination by the probation officer and

21   concurrence in that objection I'm treating as on objection by

22   the Government -- a total objection by the Government.

23         I'm overruling the Government's objection and the

24   recommendation of the Probation Office and finding that, under

25   these circumstances, it does not apply.  I'm therefore

```
1   sustaining the Defendant's objection to the original
2   computation.  And I will ask the probation officer to start
3   figuring out where that leaves us with matters.
4          But there's where we are on the Government's original
5   objection, which I recognize and understand the probation
6   officer agreed with, but I'm overruling all that.  Now we are
7   back to what was the original computation.
8          All right.  Now we have, as I've indicated to you, the
9   six objections -- broad objections to the presentence report.
10  The first one deals with Paragraphs 33, 47, 51, 68, 69 in a
11  broad grouping.
12         And then, after that, there are objections to
13  Paragraph 82 -- that's Objection No. 2 -- Objection No. 3 by
14  the defense as to Paragraph 84; Objection No. 4 as to
15  Paragraph 85; Objection No. 5 as to Paragraphs 90, 93 and 137,
16  which deal generally with the calculation in its totality,
17  broken down by individual items; and then No. 6 is the
18  objection to Paragraph 117.
19         I will hear from Mr. Wax on his objections.  These are
20  multiple objections.  But perhaps, if we adhere to the
21  sequencing as was in the PSI, it may be that then we're all
22  addressing the same count or counts or the same item, same
23  objections, in somewhat of an organized fashion --
24         MR. WAX:  Yes.
25         THE COURT:  -- if that's convenient for you.
```

```
 1              MR. WAX:  I believe that it is, your Honor.

 2              THE COURT:  All right.

 3              MR. WAX:  That's why I laid them out the way that I

 4    did in the objections, in a sequential order with respect to

 5    the initial PSI, as opposed to the revised one yesterday --

 6    that we received yesterday.

 7              I'm not certain if the numbering of the paragraphs is

 8    the same with the revised PSI; so, when I refer to the

 9    paragraph numbers, I'll be referring to the original PSI, which

10    was disclosed on November 1st of 2011.

11              THE COURT:  Thank you.

12              MR. WAX:  You're welcome.

13              Your Honor, the initial series of objections are

14    factual in nature and deal specifically with conclusions in the

15    presentence investigation report with which the Defendant

16    disagrees.

17              I would emphasize that these conclusions have no

18    bearing on the calculation of the sentencing guidelines, but

19    merely are designed to clarify specific factual matters.

20              At Paragraph 33 of the PSI, it talks about American

21    Sleep Institute, which was the sleep study company where

22    individuals who were beneficiaries -- Medicare beneficiaries

23    who attended American Therapeutic Corporation went for sleep

24    studies.

25              And it's just one sentence in there which says,
```

1   "Cooperating witnesses have indicated that there were no

2   doctors present at night to monitor the patients at ASI who

3   were purportedly undergoing a study of their sleep ailments."

4          The basis for this objection is quite straightforward,

5   that it implies that doctors, by law or by regulation, needed

6   to be present when the actual monitoring of the sleep and the

7   testing was taking place.

8          And in support of our objection is Exhibit 1.  I've

9   attached the local coverage determination from First Coast

10  Service Options, which makes it clear that a physician's

11  presence during that testing, otherwise known as

12  polysomnography, is neither necessary or required.

13         To that extent, your Honor, we object to the inclusion

14  of that statement as misleading and inaccurate and move that it

15  be stricken.

16         THE COURT:  All right.  Let's move on.

17         I'll give everybody an opportunity.  But go ahead

18  through your objections; and we'll ask counsel to make her

19  notations and reply at the end of the objection.

20         MR. WAX:  Very well.

21         Your Honor, with respect to Paragraph 47 of the

22  presentence investigation report, there is a discussion about

23  the implementation of payment schemes to transfer Medicare

24  proceeds to themselves and it discusses the use of shell

25  corporations and sham transactions.

1          While it's clear that monies were transferred from

2     American Therapeutic Corporation, American Sleep Institute, to

3     MedLink for distribution of checks or wire transfers, which

4     were, in turn, cashed to pay kickbacks to the owners of

5     assisted living facilities, halfway houses, group homes and

6     matters such as that, this particular paragraph discusses

7     several corporations, the majority of which were wholly owned

8     by Lawrence Duran.

9          And while certainly one could broaden the scope of

10    relevant conduct and say, "Well, because Mr. Duran opened these

11    several corporations and because he is the leader of this

12    conspiracy and because the jury found Ms. Negron guilty of the

13    conspiracy, that knowledge or foreseeability of the existence

14    of these corporations could be attributed to her," our

15    objection primarily, your Honor, is that no such evidence was

16    ever adduced at trial with respect to the majority of these

17    shell corporations that were owned by Mr. Duran.

18         Now, this particular paragraph mentions one

19    corporation, Fates Elite Holding, and Ms. Negron did have an

20    interest in Fates Elite Holdings.

21         But the other corporations, I believe, 2000 Biscayne,

22    LLC, Old Winter Garden Road Properties, LLC, and a vague amount

23    of other entities, there was nothing, no evidence presented

24    whatsoever, that Ms. Negron had any ownership interest in those

25    or that they were used to transfer funds to her in any way.

 1         So based upon the foregoing, your Honor, we would move

 2    to strike that from the presentence investigation report.

 3         THE COURT:  Thank you.

 4         Your next item?

 5         MR. WAX:  Paragraph 51 of the presentence

 6    investigation report, your Honor, addresses the involvement of

 7    Mr. Duran, Ms. Valera and Ms. Negron and other unindicted

 8    co-conspirators, including Adriana Mejia and Lazaro Acosta,

 9    opening phony corporations to receive checks and wire transfers

10    from ATC and MedLink with the purpose to enrich themselves, pay

11    kickbacks and bribes and to conceal and disguise the nature of

12    the funds that were the proceeds of the healthcare fraud.

13         We know from the trial testimony of Adriana Mejia

14    that, at the behest of Mr. Duran, in conjunction with an

15    in-house accountant, that she was given a check originally --

16    or a wire transfer, I should say, directly by Mr. Duran for

17    $106,000.

18         When she went to get the cash from the bank for that

19    wire transfer, she was unable to obtain that money.  The bank

20    refused to give it to her.

21         As a consequence, Mr. Duran and the accountant

22    instructed her to go open up five other bank accounts in the

23    names of phony corporations and that money would then be wired

24    to those bank accounts in smaller increments and she would then

25    be able to obtain that money and give the cash to Mr. Duran to

```
 1    be used to pay kickbacks.  Ostensibly, he would turn that money
 2    over to Margarita Acevedo to pay those kickbacks.
 3              The implication, of course, of this paragraph to which
 4    we object is that Ms. Negron had direct knowledge of the
 5    opening of these phony corporations to receive checks and wire
 6    transfers.
 7              And it is the defense's position that, while that may
 8    form relevant conduct for the overall conspiracy, it attributes
 9    knowledge to her and foreseeability which was not established
10    by the evidence.
11              While it is foreseeable that kickbacks would be paid,
12    it was in no way established that it was reasonably foreseeable
13    for Ms. Negron to know that Mr. Duran was engaging in this
14    conduct with Adriana Mejia.  And so, for those reasons, your
15    Honor, we are moving to strike that.
16              Now, I believe, your Honor, that that concludes the
17    solely factual objections which the defense raised to the
18    contents of the presentence investigation report and that the
19    remainder of the objections which we have go to specific
20    calculations of the sentencing guidelines --
21              THE COURT:  All right.
22              MR. WAX:  -- although there are other factual
23    objections which are very minor that come later in the
24    presentence report when dealing with Mrs. Negron's income and
25    financial aspects.
```

 1              I can -- I think, if we're just going to stay

 2     chronological, I can get back to those later, Judge.

 3              THE COURT:  Well, we're dealing now with the first

 4     phase, as you have quite correctly designated it, of the total

 5     guideline range.  We're computing that.

 6              So I understand the first factual objections based

 7     upon the record and so on, but I believe it would be logical

 8     for me to go ahead and hear the rest of your computation.

 9     These numbers will just follow.

10              MR. WAX:  Yes.

11              THE COURT:  If they are sustained, it's a minus, if

12     it's of the probation recommendation on those three items.  If

13     they're overruled, then they remain.

14              We've already had one change in the PSI

15     recommendation, which results in a minus two points, I think --

16     I believe it's minus two points -- on my ruling on the

17     Government's objection.  I'm not as good on numbers as you

18     folks are.

19              But my analysis of your remarks would translate into

20     something like a guideline range of 35.  I don't ask you to

21     affirm or deny this.  As I said, it's approximately.

22              The PSI is recommending -- or calculating for my

23     consideration a guideline range of 50, which I have already

24     reduced by two, which would make it then a 48 total guideline

25     range.

13

```
 1            I think that's where we are at this point.  And if

 2     you'd like to go forward, we'll just bear that in mind.

 3            MR. WAX:  Great.

 4            THE COURT:  And then we'll let Ms. Saulino argue or

 5     agree with you, as she may or not.  And we'll hear her argument

 6     in a moment.

 7            Okay.

 8            MR. WAX:  All right.  Thank you, your Honor.

 9            With that said, then I will proceed to the calculation

10     of the loss amount.

11            We are aware, of course, your Honor, of your rulings

12     with respect to the Co-Defendants, Lawrence Duran and

13     Marianella Valera, in this case and your finding that the

14     proper measure of loss amount in this case was the intended

15     loss represented by the total billings to Medicare of American

16     Therapeutic Corporation and American Sleep Institute in the

17     neighborhood of 205 million.

18            The purpose of the objections which I have presented

19     to the Court in the first instance, of course, is to assert

20     what we believe the proper calculation of loss and specific

21     offense characteristics applicable to the Defendant should

22     properly be.

23            But the underlying basis for the Defendant's assertion

24     that the proper offense level should be Level 35 is also

25     designed to bring reason and rationality to the calculation of
```

1    the guidelines in this particular case, your Honor.

2           When you look at loss amount in this case, it's very

3    clear from the testimony of Wynette Sandlin from First Coast

4    Service Options, Incorporated, during the course of the trial

5    that Medicare has published rates for what they will pay for a

6    specific claim made by a Medicare provider and that these

7    promulgated rates were known to all of the providers.

8           Ms. Sandlin further went forward to say it does not

9    matter how much you bill; the only issue is the service which

10   is provided and the amount that Medicare agrees to pay.

11          So we have three amounts, your Honor.  We have the

12   billed amount, we have the allowable amount, and we have the

13   paid amount.

14          The paid amount, we know with specificity in this

15   case, was $87 million.  And I round the figure off.  We know

16   that it was 87 million and a few hundred thousand.  But to be

17   succinct, let's stay with 87 million, your Honor.

18          Now, unlike a typical fraud case, when we are dealing

19   with Medicare, we are clearly dealing with a government

20   entitlement program.  This issue was not raised with your Honor

21   during the sentencings of the Co-Defendant in this case.

22          Now, in light of the fact that Medicare is a

23   government entitlement program, there is a special rule

24   contained in Guideline Section 2B1.1 at Commentary Note 3F,

25   which is a special rule for government benefits programs.

1             And what it indicates is that, in a case involving

2    government benefits, loss shall be considered to be not less

3    than the value of the benefits obtained by unintended

4    recipients or diverted to unintended uses, as the case may be.

5             Now, obviously, your Honor, that section says not less

6    than.  So the Court retains some flexibility to make a

7    determination that the amount of loss is more than the actual

8    loss.

9             The case law in this area is at both ends of the

10   spectrum.  We have presented cases to your Honor in our

11   objections to the presentence investigation report where other

12   United States district judges and appeals courts have come to

13   the conclusion that the proper measure of loss in a Medicare

14   fraud case is the actual loss.

15            In fact, one of the cases which we highlight is the

16   *United States versus Fallah* case -- F-a-l-l-a-h -- out of the

17   Southern District of Texas, where the Court -- I believe it's

18   Judge Rosenthal -- specifically stated that intended loss is

19   not the billed amount because all parties knew that Medicare

20   would not pay the billed amount, but would only reimburse a

21   capped portion of that amount.

22            Now, certainly, your Honor, you have taken a position

23   and the law permits you to take a position that the intended

24   loss is the billed amount.  And I submit to your Honor that

25   that is artificial, that there is no rational basis for

1   assessing this astronomical amount to the Defendant as the loss

2   amount in this case merely because it was the amount billed.

3          When you sentenced Mr. Duran, your Honor, I believe

4   you spoke about 80 percent being paid by Medicare and the other

5   20 percent being pursued through Medicaid or other means.

6          It's my understanding that American Therapeutic

7   Corporation and American Sleep Institute did not have Medicaid

8   provider numbers and could not submit for reimbursement.  And I

9   have never seen in all of my investigation into this case any

10  Medicaid billing data.

11         THE COURT:  The testimony was by Mr. Duran, I believe,

12  that he pursued vigorously that other 20 percent through

13  objections or complaints to the -- whoever it was, that group

14  in Jacksonville or Atlanta, the First Federal or whoever the

15  government agency was that approved these things, and he

16  took -- he had given instructions to pursue every appeal

17  where they were denied and they were seeking actively that

18  20 percent.

19         MR. WAX:  And I --

20         THE COURT:  That's the testimony in the record.

21         MR. WAX:  I agree.

22         I was sitting in the audience watching the sentencing

23  proceeding and, when he said it, I was completely surprised,

24  taken aback.

25         I do understand that appeals were filed for denials of

1   claims for the Medicare claims that were submitted to First

2   Coast Service Options for which they would pay 80 percent of

3   the allowable amount.  And I understand that, when he said, "We

4   did pursue appeals in every case," that that's quite correct.

5          And Ms. Saulino engaged in a very, very cogent

6   cross-examination of Mr. Duran, which she has again highlighted

7   in her response to our objections that we filed this week.  And

8   certainly it's very clear that they did pursue claims which

9   were denied by Medicare.

10          Be that as it may, your Honor, one of the other

11   aspects of the loss amount in this case is just a plain fact of

12   operating a business.

13          You know, the mandatory Victims Restitution Act in

14   this case says that the actual loss amount of 87 million shall

15   be the restitution.

16          But what we see within that number of claims paid

17   by Medicare that is not articulated in the presentence

18   investigation report, nor is it articulated anywhere else, is

19   the costs of running these businesses.

20          Now, there were many, many people working in these

21   businesses over a period of seven or eight years.  We're

22   talking about, ultimately, seven or eight locations with

23   hundreds of employees, payroll, payroll taxes, overhead,

24   expenses.

25          So it wasn't as if --

```
 1              THE COURT:  Kickbacks.

 2              MR. WAX:  Kickbacks.

 3              THE COURT:  Millions of dollars.  Yeah.  We can go on

 4    and on with the --

 5              MR. WAX:  We can.

 6              THE COURT:  -- illegal kickbacks.

 7              MR. WAX:  Absolutely.  And I --

 8              THE COURT:  I understand that there were -- pardon me

 9    for interrupting.

10              MR. WAX:  Sure.

11              THE COURT:  I understand there were -- that all of

12    these hundreds of millions of dollars did not find their way

13    into the individual Defendants' pockets in their entirety.  But

14    that was the intent.  That was where they were headed.  That's

15    what they wanted.

16              If they could have gotten all of it, they -- he

17    answered -- Mr. Duran answered that question, I think, quite

18    frankly.  He said, "Yeah.  We were out to get every dollar we

19    could."

20              MR. WAX:  Yes, he, did your Honor.  Yes, he did.

21              And I think that that's obviously a conclusion which

22    is very easy to draw from his testimony because it is, in fact,

23    what he said.

24              But in trying to bring some level of --

25              THE COURT:  Rationality.
```

```
 1          MR. WAX:  -- to the calculation of the guidelines --

 2          THE COURT:  You're arguing rationality and logic, if I

 3    can put words in your mouth.  I think that's what you're doing.

 4          MR. WAX:  And you are, Judge.  That's correct.

 5          We have a guidelines scheme which says, well, if you

 6    take more than 70 million, you add 24 levels.  And if you take

 7    more than 100 million, you add 26.  If you take more than

 8    400 million, you add 30.

 9          What I'm getting at is --

10          THE COURT:  200 million -- you left out a critical --

11          MR. WAX:  28.  28.

12          THE COURT:  Go ahead.

13          MR. WAX:  And who made the decision?  This is what I'm

14    getting at.  Who made the decision that these were the cutoff

15    levels?

16          You know, when we used to have -- before 2B1.1, we had

17    2F1.1.  And we had high -- I think the highest level back

18    then -- and correct me if I'm wrong -- might have been 24 -- an

19    increase of 24.

20          And then all of a sudden they said, "Well, you know,

21    we need to move these numbers up."  But based on what?  That's

22    really what I'm getting at, your Honor.  Based on what?  It's

23    arbitrary and it's capricious, to use those buzzwords.

24          And what I'm saying, to echo what the Court said in

25    United States versus Renick at 273 F.3d 1009, which was an
```

1    Eleventh Circuit case, your Honor -- they were talking about

2    the *Miller* case.  And they said, in the *Miller* case -- which

3    the Court had specific evidence from which it could make a

4    reasonable estimate.

5         And here, you do have specific evidence.  You have two

6    pieces of specific evidence.  One is the 200-million-dollar

7    billed figure.  The other is the 87-million-dollar paid figure.

8    And it is specific.

9         And the Court has to make a decision about which one

10   of those would be the appropriate measure of loss in

11   calculating the guidelines.

12        You know, it's interesting.  You know, none of the

13   cases in the Eleventh Circuit that I found ever addressed the

14   special rule for government entitlement programs.

15        They all go specifically to the determination of

16   actual loss and saying, obviously, the general rule controls

17   and says it could be the greater of actual or intended loss.

18        But, you know, I go back to *Booker* for a minute,

19   Judge.  And, you know, *Booker* was an interesting sleight of

20   hand by the U.S. Supreme Court where they turn around and they

21   say, you know, "These guidelines are unconstitutional.  They

22   violate the Sixth Amendment.  But we're not going to throw out

23   the baby with the bath water.  We're going to tell the judge

24   that we still calculate the guidelines, even though we just

25   found that calculating those guidelines violates the Sixth

1 Amendment, and tell you to take them into consideration as a

2 factor."

3        But the practical effect of calculating those

4 guidelines based on artificial, arbitrary cutoff points that

5 violate the Sixth Amendment bring us to a conclusion which --

6 how can it possibly rationally, again, factor into a

7 determination of what an appropriate sentence should be for an

8 individual pursuant to 18, USC, 3553?

9        And I think, at the end of the day, that's what I'm

10 getting at when I talk about loss amount.  Even in the face of

11 the argument -- of the ruling that you made for the

12 Co-Defendants in this case, it artificially inflates the

13 amount.

14        So I think my argument has been made.  I will rest on

15 that, along with the written submission for the calculation of

16 loss, your Honor.

17        THE COURT:  All right.

18        MR. WAX:  Moving on to the sophisticated means

19 enhancements -- and I'd like to address these in tandem --

20 there were two sophisticated means enhancements applied in this

21 case.

22        The first was the sophisticated means, specific

23 offense characteristic, pursuant to the healthcare fraud and

24 the calculation of the offense level and specific offense

25 characteristics under Section 2B1.1.

1          As your Honor knows, those counts were grouped with

2     the money laundering and structuring counts and, ultimately,

3     the money laundering guideline was used to calculate the base

4     offense level and additional specific offense characteristics.

5          If you go back to the indictment in this case, your

6     Honor, there were two conspiracies involving healthcare fraud.

7     The first conspiracy was the conspiracy to commit healthcare

8     fraud under 18, USC, 1349, which was you submitted false claims

9     to Medicare.

