1

```
 1                    UNITED STATES DISTRICT COURT
                      SOUTHERN DISTRICT OF FLORIDA
 2                         MIAMI DIVISION
 3                      CASE 10-20767-CR-JLK
 4
     UNITED STATES OF AMERICA,
 5
                           Plaintiff,
 6
         vs.                          MIAMI, FLORIDA
 7                                    AUGUST 18, 2011
     JUDITH NEGRON                    THURSDAY - 9:00 A.M.
 8
                       Defendant.        EXCERPT
 9
10              EXCERPT OF JURY TRIAL PROCEEDINGS
               [Witness testimony - Doctor Alan Gumer]
11            BEFORE THE HONORABLE JAMES LAWRENCE KING
                 SENIOR UNITED STATES DISTRICT JUDGE
12                          DAY 4
     ------------------------------------------------------------
13
     APPEARANCES:
14
     FOR THE GOVERNMENT:   JENNIFER L. SAULINO, TRIAL ATTORNEY
15                         BENJAMIN D. SINGER, ASSISTANT CHIEF
                           U.S. Department of Justice
16                         Criminal Division, Fraud Section
                           1400 New York Avenue NW, Bond Building
17                         Washington D.C.  20530
                           Email:  jennifer.saulino@usdoj.gov
18                                 benjamin.singer@usdoj.gov
19   FOR THE DEFENDANT:    BARRY MICHAEL WAX, ESQ.
                           Law Offices of Barry M. Wax
20                         800 Brickell Avenue, Penthouse 2
                           Miami, FL  33131 - 305/373-4400
21                         Email:  barrywax@bellsouth.net
     REPORTED BY:
22                         ROBIN MARIE DISPENZIERI, RPR
                           Official Federal Court Reporter
23                         United States District Court
                           Wilkie D. Ferguson Federal Courthouse
24                         400 N. Miami Avenue, Ste. 08S67
                           Miami, FL  33128 - 305/523-5659
25                         Email:  robinc1127@aol.com
```

TABLE OF CONTENTS

Page

DOCTOR ALAN GUMER ......................................... 4

Direct Examination Cont'd By Ms. Saulino ................... 4

    Cross-Examination By Mr. Wax .......................... 18

    Redirect Examination By Ms. Saulino ................... 44

    Cross-Examination By Mr. Wax .......................... 47

INDEX TO EXHIBITS

| Exhibits | Marked for Identification | | Received in Evidence | |
|---|---|---|---|---|
| Description | Page | Line | Page | Line |

| Government Exhibit 3 ............................. 11 | | | | 6 |
| Government Exhibit 40 ............................. 5 | | | | 3 |
| Defense Exhibit NN ............................... 26 | | | | 20 |
| Defense Exhibit OO ............................... 30 | | | | 17 |
| Government Exhibit 87 ........................... 33 | | | | 21 |
| Defense Exhibit PP ............................... 48 | | | | 14 |

1        [Continuation of Witness Testimony of Doctor Alan Gumer]

2                          [continued from 8/17/11]

3            THE COURT:  Would you have the Doctor come back and

4    take the stand.

5            [The jury returns to the courtroom at 9:07 a.m.]

6            THE COURT:  Thank you, be seated.  We will continue

7    with the direct-examination of Doctor Gumer.  You are reminded

8    that you are under the same administered oath.

9            Ms. Saulino.

10           DOCTOR ALAN GUMER, GOVERNMENT'S WITNESS

11                      DIRECT EXAMINATION

12                      cont'd from 8/17/11

13   BY MS. SAULINO:

14   Q.  Good morning, Doctor Gumer.

15           If I could remind you to speak directly into the

16   microphone, closer than you think you need to be.

17   A.  Okay.

18   Q.  Doctor Gumer, I don't want to go back over your testimony

19   from yesterday, but just to refresh the jury and yourself, you

20   were discussing when we left last night your referrals to the

21   American Sleep Institute, do you remember that?

22   A.  Yes.

23   Q.  You did refer patients to the American Sleep Institute?

24   A.  Yes, I did.

25   Q.  Doctor Gumer, I am going to hand you what has been marked

1  for identification Government's Exhibit 40, which I believe is

2  not objected to by the defense?

3        MR. WAX:  That is correct, Your Honor.

4        THE COURT:  Admitted into evidence, Government's

5  Exhibit 40.

6        [Government Exhibit 40 received in evidence].

7  BY MS. SAULINO:

8  Q.  Doctor Gumer, I would like you to take a look at this file,

9  in particular, two pages that I will hand you.  Feel free to

10  take a moment and look at the file.

11        Doctor Gumer, do you, in general, recognize what

12  Exhibit 40 in its totality is?  The whole file, what is that?

13  A.  The first two pages?

14  Q.  No, the whole file.  What is that whole file?

15  A.  Okay, this appears to be a file.  I have never seen one.

16  Actually, one time earlier.

17  Q.  Is this a patient file?

18  A.  It's a patient file from American Sleep Institute.  I

19  generally wouldn't have access to this because I have never

20  been there.

21  Q.  Okay.  Thank you, Doctor.  I am going to take that back

22  from you now that you have looked at those two pages.  Doctor

23  Gumer, do you see the document that I have taken out out of

24  Exhibit 40 and put on the screen?

25  A.  I do.

GUMER - Continued Direct

5

1   Q.   What is that?

2   A.   A patient by the name of James Pratt that I referred to the

3   sleep disorder study.

4   Q.   Does it appear to be a file prepared by you?

5   A.   No, it's my name but that's not my signature.

6   Q.   Doctor Gumer, the second page that I handed you before was

7   the wrong page.  I will hand you the second page, the top of

8   the page that I am showing you right now.

9   A.   Yes.

10  Q.   Now I am showing the bottom of the page.  This is another

11  page from Exhibit 40.  Do you recognize this document?

12  A.   I never really had any familiarity with this document

13  because I was never given this document at my facility, no.

14  Q.   Do you see at the bottom where it says physician signature

15  and date?

16  A.   I do.

17  Q.   Is that your signature?

18  A.   That is not my signature.

19  Q.   Now, Doctor Gumer, returning to your work for American

20  Therapeutic Corporation, yesterday you discussed your work with

21  initial psychiatric evaluations, and I don't want to go back

22  over that, but as I recall, you testified that you only did

23  them at first.  After that, you largely did not do the initial

24  psychiatric evaluations, is that right?

25  A.   That is correct.

GUMER - Continued Direct

6

1  Q.  Doctor Gumer, you also testified yesterday that you did

2  prescribe medications to people who were not on psychiatric

3  medications yet, is that right?

4  A.  Yes.

5  Q.  Did those psychiatric patients need the medications that

6  you were prescribing to them?

7  A.  Some of them actually did not.

8  Q.  They did not?

9  A.  No.

10  Q.  Doctor Gumer, are you familiar with a treatment plan?

11  A.  Yes, I am.

12  Q.  In your experience as a psychiatrist, is that a part of

13  Partial Hospitalization Program treatment?

14  A.  Yes, it is.

15  Q.  Very briefly, what is it?

16  A.  A treatment plan is an overall plan in order to help the

17  patient to analyze what their main problems might be and to

18  figure out what the main routes effective ways of treating them

19  would be.

20  Q.  Were treatment plans done at American Therapeutic

21  Corporation?

22  A.  They had them on the chart, yes.

23  Q.  Were you involved in creating them at American Therapeutic

24  Corporation?

25  A.  I never was, no.

GUMER - Continued Direct

7

1  Q.  As a treating psychiatrist at a PHP, should you have been

2  involved?

3  A.  Yes, I should have been.

4  Q.  Did you sign treatment plans?

5  A.  I did.

6  Q.  Those were not treatment plans that you helped develop?

7  A.  I did not.

8  Q.  Doctor Gumer, the treatment plans that you signed at

9  American Therapeutic Corporation, were they individual to the

10  patients?

11  A.  No, they were not.

12  Q.  Can you explain to the jury what you observed about the

13  treatment plans?

14  A.  It seemed that there was, in almost cook book fashion,

15  there were treatment plans designed to help to make sure the

16  insurance would pay for the --

17          MR. WAX:  Objection.

18          THE COURT:  That is an opinion.  I guess we will have

19  to limit it to facts.

20          In reviewing the plan, were they designed to help the

21  patient?

22          THE WITNESS:  They were basically only several

23  treatment plans that it seemed like, in cook book fashion, that

24  they had that they were not individualized like they should

25  have been.

August 18, 2011

GUMER - Continued Direct

8

1          THE COURT:  All right.  Next question.

2          MS. SAULINO:  Thank you, Your Honor.

3    BY MS. SAULINO:

4    Q.  Doctor Gumer, as a treating psychiatrist should a treatment

5    plan be just over the time?

6    A.  They should.

7    Q.  Were they just over a period of time at American

8    Therapeutic Corporation?

9    A.  There were changes made, yes, there were some adjustments

10   made in the treatment plan.

11   Q.  Were those changes based on the need of the patients from

12   your observation?

13   A.  No, they were not.

14   Q.  How were the adjustments seem to be made?

15   A.  It seemed to be changed to allow for Medicare to pay.

16   Q.  Doctor Gumer, just what you saw, what did you see in the

17   changes?

18   A.  They all showed a slow but steady progress no matter what,

19   almost always.

20   Q.  Doctor Gumer, you signed those changed treatment plans?

21   A.  I did.

22   Q.  Doctor Gumer, as a treating psychiatrist at a PHP, should

23   you have seen the patients on any kind of regular basis?

24   A.  Once a week.

25   Q.  How often did you see the patients at ATC?

1  A.   Many were not seen on weekly basis or some not at all.  I

2  had to rely on what others told me about the patient.

3  Q.   Were there other doctors at ATC that you observed in the

4  Broward facility?

5  A.   Yes.

6  Q.   Which other doctors?

7  A.   It was Doctor Punjwani, or mainly his ARNPs, which is an

8  assistant who worked for him, Doctor Kushner, Doctor Willner,

9  in his case almost exclusively employees which would be ARNPs

10  or nurse practioners.

11  Q.   Doctor Gumer, did you observe Doctor Willner seeing the

12  patients on a once a week basis?

13  A.   I did not.

14  Q.   Doctor Kushner, did you observe him seeing patients on a

15  weekly basis?

16  A.   Some of them did, not all.

17  Q.   Did you see Doctor Punjwani seeing patients on a weekly

18  basis?

19  A.   I did not.

20  Q.   Doctor Gumer, did you ever see the patients?

21  A.   Yes.

22  Q.   When did you see them?

23  A.   Generally every Friday in the afternoons.

24  Q.   Did you see all of them for an examination then?

25  A.   I did not.  It was strictly the patients they brought to

1    me, the nurse or someone else would bring to me, at the

2    patient's request, for medication refills for example.

3    Q.  How long would you spend with each patient?

4    A.  It would just be a few minutes with a patient.

5           MS. SAULINO:  Your Honor, the government offers into

6    evidence Government's Exhibit 3 which is a photograph.

7           MR. WAX:  No objection.

8           THE COURT:  Exhibit 3 is admitted into evidence.

9           [Government Exhibit 3 received in evidence].

10   BY MS. SAULINO:

11   Q.  Doctor Gumer, I have put up on the screen Government's

12   Exhibit 3.  We are trying to make the viewing a little better.

13   Can you see Government's Exhibit 3 a little better?

14   A.  Yes, I can.

15   Q.  What does it depict?

16   A.  It shows the physician examining room.

17   Q.  Is this an accurate representation of the physician's

18   examining room at the Broward facility?

19   A.  Well, it was quite small.  I don't think you can realize

20   how small it was based on that picture.

21   Q.  Doctor Gumer, did you write notes based on having examined

22   the patients at ATC?

23   A.  Many of the notes were written based on other peoples

24   information.