10          And we're saying that the submission of those false

11     claims to Medicare constituted -- or what the presentence

12     investigation report is saying is that the submission of those

13     false claims to Medicare and the method by which it was done

14     constituted sophisticated means.

15          And the method by which it was done, as the Government

16     laid out from their opening statement throughout the course of

17     the trial and through closing argument, was depicted as a

18     circle:

19          Kickbacks were paid to the owners of assisted living

20     facilities, halfway houses and patient brokers.  Patients came

21     to ATC and were provided some services that Medicare was billed

22     for under the partial hospitalization program, local coverage

23     determination.

24          Medicare paid the claims by depositing the money into

25     ATC's bank accounts via wire transfer or checks were written to

1    ATC and the money was then deposited in the account.

2         The money was taken out of the account by wire

3    transfers or checks or some other methodology whereby it was

4    cashed and kickbacks were paid again to the patient brokers and

5    ALF homeowners.

6         And it was this circle that the Government talked

7    about that also forms the basis for the application of the

8    sophisticated means offense characteristic under

9    2B1.1(b)(9)(C).

10        But then there's a second conspiracy, which is the

11   conspiracy to defraud the United States under 18, USC, 371, by

12   paying kickbacks -- by paying healthcare kickbacks.

13        And what that does is that conspiracy sort of takes a

14   portion of the first conspiracy and carves it out, the portion

15   where the checks are cashed or the wire transfers are made and

16   cash is received and that cash is then given to pay kickbacks

17   to the various individuals and entities.  And that forms the

18   basis for that second conspiracy.

19        And these are two conspiracies which are separate from

20   the money-laundering conspiracy, completely separate in terms

21   of the way they're charged in the indictment, but not in terms

22   of the offense conduct.

23        And that's where the objection becomes important.

24        The determination of whether the offense involved

25   sophisticated means is, of course, fact-specific.  And when we

1    look at a typical Medicare fraud, as we know in this district,

2    essentially, they follow a pattern, which is patient brokers

3    deliver individuals to companies, whether it's a community

4    mental health center, a durable medical equipment company, an

5    HIV infusion therapy clinic, and those people either receive

6    services or they don't receive services or they receive goods

7    or they don't receive goods.

8         Medicare gets billed.  Medicare pays the claims.  The

9    claims are taken out of the bank -- the proceeds are taken out

10   of the bank account.  And the proceeds are used to pay

11   kickbacks or the proceeds are merely pocketed by the

12   individuals who are conducting the fraud.

13        Essentially, that's what happened here.  By its own

14   nature, a 200-million-dollar fraud or even an 87-million-dollar

15   fraud has as an inherent component some level of intricacy, but

16   it's not unusual.

17        And so by applying, in the first instance, a

18   sophisticated means offense characteristic, I submit to the

19   Court that all you're doing is enhancing what is already

20   inherent in the base offense level for this particular type of

21   fraud.

22        Stepping back from that for a moment, your Honor, we

23   now have to look at the sophisticated laundering enhancement

24   because, when you go to 2S1.1, which is the money laundering

25   guideline, you're now saying, "Okay.  We've calculated the base

1   offense level for the underlying offense under 2S1.1.  We've

2   then gone ahead and we've added in all of the specific offense

3   characteristics from 2B1.1 as well."

4        So we've already included sophisticated means.  We've

5   already included the loss amount.  And we've already reached

6   this base offense level of -- if I'm not mistaken, I think it's

7   30 in the guidelines.

8        But now we're going to pile on.  Now we're going to

9   turn around and we're going to say, "Your laundering activity

10  was sophisticated laundering activity because it involved

11  different transactions, other corporations, layering" -- name

12  what you will -- when, in fact, the very conduct for which

13  sophisticated laundering is being urged upon the Court is the

14  conduct which was part of the conspiracy to defraud the

15  Government by paying kickbacks under 18, USC, 371.

16       It's already been calculated in determining the base

17  offense level pursuant to 2B1.1, which is then grafted on to

18  2S1.1.

19       There is a note in 2S1.1 which specifically says at

20  Application Note 5B, "Nonapplicability of Enhancement:  If

21  Subsection B3 applies" -- which is the enhancement for

22  sophisticated laundering under 2S1.1 -- "and the conduct that

23  forms the basis for an enhancement under the guideline

24  applicable to the underlying offense" -- which is 2B1.1 -- "is

25  the only conduct that forms the basis for application of

```
 1    Subsection B3 of this guideline, do not apply Subsection B3 of
 2    this guideline."
 3              I have to step back for a second, Judge, because, you
 4    know, I know that you've been on the bench for 48 years now and
 5    there was --
 6              THE COURT:  Oh, that's right.  You're right.  You
 7    added in the circuit court.
 8              MR. WAX:  I did.  Yes.
 9              THE COURT:  That puts it up a little longer.
10              MR. WAX:  And, you know, I've been at it now for
11    27 years.  I started right before the guidelines came.  I had
12    sentencing hearings before the guidelines.  And you had
13    thousands of sentencing hearings before the guidelines and you
14    didn't go through all these machinations.
15              THE COURT:  We had sentencing guidelines, the first.
16    We had no limitation on a judge's conscience and feeling of
17    right and wrong except his own individual determination for ten
18    years or whatever it was.
19              Then we had -- I'm going to get this wrong.  Then we
20    had ten years of -- well, then the guidelines came into effect
21    and we had a period of time when this Court, by the way, held
22    them unconstitutional in a brilliant opinion written by Judge
23    Marcus, who now sits on the Eleventh Circuit Court of Appeals,
24    speaking for a majority of the Court in an *en banc* hearing,
25    which had never been done before in America.
```

1           But we felt it was important because of the massive

2   criminal caseload here.  That was ultimately reversed and the

3   guidelines came into effect and we applied them for a 10- or

4   15-year period, whatever it was.

5           So I had about 10 years before people saw the

6   guidelines and about 10 years or 15 years when they had

7   guidelines and we now have whatever period of time since

8   they've been advisory.  So I've been through all of it.

9           And in the course of that, it's something in excess of

10  5- or 6,000 human beings that have sat in this courtroom and

11  had their lives dealt with by lawyers, good lawyers like you,

12  in this division of court.  That's a lot of sentencing.  And

13  they all were difficult and every single one of them is

14  entitled to individual consideration.

15          Well, that digresses.  But you're making a very

16  thorough and analytical analysis of what we must deal with at

17  this point in time, several hours or several days, to determine

18  the advisory guideline range, which, as you've indicated,

19  doesn't really change the ultimate -- that ultimate number,

20  whatever we arrive at, with all of this tremendous legal effort

21  that you and Ms. Saulino have put into this and the effort of

22  the Court to find this number.

23          And because of the magnitude of the suggested loss,

24  which was the principal -- I think the principal part of your

25  argument and very well articulated, extremely well articulated,

1    it passes it beyond the life imprisonment category.

2            So we have to wonder at times, you know, is the effort

3    worth it?  But, of course, we must go through it.  I'm talking

4    about the calculation.  I'm not talking about the very

5    important issue, if we ever get to it, of what happens to the

6    Defendant in her life.  That's the important part of this

7    hearing.

8            MR. WAX:  Right.

9            THE COURT:  And we've got to go through another half a

10   day in addition to the other -- and I don't really know on

11   Mr. Duran and the others what it would total up to, but several

12   days in sentencing for each one, hours and hours and hours and

13   hours, to come out with something that the guidelines say

14   equates to life imprisonment.

15           Am I basically correct that you would have to get

16   below the -- the guideline total chart ends at Level --

17   somebody help me out --

18           MR. WAX:  43.

19           THE COURT:  -- 43.  Yes.

20           MR. WAX:  I mean, I am on the exact same wavelength

21   with you, Judge.  I mean, you understand exactly where I'm

22   coming from.  I'm sitting here making this argument to you and

23   right in the middle of the argument I'm like, "Why am I making

24   this argument?"

25           THE COURT:  Because you must.

1        MR. WAX:  Because I must.

2        THE COURT:  Because I must and Ms. Saulino must.  I

3   don't want somebody to look at this at the appellate level and

4   say, "Well, the Judge concluded it didn't matter."

5        No.  It does matter because it is the law and we have

6   to do it.  And that's why we're doing it and we're doing the

7   best we can.

8        Fortunately, fortunately, the Court today is

9   extremely -- I hesitate to use the word "blessed," but

10  extremely -- it's very good, very good, that I have excellent,

11  excellent lawyers to help me work through all this because this

12  thing could bog down and make the Okefenokee Swamp look like a

13  day at the beach --

14       MR. WAX:  Exactly.

15       THE COURT:  -- if I didn't have both you and

16  Ms. Saulino.  That's my way of saying I think both of you are

17  doing an excellent job on this, which -- but let's move on --

18       MR. WAX:  Thank you, Judge.

19       THE COURT:  -- or, my gosh, we'll be here another

20  45 years if I keep interrupting you.

21       But you're doing it because you have to do it.  I

22  compliment the two of you for doing it so thoroughly and

23  correctly and we are treating it seriously.

24       But at some point, we get to the point where we get to

25  the important part -- to me, the important part of this case,

1    and that's what happens to this Defendant.

2            MR. WAX:  And I thank you, Judge.  I appreciate you

3    allowing me to digress for that brief period of time.

4            In any event, your Honor, I guess what I'm getting at

5    is certainly the facts of this case would enable you to make a

6    finding that there was sophisticated means in the healthcare

7    fraud or there was sophisticated laundering in the money

8    laundering.  But what we really come down to is you can't do

9    both.

10           Now, I'd like to see both of the enhancements taken

11   away, again, to bring some rational basis or rationality back

12   to the guidelines instead of this artificial piling on, which

13   is inherent, I submit, in the commission of the offense.

14           But be that as it may, it's clear that it's all

15   overlapping.  You can't turn around and carve out the money

16   laundering and say, "Well, this money laundering conduct is

17   completely different than the fraud conduct of 2B1.1," because

18   eye not.  It's all part and parcel.

19           So in the first instance, of course, my argument and

20   my objection is to remove both of the enhancements.  As a

21   reasonable man, as a reasonable advocate for my client, I think

22   it's beyond peradventure that at least two levels have to go.

23           Your Honor, with respect to the victim-related

24   adjustments, under 3A1.1(a)(1) and (2), we have four levels

25   that have been added to the guidelines.

1        I went back when I was doing my objections initially

2   and I looked at the Duran sentencing and the transcript.  And I

3   attached it to my objections as Exhibit 2.

4        And your Honor had found, first, that the victims of

5   the fraud were the Medicare beneficiaries who attended ATC and,

6   to some extent, ASI.

7        And then there was a second group that you found of

8   vulnerable victims, which were the individuals who did not

9   attend those programs, but who otherwise would have been

10  entitled to the money in Medicare's coffers to pay the claims

11  for their otherwise legitimate medical services, which they

12  don't have the benefit of because the money was diverted to

13  ATC.

14       So when I went back and analyzed it, I started first

15  with the concept of:  What is a victim?

16       And I looked at 2B1.1, which is where it all emanates

17  from.  And, of course, it says that the victim is a person who

18  sustained an actual loss.

19       I said, well, in the first instance, these

20  beneficiaries didn't sustain any actual loss -- pecuniary loss.

21  2B1.1, after all, is designed to address pecuniary harm,

22  financial crimes.  And so, as a basis, these people could not

23  possibly be victims.

24       Now, of course, the Eleventh Circuit, through its many

25  opinions, has disagreed.  And they have said, "No.  These

1    people are victims."

2           I believe it was said very cogently in one of the

3    cases that the Government had cited with respect to an economic

4    offense and how the individuals who were patients facilitate --

5    not personally, but the use of those patients facilitate the

6    economic offense.

7           There are other courts that have found, of course, as

8    we lay out in our objections to the presentence report, that

9    they are not victims for purposes of this crime.

10          And I suppose that one reason that I'm putting this

11   argument forward to your Honor is that perhaps one day the

12   issue will be resolved once and for all by the United States

13   Supreme Court, if they ever wanted to interpret the guidelines

14   again.  But I suspect that they don't.

15          So that really brings us, your Honor, to your

16   fact-specific determination of whether or not the Medicare

17   beneficiaries who attended ATC and ASI were victims.

18          And I will not belabor that argument any longer, but I

19   would address the issue of the vulnerable victims, your Honor.

20          In the first instance, the nebulous class of

21   vulnerable victims, which your Honor isolated in the Duran

22   sentencing as those individuals who did not attend ATC, but

23   would have had the benefit of those funds to satisfy claims for

24   their legitimate medical services -- that class of people was a

25   class of vulnerable victims.

33

1              And the case law is very clear that you can't isolate

2      a class without some nexus between the class and the crime.

3      And so, in this particular case, that second class of

4      vulnerable victims cannot be vulnerable victims under 3A1.1 or

5      2B1.1 or any analysis because of that lack of nexus, regardless

6      of the impact of the payment of Medicare proceeds to ATC and

7      ASI.

8              There were two Eleventh Circuit cases which we rely

9      upon, *United States versus Malone* and *United States versus*

10     *Long*.  In both of those cases, the Court indicated that it

11     could not apply to a subject class because the vulnerable

12     victim adjustment focuses on the conduct of the Defendant and

13     can only be applied where the Defendant selects the victim due

14     to the victim's perceived vulnerability to the offense.

15             And you can't say that those victims, that class of

16     individuals that your Honor isolated, were selected by the

17     operators of ATC and ASI because that never even entered into

18     their calculus, never even entered into their thought process.

19             So then we get back to whether or not the Medicare

20     beneficiaries who attended ATC and ASI can be considered

21     vulnerable victims.

22             Now, the Government's position is, "Well, you know,

23     these people were in need of medical treatment.  They were

24     elderly.  They were infirm.  They were Alzheimer's patients.

25     And because of that, they were targeted."

1           But that's not the reason those individuals were

2      targeted, see, because, again, it goes back to the Defendants'

3      conduct and why.  Not all of the individuals who attended ATC

4      and ASI were elderly.  Not all of those individuals were

5      infirm.  Not all of those individuals had Alzheimer's or

6      dementia.  Some of them were just drug abusers, substance

7      abusers, addicts.  Some of them were in their 20s.  Some were

8      in their 30s.  It ran the spectrum.

9           What they all had in common, though, was one thing,

10     which was a Medicare provider number.  That's the reason that

11     those individuals were there.  That's the reason that they

12     were, quote-unquote, targeted, not because they were vulnerable

13     due to age or dementia or some other infirmity, but because

14     they had a Medicare number.

15          And that's the basis for our objection that it was not

16     the vulnerability of the victim from a physical or mental

17     perspective that was the reason they were brought to ATC.

18          And so we submit that, even if your Honor finds that

19     the Medicare beneficiaries who attended ATC qualify as victims

20     for purposes of 2B1.1, that they do not qualify as vulnerable

21     victims for 3A1.1, such that there would be an additional two

22     levels added to that.

23          And, your Honor, I'm mindful of the fact that you have

24     made these findings in the cases of the Co-Defendants.  But

25     that doesn't necessarily make it the law of the case.  That

 1    doesn't necessarily mean that it has to be applied to this

 2    Defendant, particularly in light of the fact that we're making

 3    completely different arguments on behalf of Ms. Negron that --

 4    than those that were made for the Co-Defendants and, to a great

 5    extent, resulted in your Honor's rulings, which I'm clearly

 6    standing before you asking you to reconsider as applied to the

 7    guidelines calculation for this individual.

 8         Judge, the final argument that we have for the

 9    guidelines calculation deals strictly with the aggravating role

10    enhancement under Section 3B1.1.  The probation report -- the

11    presentence investigation report has said she should have a

12    four-level increase as an organizer/leader.  We have submitted

13    that the more appropriate measure for her would be as a

14    manager/supervisor.

15         It is highly fact-specific, your Honor.  Certainly the

16    Court has the recollection of the testimony at trial about what

17    the roles of the individuals here were.

18         It is at this time that I want to highlight the fact

19    that, when Ms. Negron began working at ATC, she came in as a

20    per-diem therapist; that is, she was a contract employee, a

21    1099 employee, who was there running groups at ATC.  She was

22    not in an ownership role.  She was not in a managerial role, a

23    supervisory role, nothing.  And that went on for a period of

24    about two years.

25         And she was so dedicated to her work that she did rise

1    up through the ranks and, ultimately, Mr. Duran offered her the

2    opportunity to have an ownership interest in MedLink.  And she

3    accepted that opportunity.  And through her sweat equity, she

4    was given that position.

5         And, of course, you heard about the managerial role

6    that she fulfilled in the day-to-day operations of the ATC

7    facilities.  She did own American Sleep Institute for the

8    period of the -- the brief period of time that it was

9    operational and she was a principal of MedLink, which was the

10   management company.

11        But all of the decisions in this case, all of the

12   machinations, all of the fraud, was done by Larry Duran.  This

13   was Larry Duran's scheme.  He told you in his testimony, your

14   Honor, at his sentencing it was fraud from the beginning.

15        Did Judith Negron know it was fraud from the

16   beginning?  No, Judge.  No, she didn't.  Did she get caught up

17   in the fraud?  Yes, she did.  Yes, she did.

18        But is her position within the company and her

19   day-to-day role in the operations worthy of being equated with

20   Larry Duran in making an assessment of what aggravating role

21   should be properly attributed to her?

22        And I submit to you, your Honor, that while an

23   aggravating role is proper, that only a three-level increase is

24   appropriate.

25        Now, if we take all of those objections to the offense

1    level, your Honor, and you were to grant all of my

2    objections -- and I harbor no illusions that that would be the

3    case, although I'm hopeful -- we would come from an offense

4    level of 48, which is off the charts, down to an offense level

5    of 35, which is a more reasonable, rational offense level,

6    which results in a guideline calculation of 168 to 210 months.

7              And I point that out because my goal here, your Honor,

8    is to bring that reason and rationality to the calculation of

9    the guidelines.  If I'm successful, then we've accomplished

10   something here today as an advocate and as a human being that

11   would make me proud.

12             If I'm unsuccessful, then I do find some relief in the

13   fact that this is but merely one factor that the Court would be

14   taking into account in determining what's an appropriate

15   sentence for this individual.

16             So I only can hope that the arguments that I've made

17   to your Honor with respect to the calculation of the guidelines

18   have not fallen -- or have not been of no consequences to it.

19   I believe that they have.  I believe that they do make sense

20   and that they can be applied.

21             Of course, the Government wants guidelines that are

22   off the charts.  I don't know why.  That's their prerogative,

23   certainly, as my adversary.

24             Your Honor, I just briefly have to return to some

25   factual corrections in the presentence investigation report.  I

1    just need to go back and find them for a moment.

2            Paragraph 116 of the PSI indicates that the Defendant

3    disclosed that her monthly gross income from MedLink was

4    between 150,000 to 250,000 a year.  So, obviously, that

5    sentence in and of itself doesn't make sense.

6            We know from the salary that she received and her

7    weekly checks that it's accurate that she received a gross

8    annual income of between 150- to $200,000 a year.

9            And I just want to point out to your Honor that that's

10   salary.  You know, the kickback checks that were written in her

11   name and that were cashed -- we're not talking about salary.

12   I'll get to that later in my allocution.

13           So I would just move the Court to correct that

14   sentence to annual income of 150- to $200,000 a year.

15           THE COURT:  Correct it to what?  To what?

16           MR. WAX:  Just an annual salary, which is what it was.

17           THE COURT:  Oh.  You want to call it annual salary

18   instead of gross monthly --

19           MR. WAX:  Yes.  Because what it says is the Defendant

20   disclosed that her monthly gross income was between 150,000 to

21   250,000 a year.  We're just mixing month and year.  Her

22   monthly -- by no means did she ever get 150- to $250,000 a

23   month.  I think that's very clear and I think even the

24   Government can agree with that.

25           THE COURT:  Any objection?

1          MS. SAULINO:  No objection, your Honor.

2          THE COURT:  Granted.

3          We'll ask the probation officer to correct -- or to

4    modify Paragraph 117 as indicated to annual income.