25   Q.  Did you write notes based on other people's information?

1  A.  Yes, I did.

2  Q.  Did other people write notes for you?

3        MR. WAX:  Objection.

4        THE COURT:  Overruled.

5        Did sometimes or occasionally other people write notes

6  for you, if you know?

7        THE WITNESS:  I do know, and they did.

8  BY MS. SAULINO:

9  Q.  Were the notes about patients signed by you in the

10 patients' files?

11 A.  They were.

12 Q.  Even if you didn't write them?

13 A.  Yes, they were.

14 Q.  Doctor Gumer, did you individually monitor each patients'

15 progress that was assigned to you at ATC?

16 A.  I did not.

17 Q.  As a treating psychiatrist at a PHP, should you have?

18 A.  Yes.

19 Q.  How closely should you have monitored them?

20 A.  As often as needed but at least once a week.

21 Q.  Doctor Gumer, is group therapy a part of PHP therapy?

22 A.  It is.

23 Q.  As a treating psychiatrist, should you have been treating

24 the group therapy notes?

25 A.  Yes.

1  Q.  Should you have been consulting with the therapists?

2  A.  Yes.

3  Q.  Did you look at the group therapy notes?

4  A.  I did.  I mean, at first, I looked at them and found they

5  were kind of cook book --

6        MR. WAX:  I am going to object.

7        THE COURT:  I will permit him to express an opinion on

8  this as to what he observed based on his experience.  He may

9  be cross-examined on this if need be.

10        Finish your answer.

11        THE WITNESS:  Yes, I stopped reading them when I

12  realized they weren't truly individualized.

13  BY MS. SAULINO:

14  Q.  What did you observe about the group therapy notes that you

15  did read?

16  A.  They looked similar, many of the notes.  You couldn't tell

17  which patient you were looking at most of the time.

18  Q.  Doctor Gumer, what is the ultimate treatment for all of

19  this treatment as a treating psychiatrist?

20        MR. WAX:  I am going to object to him being an expert.

21        THE COURT:  If you are getting into his opinions, you

22  are going to have to qualify him as an expert.

23        MS. SAULINO:  Thank you, Your Honor.

24  BY MS. SAULINO:

25  Q.  Doctor Gumer, as a treating psychiatrist at American

GUMER - Continued Direct

1   Therapeutic Corporation, did you work to stabilize each of the

2   patients that were under your care?

3   A.  I did not.

4   Q.  Doctor Gumer, do you know the term "length of stay"?

5   A.  Yes, I do.

6   Q.  What is it in the context of a PHP?

7   A.  It's the amount of time a patient would be -- usually given

8   in weeks, the amount of time the patient will be in treatment

9   in the Partial Hospitalization Program.

10  Q.  How long is the length of stay supposed to be for a

11  patient, as a treating psychiatrist for a patient in an PHP?

12          MR. WAX:  Object to the question.  Vague.

13          MS. SAULINO:  I can rephrase, Your Honor.

14          THE COURT:  These are based on experience and opinion.

15  He is probably qualified to answer, but he has to be tendered

16  as an expert.  You may wish to do that or otherwise.  It's

17  generalized question.  Sustained.

18          MS. SAULINO:  Thank you, Your Honor.

19  BY MS. SAULINO:

20  Q.  What was the length of the stay of patients at American

21  Therapeutic Corporation that you observed?

22  A.  Almost always was eight weeks.

23  Q.  Doctor Gumer, does the treating psychiatrist have any role

24  in discharge of the patient in a legitimate PHP?

25  A.  Yes.

1  Q.  What role?

2  A.  To make the final decision how long a patient should remain

3  in treatment.

4  Q.  Was that true at American Therapeutic Corporation?

5  A.  It was not.

6  Q.  Who made the decision about how long a patient would stay?

7  A.  It was the Administrator as guided by the powers that be.

8         MR. WAX:  Judge, I am going to object to the vagueness

9  of that response.

10         THE COURT:  Yes, I think we are going to have to break

11  it down as to time and who was making those decisions.  Just a

12  generalization, I will have to sustain that.

13  BY MS. SAULINO:

14  Q.  Doctor Gumer, you testified about a woman named Angela

15  Coley yesterday, do you remember that?

16  A.  Yes.

17  Q.  What was her position at ATC?

18  A.  She had several roles.  It seemed like for the first few

19  years --

20         MR. WAX:  I am going to object to the characterization

21  of "seemed like", Your Honor.

22         THE COURT:  Okay.  We are going to do this carefully.

23  Sustained.

24  BY MS. SAULINO:

25  Q.  Doctor Gumer, what was her title at American Therapeutic

1  Corporation during the end of the time that she was at American

2  Therapeutic Corporation?

3  A.  Towards the end, she was one of the administrators at the

4  Fort Lauderdale office.

5  Q.  What time period was that?

6  A.  Again, it was approximately one and a half years.

7  Q.  Did Angela Coley tell you when to discharge the patients?

8  A.  She did.

9  Q.  Did she tell you who told her when to discharge the

10 patients?  Just yes or no.

11 A.  Yes.

12 Q.  Who did she tell you said when to discharge the patients?

13 A.  The owners.

14 Q.  Did she give you names?

15 A.  Usually she mentioned Mary.

16 Q.  Did she mention any others?

17 A.  I don't recall.

18 Q.  Doctor Gumer, did you ever try to change the length of stay

19 for a patient?

20 A.  I did.

21 Q.  Can you recall one of those examples?

22 A.  Yes.

23 Q.  When was it?

24 A.  Various times during my role there, six or seven years,

25 patients would approach me and tell me they didn't wish to be

1  in the PHP or feel like they didn't require the intensity of

2  care for a lengthy eight week program.

3  Q.  Were you able to discharge those patients?

4  A.  I was not.

5  Q.  Doctor Gumer, on October 21, 2010, when the FBI came to

6  visit you, did you lie to the FBI that day?

7          MR. WAX:  Objection.

8          THE COURT:  Sustained.  You have to go question and

9  answer.  Facts.

10  BY MS. SAULINO:

11  Q.  Doctor Gumer, during the time you were working at American

12  Therapeutic Corporation, did you pay taxes?

13  A.  I paid some quarterly estimates a part of the time, yes.

14  Q.  Did you file your tax returns?

15  A.  I filed mostly tax extensions.  I did not file timely.

16  Q.  When was the last time you filed a tax return, if you know?

17  A.  Probably about ten years ago.

18  Q.  Doctor Gumer, have you been charged with any crimes related

19  to your tax problems?

20  A.  I have not.

21  Q.  Doctor Gumer, have you had an issue with gambling?

22  A.  Yes, I have.

23  Q.  What is that issue?

24          THE COURT:  Is that material to this in some way?  Is

25  there any objection to this?  It seems to be getting into his

1    personal life.

2            MR. WAX:  Judge, my only objection is it's improper

3    anticipatory rehabilitation of a witness.  It was an area of

4    cross-examination.  It will be an area of cross-examination.

5            THE COURT:  I just don't see the materiality.  The

6    fact that the witness committed these acts for greed or

7    motivation or whatever, immaterial.  He told what he did.

8    There is no objection.  All right, go ahead.

9    BY MS. SAULINO:

10   Q.  Doctor Gumer, what was your issue with gambling?

11          Speak right into the microphone please.

12   A.  I possibly wasn't aware of it then.  I am now, that over

13   the years I had a severe gambling problem initially with stock

14   markets, later, with sports and horses.

15   Q.  Because of that problem, did you need money?

16   A.  I did.

17          MS. SAULINO:  One moment, Your Honor.

18          Your Honor, the government has no further questions of

19   this witness at this time.

20          THE COURT:  Cross-examination.

21                        CROSS EXAMINATION

22   BY MR. WAX:

23   Q.  Good morning.  My name is Barry Wax.  I represent Judith

24   Negron.  You and I have never met, have we?

25   A.  We have not.

1  Q.  We never discussed your testimony?

2  A.  We have not.

3  Q.  You have met with the government, correct?

4  A.  Yes.

5  Q.  You met with the government on several occasions, correct?

6  A.  Yes.

7  Q.  You met with the government when you were in jail, didn't

8  you?

9  A.  I did.

10  Q.  You met with the government after you were released from

11  jail, correct?

12  A.  That is correct.

13  Q.  When you met with the government, of course, you went over

14  your testimony, didn't you?

15  A.  I am not sure.  They asked me many questions.  I didn't

16  know whether it was going to be testimony or not.

17  Q.  On October 21 of last year, you were visited at your home

18  by federal agents, correct?

19  A.  That is correct.

20  Q.  There were two agents who visited you, correct?

21  A.  Correct.

22  Q.  One of them was Agent Brian Waterman, do you remember that?

23  A.  I remember the first name, yes.

24  Q.  The other was Agent Purify, do you remember that?

25  A.  Yes.

1  Q.  They questioned you about your employment at American

2  Therapeutic Corporation, didn't they?

3  A.  They did.

4  Q.  You told them you had been the Director at American

5  Therapeutic Corporation for about six or seven years, right?

6  A.  That is correct.

7  Q.  You told them at that time that you had a nurse

8  practitioner who worked there with you, correct?

9  A.  For the past two years, yes.

10 Q.  That was a woman Linda Sue Milano, correct?

11 A.  That's correct.

12 Q.  Ms. Milano would see the patients for you, correct?

13 A.  That is true.

14 Q.  Ms. Milano would do the initial psychiatric assessments

15 during that time, correct?

16 A.  That is correct.

17 Q.  She would give you the notes from her evaluations and

18 assessments, correct?

19 A.  Not directly.  I was given notes that she had signed.  She

20 wouldn't hand them to me, no.

21 Q.  I am asking you what you told the agents.  You told the

22 agents that she would give you the patient notes, correct?

23 A.  I don't recall the wording.

24 Q.  You told the agents also that you would write

25 prescriptions, right?

GUMER - Cross

```
 1   A.   That's correct.
 2   Q.   You saw one or two patients a week at American Therapeutic
 3   Corporation, correct?
 4   A.   Towards the end, yes.
 5   Q.   But when the agents asked you to name the last patient that
 6   you had seen at American Therapeutic Corporation, when they
 7   asked you this on October 21, 2010, you were unable to remember
 8   the name of any patients that you had seen, correct?
 9   A.   I couldn't recall.
10   Q.   Now, the next time that you saw the agents was on the day
11   that you were arrested, correct?
12   A.   That's correct.
13   Q.   February 15th of 2001, correct of 2011, excuse me.
14   A.   2011, yes.
15   Q.   They came to your home again, didn't they?
16   A.   Yes.
17   Q.   Early in the morning?
18   A.   That is correct.
19   Q.   They took you away?
20   A.   That is correct.
21   Q.   In handcuffs?
22   A.   That is correct.
23   Q.   They took you to the courthouse that day and you were
24   processed, correct?
25   A.   That is correct.
```

GUMER - Cross

1   Q.  You were photographed, correct?

2   A.  Yes.

3   Q.  You were fingerprinted, correct?

4   A.  Yes.

5   Q.  You were placed in shackles, correct?

6   A.  That is correct.

7   Q.  You were taken to court in shackles, correct?

8   A.  I was.

9   Q.  When you were taken to court that day, Ms. Saulino was

10  there, wasn't she?

11  A.  I believe so.

12  Q.  The prosecutor, she was prosecuting you, correct?

13  A.  I wasn't brought to the courtroom per se that day.  I

14  believe it might have been the next day.

15  Q.  All right, so you had to spend the night in jail?

16  A.  More than one night, yes, one more.

17  Q.  The day after your arrest, or the same day you were taken

18  in front of a Judge, Judge Palermo, do you recall that?

19  A.  I don't recall his name.  It was a Judge for the bond

20  hearing,

21  Q.  An elderly gentleman, correct?

22  A.  That's correct.

23  Q.  You had been indicted, correct?

24  A.  Correct.

25  Q.  You were indicted along with many other people, weren't

1  you?