5          Next?

6          MR. WAX:  Judge, also, in that same paragraph, 116,

7    there was an allegation that, from 2004 to October, 2010, the

8    Defendant received more than $10 million from Medicare by way

9    of ATC.

10         We object just to that because this Defendant never

11   received $10 million.  This implies that she personally

12   received it.

13         The truth of the matter is that we know that that

14   figure is attributable to ATC transfers to ASI.  There was no

15   evidence adduced at trial that this Defendant personally

16   received $10 million.

17         And so we would move to strike that or to modify it to

18   read that more than $10 million was transferred from Medicare

19   to ATC to MedLink.

20         THE COURT:  We'll take that up in your argument later.

21         Next?

22         MR. WAX:  I believe, your Honor, that I have addressed

23   all of the objections.  Let me just check with Mr. Mineau to

24   see if I've forgotten anything.

25         THE COURT:  Thank you.

1          MR. WAX:  Your Honor, I've been advised that I have

2    concluded all of the objections.

3          Thank you.

4          THE COURT:  Thank you.

5          Assistant US Attorney Saulino, Ms. Saulino, we have

6    considered the defense well-argued and well-briefed objections

7    for the past hour or so, hour and a half.

8          I was about to ask you to limit your comments to

9    certain ones that are suggested by Mr. Wax and observed by you

10   and me -- or by the Court and by counsel in the courtroom to be

11   sort of a new or different argument.  But that would be unfair

12   to the Government.  You're entitled to say whatever you want to

13   say.

14         I was trying to bring this into focus on some of these

15   specific issues, but that gets more complicated than simply

16   saying I'll be pleased to hear from you now on anything you

17   want to say.

18         MS. SAULINO:  Thank you, your Honor.

19         I will endeavor to be as concise as possible and -- as

20   I know the Court is not at all shy about this, but I would be

21   more than happy to take questions from the Court on the most

22   relevant issues to the Court.

23         Briefly, just addressing the first three objections

24   that Mr. Wax and I have both recognized are the sort of main

25   factual objections, the first objection regarding Paragraph 33,

1   the Defendant's objecting to a statement that cooperating

2   witnesses have indicated that there were no doctors present at

3   night to monitor the patients at ASI who were purportedly

4   undergoing a study of their sleep ailments, that statement is

5   factually correct.  It is borne out by witnesses at trial and

6   cooperating witnesses with whom the Government has spoken and

7   about whom information was provided to the Probation Office.

8          I don't believe that Mr. Wax is disputing that that

9   statement itself is factually correct.  His concern is that he

10  believes it leaves a misimpression that doctors were required

11  to be present during the sleep studies.

12         As was borne out at trial, the American Sleep

13  Institute was a fraudulent company that was opened in order for

14  Ms. Negron and her co-conspirators to obtain additional money

15  from the same patients they were exploiting at ATC.

16         And those patients didn't receive sleep studies that

17  they needed and they didn't receive followup from those sleep

18  studies, as we heard from Dr. Gumer.

19         So, your Honor, the statement is factually correct.

20  If the Court chooses to excise the statement from the PSR, the

21  Government doesn't believe it will have any effect on the

22  overall guidelines and simply provides the information to the

23  Court that it is a factually correct statement.

24         I don't believe anyone in this room believes that the

25  Court is under a misimpression about what happened here.

1          THE COURT:  It was clear -- when I read that, it was

2    clear that there was no testimony on a day-by-day,

3    week-by-week, month-by-month about which doctors were there and

4    which doctors weren't.

5          There was some testimony about one doctor, that he

6    showed up and would sign -- and I've forgotten the number --

7    100, 150 charts all in a one-hour period as fast as his hand

8    would write, which would indicate that he wasn't there.

9          But we don't have the specifics that the guidelines

10   seem to desire and everybody seems to like to do.  That is on a

11   day-by-day.

12         Does the record reflect that, in 2004, on July 15th,

13   Dr. -- there was no doctor in the sleep facility?  No.  It

14   doesn't.

15         But I don't know how this would be -- we perhaps could

16   add in a modifying phrase that says something to the effect

17   that the regulations do not require that or something.  I don't

18   know.  It just gets more -- frankly, more trouble than it's

19   worth.

20         But agreeing with the defense objection and getting it

21   worded correctly is -- I leave to counsel to work with the

22   Probation Office to modify it however you want to to reflect

23   the accurate testimony at trial.

24         Let's move on to something else.  That's all I can do.

25   Let me sustain the objection.

1          Next?

2          MS. SAULINO:  Thank you, your Honor.

3          Regarding Objection 2, which was Paragraph 47 about

4   transferring money to using shell corporations and sham

5   transactions to herself, your Honor, Ms. Negron not only

6   received roughly -- more than $1 million from this scheme to

7   herself, but she was the owner of a number of companies to

8   whom -- or to which money was transferred, including MedLink,

9   including Fates Elite and including the American Sleep

10  Institute and including a company called T Med Logistics, which

11  is not listed in the PSR, that was also her company.

12         So, your Honor, to the question of whether Ms. Negron

13  was the beneficiary of sham transactions, the answer is

14  unequivocally "yes."  She was the owner and had signature power

15  over the bank accounts of ASI, MedLink and Fates Elite.  And so

16  money that was transferred to those companies was transferred

17  to her.

18         THE COURT:  Go ahead.

19         MS. SAULINO:  I was going to move on to the next

20  objection, your Honor.

21         THE COURT:  Yes.

22         MS. SAULINO:  With regard to Objection No. 3,

23  Paragraph 51, the Defendant is objecting to the inclusion of

24  the statement that she and other indicted co-conspirators,

25  including Adriana Mejia and Lazaro Acosta, opened phony

```
 1   corporations to receive checks and wire transfers from ATC and

 2   MedLink.

 3           Your Honor, according to Mr. Wax's argument, the

 4   Defendant's objection here is that she is contending there was

 5   no evidence at the trial that she had knowledge of those phony

 6   corporations.  In fact, your Honor, that statement is

 7   incorrect.

 8           Evidence admitted at trial included the checks from

 9   the MedLink main operating account, the 0305 account, on which

10   Ms. Negron was a signer.

11           And as a part of the evidence at trial, the United

12   States introduced as a separate subset of the 0305 bank account

13   the checks that Ms. Negron signed and included in those checks

14   were checks to Adriana Mejia and to individuals who didn't

15   exist.  And those checks then went through South Dade Trade

16   Corporation.

17           So the idea that Ms. Negron didn't know what Adriana

18   Mejia was doing to launder money or what was happening with the

19   shell corporations is patently false.

20           The jury, in fact, your Honor, convicted Ms. Negron on

21   every single count of money laundering and structuring that was

22   included in the indictment.

23           So the jury itself found that she had knowledge and

24   was a part of the conspiracy that included phony corporations

25   that received checks and wire transfers from both ATC and
```

1    MedLink.

2         Again, your Honor, as you've recognized, I don't need

3    to belabor the points of each of these specific wording

4    objections because the Court understands the overall scheme and

5    the specific wording objections don't affect the guidelines

6    calculations.  So unless the Court has additional questions,

7    I'll leave it there.

8         Now, your Honor, with respect to the loss amount,

9    which covers a number of the objections that the Defendant has

10   put forward against the PSR, I'd first like to go to something

11   that Mr. Wax said at the very end of his comments.  He said the

12   Government wants a guidelines recommendation that is off the

13   charts.

14        The Government does not want anything here, your

15   Honor.  The Government is simply calculating the guidelines as

16   has been provided by Congress, by the United States Supreme

17   Court, by the Sentencing Commission, by the Eleventh Circuit,

18   by this Court and by the other judges in this district.

19        Your Honor, the loss amount has been addressed by all

20   of those entities over the years with respect to Medicare

21   fraud.  Medicare fraud is in a special category.  Medicare

22   fraud was, in fact, recently addressed by Congress and by the

23   Sentencing Commission in the Patient Protection and Affordable

24   Care Act.

25             In that act, Congress said that Medicare fraud was

1    such a problem it was adding additional levels of enhancement

2    based on loss amount.

3          So contrary to what Mr. Wax has argued, that there is

4    no rationality to the levels that are included in Section 2B1.1

5    of the sentencing guidelines, Mr. Wax argues that there's no

6    rationality there because we don't know where those numbers

7    come from and 200 to 400 million equals a Level 28 and that

8    severely overstates what is rational here.

9          Congress has recently spoken on that issue and said

10   that, for a loss amount of more than $20 million, the

11   guidelines understate the impact of the Medicare fraud and a

12   four-level enhancement should be added.

13         Now, the Government is not advocating that four-level

14   enhancement be added here, your Honor, because that four-level

15   enhancement did not take effect in the sentencing guidelines

16   until this month.

17         But Justice Sandra Day O'Connor in an opinion in the

18   Eleventh Circuit, as she was sitting by designation roughly a

19   year and a half ago, found that the fact that Congress had made

20   that decision is relevant in determining whether a sentence is

21   reasonable.  And she said that in determining that a 30-year

22   sentence for Medicare fraud was reasonable.

23         So, your Honor, when we are looking at the issue of

24   loss amount colored by the rationality that Ms. Negron asks us

25   to color it with, we need to look at rationality as measured by

```
 1    the way this country measures rationality.
 2              And that is:  What has Congress said about the issue?
 3    What has the Supreme Court said about the issue?  What has the
 4    Eleventh Circuit said about the issue?  And what has this Court
 5    repeatedly said about the issue?
 6              And that is that, in a Medicare fraud case, intended
 7    loss -- the prima facie evidence of intended loss -- this was
 8    also a part of the Patient Protection and Affordable Care
 9    Act -- the prima facie evidence of intended loss is the billed
10    amount.
11              And why is that?  As the Eleventh Circuit has told us
12    in Hoffman-Vaile, the controlling Eleventh Circuit case here,
13    it's because what an individual intends to steal from the
14    Government is what they bill to the Government.
15              Now, there might be a question, as Hoffman-Vaile
16    recognizes, as to whether an individual intended to get payment
17    that would have been provided through copays, copayments.
18              And so, in Hoffman-Vaile, there is some question as to
19    whether there's a requirement that the Defendant have tried to
20    collect the copays from the individuals that were Medicare
21    recipients.
22              But here, as your Honor recognized, we have clear
23    evidence that they did try to collect the copays.  There was no
24    ambiguity in Mr. Duran's testimony or in Ms. Valera's
25    testimony.
```

1        I asked them straight out, "Did you try to collect the

2   copays?"

3        They answered, "Yes."

4        They also detailed how they appealed every denial of a

5   Medicare determination that they were not entitled to payment.

6   But that was a separate conversation from the question of

7   whether -- straight up, whether they tried to collect the

8   copays.  The answer was, "Yes."

9        Now, your Honor, as a part of his argument regarding

10  the loss amount, Mr. Wax posited that the amount of loss

11  doesn't really matter in determining a sentence.

12       But here, your Honor, the Defendant committed fraud.

13  The Defendant committed massive fraud.  So the amount that she

14  tried to steal from the Government absolutely matters.

15       It should, of course, be the largest driving factor of

16  the guidelines range that is set.  And that is what has been

17  set by the Sentencing Commission.  That is what has been set by

18  Congress.

19       If the levels seem high, they seem high because

20  Congress has recognized the great sentiment around this country

21  and of the judges in this district that Medicare fraud is a

22  serious problem.  It is a serious problem that requires serious

23  treatment.  And this Court has repeatedly given it serious

24  treatment.

25       And so, while it is understandable that the Defendant

 1   puts forward arguments attempting to lower the calculation of

 2   her loss amount, those arguments fall short of the case law and

 3   the law set by the Sentencing Commission and Congress, which

 4   are very clear on this issue.

 5        The intended loss is the amount that they tried to

 6   bill to the Government, that they tried to get from the

 7   Government.  And they would have, as Mr. Duran said, taken

 8   every penny they could have gotten.

 9        Now, on the question of sophisticated means, your

10   Honor, the objection here, as I understand it, is that the

11   Defendant believes that sophisticated means and sophisticated

12   laundering, which are two separate enhancements provided for

13   under the guidelines, are double-counting.

14        Your Honor, that is plainly not the case.  Simply by

15   reading the guidelines, if we start at Section 2S1.1, which is

16   the guideline range for money laundering, and we look at

17   Application Note 5B, nonapplicability of the enhancement -- and

18   Mr. Wax himself read this to the Court -- "If Subsection B3

19   applies" -- which it does here -- "and the conduct that forms

20   the basis for an enhancement under the guideline applicable to

21   the underlying offense" -- here, that would be the

22   sophisticated means -- "if the conduct that forms the basis for

23   that enhancement is the only conduct that forms the basis for

24   the application of the sophisticated laundering enhancement, do

25   not apply the sophisticated laundering enhancement."

1          But the important word there, your Honor, is "only."

2   And here, there is sophisticated means and there is

3   sophisticated laundering.  Are they related?  Absolutely.  Were

4   they committed by the same people?  Yes.

5          But is the basis for the sophisticated laundering --

6   is the basis for the sophisticated means in the healthcare

7   fraud the only basis for the sophisticated laundering

8   enhancement?  Absolutely not, your Honor.

9          In this case, as your Honor well knows, these

10  individuals spent eight years, hundreds of employees, more than

11  7,000 Medicare beneficiaries, conducting a fraud scheme that

12  was so complicated and so complex it was able to succeed to the

13  tune of $205 million billed, $87 million paid.

14         Now, Mr. Wax says, of course, a 200-million-dollar

15  scheme has some level of intricacy, but it's not an unusual

16  level of intricacy here.

17         The level of intricacy here was extraordinary, your

18  Honor.  The patients were purchased from assisted living

19  facilities.  The patients themselves, as we'll get to in a

20  moment, were vulnerable patients by design so that they were

21  patients who wouldn't give away the scheme, so that they were

22  patients who would sit there all day complacently.

23         The therapists were told how to write their notes.

24  Ms. Negron herself would go back and check those notes and

25  those signatures before any inspection by Medicare or the

1    accreditation organization.

2              Millions of dollars was laundered -- and we'll get to

3    that in a moment because that's a sophisticated laundering

4    piece -- but it was laundered to pay kickbacks to individuals

5    who were providing the patients to ATC.

6              Now, I'd like to focus on the kickbacks to the people

7    who were providing the patients for a moment.

8              While hundreds of thousands of dollars went out the

9    door in cash and straight into the hands of people who were

10   providing patients, there is also evidence in the record -- and

11   it was -- and there was testimony at trial, for instance, by

12   Mr. Humes, Keith Humes, who was a patient recruiter -- that

13   there were patient recruits whose job it was to find patients

14   and they were paid not only in cash, but in check.

15             And those checks were often not written to them

16   directly.  They were written to corporations that were set up

17   by them in order to receive kickbacks.

18             And those corporations had names that would look

19   legitimate if anyone ever looked at the accounts of American

20   Therapeutic or MedLink.  Those corporations had names, for

21   instance, of transportation companies, of -- I believe

22   Mr. Humes's corporation was called Team Placement.

23             So to the question of whether there were phony

24   corporations set up that were not a part of the sophisticated

25   laundering, that were a part of the sophisticated means, the

1    answer is "yes."

2          Now, that's the sophisticated means, your Honor.  I

3    could go on and on, as your Honor well knows.  And we heard

4    testimony for five days about how sophisticated this fraud

5    scheme was.

6          That's the sophisticated means that supports the

7    sophisticated means enhancement.

8          Now, is that conduct the only conduct that supports

9    the sophisticated laundering enhancement?  No.  Because the

10   sophisticated laundering enhancement is supported by Adriana

11   Mejia opening multiple shell corporations; transfers from

12   American Therapeutic to MedLink to Ms. Mejia or her shell

13   corporations, which then were converted into cash; more than

14   $3 million in checks to people who didn't exist, one of whom

15   testified at the trial he did exist, but he never got those

16   checks because his identity had been stolen in order to write

17   those checks to him.

18         And who signed those checks on his behalf?  Who

19   endorsed those checks so that the bank would pay them?  Judith

20   Negron.  That's what we heard at the trial.

21         So was the laundering in this case sophisticated?

22   Absolutely, your Honor.

23         But the evidence of sophisticated laundering is more

24   than just the evidence of the fraud.  And so both enhancements

25   apply.

1              And Mr. Wax cannot cite to you any case that says that

2     these two enhancements cannot be applied together, because

3     indeed they can.  And the guidelines provide for it.  And here

4     is where it is warranted.

5              The victim-related enhancements, your Honor:  The

6     important piece of law here is the Eleventh Circuit.  The

7     Eleventh Circuit has stated that the vulnerable victims

8     enhancement applies to the victims of an economic crime even if

9     the victims of that economic crime did not sustain an actual

10    pecuniary loss.

11             Now, in the case that the Eleventh Circuit was

12    considering last summer, they considered individuals who

13    received blood derivatives.

14             Here, as your Honor well recognized, we have

15    individuals who were purchased to sit at American Therapeutic

16    all day every day for eight years to give the impression that

17    American Therapeutic was providing real therapy to real people.

18             Mr. Wax boils the issue down to the question of

19    whether they were targeted because of who they were, because

20    they were vulnerable.  Of course they were targeted because

21    they were vulnerable, your Honor.  They were targeted because

22    they lived at assisted living facilities.

23             By definition, people who live at assisted living

24    facilities need assistance.  They are people who will do what

25    their homeowners tell them to do.  They are people who will get

 1    on a bus when they're told to get on a bus.  They will sit all

 2    day somewhere they are told to sit and they will go back to

 3    their home when they are told to go back there.

 4          Substance abusers are similarly vulnerable, despite

 5    what the Defendant may argue, substance abusers who went to

 6    halfway houses because they needed treatment, they wanted to

 7    get treatment, but they had nowhere else to live.  And so, when

 8    their halfway house owners told them, "If you want to live

 9    here, you go to ATC," that's where they went.

10          These people were targeted because of who they were.

11    They weren't the ones who were paid, although there is some

12    evidence that a small amount of the beneficiaries were paid.

13          The primary evidence, as your Honor heard at trial, is

14    that the individuals who were used -- the people who were used

15    at ATC were people who had no way to speak for themselves.

16    They were people for whom others were supposed to speak.  They

17    were people Ms. Negron and people like her were supposed to

18    protect.

19          They were people like Ruth Herrera.  We heard about

20    Ruth Herrera at the trial and I know your Honor remembers that

21    story.  Ruth Herrera was in a neurovegetative state.  She was

22    sitting in her wheelchair because she couldn't walk on her own.

23    She couldn't answer on her own.  She couldn't do anything for

24    herself.

25          Her homeowner sold her to ATC.  She was bought there.

1    And the therapists wanted to send her back because they didn't

2    think she qualified for PHP.  The therapists complained so much

3    that Ms. Negron personally came to see for herself whether Ruth

4    Herrera qualified.

5           She walked up to Ruth Herrera.  She knelt down in

6    front of her.  And she said, "Ruth.  Ruth."  And Ruth picked up

7    her head and put it back down again.

8           And Ms. Negron turned to Amy Lynn Graham, who

9    testified at the trial of this Defendant, and she said, "See?

10   You just need to talk louder."

11          Ms. Negron exploited vulnerable people to steal

12   millions and millions and millions of dollars from the United

13   States Government.  She did it knowingly and she did it

14   willfully.

15          And that was found by a jury and that has been found

16   by this Court with respect to her Co-Defendants.  And there is

17   no question that this enhancement is designed to apply to

18   people like Ms. Negron.