2  A.  I was.

3  Q.  You mentioned some of the names, Doctor Willner, Doctor

4  Ayala, other individuals from American Therapeutic Corporation,

5  correct?

6  A.  That is correct.

7  Q.  You had been charged with a conspiracy to commit health

8  care fraud, correct?

9  A.  That is correct.

10  Q.  In addition to the conspiracy charge, you were charged with

11  four counts, four actual counts of committing health care

12  fraud, correct?

13  A.  Either four or five, I don't recall.

14  Q.  Now, Ms. Saulino at that time asked to grant you a $1

15  million bail bond, didn't she?

16  A.  She did.

17  Q.  $1 million, let me back up for a second.

18          At the time you were represented by an attorney Steven

19  Amster, correct?

20  A.  No, the first time I had none.

21  Q.  At a subsequent hearing, you had an attorney come and

22  represent you, right?

23  A.  My family had hired Steven Amster for that one time.

24  Q.  Mr. Amster was able to convince the Judge at that

25  subsequent hearing to reduce that $1 million bond to $500,000,

 1  correct?

 2  A.  I am not sure.  It was still pretty high.  I don't recall

 3  if it was reduced.

 4  Q.  Well, it was a bond that you couldn't afford to post,

 5  correct?

 6  A.  Either way, I couldn't afford to post it.

 7  Q.  So you stayed in jail?

 8  A.  I did stay in jail.

 9  Q.  A few days later you went back to court again for another

10  hearing, do you remember that?

11  A.  I did, yes.

12  Q.  At that next hearing, the government, Ms. Saulino agreed to

13  lower the bond at that point to $250,000, do you remember that?

14  A.  I am not sure of the time frame.

15  Q.  Do you remember that the bond was reduced to $250,000,

16  Doctor Gumer?

17  A.  I know it was reduced, yes.

18  Q.  But you still couldn't afford to post that bond, could you?

19  A.  That's correct.

20  Q.  To post a $250,000 bond would have meant that you would

21  have to come up with $37,000, correct?

22  A.  That is correct.

23  Q.  You didn't have $37,000, did you?

24  A.  I didn't have that.

25  Q.  Now, you went back to jail, correct?

GUMER - Cross

1   A.   That's correct.

2   Q.   Obviously, you wanted to get out of jail, didn't you?

3   A.   I did.

4   Q.   Shortly thereafter you retained a new lawyer, didn't you?

5   A.   It was fairly soon after approximately one week.

6   Q.   It was March 1st exactly that you had a new lawyer come

7   into your case by the name of William Pearson, do you remember

8   that?

9   A.   Of course, William Pearson.  I don't remember the exact

10   date.

11   Q.   Mr. Pearson took over for Mr. Amster, correct?

12   A.   He did.

13   Q.   You had an opportunity to meet with Mr. Pearson, correct?

14   A.   I did.

15   Q.   You had an opportunity to go over the indictment, correct?

16   A.   That's correct.

17   Q.   You knew at that time, based on the five charges that you

18   had, you were looking at a potential maximum sentence of 50

19   years in prison, correct?

20   A.   I am not sure how many years, but it was a lengthy amount

21   of time.

22   Q.   Ten years for each count, right?

23   A.   I wasn't sure.  It was at least ten years, I know that for

24   sure.

25   Q.   You decided at that time -- well, you told Mr. Pearson of

1  course, you want to get out of jail, right?

2  A.  Yes, of course.

3  Q.  You asked him; what can we do to get me a lower bond or get

4  out of jail, right?

5  A.  Yes.

6  Q.  One of the things you talked about was if you cooperated

7  with the government you may be able to get out of jail,

8  correct?

9  A.  I thought it would improve my chances of getting out of

10  jail earlier.

11  Q.  On March 2nd, the very next day, you met with the

12  government, right?

13  A.  I am not sure if it was the next day, but it sounds about

14  right.

15  Q.  Doctor Gumer, I am showing you what has been marked as

16  Defendant's Exhibit NN and I ask you to take a look at that

17  document.

18        MR. WAX:  Your Honor, by the agreement of the parties

19  I will be entering Defendant's Exhibit NN.

20        MS. SAULINO:  No objection.

21        THE COURT:  By agreement, it is entered into evidence

22  as Defendant's Exhibit NN in evidence.

23        [Defense Exhibit NN received in evidence].

24  BY MR. WAX:

25  Q.  Have you had an opportunity to look at that, Doctor Gumer?

GUMER - Cross

1  A.  Yes, I have.

2  Q.  That's a letter from the United States attorney,

3  Ms. Saulino, to your attorney, Mr. Pearson, correct?

4  A.  That is correct.

5  Q.  It is in reference to you, Alan Gumer, correct?

6  A.  Yes.

7  Q.  It is dated March 2, 2011, correct?

8  A.  That is correct.

9  Q.  Your signature appears on page two of that document,

10  doesn't it?

11  A.  Yes, sir.

12  Q.  This document establishes, does it not, that you are going

13  to give a statement to the United States, correct?

14  A.  That is correct.

15  Q.  That is on the date that you gave the statement, wasn't it?

16  You signed that?

17  A.  I believe so, yes.

18  Q.  You signed that document while you were in custody,

19  correct, while you were in jail, correct?

20  A.  I did.

21  Q.  Now, what this document said was that essentially the

22  government was going to give you a chance to talk with them.

23  If they believed that you were truthful, they were going to

24  continue talking with you and perhaps you could reach an

25  agreement, correct?

1  A.  That is correct.

2  Q.  On March 2nd, 2011, you met with the government at the

3  Federal Detention Center right across the street, correct?

4  A.  I did.

5  Q.  At that time you had been in jail for two weeks by then,

6  correct?

7  A.  Yes.

8  Q.  Now, after you met with the government on March 2, 2011,

9  you met with them a second time while you were in jail,

10  correct?

11  A.  I did.

12  Q.  You met with them again with your attorney, Mr. Pearson,

13  correct?

14  A.  Correct.

15  Q.  That was on March 8, 2011, correct, about a week later?

16  A.  Approximately a week later.  I am not sure of the exact

17  date.

18  Q.  By then you had been in jail for three weeks, correct?

19  A.  That is correct.

20  Q.  After that meeting, you went back and stayed in jail,

21  correct?

22  A.  I did.

23  Q.  You met with the government yet a third time, correct?

24  A.  I recall that, yes.

25  Q.  You were still in jail during that third meeting, weren't

1  you?

2  A.  I was.

3  Q.  That was on March 16, 2011, correct?

4  A.  I don't recall the exact date.  It was approximately then.

5  Q.  About another week later?

6  A.  Again, I am not positive about the date.  It seemed about

7  right.

8  Q.  You were still in jail, and at that point you had been in

9  jail for over a month, correct?

10  A.  That is correct.

11  Q.  You still had a $250,000 bond, correct?

12  A.  Correct.

13  Q.  Which you couldn't afford to post?

14  A.  Correct.

15  Q.  The next day after your third meeting with the government,

16  the government agreed to a bond reduction, didn't they?

17  A.  I believe the timing was about right, yes.

18  Q.  The government, in fact, agreed to a $100,000 personal

19  surety bond, didn't they?

20  A.  Yes, I believe so, yes.

21  Q.  A personal surety bond, unlike the other bond that you had,

22  is the type of bond that really just requires a signature,

23  correct?

24  A.  I wasn't involved in the negotiations.  I wasn't sure.

25  Q.  All you had to do was sign a piece of paper with respect to

1    that bond, correct?

2    A.   I believe it was easier, but I didn't know the details.

3    Q.   You didn't have to come up with any money, did you?

4    A.   My family was handling most of that.  I don't believe so.

5    Q.   You didn't have to come up with any money, did you?

6    A.   Me personally, didn't have any money to come up with.

7    Q.   In fact, conditions of your bond was not just that you sign

8    it, but that your brother and sister-in-law, his wife, sign it,

9    correct?

10   A.   That is correct.

11        Let me amend that.  I wasn't sure if they had to sign

12   it or not.

13   Q.   Doctor Gumer, I am showing you what has been marked as

14   Defendant's Exhibit OO for identification.  I ask you to take a

15   look through that document.

16        MR. WAX:  Judge, by the agreement of the parties I

17   move for the introductions of Exhibit OO.

18        THE COURT:  OO without of objection is admitted into

19   evidence.

20        [Defense Exhibit OO received in evidence].

21   BY MR. WAX:

22   Q.   Do you see your signature on page 4, Doctor?

23        MS. SAULINO:  Objection, I will object to counsel

24   conducting his cross-examination from the witness box.

25        THE COURT:  Why?  Overruled.

1          The whole purpose of this about getting information to

2    go back and forth is to keep anyone from badgering or harassing

3    of the lawyer.  As long as that is not going on, of course I

4    have no objection to them going over, for convenience, to deal

5    with these papers.  That's what that is all about.  If anybody

6    starts to hammer at the witness, I will move them back up.

7    Nobody even needs to object.  I will take care of it.  So

8    everybody understands, particularly when you have got your own

9    witness on, you don't need to ask permission.  Just go ahead.

10   It is in the interest of moving the case along.  Go ahead.

11   BY MR. WAX:

12   Q.  Doctor Gumer, your signature appears at page four, correct?

13   A.  Yes.

14   Q.  That is the bond document that was posted with the Court,

15   correct?

16   A.  That is correct.

17   Q.  Also on page four appears the signature of your brother,

18   correct?

19   A.  Yes.

20   Q.  And of your sister-in-law, correct?

21   A.  Yes.

22   Q.  Doctor Gumer, the same day that you signed this bond, which

23   according to this document was March 17, 2011, you were

24   released from jail, correct?

25   A.  That is correct.

1  Q.  You were able to go home, correct?

2  A.  I believe it was the following day after I had signed it.

3  Q.  Now, the indictment against you charging you with health

4  care fraud was still pending at that time, correct?

5  A.  Yes.

6  Q.  As far as we know, the evidence against you that resulted

7  in, you being indicted was the same, correct?

8  A.  That is correct.

9  Q.  The government, who had previously asked for a $1 million

10  bond to keep you in jail, and then a $500,000 bond, and then a

11  $250,000 bond, all of a sudden agreed you can leave jail on

12  your signature now, Doctor Gumer, correct?

13  A.  I believe there was a townhouse that was put up.

14  Q.  Your brother and sister-in-law had to agree, did they not,

15  that they would not sell their house during the pendency of

16  your case, correct?

17  A.  I believe that was the guarantee they had to give.

18  Q.  They didn't have to move out of their house, correct?

19  A.  It was a townhouse that they owned.  They didn't live

20  there.

21  Q.  They still have their townhouse, correct?

22  A.  Yes.

23  Q.  The government basically unlocked the jail door for you and

24  let you go home, correct?

25  A.  Under a lot of rules of the parole, yes.

1  Q.  You have conditions and rules of your release, let's talk

2  about them.  One of the conditions is that you receive

3  treatment for your gambling addiction, correct?

4  A.  Yes.

5  Q.  One of the conditions of your release is that you report to

6  Pre-trial Services, the arm of your supervised release,

7  correct?

8  A.  Yes.

9  Q.  It beats jail, doesn't it?

10  A.  Yes, sir.

11  Q.  Shortly thereafter, you entered into a plea agreement with

12  the government, correct?

13  A.  It was probably at least a couple of months later, yes.

14  Q.  Government's Exhibit 87, Doctor Gumer, your plea agreement,

15  do you see that?

16  A.  I see it.

17  Q.  Your Honor, Ms. Saulino advised me she is not sure that

18  exhibit was formerly admitted.  If it's not, I would move for

19  its admission sit?

20          MS. SAULINO:  No objection.

21          THE COURT:  Did the government have a number on it?

22          THE COURT:  Government's Exhibit 87 is admitted into

23  evidence.