19          Now, the final question is whether Ms. Negron was a

20   leader and organizer in this scheme.  I agree with Mr. Wax that

21   this is a highly fact-specific consideration.

22          But the evidence at trial was very clear that

23   Ms. Negron was an owner.  She was considered by the staff to be

24   one of the three owners, to be the boss.

25          Margarita Acevedo testified that Ms. Negron was the

1    one who originally brought her into the scheme and that she

2    always knew Judy to be her boss.

3          She was an owner of MedLink.  She was the owner of the

4    American Sleep Institute.  And she was an owner of another

5    company that these co-conspirators had opened called Fates

6    Elite.

7          It has been posited that Lawrence Duran is the

8    individual who committed this fraud, but this is the kind of

9    fraud that one man doesn't commit alone.  Lawrence Duran

10   certainly was a charismatic fellow and his participation in the

11   fraud was critical, but so was Judith Negron's.

12          As the evidence at trial showed, without Ms. Negron,

13   Mr. Duran could not possibly have succeeded in this fraud,

14   particularly not for eight years.  She was the one who checked

15   the census every week.

16          We heard that from Margarita Acevedo.  We heard that,

17   when the census would get a little low at one of the centers,

18   Ms. Negron was the first one to call Ms. Acevedo.

19          She was the one who hammered Ms. Acevedo to find out

20   why was the census low and what was she doing to pick up the

21   census.  And we all know how the census was increased at the

22   centers:  More payments for more vulnerable people.

23          She was the person who kept a close eye on the books.

24   She was even the person who told people to turn off the lights

25   and use less printer paper because she was trying to keep the

1    costs down.

2             She was a signer on the MedLink bank account.  The

3    MedLink bank account is where a large amount of the fraud was

4    committed.  The money was transferred from ATC to MedLink so

5    that ATC's books would look cleaner.

6             And from MedLink, that's where many of the kickbacks

7    were paid and that's where the majority of the laundering

8    happened.

9             Ms. Negron would travel from center to center as the

10   boss.  We heard a story about her traveling to Orlando with

11   Ms. Acevedo and she was going there as the boss to speak with

12   the individuals at the Orlando center.

13            There is no question that there were three leaders and

14   organizers in this scheme:  Mr. Duran and Ms. Valera, who have

15   already been sentenced, and Ms. Negron, who sits before you

16   today.

17            Ms. Acevedo was sentenced and she was designated as a

18   manager, which she agreed to in her plea agreement, in fact,

19   although your Honor also found that she was a manager.  And, of

20   course, that controlled.

21            She was a manager.  She managed the kickback scheme.

22   And she was hired by Ms. Negron and Mr. Duran.  Ms. Negron's

23   the one who brought her into this scheme.

24            Ms. Negron was unquestionably a leader and an

25   organizer here, in fact, so much so that she was the one who

1    endorsed the money laundering checks, the millions of dollars

2    of money laundering checks that were written to people whose

3    identities were stolen or who didn't exist.

4         Your Honor, I would be happy to address any questions

5    from the Court.  But beyond that, I will simply remind the

6    Court that what is rational in the guidelines has been provided

7    to us by Congress, by the Sentencing Commission, by the

8    Eleventh Circuit and by the Supreme Court.

9         Under *Booker*, we have to look at what's rational.  And

10   what is rational, as this Court well knows, is that Medicare

11   fraud is a horrific problem in this country, but particularly

12   in this district.

13        And this is the case in this district that has set the

14   top bar for the amount of money that was stolen in one scheme

15   in an eight-year period.  And so the guidelines accurately

16   reflect that the perpetrators of this scheme should fall off

17   the charts.  This is an off-the-charts scheme, your Honor.

18        Your Honor, in an effort to keep myself concise -- or

19   as concise as possible, I will end there, unless you have

20   questions.

21        THE COURT:  Thank you very much.  No.  All your

22   pleadings and arguments and this and all the other hours and

23   hours and hours of arguments that I've listened to all counsel,

24   but you've been there at each one, have fully, I think,

25   outlined and explained the Government's position.  So I have no

1    questions.

2         Mr. Wax, would you like to respond?

3         MR. WAX:  No, your Honor.  I don't believe a rebuttal

4    is necessary.  I think your Honor has all the information to

5    rule on the guidelines.

6         THE COURT:  Thank you, Mr. Wax.

7         This period of time that we've listened to the

8    argument has dealt with what I like to call and which the

9    lawyers have gotten into the -- or accepted as the way to

10   describe it as being the first phase of the sentencing.

11        This simply has to do with the necessity of the Court

12   to evaluate carefully the -- any objections to the presentence

13   investigation report and to formulate a decision as to the

14   guideline that shall be accepted and treated as advisory by the

15   Court, in moving to the second phase of the sentencing, which

16   is the very, very important part about what the sentence should

17   be after the guidelines are treated as advisory.

18        The last time I went through this, one of my fine law

19   clerks told me that it took me an extended period of time to go

20   through this and make findings on each and every objection,

21   each and every count, and the time that it took me to dictate

22   my findings and conclusions in open court at the end of the

23   arguments was approximated at 45 minutes or an hour.

24        At this point, on this sentencing, I will make an

25   order that the findings of the Court on at least the

1    sentencings of two of the Defendants who are managers and

2    leaders, that is to say, Lawrence Duran and Marianella Valera,

3    are herewith ordered incorporated into this sentencing hearing

4    so that, upon consideration of this matter, that the Eleventh

5    Circuit or Supreme Court level, the judges who review what we

6    have done here today and our findings will have an availability

7    of all of the Court's comments on at least these three

8    Defendants.

9         If there's other relevant material, of course, the

10   Court of Appeals will probably and should probably consider

11   those remarks and orders of the Court regarding the sentencing

12   guidelines phase or regarding the entire sentencing hearing.

13        What I'm trying to say simply is, instead of repeating

14   a lot of what I've already said in hours of dictation of my

15   findings and conclusions of law and ruling in open court on

16   these other hearings, I am ordering that they be incorporated

17   by reference into this record of this hearing and should on the

18   ultimate appeal of the sentence that the Court is about to

19   enter, if there should be an appeal -- and I'm assuming there

20   will be and, in fact, feel that there should be, so that the

21   appellate court may review these excellent arguments that have

22   been made not only in this case, but the other attorneys in

23   those other two sentencing hearings, with the view in mind that

24   they may -- and which, of course, they have the right to do --

25   modify or change some of the written material or decisions of

1    the sentencing guidelines people.  They have more latitude,

2    certainly, than this Court does in that respect.

3         However, we can move that out of the way in the effort

4    to announce my findings and conclusions here with respect to

5    the objections that have been made in less time than it would

6    take to go through all of them and indicating to you that many

7    of the findings will be the same as the other rulings and

8    findings on the objections that were made in those other two

9    sentencings.

10         Turning to the first objection, which was as to

11    Paragraphs 33, 47, 51, 68 and 69 of the PSR dealing with the

12    issues of the numbers of doctors present on a given evening,

13    the fact in Paragraph -- the objection to Paragraph 47 that

14    there was no evidence or insufficient evidence that the

15    Defendant had transferred monies to herself by using shell

16    companies and sham transactions, the objection in Paragraph 51

17    that there's no evidence that this Defendant, Mrs. Judith

18    Negron, had knowledge of the activity outlined in Paragraph 51

19    of this conspiracy and as to Paragraphs 68 and 69 dealing with

20    the loss amount that was recommended in the PSI, which would

21    result in a difference between a Level 24 and a Level 28, with

22    respect -- that's one combined objection to those respective

23    paragraphs -- with respect to those paragraphs, the Court, with

24    the exception to the licensed mental health counselor facet,

25    which I've already dealt with, which will result in a minus

1    two, the other objections are overruled and denied.

2          The Court finds that the level for enhancement of

3    victims' loss is 28.  That's based on 205 million billed to

4    Medicare, the amount of calculation.

5          The base offense level -- there's no objection -- is

6    6.

7          Getting to the other objections by the defense to the

8    sophisticated means vis-à-vis sophisticated money laundering

9    argument and objection, the Court finds and concludes that the

10   two that are objected to, that is, the sophisticated means, the

11   defense wishes the Court and argues that it should be a zero

12   number, the Court finds that the two points is appropriate.

13   The Court also finds that the two points for sophisticated

14   money laundering is appropriate.

15          And, of course, there was no objection to the money

16   laundering two-point phase.  So the total of these -- the two

17   that are objected to, the Court finds, should be and are hereby

18   found to be two for each, or four.  The objection is overruled

19   on those two.

20          The abuse of trust and that I've dealt with.  And

21   that's a minus two.  That objection is sustained.

22          The vulnerable victims:  The defense suggests it

23   should be zero.  The Government argues four.  The defense

24   objection is overruled.

25          The Court finds that a two-point enhancement for

1    vulnerable victims is appropriate and proper and the large

2    number of vulnerable victims is also calculated correctly.

3           So, therefore, the objection to those two is -- the

4    two of them -- two objections are denied.

5           She gets no credit for acceptance of responsibility

6    under the law, as we understand it, and that was not objected

7    to as a deduction.

8           This brings to a total offense level -- and the Court

9    finds that this is the appropriate, proper total offense

10   level -- is 48.  Under the sentencing guidelines calculations

11   and formulas, that translates to a guideline range of life

12   imprisonment.

13          The matter of what is the appropriate sentence within

14   the guideline range will be determined, will be taken up, after

15   the Court has recessed for a period -- for one and a half

16   hours.

17          I have a commitment with another judge.  I don't want

18   to get into judges here.  But, anyway, I have another

19   commitment at noon today, longstanding, that we keep every year

20   at this time.  We get together.  And we've done that for over

21   40 years.  So I'm going to go to lunch with my friend.

22          I will not be discussing this case at all with him, of

23   course, or anything about it.  But we will get back to the

24   vitally important phase of this case at 1:30 this afternoon.

25          I will urge the parties or the people, the spectators

 1  who are here on both sides, whoever they may be, or whatever

 2  family, witnesses, just interested public, not to discuss this

 3  matter or this case with the principal people involved on the

 4  Government's side, that is to say, Mrs. Saulino and her

 5  colleagues, or with the probation officer, Mrs. Brantley, or

 6  with Mr. Wax, Mr. Mineau or the Defendant.

 7          In other words, I wish to keep this hearing to proceed

 8  in a manner in which there's no intrusion on people running up

 9  and asking these folks questions.

10          I particularly, I guess, have in mind people who may

11  be here -- I don't know whether you are or not -- from the

12  media, from television, radio or somebody.  Please don't bother

13  the principals here with this.

14          Obviously, Mr. Wax, Mr. Mineau, you can talk to your

15  client.  I don't mean anything like that.

16          Obviously, Ms. Saulino, you can discuss with your

17  colleagues whatever you want to.

18          But I don't want a lot of running around talking about

19  all this with the people who have the responsibility of arguing

20  this this afternoon and/or anybody connected with my office, of

21  course.  That goes without saying.

22          1:30 this afternoon.

23           (Thereupon, a luncheon recess was taken, after which

24  the following proceedings were had:)

25          THE COURT:  Thank you.

```
 1              Be seated, please.

 2              My law clerk brought to my attention that I did not

 3    make a ruling on one item that was in contention, and that is

 4    the organizer role -- manager/organizer role.

 5              In reviewing these papers earlier on and after

 6    listening to the argument, I believe that the objection should

 7    be overruled.  This lady was very involved, along with at least

 8    the two of other Defendants, as a manager.

 9              So the four-point is included in the 48-point

10    calculation that I had made earlier.  I think that was probably

11    obvious to the lawyers or self-evident, but I make that

12    finding.

13              With respect to -- I have a document that has been

14    asked to be sealed.  And I'm not sure Ms. Saulino knows what

15    I'm talking about or Mr. Wax.  But, in any event, I'm going to

16    seal it.

17              It will be sealed for obvious reasons, which I'll put

18    in a written order later on.  But the parties should not be

19    concerned about that particular document.  It will be sealed.

20              The Court will consider it, but it will be sealed.

21    I'll explain this later on.

22              Now we turn to the part of the sentencing hearing

23    which, as you know, the Court considers the most serious part

24    of the hearing.

25              And I will -- I suppose it would be reasonable or
```

1    appropriate to start with Mr. Wax's case that he would like to

2    present, any witnesses he would like to call, if any.

3            The Defendant, of course, has an absolute right to

4    speak.  She's not required to do so.  No detriment would be

5    asserted to her position if she elected not to do so.  But if

6    she wants to do so, she has an absolute right to do so.  And

7    the Court will hear from her.

8            This is the subject of recent opinions of the Court of

9    Appeals.  So I make such a point over that.  I'm sure Mr. Wax

10   has explained all this to his client.

11           But at this point in time, we will hear from -- unless

12   there's an objection to starting with the defense.  I don't

13   know --

14           MS. SAULINO:  No objection.

15           THE COURT:  We will start, Mr. Wax, with the case you

16   would like to present.  I have reviewed the papers that you've

17   submitted.  They are very, very, very thorough, very complete.

18           It may well be the most complete sentencing memorandum

19   that I've perhaps ever reviewed, but certainly in my recent

20   memory have reviewed -- I mean, that I've had submitted for my

21   review.  But I have reviewed it.

22           But, if you wish, you may wish to offer it into

23   evidence in the record.

24           MR. WAX:  I do, your Honor.  Thank you.  It would be

25   Defense Exhibit A.

1          THE COURT:  Joyce, would you mark this.  Well, now,

2     let's see.  It will be Exhibit A in evidence.

3          No objection, Ms. Saulino?

4          MS. SAULINO:  No objection, your Honor.

5          THE COURT:  Admitted into evidence.

6           (Whereupon, Defendant's Exhibit No. A was entered

7     into evidence.)

8          THE COURT:  Mr. Wax.

9          MR. WAX:  Thank you, your Honor.

10          And I would be remiss if I did not thank Mr. Ray

11    Mineau, who's at counsel table today, for his contribution in

12    the preparation of this sentencing memorandum.

13          As you know, Mr. Mineau was a United States probation

14    officer in the district here for many, many years, appeared in

15    front of your Honor many, many times.

16          THE COURT:  Hundreds of times.

17          MR. WAX:  Hundreds.

18          THE COURT:  At least, if not thousands.  It's been in

19    excess of 8,500 people.

20          MR. WAX:  His assistance --

21          THE COURT:  That's a lot of people.

22          MR. WAX:  His assistance to the defense here was

23    invaluable, your Honor.  I thank him for that.

24          And I appreciate your Honor's consideration of the

25    sentencing memorandum, because the reason that we presented

1   this document to you was primarily to give you a picture of who

2   Judith Negron is, the individual who stands before you, as more

3   than just the Defendant, more than just the individual who is

4   awaiting sentencing on this most solemn occasion as she stands

5   before your Honor for what is probably going to be the single

6   most important day of the rest of her life.

7        The impact of it cannot be understated.  Through the

8   photographs and the letters which are attached to the

9   sentencing memorandum, you can get a picture of a life.  You

10  can get a picture of an individual from a perspective that you

11  don't get from the presentence investigation report.

12       And, your Honor, you'll notice that attached to this

13  sentencing memorandum were 60 letters.  And when -- I tell you

14  that, in the last week, I've had more people calling and asking

15  to provide letters and I've had to tell them, "We've already

16  presented the documents to the Court.  Thank you so much."

17       But the support that Judith has from her family, from

18  her friends, from her neighbors, is so complete and so

19  wonderful.  And I know that you saw every day of the trial that

20  the courtroom was filled with her family and friends, as it is

21  today, as they stand here.

22       What I'd like to do, your Honor, is -- I have six

23  individuals who have asked to address the Court who I'm going

24  to call forward one at a time to make a brief statement, after

25  which time Judith has a statement that she'd like to read to

1    the Court.  And then I have my allocution --

2              THE COURT:  Fine.

3              MR. WAX:  -- that I will make.

4              Just as -- so I understand, your Honor, when we're

5    complete, I know the Government is going to go.  Would that be

6    the conclusion of it after the Government or may I reserve my

7    remarks for the last --

8              THE COURT:  Usually, I treat it as we would any other

9    evidentiary matter, where you present what you wish.  There's

10   cross-examination, if any, on a given witness and then a

11   redirect examination at the end of it.  You will make an

12   argument and they will make an argument -- the Government --

13   and then a brief rebuttal.

14             I see no reason to deviate from that.  But to answer

15   your question, I think, yes, you have an opportunity to come

16   back.  And if something comes up that is on the Government's

17   cross-examination or their presentation of whatever witnesses

18   they wish to call, which you have the right to cross-examine,

19   then you can bring that up.

20             There's no hard-and-fast rules about this part.  The

21   idea is to have everybody comfortable with what they've brought

22   to the Court, everything that they think is important on both

23   sides.

24             MR. WAX:  The individuals I'm calling, your Honor, I'm

25   not putting on as witnesses, per se.  I suppose that's what

```
 1   they would be.  But they just have brief statements they'd like
 2   to read.
 3             THE COURT:  That's fine.
 4             MR. WAX:  The first witness I would be calling is
 5   Vivian Soles, S-o-l-e-s.
 6             THE COURT:  All right.  Now, Mr. Wax, I don't want
 7   to -- I hope I didn't mislead anybody.  But Ms. Saulino will
 8   have the right, if she wishes, to ask any questions.  I don't
 9   know that she will.
10             MR. WAX:  All right, your Honor.
11             THE COURT:  And that goes both ways.
12             MR. WAX:  Right.  I made a mistake.  My first witness
13   is Gilbert Soles.
14             THE COURTROOM DEPUTY:  Do you want me to swear them
15   in?
16             THE COURT:  Well, it doesn't matter to me.  This is
17   just a statement he wishes to read.
18             MR. WAX:  That's all it is, your Honor.
19             And I want to make it clear that no one's going to
20   talk about the facts of the case or anything like that.  That's
21   not -- this is only in the nature of character reference.
22             THE COURT:  Go ahead.  We'll be pleased to hear from
23   you, Mr. Soles.
24             MR. GILBERT SOLES:  Good afternoon, Honorable Judge
25   Lawrence [sic].
```

 1          I'd like to thank you so much for allowing us to stand

 2  up here and talk a little bit about Judy and let you know who

 3  she is from our side.

 4          I think that you've seen through all the trial the

 5  family here, the friends here and the support that we are

 6  giving her because of the person that she is.

 7          I've known Judy for 11 years now.  She's my neighbor.

 8  We've done many activities together since the day that we met.

 9  Through the years, we've gotten to know each other very well.

10          There's a lot of things that Judy has done that I

11  may -- if I may, I'm going to point them out.  And what I want

12  to point out is not things that she has actually said, but

13  actions, actions that you see of a person who has a very good

14  heart and means well to everyone, actions like, when we had any

15  issues with our children, the first one who would be there to

16  help us with our children was Judy, asking us, "Bring them to

17  our home."

18          She would take care of them.  If needed to be, she

19  would take them to school for us.  Whatever it would take, she

20  was always there for us.

21          I also saw some other actions that impressed me of

22  Judy.  And I'll tell you this:  The neighbor across the street

23  from her, ex-neighbor -- she moved out -- at one point needed a

24  mural done inside her home.  She was getting estimates to do

25  that.  She went through the estimates, got some folks there.

 1              Judy found out about this.  This young lady bought the

 2    paint and Judy took care of the mural for her -- she's an

 3    excellent artist -- out of the kindness of her heart, just to

 4    help the neighbors and the people around her.

 5              There's so many examples that I can give you today to

 6    let you know who this person is around us.  I want you to know

 7    that we live in a very modest community.  We bought the homes

 8    at the same time in -- in the year 2000.