24      [Government Exhibit 87 received in evidence].

25  BY MR. WAX:

1  Q.   Now, Doctor Gumer, the plea agreement which you entered

2  into in this case provided that you would plead guilty to Count

3  1 of the indictment, correct?

4  A.   That is correct.

5  Q.   Now, you previously had five counts in the indictment,

6  didn't you?

7  A.   I did.

8  Q.   And each of the five counts was punishable by ten years in

9  prison, correct?

10 A.   I believe so.

11 Q.   So you were looking at a maximum of 50 years in prison,

12 correct?

13 A.   That is correct.

14 Q.   But by the terms of your plea agreement, that document in

15 front of you, you only were pleading guilty to one count,

16 correct?

17 A.   That is correct.

18 Q.   So all of those other 40 years were eliminated, correct,

19 they are going go to dismissed by the government, aren't they?

20 A.   Yes, sir.

21 Q.   So your maximum possible exposure now is only ten years,

22 correct?

23 A.   That is correct.

24 Q.   Doctor Gumer, you are 65 years old, correct?

25 A.   Yes, sir.

1  Q.  A 50 year sentence, 40 year sentence, that is a life

2  sentence to you, isn't it?

3  A.  So is a ten year sentence.

4  Q.  Correct.  It's a long time, correct?

5  A.  That's correct.

6  Q.  As part of your plea agreement that you negotiated, you

7  understand that one of the factors that the Judge is going to

8  take into consideration in sentencing you is the sentencing

9  guidelines, correct?

10  A.  That's correct.

11  Q.  That's this book.  You have seen this book, haven't you?

12  A.  I have not.

13  Q.  Your lawyer has never gone over the sentencing guidelines

14  with you?

15  A.  He did but -- Mr. Pearson has never shown you this book.

16  A.  He has not.

17  Q.  Mr. Pearson did; however, explain the guidelines to you,

18  didn't he?

19  A.  He did.

20  Q.  He told you one of the factors that is going to be taken

21  into consideration by Judge Seitz is what the sentencing

22  guidelines say?

23  A.  Yes.

24  Q.  In your plea agreement, Doctor, specifically at paragraph

25  13 on page 7.

GUMER - Cross

```
 1  A.   Yes.
 2  Q.   Typically what it indicates is, at paragraph 13, that your
 3  total offense level under the guidelines is a level 30,
 4  correct?  You see that at the bottom of the page?
 5  A.   Yes, I see that.
 6  Q.   Turn the page, please, Doctor.
 7        You will then see that after you plead guilty, your
 8  total offense level is now level 27, correct?  Doctor Gumer, do
 9  you see that?
10  A.   Oh, I see it now, yes.
11  Q.   So now, based on a total offense level of 27, you are
12  looking at a sentence of somewhere in the range of 70 to 87
13  months in prison, correct?
14  A.   I believe approximately that, yes.
15  Q.   I mean, you have discussed this with your lawyer, right?
16  He is a good lawyer?
17  A.   He let me know that it's up to the Judge to make a
18  decision.
19  Q.   Well, we will get to that.  We will get to that.  He
20  discussed that your guideline range is just shy of six years to
21  just a little more than seven years, correct?
22  A.   I have heard anywhere from seven years to ten years, yes.
23  Q.   Now, it is your hope, Doctor Gumer, is it not, that by
24  cooperating with the government, you are going to get a lower
25  sentence, correct?
```

1  A.   Yes.

2  Q.   In fact, you would hope that you don't go to jail at all,

3  correct?

4  A.   Well, that would be the ultimate wish, of course.   But

5  there has been no guarantee or promise of that.

6  Q.   Because the one month that you spent in jail already was a

7  terrible, terrible time, wasn't it?

8  A.   It wasn't great.

9  Q.   Not something that you would want to do again?

10  A.   I don't think anybody would want to go back to jail if they

11  didn't have to.

12  Q.   Now, Doctor Gumer, in order for you to get a sentence below

13  70 to 87 months, the government, Ms. Saulino and her

14  colleagues, have to file a motion with Judge Seitz, don't they?

15  A.   I am not sure how it works.

16  Q.   Doctor Gumer, let me ask you a question.   Did you read your

17  plea agreement?

18  A.   I did.

19  Q.   You signed it, didn't you?

20  Q.   In fact, it says on page 14 of your plea agreement, and you

21  can go there.   Tell me when you are at page 14.   Are you there?

22  A.   Yes, I am there now.

23  Q.   See right at the top where your signature is?

24  A.   Yes.

25  Q.   Right above your signature it says, I, Allan Gumer, have

1  consulted with my counsel, and fully understand all of my

2  rights with respect to the indictment pending against me.

3  Further, I have consulted with my attorney and fully understand

4  my rights with respect to the provisions of the Sentencing

5  Guidelines and policy statements which apply in my case.  I

6  have read this agreement and carefully reviewed every part of

7  it have with my attorney.  I understand the agreement, and I

8  voluntary agree to it." It says that doesn't it?

9  A.  Yes, sir.

10  Q.  You understand what is in this agreement, right?

11  A.  I am not a lawyer or know the intricate details, but for

12  the most part, it was explained to me, yes.

13  Q.  Doctor, you understand that one of the provisions of the

14  plea agreement is that if, in the government's sole and

15  unreviewable discretion, their judgment, that if you provide

16  cooperation in the prosecution of another person, that they

17  might file a motion with Judge Seitz asking her to go below the

18  Sentencing Guidelines, correct?

19  A.  They could ask her for that, yes.

20  Q.  That is based on their decision, the government's decision

21  in the first instance, correct?

22  A.  I mostly have been told that it's still up to the Judge who

23  doesn't have to abide by any recommendation.

24  Q.  Please go to page five then, of your plea agreement, Doctor

25  Gumer.

1  A.  Yes, sir.

2  Q.  Paragraph 9, Doctor Gumer, "The United States reserves the

3  right to evaluate the nature and the extent of the defendant's

4  cooperation and to make the defendant's cooperation or lack

5  thereof known to the Court at the time of sentencing".

6  A.  Yes, sir.

7  Q.  If in the sole and unreviewable judgment of the United

8  States, the defendant's cooperation is of such quality and

9  significance --

10         MS. SAULINO:  Judge, the defendant has already

11  answered the question about this paragraph.

12         THE COURT:  I think so.  The document is in evidence.

13  You can argue it to them.

14  BY MR. WAX:

15  Q.  Doctor Gumer, it is your hope that by testifying that you

16  will receive the lowest possible sentence, correct?

17  A.  That would be correct.

18  Q.  Of course, we know that the ultimate decision is up to

19  Judge Seitz, correct?

20  A.  I know that, yes.

21  Q.  Now Doctor, you can put that down.  I would like to go back

22  to your bail bond for a moment and the condition that you for

23  gambling.  As you stated on direct-examination you were

24  addicted to gambling?

25  A.  Yes, sir.

1  Q.  You started gambling in the stock market?

2  A.  A long time ago, over 30 years ago.

3  Q.  Then you moved on to horse racing, correct?

4  A.  Yes, sir and sports.

5  Q.  And sporting events.  And you placed your bets through

6  bookmakers, correct?

7  A.  That is correct.

8  Q.  A bookmaker is someone who takes bets from gamblers,

9  correct?

10  A.  That is correct.

11  Q.  If you win, the bookmaker pays you, correct?

12  A.  That is correct.

13  Q.  If you lose, you pay the bookmaker, correct?

14  A.  That's correct.

15  Q.  That is a crime, isn't it?

16  A.  It is.

17  Q.  You haven't been prosecuted for any of these crimes, have

18  you?

19  A.  I have not.

20  Q.  In fact, you owe money to the bookies, don't you?

21  A.  When I was arrested, yes.

22  Q.  Those debts are serious debts, correct?

23  A.  Yes.

24  Q.  How much did you owe the bookmakers at the time that you

25  were arrested, Doctor Gumer?

GUMER - Cross

1   A.   6 to $7,000.

2   Q.   Have you since paid the bookmakers the money that you owe?

3   A.   I would be unable to.

4   Q.   That would be against the law, correct?

5   A.   That is correct.

6   Q.   You were gambling through illegal bookmakers while you were

7   at American Therapeutic Corporation, correct?

8   A.   That is correct.

9   Q.   You did have this gambling addiction while you were

10  employed at American Therapeutic Corporation, correct?

11  A.   I did.

12  Q.   You also have problems with the Internal Revenue Service,

13  don't you?

14  A.   I do.

15  Q.   There is a tax lien on your house, isn't there?

16  A.   There is.

17  Q.   As you said on direct-examination, you haven't filed a tax

18  return in ten years, correct?

19  A.   That's correct.

20  Q.   That is a federal offense, isn't it?

21  A.   I am not sure, I filed extensions, I don't know if that's a

22  federal offense not to file it or not.

23  Q.   Your experiences are only good until October of the year

24  that you are suppose to file your taxes, correct?

25  A.   I am not sure.

GUMER - Cross

1  Q.  You are aware that failure to file a tax return is a

2  federal crime, correct?

3  A.  Yes.

4  Q.  You haven't been charged with that crime, have you?

5  A.  I have not.

6  Q.  You haven't filed tax returns then since before you started

7  working at American Therapeutic Corporation, correct?

8  A.  That is correct.

9  Q.  So financially, is it fair to say, Doctor Gumer, that you

10  are a mess?

11  A.  Yes, unfortunately.

12  Q.  When you say that you didn't want to loose your job at

13  American Therapeutic Corporation, you were talking about that

14  yesterday on your direct examination, it was simply because you

15  needed the money, correct?

16  A.  That was one of the reasons, yes.

17  Q.  I mean, that was your job, right?  It was how you were

18  going to pay your bills, right?

19  A.  Yes.

20  Q.  It was how you were going to pay the bookies, right?

21  A.  Unfortunately, that was part of it.

22  Q.  It wasn't how you were going to pay your taxes because you

23  didn't pay your taxes, right?

24  A.  I was hoping to.

25  Q.  It was purely for your needs, correct?

1   A.  Also for my son, who is living with me, and my family.

2   Q.  Now, Doctor, you have also lost your medical license,

3   haven't you?

4   A.  Not as of yet.

5   Q.  You are going to, aren't you?

6   A.  They are investigating now.

7   Q.  You have received a letter from the State of Florida,

8   Department of Business and Professional Regulation, Board of

9   Medicine, that your license is suspended, correct?

10  A.  I have not.

11  Q.  You haven't received that letter yet?

12  A.  I have not.

13  Q.  As of right now, your license is active?

14  A.  As far as I know.

15  Q.  You are aware, are you not, that it is a violation of your

16  license with the State of Florida as a Medical Doctor, to

17  commit crimes, correct?

18  A.  I am not sure which crimes are the details of that.

19  Q.  Are you saying to this jury that the State of Florida would

20  permit you to practice medicine as a convicted felon?

21  A.  I am not sure.

22  Q.  Now, Doctor, yesterday when you took the witness stand, you

23  took an oath, didn't you?

24  A.  I did.

25  Q.  There is another oath that you have taken in your life,

```
 1  isn't there?
 2  A.  The medical oath or hypocratic oath.
 3  Q.  The hypocratic oath, correct?
 4  A.  That is correct.
 5  Q.  What that oath basically says is first do no harm, correct?
 6  A.  That is correct.
 7  Q.  What that means is first do no harm in the practice of
 8  medicine, correct?
 9  A.  That is correct.
10  Q.  Do no harm to your patients, right?
11  A.  Yes, sir.
12  Q.  Practice medicine honestly and ethically, correct?
13  A.  That is correct.
14  Q.  But by your testimony that you have told this jury, you
15  violated that oath, didn't you?
16  A.  Regrettably, yes.
17          MR. WAX:  I have no further questions, Your Honor.
18          THE COURT:  All right.  Rebuttal questions.
19                    REDIRECT EXAMINATION
20  BY MS. SAULINO:
21  Q.  Doctor Gumer, did you lie to the FBI on October 21, 2010?
22          THE COURT:  Well, now --
23          MS. SAULINO:  It was a part of the cross-examination,
24  Your Honor.
25          THE COURT:  All right.  Go ahead.
```

 1          THE WITNESS:  Yes, regrettably I did.

 2    BY MS. SAULINO:

 3    Q.  Have you been charged with making a false statement to a

 4    government agent as of yet?