 9              There's no extravagant areas.  We don't do any

10    extravagant parties.  As a matter of fact, when we've had

11    little get-togethers, my wife and Judy has gotten together,

12    "Let's go to J.C. Penney's" or, "Let's go to Target" to buy a

13    dress or to buy the little things, nothing out of the ordinary

14    ever.

15              Some of the things that she has done for particularly

16    my son throughout the years and something that my wife and I

17    haven't been able to do is help with some of the art projects.

18    And the school that he was in required a lot of projects.

19              She was always there out of the kindness of her heart

20    to help, to make sure that he was guided correctly.  And

21    particularly I remember one project where it depended on

22    colors.  She spent hours on hours mixing colors with my son so

23    that his project would be the very best.

24              There was another project where it was with beans,

25    making a mural, I believe it was, on a piece of paper for

1    Martin Luther King.  Hours on hours were spent with him to help

2    him and to make sure that he would move on and make a good

3    project for his school.

4            But, more importantly, my daughter and Judy have

5    always, since very little that my daughter -- when we moved in,

6    they have become the best friends ever, and the attention --

7    like a second mother to my daughter.

8            The movies, the get-togethers, the carnivals, my gosh,

9    that -- Judy was always there when we would either go in a

10   group or, if we couldn't go, she would take my daughter with

11   her, do an activity.

12           She always with actions showed the type of person that

13   she is, a truthful, honest, responsible person, loved very much

14   by her wonderful husband, loved very much by her parents, by

15   her sister and by the rest of the family.  I consider myself

16   family.  She is a wonderful, wonderful person.

17           I'd like to read a small paragraph of the letter that

18   I submitted.  And it goes like this:  I'm aware of the charges

19   against Judith and understand that she is charged with

20   conspiracy, which means, to me, that she was aware of

21   something -- that someone was doing inappropriate business and

22   she failed to report it to the appropriate authorities.

23           I understand that this was very poor judgment on her

24   part.  But, if I may, I would like to make you aware of Judith

25   Negron, that I have known for many years.

1      Judith is a responsible, fun-loving person, but most

2  of all, she is dedicated, a warm and caring mother of two

3  outstanding boys, Brandon and Brody Negron.

4      Your Honor, like I said, I have two children.  Not

5  having their mother at home -- Brody is 7, Brandon is 11 -- on

6  a day-to-day basis, I have seen the change in their attitude,

7  in their behavior.

8      Brandon, who's older -- and he sees and understands

9  more of what's going on -- when I'm outside doing things with

10  my son, he'll come over.  And he doesn't know if to hug me, to

11  shy away from me.  He doesn't -- he's confused -- totally

12  confused.  And at times, he's asked me, "When's Mom coming

13  home?  When is Mom coming home?"

14      And it tears my life up to not be able to give him an

15  answer, not being even able to explain to him, being 11 years

16  old -- I'm not -- I don't have -- I don't know what to say to

17  him, to comfort him.  It is very, very difficult.

18      There is a lot of problems in our country, and those

19  problems are caused because of broken homes.  This is the

20  reason I'm standing here, is to beg your -- please, to take

21  this into consideration with Judy.

22      She, based on everything, has made a mistake.  I

23  guarantee you that, if given a chance, all the right things

24  will be done.

25      But the most important thing here is these kids that

```
 1    are wonderful, wonderful kids that need their mother.  They

 2    need their mother to give them that motherly love.  There's

 3    only one mother.  We only have one mother.

 4            Fathers -- unfortunately, there may be others.  But

 5    mothers -- you know, we're only born from one mother.  And I

 6    beg you to please consider these facts and the wonderful person

 7    that Judy is.

 8            There is other neighbors around.  I mean, we have in

 9    our association 104 homes.  The one that we are so close to and

10    we've become like a family is Judy and her husband because

11    they're such wonderful, giving people.

12            Thank you so much for allowing me to speak in front of

13    you today.  And please consider my request.

14            Thank you so much.

15            MR. WAX:  Your Honor, we would next ask Vivian Soles

16    to come forward.  Yolanda.  Excuse me.

17            MS. YOLANDA SOLES:  Good afternoon, Judge.

18            I'm going to read.  I cannot improvise it.  I need to

19    read it.

20            Good afternoon, your Honor.  My name is Yolanda Soles.

21    I thank you for allowing me the opportunity to speak to you

22    today on behalf of Judy and her family.

23            My family and I met Judy in 2000, when we were in the

24    process of buying our home.  Judy and her family were also

25    doing the same.  We both moved into our development at around
```

1    the same time, in 2001, and since then we have been very close.

2            Judy has been like the sister I never had.  She has

3    helped my son out with school projects and assignments which I

4    have not been able to assist with because of my lack of

5    artistic abilities.

6            Judy is truly an artist.  An example of it is the art

7    class she has started in prison.  She has a group of inmates

8    that attend her class regularly.  She does this because she

9    knows that there is very little an inmate can given his family

10   and friends.  So artwork serves as therapy for the inmate and

11   is something they can give to a loved one.

12           Judy and my daughter, who is 14 years old, have many

13   interests in common.  They both love movies, shopping and

14   reading *Twilight*.  They have gone shopping and to the theater

15   together several times and have shared the *Twilight* book

16   series.

17           As you can imagine, my daughter is completely

18   devastated with Judy's situation.  About three weeks ago, the

19   latest chapter in the *Twilight* book series was released in

20   theaters and the first thing my daughter said was, "Mom, how

21   can I go see this movie without Judy?"

22           Your Honor, this might seem trivial, but it was very

23   real and painful for my daughter.  She misses Judy greatly.

24           A few years ago, my father suffered a stroke and my

25   husband and I both remained at his side at the hospital and

1    Judy stayed with our children for a few days.  My father

2    suffered a second stroke shortly after the first and Judy again

3    stayed with our children.

4         This is just the kind of person Judy is.  She is

5    always putting other people's needs before her own.

6         Judy has always been a very energetic, loving,

7    hardworking family-oriented lady devoted to her husband and two

8    children, Brandon, age 11, and Brody, age 7.

9         Judy is an exemplary mother.  She has always been very

10   involved in her boys' lives, their schoolwork, extracurricular

11   activities.  She has always been very concerned with the moral

12   values her children grew up with and sacrificed much so that

13   they would receive a strong Christian education.

14        The boys, in turn, are very close to her and her

15   absence is extremely difficult for them.  Brandon and Brody are

16   at an age where they need their mother the most.  They're

17   constantly asking, "When's Mommy coming home?"  Sadly, there is

18   no easy way to explain the situation to them.

19        As an elementary school counselor, I know how

20   detrimental an extended period of absence from their mother

21   will be for these boys.  Unfortunately, I have seen the stress

22   and negative effects on children when their mother is not at

23   home.

24        Many of these children struggle academically and

25   emotionally.  They become depressed, withdrawn and aggressive.

1  Many also develop at-risk behaviors, such as substance abuse,

2  suicidal tendencies and maladaptive behaviors.

3          In Brandon and Brody's case, their grades have already

4  started to suffer.  Emotionally, they are greatly affected

5  already as well.

6          I'm very concerned for these boys and the kind of

7  future they will face if they cannot have their mother with

8  them every day.

9          Your Honor, as a school counselor, I understand and

10  help the children I work with understand the fact that

11  everything we do or fail to do in life has a consequence.

12          But as a human being, I also understand that we are

13  imperfect and make mistakes and oftentimes use poor judgment.

14  At these times, we need forgiveness and mercy from any and all

15  whom our actions or lack thereof have hurt.

16          I don't know all the circumstances surrounding Judy's

17  case, but I do know that Judy's absence from her family and

18  friends is a tremendous burden not just on Judy, but on all of

19  the people who love her.

20          Judy has never had any problems with the law before,

21  and I truly believe, if given a second chance, she would do

22  everything she could to correct whatever wrongs she may have

23  done.

24          Because of the immense hardship and difficulty that

25  Judy's husband and children, whom are innocent of any

1   wrongdoing, will face without Judy's presence, I beg you, your

2   Honor, to grant Judy the lowest possible sentence.

3          I feel that her loss of her two children, credibility,

4   respect in the community and freedoms she was enjoying before

5   her felony conviction have been a big lesson for her than

6   keeping her in prison.

7          Your Honor, please have mercy on Judy and this family.

8          Thank you.

9          THE COURT:  Mr. Wax.

10         MR. WAX:  Your Honor, we would call Aerlim Diaz.

11         THE COURT:  Yes, ma'am.  The name?

12         MS. AERLIM DIAZ:  My name is Aerlim Diaz.

13   A-e-r-l-i-m, D-i-a-z.

14         Good afternoon, your Honor.  I am a childhood friend

15   of Judy and her sister, Yamila.  I am a graduate of Florida

16   International University and currently a certified public

17   accountant, working in a private practice.

18         I met Judy 24 years ago.  Judy and her sister were my

19   first childhood friends in this country.  During the time that

20   I met Judy, I had recently arrived to this country, knew very

21   little English and was having a lot of trouble making friends,

22   as being immigrants was not easy while growing up.

23         Like us, they had great admiration for this country

24   and eternally grateful for its freedoms and opportunities.

25   Judy and her entire family embraced my family and gave us

 1    support and friendship when we needed it the most.

 2              Our friendship eventually extended to the point that

 3    her parents, uncles, aunts and grandparents became an extension

 4    of my own family.

 5              We have a lot of respect and admiration for her and

 6    her family, as they have always been hardworking, committed and

 7    with strong -- very strong family ties.

 8              Throughout the years, our families have always managed

 9    to share many important events, trips, good memories, laughter

10    and even tears.

11              Growing up, being that Judy was the oldest, I always

12    idolized her, admired her beauty, integrity, character, humor

13    and natural grace.  Judy became my hero when I was only 15.

14              While on vacation with my parents in Mexico, we had an

15    incident in which my mother, presently here today, almost

16    drowned in a beach.  I can still remember my fear and my own

17    near-death experience as my mother pulled me down in panic as

18    she fought an underwater current.

19              I knew that my mother did not stand a chance, as she

20    did not know how to swim and my father was not in sight.  In

21    those short seconds, as my mom held on to me in despair and I,

22    too, struggled to take a breath, I remember pleading to God

23    that I did not want to live if my mother was going to die.

24              When I surely lost any hope of surviving, Judy came to

25    our rescue.  To this day, I have no idea how someone so

1    petite -- and my mother's almost 5'11" -- fragile and as young

2    as Judy managed to separate my mother from me and push her out

3    of the furious current.

4           Judy's courage and determined, selfless spirit saved

5    my mother and me that day.  She has been an inspiration and

6    blessing to many of us, and I am convinced that she has been a

7    hero to many others that may or may not be present here today.

8           Due to her trusting nature, kind spirit, optimism and

9    always wanting to be of service to others, there was no doubt

10   why she chose psychology as her profession.

11          This, your Honor, is the human side of Judy that I

12   believe should be considered by you and not forgotten when

13   making your decision.

14          Judge, as I am sure you are aware, Judy is a mother of

15   two.  Being a mother of two myself, I can't help but think of

16   the pain and suffering that a loss of a mom would have on their

17   children, especially at their age.

18          Her children are young and at a critical stage.  An

19   extended and long separation from their mother would be

20   extremely detrimental to their formation and emotional state.

21   I cannot imagine the consequences of the long-term trauma and

22   permanent loss that will be endured by her boys in the event

23   that she is taken away for an excessive amount of time.

24          Your Honor, please, I beg mercy and clemency of the

25   sentencing of my friend, Judy.  I truly believe that Judy has

 1   already suffered extensively.  I kindly implore to keep her

 2   children, Brandon and Brody, close at your heart when deciding

 3   her sentence.

 4          Today, in addition to Judy's life, the Court will

 5   decide the fate of her aging parents, her sister, her husband,

 6   her family and friends.  But above all, I plead mercy for her

 7   11- and 7-year-old.  They don't deserve to grow up without

 8   their mother by their side.

 9          In faith, I truly thank you for your consideration and

10   opportunity to be here.

11          Thank you.

12          THE COURT:  Thank you.

13          MR. WAX:  Your Honor, we would call the family

14   spiritual advisor, Pastor George Granda.

15          PASTOR GRANDA:  Good afternoon, your Honor.

16          I'm George Granda.  I'm a pastor at New Testament

17   Baptist Church, Dade Christian School, which is the school that

18   Brandon and Brody attend currently.

19          I've known this family for four years and I really

20   have taken to the boys, because Brandon, which was going

21   through some issues a couple of years ago, was assigned to me

22   as a mentor.

23          One of my responsibilities is directly working with

24   children as a children's pastor at Dade Christian School, and

25   this is really how I got to know the Negron family.

1          In my time of knowing them and getting involved in the

2     life of Brandon and Brody, I really noticed the involvement of

3     Mother and Dad, especially -- one of the areas I also see is

4     elementary soccer there.  Brody was actively -- is currently

5     playing -- was currently playing soccer and everything.

6          And Mom was there and their participation, both

7     parents there, was so important because nowadays you really

8     don't see both parents at one -- you know, supporting their

9     children in any particular sport.

10          But what brings me before you today, Judge, is I had

11     the opportunity of visiting Judy about a month ago at the

12     Detention Center here next door.  And I went with, like,

13     50 verses on being strong and courageous, because these are

14     difficult times.

15          I spent an hour with her and we went through verses

16     and I think one of the most important things that I left out of

17     there with -- and we chatted a while and so forth -- was the

18     fact that she was amazed how what had transpired in her life

19     has brought the family closer and friends closer, but more

20     importantly, had brought the family closer in their faith to

21     God.

22          Sometimes things -- weird things happen that has to

23     bring us closer to that faith.  And I left her saying, "You

24     know what?  There's a reason why things happen in life."  And

25     she said it very eloquently that day when I was with her, that

1  sometimes things happen.

2         And she's been found guilty by a jury of her peers.

3  And so now she is here before, you know, the mercy of this

4  Court and you, your Honor, in regards to the sentencing part of

5  it.

6         Here's where the mercy part comes in.  The mercy part

7  is -- you know, sometimes, you know, we don't get what we

8  really deserve, you know.  We really don't get what we really

9  deserve.

10         And it brings me -- and I don't -- you know, I didn't

11  bring -- prepare a sermon or anything like that.  But one day

12  Jesus Christ was there on the cross and he had two men next to

13  him, one on each side.

14         And one of them said, "Hey, if you're the king, save

15  yourself."  And the other thief interrupted him and said, "Wait

16  a minute.  You and I are here.  We deserve what we get.  This

17  man has done nothing."

18         They were tried and they were already sentenced.  But

19  Jesus looked at them and said, "Today you'll be in paradise

20  with me."  And that was God's mercy.

21         Judge, Judith Negron is before you today looking for

22  that mercy.  The families and the other neighbors and relatives

23  that have spoken before me are looking for that mercy because

24  of the impact.

25         I think this would be totally different if children

1    weren't involved, you know.  I think it would be a different

2    perspective, different light, to the whole severity of the

3    impact it's going to have on Brandon and Brody for the rest of

4    their lives.

5              And I just pray that you show that mercy because of

6    the children, because of the effect it'll have on her husband.

7    It's already brought a family together.  And I just pray that

8    you express that and show that mercy today, sir.

9              Thank you for your time.

10              THE COURT:  Thank you.

11              MR. WAX:  Your Honor, we call Alfredo Cruz, Judith's

12    father.  And this is the gentleman who needs the interpreter.

13    After he concludes his remarks, your Honor, we will no longer

14    need the services of the court interpreter.

15              THE COURT:  Thank you.

16              ALFREDO CRUZ:  Good afternoon, your Honor.

17              I am Alfredo Cruz and I am Judith's father.  I was

18    born in Cuba.  In 1980, I immigrated into this country with my

19    wife, Barbara, and my two daughters, Judy and Yamila.

20              We all come from an honest and humble family, but

21    we're also hardworking, loving and a very close-knit family.

22    And in this courtroom, you can see the evidence of this unity

23    among us.

24              My family is my greatest treasure.  I have always

25    worked hard for my daughters.  I am very proud of my family.

1    But at this time, I stand before you with a heavy heart

2    because, through my daughter's absence, that is, Judy, our

3    lives will never again be the same.

4         Judy has always been a wonderful and an excellent

5    daughter, filling our lives with love and giving us support.

6    Now that she's a wife, she still walks with her husband hand in

7    hand, just like they did when they were first going together as

8    youngsters.

9         And as a mother, she has always been attentive and has

10   always taken care of her children, their education and the most

11   important thing of all, to give them that mother's love.

12        My heart falls to pieces when those young children who

13   are suffering look at me with their innocent faces and ask,

14   "When is Mommy coming home?"

15        As her father, I know that she has helped many people

16   and she's always willing to help others.  She has never had any

17   problems with the law.  We all deserve another opportunity.

18        Judy is part of my life.  I would give my own life

19   just to see again my daughter, along with my grandchildren,

20   come home, sit down at my dining room table as we have always

21   done as a family.

22        Honorable Judge, I ask you in God's name to give her

23   another chance.  And in God's name and in my grandchildren's

24   name, I ask you to please be merciful towards my little girl.

25        Thank you so much, and may God shed his light on you.

1            THE COURT:  Thank you.

2            MR. WAX:  Your Honor, we would ask Yamila Cruz,

3    Judith's sister, to step forward, please.

4            YAMILA CRUZ:  My name is Yamila Cruz.  I need to hold

5    on.  I might fall.  Thank you.

6            Good afternoon, your Honor.

7            As I mentioned, my name is Yamila Cruz.  I also would

8    like to thank you for the opportunity to speak about my sister,

9    Judy Negron.

10            Judy and I came to this country in 1980 when my

11   parents took the extraordinary risk to leave everything they

12   had ever known for a better life for their girls.

13            We came to this country penniless and we saw how hard

14   they worked to just get by.  Even as children, Judy and I were

15   so appreciative of all the sacrifice they had made to risk so

16   much and to face a new life with so little.

17            Even though we didn't have much growing up, we had

18   just enough.  We had the love and support of our parents and

19   the example they had set for us.

20            Judy carried this strong work ethic in her studies.

21   Not knowing English was another hurdle she overcame.  She was a

22   good student and was the first person in our family to ever go

23   to college.  She inspired me to do well in school as well.

24            Judy has always been a hard worker.  She takes pride

25   in doing a good job and has a high sense of excellence.  She's

1   also caring and compassionate.  She's willing to always help

2   people in need.

3           Judy has done volunteer work with the Diabetes

4   Research Institute and the Children's Cancer Care Clinic, and

5   she has encouraged me to volunteer my time as well as the vice

6   president of the parents' organization of my children's school.

7           Many people give of their time and help others, but

8   Judy has gone beyond that and has risked her own life to save

9   that of another.

10          When we were younger, a friend of the family, who is

11  here, who, as you know, is here today, invited Judy and I to go

12  on vacation with her family to Cancun, Mexico.

13          While swimming on the beach, giant waves began to

14  pound on us.  I remember very clearly as if it was yesterday

15  how the waves pinned me down, almost to the sandy floor.

16          When I finally reached the top, I looked for my

17  sister, but she had headed towards the deep to rescue Magadi

18  Mercir, who was drowning under the waves.  My sister risked her

19  own life that day to save that of another.

20          When the two of them finally crawled out, I asked my

21  sister if she was okay, and I remember she was being brave and

22  said she was okay.  But I also recall shortly after all the

23  tears that started to rush down and how we hugged each other

24  for a very long time.

25          My sister saved someone's life today -- and today I

1    beg you to save hers.  My sister's an incredible person and I

2    couldn't ask for a better sister.  She is my best friend and a

3    central part of our family.  She has always been the glue that

4    has held us together.