 5    A.  As of yet, no.

 6    Q.  Is anything about that potential for a charge anywhere

 7    mentioned in your plea agreement?

 8    A.  It is not.

 9    Q.  So does your plea agreement absolve you from that crime?

10    A.  It does not.

11    Q.  Doctor Gumer, when did you tell the government about your

12    tax problems, approximately?

13    A.  I believe about three months ago.

14    Q.  About three months ago.  Do you know one way or the other

15    whether the government is investigating those tax issues?

16    A.  I do not know.

17    Q.  Have you been providing information to the government about

18    your tax issues?

19    A.  Yes, I have.

20    Q.  Is there anything in your plea agreement about whether the

21    government will prosecute you for your tax issues?

22    A.  There is not.

23    Q.  So your plea agreement, does it absolve you from your tax

24    issues?

25    A.  It does not.

1  Q.  Doctor Gumer, you remember discussing with Mr. Wax about

2  the weeks that you spent in jail and about your bond?

3  A.  Yes.

4  Q.  Who made the decision changes in your bond?

5  A.  It was the Judge and also it would be the prosecutor.

6  Q.  Doctor Gumer, before your bond was changed, did we go into

7  court?

8  A.  Yes.

9  Q.  And do you remember Judge Garber?

10  A.  I do.

11  Q.  Did Judge Garber make the decision about the change in your

12  bond?

13  A.  Yes.

14  Q.  Doctor Gumer, is it your understanding as a result of

15  pleading guilty to your crimes that you will spend a

16  significant amount of time in jail?

17  A.  That was a strong possibility, yes.

18  Q.  So Doctor Gumer, did you plead guilty to your crimes in

19  order to get out of jail?

20  A.  I did not.

21        MR. WAX:  Objection.

22        THE COURT:  Overruled.  He answered the question.  He

23  did not.  Next question.

24  BY MS. SAULINO:

25  Q.  Doctor Gumer, why did you plead guilty to your crimes?

1    A.   To clear my conscious about what I had done and to start

2    making good on some of the poor decisions that I had made.

3    Q.   When you plead guilty to Judge Seitz, what did you tell her

4    in answer to that question?

5    A.   It's the right thing to do.

6         MS. SAULINO:  No further questions, Your Honor.

7         MR. WAX:  Your Honor, if I may, I believe there is an

8    area of recross that the government brought up.  I would like a

9    side bar with the Court.  I want a very brief recross.

10        THE COURT:  What is the subject-matter?

11        MR. WAX:  It has to do about what Ms. Saulino just

12   said about Judge Garber.

13        THE COURT:  All right.  I will make an exception and

14   permit that.  One or two questions, go ahead.

15        MR. WAX:  I would like to show the government a

16   document.

17        THE COURT:  Go ahead.

18        MS. SAULINO:  Your Honor, the government disagrees

19   that this topic has not been covered.

20        THE COURT:  Judge Garber's decision?  I heard you ask

21   if Judge Garber made a decision.  You have a question regarding

22   whether he made the decision or not.

23        I will listen to your question subject to objection.

24   One question, let's hear it.

25                         CROSS EXAMINATION

```
 1   BY MR. WAX:
 2   Q.  Doctor Gumer, isn't it a fact that your attorney,
 3   Mr. Pearson, filed an unopposed motion to modify the conditions
 4   of your release and reduce your bond from a $250,000 corporate
 5   surety bond to a $100,000 personal surety bond based upon an
 6   agreement with the government not to oppose that reduction?
 7   A.  I am not sure of all the details.
 8          THE COURT:  Was it reflected in the pleadings that he
 9   filed?
10          MR. WAX:  It is a pleading which was filed in Doctor
11   Gumer's case, Your Honor.
12          THE COURT:  By his lawyer with an agreement with the
13   government.
14          MR. WAX:  I would move to admit that document as
15   Defendant's Exhibit PP.
16          THE COURT:  PP is in evidence.
17          [Defense Exhibit PP received in evidence].
18          THE COURT:  Ladies and gentlemen, we will take a mid
19   morning recess at this time.  Thank you, step into the jury
20   room.  The witness is excused.
21                    *************************
22
23
24
25
```

48

1                        C E R T I F I C A T E

2          I hereby certify that the foregoing is an accurate

3    transcription of proceedings in the above-entitled matter.

4

5

6

7

8     5-16-2012              /S/  ROBIN MARIE DISPENZIERI
      _____        _____
9     DATE FILED              ROBIN MARIE DISPENZIERI, RPR
                              Official Federal Court Reporter
10                            United States District Court
                              400 No. Miami Ave., Ste. 8S67
11                            Miami, FL  33128 - 305/523-5659
                              Email:  robinc1127@aol.com
12

13

14

15

16

17

18

19

20

21

22

23

24

25

**A**

abide 37:23
able 16:3 22:24 25:7 31:1
about 7:12 9:2 11:9 12:14 14:6,14
16:17 19:1,5 25:6,13 27:15 28:5,6,6
28:17 30:1,5 32:2 38:11 41:13 44:6
44:11,13,14,17,20 45:1,2,11 46:1,11
46:12
above 36:25
above-entitled 48:3
absolve 44:9,23
access 4:19
according 30:23
accurate 10:17 48:2
across 27:3
active 42:13
acts 17:6
actual 22:11
actually 4:16 6:7
addicted 38:24
addiction 32:3 40:9
addition 22:10
adjustments 8:9,14
administered 3:8
Administrator 14:7
administrators 15:3
admission 32:19
admit 47:14
admitted 4:4 10:8 29:18 32:18,22
advised 32:17
afford 23:4,6,18 28:13
after 5:23 18:10 21:17 24:5 27:8,20
28:15 31:2 35:7
afternoons 9:23
again 15:6 20:15 23:9 27:12 28:6 36:9
against 31:3,6 37:2 40:4
agent 18:22,24 44:4
agents 18:18,20 19:21,22,24 20:5,10
ago 16:17 39:2,2 44:13,14
agree 31:14 37:8
agreed 23:12 28:16,18 31:11
agreement 25:18,21 26:25 29:16
32:11,14 33:1,14 34:6,24 36:17,20
37:6,7,10,14,24 44:7,9,20,23 47:6
47:12
ahead 17:8 30:9,10 43:25 46:14,17
Alan 1:10 2:3 3:1,10 26:5
Allan 36:25
allow 8:15
almost 7:14 8:19 9:9 13:22
along 21:25 30:10
already 36:6 38:10
always 8:19 13:22
amend 29:11
AMERICA 1:4
American 3:21,23 4:18 5:19 6:20,23
7:9 8:7 12:25 13:20 14:4,25 15:1
16:11 19:1,4 20:2,6 22:4 40:7,10
41:7,13
amount 13:7,8 24:20 45:16
Amster 22:19,23,24 24:11
analyze 6:17
Angela 14:14 15:7
another 5:10 23:9 28:5 37:16 42:25
answer 12:10 13:15 16:9 46:4
answered 38:11 45:22
anticipatory 17:3
anybody 30:5 36:10
anyone 30:2
anything 44:6,20
anywhere 35:22 44:6
appear 5:4
APPEARANCES 1:13
appears 4:15 26:9 30:12,17
apply 37:5
approach 15:25
approximately 15:6 24:5 27:16 28:4
35:14 44:12
area 17:3,4 46:8
argue 38:13
arm 32:6
ARNPs 9:7,9
arrest 21:17
arrested 20:11 39:21,25
asked 18:15 20:5,7 22:14 25:3 31:9
asking 19:21 37:17
assessments 19:14,18

**B**

assigned 11:15
assistant 1:15 9:8
ATC 8:25 9:3 10:22 11:15 14:17
attorney 1:14 22:18,21 26:2,3 27:12
37:3,7 47:2
AUGUST 1:7
Ave 48:10
Avenue 1:16,20,24
aware 17:12 41:1 42:15
away 20:19
Ayala 22:4
a.m 1:7 3:5

**B**

back 13:4 18:4 21 5:21 22:17 23:9,25
27:20 30:2,6 36:10 38:21
badgering 30:2
bail 22:15 38:22
bar 46:9
Barry 1:19,19 17:23
barrywax@bellsouth.net 1:21
based 8:11 10:20,21,23,25 12:8 13:14
24:17 35:11 37:20 47:5
basically 7:22 31:23 43:5
basis 8:23 9:1,12,15,18
beats 32:9
before 1:11 5:6 41:6 45:6
being 12:20 31:7
believe 4:1 21:11,14 26:17 28:17,20
29:2,4 31:2,13,17 33:10 35:14
44:13 46:7
believed 26:23
below 36:12 37:17
BENJAMIN 1:15
benjamin.singer@usdoj.gov 1:18
bets 39:5,8
better 10:12,13
bills 41:18
Board 42:8
bond 1:16 21:19 22:15,25 23:4,13,15
23:18,20 25:3 28:11,16,19,21,21,22
29:1,7 30:14,22 31:10,10,11 38:22
45:2,4,6,12 47:4,5,5
book 7:14,23 12:5 34:11,11,15
bookies 39:20 41:20
bookmaker 39:8,11,13
bookmakers 39:6,24 40:2,6
bottom 5:10,14 35:4
box 29:24
break 14:10
Brian 18:22
Brickell 1:20
brief 46:9
briefly 6:15
bring 10:1
brother 29:8 30:17 31:14
brought 9:25 21:13 46:8
Broward 9:4 10:18
Building 1:16
Business 42:8

**C**

C 48:1,1
came 16:5 20:15
care 13:2 16:2 22:8,11 30:7 31:4
carefully 14:22 37:6
case 1:3 9:9 24:7 30:10 31:16 33:2
37:5 47:11
Center 27:3
certify 48:2
chance 26:22
chances 25:9
change 15:18 45:11
changed 8:15,20 45:6
changes 8:9,11,17 45:4
characterization 14:20
charge 22:10 44:6
charged 16:18 22:7,10 41:4 44:3
charges 24:17
charging 31:3
chart 6:22
CHIEF 1:15
clear 46:1
closely 11:19
closer 3:16
Coley 14:15 15:7
colleagues 36:14