5           When my 17-year-old cousin, Jesus Cruz, was diagnosed

6    with Stage IV Hodgkin's lymphoma, the family fell apart.  It

7    was Judy that helped us emotionally get through this very

8    difficult time that none of us were prepared for.

9           It was Judy that explained to us that grieving for him

10   when he passed away on November 21st, 2006, was something that

11   each of us had to deal with in our own way.  She helped us

12   through that.

13          Some might say that it was because of her training,

14   her occupation, that helped us.  But I would say that it was

15   because it's always been in Judy's nature to be giving and

16   loving and to want to see the good in every person and every

17   situation, no matter how bleak it may seem to others.

18          It is because of these traits that Judy chose her

19   occupation to help others and to provide comfort for those in

20   need.  And provide comfort she did, not just at work, but also

21   to her friends and family, as her loved ones aged and faced the

22   debilitating illnesses.

23          My good friend and neighbor, Rita Machado, came to

24   Judy with her father suffering from Parkinson's disease and

25   dementia.  Judy helped her cope with this illness and she gave

1    advice on how to better assist her father through this

2    difficult time.

3            My own grandfather, Alfredo Cruz, Sr., was diagnosed

4    with Alzheimer's and couldn't recognize any of us, let alone

5    his own son.  This was devastating to my dad and I didn't know

6    how to help him.  But Judy did.

7            Judy would visit Grandpa with Dad and she would help

8    Dad understand what was happening to Grandpa.  And even though

9    little could be done to stop the disease from robbing my dad of

10   his father, I know how important it was to all of us to have

11   Judy there comforting him.  Without Judy, Daddy would have just

12   been confused and angry and just devastated.

13           I also recall during one of my visits to see my

14   grandmother, Luelda Cruz, at the hospital, that Grandma leaned

15   over to Judy and told her she has soiled herself.

16           Judy wanted Grandma to keep her dignity and asked me

17   to leave the room so that she can clean her.  I thought at that

18   moment that my sister was amazing because she didn't even

19   hesitate.  She knew what she had to do.

20           Unfortunately, all our grandparents have passed away

21   with the exception of my dear grandmother, Isabel Christina

22   Cruz.  She is 82 years old and she lives with my aunt.  She's a

23   sweet, caring woman and she just adores Judy.

24           Sometimes Judy would tell me about the latest gossip

25   on a Spanish soap opera and I would ask Judy, "How do you even

1  know this?"

2          And she would say, "Grandma told me."

3          Even though Judy worked long hours, she always found

4  time to visit and call Grandma to check up on her.  My

5  grandmother's not in this courtroom today due to her failing

6  health.

7          She has diabetes, hypertension, coronary disease and

8  other issues.  We couldn't take the chance of what seeing Judy

9  like this might do to her health.

10          My grandmother has already suffered so much, first

11  with the death of her husband, Martin Cruz, and a few months

12  later with the death of her grandson, our cousin, Jesus Cruz.

13          Our hopes are that placing Judy -- our hopes are that

14  Grandma will get the opportunity to see Judy once again before

15  she passes.  Placing Judy far away from her home will ensure

16  that never happens.  My grandmother's praying today and asking

17  God for a merciful sentence.

18          As many have spoken before me, Judy is also a talented

19  artist and she shares her gift with others.  Since her

20  incarceration, Judy has started an art class in the unit and

21  she has about eight to ten people that attend her class on

22  shading and coloring regularly.

23          Judy knows that there's very little an inmate can

24  provide except for an occasional phone call, which she has been

25  deprived of that as well, and a drawing or a letter.

1              Your Honor, these are the latest drawings my sister

2    sent me, sent my children.  They're beautiful not because

3    they're well done.  They're beautiful because they represent

4    Judy's ability to do something wonderful, even in a very bleak

5    situation.  Even in the desperate situation she finds herself

6    in, she shares her talent with others, helps others and manages

7    to do good for others.

8              She has told me she's also doing a monthly mural for

9    the psychologist in the unit with drawings for the season and

10   inspirational quotes.  It's called the power of positive

11   thinking.

12             And she has received much positive feedback from other

13   inmates as well as the staff.  This does not surprise me one

14   bit because Judy could always brighten up a room with her

15   optimism and her warmth.

16             Judy's a caring granddaughter, a supportive daughter,

17   a loving wife and my sister and best friend.  But more

18   importantly, she's an amazing mother to her two young boys,

19   Brandon and Brody.

20             As was stated, Brandon is age 11, and he's a wizard

21   and building and, unfortunately, taking apart things.  And

22   Brody is age 7 and he has a smile that melts your heart, even

23   though he just lost his two front teeth.

24             Seeing Judy with her boys is a beautiful sight.  She

25   listens to every little comment the boys have, no matter how

 1    silly it might appear to the rest of us.  She knows how to make

 2    them feel special.

 3         Judy has shown them a love that only a dedicated

 4    mother can.  The boys see life through her eyes.  And words

 5    cannot explain the pain they are living now.  It is

 6    unfathomable to think how Brandon and Brody will grow up

 7    without the constant love they receive from their mom.

 8         As you can see in our courtroom, Judy's children,

 9    Brandon and Brody, are not here today.  And I will never know

10    if that was the right decision.  But the family respects Judy's

11    wishes that they should not attend.

12         Despite how badly she wants to see their little faces

13    right now, she didn't want her children to suffer any more than

14    they have already.

15         Judy's a loving mother who places her children first.

16    And I know that she would never have thought she would find

17    herself in this situation she finds herself in now or that she

18    would have ever thought of causing any hurt.

19         I know how being separated from them is killing her.

20    I can see it in her eyes.

21         Your Honor, I stand before you to beg you for a

22    reduced sentence for my sister's life as well as that of our

23    own, because our lives without my sister will never be

24    complete.

25         Your sentence today is not just for her, but for all

1    of us here today whose lives she has touched with her warmth

2    and love.

3         More importantly, your sentence today will determine

4    if two little boys will ever again have a meaningful

5    relationship with their mother.

6         We hope and pray that Judy gets the opportunity to see

7    her children graduate from college, from high school, to see

8    Brandon as he stands before God about to be joined in marriage,

9    to see Brody as he carries his firstborn child.

10        Please allow Judy her boys to pick up the pieces and

11   still create a life together.  Your Honor, please see that my

12   sister is a decent person.

13        She has never, never been in any kind of trouble

14   before.  She has always been a reliable, trustworthy,

15   hardworking member of our society.  One situation should not

16   undo all the good that she has done in her life.

17        I beg you to please give my sister a chance to do

18   right by her family and by her community and let her spend her

19   time helping others once again.

20        Thank you for your time.

21        THE COURT:  Thank you.

22        Mr. Wax.

23        MR. WAX:  Your Honor, I need just a moment.

24        THE COURT:  All right.

25        MR. WAX:  Thank you.

1          MS. SAULINO:  Your Honor, the Government has no

2   objection if Mr. Wax would like to take a brief break so that

3   his client may have a moment.

4          THE COURT:  All right.  We'll take a short recess.

5          MR. WAX:  Thank you, Judge.

6           (Thereupon a recess was taken, after which the

7   following proceedings were had:)

8          THE COURT:  Thank you.  Be seated.

9          Mr. Wax.

10          MR. WAX:  Your Honor, at this time, Ms. Negron is

11   going to exercise her right of allocution.

12          THE COURT:  Okay.

13          THE DEFENDANT:  Please excuse me, your Honor, for the

14   lengthy statement I'm about to read, but this is the first and

15   only time I'll have an opportunity to address you.

16          I'm supposed to stand in front of your Honor and be

17   remorseful and accept responsibility for my actions in order to

18   minimize an exaggerated amount of years incarcerated for a

19   crime I have yet to fully understand.  I must admit that I have

20   struggled with this for a long time.

21          While I understand my priority is to make it home to

22   be with my beloved family and friends -- and believe me when I

23   say that being with my family and friends is the only thing

24   that matters in my life -- I have to also be true to myself and

25   to them who have supported me all my life.

1          My parents risked our lives coming to this country in

2     order to give my sister and I an opportunity to live our

3     dreams, something they knew too well -- sorry.  I'm nervous --

4     that, if we stayed in Cuba, it would never be possible.

5          I can only now comprehend, after being my own --

6     having my own two children, the desperation my parents must

7     have felt to take that daring trip across those choppy deadly

8     waters of the Gulf of Mexico where so many people before and

9     after us didn't succeed.

10          But their love and trust in the Lord led the way and,

11     though the trip was as terrible as imaginable, they made it a

12     point to still shelter us by turning sharks' fins into dolphins

13     and by justifying the 8-foot waves that came crushing in and

14     out of the 42-footer as a washup to clean the water from the

15     roller coaster ride where many were throwing up their lives.

16          I didn't understand why my dad told me to hug him

17     tight on his waist when I told him, "Papi, I have to pee-pee."

18     It wasn't until my teen years that I learned that the toilet in

19     the boat had been captured because it was taking in water.

20          At that point in my life, I knew too well that I

21     wanted to make them proud of me and prove to them that those

22     endless hours of drifting aimlessly in the deep ocean waters

23     with 77 others and even stopping to help the less-fortunate

24     ones when we were already in trouble ourselves -- all of

25     that -- all of that would be worth it.

1          So I worked very hard everywhere I went, everywhere I

2    was employed and in everything I did.  My employers were very

3    pleased with my work and I often received raises and

4    promotions.

5          But at the end of 2003, when I was asked by Lawrence

6    Duran to become a partner and owner of my own company, I was

7    overcome with excitement.  This was what I had been waiting

8    for, to own my own company.

9          I knew that, implementing my parents' taught skills of

10   hard work, I would be successful.  But I wanted to prove to my

11   new partners that my lack of financial investment would be

12   substituted by my own sweat and commitment.

13         And so I worked countless hours every day, in and out,

14   but I didn't mind the hard work.  I was raised with that ideal

15   and I was also very grateful for the opportunity I had been

16   given of having a 30 percent ownership.

17         So I began my new role as a healthcare consultant and

18   I was to ensure that the centers that would open were rolled

19   out and accredited appropriately.

20         At the time, it was only ATC Miami that was open.  And

21   so I implemented their policy and procedures.  Then came the

22   rolling out of the Boca Raton center.  Then it was followed by

23   the Homestead center and later Ft. Lauderdale and, finally, the

24   Orlando center.  This had been ATC's owner and CEO, Marianella

25   Valera's, vision.

 1          So from purchasing the furniture, to placing it in the

 2    most appropriate places, tables and chairs and computers and

 3    picture frames, we worked endless hours retouching the walls

 4    and the chairs with paint that was bright and uplifting,

 5    putting window shades to block the sunlight, the rooms -- to

 6    make sure they were cool, assigning parking spaces to the vans

 7    so they were close for the patients to have easy access -- I'm

 8    sorry -- equipping the kitchen area with the coffee makers, the

 9    toasters, the refrigerators, the microwaves, so that they could

10    have their snacks.

11          And let's not forget my favorite part of the setup,

12    which was the children's room full of stuffed animals, board

13    games, puzzles, coloring books and other hand-me-down toys from

14    family and friends, complete with a beach and sailboat across

15    the sunset scene painted on all four walls, as was the case in

16    the Miami center, and, finally, 82 working binders and logs

17    together with three volumes of policy and procedures that would

18    make the center for fully operational.

19          I loved what I did and I welcomed the challenge of

20    rolling out each center and training the staff until they were

21    fully functional.  I would then move on to the other site, but

22    I was still responsible for establishing the -- for the

23    established sites and going back on a weekly basis.

24          Sorry.

25          Once all the centers were well established, the CEO

1    engaged in the pursuit of the highest accreditation of the

2    healthcare industry, the Joint Commission on Accreditation of

3    Healthcare Organizations.  For that, we hired additional

4    consultants that had the qualifications and experience working

5    with JCAHO.

6         At that time, the policies and procedures were even

7    further expanded to accommodate the additional requirements

8    that were not even present in the CMS.  Several committees were

9    implemented and individuals assigned to follow up in areas such

10   as patient care, delivery and service, infection control and so

11   on.

12        My day would consist of 12 hours in the site because

13   trying to reply to 100 e-mails daily was alone a full-time job.

14   Add in emergency crisises and telephone calls while doing the

15   centers' rounds to ensure patient safety at all times where

16   there was more than 100 patients in a given site.

17        It's no wonder I had no time for lunch.  Thank God for

18   the oversized cup of cafe con leche that my husband would

19   prepare for me every morning to last me the whole day.  But I

20   enjoyed what I did.

21        I welcomed the challenge from assisting the stubborn

22   patient that slapped me across my face because she didn't want

23   to wear her safety walker, to calling rescue for the severely

24   delusional one that broke his hand hitting the wall trying to

25   kill a tarantula.

1      All the staff understood that the patients' care was a

2   priority and, therefore, from their arrival to their departure,

3   we were all at watch to ensure their safety and their

4   well-being, not only of the patients, but the staff as well.

5      After all, these were crises centers and, though, at

6   times there would be chaos, we would refer to as "controlled

7   chaos."

8      Therefore, it was the responsibility of the program

9   directors, which I supervised, to make their rounds at all the

10   centers, to ensure that the sessions were starting on time and

11   would end on time, to ensure that the clinical staff was

12   prepared with the sign-in sheets and activities for the day, to

13   ensure that the MHTs were readily available outside the group

14   rooms to provide any assistance in case it was necessary, to

15   make sure that the support staff would maintain the rooms clean

16   at all times so that we didn't have any slip-and-falls, to make

17   sure that the patients were assisted in and out of the

18   15-passenger vans, to make sure that the vans were cleaned and

19   cooled off five minutes before their departure so that the ride

20   would be comfortable and that all seat belts and wheelchairs

21   were fastened, to make sure that the diabetics and hypertensive

22   patients received proper meals according to their dietary

23   needs, to make sure the nurses took their vitals.

24      Sorry.

25      And these were just for the partial hospital program

1   services.  While it was our largest, it was just one of our

2   many core services.

3          Other services that we called our specialty services

4   comprised of adult services, children's services, couples,

5   family counseling, supervised and therapeutic visitations,

6   monitored exchanges, educational classes, like anger

7   management, parenting classes, drug program, DUI, divorce

8   classes, and these would all be in the afternoon.

9          The center would be open from early in the morning to

10  late in the evening and weekends as well.  So the day-to-day

11  operations of the centers was not an eight-hour shift.

12  Therefore, the programs directors often needed my help.

13         So I would provide assistance to cover each center at

14  least once a week.  I would rotate the weekends with them to

15  take a day off -- to give them a day off.

16         I would also travel to the Orlando center once a

17  month.  This schedule didn't leave much room for me to focus on

18  my own company, MedLink, but I was fulfilling my contract with

19  ATC to facilitate their operational needs.

20         And so my small company that was mostly comprised

21  of contractors did not take priority against the 250 to

22  300 employees that ATC had grown into as well as the five

23  centers and three satellite offices that I had to rotate with.

24         It was hard work, but I didn't mind it.  I saw the

25  growth of each center from 15 patients to sometimes

1    100 patients daily.

2         I saw the care that the staff would provide to the

3    patients every day with the daily encouragement of each driver

4    who took those patients that didn't want to get out of bed

5    because of a disabling apathy and would go into their homes to

6    assist them in getting dressed to attend the sessions, to the

7    never-ending patience of each clinician who would slowly peel

8    through their walls of guardedness to enable them to openly

9    express years of repressed feelings and emotions.

10        The more I was in the centers, the more I saw the good

11   that each individual staff was doing.  They were providing them

12   hope for their otherwise dim future.  That would motivate me.

13   And so I would, too, work hard.  I would get up every morning

14   because they did it -- because I believe in leading by

15   example -- and put in a hard day's work like the staff did.

16        So whether a driver got stranded -- excuse me --

17   whether a driver got stranded and I had to pick up patients in

18   my own vehicle to help them with the route or whether the

19   medical records clerk was falling behind or called out sick and

20   I had to go file or whether I had to cover the front desk and

21   answer the phones or clean the toilets, it was teamwork and it

22   was what we all did for our patients.

23        I still recall Maria's eyesight, who progressively got

24   worse, and I had to hold her hand to walk to the van, as she

25   would not see her step due to her cataracts, while I would

1   describe to her the surroundings in detail each step of the way

2   so that she would not be scared of the her new blindness, or

3   when Raquel, an eloquently spoken teacher -- retired

4   schoolteacher, became impotent and expressed her embarrassment

5   of having soiled herself because she was too proud to wear

6   diapers, how she cried in thankfulness of my comfort.

7           And let's not forget Lucille, how she was gleaming

8   when the room was rearranged to make extra space for her dolly

9   and stroller or James, who after breaking the chair in an angry

10  outburst would apologize profusely to not be kicked out of the

11  program.

12          We all worked hard and were committed in ensuring the

13  patients received the best possible service.  It is insulting

14  to hear that everything we did was fraudulent and that we did

15  not care for the patients' well-being.

16          With such a large responsibility on my shoulders, I

17  had no time for anything else.  As I was working hard in doing

18  my job and doing it well, I trusted that my partners were doing

19  the same.  I trusted that they were following the right path

20  and not cutting corners where it mattered most.

21          I had no reason not to trust them or to question my

22  partners.  After all, I felt they were the ones trusting me to

23  do a good job because they were the ones giving me the

24  opportunity of a lifetime to run my own business.

25          And I paid them back by working hard.  And our roles

1    were clearly delineated.  I took responsibility for the

2    operations and Mary took responsibility for the clinical and

3    Larry took responsibility for the financials.

4         And though my salary of 150 to 200 a year was a good

5    salary, it was all I earned and I earned it working countless

6    hours every single day as well as I had a clear understanding

7    from the beginning that the goal was to grow the business and

8    venture into other businesses.

9         So when I was being asked to reinvest the profits of

10   all the distributions back into the company to ensure its

11   continued growth, it made business sense.

12        Sorry.  Sorry.  I lost my way.

13        Besides, I had only been promised a salary.  And, of

14   course, I would not be responsible for those unearned taxes

15   because the company would pay them back or so I thought.

16        But it was about continued growth and growth -- grow

17   it did, from one initial center to eight centers of

18   approximately 5,000 square feet each, from one 15-passenger van

19   to a 45 15-passenger fleet with wheelchair capabilities, from a

20   handful of staff to close to 300 employees and contractors and

21   from just a few patients to over 600 patients a day.  And that

22   was just in the partial hospital program.

23        And the vision of growth continued.  And so, when

24   Larry proposed auxiliary businesses to complement the existing

25   one, such as the sleep center and the restaurant, it made

1    business sense.

2           But, of course, I don't have a business degree nor was

3    I in charge of the financials to know what started up the

4    business.  But I still believed that hard work was the driving

5    force behind any success.

6           So I would ensure that, once again, the policy and

7    procedures were put in place and that the standards for joint

8    commission were met as well as the requirements of all the

9    other entities that were entrusting their patients to us, such

10   as First Coast and private insurances, like BlueCross

11   BlueShield, Aetna, AvMed, Humana, and contracts like drug

12   court, family court, Department of Children and Family and

13   AHCA, entities that on many occasions came to our facilities

14   unannounced to do on-site inspections and, in the process,

15   interview patients and staff alike, sometimes for one hour to

16   one week, as it was in the case of JCAHO.

17          One has to wonder, if it was all fraud, why wasn't it

18   evident to the inspectors or to the staff or the patients,

19   patients that often submitted numerous letters after they

20   completed their treatment thanking us for their change in their

21   lives or that provided us with positive feedback in their

22   monthly satisfaction surveys and how appreciative they were of

23   the staff efforts during their program stay.

24          The company's vision was to provide the best quality

25   care for the patients at the most cost-effective level, and all

1    stuff and patients alike saw that day in and day out because

2    the staff that was in the center was working hard to ensure

3    that was how we conducted the day-to-day operations.