**Come/Commit column 3**

come 3:3 22:21 23:21 24:6 29:3,5,6
commit 22:7 42:17
committed 11:16
committing 22:11
condition 38:22
conditions 29:7 32:1,2,5 47:3
conducting 29:24
conscious 46:1
consideration 34:8,21
conspiracy 22:7,10
consulted 37:1,3
consulting 12:1
CONTENTS 2:1
context 13:6
Continuation 3:1
continue 3:6 26:24
continued 3:2
cont'd 2:4 3:12
convenience 30:4
convicted 42:20
convince 22:24
cook 7:14,23 12:5
cooperated 25:6
cooperating 35:24
cooperation 37:16 38:4,4,8
corporate 47:4
Corporation 5:20 6:21,24 7:9 8:8 13:1
13:14 14:15:1,2 16:12 19:2,5 20:3
20:6 22:4 40:7,10 41:7,13
correct 4:3 5:25 18:3,5,11,12,18,19,20
18:21 19:6,8,10,11,12,15,16,18,22
20:1,3,8,11,12,13,20,22,24,25
21:1,3,5,6,7,12,21,22,23,24 22:5,6,8
22:9,12,19 23:1,5,19,21,22,25 24:1
24:11,13,15,16,19 25:8 26:3,4,5,7,8
26:13,14,19,19,25 27:1,3,6,10,13,14
27:15,18,19,21,23 28:3,9,10,11,12
28:14,23 29:1,9,10 30:12,15,16,18
30:20,24,25 31:1,4,7,8,12,16,18,21
31:24 32:3,7,12 33:3,4,9,12,15,16
33:17,18,22,23,24 34:4,4,5,9,10
35:4,8,13,21,25 36:3 37:18,21
38:16,17,19 39:3,6,7,9,10,11,12,13
39:14,22 40:4,5,7,8,10,18,19,24
41:2,7,8,15,25 42:9,17 43:3,4,5,6,8
43:9,12,13
counsel 29:23 37:1
count 24:22 33:2,15
counts 22:11,11 33:5,8
couple 32:13
course 18:13 24:9 25:1,2 30:3 36:4
38:18
court 1:1,22,23 3:3,6 4:4 7:18 8:1 10:8
11:4 12:7,21 13:14 14:18 16:8
16:24 17:5,20 21:7,9 23:9 25:21
29:18,25 30:14 32:21,22 38:5,12
43:18,22,25 45:7,22 46:9,10,13,17
46:20 47:8,12,16,18 48:9,10
courthouse 1:23 20:3
courtroom 3:5 21:13
covered 6:23
creating 6:23
crime 39:15 41:2,4 44:9
crimes 16:18 39:17 42:17,18 45:15,18
45:25
Criminal 1:16
CROSS 17:21 46:25
cross-examination 2:5,7 17:4,4,20
29:24 43:23
cross-examined 12:9
custody 26:18

**D**

D 1:15,23
date 5:15 24:10 26:15 27:17 28:4,6
48:9
dated 26:7
day 1:12 16:6 20:10,23 21:9,13,14,17
21:17 25:11,13 28:15 30:22 31:2
days 23:9
deal 30:4
debts 39:22,22
decided 24:25
decision 14:2,6 35:18 37:20,20 38:18
45:4,11 46:20,21,22
decisions 14:11 46:2
defendant 1:8,19 38:10

**D column extension**

defendant's 25:16,19,22 29:14 38:3,4
38:8 47:15
defense 2:13,14,16 4:2 25:23 29:20
47:17
Department 1:15 42:8
depict 10:15
Description 2:10
designed 7:15,20
details 29:2 37:11 42:18 47:7
Detention 27:3
develop 7:6
direct 2:4 3:11 41:14
directly 3:15 19:19
Director 19:4
direct-examination 3:7 38:23 40:17
disagrees 46:18
discharge 13:24 15:7,9,12 16:3
discretion 37:15
discussed 5:20 18:1 35:15,20
discussing 3:20 45:1
dismissed 33:19
disorder 5:3
DISPENZIERI 1:22 48:8,9
District 1:1,1,11,23 48:10
Division 1:2,16
Doctor 1:10 2:3 3:1,3,7,10,14,18,25
4:8,11,21,22 5:6,19 6:1,10 7:8 8:4
8:16,20,22 9:7,8,8,11,11,14,17,20
10:11,21 11:11,14,21 12:18,25 13:4,23
14:14,25 15:18 16:5,11,18,21 17:10
22:3,3 23:16 25:15,25 29:13,22
30:12,22 31:12 32:14 33:1,24 34:24
35:6,8,23 36:12,16 37:13,24 38:2
38:15,21 39:25 41:9 42:2,16,22
43:21 44:11 45:1,6,14,18,25 47:2
47:10
doctors 9:3,6
document 4:23 5:11,12,13 25:17 26:9
26:12,18,21 29:15 30:14,23 33:14
38:12 46:16 47:14
done 6:20 46:1
door 31:23
down 14:11 38:21
during 15:1,24 16:11 19:15 27:25
31:15
D.C 1:17

**E**

E 48:1,1
each 10:3 11:14 13:1 24:22 33:8
earlier 4:16 25:10
Early 20:17
easier 29:2
effective 6:18
eight 13:22 16:2
Either 22:13 23:6
elderly 21:21
eliminated 33:18
Email 1:17,21,25 48:11
employed 40:10
employees 9:9
employment 19:1
end 15:1,3 20:4
entered 25:21 32:11 33:1
entering 25:19
ESQ 1:19
essentially 26:21
establishes 26:12
estimates 16:13
ethically 43:12
evaluate 38:3
evaluations 5:21,24 19:17
even 11:12 30:7
events 39:5
ever 9:20 15:18
every 9:23 37:6
everybody 30:8
evidence 2:9 4:4,6 10:6,8,9 25:21,22
25:23 29:19,20 31:6 32:23,24 38:12
47:16,17
exact 24:9 27:16 28:4
exactly 24:6
examination 2:4,6 3:11 9:24 17:21
41:14 43:19 46:25
examined 10:21
examining 10:16,18
example 10:2

examples 15:21
exception 46:13
EXCERPT 1:8,10
exclusively 9:9
excuse 20:13
excused 47:20
exhibit 2:11,12,13,14,15,16 4:1,5,6,12
  4:24 5:11 10:6,8,9,12,13 15:19
  25:22,23 29:14,17,20 32:14,18,22
  32:24 47:15,17
Exhibits 2:8,9
experience 6:12 12:8 13:14
experiences 40:23
expert 12:20,22 13:16
explain 7:12 34:17
explained 37:12
exposure 33:21
express 12:7
extensions 16:15 40:21
extent 38:3

**F**

F 48:1
facility 5:13 9:4 10:18
fact 17:6 28:18 29:7 36:2,20 39:20
  47:2
factors 34:7,20
facts 7:19 16:9
failure 41:1
fair 41:9
fairly 24:5
false 44:3
familiar 6:10
familiarity 5:12
family 22:23 29:4 42:1
far 31:6 42:14
fashion 7:14,23
FBI 16:5,6 43:21
February 20:13
federal 1:22,23 18:18 27:3 40:20,22
  41:2 48:9
feel 4:9 16:1
felon 42:20
Ferguson 1:23
few 10:4 14:18 23:9
figure 6:18
file 4:8,10,12,14,14,15,17,18 5:4 16:14
  16:15 36:14 37:17 40:22,24 41:1
filed 16:15,16 40:17,21 41:6 47:3,9,10
  48:9
files 11:10
final 14:2
financially 41:9
fingerprinted 21:3
Finish 12:10
first 4:13 5:23 12:4 14:18 18:23 22:20
  37:21 43:5,7
five 22:13 24:17 33:5,8 37:24
FL 1:20,24 48:11
Florida 1:1,6 42:7,16,19
following 31:2
foregoing 48:2
formerly 32:18
Fort 15:4
forth 30:2
found 12:4
four 22:11,11,13 30:12,17
frame 23:14
fraud 1:16 22:8,12 31:4
free 4:9
Friday 9:23
from 3:2,12,19 4:18,22 5:11 8:11
  18:10 19:17 22:4 26:2 29:24 30:2
  30:24 35:22 39:8 42:7 44:9,23 47:4
front 21:18 33:15
fully 37:1,3
further 17:18 37:3 43:17 46:6

**G**

gamblers 39:8
gambling 16:21 17:10,13 32:3 38:23
  38:24 39:1 40:6,9
Garber 45:9,11 46:12,21
Garber's 46:20
gave 26:15
general 4:11
generalization 14:12

generalized 13:17
generally 4:19 9:23
gentleman 21:21
gentlemen 47:18
getting 12:21 16:25 25:9 30:1
give 15:14 19:17,22 26:13,22 31:17
given 5:13 13:7 19:19
go 3:18 5:21 16:8 17:8 24:15 30:2,9,10
  31:1,24 33:19 36:2,10,21 37:17,24
  38:21 43:25 45:6 46:14,17
going 3:25 4:21 12:6,20,22 14:8,10,20
  14:22 18:16 26:12,22,23 30:3,4
  33:19 34:7,20 35:24 41:18,20,22
  42:5
gone 34:13
good 3:14 17:23 35:16 40:23 46:2
government 1:14 2:11,12,15 4:6 10:5
  10:9 17:18 18:3,5,7,10,13 23:12
  25:7,12 26:22 27:2,8,23 28:15,16
  28:18 31:9,23 32:12,21,24 33:19
  35:24 36:13 44:4,11,15,17,21 46:8
  46:15,18 47:6,13
government's 3:10 4:1,4 10:6,11,13
  32:14,22 37:14,20
grant 22:14
great 36:8
greed 17:6
group 11:21,24 12:3,14
guarantee 31:17 36:5
guess 7:18
guided 14:7
guideline 35:20
guidelines 34:9,13,17,22 35:3 37:5,18
guilty 33:2,15 35:7 45:15,18,25 46:3
Gumer 1:10 2:3 3:1,7,10,14,18,25 4:8
  4:11,23 5:6,19 6:1,10 7:8 8:4,16,20
  8:22 9:11,20 10:11,21 11:14,21
  12:18,25 13:4,23 14:14,25 15:18
  16:5,11,18,21 17:10 23:16 25:15,25
  26:5 29:13 30:12,22 31:12 32:14
  33:1,24 35:8,23 36:12,16,25 37:25
  38:2,15 39:25 41:9 43:21 44:11
  45:1,6,14,18,25 47:2
Gumer's 47:11

**H**

half 15:6
hammer 30:6
hand 3:23 4:9 5:7 19:20
handcuffs 20:21
handed 5:6
handling 29:4
harassing 30:2
harm 43:5,7,10
having 10:21
health 22:7,11 31:3
hear 46:24
heard 35:22 46:20
hearing 21:20 22:21,25 23:10,12
help 6:16 7:15,20
helped 7:6
her 14:17,25 15:9 19:17 36:13 37:17
  37:19 46:3
high 23:2
him 9:8,14 12:7,20,22 25:3
hired 22:23
home 18:17 20:15 31:1,24
honestly 43:12
Honor 4:3 8:2 10:5 12:23 13:13,18
  14:21 17:17,18 25:18 32:17 43:17
  43:24 46:6,7,18 47:11
HONORABLE 1:11
hope 35:23 36:2 38:15
hoping 41:24
horse 39:3
horses 17:14
Hospitalization 6:13 13:9
house 31:15,18 40:15
hypocratic 43:2,3

**I**

identification 2:9 4:1 29:14
illegal 40:6
immaterial 17:7
improper 17:2
improve 25:9
INDEX 2:8

indicates 35:2
indicted 21:23,25 31:7
indictment 24:15 31:13 33:3,5 37:2
individual 7:9
individualized 7:24 12:12
individually 11:14
individuals 22:4
information 10:24,25 30:1 44:17
initial 5:21,23 19:14
initially 17:13
instance 37:21
Institute 3:21,23 4:18
insurance 7:16
intensity 16:1
interest 30:10
Internal 40:12
intricate 37:11
introductions 29:17
investigating 4:2 44:15
involved 6:23 7:2 28:24
issue 16:21,23 17:10
issues 44:15,18,21,24

**J**

jail 18:7,11 21:15 23:7,8,25 24:2 25:1
  25:4,7,10,26 19 27:5,9,18,20,25
  28:8,9 30:24 31:10,11,23 32:9 36:2
  36:6,10 45:2,16,19
James 1:11 5:2
JENNIFER 1:14
jennifer.saulino@usdoj.gov 1:17
job 41:12,17
Judge 1:11 14:8 17:2 21:18,18,19
  22:24 29:16 34:7,21 35:17 36:14
  37:17,22 38:10,14 45:5,9,11 46:3
  46:12,20,21
judgment 37:15 38:7
Judith 1:17 17:23
jury 1:10 3:5,19 7:12 42:19 43:14
  47:19
just 3:19 8:5,7,16 10:4 14:11 15:10
  17:5 28:22 29:7 30:9 35:20,21
  46:11
Justice 1:15