4          From the extra care that the Boca Raton clinical staff

5    would provide in tailoring to each patient's needs with

6    individual sessions on a daily basis, to the cafe con leche and

7    Cuban bread snacks that the Homestead center would provide to

8    the support staff, to turn a frown upside-down, these patients

9    benefit from the treatment they received at ATC.

10         It is written in their satisfaction surveys.  It is

11   written in numerous letters of appreciation.  It's what the

12   field of mental health is about, to help individuals which,

13   because of the unfortunate circumstances in their lives, don't

14   have the capability to see a brighter tomorrow without the help

15   of others today.

16         Medicare said that they worked with an honor system.

17   I'm here to tell you, your Honor, that I did as well.  I

18   trusted that my partners were doing their jobs honorably.

19   Working hard, doing the right thing, has always been what I've

20   stood for and I had no reason not to trust others to do the

21   same.  After all, it was their business initially and they gave

22   me the opportunity.

23         So I felt they were the ones trusting me and, in turn,

24   I would show them that through hard work and dedication one can

25   be successful.  It was what my parents taught me, what I saw

1    growing up from the people that surrounded me, from my family,

2    my friends.

3           There has never been any reason in my life to suspect

4    of others or to not trust others, for I have always been

5    fortunate enough to have always been surrounded by good,

6    honest, hardworking individuals who have helped me along the

7    way.  I have always been very lucky that way.

8           But as Jennifer Saulino put it during the reverse

9    proffer, my luck was about to run out.  Though I did not know

10   it at the time, I truly thought that I was -- that was just

11   another one of my fortunate experiences in my life, where I

12   would grow not only financially, but intellectually as well.

13          I felt truly honored to have been given an opportunity

14   to own my own business and, though I didn't know the first

15   thing about owning a business, I knew I would work hard to make

16   sure it was successful.

17          I knew that I would try my hardest not to fail so that

18   the business could grow.  And grow it did, though I was not

19   fully aware of some of the driving forces behind the growth of

20   the business.  And for that I am sorry.  I truly believed that

21   we did help many individuals overcome the severity of their

22   psychological issues into being more independently functional.

23          So now I stand in front of your Honor and ask for

24   forgiveness for this horrific episode that I'm going through,

25   forgiveness for abusing the trust of the individuals we served,

1    where we did the best to accommodate them and their needs,

2    forgiveness for stealing millions of dollars from the Medicare

3    trust when I didn't receive anything but my hard-earned salary,

4    later to be stripped from more than what I came to this country

5    with.

6            I do need forgiveness, but the forgiveness I need is

7    from my family, forgiveness for putting work before their

8    needs, forgiveness for taking so much time from them to put

9    into a company that was fake that I truly believed in, a

10   company that was to be built on successfully helping others

11   become independent from their debilitating mental illness,

12   forgiveness for being so naive and believing I was doing the

13   right thing.

14           I thought I was doing what I went to school for.  I

15   thought I was helping thousands of people feel better about

16   themselves, sharing their pain and hoping that, even if

17   minimal, their experience in our programs would benefit their

18   lives.

19           Isn't that what I went to school for?  To assist in

20   dealing better with their daily stressors and improve their

21   quality of life, even if it was just for a little while?

22           I truly believed in the service we provided, just like

23   I believed in the wonderful clinicians that showed empathy in

24   their sessions to our clients day in and day out without

25   becoming burdened themselves, just like I believed in the

1   dedicated support staff that assisted those less physically

2   capable patients in their feeding, in their walking and in

3   their diaper changes without showing disgust so they would not

4   feel any more shame than they already felt.  It was the humane

5   thing to do and they did it day in and day out.

6        And our drivers would go beyond their duty to

7   encourage these apathetic patients out of their bed to come and

8   participate in the program instead of sitting alone in a room

9   on many occasions with no emotional stimulation.  They, too,

10  understood the benefits these individuals were receiving.

11       To all the staff members, I ask for forgiveness

12  because I pushed them to work hard and believe in something

13  that, in the end, was not worth believing in because it was all

14  fraud.

15       I am angry.  I am angry at myself for not realizing

16  that what I believed in and worked so hard on was just a fraud.

17  I am angry for putting so much time and effort into something

18  that was fake.  I am angry for having pushed others to work so

19  hard at something that was not worth it.

20       I am angry for robbing my family of precious time we

21  could have spent together.  I am angry for putting them through

22  so much stress to accommodate my work demand.  And for what?

23  For something that was fraud.  I am angry that I have to be

24  sorry for these things I did, thinking that they were the right

25  thing and now they're wrong.

1    I am sorry that I -- sorry.  I lost my place.

2    I am sorry for putting my family through this shameful

3 experience in their lives.  I am sorry for not making my

4 parents proud.  I am sorry for not being able to come -- to

5 come home to my husband at night after 23 years together.

6    I am sorry that my boys have to tell their friends

7 that their mommy is in jail.  I am sorry for not being -- I am

8 sorry for not being able to tuck them in at night and do our

9 prayer.

10    I am sorry for the disgrace and pain my entire family

11 is going through.  I am sorry for the financial debt I have

12 made them incur.  I am truly sorry for working so hard,

13 thinking I was doing the right thing, when, in reality, it was

14 not.

15    I'm sorry.

16    When I missed my son's Mother's Day breakfast in

17 kindergarten because I had to be in Homestead for a DCF

18 inspection.  I'm sorry when I made it late to my grandfather's

19 funeral because I had to deal with a disciplinary action of a

20 staff member.

21    I am sorry that I was covering Orlando the day my

22 little cousin passed away from cancer and more sorry that my

23 mother, who was working with me at the time, was not able to be

24 by her brother's side to console him on the loss of his only

25 child.

1   I am sorry for the countless times I told my boys we

2   can't go to the park this weekend because I had to work.  It is

3   no wonder when my little one would think that my favorite thing

4   to do was work.  It was him who always told me, "Remember the

5   Sabbath day to keep it holy."

6   I am sorry for missing out on my family, though I

7   always tried my best.  I am truly sorry for what I have done.

8   I wish I would have known what I was doing was wrong.

9   I have said what I truly feel in my heart and, if it

10  will not grant me my way home sooner, I pray the Lord will

11  grant me the serenity to endure this obstacle that's now in my

12  path.

13  What matters is that I am true to my heart and to my

14  family, and that is the most important thing to me.  I know my

15  family's one of a kind and will always be there for me, no

16  matter what the circumstances bring.  That is what keeps me at

17  peace with myself.

18  And though these past three months being away from

19  them has caused me to cry myself to sleep every single night,

20  feeling I have no hope, their e-mails, their letters, their

21  visits, are like the Red Bull of my day.

22  I go to bed praying and hoping that I'm home soon,

23  that I wake up from the nightmare, that it's just a matter of

24  time.  Then the morning comes and I see the while walls when I

25  open my eyes.  It breaks my heart.

1        It breaks my heart when my boys write to me saying

2   that I need to come home right now, this instant, because they

3   love me more than the universe.  All I can say to them is,

4   "Mommy will be home soon."  But, in reality, I don't even know

5   when "soon" will be.

6        It kills me to see my husband and friend of 23 years

7   with a tired look in his eyes.  I know he has been crying.  I

8   know he's not sleeping.  I know he's suffering.  And I see the

9   same look in my father's eyes.  It kills me that my family's

10  going through this because the punishment should be for me and,

11  yet, every one of them are suffering on my behalf.

12        And so again I ask for forgiveness.  I never meant to

13  hurt anyone.  I just wanted to make them proud of my hard work,

14  out of what I stood for.  But in the end, I got it wrong.  I

15  should have known.  And for that I'm sorry.

16        I want to thank you, your Honor, in advance for your

17  words when you stated that you would not hold it against anyone

18  who invokes their constitutional right to proceed to trial.  It

19  gives me peace of mind and puts me at ease to know that, by

20  doing what I felt was right in my heart, it would not be held

21  against me.

22        Thank you.

23        THE COURT:  All right.  Mr. Wax.  Do you wish another

24  five-minute recess before we start?

25        MR. WAX:  No, your Honor.  I can proceed.  I'm able to

113

```
 1    proceed.  Thank you.
 2              THE COURT:  All right.
 3              MR. WAX:  Thank you.
 4              THE COURT:  Are you finished with your witnesses?
 5              MR. WAX:  Yes, sir.
 6              THE COURT:  For the Government, do you -- this is your
 7    opportunity to call such witnesses you may elect to call.
 8              MS. SAULINO:  Your Honor, the Government has no
 9    witnesses at this time.
10              THE COURT:  All right, then.  Before we get into
11    closing summation or argument, we'll take a short recess.
12              (Thereupon a recess was taken, after which the
13    following proceedings were had:)
14              THE COURT:  Thank you.  Be seated, please.
15              I believe all the testimony or oral presentation by
16    the lay witnesses -- not the lawyers, the lay witnesses -- have
17    been completed and concluded.  So at this point in time, who
18    would like to go first?
19              MR. WAX:  (Indicates.)
20              THE COURT:  Mr. Wax would.  Thank you.  I'd be pleased
21    to hear from you, Mr. Wax.
22              MR. WAX:  Thank you.
23              You know, I've been thinking for months about what I
24    would say today, Judge.  It's a crazy profession.  I wake up in
25    the middle of the night thinking about my cases, for years now.
```

1    This one's causing me to lose a lot of sleep.

2          I ask myself -- you know, thoughts occur to me and I

3    say, "Am I going to remember this?  Am I going to be able to

4    say what I want to say?  Am I going to be able to persuade

5    Judge King to give Judith a sentence that I can walk out of

6    this courtroom and feel like justice was done?"

7          I remember the first day I was in court in 1984.  I

8    was in Courtroom 4-1.  I was fortunate.  I was assigned in the

9    Justice Building, to the big courtroom, as big as this one,

10   Judge Shapiro -- Sid Shapiro, over at the Gerstein Building --

11   well, the Metro Justice Building.  I had been in that courtroom

12   when I was in high school.

13         There was a big trial.  I know you remember it.  It

14   was the Sanford Bronstein trial, Cedars of Lebanon.  And I

15   remember watching an old lawyer, Norman Hoeft, try that case.

16   And I'm sure you knew him well.  And I think it was when I

17   watched that trial -- and I must have been 16 or 17 years

18   old -- that it sparked something in me.

19         And so the first day I was allowed to go to court I

20   was an intern, my third year of law school, and I was assigned

21   to that courtroom.

22         The lawyer that I was assigned to threw me right into

23   the fire and said, "Go handle this guy's sentencing."

24         I don't remember what the sentencing was.

25         I said, "Well, what do you say at a sentencing?  What

1    do you say?"

2             And he said, "Figure it out."

3             And I did.  And I don't even remember what the

4    sentence was.  But I just remember asking myself, "All these

5    years, you know, what do you say at a sentencing?"

6             As I became more experienced, one of the things I

7    learned was that I'm not just a lawyer.  I'm a counselor.  I'm

8    a human being.  And I see my clients differently.  Every single

9    one of them I see differently.

10            You know, I've stood next to some really bad people,

11   Judge.  I mean really bad people.  You know, I remember I was

12   standing next to an 18-year-old murderer while he was being

13   sentenced and there wasn't a single person in the courtroom for

14   him.  And I thought to myself how horrible that is.  But it

15   wasn't surprising why he became a murderer at such a young age.

16   There wasn't one person there to stand up for that kid.

17            I've sat there and watched judges hand out sentences

18   that, while they were lengthy, they were appropriate, because

19   the people who had committed those crimes had forfeited their

20   right to walk among free society.  They had done things that

21   were so violent and were so unremorseful that I couldn't

22   disagree.

23            I remember once I had a client who committed a murder

24   on Easter Sunday in broad daylight in his home neighborhood,

25   where everybody knew him.  And he insisted he didn't commit the

1    crime.  He insisted he had an alibi.

2           I remember the day of his sentencing.  The judge gave

3    him life in prison.  And I had arranged for a 20-year plea

4    offer -- a 20-year plea bargain for him and he turned it down.

5    He wouldn't take it.  In the middle of trial, I was able to get

6    this guy a 20-year plea bargain and he wouldn't take it.

7           And I remember going into Judge Stan Blake's chambers

8    at the end and he said, "Barry, I'm so sorry.  I'm so sorry."

9           And I said, "No.  Don't apologize to me.  You don't

10   have to apologize to me."

11          But it's run the gamut, your Honor.  And there are

12   times when I walk into a courtroom and people walk out with

13   probation and I feel wonderful or a year or five years.  I'm

14   not sure.

15          Maybe I'm rambling a little.  But this sentencing

16   here, this case, this is one that I've lost a lot of sleep over

17   because the consequences are so severe.

18          I mean, Judith -- look at her.  I mean, she's a first

19   offender, a first offender in a very, very, very serious crime.

20   But she's a human being, an individual.

21          I don't for a minute believe that Judith set out to

22   commit fraud with Larry Duran.  I don't believe for a second

23   that that ever happened.  Do I believe that she got in over her

24   head?  Absolutely.  Do I know why she didn't back out of it?

25   No, I don't.  I don't have that answer.

1          Sufficient, but not greater than necessary.  That's

2    our mantra nowadays.  That's the sentencing mantra that we've

3    been given by the US Supreme Court after *United States versus*

4    *Booker*, sufficient, but not greater than necessary, to serve

5    the twin goals of sentencing, punishment and deterrence.

6          And I've got to tell you, Judge, your message of

7    deterrence, that was sent loud and clear.  I mean, when you

8    sentenced Larry Duran to 50 years, that was front-page news all

9    over the world, much less in South Florida.  That message of

10   deterrence was sent.

11         And whenever anyone in this district gets sentenced

12   for Medicare fraud, that message of deterrence gets sent.  But

13   does it outweigh the question of individualized punishment for

14   the offender?

15         You know, I said to you in the first part -- when we

16   were talking about the guidelines, I expressed my consternation

17   with the guidelines and their artificial inflation and how the

18   numbers have gone up and up and up and up and the way that the

19   politics have intruded into sentencing.

20         You know, I don't know when it got like this.  I just

21   don't know when we got to a point that we just reached these

22   astronomical numbers and I don't for the life of me understand

23   the correlation.

24         You know, Ms. Saulino, when she talked about the

25   Patient Protection Act and how they felt that the guidelines

1  weren't high enough for Medicare fraud and so they want to add

2  another four levels for a 20-million-dollar Medicare fraud, I

3  said, "How much higher can you go?  How much higher can you go

4  than you've already gone?  And why $20 million?  Why cut it off

5  at $20 million?  Why not cut it off at $2 million or cut it off

6  at $50 million?"

7          The decision is political.  And politics have intruded

8  in the criminal justice system.  And what does that say about

9  us as a civilized society?

10         I read the Government's sentencing submission

11 yesterday and the Government says they're asking for 45 years.

12 45 years.  No one died.  When the people came to ATC, no one

13 set them on fire.  No one abused them.

14         I've read some of these articles about the abuses in

15 ALFs across the state and I daresay that maybe getting out of

16 some of those ALFs for a few hours a day was the best thing

17 that could have happened to some of these people.

18         But I don't want to misplace my argument here, Judge.

19 Because what does it say about us, as a civilized society, that

20 we can throw these types of numbers around?

21         You know, in some societies, they cut your hand off.

22 They cut your hand off.  We call that barbaric.  But I've got

23 to tell you, if you turned to Judith Negron today and said,

24 "We'll cut your hand off or you can go to prison for what the

25 Government's urging," which alternative do you think she would

1   take?  Because you can live without a limb.  You can overcome

2   the loss of a limb.  But the loss of a life?

3              You've heard a lot about the effect that this case has

4   had on the family.  As some people have said, it's brought them

5   closer together.  But at the end of the day, a part of their

6   family is missing.

7              The only construct that we know in this country for

8   punishment is imprisonment.  That's what we know.  And I've

9   seen all the articles.  They seem to show up more and more

10  lately.  We have 4 percent of the world's population and

11  25 percent of the world's prison population.  We've created

12  this prison industry.  We've given up on people.

13             And when we punish people by putting them -- by

14  incarcerating them, by housing them for years and years and

15  years, at some point, there's a point of diminishing returns.

16  At some point, you've punished them.  But the effect of the

17  punishment goes on.  And what really is punishment?

18             You know, if you say to someone, "I'm going to put you

19  in prison," they suffer, but the family suffers so much more.

20             Is it punishment to say that you're going to go to

21  prison for 10 years or 15 years or 20 years or 30 years or

22  40 years or life or whatever it is or is the real punishment

23  missing out on the milestones?  Is the real punishment not

24  being there to share a birthday or a wedding or the birth of a

25  child or the death of a parent?

1          Judith's 40 years old.  If you were to follow the

2     Government's recommendation of 45 years, when she got released

3     from prison, she would be in her 80s.

4          I hope we all live into those years and longer.  But

5     what will be there for her when she comes out?  A family, many

6     of whom have passed away?  Children she doesn't know?

7          The effect of this type of punishment is profound.

8     She has a 7-year-old son.  I provided your Honor with the

9     report that I got yesterday that you placed under seal.  It's

10    no surprise that these children are suffering.  It's a fact,

11    like many children suffer when their parents commit crimes.  It

12    is a fact.

13         But why should a 7-year-old boy's only memories of his

14    mother be visiting her in jail and visiting her in prison?  How

15    many memories do we have from before we're 7 years old?  An

16    image here?  A picture there?

17         I understand that there has to be punishment here.  I

18    just don't know what the extent of it is.

19         And, you know, your Honor, you've been on the bench

20    for 48 years now.  And I said it earlier.  You sentenced

21    without the benefit of the guidelines.  You sentenced some

22    very, very bad people, and you sentenced them appropriately.

23    You sentenced some good people, and you sentenced them

24    appropriately, too.

25         But there was a period of time when you were bound by

1    those sentencing guidelines and you sentenced people to terms

2    of years that I would daresay was not appropriate.  Maybe it

3    was.  I don't know your personal philosophy.  I don't know.

4         But I do know that the best thing in the world that

5    ever happened was that a judge like yourself, with the

6    experience that you have and the perspective that you have, is

7    much better.

8         We're grateful that your decision can be based on

9    truth, that your decision can be based on justice, and not a

10   calculation of numbers that was arbitrarily decided by some

11   politicians who want to be tough on crime and that does nothing

12   to really look at an individual.

13        And I know those are harsh words that I'm saying,

14   Judge, but, you know, this is the kind of thing that kept me up

15   at night and keeps me up thinking about this case.

16        I have to bring a few things to your attention, your

17   Honor, that I don't know that you're specifically aware of or

18   that you've thought about.

19        But in this indictment, there's a forfeiture count.

20   In the forfeiture count, there are 33 specific assets that are

21   listed that the Government wants to forfeit.

22        The only one that names Judith is the first one that

23   deals with the money that Medicare paid, the $87 million, the

24   gross proceeds of the fraud.  And that says perpetrated by

25   Duran, Valera, Judith, Acevedo, ATC and MedLink.

 1              What those businesses generated?  Every other of the

 2    remaining 32, a Maserati registered to Lawrence Duran, a

 3    Lincoln Navigator for Lawrence Duran, a Harley-Davidson for

 4    Lawrence Duran, a BMW for Lawrence Duran, a Range Rover for

 5    Lawrence Duran, a Harley-Davidson for Marianella Valera, a

 6    Range Rover for Marianella Valera, property, Mercedes-Benzes.

 7    You heard the testimony at trial.  Watches, vacations.

 8              You didn't hear that about Judith.  And she told you

 9    in her statement that was one of the most heartfelt statements

10    I've ever heard come out of someone between the tears she got

11    her salary.