**K**

keep 30:2 31:10
kind 8:23 4:5 7:9
KING 1:11
knew 24:17
know 1:5,6,7 13:4 16:16 18:16 23:17
  24:23 29:2 31:6 35:17 37:11 38:18
  38:20 40:21 42:14 44:14,16
known 38:5
Kushner 9:8,14

**L**

L 1:14
lack 38:4
Ladies 47:18
largely 5:23
last 3:20 16:16 18:17 20:5
later 17:14 23:9 27:15,16 28:5 32:13
Lauderdale 15:4
law 1:19 40:4
LAWRENCE 1:11
lawyer 24:4,6 30:3 34:13 35:15,16
  37:11 47:12
least 11:20 24:23 32:13
leave 31:11
left 3:20
legitimate 13:24
length 13:4,10,20 15:18
lengthy 16:2 24:20
let 22:17 29:11 31:24 35:17 36:16
let's 32:1 46:24
level 35:3,3,8,8,11
license 42:2,9,13,16
lie 16:6 43:21
lien 40:15
life 17:1 34:1 42:25
like 4:8 7:23,24 14:18,21 16:1 38:21
  46:8,15
limit 7:19
Linda 19:10
Line

2:10,10
listen 46:23
little 10:12,13 35:21
live 31:19
living 42:1
long 10:3 13:10 14:2,6 30:3 34:4 39:2
look 4:8,10 12:3 25:16,25 29:15
looked 4:22 12:4,16
looking 12:17 24:18 33:11 35:12
loose 41:12
lose 39:13
lost 42:2
lot 31:25
lower 23:13 25:3 35:24
lowest 38:16

**M**

M 1:19
made 8:9,10,14 14:6 45:4 46:2,21,22
main 6:17,18
mainly 9:7
make 7:15 10:12 14:2 35:17 38:4
  45:11 46:13
making 14:11 44:3 46:2
many 9:1 10:23 12:16 18:15 21:25
  24:20
March 24:6 25:11 26:7 27:2,8,15 28:3
  30:23
MARIE 1:22 48:8,9
marked 2:9 3:25 25:15 29:13
market 39:1
markets 17:14
Mary 15:15
material 16:24
materiality 17:5
matter 8:18 48:3
maximum 24:18 33:11,21
may 12:8 13:16 25:7 46:7
mean 12:4 35:15 41:17
means 43:7
meant 23:20
medical 42:2,16 43:2
Medicare 8:15
medication 10:2
medications 6:2,3,5
medicine 42:9,20 43:8,12
meet 24:13
meeting 27:20,25 28:15
mention 15:16
mentioned 15:15 22:3 44:7
mess 41:10
met 17:24 18:3,5,7,10,13 25:11 27:2,8
  27:9,12,23
Miami 1:2,6,20,24,24 48:10,11
MICHAEL 1:19
microphone 3:16 17:11
mid 47:18
might 6:17 21:14 37:17
Milano 19:10,12,14
million 22:15,17,25 31:9
minutes 10:4
modify 47:3
moment 4:10 17:17 38:22
money 17:15 29:3,5,6 39:20 40:2
  41:15
monitor 11:14
monitored 11:19
month 28:9 36:6
months 32:13 35:13 36:13 44:13,14
more 21:16,16 35:21
morning 3:14 17:23 20:17 47:19
most 12:17 29:4 37:12
mostly 16:15 37:22
motion 36:14 37:17 47:3
motivation 17:7
move 29:17 30:6 31:18 32:18 47:14
moved 39:3
moving 30:10
much 39:24

**N**

N 1:24
name 5:2,5 17:23 18:23 20:5,8 21:19
  24:7
named 14:14
names 15:14 22:3
nature 38:3

need 3:16 6:5 8:11 12:9 17:15 30:9
needed 11:20 41:15
needs 30:7 41:25
negotiated 34:6
negotiations 28:24
Negron 1:7 17:24
never 4:15,19 5:12,13 6:25 17:24 18:1 34:13,15
new 1:16 24:4,6
next 8:1 20:10 21:14 23:12 25:11,13 28:15 45:23
night 3:20 21:15,16
NN 2:13 25:16,19,22,23
Nobody 30:7
none 22:20
notes 10:21,23,25 11:2,5,9,24 12:3,14 12:16 19:17,19,22
number 32:21
nurse 9:10 10:1 19:7
NW 1:16

O
oath 3:8 42:23,25 43:2,2,3,5,15
object 12:6,20 13:12 14:8,20 29:23 30:7
objected 4:2
objection 7:17 10:7 11:3 16:7,25 17:2 17:8 25:20 29:18,23 30:4 32:20 45:21 46:23
observation 8:12
observe 9:11,14 12:14
observed 7:12 9:3 12:8 13:21
Obviously 24:2
occasionally 11:5
occasions 18:5
October 16:5 18:17 20:7 40:23 43:21
offense 35:3,8,11 40:20,22
offers 10:5
office 15:4
Offices 1:19
Official 1:22 48:9
often 8:25 11:20
Oh 35:10
Okay 3:17 4:15,21 14:22
old 33:24
once 8:24 9:12 11:20
one 4:15,16 15:3,6,21 17:17 18:22 20:2 21:16,16 22:23 24:5 25:6 32:2 32:5 33:15 34:7,20 36:6 37:13 41:16 44:14 46:14,24
only 5:22 7:22 17:2 33:15,21 40:23
OO 2:14 29:14,17,18,20
opinion 7:18 12:7 13:14
opinions 12:21
opportunity 24:13,15 25:25
oppose 47:6
order 6:16 36:12 45:19
other 9:3,6 10:23,25 11:2,5 18:24 21:25 22:4 28:21 33:18 44:14
others 9:2 15:16
otherwise 13:16
out 4:23,23 6:18 24:2 25:1,4,7,9 31:18 45:19
over 3:18 5:22 8:5,7 17:12 18:13 24:11 24:15 28:9 30:4 34:13 39:2
overall 6:16
Overruled 11:4 29:25 45:22
owe 39:20,24 40:2
own 30:8
owned 31:19
owners 15:13

P
page 2:2,10,10 5:6,7,7,8,10,11 26:9 29:22 30:12,17 34:25 35:4,6 36:20 36:21 37:24
pages 4:9,13,22
paid 16:13 40:2
Palermo 21:18
paper 28:25
papers 30:5
paragraph 34:24 35:2 38:2,11
parole 31:25
part 6:12 11:21 16:13 34:6 37:6,12 41:21 43:23
Partial 6:13 13:9
particular 4:9

particularly 30:8
parties 25:18 29:16
past 19:9
patient 4:17,18 5:2 6:17 7:21 9:2 10:3 10:4 12:17 13:7,8,11,11,24 14:2,6 15:19 19:22 20:5
patients 3:23 6:5 7:10 8:11,23,25 9:12 9:14,17,20,25 10:22 11:9,10,14 13:2,20 15:7,10,12,25 16:3 19:12 20:2,8 43:10
patient's 10:2
pay 7:16 8:15 16:12 39:13 41:18,20,22 41:23
pays 39:11
Pearson 24:7,9,11,13,25 26:3 27:12 34:15,17 47:3
pendency 31:15
pending 31:4 37:2
Penthouse 1:20
people 6:2 11:2,5 21:25
peoples 10:23
people's 10:25
per 21:13
perhaps 26:24
period 8:7 15:5
permission 30:9
permit 12:7 42:20 46:14
person 37:16
personal 17:1 28:18,21 47:5
personally 29:6
photograph 10:6
photographed 21:1
PHP 7:1 8:22 11:17,21 13:6,11,24 16:1
physician 5:14 10:16
physician's 10:17
picture 10:20
piece 28:25
placed 21:5 39:5
Plaintiff 1:5
plan 6:10,16,16 7:20 8:5,10
plans 6:20 7:4,6,8,13,15,23 8:20
plea 32:11,14 33:1,14 34:6,24 36:17 36:20 37:14,24 44:7,9,20,23
plead 33:2 35:7 45:18,25 46:3
pleading 33:15 45:15 47:10
pleadings 47:8
please 17:11 35:6 37:24
point 23:13 28:8
policy 37:5
poor 46:2
position 14:17
positive 28:6
possibility 45:17
possible 33:21 38:16
possibly 17:12
post 23:4,6,18,20 28:13
posted 30:14
potential 24:18 44:6
powers 14:7
PP 2:16 47:15,16,17
practice 42:20 43:7,12
practioners 9:10
practitioner 19:8
Pratt 5:2
prepared 5:4
prescribe 6:2
prescribing 6:6
prescriptions 19:25
pretty 23:2
previously 31:9 33:5
Pre-trial 32:6
prison 24:19 33:9,11 35:13
probably 13:15 16:17 32:13
problem 17:13,15
problems 16:7 16:19 40:12 44:12
proceedings 1:10 48:3
processed 20:24
Professional 42:8
program 6:13 13:9 16:2
progress 8:18 11:15
promise 36:5
prosecute 44:21
prosecuted 39:17
prosecuting 21:12
prosecution 37:16
prosecutor 21:12 45:5
provide 37:15

provided 33:2
providing 44:17
provisions 37:4,13
psychiatric 5:21,24 6:2,5 19:14
psychiatrist 6:12 7:1 8:4,22 11:17,23 12:19,25 13:11,23
punishable 33:8
Punjwani 9:7,17
purely 41:25
Purify 18:24
purpose 30:1
put 4:24 10:11 31:13 38:21

Q
qualified 13:15
qualify 12:22
quality 38:8
quarterly 16:13
question 8:1 13:12,17 16:8 36:16 38:11 45:22,23 46:4,21,23,24
questioned 19:1
questions 17:18 18:15 43:17,18 46:6 46:14
quite 10:19

R
R 48:1
racing 39:3
range 35:15,12,20
reach 26:24
read 12:15 36:16 37:6
reading 12:11
realize 10:19
realized 12:12
really 5:12 28:22
reasons 41:16
Rebuttal 43:18
recall 5:22 15:17,21 19:23 20:9 21:18 21:19 22:13 23:23 27:24 28:4
receive 32:2 38:16
received 2:9 4:6 10:9 25:23 29:20 32:24 42:7,11 47:17
recess 47:19
recognize 4:11 5:11
recommendation 37:23
recross 46:9
Redirect 2:6 43:19
reduce 22:25 47:4
reduced 23:3,15,17
reduction 23:16 47:6
refer 3:23
reference 26:5
referrals 9:2
referred 5:2
refills 10:2
reflected 47:8
refresh 3:19
regarding 46:21
regrettably 43:16 44:1
regular 8:23
Regulation 42:8
rehabilitation 17:3
related 16:18
release 32:1,5,6 47:4
released 18:10 30:24
rely 9:2
remain 14:2
remember 3:21 14:15 18:22,23,24 20:7 23:10,13,15 24:7,9 45:1,9
remind 3:15
reminded 3:7
rephrase 13:13
report 32:5
REPORTED 1:21
Reporter 1:22 48:9
represent 17:23 22:22
representation 10:17
represented 22:18
request 10:2
require 16:1
requires 28:22
reserves 38:3
respect 28:25 37:2,4
response 14:9
result 45:14
resulted 31:6
retained 24:4

return 16:16 40:18 41:1
returning 5:19
returns 3:5 16:14 41:6
Revenue 40:12
reviewed 37:6
reviewing 7:20
right 5:8,24 6:3 8:1 17:8,11 19:5,25 21:15 22:22 24:22 25:1,4,12,14 27:3 28:7,17 35:15 36:23,25 37:10 38:3 41:17,18,20,23 42:13 43:10,18 43:25 46:5,13
rights 37:2,4
ROBIN 1:22 48:8,9
robinc1127@aol.com 1:25 48:11
role 13:23 14:1 15:24
roles 14:18
room 10:16,18 47:20
routes 6:18
RPR 1:22 48:9
rules 31:25 32:1