12              The same day that they were indicted, a civil

13    restraining order was issued that fell in front of Judge

14    Martinez, as you're aware, and all assets were frozen.

15              Judith was the only Defendant who filed a financial

16    affidavit in that case.  Judith was the only Defendant that had

17    assets that the Government froze.

18              And what were those assets?  Her joint bank accounts

19    with her husband and her savings account at Raymond James.  And

20    the Government froze, by their own account, $267,973.

21              When she got her paycheck, Judge, it was split in two.

22    Half her paycheck went into her joint bank account with her

23    husband to pay their bills and the other half went into a

24    savings account.

25              There were no cars.  There were no jewelry.  There

1    were no properties.  She didn't live some lavish lifestyle.

2    She lives in a modest three-bedroom home in Miami Lakes.

3           She has over $400,000 in tax liens for the years 2008

4    and 2009 for not paying taxes on all of those checks that were

5    written to her individually and cashed for kickbacks.

6           Some might say that's just punishment, and perhaps it

7    is.  But what it points up is the lack of sophistication on her

8    part about exactly what she was doing.

9           Your Honor, this was Larry Duran's fraud.  And do you

10   believe for a second that it is any coincidence that Larry

11   Duran surrounded himself with beautiful women?  Do you think

12   for a second that Larry Duran didn't know exactly what he was

13   doing?

14          He sat on that witness stand and told you what he

15   needed to tell you that he thought was going to help him, and

16   he was wrong.

17          But that man ruined a lot of lives.  I don't know what

18   he sold people.  I don't know what kind of Kool-Aid he was

19   giving them to drink.  But I don't find it a coincidence.

20          In our sentencing memorandum, we laid out the

21   different offense levels for different types of conduct.  This

22   offense level equates to violent crime:  Murder, air piracy,

23   treason, criminal sexual abuse, possession of weapons of mass

24   destruction and biological weapons.

25          People who commit crimes like that have forfeited

1    their right to walk among free society.  Where did we lose our

2    perspective?  Is Judith beyond forgiveness?  Is she beyond

3    rehabilitation?

4         No, she's not, your Honor.  She's not beyond

5    rehabilitation.  She's not.  She committed a crime.  The jury

6    found her guilty of the crime.  But the question is:  What is

7    the sentence?  What is sufficient, but not greater than

8    necessary?

9         One of the 18, US Code, 3553(a), factors is to provide

10   just punishment, just, not just for the crime, but for the

11   individual.  A sentence needs to be meaningful, your Honor, but

12   it doesn't need to be life-shattering, not for the person who's

13   being sentenced, not for her family, and not for society.

14        There is a sentence for Judith Negron.  There is a

15   sentence which your Honor can mete out here which deters

16   people, but which does not destroy an individual.

17        I'm asking you -- no, your Honor.  I'm begging you as

18   I have never before to please show mercy to this young lady and

19   to please treat her as an individual and recognize that she is

20   not beyond redemption.

21        There's a saying in the Talmud that he who saves an

22   individual life, it is as if he has saved a universe.  There is

23   a universe out there to be saved, your Honor.

24        Thank you.

25        THE COURT:  Thank you, Mr. Wax.

1       Ms. Saulino.

2       MS. SAULINO:  Thank you, your Honor.

3       Your Honor, standing before you right now is the most

4   serious thing I do in my job.  And I know that this is the most

5   serious thing that you do in yours and it is an enormously

6   weighty responsibility that you have.

7       I think it's fair to say I'm the youngest of the

8   lawyers before you today.  I don't have stories like Mr. Wax or

9   like your Honor.  But I do know the evidence in this case, your

10   Honor, as do you.  And the evidence in this case was

11   overwhelming.

12       The jury found resoundingly that Judith Negron was

13   guilty of all 24 counts she was charged with and they did it in

14   roughly three and a half hours of deliberations.

15       The evidence that your Honor heard during that trial

16   overwhelmingly demonstrated that Judith Negron knew exactly

17   what she was doing.

18       Your Honor just heard a statement from Ms. Negron

19   during which she did not accept responsibility for her crimes.

20   She still is putting before your Honor the defense that her

21   partners did it and she didn't know.  But the evidence that

22   this Court heard overwhelmingly demonstrates the contrary.

23       And Ms. Negron said something else very important

24   during her statement.  She said several times, "We did this

25   because it made business sense."  Your Honor, this crime was

 1    committed because it made business sense for the partners in

 2    the crime.

 3          We have heard from a number of people close to

 4    Ms. Negron.  It is clear that she has very tight family bonds

 5    and probably even more clear that she cannot admit to them

 6    that, while she may have had tight family bonds with them and

 7    been close with them, she committed this heinous crime.

 8          She knew she was doing it at the time and she did it

 9    because of money, because she wanted to steal money from the

10    Federal Government.

11          The factors that we are to consider -- that you are to

12    consider now, your Honor, first include the nature and

13    circumstances of the offense.

14          This was a 205-million-dollar Medicare fraud.

15    Regardless of the policy considerations that Mr. Wax raised,

16    Congress has spoken on the seriousness of this offense, as has

17    the Sentencing Commission, as have the judges of this district,

18    as has this Court.

19          This is an extraordinarily serious offense.

20          Now, the history and characteristics of the Defendant

21    are also important to your consideration.

22          And often, your Honor, when courts are asked to

23    consider such things, they are asked to consider that the

24    Defendant had a difficult childhood, that the Defendant didn't

25    have the support system that the rest of us had, that the

1    Defendant didn't have the ability to learn true right from

2    wrong or even, maybe, that the Defendant needed to support her

3    family and, so, she stole only to do that.

4            In fact, I'm aware of another Defendant in the related

5    case, your Honor, who had a very sick child that she needed to

6    support.

7            Here, the Defendant had a very supportive childhood

8    and family, has very close relatives, all of whom are willing

9    to be her for here.  She clearly knew right from wrong.  She

10   was extraordinarily well educated.

11           Your Honor has before you the many, many, many

12   certificates that she received for various kinds of education.

13   She was a straight A student.  And she was trained in the very

14   area that was the focus of this fraud.  She was better trained

15   than virtually anyone to know that what she was doing was

16   fraud.

17           And so, as your Honor heard during the trial, when the

18   therapists at American Therapeutic came to her and said, "I'm

19   concerned these patients don't qualify," "I'm concerned that we

20   are committing fraud," as Mr. Lopez said, "I am concerned," as

21   Amy Lynn Graham said, "that the FBI is going to come raid us,"

22   she was in a better position than anyone to know that what they

23   were saying was absolutely true because she and her partners

24   had been committing fraud for eight years.

25           We've also heard, your Honor, and seen from the

1    letters that this is not even a person who didn't understand

2    Alzheimer's and dementia.

3          And so, when the people who came to ATC from those

4    assisted living facilities came with those diseases, she knew

5    that they couldn't benefit from the services that ATC was

6    providing.  She knew that billing for them was stealing from

7    the Federal Government.

8          We appear to be hearing today a bit of a Robin Hood

9    defense, that, well, at least they were better off sitting at

10   ATC than they were at their assisted living facilities.

11         And whether or not that's true, your Honor, the one

12   thing we do know is that Ms. Negron and her associates paid

13   hundreds of thousands of dollars a month, millions and millions

14   of dollars in kickbacks, to the owners and operators of those

15   assisted living facilities to keep them in business, to keep

16   them running, to keep them sending more people to ATC.

17         So make no mistake.  Whether or not it's true that for

18   a few hours at ATC, they may or may not have been better off

19   than they were at their assisted living facilities, ATC's money

20   is what kept those assisted living facilities doing what they

21   were doing.  And that was money that came from Larry Duran and

22   Judith Negron and Marianella Valera.

23         Your Honor, you were also asked to consider the

24   seriousness of the offense and a just punishment and the

25   potential for the Defendant to commit this kind of crime again.

```
 1              And I'd ask your Honor to remember, as you've heard,
 2    this Defendant not only knew the crime she was committing while
 3    she was committing it, but knew that the Government was
 4    investigating her crime.  Your Honor has heard much about this
 5    qui tam lawsuit.
 6              Your Honor also knows, as a result of that, that these
 7    partners knew they were being investigated by the Federal
 8    Government and they still didn't stop what they were doing.
 9    They continued to commit the crime right under the nose of the
10    Federal Government.
11              In fact, you heard at trial from Margarita Acevedo
12    that Ms. Negron, while driving in the car with Ms. Acevedo and
13    talking about something related to the crime, told Ms. Acevedo
14    to take the battery out of the back of her cell phone because
15    she was worried that the FBI was listening.
16              This is a Defendant who has not accepted
17    responsibility and who, when given the chance -- when she knew
18    that the Government was investigating, she just kept right on
19    doing what she was doing.  And so we've seen from her actions
20    the potential for her to commit a crime like this again.
21              This is the Defendant who took her cell phone battery
22    out.  This is the Defendant who endorsed the money laundering
23    checks for the people whose identities were stolen.
24              And this is the Defendant who got her own mother
25    involved in money laundering, as Ms. Acevedo testified, and as
```

1   the financial records show from the evidence admitted at trial,

2   to the tune of $113,000 cashed through her mother, the mother

3   who's here supporting her.

4          Again, while she may have a very close relationship

5   with her family, the other side of her is the side she doesn't

6   want to show to them.

7          Your Honor, in considering a just punishment, the

8   Court needs to consider -- and as the Court has always done

9   so -- who speaks for the Defendant.  And you've heard that

10  today.  The other question is:  Who speaks for the victims of

11  this crime?

12         And you heard those people at trial.  Margarita

13  Acevedo cried each time she had to say something that was

14  particularly damning about Ms. Negron because they were

15  friends.  But she explained the fraud in extraordinary detail.

16         Juan Carlos Lopez, a therapist at ATC, came and

17  testified before this Court and showed the Court and the jury a

18  letter he wrote to Medicare about his concerns that ATC was

19  committing fraud.

20         Beth Poteet came and testified before this Court.  She

21  was a therapist and a program director.  She testified about

22  how she raised her concerns with Ms. Negron and the other

23  partners about the fact that they were committing fraud.

24         And Amy Lynn Graham testified before this Court and

25  she spoke for Ruth Herrera.

1              This is a Defendant who led two lives.  The apparent

2     distress of her family is tragic, your Honor, but so is the

3     tragedy that occurred for all of the many, many victims of this

4     crime, all of the people that were used by American Therapeutic

5     and, as your Honor has recognized, all of the people who will

6     suffer as a result of the Medicare program having been

7     defrauded in this horrible way.

8              And, finally, your Honor, the Court is to consider

9     sentencing disparities.

10             Now, Mr. Wax has put before the Court a number of

11    different types of crimes and their relative sentences.  But

12    looking at economic crimes, your Honor, the sentence that the

13    Government requests, 45 years, is in line with the seriousness

14    of an economic crime offense, particularly one like this that

15    used vulnerable victims in its commission.

16             Obviously, your Honor, your sentences of Mr. Duran and

17    Ms. Valera are instructive, but so are the sentences of the

18    types of people who commit other kinds of economic crimes, for

19    instance, Scott Rothstein in Ft. Lauderdale, who received

20    50 years for his economic crime.  The Government has outlined

21    in its sentencing memorandum several other examples.

22             Now, Mr. Wax raised the issue of money that Ms. Negron

23    made off of this crime.

24             Your Honor heard about that during the trial.  And, in

25    fact, the disclosure that he raised just now that she signed

1    and that -- or that she submitted before Judge Martinez told

2    the story that you heard during trial.

3           But she earned a lot of money off of this crime.  She

4    calls it a salary.  But that disclosure included for one

5    year -- I believe it was 2009 -- $900,000 that was claimed on

6    her taxes.

7           She says now, "Well, that's because some of that money

8    was money laundering money and kickback money."  How are we to

9    know whether it went in her pocket or whether it went to

10   kickbacks or money laundering?  Either way, it was money that

11   she used to commit a crime that she benefited from and that she

12   did knowingly.

13          This was not just Larry Duran's fraud.  This is an

14   extraordinarily intelligent woman who has presented to this

15   Court all of the information that she wants it to consider

16   regarding her education and her background.

17          But that same evidence shows this Court that this is a

18   Defendant who had every reason to know what she was doing was

19   wrong, had every capacity to further this crime.  And as the

20   evidence at trial showed, she was the one who made it work.

21          Yes, Larry Duran was the one who was the glad-hander,

22   the wheeler and dealer.  But she was the one who made the

23   trains run on time.

24          She was the one who made sure that the census was up

25   at each of the centers.  She was the one who checked the

1    patient files before the accreditation organizations came in

2    and before Medicare came in.  She took on the role of the

3    details person, the person who made the fraud run well, so that

4    it was undetectable.

5           And when it was finally detected, your Honor, she then

6    used those same details to try to hide behind them, to say,

7    "Well, I was simply an administrator."

8           But the evidence at trial, the evidence that this

9    Court knows better than anyone, shows a very different story,

10   your Honor.

11          I don't know how this Court is to determine what a

12   good person is, as Mr. Wax asks it to do.  But I will ask the

13   Court to consider whether a good person is a person who only

14   treats their family well or whether a good person is a person

15   who follows the law and who doesn't use other people, who

16   treats all of the people that it interacts -- that this person

17   interacts with well.

18          This individual defrauded the Federal Government to

19   the tune of $205 million and used more than 7,000 people to do

20   it.

21          Your Honor, at this time, the Government has no --

22   nothing further for this Court.

23          THE COURT:  Thank you.

24          As I indicated, Mr. Wax, brief rebuttal is allowed or

25   appropriate, if you have anything further you wish to say.

 1    You're not required to do that.  But if you do, why, you have

 2    that opportunity.

 3              MR. WAX:  Thank you, your Honor.

 4              Everything has got two sides.  Everything's a

 5    double-edged object, sword.  It doesn't change the calculus

 6    that you have to engage in.  Sufficient, but not greater than

 7    necessary.

 8              Judith is 40 years old.  How much of her remaining

 9    years will be taken away from her as sufficient punishment for

10    this crime?  All of them?  Half of them?  Some of them?

11              That's the question.  That's really what it comes down

12    to.

13              Regardless of what I say or the Government says,

14    that's where your wisdom comes in.  We can't ask for anything

15    more, your Honor.

16              Thank you.

17              THE COURT:  Thank you.

18              The Court has considered, as the law mandates, the

19    advisory guideline range and the Section 3553(a) factors to

20    fashion a sentence that, as counsel have reminded us several

21    times this afternoon, is reasonable and individually tailored

22    to the Defendant and sufficient, but not greater than the

23    district court deems necessary to comply with the statutory

24    purposes of the sentencing guidelines.

25              The Defendant will stand with her counsel and her --

1   or counselors, her lawyer and her counselor, Mr. Mineau.

2           Judith Negron, it is the judgment of this Court that

3   you be remanded to custody of the Bureau of Prisons to be

4   imprisoned for a term of 35 years.

5           This term consists of 420 months on the 26-count

6   indictment upon which you have been found by a jury of your

7   peers guilty.

8           The Court reserves the right to specify count by count

9   and item by item, as the statutes seem to like the Court to do.

10  I'll reserve the right to work that out later as to count by

11  count.

12          Suffice it to say that at this point, as to Count 1,

13  ten years; Count 6, ten years; Count 7, ten years; Count 13,

14  five years.

15          And the balance of counts, being 14 through 37, will

16  all run concurrently with the Counts 1, 6, 7 and 13, totaling

17  35 years.  All the rest of the counts will run concurrently

18  with those counts.

19          But that'll be outlined in a written order more

20  particularly, and I'll ask the probation officer to consult

21  with my courtroom deputy in preparing the judgment and

22  commitment.

23          Additionally, I do impose the joint and several

24  obligation for restitution with the other Co-Defendants that

25  are outlined in the presentence investigation material and the

1    recommendation of the Probation Office without reading through

2    all that.  Again, it's all there.  That'll be put into the

3    judgment and commitment order.

4            The total amount is $87,533,863.46.  87,533,863.46.

5            It'll be repaid pursuant to the provisions as

6    recommended by the Probation Office in the presentence report

7    and payable to the clerk of this court.

8            Upon release from imprisonment on the 29 counts, you

9    shall serve a three-year supervised release term that'll run

10   concurrently.

11           That supervised release is imposed on Count 1 and all

12   the rest of the counts run concurrently with a total three-year

13   supervised release sentence, during which time while you are on

14   supervised release you shall not commit any other crime.  You

15   are prohibited from possessing a firearm or other dangerous

16   device or any controlled substance.

17           You must cooperate in the collection of DNA material

18   and comply with the standard conditions of supervised release

19   of the Southern District of Florida, including a specific

20   requirement for financial disclosure, no new debt restriction,

21   self-employment restriction, related concern constrictions as

22   sets forth in Part G of the presentence investigation report.

23           The other recommendations are denied and not imposed.

24           Total sentence:  35 years; $87,533,863.46 restitution,

25   three years' supervised release; and a 2,500-dollar special

 1    assessment required by Congress relating to $100 on each of the

 2    25 counts.

 3            You are advised you have a right to appeal within

 4    14 days.  If you cannot afford a lawyer to represent you or to

 5    pay costs of appeal, you may apply for leave to appeal *in forma*

 6    *pauperis*, after a scheduled hearing for you with a magistrate

 7    or this court.  That matter will be not unreasonably withheld,

 8    but that is your right.  Fourteen days, you have the right to

 9    appeal for *in forma pauperis* treatment.

10            Under *US versus Jones*, I'm obliged to ask counsel --

11    both counsel and the Defendant if there's any objection to the

12    sentence or the manner in which it was pronounced, except and

13    apart from all the considerations that have been given, all the

14    objections and arguments that have been made on the various

15    objections.

16            Those are all fully preserved to the party asserting

17    them, the Defendant or the Government, to be raised on appeal,

18    if there should be an appeal, and if you deem appropriate.

19            You will not need to report those.  The Court will

20    fully protect the Defendant and the Government in case somebody

21    raises the issue that you didn't go through a litany of them

22    again here for the next hour or so.  You don't have to repeat

23    them.

24            But under *US versus Jones*, as you're aware, I'm

25    obliged to ask and I now do ask:  Any objection under *US versus*

1  *Jones* from the Government?

2          MS. SAULINO:  No, your Honor.

3          THE COURT:  Mr. Wax?

4          MR. WAX:  Nothing in addition to what you've

5  articulately permitted us to raise, your Honor.

6          THE COURT:  Mr. Wax, I'm very reluctant to do this,

7  but I believe it's required.

8          Ms. Negron, do you have any objection under *US versus*

9  *Jones*?  You've heard what Mr. Wax has said.  Do you have any

10  objection?

11         THE DEFENDANT:  (Consults with her counsel privately.)

12         I have to rely on my attorney because I'm not quite

13  sure I understand.

14         THE COURT:  Yes.  You rely on your attorney.  That's

15  fine.  That's good.  That preserves any objection that you

16  would have had.

17         The motions concerning place of confinement and other

18  matters that we normally take up at this time will be taken up

19  at a subsequent time.  You can file whatever you wish to file

20  in five days about those routine matters.  Matters of

21  forfeiture orders will be taken up later.  Do all that in the

22  next five days.

23         Don't forget.  The right of appeal is 14 days,

24  14 days.  I don't want to confuse this.

25         The Defendant is remanded to the custody of the United

1    States Marshal.

2            (Proceedings concluded.)

3

4                    C E R T I F I C A T E

5

6        I hereby certify that the foregoing is an accurate

7    transcription of the proceedings in the above-entitled matter.

8

9

10   _____        /s/Lisa Edwards_____
          DATE              LISA EDWARDS, CRR, RMR
11                          Official United States Court Reporter
                            400 North Miami Avenue, Twelfth Floor
12                          Miami, Florida 33128
                            (305) 523-5499
13

14

15

16

17

18

19

20

21

22

23

24

25