S
S 48:8
same 3:8 21:17 30:22 31:7
Saulino 1:14 2:4,6 3:9,13 4:7 8:2,3 10:5,10 11:8 12:13,23,24 13:3,18 13:19 14:13,24 16:10 17:9,17 21:9 22:14 23:12 25:20 26:3 29:23 32:17 32:20 36:13 38:10 43:20,23 44:2 45:24 46:6,11,18
saw 6:16 20:2,10
saying 42:19
says 5:14 36:20,25 37:8 43:5
screen 4:24 10:11
se 21:13
seated 3:6
second 5:6,7 22:17 27:9
Section 1:16
see 4:23 5:14 8:16,25 9:17,20,22,24 10:13 17:5 19:12 29:22 32:15,16 35:4,5,7,9,10 36:23
seeing 9:11,14,17
seem 8:14
seemed 7:14,23 8:15 14:18,21 28:6
seems 16:25
seen 4:15 8:23 9:1 20:6,8 34:11
Seitz 34:21 36:14 37:17 38:19 46:3
sell 31:15
SENIOR 1:11
sentence 24:18 34:1,1,2,3 35:12,25 36:12 38:16
sentencing 34:8,8,13,21 37:4,18 38:5
serious 39:22
Service 40:12
Services 32:6
seven 15:24 19:5 35:21,22
several 7:22 14:18 18:5
severe 17:13
shackles 21:5,7
Shortly 24:4 32:11
show 46:15
showed 8:18
showing 5:8,10 25:15 29:13
shown 34:15
shows 10:16
shy 35:20
side 46:9
sign 7:4 28:25 29:7,8,11
signature 5:5,14,17,18 26:9 28:22 29:22 30:12,17 31:12 36:23,25
signed 7:8 8:20 11:9 19:19 26:16,18 30:22 31:2 36:19
significance 38:9
significant 45:16
similar 12:16
simply 41:14
since 40:2 41:6
SINGER 1:15
sir 26:11 32:10 33:20,25 37:9 38:1,6 38:25 39:4 43:11
sister-in-law 39:20 30:20 31:14
sit 32:19
six 15:24 19:5 35:20
sleep 3:21,23 4:18 5:3
slow 8:18
small 10:19,20
sole 37:14 38:7

**some** 6:7 8:9 9:1,16 16:13,24 22:3 46:2
**someone** 10:1 39:8
**something** 36:9
**sometimes** 11:5
**somewhere** 35:12
**son** 42:1
**soon** 24:5
**sounds** 25:13
**SOUTHERN** 1:1
**speak** 3:15 17:11
**specifically** 34:24
**spend** 10:3 21:15 45:15
**spent** 36:6 45:2
**sporting** 39:5
**sports** 17:14 39:4
**stabilize** 13:1
**stand** 3:4 42:22
**start** 46:1
**started** 39:1 41:6
**starts** 30:6
**State** 42:7,16,19
**stated** 38:23
**statement** 26:13,15 44:3
**statements** 37:5
**States** 1:1,4,11,23 26:2,13 38:2,8 48:10
**stay** 13:4,10,20 14:6 15:18 23:8
**stayed** 23:7 27:20
**steady** 8:18
**step** 47:19
**Steven** 22:18,23
**still** 23:2,18 27:25 28:8,11 31:4,21 37:22
**stock** 17:13 39:1
**stopped** 12:11
**street** 27:3
**strictly** 9:25
**strong** 45:17
**study** 5:3
**subject** 46:23
**subject-matter** 46:10
**subsequent** 22:21,25
**sudden** 31:11
**Sue** 19:10
**supervised** 32:6
**suppose** 40:24
**supposed** 13:10
**sure** 7:15 18:15 23:2,14 24:20,23,24 25:13 27:16 28:24 29:11 32:17 36:15 40:21,25 42:18,21 47:7
**surety** 28:19,21 47:5,5
**suspended** 42:9
**sustain** 14:12
**Sustained** 13:17 14:23 16:8

**T**

**T** 48:1,1
**TABLE** 2:1
**take** 3:4 4:8,10,21 25:16 29:14 30:7 34:8 47:18
**taken** 4:23 21:7,9,17 34:20 42:25
**takes** 39:8
**talk** 26:22 32:1
**talked** 25:6
**talking** 26:24 41:13
**tax** 16:14,15,16,19 40:15,17 41:1,6 44:12,15,18,21,23
**taxes** 16:12 40:24 41:22,23
**tell** 12:16 15:7,9,12,25 36:21 44:11 46:3
**ten** 16:17 24:22,23 33:8,21 34:3 35:22 40:18
**tendered** 13:15
**term** 13:4
**terms** 33:14
**terrible** 36:7,7
**testified** 5:22 6:1 14:14
**testifying** 38:15
**testimony** 1:10 3:1,18 18:1,14,16 43:14
**Thank** 3:6 4:21 8:2 12:23 13:18 47:19
**their** 6:17 31:15,18,21 37:15,20
**Therapeutic** 5:20 6:20,23 7:9 8:8 13:1 13:21 14:4,25 15:2 16:12 19:2,5 20:2,6 22:4 40:7,10 41:7,13

**therapists** 12:1
**therapy** 11:21,21,24 12:3,14
**thereof** 38:5
**thing** 46:5
**things** 25:6
**think** 3:16 10:19 14:10 36:10 38:12
**third** 27:23,25 28:15
**thought** 25:9
**three** 27:18 44:13,14
**through** 29:15 39:5 40:6
**THURSDAY** 1:7
**time** 4:16 8:5,7 12:17 13:7,8 14:11 15:1,5 16:11,13,16 17:19 19:7,15 20:10 22:14,18,20,23 23:14 24:17 24:21,25 27:5,9,23 31:4 34:4 36:7 38:5 39:2,24 45:16 47:19
**timely** 16:15
**times** 15:24
**timing** 28:17
**title** 14:25
**told** 9:2 15:9 17:7 19:4,7,21,21,24 24:25 34:20 37:22 43:14
**top** 5:7 36:23
**topic** 46:19
**total** 35:3,8,11
**totality** 4:12
**Towards** 15:3 20:4
**townhouse** 31:13,19,21
**transcription** 48:3
**treating** 6:18 7:1 8:4,22 11:17,23,23 12:19,25 13:11,23
**treatment** 6:10,13,16,20 7:4,6,8,13,15 7:23 8:4,10,20 12:18,19 13:8 14:3 32:3
**TRIAL** 1:10,14
**true** 14:3 14:19,13
**truly** 12:12
**truthful** 26:23
**try** 15:18
**trying** 10:12
**Turn** 35:6
**two** 4:9,13,22 18:20 19:9 20:2 26:9 27:5 46:14
**type** 28:22
**Typically** 35:2

**U**

**ultimate** 12:18 36:4 38:18
**unable** 20:7 40:3
**under** 3:8 13:2 31:25 35:3
**understand** 34:7 37:1,3,7,10,13
**understanding** 45:14
**understands** 30:8
**unfortunately** 41:11,21
**United** 1:1,4,11,23 26:2,13 38:2,7 48:10
**unlike** 28:21
**unlocked** 31:23
**unopposed** 47:3
**unreviewable** 37:15 38:7
**until** 40:23
**usually** 13:7 15:15
**U.S** 1:15

**V**

**Vague** 13:12
**vagueness** 14:8
**Various** 15:24
**very** 6:15 25:11 46:9
**viewing** 10:12
**violated** 43:15
**violation** 42:15
**visit** 16:6
**visited** 18:17,20
**voluntary** 37:8
**vs** 1:6

**W**

**want** 3:18 5:21 25:1 36:9,10 41:12 46:9
**wanted** 24:2
**Washington** 1:17
**wasn't** 17:12 21:10,13 24:23 26:15 28:24,24 29:11 36:7,8 41:22
**Waterman** 18:22
**Wax** 1:19,19 2:5,7 4:3 7:17 10:7 11:3

**12:6,20** 13:12 14:8,20 16:7 17:2,22 17:23 25:18,24 29:16,21 30:11 32:25 38:14 43:17 45:1,21 46:7,11 46:15 47:1,10,14
**way** 16:24 23:6 44:14
**ways** 6:18
**week** 8:24 9:12 11:20 16:2 20:2 24:5 27:15,16 28:5
**weekly** 9:1,15,17
**weeks** 13:8,22 27:5,18 45:2
**well** 10:19 23:4 24:25 35:19 36:4 43:22
**went** 18:13 23:9,25 27:20
**were** 3:20 6:2,6,20,23 7:6,9,11,15,20 7:22,24 8:7,9,9,11,13,14 9:1,3 10:23 11:9,11,13 12:5,17 13:2 16:3 16:11 18:7,10,17,20 20:7,11,23 21:1,3,5,7,9,17,25 22:10,18 24:18 26:18,19,23,23 27:9,25 28:8 30:23 31:1 33:11,15,18 38:23 39:25 40:6 40:6,9 41:13,17,20,22
**weren't** 12:12 21:25 27:25
**while** 26:18,19 27:9 40:6,9
**whole** 4:12,14,14 30:1
**wife** 29:8
**Wilkie** 1:23
**William** 24:7,9
**win** 39:11
**wish** 13:16 15:25 36:4
**witness** 1:10 3:1,10 7:22 11:7 12:11 17:3,6,19 29:24 30:6,9 42:22 44:1 47:20
**woman** 14:14 19:10
**wording** 19:23
**work** 5:19,20 13:1
**worked** 9:8 19:8
**working** 16:11 41:7
**works** 36:15
**wouldn't** 4:19 19:20
**write** 10:21,25 11:2,5,12 19:24
**written** 10:23
**wrong** 5:7

**Y**

**year** 18:17 34:1,1,3 40:23
**years** 14:19 15:6,24 16:17 17:13 19:5 19:9 24:19,20,22,23 33:8,11,18,21 33:24 35:20,21,22,22 39:2 40:18
**yesterday** 3:19 5:20 6:1 14:15 41:14 42:22
**York** 1:16

**S**

**$1** 22:14,17,25 31:9
**$100,000** 28:18 47:5
**$250,000** 23:13,15,20 28:11 31:11 47:4
**$37,000** 23:21,23
**$500,000** 22:25 31:10
**$7,000** 40:1

**0**

**08S67** 1:24

**1**

**1** 33:3
**1st** 24:6
**10-20767-CR-JLK** 1:3
**11** 2:11
**13** 34:25 35:2
**14** 2:16 36:20,21
**1400** 1:16
**15th** 20:13
**16** 28:3
**17** 2:14 30:23
**18** 1:7 2:5

**2**

**2** 1:20 26:7 27:8
**2nd** 25:11 27:2
**20** 2:13
**2001** 20:13
**2010** 16:5 20:7 43:21
**2011** 1:7 20:13,14 26:7 27:2,8,15 28:3 30:23

**20530** 1:17
**21** 2:15 16:5 18:17 20:7 43:21
**26** 2:13
**27** 35:8,11

**3**

**3** 2:11,12 10:6,8,9,12,13
**30** 2:14 35:3 39:2
**305/373-4400** 1:20
**305/523-5659** 1:24 48:11
**33** 2:15
**33128** 1:24 48:11
**33131** 1:20

**4**

**4** 1:12 2:3,4 29:22
**40** 2:12 4:1,5,6,12,24 5:11 33:18 34:1
**400** 1:24 48:10
**44** 2:6
**47** 2:7
**48** 2:16

**5**

**5** 2:12
**5-16-2012** 48:8
**50** 24:18 33:11 34:1

**6**

**6** 2:11 40:1
**65** 33:24

**7**

**7** 34:25
**70** 35:12 36:13

**8**

**8** 27:15
**8S67** 48:10
**8/17/11** 3:2,12
**800** 1:20
**87** 2:15 32:14,22,24 35:12 36:13

**9**

**9** 38:2
**9:00** 1:7
**9:07** 3:5